UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

KENDRICK SCOTT,

                    Plaintiff,

    -against-

DETROIT POLICE DEPARTMENT ("DPD")
SERGEANT WAYNE PRITCHETT; DPD
OFFICER CATHERINE ADAMS; DPD
OFFICER BARBARA SIMON; and DPD
OFFICER RODNEY JACKSON,

                Defendants.

Index No.

**COMPLAINT
AND JURY DEMAND**

Plaintiff Kendrick Scott, by and through his attorneys, Emery Celli Brinckerhoff & Abady LLP and Goodman, Hurwitz & James, P.C., for his Complaint alleges as follows:

**PRELIMINARY STATEMENT**

1.    Kendrick Scott spent nearly 20 years in jail for a crime he did not commit. He was innocent. But the police framed him. Police officers beat up an illiterate, intoxicated sixteen-year-old boy to force him to falsely inculpate Mr. Scott. They threatened another teenager, who had a history of mental illness, to do the same. They concealed evidence that pointed to the true culprit. They threw Mr. Scott in jail, then they threw away the key.

2.    There was no evidence that connected Mr. Scott to the crime. He had an alibi. He had no motive. There were no eyewitnesses who said he was involved. There was no DNA. There was no forensic evidence. There was nothing. Nothing but police abuse and coercion.

3.    This case is brought to vindicate Mr. Scott's civil rights. It is brought to shine the light on police abuse. It is brought to remedy an injustice that began in 1999.

4.      On May 9, 1999, Lisa Kindred, a thirty-five-year-old white woman, was shot and killed late one night in the east side of Detroit.

5.      Any reasonable police officer would have immediately focused on her husband, Will Kindred, as the natural suspect. Over the two years before her murder, Lisa had called in seventeen domestic violence reports about Will. Just months before her murder, Lisa had obtained a personal order of protection and had begun divorce proceedings. On two separate occasions in the months before she was killed, Lisa had specifically told those close to her that if something were to happen to her, police should suspect Will. And just six weeks after Lisa's murder, Will collected a substantial payment on Lisa's life insurance policy.

6.      But Detroit Police Department Officers Catherine Adams, Barbara Simon, Wayne Pritchett, and Rodney Jackson are not reasonable officers. Instead of following the trail of evidence pointing squarely at Will, they cleared him as a suspect within three hours of the murder. They decided instead to frame Kendrick Scott and his friend, Justly Johnson, two innocent young men who had the bad luck of being picked up by the police during a sweep they made through the neighborhood after the shooting.

7.      The police fabricated evidence to convict Kendrick Scott and Justly Johnson. First, they beat up an illiterate, intoxicated teenager named Antonio Burnette whom they had also picked up in their sweep. Burnette was only sixteen years old, but the police interrogated him without his parents. They forced him to falsely say that Mr. Scott and Mr. Johnson had confessed to the shooting. Then, they threatened and coerced a mentally ill teenager named Raymond Jackson into providing similarly false testimony.

8.      The police lied about the circumstances under which Burnette and Jackson were interrogated. They lied about the violence and coercion they applied to secure Burnette's

and Jackson's statements. They concealed the evidence that Lisa had expressed fear that Will would kill her. They failed to interview an eyewitness who was *in the car* when Lisa was shot. They did not investigate the long history of domestic violence between Will and Lisa. They engaged in this extensive cover-up because they knew Kendrick Scott's prosecution was a sham that could not be justified based on the truth.

9.      Because of the officers' fabrication and concealment of evidence, Kendrick Scott was convicted of felony murder, assault, and criminal possession of a firearm on June 1, 2000, and sentenced to life in prison. He spent the next eighteen and a half years in prison.

10.      In 2015, however, the truth finally began to come to light. For the first time, the eyewitness to the shooting testified under oath that Mr. Scott was not the shooter. Lisa's sister and her ex-husband both submitted sworn testimony that Lisa had feared Will would kill her.

11.      Free from police violence and threats, Burnette recanted his testimony and testified that he had no actual knowledge of who killed Lisa. He explained, for the first time, the police officers' physical and psychological abuse that pervaded his interrogation, culminating in his agreement to sign a false statement. Jackson had passed away by this time, but his cousin submitted an affidavit confirming that he had also been threatened by the police into providing false testimony inculpating Mr. Scott and Mr. Johnson in Lisa's murder.

