UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENDRICK SCOTT,

               Plaintiff,

    -against-

DETROIT POLICE DEPARTMENT
("DPD") SERGEANT WAYNE
PRITCHETT; DPD OFFICER
CATHERINE ADAMS; DPD OFFICER
BARBARA SIMON; and DPD OFFICER
ANTHONY JACKSON,

               Defendants.

No. 19 Civ. 12718

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

**EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP**
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## **TABLE OF CONTENTS**

**PAGE NO.**

TABLE OF CONTENTS........................................................ I

TABLE OF AUTHORITIES ...................................................III

STATEMENT OF ISSUES PRESENTED............................... VI

CONTROLLING AUTHORITY FOR RELIEF SOUGHT ................. VII

PRELIMINARY STATEMENT .............................................1

RELEVANT FACTS ...........................................................2

ARGUMENT ....................................................................8

    I.     RAYMOND JACKSON'S RECANTATION IS ADMISSIBLE ............8

          A.     Defendants Had No Probable Cause............................9

          B.     Mr. Jackson's Recantations Are Admissible ..........................10

                1.     There Are Sufficient Guarantees of Trustworthiness.................................................10

                2.     The Recantations Are More Probative Than Any Other Evidence ................................14

    II.    DEFENDANT JACKSON VIOLATED *BRADY* .....................15

          A.     Ms. Kindred's Warning to Her Sister Was Exculpatory, Impeaching, Suppressed, and Substantively Material ..............15

          B.     Ms. Kindred's Warning to Her Sister Was Admissible............17

          C.     The Statement Would Have Led to Other Admissible Evidence ................................19

    III.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ................................21

          A.     *Brady* Claim Against Defendants Pritchett, Adams, and Simon ................................22

                1.     Plaintiff's *Brady* Rights Were Established Decades Earlier.........................................22

2.    Defendants Pritchett, Adams, and Simon Violated
      *Brady*................................................................................23

B.    Malicious Prosecution Claim Against Defendant Jackson.......24

CONCLUSION ......................................................................................25

# TABLE OF AUTHORITIES

**PAGE NO.**

## CASES

*Ahmed v. Wilson*,
No. 18 Civ.13849, 2020 WL 4040649 (E.D. Mich. July 17, 2020) ....................1

*Barton v. Warden, S. Ohio Corr. Facility*,
786 F.3d 450 (6th Cir. 2015) ...............................................................19

*Baxter v. Palmigiano*,
425 U.S. 308 (1976)...........................................................................12

*Bies v. Sheldon*,
775 F.3d 386 (6th Cir. 2014) ...............................................................16

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001) .................................................................15

*Brady v. Maryland*,
373 U.S. 83 (1963)..................................................................... passim

*Brumley v. Albert E. Brumley & Sons, Inc.*,
727 F.3d 574 (6th Cir. 2013) ...................................................... 11, 12

*Cristini v. City of Warren*,
No, 07 Civ. 11141, 2012 WL 5508369 (E.D. Mich. Nov. 14, 2012)................16

*Encana Oil & Gas (USA), Inc. v. Zaremba Family Farms, Inc.*,
No. 12 Civ. 369, 2016 WL 7971983 (W.D. Mich. Apr. 11, 2016) ...................12

*Giglio v. United States*,
405 U.S. 150 (1972).................................................................. 22, 23

*Goudy v. Cummings*,
922 F.3d 834 (7th Cir. 2019) ...............................................................16

*Hampton v. City of Chicago*,
No. 12 Civ. 5650, 2017 WL 2985743 (N.D. Ill. July 13, 2017).......................14

*Holmes v. South Carolina*,
547 U.S. 319 (2006)...........................................................................19

*In re Hernandez*,
552 B.R. 750 (D. Minn. 2016).............................................................12

*Jackson v. City of Cleveland*,
925 F.3d 793 (6th Cir. 2019) ...................................................... passim

*Kiniun v. Minn. Life Ins. Co.*,
   No. 10 Civ. 399, 2013 WL 12146384 (N.D. Fla. Jan. 14, 2013) ............... 12, 15

*Kyles v. Whitley*,
   514 U.S. 419 (1995)...........................................................................................17

*LiButti v. United States*,
   107 F.3d 110 (2d Cir. 1997) .............................................................................12

*People v. Catanzarite*,
   211 Mich. App. 573 (Mich. Ct. App. 1995) .....................................................20

*People v. Davis*,
   No. 335051, 2018 WL 1768072 (Ct. App. Mich. Apr. 12, 2018) .....................18

*People v. Hall*,
   433 Mich. 573 (Mich. 1989) .............................................................................21

*People v. Hubbard*,
   No. 256831, 2005 WL 3304121 (Ct. App. Mich. Dec. 6, 2005).......................18

*People v. Johnson*,
   502 Mich. 541 (2018) .........................................................................................8

*People v. Johnson*,
   No. 245503, 2004 WL 840226 (Ct. App. Mich. Apr. 20, 2004) .......................20

*People v. Null*,
   No. 271597, 2008 WL 782584 (Mich. Ct. App. Mar. 25, 2008).......................20

*People v. Susalla*,
   No. 299402, 2011 WL 5008586 (Ct. App. Mich. Oct. 20, 2011) ......................18

*Ricks v. Pauch*,
   No. 17 Civ. 12784, 2020 WL 1640166 (E.D. Mich. Apr. 2, 2020) .......... 1, 2, 21

*Sanford v. Russell*,
   381 F. Supp. 3d 905 (E.D. Mich. 2019), *aff'd* 815 F. App'x 856 (6th Cir.
   2020) ....................................................................................................................1

*Sims v. United States*,
   No. 04 Civ. 70474, 2006 WL 8435527 (E.D. Mich. Jan. 18, 2006) ........... 10, 11

*Stanley v. ExpressJet Airlines, Inc.*,
   356 F. Supp. 3d 667 (E.D. Mich. 2018) ..................................................... 21, 25

*Stapley v. Minn. Life Ins. Co.*,
   No. 17 Civ. 653, 2019 WL 2028367 (D. Utah May 8, 2019).............................15

*Sykes v. Anderson*,
    625 F.3d 294 (6th Cir. 2010) ................................................................ 8, 24, 25

*Thacker v. City of Columbus*,
    328 F.3d 244 (6th Cir. 2003) ..............................................................10