12.      Based on the totality of the new evidence, the Supreme Court of Michigan vacated Mr. Scott's conviction on July 23, 2018. On November 28, 2018, the charges against him were finally dismissed. Nearly twenty years after being arrested, Mr. Scott was finally a free man.

3

13.     Detroit Police Department officers stole nearly twenty years of Mr. Scott's life by fabricating inculpatory witness statements and hiding exculpatory ones. This action is brought pursuant to 42 U.S.C. § 1983 to vindicate Mr. Scott's constitutional rights. It is time for this decades-long injustice to end.

## THE PARTIES

14.     Plaintiff Kendrick Scott is a citizen of the United States and at all relevant times was a resident of Detroit, Michigan.

15.     Defendants Sergeant Wayne Pritchett, Officer Catherine Adams, Officer Barbara Simon, and Officer Rodney Jackson (collectively, "Defendant Officers" or "Officers"), at all times relevant to this Complaint, were police officers with the Detroit Police Department ("DPD"), and as such were employed by the City of Detroit. In this role, the Officers were duly appointed and acting officers, servants, employees and/or agents of the City of Detroit. At all relevant times, they were acting in the scope of their employment and under color of state law.

## JURISDICTION AND VENUE

16.     This action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, through 42 U.S.C. §§ 1983 and 1988.

17.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

18.     The acts complained of occurred in the Eastern District of Michigan, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

19.     Plaintiff demands trial by jury.

4

## FACTUAL ALLEGATIONS

***Lisa Kindred is Murdered in East Detroit***

20.     On the evening of May 8, 1999, Lisa Kindred went to see a movie with her husband, Will Kindred, and their young children—two they had together (including the then-ten-day-old infant Dakota Kindred), and one from Lisa's previous marriage.

21.     After the movie ended, Will announced they had to drive into Detroit to meet with his brother-in-law. They arrived shortly after midnight on May 9, 1999. Will parked the car in front of his brother-in-law's house, then went in, telling Lisa and the three children to stay outside, alone in the car.

22.     Lisa moved into the driver's seat of the car, and her eight-year-old son from her prior marriage, Charmous Skinner, Jr. ("C.J."), moved to the front passenger seat.

23.     Will stayed in the house for over half an hour. At one point, Lisa got out of the car and walked up to Will's brother-in-law's house, asking when they would be able to go home. Will responded that he would be done soon.

24.     Lisa walked back to the car. As she opened the driver's side door to get in, the interior light went on, illuminating the car's immediate surroundings.

25.     In the light, C.J. could clearly make out a figure behind his mother. It was a man in his early thirties, with a wide nose and an unruly beard.

26.     At the time, Kendrick Scott was twenty years old and clean-shaven. Justly Johnson was twenty-four and clean-shaven.

27.     C.J. then heard a single gunshot ring out. It shattered the driver's side window and struck Lisa in the chest. The man who had fired the shot walked quickly away.

28.     Lisa, though injured, managed to start the car and drive a few blocks to a nearby gas station. There, she collapsed in the parking lot and died.

5

29.     From inside the house, Will claimed he heard what he described as a car door slamming, prompting him to walk out onto the sidewalk. He claimed he observed Lisa "speeding" off. But he did not follow her.

30.     Instead, Will claimed to have seen a figure running off into a field. Will supposedly chased the figure briefly, but could not identify any of the figure's features, or even its approximate height. Will could not even confirm whether the figure was a man or a woman.

31.     The killer took nothing from Lisa; as the police report made clear, Lisa's wallet, cash, checks, and gift cards remained untouched. There was no evidence of any robbery or attempted robbery.

### Detroit Police Officers Decide to Frame Kendrick Scott and Justly Johnson

32.     Detroit Police Officers Frank Scola and Willie Soles were the first to respond to the scene, closing off the area.