*Tolan v. Cotton*,
    572 U.S. 650 (2014)............................................................................22

*United States v. Dish Network, L.L.C.*,
    75 F. Supp. 3d 942 (C.D. Ill. 2014) ....................................................12

*United States v. Hall*,
    165 F.3d 1095 (7th Cir. 1999) ............................................................11

*United States v. Leal-Del Carmen*,
    697 F.3d 964 (9th Cir. 2012) ..............................................................13

*United States v. Phillip*,
    948 F.2d 241 (6th Cir. 1991) ..............................................................17

*United States v. Sinclair*,
    74 F.3d 753 (7th Cir. 1996) ................................................................13

*United States v. Vretta*,
    790 F.2d 651 (7th Cir. 1986) ....................................................... 11, 14

*United States v. Whitlock*,
    418 F. Supp. 138 (E.D. Mich. 1976), *aff'd,* 556 F.2d 583 (6th Cir. 1977) .........9

*Wogenstahl v. Mitchell*,
    668 F.3d 307 (6th Cir. 2012) ..............................................................19

*Wood v. Bartholomew*,
    516 U.S. 1 (1995)................................................................................19

*Wright v. Beard*,
    No. 14 Civ. 90, 2016 WL 7173787 (W.D. Ky. Dec. 8, 2016).................... 10, 11

## **RULES**

Fed. R. Evid. 807 ................................................................ 12, 13, 14, 15

Mich. R. Evid. 401 ..............................................................................20

Mich. R. Evid. 404 ..............................................................................20

Mich. R. Evid. 803 ..............................................................................18

## STATEMENT OF ISSUES PRESENTED

1.    Are Defendants entitled to summary judgment regarding Plaintiff's Federal

Civil Rights claim for malicious prosecution?

<u>Defendants say</u>: "Yes"

<u>Plaintiff says</u>: "No"

2.    Are Defendants entitled to summary judgment on Plaintiff's Federal Civil

Rights claim for violation of *Brady* regarding a statement made by Jodi

Gonterman?

<u>Defendants say</u>: "Yes"

<u>Plaintiff says</u>: "No"

3.    Does the doctrine of qualified immunity bar Plaintiff's malicious

prosecution claim against Defendant Jackson and Plaintiff's *Brady* claim

against Defendants Pritchett, Adams, and Simon?

<u>Defendants say</u>: "Yes"

<u>Plaintiff says</u>: "No"

## <u>CONTROLLING AUTHORITY FOR RELIEF SOUGHT</u>

### <u>Cases</u>

*Kyles v. Whitley*, 514 U.S. 419 (1995)

*Giglio v. United States*, 405 U.S. 150 (1972)

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019)

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014)

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010)

*Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003)

### <u>Statutes and Rules</u>

Fed. R. Evid. 708

Mich. R. Evid. 803(3)

Mich. R. Evid. 404(b)(1)

## PRELIMINARY STATEMENT

Plaintiff Kendrick Scott spent nearly two decades in prison, including over *four years* in solitary confinement, for the murder of Lisa Kindred, a crime he did not commit. The record built over the course of discovery proves that Defendant Detroit Police Department ("DPD") Officers Catherine Adams, Wayne Pritchett, Barbara Simon, and Anthony Jackson used every dirty trick in the book to frame Plaintiff and his co-Plaintiff Justly Johnson. They coerced a middle school student and a mentally ill young man into signing fabricated inculpatory statements. Then they suppressed all evidence of their coercion, and when the victim's own sister came to the DPD with exculpatory information pointing to the victim's husband as an alternative suspect, they suppressed that too.

Defendants' motion for partial summary judgment is the latest in a series of similarly deficient motions brought by the DPD in other wrongful conviction cases to deliberately delay the inevitable trials. *See Ricks v. Pauch*, No. 17 Civ. 12784, 2020 WL 1640166, at *25 (E.D. Mich. Apr. 2, 2020) (Borman, D.J.) ("Courts routinely decline to consider perfunctory arguments of the sort made by Defendants here")[1]; *Sanford v. Russell*, 381 F. Supp. 3d 905, 919, 922-23 (E.D. Mich. 2019), *aff'd* 815 F. App'x 856 (6th Cir. 2020) (motion "borders on the frivolous" and "brazenly misrepresents the record"); *Ahmed v. Wilson*, No. 18 Civ.13849, 2020 WL 4040649, at *5 (E.D. Mich. July 17, 2020) (motion "fails to fulfill the basic requirements of a properly supported motion for summary judgment"). The same is true here: Defendants vaguely refer to so-called

---

[1]     Citations in this brief have been cleaned up.

undisputed facts without accurately citing any specific evidence, in violation of the Court's Individual Rules, which require parties to specify the page numbers and lines of depositions. As this Court recently ruled in another DPD improper summary judgment, Defendants have made their arguments "in the most skeletal way" and ask the Court and Plaintiff to "put flesh on [their] bones." *Ricks*, 2020 WL 1640166, at *25. This partial motion should be denied in its entirety.

## RELEVANT FACTS

### *Lisa Kindred is Murdered*

The night of May 8, 1999, William Kindred, his wife Lisa Kindred, Mr. Kindred's eight-year-old stepson, CJ Skinner, Jr., and the Kindreds' daughter Shelby (two years old) and son Dakota (a newborn) went to a drive-in movie. Ex. K at 5:12-6:22.[2] After the movie, at 11:30 p.m., with a days-old infant and toddler in the car, Mr. Kindred decided the family had to stop by the home of his sister, Lillie Harris, who lived on Bewick Street on the east side of Detroit. *Id.* at 27:20-23; Ex. L at 1. Mr. Kindred's incredible explanation for this detour: he purportedly wanted to bring his whole family, in the middle of the night, while he spoke with his brother-in-law about the purchase of a motorcycle. Ex. L at 1; Ex. M at 1.

When the Kindred family arrived on Bewick Street, Mr. Kindred left his wife and three young children alone in their minivan, in the dark, in a dangerous neighborhood, and went inside Ms. Harris's house for approximately 20 to 30 minutes. Ex. K at 26:17-27:9; Ex. L at 1. Eventually, Ms. Kindred grew impatient, walked up to the house, and spoke with Mr. Kindred. *Id.* at 8:17-22, 27:13-19. Ms.

---

[2]     "Ex." refers to exhibits to the April 5, 2021 Declaration of Nick Bourland.