33.     Neither Officer Scola nor Officer Soles attempted to speak with C.J., who had witnessed the shooting.

34.     As Officer Scola waited for the evidence unit and other officers to arrive, he wandered over to nearby Bewick Street, where he saw Kendrick Scott and Raymond Jackson walking down the street. Based on nothing more than their proximity to the scene of the shooting, Officer Scola placed both Mr. Scott and Mr. Jackson under arrest shortly after 1:00 a.m.

35.     Sergeant John Falk and Sergeant Arlie Lovier arrived on the scene shortly after to take over the investigation. They questioned Will, who right away lied and told them that he had only been in his brother-in-law's house "for a few minutes."

36.     Down at the precinct, meanwhile, multiple officers interrogated Mr. Jackson and Mr. Scott separately over the course of the next several hours. Mr. Scott was

interrogated by several officers, including Officer Monica Childs. Officer Childs continued her questioning even after Mr. Scott requested the opportunity to speak with a lawyer.

37.     Mr. Scott told the officers that he had been waiting outside his girlfriend's house when he observed two men walking near Will's brother-in-law's house. One of them was carrying a rifle. Mr. Scott's girlfriend corroborated him.

38.     Mr. Jackson also corroborated Mr. Scott. In a statement recorded by Sergeant Falk, he told the officers that he had been sleeping when he woke up to the sound of a gunshot. He walked outside and saw Mr. Scott standing in front of his girlfriend's house; when he asked Mr. Scott what happened, Mr. Scott told him that two men with a rifle had just walked by.

39.     Witnesses Lakenya Hicks and Quentin Billingslea both gave Mr. Scott an alibi: he was with them at the moment they heard the shot.

40.     Frustrated that they may have been wrong to suspect Mr. Scott but unwilling to reconsider the course of their investigation, the officers decided to fabricate evidence where there was none.

41.     Both Mr. Scott and Mr. Jackson had mentioned that they had spent part of the previous evening with Antonio Burnette and Justly Johnson.

42.     At approximately 8:00 a.m. on May 9, 1999—just a few hours after both Mr. Scott and Mr. Jackson gave their initial statements—investigating officers, including Officer Rodney Jackson, found Antonio Burnette, then sixteen years old, sleeping in Mr. Scott's car, and placed him under arrest. Mr. Burnette was drunk and high, having spent the previous night consuming a significant quantity of alcohol and smoking several ounces of marijuana.

43.     At around the same time, officers found and arrested Justly Johnson as

7

well.

44.     Over the next six hours, between 8:00 a.m. and 2:00 p.m., Officer Adams, Officer Simon, and Sergeant Pritchett, along with other DPD officers, forcefully interrogated Mr. Burnette.

45.     Neither Mr. Burnette nor Mr. Johnson had any knowledge of Lisa's murder. When asked about it at first, Mr. Burnette responded, "What the hell are you talking about?" But Sergeant Pritchett, Officer Adams, and Officer Simon refused to accept that. They continued the interrogation.

46.     The police, including Officer Adams, Officer Simon, and Sergeant Pritchett, knew Mr. Burnette was a minor; in fact, they believed he was just fourteen years old. But when he asked for his parents, the police refused to call them.

47.     Mr. Burnette's mother independently called the precinct late in the morning to ask about her son's whereabouts; DPD officers lied and told her Mr. Burnette was not in their custody.

48.     The officers began screaming at Mr. Burnette to start naming names, threatening that if he failed to give them the identity of the killer, they would be "putting this murder on [him]." Their meaning was clear: talk, or the witch hunt would have a new target.

49.     At some point, the officers presented Mr. Burnette with a statement written by Sergeant Pritchett, which inculpated Mr. Scott and Mr. Johnson, and directed Mr. Burnette to sign it. When Mr. Burnette told the officers he couldn't read, Sergeant Pritchett "threatened [him] with prison time for the rest of [his] life if [he] d[idn't] sign these statements."

50.     As the interrogation became more and more coercive, Sergeant Pritchett and Officer Simon edited and rewrote the statement—still without explaining to Mr. Burnette

8

what it said.

51.     When threats were not enough, the police turned to physical abuse. Sergeant Pritchett and Officer Simon began "roughing [Mr. Burnette] up," including by "throwing [him]" and "chok[ing] [him] up." Officer Adams stood by and watched. She did nothing to stop the beating or protect Mr. Burnette.