Kindred then returned to the minivan; as she was opening the door, her son CJ heard a loud bang and saw a flash and glass shatter. *Id.* at 9:7-11:17. Ms. Kindred had been shot, but she managed to put the car in gear and sped up the street to a nearby gas station. *Id.* at 15:3-9. Ms. Kindred then got out of the car and collapsed. *Id*. She was later pronounced dead. Ex. M at 1.

At the moment Ms. Kindred was shot, Plaintiff Mr. Scott was with his nephew, Quinton Billingslea, and his nephew's girlfriend, Lakeniya Hicks, at their home a block west of the shooting. Ex. A at 43:12-44:13; Ex. H at 8:13-9:8. He went there because he had just seen two suspicious men walking through the alley carrying a rifle. Ex. H at 8:13-9:21; Ex. A at 43:17-44:3. While Plaintiff was inside Ms. Hicks's and Mr. Billingslea's home, they heard a gunshot. Ex. H at 11:24-12:3; Ex. A at 43:17-44:3. Co-Plaintiff Justly Johnson was away from the neighborhood at the time, attending several parties with his friends Antonio Bernette and Mike. Ex. N at 29:7-33:25; Ex. O at 18:12-20:19. CJ, who was not interviewed by DPD in 1999, testified in this case that neither Plaintiff nor Mr. Johnson was the shooter. Ex. K at 70:22-71:1.

### *Defendants "Round Up Witnesses," Including Plaintiff and Raymond Jackson*

At approximately 1:00 a.m. on May 9, DPD Officer Frank Scola and his partner responded. Ex. P at 16:14-17:8; Ex. Q at 1. Officer Scola canvassed the scene, where he saw Plaintiff and Raymond Jackson,[3] who were standing in front of Mr. Jackson's house on Bewick. Ex. P at 33:19-35:6; Ex. A at 63:2-6.

---

[3]    "Defendant Jackson" refers to Defendant Anthony Jackson, while "Mr. Jackson" refers to Raymond Jackson.

At the time, the DPD had a practice of "rounding up witnesses, arresting them, keeping them even though there might not be probable cause for their arrest." Ex. R at 17:16-18:14. Defendant Adams explained: "if somebody were at the scene where somebody got killed, everybody would go to jail." Ex. S at 273:9-274:25. True to form, without any probable cause, DPD rounded up Plaintiff and Mr. Jackson and took them to headquarters around 1:30 a.m. Ex. P at 35:7-20, 41:3-5; Ex. A at 63:2-14; Ex. Q at 1. Plaintiff "never got released again." Ex. A. at 63:7-12.

At DPD headquarters, Mr. Jackson was interviewed and did not say anything to inculpate Plaintiff or Mr. Johnson. Ex. T at 1-3. Plaintiff denied any involvement in the crime and explained he had seen two men with a rifle. Ex. U at 1-2. That same morning, DPD officers searched Plaintiff's home, even though, as Defendant Adams now admits, they lacked any probable cause. Ex. S at 136:18-137:3.

### *Defendants Verbally and Physically Threaten Antonio Bernette, a Juvenile*

Later that morning, DPD officers found juvenile Antonio Bernette sleeping in a car, arrested him without probable cause, and took him to headquarters. Ex. V at 1; Ex. O at 28:13-25, 32:11-35:6. Mr. Bernette had consumed large quantities of alcohol and marijuana the night before and was so "drunk and high" that he was still intoxicated when he was arrested and reeked of alcohol. Ex. O at 23:14-24, 32:22-24; Ex. W at 81:14-16.

At headquarters, officers took Mr. Bernette to a small interrogation room where he was handcuffed to a table. Ex. O at 35:7-36:5. He was only a middle

school student, *id.* at 60:4-6, but he was forced to spend seven or eight hours in the interrogation room, *id.* at 39:14-40:5, where he was interrogated by multiple officers, including Defendant Pritchett, *id.* at 37:10-25; Ex. W at 74:16-18.

Mr. Bernette told Defendant Pritchett and the other officers he was a juvenile, he did not understand what was going on, and he wanted his mother and father. Ex. O at 37:23-38:10. Defendant Pritchett told Mr. Bernette that his parents "can't help you here." *Id.* at 37:6-22. During Mr. Bernette's interrogation, Defendants Pritchett, Simon, and Adams threatened Mr. Bernette and told him he would be charged with murder if he did not tell them what they wanted to hear and sign a statement. *Id.* at 48:7-52:24; 63:7-9; 78:25-79:2. Officer Pritchett punched Mr. Bernette eight to ten times in his lower body. *Id.* at 53:14-54:21. Defendant Simon slapped Mr. Bernette. *Id.* at 54:22-55:10. Not a single officer tried to intervene and stop the physical abuse. *Id.* at 55:16-23.

At 2:15 p.m. on May 9, Mr. Bernette succumbed to the threats and signed a notification of rights form, even though he could barely read or write. *Id.* at 57 14-58:7, 60:15-25; Ex. X at 1. He even misspelled his own last name. Ex. O at 58:8-20; Ex. X at 1. He did not understand the form; he signed because he "was forced." Ex O. at 59:9-24, 61:1-15.

Defendants Simon and Pritchett then forced Mr. Bernette to sign a witness statement they fabricated. *Id.* at 62:4-66:16; Ex. Y. Mr. Bernette did not write anything on this form; Defendant Pritchett wrote it all. *Id.* at 64:17-23; Ex. W at 74:16-23. Mr. Bernette "couldn't read" the statement. Ex. O at 63:18-21. The statement said that Plaintiff told Mr. Bernette the previous night at 2:30 a.m. that

he had shot a woman named Lisa after trying to "hit a lick" (*i.e.*, rob her) with Mr. Johnson. Ex. Y. Mr. Bernette never said "hit a lick," *id.* at 64:2-16, and had never heard of "Lisa" before Defendant Simon told him that name, *id.* at 65:24-66:16. The officers "wrote up everything, and [] just had [Mr. Bernette] sign and initial." *Id.* at 64:2-10. At 2:30 a.m., the time of this purported confession, Plaintiff had already been in police custody for an hour. *See supra* at 3-4.

### Defendant Jackson Suppresses Exculpatory Information on Another Suspect

At the time of Ms. Kindred's death, her sister, Jodi Gonterman, lived in Albuquerque, New Mexico, where she worked as a police officer. Ex. E at 22:4-11. She flew home to Detroit on May 9, 1999, after learning of the murder. *Id.* at 37:2-7.