52.     Overwhelmed by the beating, the threats, and the stress of a multi-hour interrogation, and in fear for his life and liberty, Mr. Burnette agreed to sign the statement he could not read.

53.     During this same time, the officers brought Mr. Jackson (who had been released) back in and began re-interrogating him.

54.     The playbook was familiar: Officer Adams, Officer Simon, and Sergeant Lovier accused Mr. Jackson of committing the murder, and threatened to charge him with the crime if he did not inculpate Mr. Scott and Mr. Johnson.

55.     After several hours of being intimidated and threatened with life in prison, Mr. Jackson—who had a history of struggling with mental illness—agreed to change his story. He signed a new, false statement, prepared by Sergeant Lovier, that implicated Mr. Scott and Mr. Johnson in the murder.

***The Officers Concealed Evidence of Kendrick Scott's Innocence***

56.     Mr. Burnette's and Mr. Jackson's statements were obviously false.

57.     The fabricated statements indicated that Mr. Johnson and Mr. Scott had set out to commit a robbery on the evening of May 8, 1999. But not a single possession of Lisa Kindred's was taken and there was no evidence of any attempted robbery.

58.     Mr. Burnette's statement indicated that Mr. Scott and Mr. Johnson had

9

planned to kidnap Lisa because of an unpaid drug debt. But Lisa Kindred did not use drugs, Mr. Scott and Mr. Johnson did not know Lisa, and Mr. Scott and Mr. Johnson did not know the Kindred family would be in Detroit that evening.

59.     Mr. Burnette's statement claimed that Mr. Scott had confessed to the killing at approximately 2:30 a.m. on May 9, 1999. But Mr. Scott was already in police custody by 2:30 a.m. on May 9, 1999.

60.     Both statements indicated that both Mr. Scott and Mr. Johnson were present at the scene when Lisa was shot. But C.J., who was sitting in the front seat of the car in which Lisa was murdered, only saw one man at the scene—who did not look like Mr. Scott or Mr. Johnson.

61.     Mr. Burnette's statement claimed that Mr. Scott had confessed to the shooting. But Mr. Jackson's statement claimed that Mr. Johnson had confessed to the shooting.

62.     Mr. Burnette later testified at trial that he saw Mr. Scott put a gun in a car at 7:00 or 8:00 a.m., the morning after the shooting. But Mr. Scott was in custody at that time, as Officer Jackson confirmed in his trial testimony.

63.     If these inconsistencies alone were not enough, Lisa's sister Jodi Gonterman, herself a police officer in Albuquerque, New Mexico, spoke to the DPD detectives on the case on May 10, 1999. She told the officers that, just a few months prior, Lisa told her that "if anything ever happened to [Lisa] she wanted [Jodi] to look at Will as a suspect."

64.     This should have been the end of the officers' campaign of harassment of Mr. Scott and Mr. Johnson: only fabricated testimony linked them to the crime, while *Lisa herself* had pointed the finger at Will.

65.     But instead of refocusing their investigation, the officers told Jodi "that

they had already found out who killed [Lisa], and that Will did not have anything to do with it."

66.    Officer Rodney Jackson wrote a statement for Jodi that omitted any mention of Lisa's warning about Will, and directed her to sign it.

67.    The police concealed Jodi Gonterman's evidence.

68.    Upon information and belief, not a single officer involved in the investigation revealed the true extent of Jodi Gonterman's knowledge to any prosecutor or defense attorney.

***Lisa and Will's Marriage Was Marred by Domestic Violence and Abuse***

69.    The domestic violence and Lisa's fear of Will should have been particularly important in pointing the investigation towards Will.

70.    Studies have shown that approximately 55% of murders of women are committed by current or former romantic partners.[1]

71.    Will had a well-documented history of abusing Lisa and their children. C.J., then just a child, saw Will beat Lisa regularly, often choking her.

72.    In the two years before the murder, Lisa had called in seventeen domestic violence complaints about Will to the Roseville Police Department.

73.    In 1999, just months before her murder, Lisa had obtained a personal protection order against Will and had filed for divorce.

74.    Around that same time, Lisa expressed fear of Will to her ex-husband Charmous. She warned him just as she warned her sister Jodi: "Lisa also said that if anything ever happened to her, [Charmous] should not let the police exclude Will Kindred as a suspect."