The next day, Ms. Gonterman went to the DPD headquarters. *Id.* at 39:1-21. Defendant Jackson interviewed Ms. Gonterman, Ex. F at 1; Ex. G at 27:10-12, but he has "no recollection of this case" or Ms. Gonterman, Ex. G at 9:20-10:16.

Ms. Gonterman testified that she went to the Homicide Section that day with one specific goal: she wanted to tell the police about a phone conversation she had with her sister a year prior. Ex. E at 39:3-40:11. She told Defendant Jackson that Ms. Kindred had told her during a phone conversation in 1998 that William Kindred should be a suspect if anything ever happened to Ms. Kindred. *Id.* at 48:5-17. As a trained detective herself, Ms. Gonterman knew this information was "important and [she] needed to relay that information to [the DPD]." *Id.* at 40:12-41:2.

But Defendant Jackson omitted this exculpatory information from Ms. Gonterman's witness statement. *See* Ex. F at 1-2. Today, Defendant Jackson has no explanation for why the information is missing, repeatedly testifying that he "[doesn't] recall anything in regards to this case." Ex. G at 43:10-15.

As a result of Defendant Jackson's actions, this exculpatory information was never turned over to the prosecutor or the defense, and Ms. Gonterman was never called as a witness at Mr. Scott's trial. *See* Ex. B at 62:15-63:9; Ex. C at 24:16-25:19. Had the information been turned over, it would have led defense counsel to a record of Mr. Kindred's physical abuse of his wife, his threats to kill her, her order of protection against him, and his ownership of *multiple* .22 rifles, the very kind of gun used in the murder. *See* Ex. D at 6, 13; Ex. S at 294:19-22.

### *DPD Forces Raymond Jackson to Sign a Fabricated Statement*

By May 10, Defendants had Mr. Bernette's coerced statement inculpating Plaintiff and Mr. Johnson, but no other evidence. So that afternoon, they picked up Mr. Jackson again and brought him in for another interrogation. Ex. AA at 1; *see also* Ex. Z at 87:17-88:12. Mr. Jackson had severe mental health issues and was taking prescription medications used to treat schizophrenia, depression, and alcohol abuse, which made him "see blurry," "forget a lot of things," and have hallucinations. Ex. Z at 85:17-89:9, 96:21-97:5. DPD officers wrote out a second witness statement for Mr. Jackson, which radically differed from his first and suddenly inculpated Plaintiff and Mr. Johnson. Ex. AA at 1-2.

This statement was, like Mr. Bernette's, false and coerced. Before Mr. Jackson died in 2008, Ex. I at 10:4-7, he recanted three times. In 2000, at the time

of Plaintiff's trial, Mr. Jackson told Mr. Billingslea and Ms. Hicks his inculpatory statement "was a lie and he wanted to recant but he . . . was scared," and that the police had "coerced him to talk." Ex. H at 14:23-16:17, 33:15-18.

Mr. Jackson also recanted twice to his cousin, Lameda Thomas. At a family gathering in 2002 and at a birthday party in 2006, Mr. Jackson confided in his cousin that he had lied. Ex. I at 10:12-14:16. Mr. Jackson explained "[h]e was scared because he was under a lot of pressure from the police, who told him he and his grandmother could go to jail if he did not cooperate with [them]." *Id.* at 11:10-21.

### Plaintiffs Are Convicted Based on the Coerced False Testimony

The prosecution's case against Plaintiff and Mr. Johnson was built solely on the coerced, false testimony of Mr. Bernette and Mr. Jackson. Ex. B at 129:6-15.

Plaintiff spent the next 19 years of his life maintaining his innocence in prison, where he endured over four years of solitary confinement. The Michigan Supreme Court finally vacated the conviction, concluding: "An examination of the trial testimony alone indicates that [these] convictions were based on shaky grounds." *People v. Johnson*, 502 Mich. 541, 576 (2018).

<div align="center">

**ARGUMENT**

</div>

Defendants' motion for partial summary judgment should be denied.

## I.   RAYMOND JACKSON'S RECANTATION IS ADMISSIBLE

Defendants dispute only one element of Plaintiff's malicious prosecution claim—that "there was a lack of probable cause for the criminal prosecution." *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010).

<div align="center">

8

</div>

## A.     Defendants Had No Probable Cause

It is undisputed that probable cause was based solely on the Bernette and Jackson statements. *See* Def. Br. at 11-12[4]; Ex. B at 129:6-15. But both statements were coerced and Defendants cannot rely on "information obtained as a result of a coerced statement to furnish probable cause." *United States v. Whitlock*, 418 F. Supp. 138, 142 (E.D. Mich. 1976), *aff'd,* 556 F.2d 583 (6th Cir. 1977).

Even before considering Mr. Jackson's recantations (*see infra*), a jury is likely to conclude his inculpatory statement was coerced. *First*, his initial statement did not contain any inculpatory information. *See* Ex. T at 1-3. It was only after the police brought him down for a second interrogation that they extracted an inculpatory statement from him, *see* Ex. AA, which used the identical "hit a lick" language used in the false inculpatory statement they had coerced from Mr. Bernette a few hours earlier, *see* Ex. Y. *Second*, the record establishes these officers coerced Mr. Bernette's statement. *See supra* at 4-6. *Third*, these officers also tried to coerce another witness: Defendant Simon had Plaintiff's then-girlfriend Falynn Kenner (another juvenile), arrested, sent to juvenile detention, and charged with murder without any probable cause after she refused to sign a statement. Ex. BB at 109:4-7; Ex. CC at 1. These bogus charges were thrown out of court the next day. Ex. BB at 81:6-91:18; Ex. DD. *Fourth*, the evidence is clear these officers had decided to frame Plaintiff even before they coerced Mr. Bernette and Mr. Jackson: they searched his home earlier that day without any probable cause. Ex. S at 136:18-137:3. A reasonable jury could easily conclude from this

---

[4]     References to "Def. Br." are to Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Dkt. 38.

pattern of misconduct that Defendants also coerced Mr. Jackson and therefore did not have probable cause. "The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003). Here, at the very least, there is a fact issue that precludes summary judgment.