---

[1] *See* Petrosky, et al., *Racial and Ethnic Differences in Homicides of Adult Women and the Role of Intimate Partner Violence—United States, 2003-2014*, Ctr. for Disease Control Morbidity & Mortality Weekly Report 66(28), 741-46 (July 2017), *available online at* https://www.cdc.gov/mmwr/volumes/66/wr/mm6628a1.htm?s_cid=mm6628a1_w.

75.     At a recent deposition in an action brought pursuant to Michigan's Wrongful Imprisonment Compensation Act, Will invoked his Fifth Amendment privilege against self-incrimination, refusing to answer any questions about Lisa's murder.

***The Detroit Police Department's Constitutional Violations Were Pervasive***

76.     As shocking as DPD officers' conduct during their investigation of Lisa's murder was, it was far from an aberration; rather, it was emblematic of how the Department operated as a matter of course during this period of time.

77.     As Officer Adams confirmed under oath in a recent deposition, DPD had a practice at the time of "rounding up witnesses, arresting them, keeping them even though there might not be probable cause for their arrest." As Officer Adams explained: "if people were at a crime scene, they were generally rounded up, arrested, interrogated or interviewed down at the squad headquarters."

78.     In 2000—the year after Lisa's murder—the federal Department of Justice opened an investigation into DPD's use of force, its arrest practices, and its treatment of material witnesses.

79.     The investigation found a "pattern or practice by DPD officers that deprives persons of rights, privileges, and immunities secured or protected by the Constitution or laws of the United States . . . ."

80.     In 2003, that investigation culminated in a civil enforcement action against the City of Detroit for DPD's pattern and practice of violating individuals' constitutional rights.

81.     On July 18, 2003, the civil enforcement action resulted in a consent decree in which DPD agreed to reform its arrest practices, interrogation techniques, and incident documentation protocols under the supervision of an independent monitor. This consent decree

remained in place for over eleven years, ending in August 2014.

**The Officers Push for the Prosecution of Mr. Scott Based on False Evidence**

82.    Armed with nothing more than their fabricated witness statements, and with the inconvenient fact of Jodi Gonterman swept neatly under the rug, DPD officers presented the case to the Wayne County Prosecutor's Office.

83.    On May 12, 1999, the prosecution charged Mr. Scott and Mr. Johnson with the murder of Lisa Kindred. Mr. Scott was also charged with assault with intent to rob while armed, and felony firearm possession.

84.    Mr. Scott and Mr. Johnson were tried separately. Mr. Scott elected to proceed to a jury trial, which commenced on May 30, 2000. Officer Adams sat at the prosecutor's table during his trial.

85.    Trial lasted just two days; the prosecution's *only* evidence connecting Mr. Scott to the murder was the coerced and fabricated testimony of Mr. Burnette and Mr. Jackson.

86.    During the trial, the prosecutor had to repeatedly "refresh" Mr. Burnette's "memory" with his fabricated statement.

87.    After deliberating for less than 90 minutes, the jury convicted Mr. Scott on June 1, 2000. On June 21, 2000, Mr. Scott was sentenced to life in prison. He would spend nearly twenty years in prison for a crime he did not commit.

**Years of Postconviction Investigation Reveal the Fabrication and Suppression**

88.    From the beginning, Mr. Scott maintained his innocence. In 2011, he contacted the University of Michigan Innocence Clinic, which began to further investigate Lisa's murder.

89.    Attorneys with the Innocence Clinic spent years locating Antonio

Burnette. When they finally found him, he told them about the violent and coercive interrogation that led to his false statement.

90.     The Innocence Clinic learned that Raymond Jackson had also recanted his testimony to his cousin Lameda Thomas before he died.

91.     The Innocence Clinic lawyers spoke with C.J., who reviewed a photo lineup and unequivocally stated that the man who shot his mother was neither Mr. Scott nor Mr. Johnson.

92.     The Innocence Clinic also spoke with Jodi Gonterman, who revealed the full nature of her statement to the police, rather than the false, abridged one she signed.