### B.    Mr. Jackson's Recantations Are Admissible

In any event, Mr. Jackson's multiple subsequent recantations are admissible under FRE 807—a rule Defendants do not even address. Def. Br. at 15-17.

A hearsay statement is admissible under Rule 807 if:

(1)    the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement; and

(2)    it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

"District courts have considerable discretion in applying [FRE 807]." *Sims v. United States*, No. 04 Civ. 70474, 2006 WL 8435527, at *7 n.14 (E.D. Mich. Jan. 18, 2006).

### 1.    There Are Sufficient Guarantees of Trustworthiness

For the first element, "[m]ost courts apply a broad inquiry, looking to the totality of the circumstances that surround the statement when determining whether it possess the requisite guarantees of trustworthiness." *Wright v. Beard*, No. 14 Civ. 90, 2016 WL 7173787, at *5 (W.D. Ky. Dec. 8, 2016). Courts may apply various factors in assessing trustworthiness under Rule 807, including:

(1) the probable motivation of the declarant in making the statement, (2) the circumstances under which the statement was made, (3) the knowledge and qualification of the declarant, (4) the existence of corroborating evidence, (5) the character of the declarant for truthfulness and honesty and the availability of evidence on the issue, (6) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury, and (7) whether the witness ever recanted his testimony.

*Id.* (quoting *United States v. Hall*, 165 F.3d 1095, 1110-11 (7th Cir. 1999)). Courts also consider the "frequency with which [the] declarant has made similar statements" and "the statement's temporal proximity to the event related." *Sims*, 2006 WL 8435527, at *7 n.14.[5]

Mr. Jackson's statements have the requisite guarantees of trustworthiness.

**Personal knowledge.** Mr. Jackson indisputably had first-hand knowledge that his statement inculpating Plaintiff was false and coerced by the police.

**Frequency and corroboration.** Mr. Jackson made the statements on three separate occasions and to three different people: first to Mr. Billingslea and Ms. Hicks in 2000, and two more times to Ms. Thomas in 2002 and 2006. The frequency alone lends credibility to the statements. *See United States v. Vretta*, 790 F.2d 651, 659 (7th Cir. 1986) ("[declarant] told a number of people about [defendant's] threats . . . lending credibility to the fact that [declarant] made the statements").

The police coercion of Mr. Bernette and other evidence further corroborates Mr. Jackson's statements, establishing a pattern of coercion by these officers (*see*

---

[5]      The *Wright* and *Sims* courts sourced these factors from the Seventh Circuit due to the "lack of Sixth Circuit case law on the residual trustworthiness requirement outside of the Confrontation Clause context." *Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013).

*supra* Part I(A)). *See United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 968-99 (C.D. Ill. 2014) (statements admitted under FRE 807 because unrelated declarants described the same type of unlawful conduct by defendant).

Finally, William Kindred's invocation of the Fifth Amendment at his deposition further corroborates Mr. Jackson's recantations. Ex. J at 45:16-46:21. Because "[s]ilence is often evidence of the most persuasive character," *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976), an adverse inference against a party in a civil suit may be drawn from a non-party's invocation of the Fifth Amendment, *see LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997).[6] Mr. Kindred's invocations of the Fifth Amendment lead to an inference that *he* was responsible for Ms. Kindred's death, not Plaintiffs.

**Relationship between declarant and witnesses.** In *Brumley*, the Sixth Circuit held that an out-of-court statement should be considered reliable when it was made to someone with whom the declarant had a close relationship—*i.e.*, when the declarant and witness were "not strangers." 727 F.3d at 578.[7] Here, Mr. Jackson made two out-of-court statements to Ms. Thomas, and another to Mr.

---

[6]     The test articulated in *LiButti* is used by courts, including courts in the Sixth Circuit, to weigh admissibility of a non-party's invocation of the Fifth Amendment for the purposes of drawing an adverse inference against a party to a civil action. *See, e.g., Encana Oil & Gas (USA), Inc. v. Zaremba Family Farms, Inc.*, No. 12 Civ. 369, 2016 WL 7971983, at *5 (W.D. Mich. Apr. 11, 2016).

[7]     *See also In re Hernandez*, 552 B.R. 750, 755-56 (D. Minn. 2016) (deceased grandmother's out-of-court statement to granddaughter had circumstantial guarantees of trustworthiness and was properly admitted under Rule 807 where granddaughter "seem[ed] to have [had] the confidence of [her grandmother]"); *Kiniun v. Minn. Life Ins. Co.*, No. 10 Civ. 399, 2013 WL 12146384, at *2 (N.D. Fla. Jan. 14, 2013) (out-of-court statement by deceased declarant to a friend in whom she "confided . . . about various aspects of their personal lives" was trustworthy and admissible under Rule 807).

Billingslea and Ms. Hicks. Ms. Thomas was Mr. Jackson's cousin—someone Mr. Jackson trusted. Ex. I at 9:13-10:3. Mr. Jackson was friends with Mr. Billingslea and his girlfriend Ms. Hicks. Ex. H at 7:24-8:3, 13:25-14:7. Mr. Jackson was close to the people he confided in.

**Close temporal proximity.** "Immediacy of [] knowledge is one of the key circumstances indicating trustworthiness." *United States v. Sinclair*, 74 F.3d 753, 758 (7th Cir. 1996). Mr. Jackson made the out-of-court statement to Mr. Billingslea and Ms. Hicks in 2000, only one year after he was coerced into giving a false statement and while Plaintiff's criminal trial was ongoing. Ex. H at 15:25-16:6. He made the same consistent statements to Ms. Thomas two years later and again in 2006. Ex. I at 10:8-21, 11:10-14; 13:1-21.

**The voluntary nature of the statements.** There is no dispute that Mr. Jackson made the statements voluntarily. He was not under any duress when he recanted to Mr. Billingslea and Ms. Hicks in the comfort of their home in 2000, to Ms. Thomas at a family gathering at Ms. Thomas's mother's house in 2002, or to Ms. Thomas at a birthday party at a relative's house in 2006.

Moreover, Ms. Thomas testified that when Mr. Jackson made the out-of-court statements, he had a sad demeanor and appeared truthful, Ex. I at 11:22-24, 18:19-21, which further supports admissibility. *See, e.g.*, *United States v. Leal-Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012) (statement admissible under FRE 807 because it "show[ed] the demeanor of the witness" and therefore allowed a jury to assess the witness's credibility).