93.     Armed with a trough of new evidence, Mr. Scott filed a motion to vacate his conviction in December 2011.

94.     Over four days in 2015, the trial court held an evidentiary hearing on Mr. Scott's motion, which it went on to deny on August 7, 2015. The Michigan Court of Appeals affirmed this decision on May 31, 2016.

95.     In an opinion and order dated July 23, 2018, the Michigan Supreme Court reversed the Court of Appeals, finding that "[a]n examination of trial testimony alone indicates that the defendants' convictions were based on shaky grounds."

96.     On November 28, 2018, the Wayne County Prosecutor's Office dismissed all charges against Mr. Scott and Mr. Johnson.

***Mr. Scott, Though Free, Has Been Injured Beyond Measure***

97.     Although Mr. Scott has finally been vindicated, his victory rings hollow in the face of the twenty years of life he lost.

98.     In this case, justice delayed is truly justice denied. Mr. Scott spent, in total,

14

approximately nineteen years and six months in prison for a crime he did not commit.

99.     Mr. Scott entered prison at the age of 20. He walked out at the age of 40, having missed the opportunity to finish school, have a career, or have meaningful family relationships. He is just now starting his life—twenty years behind his peers.

100.     It is simply too late for Mr. Scott to repair many of the social and familial relationships he had before his conviction. The mere fact that he was accused and convicted was enough to sour the majority of his relationships.

101.     While in prison, Mr. Scott was forced to live in inhumane conditions—he was denied privacy and subjected to daily humiliation and harsh treatment. He suffered greatly knowing he was in prison even though he was innocent. He spent long periods in solitary confinement.

102.     Mr. Scott continues to suffer from extreme emotional distress and anguish as a result of his unjust and unlawful conviction. He has nightmares about his experience in prison, and cries frequently about how much of his life he has lost.

103.     The stress of his twenty-year wrongful incarceration worsened Mr. Scott's preexisting mental illnesses, which he continues to struggle with to this day. Instead of receiving steady treatment and developing a care plan for his mental health needs, Mr. Scott was denied access to proper medication and consistent therapy, and his condition predictably worsened.

104.     As a direct result of the police fabricating and suppressing evidence, Mr. Scott was denied the most basic of his constitutional and fundamental human rights: his liberty.

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth/Fourteenth Amendments
Malicious Prosecution
(Against All Defendant Officers)

105.     Plaintiff repeats and realleges the above paragraphs as if the same were

15

fully set forth at length herein.

106.    Defendant Officers maliciously and without justification commenced criminal proceedings against Plaintiff.

107.    Defendant Officers charged Plaintiff with crimes falsely, maliciously, in bad faith, and without probable cause.

108.    Defendant Officers knew they lacked probable cause to prosecute Plaintiff because of the evidence provided by Jodi Gonterman that Will Kindred had committed the murder, which they suppressed, and because they fabricated Antonio Burnette's and Raymond Jackson's statements.

109.    No reasonable detective or officer would have believed there was probable cause to prosecute Plaintiff under these circumstances.

110.    All charges against Plaintiff were terminated in Plaintiff's favor upon the November 28, 2018 dismissal of the indictment against Plaintiff.

111.    Defendant Officers acted under pretense and color of state law. Said acts by Defendant Officers were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendant Officers acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendment to the United States Constitution.

112.    Defendant Officers' conduct was willful, wanton, and reckless.

113.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

16

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Denial of Due Process: Fabrication of Evidence
(Against Defendant Officers Pritchett, Adams, and Simon)

114.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

115.     Defendant Officers Pritchett, Adams, and Simon initiated, or caused the initiation of, criminal proceedings against Plaintiff.

116.     Defendant Officers Pritchett, Adams, and Simon created false information and fabricated evidence likely to influence the jury, including the fabricated testimony and witness statements of both Antonio Burnette and Raymond Jackson, which were procured through threats, coercion, and physical assault.

117.     The conduct of Defendant Officers Pritchett, Adams, and Simon in fabricating evidence proximately caused Plaintiff's detention and loss of liberty.

118.     Defendant Officers Pritchett, Adams, and Simon acted under pretense and color of state law. Said acts by Defendant Officers Pritchett, Adams, and Simon were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendant Officers Pritchett, Adams, and Simon acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourteenth Amendment to the United States Constitution.