13

**Motivation in making the statements.** Mr. Jackson had no improper motivation to tell his friends and cousin that his police statement had been false and coerced. It is difficult "to comprehend what [Mr. Jackson] might have gained, if anything, from revealing [Defendants'] threats" to these "disinterested third parties." *Vretta*, 790 F.2d at 659. On the contrary, Mr. Jackson had everything to lose: he was scared of the police, Ex. H at 15:16-17; Ex. I at 14:7-16, 37:6-38:5, and his recantation exposed him to felony perjury charges, *see* M.C.L.A. 750.422.

**Lack of recantation.** There is no dispute that Mr. Jackson never recanted the statements he made to Mr. Billingslea, Ms. Hicks, and Ms. Thomas. On the contrary, he consistently made the same statements in 2000, 2002, and 2006.

Mr. Jackson's statements are supported by sufficient guarantees of trustworthiness. The first FRE 807(a) element is met.

### 2.   The Recantations Are More Probative Than Any Other Evidence

Mr. Jackson's statements, as relayed under oath during two depositions in this case, are the only evidence of Mr. Jackson's recantation and his coercion by Defendants. Mr. Jackson is now deceased. His out-of-court statements to Ms. Thomas, Mr. Billingslea, and Ms. Hicks are therefore "more probative on the point for which [they] [are] offered than any other evidence that [Plaintiff] can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2); *see Hampton v. City of Chicago*, No. 12 Civ. 5650, 2017 WL 2985743, *at* *11, *14-*15 (N.D. Ill. July 13, 2017) (in wrongful conviction action, unavailable declarant's out-of-court statement was admissible under FRE 807 because it was "the only evidence

specifically addressing" whether defendant fabricated the declarant's police report).[8] The second 807 factor is met.

Mr. Jackson's recantations are admissible under FRE 807 and are further evidence of Defendants' lack of probable cause. Defendants are not entitled to summary judgment on the malicious prosecution claim.

## II.    DEFENDANT JACKSON VIOLATED *BRADY*

Defendant Jackson suppressed material exculpatory evidence when he failed to disclose Ms. Kindred's warning to her sister that her husband should be a suspect.

All three *Brady* elements are met here: "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Jackson v. City of Cleveland*, 925 F.3d 793, 814 (6th Cir. 2019).

### A.    Ms. Kindred's Warning to Her Sister Was Exculpatory, Impeaching, Suppressed, and Substantively Material

*First*, the evidence was exculpatory and impeaching. Because Ms. Kindred's warning to her sister tended to incriminate an alternative suspect, it was exculpatory evidence Defendant Jackson was obligated—but failed—to turn over

---

[8]    *See also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 112 (3d Cir. 2001) (statement admissible because it was the "only evidence [plaintiff] could present to counter [defendant's] allegation" regarding a key fact); *Kiniun*, 2013 WL 12146384, at *2 (statement admissible because it was "the only evidence of which the court is aware" that demonstrates a key fact in dispute); *Stapley v. Minn. Life Ins. Co.*, No. 17 Civ. 653, 2019 WL 2028367, at *3 (D. Utah May 8, 2019) (statements admissible because they "are the only evidence that exists as to [the deceased declarant's] observations").

to the prosecutor. *See Bies v. Sheldon*, 775 F.3d 386, 400 (6th Cir. 2014) (knowledge of a second suspect is *Brady* material).[9] Evidence of Ms. Kindred's fear that her husband might harm or kill her would also have "raised opportunities to attack the thoroughness and even the good faith of the investigation," *id.*, which failed to investigate Mr. Kindred and uncover at least 17 incidents of prior domestic abuse. It could also have been used to impeach Mr. Kindred at Mr. Scott's trial. Plaintiff's trial counsel testified that it would have changed his examination of Mr. Kindred. Ex. C at 25:20-26:4 ("[Mr. Kindred's] credibility could have been brought very seriously into question if we had had information about his being a threat and a possible suspect in the killing.").[10]

*Second*, Defendant Jackson suppressed this evidence. Neither the prosecutor, Ex. B at 62:15-63:9, nor Plaintiff's defense attorney, Ex. C at 24:16-25:19, ever heard about it. As Defendant Jackson "did not disclose any of this evidence to prosecutors, a reasonable jury could find that he suppressed exculpatory evidence in violation of *Brady*." *Jackson*, 925 F.3d at 815.

---

[9]    *See also Cristini v. City of Warren*, No, 07 Civ. 11141, 2012 WL 5508369, at *10 (E.D. Mich. Nov. 14, 2012) ("[A] statement directly implicating others in the attack on the victim could have been expected to play a significant role in the plaintiff's defense. There is little doubt that a jury could find that the withheld evidence was apparently exculpatory.").

[10]    Defendants' claim that Ms. Kindred's warning to her sister is not exculpatory because "Will [Kindred] had an airtight alibi" is nonsense. Ms. Kindred's statement tends to implicate Mr. Kindred's involvement in her murder, whether he acted directly or indirectly by hiring others, and therefore undermines Mr. Kindred's alibi (from his brother-in-law). *See Goudy v. Cummings*, 922 F.3d 834, 843-44 (7th Cir. 2019) (reversing summary judgment where detectives withheld evidence that contradicted another suspect's alibi and trial testimony).

16

*Third*, Defendant Jackson's suppression of this evidence prejudiced Plaintiff because it "was 'material;' in other words, that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Jackson*, 925 F.3d at 815; *see also Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (undisclosed evidence that "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation" and "revealed a remarkably uncritical attitude on the part of the police" was material under *Brady*).

Courts must evaluate the "cumulative effect" of evidence when determining its materiality under *Brady*. *Kyles*, 514 U.S. at 421. At Plaintiff's trial, the prosecution did not call a single eyewitness who could tie Plaintiff to the Lisa Kindred homicide; the entire case against Plaintiff was built on the testimony of two witnesses who were coerced by Defendants into giving false statements (another *Brady* violation, discussed below in Section III). Any evidence attacking the victim's husband's credibility and implicating him in the murder—especially when presented in conjunction with the evidence of Defendants' coercion of the two key witnesses, as *Kyles* instructs—would have reasonably produced a different verdict at trial.

### B.    Ms. Kindred's Warning to Her Sister Was Admissible

Information is subject to *Brady* if it "consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991). Here, Ms. Kindred's warning to her sister would have been admissible for both purposes.