119.     Defendant Officers Pritchett, Adams, and Simon acted willfully, wantonly, and recklessly.

120.     As a direct and proximate result of the conduct of Defendant Officers Pritchett Adams and Simon in fabricating evidence, Plaintiff sustained the damages hereinbefore alleged.

17

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fifth/Fourteenth Amendment
*Brady* Violation: Withholding Material Exculpatory Evidence
(Against All Defendant Officers)

121.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

122.    The full statement made by Jodi Gonterman was and is material exculpatory evidence. Had it been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at trial.

123.    Defendant Officer Jackson was aware of Jodi Gonterman's statement that Lisa Kindred had specifically feared being killed or injured by Will Kindred. He had a duty to accurately record this information and give this material, exculpatory evidence to the prosecutor so that it could be disclosed to the defense.

124.    Officer Jackson did not record Jodi Gonterman's full statement. Instead, Officer Jackson recorded a partial statement that omitted any reference to Lisa's fear of Will and produced that to the prosecution.

125.    Sergeant Pritchett, Officer Adams, and Officer Simon were all aware that they had assaulted, threatened, and coerced Antonio Burnette into signing his statement. They all had a duty to report the true circumstances of Antonio Burnette's interrogation to the prosecutor so that it could be disclosed to the defense.

126.    Sergeant Pritchett, Officer Adams, and Officer Simon did not document the circumstances surrounding Antonio Burnette's interrogation, including the coercion he was subjected to. They did not inform the prosecutor of the threats, physical assault, and coercion that had led Antonio Burnette to sign the statement implicating Mr. Scott and Mr. Johnson.

127.    Officer Adams, and Officer Simon were all aware that they had threatened

18

and coerced Raymond Jackson into signing his statement. They all had a duty to report the true circumstances surrounding Raymond Jackson's interrogation to the prosecutor so that it could be disclosed to the defense.

128.    Officer Adams, and Officer Simon did not document the circumstances surrounding Raymond Jackson's interrogation, including the coercion he was subjected to. They did not inform the prosecutor of the threats and coercion that had led Raymond Jackson to sign the statement implicating Mr. Scott and Mr. Johnson.

129.    Defendant Officers under pretense and color of state law. Defendant Officers acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights.

130.    As a direct and proximate result of Defendant Officers' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Failure to Intervene
(Against All Defendant Officers)

131.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

132.    To the extent that any Defendant Officer was not directly responsible for the withholding of exculpatory evidence, the fabrication of evidence, or the malicious prosecution described above, such Defendant Officers all had a realistic opportunity to intervene and prevent misconduct by the other Defendant Officers that caused preventable harm to Plaintiff.

133.    Any reasonable officer in the position of the Defendant Officers would have known that Plaintiff's constitutional rights were being violated by the fabrication of

19

evidence, withholding of exculpatory evidence, and/or the prosecution of Plaintiff without probable cause.

134. Not one Defendant Officer took a single step to intervene and prevent any of the constitutional violations suffered by Plaintiff.

135. Defendant Officers acted under pretense and color of state law. Defendant Officers acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights.

136. As a direct and proximate result of Defendant Officers' misconduct and abuse detailed above, Plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a. Compensatory damages against all Defendants in an amount to be determined at trial;

b. Punitive damages against Defendant Officers in an amount to be determined at trial;

c. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

d. Such other and further relief as this Court may deem just and proper.

Dated: Detroit, Michigan
      September 17, 2019

                           EMERY CELLI BRINCKERHOFF
                           & ABADY LLP

                           By: _____/s/_____

                                Zoe Salzman
                                Ashok Chandran[2]

                                600 Fifth Avenue, 10th Floor
                                New York, NY 10020
                                (212) 763-5000

                           GOODMAN, HURWITZ & JAMES, P.C.

                           By: _____/s/_____

                                William Goodman

                                1394 E. Jefferson Ave.
                                Detroit, MI 48207
                                (313) 567-6170

                           *Attorneys for Plaintiff Kendrick Scott*

---

[2]      Attorneys Salzman's and Chandran's admission in the Eastern District of Michigan is pending.

21