This evidence would have been admissible as substantive evidence under Michigan law, even though Ms. Kindred was deceased and unable to testify. Michigan Rule of Evidence 803(3) excludes from the hearsay rule a "statement of the [unavailable] declarant's then existing state of mind." "Relying on MRE 803(3)," the Michigan Supreme Court has "made clear . . . that statements of murder victims as to plans or feelings are admissible where relevant to material issues, including motive." *People v. Hubbard*, No. 256831, 2005 WL 3304121, at *3 (Ct. App. Mich. Dec. 6, 2005) (citing *People v. Fisher*, 449 Mich. 441, 449-50 (Mich. 1995)).

Michigan courts routinely admit nearly identical statements. For example, a murder victim's out-of-court statements to her cousin that she was afraid of and having problems with her boyfriend, who later killed her, "were admissible under MRE 803(3) as evidence of the victim's state of mind leading up to her death" and could be admitted to prove intent. *People v. Davis*, No. 335051, 2018 WL 1768072, at *7 (Ct. App. Mich. Apr. 12, 2018); *see also People v. Susalla*, No. 299402, 2011 WL 5008586, at *3 (Ct. App. Mich. Oct. 20, 2011) (murder victim's out-of-court statement that she was scared that her boyfriend was going to kill her was "a statement of her then existing mental feeling" and admissible under MRE 803(3)).

Plaintiff could have used this evidence to mount a third-party culpability defense, where a criminal defendant introduces evidence that is inconsistent with, and raises a reasonable doubt about, the defendant's guilt. *See Holmes v. South*

18

*Carolina*, 547 U.S. 319, 327 (2006). Plaintiff never got such a defense because Defendant Jackson suppressed the evidence of Ms. Kindred's warning.

### C.   The Statement Would Have Led to Other Admissible Evidence

Ms. Kindred's statement is also subject to *Brady* because it would have led directly to other admissible evidence.

Defendants' cited case supports Plaintiff: evidence that is inadmissible under state law "nonetheless . . . could be material under *Brady* if it would 'lead directly' to admissible evidence." *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n.3 (6th Cir. 2012); *accord Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 465 (6th Cir. 2015) (reversing dismissal of *Brady* claim because "disclosure of the substance of these statements might have led directly to admissible evidence").

*Wood v. Bartholomew* is not on point; there, the Supreme Court held that there was no *Brady* violation where the suppressed evidence—a witness's failed polygraph test—was inadmissible, and the petitioner could offer *only speculation* that disclosure would have led to "additional evidence that could have been utilized." 516 U.S. 1, 6 (1995) (emphasis added); *id.* at 7 (noting petitioner's own trial counsel testified that the suppressed evidence would not have "affected the outcome of the case"). Here, by contrast, Plaintiff's defense attorney testified that Ms. Kindred's warning to her sister would have fundamentally changed his approach to his examination of Mr. Kindred. Ex. C at 25:20-26:4. Had counsel had that evidence, that knowledge would also have led him to a treasure trove of admissible evidence concerning Mr. Kindred's lengthy history of abuse of Ms. Kindred. For example, according to a divorce complaint and request for an order of

protection filed by Ms. Kindred just months before her murder and local police records, Ex. D, Ms. Kindred reported at least 17 incidents of domestic violence by Mr. Kindred to the police, including an episode where Mr. Kindred kicked in a bathroom door, slammed Ms. Kindred on the toilet, and threatened to "kill [Ms. Kindred] and the whole family," *id.* at 3. Police officers also twice confiscated a .22 LR rifle from Mr. Kindred—the same type of weapon used in the murder. *Id.* at 4, 12; Ex. S at 294:19-22.[11]

This evidence would have been admissible under Michigan Rule of Evidence 404(b)(1), which allows admission of evidence of "other crimes, wrongs, or acts" for "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act." "MRE 401(b)(1) applies to the admissibility of evidence of other acts of *any* person, such as a defendant, a victim, or a witness." *People v. Catanzarite*, 211 Mich. App. 573, 578-9 (Mich. Ct. App. 1995). The evidence of Mr. Kindred's previous threats to kill Ms. Kindred would have been admissible as MRE 404(b)(1) evidence of his intent to kill her. *See People v. Johnson*, No. 245503, 2004 WL 840226, at *5-*6 (Ct. App. Mich. Apr. 20, 2004) (evidence that man had "shout[ed] out clear statements of an intent to kill" was admissible under MRE 404(b)(1) as evidence of his intent to kill); *see also People v. Null*, No. 271597, 2008 WL 782584, at *3 (Mich. Ct. App. Mar. 25, 2008) (evidence that defendant had previously threatened to kill the victim was admissible because it

---

[11]    William Kindred's invocation of the Fifth Amendment gives rise to another adverse inference against Defendants on this specific point. At his deposition, Mr. Kindred invoked the Fifth Amendment when asked whether he used a .22 LR rifle "to murder Lisa Kindred on May 9, [1999]" or gave a .22LR rifle to someone else to do the same. Ex. J at 35:17-20, 46:19-23.

was "highly relevant and probative" of the defendant's intent to kill the victim). Likewise, "[e]vidence of [Mr. Kindred's] possession of a weapon of the kind used in the offense," would have been admissible because such evidence is "routinely determined by courts to be direct, relevant evidence of [the individual's] commission of that offense." *People v. Hall*, 433 Mich. 573, 580 (Mich. 1989).

Defendant Jackson is liable under *Brady* for suppressing Ms. Kindred's warning regarding her husband from Ms. Gonterman's witness statement.

## III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants' qualified immunity argument fatally suffers from a lack of legal analysis. In the scant two paragraphs Defendants devote to applying the defense to two of Plaintiffs' claims, Defendants fail to cite a single case. They do not even identify for the Court *when* the constitutional rights at issue in Plaintiff's malicious prosecution and *Brady* claims were clearly established.

As Your Honor explained to the DPD defendants in *Ricks* in denying their similarly cursory qualified immunity defense: "[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves." 2020 WL 1640166, at *26. Because "[i]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," *Stanley v. ExpressJet Airlines, Inc.*, 356 F. Supp. 3d 667, 694 (E.D. Mich. 2018) (Borman, D.J.), the Court should not consider qualified immunity.

When the relevant Supreme Court and Sixth Circuit precedent is considered, it is clear that neither Defendant Jackson on Plaintiff's malicious prosecution claim, nor the other Defendants on Plaintiff's *Brady* claim, are entitled to qualified

immunity, especially when all facts and inferences are drawn in Plaintiffs' favor. *Jackson*, 925 F.3d at 813; *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

## A.    *Brady* Claim Against Defendants Pritchett, Adams, and Simon

Defendants' sole argument in support of qualified immunity for Defendants Pritchett, Adams, and Simon on Plaintiff's *Brady* claim is predicated on a misreading of Plaintiff's Third Cause of Action. Plaintiff's *Brady* claim is not based solely on Defendant Jackson's suppression of Ms. Gonterman's statement, *see* Section II, *supra*, but also on the remaining Defendants' "failure to inform the prosecutor of the threats, physical assault, and coercion that had led [Mr. Bernette and Mr. Jackson] to sign the statement[s] implicating Mr. Scott and Mr. Johnson," even though they had a duty to do so, Am. Compl., Dkt. 14, ¶¶ 125-28. Defendants Adams, Pritchett, and Simon all participated in this suppression and are therefore liable under *Brady*. Ex. O at 48:7-52:24, 63:7-9, 78:25-79:2. It is irrelevant whether Defendants Pritchett, Adams, and Simon also had knowledge of Ms. Gonterman's statement.

### 1.    Plaintiff's *Brady* Rights Were Established Decades Earlier

The Sixth Circuit recently held in *Jackson* that it was clearly established in at least 1975 that a police officer has a Fourteenth Amendment obligation to disclose exculpatory evidence. 925 F.3d at 823-24. The court further explained that in 1972, "[i]t was also clearly established that impeachment evidence, such as *the fact that a witness was coerced into making a fabricated statement*, qualifies as exculpatory." *Id.* at 824 (citing *Giglio v. United States*, 405 U.S. 150, 153-55

(1972)) (emphasis added). The rights at issue were clearly established well before 1999.

### 2. Defendants Pritchett, Adams, and Simon Violated *Brady*

*First*, the evidence of Defendants' coercion of Mr. Bernette and Mr. Jackson was favorable to Mr. Scott because it was both exculpatory and impeaching. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady's* disclosure rule]." *Giglio*, 405 U.S. at 154; *see also Jackson*, 925 F.3d at 814-15. A police officer's knowledge that a key witness was "coerced into signing the allegedly false statement . . . [is] exculpatory evidence" subject to disclosure under *Brady. Jackson*, 925 F.3d at 815. The prosecution's entire case against Plaintiff was built on Mr. Bernette's and Mr. Jackson's false testimony.

*Second*, Defendants Pritchett, Adams, and Simon failed to disclose that they had coerced Mr. Bernette and Mr. Jackson into making false statements. Ex. B at 126:5-11; Ex. C at 16:9-17:12; 18:23-19:22.

*Third*, Defendants' nondisclosure of all evidence regarding their coercion of witnesses prejudiced Mr. Scott because the suppressed evidence was material. "Because [Mr. Bernette's and Mr. Jackson's] coerced statement[s] formed the core of the prosecution's case, there is a reasonable likelihood that, had the juries in Plaintiffs' trials known that the statement was fabricated and coerced . . . the juries would not have convicted Plaintiffs." *Jackson*, 925 F.3d at 815.

These Defendants are not entitled to qualified immunity.

### B.    Malicious Prosecution Claim Against Defendant Jackson

Without citing a single case or iota of evidence, Defendants apparently challenge the first element of Plaintiff's malicious prosecution claim against Defendant Jackson, which requires that "the defendant made, influenced, or participated in the decision to prosecute [the plaintiff]." *Sykes*, 625 F.3d at 308. Defendants' argument, Def. Br. at 19, is spurious for at least two reasons.

*First*, the Sixth Circuit recently explained in *Jackson* that it was clearly established in 1945 that a police officer could be held liable for malicious prosecution where he withheld exculpatory evidence but did not otherwise actively participate in the prosecution or testify at trial. *See Jackson*, 925 F.3d at 826-27. The specific right at issue was therefore clearly established over 50 years earlier.

*Second*, Defendant Jackson's influence on Mr. Scott's prosecution gives rise to liability in this case. Regardless of which specific homicide team he was formally assigned to, he worked on this case[12] and he "relayed all information that [he] came across to the officer in charge," *id.* at 35:23-36:1, Defendant Adams.

It is irrelevant that Defendant Jackson "did not *make* the decision to initiate the criminal proceedings against [Plaintiff]." *Sykes*, 625 F.3d at 317. Defendant Jackson's suppression of exculpatory information concerning an alternate suspect "influenced" the decision to prosecute Plaintiff. *See Jackson*, 925 F.3d at 821 (police officer influenced or participated in the decision to prosecute when he withheld exculpatory information from and included "misstatements and

---

[12]    It is not true that Defendant Jackson's "only involvement in the subject case was taking the statement of [Ms. Gonterman]." Def. Br. at 19. He also took the statement of co-Plaintiff Justly Johnson. Ex. G at 18:13-20.

falsehoods in his investigatory materials, and those materials influence[d] a prosecutor's decision to bring charges"). He "cannot hide behind the officials whom [he] [had] defrauded" when he excluded that information from the statement he relayed to the officer in charge and prosecutor. *Sykes*, 625 F.3d at 317.

Defendant Jackson is not entitled to qualified immunity.[13]

## CONCLUSION

Defendants are each liable for malicious prosecution and violating *Brady*. No Defendant is entitled to qualified immunity on any of Plaintiff's claims. Defendants' partial motion for summary judgment should be denied in its entirety.

Dated: April 5, 2021

<div style="margin-left:40%">

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Zoe Salzman
Nick Bourland

600 Fifth Avenue
10th Floor
New York, New York 10020
zsalzman@ecbawm.com
nbourland@ecbawm.com

GOODMAN HURWITZ, P.C.
William Goodman

</div>

---

[13]     In their Statement of Issues, Defendants say that Defendant Jackson is also immune from Plaintiff's failure to intervene claim, yet they do not mention that claim anywhere in their brief. This issue is therefore waived, *see Stanley*, 356 F. Supp. 3d at 694-95, and cannot be raised for the first time on reply.

**PROOF OF SERVICE**

I hereby certify that on April 5, 2021, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing and the foregoing papers to the attorneys of record with the court.

*/s/Nick Bourland*