## APPENDIX A

### CITED UNREPORTED AUTHORITIES

| | |
|---|---|
| A | *Ahmed v. Wilson*, No. 18 Civ.13849, 2020 WL 4040649 (E.D. Mich. July 17, 2020) |
| B | *Cristini v. City of Warren*, No. 07 Civ. 11141, 2012 WL 5508369 (E.D. Mich. Nov. 14, 2012) |
| C | *Hampton v. City of Chicago*, No. 12 Civ. 5650, 2017 WL 2985743 (N.D. Ill. July 13, 2017) |
| D | *Kiniun v. Minn. Life Ins. Co.*, No. 10 Civ. 399, 2013 WL 12146384 (N.D. Fla. Jan. 14, 2013) |
| E | *People v. Davis*, No. 335051, 2018 WL 1768072 (Mich. Ct. App. Apr. 12, 2018) |
| F | *People v. Hubbard*, No. 256831, 2005 WL 3304121 (Mich. Ct. App. Dec. 6, 2005) |
| G | *People v. Null*, No. 271597, 2008 WL 782584 (Mich. Ct. App. Mar. 25, 2008) |
| H | *People v. Johnson*, No. 245503, 2004 WL 840226 (Mich. Ct. App. Apr. 20, 2004) |
| I | *People v. Susalla*, No. 299402, 2011 WL 5008586 (Mich. Ct. App. Oct. 20, 2011) |
| J | *Ricks v. Pauch*, No. 17 Civ. 12784, 2020 WL 1640166 (E.D. Mich. Apr. 2, 2020) |
| K | *Sims v. United States*, No. 04 Civ. 70474, 2006 WL 8435527 (E.D. Mich. Jan 18, 2006) |
| L | *Stapley v. Minn. Life Ins. Co.*, No. 17 Civ. 653, 2019 WL 2028367 (D. Utah May 8, 2019) |
| M | *Wright v. Beard*, No. 14 Civ. 90, 2016 WL 7073787 (W.D. Ky. Dec. 8, 2016) |

2020 WL 4040649
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Mubarez AHMED, Plaintiff,

v.

Ernest WILSON, Defendant.

Case No. 18-13849
|
Signed 07/17/2020

**Attorneys and Law Firms**

Wolf Mueller, Mueller Law Firm, Novi, MI, for Plaintiff.

Michael D. Weaver, Plunkett & Cooney, Bloomfield Hills,
MI, for Defendant.

OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (ECF NO. 38)

GEORGE CARAM STEEH, UNITED STATES DISTRICT
JUDGE

 **\*1** Defendant Ernest Wilson seeks partial summary
judgment in this action brought pursuant to 42 U.S.C. § 1983.
The court has reviewed the record and has determined that its
decision would not be aided by oral argument.

BACKGROUND FACTS

In 2002, Plaintiff Mubarez Ahmed was convicted of
murdering Lavelle Griffin and LaTanya White in a drive-
by shooting. He was sentenced to 30-60 years in prison. In
2018, Ahmed's conviction was revisited by the Wayne County
Conviction Integrity Unit and the University of Michigan
Law School's Innocence Clinic. After this investigation
revealed new evidence that cast doubt on the integrity of the
proceedings, the Wayne County Prosecutor's Office moved to
vacate Ahmed's conviction and dismiss the charges. Ahmed
was released from prison in 2018 after serving more than
seventeen years.

The facts leading up to Ahmed's conviction are as follows. On
February 9, 2001, White and Griffin were shot in their vehicle
while at an intersection in the City of Detroit. The shooting
was witnessed by Izora Clark, who was also at the intersection
in her car. She described the shooter as looking Hispanic, with
long sideburns, and stated that he was in a burgundy vehicle.
Another witness, Gerald Henderson, described the vehicle as
a red 1997-99 Ford Taurus.

The officer in charge of the murder investigation was
Defendant Ernest Wilson. The day after the shooting, he
received an anonymous tip that the shooter was an Arabic man
nicknamed "Spaghetti." Wilson learned from police sources
that "Spaghetti" was Mubarez Ahmed.

Days later, Ahmed's former girlfriend, Bobbi Ruff, met with
Wilson and evidence technician Eugene Fitzhugh. Wilson
asked Fitzhugh to perform a gunshot residue test on Ruff's
vehicle, a red 2000 Ford Taurus. The test result was negative.

As part of the 2018 Conviction Integrity Unit investigation,
Ruff provided a statement. According to Ruff, she told the
police officer at the vehicle inspection that she and Ahmed
had stopped dating two months before the shooting, that they
had a "very bad break-up," and that he did not have access to
her car. ECF No. 40-8.

Wilson did not mention Bobbi Ruff in his progress notes.
Rather, he incorrectly identified Ahmed's girlfriend, and the
owner of the tested vehicle, as Julie Wheeler. Wilson testified
that he obtained this information from another officer, who
learned it from an FBI task force member. Wheeler states that
she never met Ahmed or loaned him her vehicle, which was
a red, 1998 Ford Contour. Wheeler also denies meeting with
police or ever having her car inspected as part of a homicide
investigation. ECF No. 40-11.

On February 14, 2001, Wilson had Ahmed arrested. Izora
Clark was brought to the police station to view a lineup
with Ahmed in it. First, Clark was provided with mugshots
to review. While she was doing so, Wilson showed her a
photograph of Ahmed: "All of a sudden he walked over to
me and he say, here, you don't have to look no more, you
don't have to look no more. This is the motherfucker. He's the
motherfucker that did it, and he showed me the picture and he
say, I know this motherfucker did it, because I have another
witness that said he did it." ECF No. 40-10 at PageID 700.
Wilson told Clark not to tell anyone that he showed her the

photo of Ahmed. *Id.* Clark subsequently picked Ahmed out of the lineup. *Id.* at PageID 701.

**\*2** Clark testified that she would not have picked Ahmed out of the lineup if she had not seen his photo and had not been pressured by Wilson. *Id.* Clark shared her concerns with Wilson before Ahmed's preliminary examination, but he told her that she needed to "stay with the program." *Id.* According to Clark, Wilson stopped by her house once every week or two weeks prior to Ahmed's trial. *Id.* at PageID 702. "He said he was just coming to check on me, make sure I was okay...." *Id.* Clark testified that she was afraid of Wilson and that she lied when she identified Ahmed as the shooter at his preliminary examination and trial. *Id.* at PageID 702, 708.

Prior to trial, Ahmed moved to suppress the lineup identification, arguing that he had been arrested without probable cause. Wilson testified at the hearing, over which Judge Vonda Evans presided. Wilson stated that the information leading to Ahmed's arrest included Clark's description, the tip about "Spaghetti," and the fact that Ahmed's girlfriend, Julie Wheeler, owned a red car similar to the one driven by the shooter. ECF No. 40-12 at PageID 726-30, 735-36. Recognizing that the anonymous tip did not in itself establish probable cause, Judge Evans relied heavily on the fact that Ahmed had access to Wheeler's vehicle to deny his motion. *Id.* at PageID 750, 756-57 ("Then how is it, is that just coincidence that it's found out that Ms. Wheeler, who is the girlfriend of the Defendant, also drives this type of red or reddish type car?"). She testified that the alleged relationship between Ahmed and Wheeler and the description of Wheeler's car "was central to me at that time in allowing that case to go forward." ECF No. 40-17 at PageID 827.

After a jury trial, Ahmed was convicted of two counts of second-degree murder and two counts of felony firearm. Once the conviction was vacated and the charges were dismissed, Ahmed brought this action against Wilson in his individual capacity. The complaint alleges four causes of action against Wilson: Count I, *Brady* violations; Count II, malicious prosecution; Count III, violation of due process as a result of single-photo identification process; and Count IV, fabrication of evidence. Wilson seeks partial summary judgment on Counts I, II, and IV.

LAW AND ANALYSIS

I. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the court must determine " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Amway Dist. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In response to a properly supported motion for summary judgment, the opposing party must come forward with specific evidence showing there is a genuine issue of fact for trial. A "mere scintilla" of evidence is insufficient to meet this burden; the evidence must be such that a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252.

II. Analysis

Defendant acknowledges that there is a question of fact regarding the photo identification procedure and does not pursue summary judgment with respect to Count III. Defendant seeks summary judgment on three issues: 1) the physical lineup was not unduly suggestive as a matter of law; 2) Wilson did not intimidate Clark; and 3) Wilson did not fabricate the Julie Wheeler evidence.[1] In doing so, Defendant chooses pieces of evidence to challenge, rather than addressing the legal claims pleaded by Plaintiff. The flaw of this approach is that none of Plaintiff's claims are solely premised on the evidence Defendant seeks to challenge. In other words, assuming Defendant is correct that the physical lineup is not unduly suggestive, that Wilson did not intimidate Clark, and that Wilson did not fabricate the Julie Wheeler evidence, Defendant does not explain how it follows that Plaintiff's claims of malicious prosecution, *Brady* violations, and fabrication of evidence are subject to dismissal. Plaintiff relies on other evidence to support these claims, including the Clark photo identification process and the Bobbi Ruff evidence, which Defendant does not address. Defendant's motion does not acknowledge all of the material facts alleged by Plaintiff. As a result, Defendant has failed to sustain his burden to demonstrate that he is entitled to summary judgment.

**\*3**  Defendant also resists Plaintiff's presentation of four different causes of action, arguing that Plaintiff's complaint boils down to one legal claim. Defendant cites no persuasive or binding authority for this proposition, relying on *Burley v. Baltimore Police Dep't*, 422 F. Supp.3d 986, 1030 (D. Md. 2019). In *Burley*, the court determined that the plaintiff's allegation that the police had planted evidence was better understood as a fabrication of evidence claim rather than a *Brady* claim, and found the two claims "duplicative." *Id.* The Sixth Circuit has rejected such an approach, however, noting that different causes of action may share the same factual premise. *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) ("It is not the role of this Court to restrict Plaintiff's choice of viable legal theories."). *See also Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017) ("The district court combined the fabrication claim and the withholding claim into one, but this was in error."). Indeed, the Sixth Circuit has analyzed *Brady*, fabrication, and malicious prosecution claims separately, as they each involve different legal elements. *See id.; Jackson v. City of Cleveland*, 925 F.3d 793, 813-20 (6th Cir. 2019), *cert. denied*, 140 S.Ct. 855 (2020) (fabricated witness statement supported *Brady*, fabrication of evidence, and malicious prosecution claims). Defendant's failure to undertake an analysis of each of Plaintiff's claims is fatal to his motion.

## A. *Brady* Claim

For example, Defendant does not squarely address Plaintiff's *Brady* claim. In *Brady v. Maryland*, the Supreme Court held that the prosecution's suppression of material evidence favorable to the accused violates due process. 373 U.S. 83 (1963). The duty to disclose favorable evidence includes exculpatory and impeachment evidence, and applies to the police as well as the prosecutor. *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). "*Brady* claims have three elements: '[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.' " *Jackson*, 925 F.3d at 814 (quoting *Strickler*, 527 U.S. at 281-82). "To show prejudice, Plaintiffs must show that the allegedly suppressed evidence was 'material;' in other words, 'that there is a reasonable probability that the suppressed evidence would have produced a different verdict.' " *Id.* at 815 (quoting *Strickler*, 527 U.S. at 280-81). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence,

but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In determining the materiality of the suppressed evidence, the court considers it "collectively, not item by item." *Id.*

Plaintiff contends that the following exculpatory or impeachment evidence was withheld by Wilson: (1) Wilson showed Clark a photo of Ahmed and told her he was the one who committed the murders; (2) Wilson drove by Clark's house on almost a weekly basis to "check on her" before the trial; (3) Julie Wheeler was not Ahmed's girlfriend and her vehicle was not examined by police; and (4) Ahmed's former girlfriend Bobbi Ruff brought her vehicle in to be examined by police and told them that Ahmed did not have access to her car.

Defendant argues that Wilson driving by Clark's house to check on her does not amount to witness intimidation. But Plaintiff is not alleging a stand-alone witness intimidation claim. Rather, Plaintiff asserts that this evidence, in combination with other evidence withheld by Wilson, reflects on his credibility and should have been disclosed. Wilson's practice of "checking on" Clark – after he showed her a photo of Ahmed, told her Ahmed was the murderer, and said not to tell anyone that he showed her the photo – could reasonably be viewed as an attempt by Wilson to ensure that Clark stayed on message.

Defendant also argues that the Julie Wheeler evidence is not subject to disclosure under *Brady*, because Ahmed would have known that Wheeler was not his girlfriend and that he did not have access to her car. "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Ahmed would not have known, however, that Wheeler was not the one investigated – a fact bearing on Wilson's credibility and the soundness of the investigation. Moreover, even assuming that the failure to disclose the falsity of the Julie Wheeler evidence was not a *Brady* violation, Plaintiff's *Brady* claim nonetheless survives. Defendant does not dispute that neither the Izora Clark photo identification evidence nor the Bobbi Ruff evidence was produced, that this evidence was favorable to Ahmed, or that it was material. Accordingly, Defendant has not satisfied his burden of demonstrating that summary judgment is proper on Plaintiff's *Brady* claim.

## B. Fabrication of Evidence

**\*4** The Due Process Clause of the Fourteenth Amendment is also "violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Jackson*, 925 F.3d at 815 (citation omitted). Plaintiff alleges that Wilson fabricated evidence by steering Clark toward identifying Ahmed in the lineup and by testifying that Wheeler was Ahmed's girlfriend and owned a red car similar to the one driven by the shooter. Wilson responds by arguing that he did not "invent" Julie Wheeler, but relied upon information he received from the FBI. There is a question of fact, however, regarding whether Wilson knew that the information he received was incorrect. The evidence technician testified that Wilson was present, along with the owner of the car, at the vehicle inspection. ECF No. 40-7 at PageID 667. The owner of the car was Bobbi Ruff, who told the police officers present that Ahmed did not have access to her car. ECF No. 40-8. Although Wilson testified that he did not meet the vehicle owner, it is for the jury to assess his credibility in this regard.

Moreover, for the purpose of this motion, Defendant does not dispute Plaintiff's allegation that he fabricated evidence by steering Clark toward identifying Ahmed in the lineup. Clark's identification of Ahmed was the centerpiece of the prosecution's case and clearly affected the decision of the jury. Defendant has not demonstrated that summary judgment is proper with respect to Plaintiff's fabrication of evidence claim.

## C. Malicious Prosecution

A malicious prosecution claim has its underpinnings in the Fourth Amendment. The Fourth Amendment right to be free of unreasonable searches and seizures includes "the right to be free of unjust prosecution." *Jackson*, 925 F.3d at 820. A malicious prosecution claim has four elements: "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty ... apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Id.*

Plaintiff alleges that these elements are met because Wilson participated in or influenced the decision to prosecute Ahmed; there was no probable cause for his prosecution, which was based upon fabricated evidence; he suffered a deprivation of liberty; and the prosecution was resolved in his favor. Defendant presents no analysis whatsoever regarding the elements of Plaintiff's malicious prosecution claim and does not contest Plaintiff's allegations. As such, he has failed to sustain his burden and the court will deny summary judgment as to this claim.

## D. Qualified Immunity

Defendant also argues that he is entitled to qualified immunity, which shields officials from civil liability if their conduct "does not violate clearly established rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether a defendant is entitled to qualified immunity, the court analyzes "(1) whether, considering the allegations in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Richmond v. Huq*, 885 F.3d 928, 947 (6th Cir. 2018) (citation omitted).

As discussed above, Plaintiff has alleged sufficient facts to support his *Brady*, fabrication of evidence, and malicious prosecution claims. Therefore, the court must consider whether the rights at issue were clearly established "such that a reasonable official would have understood that his conduct violated the right." *Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001). "As the Supreme Court has instructed, we need not find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law[,] the unlawfulness must be apparent.' " *Id.* at 711 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

**\*5** Defendant does not articulate why he is entitled to qualified immunity with respect to Plaintiff's *Brady*, fabrication of evidence, or malicious prosecution claims. Rather, he asserts that it was not clearly established that he violated the constitution by "checking on" Clark and driving by her house repeatedly prior to trial. Again, Defendant mischaracterizes Plaintiff's claims; Plaintiff does not assert a stand-alone claim for witness intimidation. Rather, Plaintiff alleges that the evidence of Wilson "checking on" Clark is relevant to his *Brady* and fabrication claims.

Defendant also argues that he is immune because he was entitled to rely on information from the FBI regarding Julie Wheeler. As discussed above, however, there is a question of fact regarding whether Wilson knew that the information he received from the FBI was incorrect.

The question is whether a reasonable official in Wilson's position, faced with the facts as alleged by Plaintiff, would have understood that it was unconstitutional to withhold exculpatory or impeachment evidence and to fabricate evidence. The Sixth Circuit has held that these rights are clearly established and have been for decades. *Jackson*, 925 F.3d at 822-27. In *Jackson*, for example, the court denied qualified immunity for withholding evidence, fabricating evidence, and malicious prosecution, based upon the allegation that the officer had coerced a witness into making a false statement. *Id.* (finding that the rights at issue were clearly established in 1975); *see also Mills*, 869 F.3d at 486-87 (denying qualified immunity on malicious prosecution, fabrication, and withholding evidence claims to DNA analyst who prepared false report). Wilson does not articulate why the result should be different here,

when Plaintiff alleges that he pressured Clark into making a false identification, withheld evidence regarding Bobbi Ruff, and provided false evidence regarding Julie Wheeler. Accordingly, Wilson is not entitled to qualified immunity.

CONCLUSION

Defendant's motion fails to fulfill the basic requirements of a properly supported motion for summary judgment: to view the facts in the light most favorable to Plaintiff and to address each of the legal elements of Plaintiff's claims. As a result, Defendant has not sustained his burden of demonstrating that no genuine issue of material fact exists for trial, and Plaintiff has demonstrated that Defendant is not entitled to qualified immunity.

IT IS HEREBY ORDERED that Defendant's motion for summary judgment (ECF No. 38) is DENIED.

**All Citations**

Slip Copy, 2020 WL 4040649

Footnotes

1   In his response brief, Plaintiff states that he will not pursue the allegation that the physical lineup was unduly suggestive at trial. Therefore, the court will consider the claim abandoned.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Cristini v. City of Warren, Not Reported in F.Supp.2d (2012)

2012 WL 5508369
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Michael Louis CRISTINI, Plaintiff,

v.

CITY OF WARREN, Warren Police
Department, Alan Warnick, Alice Ingles as
guardian for Donald Ingles, and John Doe
members of Warren Police Department
and Office of the Prosecutor, Defendants.

No. 07–11141.
|
Nov. 14, 2012.

**Attorneys and Law Firms**

Thomas M. Lizza, Dennis A. Dettmer, Dennis A. Dettmer PLLC, Michael R. Dezsi, Law Office of Michael R. Dezsi PLLC, Paul W. Broschay, Law Offices of Paul W. Broschay PLLC, Detroit, MI, for Plaintiff.

Lindsay P. Dates, Dominick W. Savaiano, Clausen Miller, P.C., Chicago, IL, Jami E. Leach, John J. Gillooly, Garan Lucow, Detroit, MI, for Defendants.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

DAVID M. LAWSON, District Judge.

**\*1** The plaintiff in this case has filed an action that parallels an earlier case filed by Jeffrey Moldowan, contending that he was wrongfully prosecuted and convicted of a brutal kidnapping and rape by authorities that withheld evidence that was material to his innocence. Moldowan's case was settled and dismissed earlier this year. Following his subsequent acquittal, plaintiff Michael Cristini sued the defendants alleging violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 because defendants the City of Warren, the Warren Police Department, and Donald Ingles allegedly withheld exculpatory evidence in the underlying trial at which he was convicted and destroyed evidence in violation of a court order. The plaintiff also brings claims of detention and prosecution without probable cause under the Fourth and Fourteenth Amendment against the City of Warren, the Warren Police Department, the Macomb County Prosecutor, and Macomb County. The defendants in this case have filed their respective motions for summary judgment, raising many of the same arguments interposed in the Moldowan lawsuit, plus an additional defense based on the statute of limitations. The Court heard oral argument on January 12, 2012. Since then, the Macomb County defendants have resolved their part of the case and have been dismissed as parties. Their motion for summary judgment will be dismissed as moot. As to the remaining motions, the Court now concludes that the plaintiff has offered sufficient evidence to allow him to proceed against defendants Donald Ingles and the City of Warren on counts IX, X, XI, XII, and XXII, of the complaint, but the defendants are entitled to a judgment as a matter of law on the remaining counts. Therefore, the Court will grant in part and deny in part the motions for summary judgment.

## I.

As mentioned, this case arises from the same facts that spawned the Moldowan lawsuit, which was adjudicated on interlocutory appeal by the Sixth Circuit. *Moldowan v. City of Warren,* 578 F.3d 351 (6th Cir.2009).

### A. Events leading to the plaintiff's original conviction
As explained in that opinion and in other filings by this Court, the events underlying this lawsuit began on the morning of August 9, 1990 when Emergency Medical Services found Maureen Fournier injured and lying in the street in Detroit. In preliminary interviews, Fournier reported that she was abducted from Warren, Michigan and assaulted by four white males: Michael Cristini (the plaintiff in the present action), Jim Cristini, Tracy Tapp, and Jeffrey Moldowan, all of whom she knew.

At the preliminary examination on September 17 and 18, 1990, Fournier and her sister, Colleen Corcoran, testified that Moldowan had dated Fournier previously and had been abusive and threatening toward her. Corcoran stated that on August 8, 1990 Moldowan called her house looking for Fournier and told her that "he was going to get [Fournier]." Fournier testified that on the evening of August 8 she

was walking on 11 Mile Road in Warren when a van pulled alongside her. Moldowan allegedly got out of the van, grabbed her, and dragged her into the van, where she was beaten and raped. Corcoran testified that she received a call the following day from an anonymous male who immediately identified as Moldowan asking about Fournier's whereabouts. Although she knew that Fournier was in the hospital, Corcoran told the caller that her sister was at home, to which the caller allegedly replied, "No, she's not.... She's at the morgue." Following the preliminary examination, only the plaintiff and Moldowan were bound over for trial and remained as defendants in the case.

 **\*2** The first jury trial took place from April 30 to May 10, 1991. Dr. Alan Warnick, a forensic odentologist and consultant for the Medical Examiner's offices in Wayne County, Macomb County, and Monroe County, and the Michigan State Police, offered expert testimony at the trial that bite marks on Fournier's neck were consistent with Moldowan's dentition, while bite marks on Fournier's right arm and right side were consistent with the plaintiff's dentition. Dr. Warnick testified that the chances were "2.1 billion to 1 that another individual [made] those same marks," and his testimony was corroborated by his colleague Pamela Hammel, D.D.S. The plaintiff's own forensic odentologists countered Dr. Warnick's testimony regarding the bite mark evidence. The plaintiff and Moldowan also offered testimony from alibi witnesses. The jury convicted the plaintiff and Moldowan of kidnapping, assault with intent to commit murder, and two counts of criminal sexual conduct in the first degree. The plaintiff was sentenced to four concurrent prison terms of 50 to 75 years.

### B. Subsequent evidentiary findings

Following the first trial, Moldowan's family hired a private investigator who located Jerry Burroughs. Burroughs reported that when he left his mother's home on the morning of August 9, 1990, he saw four black males standing around and kicking a naked white female lying in the street before they drove away in a light-colored van. He further testified that one week following the incident he heard two of the men, Chris and Mitch, talking about the incident and bragging that they had participated. The plaintiff alleges that defendant Ingles and the Warren Police Department knew of this evidence and withheld it from him and Moldowan during the first trial.

After being approached by Moldowan's appellate counsel, Dr. Hammel recanted her 1991 trial testimony regarding the

bite marks on Ms. Fournier's body. She stated that when she originally reviewed the evidence in 1991 she had difficulty matching the bite marks to Moldowan's dentition, but that Dr. Warnick had reassured her that Dr. Norman Sperber, a highly respected forensic odentologist, had reviewed the evidence and confirmed Dr. Warnick's conclusions. In a sworn affidavit, Dr. Hammel stated that, had she known that Dr. Warnick's representation that Dr. Sperber had reviewed the evidence was untrue, she "would never have agreed to testify as a rebuttal witness in support of Dr. Warnick's conclusions."

After the first trial, the Macomb County circuit court entered an order requiring that all evidence in the custody of the Warren Police Department, the Macomb County Prosecutor's Office and the Macomb County circuit court be preserved until further order of the court. Despite that order, Officer Michael Schultz of the Warren Police Department destroyed the evidence in the police department's custody at some point after the plaintiff's first trial and before the plaintiff's second trial. The evidence that was destroyed included hairs, blood samples, bite impressions, a "spike", a jacket, pizza order tickets, a video tape, nail scrapings, and shoes. A Michigan State Police Laboratory report indicated that the nail scrapings did not have immediate evidentiary value and that the hairs were dog and cat hairs.

### C. The Plaintiff's Acquittal

 **\*3** On May 15, 2002, the Michigan Supreme Court reversed Moldowan's conviction, concluding that because of the new alibi witness, Burroughs, and the fact that the prosecution's expert witnesses had either recanted their testimony regarding the bite mark evidence or had been discredited, a new trial was warranted. *People v. Moldowan,* 466 Mich. 862, 643 N.W.2d 570 (2002). After the Michigan Supreme Court reversed Moldowan's conviction, the Macomb County prosecutor retried Moldowan beginning on January 10, 2003. On February 12, 2003, the jury acquitted him of all criminal charges.

After Molodowan's acquittal, the Macomb County circuit court granted the plaintiff's motion for relief from judgment on October 20, 2003, vacating the plaintiff's convictions and ordering a new trial. The plaintiff was released on bond and remained under house arrest throughout the trial. The plaintiff's retrial commenced on March 16, 2004, and the plaintiff was acquitted on April 8, 2004.

### D. The Moldowan Civil Action

In January 2005, Moldowan filed suit in this Court, alleging under 42 U.S.C. § 1983 that his rights guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendment and Michigan law were violated by his arrest, criminal prosecution, conviction, and retrial in the Fournier case. The case was assigned to the Honorable Anna Diggs Taylor. The theory behind the complaint was that the City of Warren, the Warren Police Department, Macomb County, the Macomb County prosecutor, Dr. Alan Warnick, Warren Police Detective Donald Ingles, Warren Police Officer Mark Christian, and Fournier acted separately and conspired together to violate the plaintiff's civil rights by fabricating evidence against him, failing to disclose exculpatory evidence, and pursuing his prosecution and retrial without probable cause. The claims in Moldowan's case are similar, although not identical, to those in the present case.

In April 2007, the defendants in the Moldowan action filed motions for summary judgment raising issues similar to those raised here. The Warren defendants argued that defendant Ingles was entitled to qualified immunity, that a *Brady* duty had not been extended to police officers, that there was no evidence of a pertinent policy or custom to support municipal liability, and that probable cause existed to try Moldowan. Macomb County and the Macomb County prosecutor filed a motion for summary judgment arguing that there was probable cause for Moldowan's prosecution and that the plaintiff's substantive and procedural due process claims were subsumed by his Fourth Amendment claims. Moldowan also moved for partial summary judgment as to his *Brady* claims against defendant Ingles. Judge Taylor granted the Warren defendants' motion for summary judgment with respect to their contention that the Warren Police Department was not an entity capable of being sued and denied it on all other grounds. Judge Taylor also denied the Macomb defendants' and Moldowan's motions for summary judgment.

**\*4** The Warren defendants appealed the district court's denial of qualified immunity, and the Sixth Circuit affirmed in part and reversed in part the district court's decision. *See Moldowan,* 578 F.3d at 351. Moldowan's surviving claims were that defendant Ingles violated the Fourth, Fifth, Sixth, and Fourteenth Amendments by withholding exculpatory evidence and committed gross negligence in connection with his role in the 1990 investigation; that the City of Warren and the Warren Police Department were liable for failing to properly train their police force and for destroying evidence in violation of a court order; and that the Warren Police Department, the City of Warren, the Macomb County

Prosecutor, and Macomb County falsely imprisoned the plaintiff without probable cause in connection with the second prosecution. The case was settled and closed on November 1, 2011.

E. The plaintiff's lawsuit
On March 15, 2007, the plaintiff filed a 29–count complaint against the City of Warren, the Warren Police Department, Macomb County, the Macomb County prosecutor, Alan Warnick, Donald Ingles, Michael Schultz, and Maureen Fournier. On January 14, 2011, all claims against defendant Fournier were dropped. Discovery has been completed. Presently before the Court are motions for summary judgment filed by defendants Donald Ingles, Michael Schultz, the City of Warren, and the Warren Police Department (the "Warren defendants"), defendants the Macomb County Prosecutor and the County of Macomb, and defendant Alan Warnick. On November 7, 2011, the parties stipulated to dismiss all claims against Schultz and certain claims against the City of Warren, the Warren Police Department, and Ingles. Defendant Donald Ingles was replaced as a defendant by his guardian, Alice Ingles, on December 1, 2011. The Court was notified of Mr. Ingles's death on May 4, 2012, and there is currently pending before the Court a motion to substitute the personal representative of his estate as a defendant. As mentioned, the Macomb defendants have resolved their part of the case and a dismissal order was entered. In addition, the parties presented an order pertaining to negotiations of settlement checks from Dr. Warnick, which implies that he settled his part of the case, although the parties have not formally notified the Court of the settlement or presented a stipulation for dismissal. Nonetheless, the Court will assume the claims against Dr. Warnick have been resolved and will dismiss his motion for summary judgment as moot. Finally, the Warren defendants and the plaintiff have agreed to dismiss several counts of the complaint, some of which are the subject of the pending summary judgment motions. The following counts remain: (1) against defendant Ingles: violation of the plaintiff's Fourth Amendment rights through failure to disclose exculpatory evidence (count IX); violation of the plaintiff's Fifth and Sixth Amendment rights through failure to disclose exculpatory evidence (count X); violation of the plaintiff's right to substantive due process under the Fourteenth Amendment through failure to disclose exculpatory evidence (count XI); and violation of the plaintiff's right to procedural due process under the Fourteenth Amendment through failure to disclose exculpatory evidence (count XII); and (2) against defendants the City of Warren and the Warren Police Department: failure to train and supervise police officers regarding the

constitutional rights of citizens (count XXII); liability for the actions of defendant Ingles as final policymaker (count XXIII); and liability for the destruction of evidence in violation of a court order (count XXIV); continued seizure during the second trial in violation of the Fourth Amendment (count XXV); continued seizure during the second trial in violation of the Fourteenth Amendment right to substantive due process (count XXVI); and continued seizure during the second trial in violation of the Fourteenth Amendment right to procedural due process (count XXVII).

## II.

**\*5** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As the Sixth Circuit has explained:

Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed.R.Civ.P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Alexander v. CareSource,* 576 F.3d 551, 557–58 (6th Cir.2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical

doubt as to the material facts.' " *Highland Capital, Inc. v. Franklin Nat'l Bank,* 350 F.3d 558, 564 (6th Cir.2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Highland Capital, Inc.,* 350 F.3d at 546 (quoting *Anderson,* 477 U.S. at 251–52) (internal quotation marks omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943 (6th Cir.2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.,* 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.,* 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson,* 477 U.S. at 248).

**\*6** In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt,* 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 895 (6th Cir.1991).

### A. Claims against Warren Police Department

The Warren defendants assert that all claims against the Warren Police Department—counts XXII through XXVII of the plaintiff's complaint—must be dismissed because the Warren Police Department is not an entity capable of being sued. Under Michigan law, a police department is an agency of the city, and is not a discrete entity that can be sued. See *Boykin v. Van Buren Tp.,* 479 F.3d 444, 450 (6th Cir.2007); *Laise v. City of Utica,* 970 F.Supp. 605, 608 (E.D.Mich.1997); *Pierzynowski v. Police Dept. City of Detroit,* 941 F.Supp. 633,

637 n. 4 (E.D.Mich.1996) (construing a complaint naming the City of Detroit Police Department as a defendant as naming the City of Detroit because the Detroit Police Department is not an entity that can be sued); *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.,* 803 F.Supp. 1251, 1256 (E.D.Mich.1992); *see also* Mich. Comp. Laws § 92.1 ("The council of any city may provide, by ordinance, for a police force...."). The plaintiff has not rebutted the Warren defendants' argument, nor has it provided any case law that conflicts with the cases cited above. The Court agrees with the defendants' argument and will grant the Warren defendants' motion for summary judgment with respect to the plaintiff's claims against defendant the Warren Police Department.

B. Qualified immunity

Defendant Ingles argues that he is entitled to qualified immunity on the claims against him. The plaintiff contends that Ingles violated his clearly established constitutional rights by not disclosing exculpatory evidence, and Ingles is collaterally estopped from raising that defense by the Sixth Circuit's decision in the Moldowan interlocutory appeal.

1.

The Court will address the second argument first. In response to the claim of collateral estoppel, Ingles replies that the parties in *Moldowan* were different and that no question of fact was fully and finally litigated, and thus collateral estoppel does not apply.

Where the judgment that a party looks to for preclusion is a federal court judgment, the Court must "look to federal law to determine its preclusive effect." *Hamilton's Bogarts v. Michigan,* 501 F.3d 644, 650 (6th Cir.2007); *see also EB–Bran Productions v. Warner,* 242 F. App'x 311, 312 (6th Cir.2007) ("[A] federal court applies *federal* law to determine the preclusive effect of a prior federal judgement ... at least where jurisdiction in the prior litigation was based on a federal 1 question."). The Sixth Circuit has listed four requirements for the application of collateral estoppel:

*7 (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and

(4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Hamilton's Bogarts,* 501 F.3d at 650 (quoting *NAACP, Detroit Branch v. Detroit Police Officers Ass'n (DPOA),* 821 F.2d 328, 330 (6th Cir.1987)). Ingles's protestations that the *Moldowan* decision did not fully and finally litigate a question of fact and that the parties are not the same are beside the point, because those are requirements for collateral estoppel under Michigan law, which does not apply in this case. *See Gilbert v. Ferry,* 413 F.3d 578, 580–81 (6th Cir.2005) (listing the requirements for collateral estoppel under Michigan law).

The only issues Ingles raises that address the requirements for collateral estoppel are the questions of law as to the plaintiff's *Brady* claim against defendant him: that is, whether *Brady* applies to police officers and whether defendant Ingles is entitled to qualified immunity. The Court believes that the decision in *Moldowan* estops Ingles from advancing those defenses here.

Ingles summarily argues that no section 1983 action may be maintained against a police officer for failure to submit exculpatory information to the prosecutor. He also argues that he would be entitled to qualified immunity as to any *Brady* violations. But in *Moldowan,* the Sixth Circuit ruled against him on both counts. It held that the plaintiff may maintain a section 1983 action against a police officer for failure to submit exculpatory information to prosecutors, that right was clearly established on the date of its alleged violation by Ingles, and therefore Ingles was not entitled to qualified immunity on the plaintiff's *Brady* claims. *Moldowan,* 578 F.3d at 381–82. Those precise issues were raised and actually litigated in the *Moldowan* case, satisfying the first requirement for collateral estoppel. Moreover, the determination on those issues was both necessary to the outcome and a final decision on the merits, satisfying the second and third requirements. Had the Sixth Circuit held differently on any of those issues, it would have been required to grant Ingles' motion for summary judgment on the plaintiff's *Brady* claims, either because the plaintiff had no claim against Ingles or because Ingles was entitled to qualified immunity. The Sixth Circuit's ruling on those questions of law must also be considered a final decision on the merits. Ordinarily, a ruling denying summary judgment will not be a final ruling on the merits. However, in this case, the Sixth Circuit accepted jurisdiction over the Warren defendants' appeal of the district court's qualified immunity finding on the

theory that the issue was a collateral order that "conclusively determine[d] the disputed question." *Moldowan,* 578 F.3d at 368 (quoting *Will v. Hallock,* 546 U.S. 345, 349, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006)). The Sixth Circuit's holding on defendant Ingles' claim of qualified immunity therefore was determined conclusively, as, necessarily, was the question whether police officers have a duty under *Brady* to disclose exculpatory information. Finally, there is no evidence to suggest that Ingles did not have a full and fair opportunity to litigate this issue, satisfying the fourth requirement.

2.

**\*8** Even if collateral estoppel did not apply, however, the outcome of the motion would be the same. In arguing that counts IX, X, XI, and XII should be dismissed, Ingles repeats the arguments that the duty to disclose exculpatory information under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), does not extend to police officers, Ingles is entitled to qualified immunity, and there is not sufficient evidence to create a genuine issue of material fact as to whether defendant Ingles violated *Brady* by withholding exculpatory evidence. The plaintiff asserts, correctly, that the first two of these issues were disposed of by the Sixth Circuit's decision in *Moldowan v. Warren,* 578 F.3d 351 (6th Cir.2009), and that a genuine issue of material fact exists as to whether defendant Ingles committed a *Brady* violation.

When determining whether defendant Ingles was entitled to qualified immunity, the *Moldowan* court considered, first, whether a duty to disclose exculpatory information under *Brady* extends to police officers; second, whether such a duty was clearly established at the time of defendant Ingles's alleged *Brady* violation; and third, whether, construing the facts in the light most favorable to the plaintiff, the plaintiff could establish a violation of his constitutional rights. The court found that "the obligations imposed under *Brady* would be largely ineffective if [police and other law enforcement officers] had no responsibility to inform the prosecutor team about evidence that undermined the state's preferred theory of the crime." *Moldowan,* 578 F.3d at 378. Therefore, "because the police are just as much an arm of the state as the prosecution, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." *Id.* at 379. The court recognized that "the due process guarantees recognized

in *Brady* also impose an analogous or derivative obligation on the police." *Id.* at 381.

The court then held that this obligation was clearly established on the date of Ingles's alleged *Brady* violation. The court found that other circuits had recognized the "*Brady*-derived" claim advanced by the plaintiff as early as 1964, and that "at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established." *Id.* at 382. The court held that "the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Ibid.*

Finally, the court found, examining the facts in the light most favorable to the plaintiff, that the evidence withheld by defendant Ingles was exculpatory and the plaintiff could make out a claim of a *Brady* violation against defendant Ingles. *Ibid.* The Warren defendants argued, as they do here, that a showing of bad faith on the part of Ingles was required in order to prevail. *Ibid.* The court disagreed, holding that

**\*9** police actions taken in bad faith are not the only species of police conduct that can deprive criminal defendants of the due process guaranteed by the Constitution. We acknowledge that a number of courts, including the Supreme Court have held that a showing of bad faith is required to prevail on a claim that the police deprived a defendant of due process by concealing or withholding evidence that is only "potentially useful." But, where the police are aware that the evidence in their possession is exculpatory, the Supreme Court's decisions in this area indicate that the police have an *absolute* duty to preserve and disclose that information. The critical issue in determining whether bad faith is required thus is not whether the evidence is withheld by the prosecutor or the police, but rather whether the exculpatory value of the evidence is "apparent" or not.... In other words, the critical issue in determining whether government conduct deprived a criminal defendant of a fair trial is the nature of the evidence that was withheld; it emphatically is not the mental state of the government official who suppressed the evidence.

*Id.* at 383–84 (emphasis in original). The court found that, even if it believed that a showing of bad faith were required, there was sufficient evidence for a reasonable jury to find that Ingles acted in bad faith. *Id.* at 389. The court found that Ingles was not entitled to qualified immunity on the plaintiff's Brady

claims. *Id.* at 401. All of those holdings apply with equal force to the present case, in which plaintiff Cristini is identically situated with Jeffrey Moldowan.

The Warren defendants now argue that the Sixth Circuit's *Moldowan* decision is inconsistent with the Supreme Court's subsequent decisions in *Ashcroft v. al-Kidd,* —— U.S. ——, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), and *Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). However, they do not explain how those decisions conflict with *Moldowan.* It is clear to the Court that neither decision calls *Moldowan* into question. *Al-Kidd* deals with a claim of qualified immunity in the context of a Fourth Amendment violation where the plaintiff alleged that a material witness warrant was used as a pretext to detain him. *Id.* at 2079. The Supreme Court overturned the lower courts' denial of qualified immunity; however, the decision has nothing to say about qualified immunity in the context of *Brady* violations by police officers. There is nothing in the decision to suggest that the Sixth Circuit's determination of the qualified immunity issue in *Moldowan* was in error. *Connick* deals with municipal liability for single instances of *Brady* violations and is thus relevant to the plaintiff's claims against the City of Warren based on defendant Ingles's conduct. However, it has nothing to do with *Brady* violations by police officers or with qualified immunity. There is nothing in either of the decisions cited by the Warren defendants to suggest that *Moldowan* was incorrectly decided.

 **\*10** Ingles argues that the record in this case could not support a finding of a *Brady* violation. According to *Moldowan,* in order to make out a claim for a violation of *Brady* by a police officer, the plaintiff must demonstrate (1) either that the suppressed evidence was apparently exculpatory or that the suppressed evidence was potentially exculpatory and the police acted in bad faith and (2) that the suppressed evidence was material. *Moldowan,* 578 F.3d at 383–84 ("The critical issue in determining whether bad faith is required thus is not whether the evidence is withheld by the prosecutor or police, but rather whether the exculpatory value of the evidence is 'apparent' or not."); *Brady,* 373 U.S. at 87. Ingles contends that the evidence he allegedly suppressed—the statement by Burroughs that he had seen four black men surrounding the victim's naked body, one of whom kicked the victim, in the early morning hours of August 9, 1990, and the discussion he overheard later—is neither apparently exculpatory nor material. In the context of this entire episode, including the subsequent criminal trials, that cannot be so.

The Sixth Circuit has not yet articulated a test for determining whether an item of evidence is apparently exculpatory or merely potentially exculpatory. *Elkins v. Summit County, Ohio,* 615 F.3d 671, 677 (6th Cir.2010). However, in *Moldowan,* the Sixth Circuit stated that "it is evident that Burroughs' statements cast serious doubt on, if not entirely discredit, Fournier's identification of Moldowan as one of her attackers, an issue that undoubtedly was one of the most important elements of the state's case. Burroughs' statements thus should have been disclosed to the defense as they undoubtedly 'would tend to exculpate' Moldowan." *Moldowan,* 578 F.3d at 382 (quoting *Brady,* 373 U.S. at 88). Those observations apply with equal force to plaintiff Cristini.

In *Elkins,* the court found that a statement that cast doubt on the identity of a victim's attacker was apparently exculpatory where the other evidence against the plaintiff was not strong. Ingles argues that in contrast, the other evidence against Cristini was strong: an eyewitness identification by the victim and bite mark evidence that appeared to implicate the plaintiff. However, in *Elkins,* the court also stated that "[w]hile we have never elucidated a test for determining what evidence is apparently exculpatory, there is no question that, in light of the broad range of evidence available to the officers at the time, the [exculpatory] statement 'cast serious doubt on, if not entirely discredit[ed Brooke's] identification of [Elkins].' *Moldowan,* 578 F.3d at 382. *Even less would have been sufficient.*" *Elkins,* 615 F.3d at 677 (emphasis added). This final statement indicates that a case as weak as that in *Elkins* is not necessary to find that a statement that calls into doubt a victim's identification is apparently exculpatory. Further, in *Elkins,* the court found it important that the exculpatory statement " 'might be expected to play a significant role in [the plaintiff's] defense.' " *Ibid.* (quoting *Moldowan,* 578 F.3d at 388). Similarly, here, a statement directly implicating others in the attack on the victim could have been expected to play a significant role in the plaintiff's defense. There is little doubt that a jury could find that the withheld evidence was apparently exculpatory; *Elkins* does not foreclose that possibility.

 **\*11** Ingles also argues that a *Brady* violation does not occur unless the suppressed evidence is material and favorable to the accused, *Elmore v. Foltz,* 768 F.2d 773, 777 (6th Cir.1985), and the evidence he withheld was not material as a matter of law. Again, that simply cannot be true. Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Kyles v. Whitley,* 514 U.S. 419, 432–36, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark,* 988 F.2d 1459, 1467 (6th Cir.1993). As the Supreme Court has stated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles,* 514 U.S. at 435.

In determining whether the evidence Ingles allegedly suppressed was material, the plaintiff's acquittal at a second trial in which the evidence was introduced looms large. Although the second trial also did not include disputed bite mark evidence, the fact that the plaintiff was acquitted in a trial that included the suppressed evidence is a strong indication of the materiality of that evidence. The Warren defendants argue that with the volume of evidence presented in the first trial, and the eyewitness and forensic evidence presented by the prosecution, the suppressed evidence could not have created a reasonable probability of a different result. However, as the Warren defendants themselves emphasize, the victim's eyewitness identification was one of the key pieces, if not the key piece, of evidence in the case against the plaintiff. Evidence that would tend to discredit that eyewitness identification would have been of paramount importance at trial. Additionally, in *Moldowan,* the Sixth Circuit held that the issue of whether the plaintiff was prejudiced—that is, whether the allegedly suppressed evidence was material—"involve[d] disputed issues of fact." *Moldowan,* 578 F.3d at 389. Ingles is not entitled to qualified immunity on counts IX, X, XI, and XII of the complaint.

C. Claims against the City of Warren

1. Liability for defendant Ingles's alleged *Brady* violation
The Warren defendants argue that counts XXII and XXIII, in which the plaintiff asserts that defendant the City of Warren is responsible for defendant Ingles's alleged *Brady* violations under either a failure to train or a final policymaker theory of liability, must be dismissed because there was no underlying constitutional violation, there is no evidence of deliberate indifference to the need for training, and defendant Ingles was not a final policymaker. The plaintiff's contention that collateral estoppel precludes these argument is not well taken. The Sixth Circuit merely held that there were factual issues

concerning the adequacy of the City of Warren's training that were beyond the scope of the appeal. *Moldowan,* 578 F.3d at 393 n. 18. Because that determination was based on a review of the record that construed the facts in light most favorable to Moldowan, *id.* at 370, it cannot be said that the prior proceeding resulted in a final judgment on the merits on this issue as required for collateral estoppel. The plaintiff also responds that there are genuine issues of material fact on these claims that preclude summary judgment for the defendants.

a. Failure to train
**\*12** "A municipality is liable for a constitutional violation when execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of Cincinnati,* 521 F.3d 555, 560 (6th Cir.2008) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). The Sixth Circuit explained that "[t]he official policy or custom 'must be the moving force of the constitutional violation' to establish the liability of a government body." *Ibid.* (quoting *Polk Cnty. v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)). The absence of a written policy endorsing the constitutional violation is not fatal to a claim. "Section 1983[ ] 'authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." ' " *Cash v. Hamilton Cnty. Dep't of Adult Probation,* 388 F.3d 539, 542–43 (6th Cir.2004) (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). To sustain municipal liability under that theory, a plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* at 543 (citation and quotation marks omitted).

As the Supreme Court recognized in *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), a city can be held liable under section 1983 for failure to train its employees. To prevail, the plaintiff must show that the "training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir.1989). A municipality can be held liable for inadequate police training under section 1983 "only where the failure to train amounts to deliberate indifference to rights of persons with whom the police come into contact." *City of Canton,* 489 U.S. at 388. The mere

fact that a few officers may be inadequately trained is not sufficient to demonstrate liability, as the shortcomings could be caused by officer inattention or poor administration. *Id.* at 391. Allegations that the officers in question could have been better trained are also insufficient. *Ibid.* Rather, the "failure to train [must] reflect[ ] a 'deliberate' or 'conscious' choice by a municipality." *Id.* at 389. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for the purposes of failure to train." *Connick,* 131 S.Ct. at 1360 (quoting *Board of Cnty. Commis of Bryan County, Olk. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

The Warren defendants have not pointed to any evidence that the City of Warren trained its police officers on avoiding *Brady* violations, beyond a statement in answer to the plaintiff's interrogatories that *Brady* standards are not taught in any formalized training but are discussed in the police academy and legal updates and may have been mentioned in some training sessions. Instead, the Warren defendants argue that the city cannot be said to have been deliberately indifferent to the need for such training. Recently, the Supreme Court held in *Connick v. Thompson* that a single instance of a *Brady* violation by a prosecutor cannot support a finding of municipal liability on a failure to train theory, as a single violation would be insufficient to put a prosecutor's office on notice of the need for specific *Brady* training. *Id.* at 1361. The Warren defendants contend that *Connick* mandates the conclusion that the plaintiff's failure to demonstrate other, similar *Brady* violations by police officers in Warren is fatal to his claim. However, the *Connick* decision relied on the fact that the alleged *Brady* violation was committed by a prosecutor, who was trained in the law and was "not only equipped ... but also ethically bound to know what *Brady* entails and to perform legal research [if he was] uncertain." *Connick,* 131 S.Ct. at 1363. The Court also relied on the fact that it was "undisputed ... that the prosecutors in [the defendant's] office were familiar with the general *Brady* rule." *Ibid.* The Court stated that the reason that a single-incident theory of liability was inapplicable in that case was "that attorneys, *unlike police officers,* are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 1364 (emphasis added).

**\*13** In contrast, here, the *Brady* violation allegedly was committed by a police officer who, unlike an attorney, presumably had no law school training or other occasion to become generally familiar with *Brady.* Nor is a police officer "equipped with the tools to find, interpret, and

apply legal principles." *Ibid.* Because of those important differences, the Warren defendants' analogy to *Connick* is imperfect. Instead, the Court believes that *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), is a more appropriate rubric under which to evaluate the plaintiff's failure-to-train claim. *Canton* has been understood generally to stand for the proposition that a single instance of a constitutional violation may be sufficient to support municipal liability where the need for training is so obvious that the failure to provide it, even in the absence of a demonstrated pattern of violations, constitutes deliberate indifference. *See Connick,* 131 S.Ct. at 1361; *Bryan County,* 520 U.S. at 409. In *Canton,* the example of obviousness that the Court provides is the need to train officers in the constitutional limits on the use of deadly force. The Court reasoned that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and the city has provided those officers with guns. *Canton,* 489 U.S. at 390 n. 10. The circumstances of the present case are much closer to *Canton* than to *Connick.* Just as in the hypothetical advanced in *Canton,* city policymakers know to a "moral certainty" that at some point, their investigating officers will be confronted with evidence that contradicts a working investigative theory and tends to exonerate a prime suspect. Unlike the prosecutors in *Connick,* those officers presumably are not generally familiar with *Brady*'s principles or equipped to do the necessary legal research to become familiar with those principles. Although it is true that a potential *Brady* violation lacks the split-second, life-or-death immediacy of a decision to use deadly force, it is still the case that "[t]here is no reason to assume that police academy applicants are familiar with the constitutional [disclosure requirements under *Brady* ]. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require." *Connick,* 131 S.Ct. at 1361. Further, the failure to disclose exculpatory information could have serious consequences, such as the conviction of an innocent person. It cannot be gainsaid, therefore, that "there is an obvious need for some sort of training." *Ibid* .

This analysis tracks Sixth Circuit authority. The court has held that a plaintiff can survive summary judgment under *City of Canton* if he can show "that officer training failed to address the handling of exculpatory materials and that such a failure has the 'highly predictable consequence' of constitutional violations of the sort Plaintiff suffered.... Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations." *Gregory v. City of Louisville,* 444 F.3d

725, 753 (6th Cir.2006). Because the Warren defendants have presented no evidence to suggest that the City of Warren provided any formal training on *Brady* issues, the Court must deny the Warren defendants' motion for summary judgment on count XXII of the complaint.

b. Liability as policymaker

**\*14** The Warren defendants further argue that the City of Warren cannot be held liable on the theory that Ingles was the final policymaker, as Michigan state law and local ordinances provide that the Warren Police Commissioner was the final policymaker for the police department and defendant Ingles was embedded in a chain of command at all times during his investigation. The plaintiff did not respond specifically to that argument.

"A municipality may be liable under Section 1983 for actions of its authorized policymakers 'where—and only where— a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " *Adair v. Charter County of Wayne,* 452 F.3d 482, 493 (6th Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). A policymaker is the final authority if his " 'decisions are final and unreviewable and are not constrained by the official policies of superior officials.' " *Ibid.* (quoting *Waters v. City of Morristown,* 242 F.3d 353, 362 (6th Cir.2001)). "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker...." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993). A final policymaker is more than a final decisionmaker; a final policymaker is charged with the duty to " 'formulate [ ] plans for the implementation of broad goals.' " *Miller v. Calhoun County,* 408 F.3d 803, 814 (6th Cir.2005) (quoting *Hager v. Pike County Bd. of Educ.,* 286 F.3d 366, 376 (6th Cir.2002)). "[T]he identification of policymaking officials is a question of state law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124–26, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (examining city charter to determine final policymaker on personnel administration issues).

The Warren defendants have provided ample evidence that defendant Ingles cannot be considered to have been a final policymaker. The Warren City Code states that "police officers" are "subject to such rules and regulations as the police commissioner shall promulgate" and are "under the direction, supervision, and control of the police

commissioner." Warren City Code Sec. 26–16. Defendant Ingles testified at his deposition that he was acting under the supervision of a sergeant, who reported to a lieutenant, who in turn was under the supervision of an inspector, who reported to the chief, who reported to the police commissioner. It is difficult to see how Ingles could be considered a final policymaker. The plaintiff has not disputed any of that evidence or come up with any of his own to the contrary. The Court will grant the Warren defendants' motion for summary judgment on count XXIII of the complaint.

2. Liability for defendant Schultz's destruction of evidence
The Warren defendants argue that the City cannot be liable under a *Monell* theory for Officer Schultz's destruction of evidence because the plaintiff cannot demonstrate an underlying constitutional violation and the plaintiff has neither presented evidence of a policy or practice of destroying evidence in violation of a court order nor identified a final policymaker responsible for ordering the destruction of evidence in this case. The plaintiff responds by citing deposition testimony by Officer Schultz that he was ordered to destroy this evidence.

**\*15** The Sixth Circuit addressed this issue in *Moldowan,* when it observed that "the state violates a suspect's due process rights, regardless of the bad faith of the state actor, where material exculpatory evidence is not preserved." *Moldowan,* 578 F.3d at 392. The court also found that if the destroyed evidence were merely potentially useful, rather than material, the plaintiff had to show bad faith to make a case. *Ibid.* Although the court found that Moldowan could not maintain a claim against Officer Schultz, it noted that the plaintiff "may be able to show that the individual with final policy-making authority who directed ... the destruction of the evidence was aware of the materiality of the evidence, and thus did violate [the plaintiff's] rights under *Trombetta* and *Youngblood.*" *Id.* at 394 n. 20 (internal quotation marks omitted). The court noted with concern that "[d]espite extensive discovery, Moldowan has yet to identify the individual responsible for ordering the destruction of evidence"; the court nevertheless did not grant the defendants summary judgment on this issue because it evaluated the record in the light most favorable to Moldowan. *Id.* at 394 n. 219.

The plaintiff in this case points to testimony by Officer Schultz that he was given an order to destroy the evidence in this case by either a sergeant or detective. However, Officer Schultz was unable to identify precisely who gave that order,

and the plaintiff has not come up with any suggestion as to who it might have been. In the absence of some identification of who ordered the destruction, it is difficult to see how the plaintiff can prove a final decision maker was the culprit. And if there is no clue on who gave the order, the plaintiff cannot demonstrate that the person knew that the evidence was material or destroyed it in bad faith. The only evidence that the plaintiff has produced suggests that the individual who made the decision was likely not a final policymaker. Officer Schultz testified at his deposition that the person who ordered the destruction was a sergeant or a detective. Those are not final policymakers for the Warren Police Department. The plaintiff has not presented sufficient evidence for a reasonable jury to find that the individual responsible for the destruction of the evidence in this case was aware of the materiality of the destroyed evidence, was acting in bad faith if the evidence was not material, or was a final policymaker for the City of Warren. The Court will grant the Warren defendants' motion for summary judgment on count XXIV.

3. Warren's liability for the plaintiff's house arrest and second prosecution

The Warren defendants argue that the plaintiff's claims arising out from his house arrest and second prosecution should be dismissed because there is no evidence that the City was involved in the decision to keep the plaintiff under house arrest or to retry him. The plaintiff did not respond to this argument.

**\*16** As the Sixth Circuit has stated, one element of such a Fourth Amendment malicious prosecution claim is that "the defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Sykes v. Anderson,* 625 F.3d 294, 308 (6th Cir.2010) (quoting *Fox v. DeSoto,* 489 F.3d 227, 237 (6th Cir.2007)) (alteration in original). In the absence of any evidence that a defendant participated in the *decision* to detain or prosecute the plaintiff, the plaintiff cannot prevail on a Fourth Amendment malicious prosecution claim against that defendant. It is not necessary that the defendant himself make the decision to prosecute the plaintiff; however, "[t]o be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids the decision, as opposed to passively or neutrally participating." *Id.* at 308 n. 5. Although a malicious prosecution claim may be sustained where an officer supplies false information to establish probable cause, "an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *Id.* at 313–14.

Warren detective Mark Christian testified that although he was the officer assigned to the Moldowan case after the convictions were overturned, he was not asked to reassess probable cause and the decision to retry the plaintiff was made before the case was assigned to him. Detective Christian explained that his role as the officer in charge was to act as a liaison between the prosecutor and the police department and to locate witnesses and evidence to be used at trial. The plaintiff has not identified any evidence that the City or Detective Christian participated in the decision to place the plaintiff under house arrest or to retry the plaintiff, much less that the City participated in such a way that "aided" the decision. Nor has the plaintiff alleged that the City or any of its police officers either fabricated or suppressed evidence at the plaintiff's *second* trial. The plaintiff's failure to present even a "scintilla" of evidence to support its claim of liability against defendant the City of Warren on counts XXV, XXVI, and XXVII requires that they be dismissed.

D. Statute of limitations

The Warren defendants argue that the plaintiff's *Brady* claims and the claim against the City of Warren based on the destruction of evidence are barred by the three-year statute of limitations for tort claims in Michigan. The plaintiff agrees that a three-year statute of limitations applies in this case. The question presented by the motion, therefore, is when the plaintiff's claims accrued. The Warren defendants argue that the plaintiff's claims accrued on the date that his first conviction was vacated, October 20, 2003; the plaintiff contends that his claims accrued on the date of his acquittal, April 8, 2004.

**\*17** The date on which a section 1983 claim accrues is determined by reference to federal law and in accordance with common-law tort principles. *Wallace v. Kato,* 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Ibid.* (internal citations, quotations marks, and brackets omitted). That rule was complicated, however, by the Court's earlier decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), in which the Court held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90. The conviction is invalidated when it "has been reversed on direct appeal, expunged by executive order,

declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 487.

The plaintiff calls his continued detention and seizure without probable cause the "crux" of his claim against the Warren defendants and argues that therefore his claim should not be considered to have accrued until the date of his acquittal on April 8, 2004. Plainly, the plaintiff's claims against the Warren defendants based on his detention and second prosecution after his first conviction was vacated hinge on the plaintiff's alleged continued detention without probable cause. *See Sykes,* 625 F.3d at 308–09. The Warren defendants insist, however, that the plaintiff's claims based on *Brady* violations accrued on October 20, 2003, when the Macomb County circuit court granted the plaintiff's motion for relief from judgment and ordered a new trial. Because the present lawsuit was not filed until March 15, 2007, the Warren defendants argue, it was filed out of time.

The Warren defendants reason that once the state court granted the plaintiff a new trial, any bar imposed by *Heck* dissipated, because the plaintiff's prior conviction that may have resulted from failure to disclose exculpatory evidence "ha[d] been invalidated." However, the plaintiff points out that he is required to demonstrate the materiality of the withheld evidence, which could not have been accomplished in the absence of his subsequent acquittal, and certainly was doomed to failure if he had been convicted at a second trial when the withheld evidence was introduced.

Certainly, the plaintiff must establish that the withheld evidence was material to the question of his guilt. *See Bagley,* 473 U.S. at 682; *see also Kyles,* 514 U.S. at 432–36. And the result of the second trial would assist him in that pursuit immeasurably. But even if the plaintiff conceivably could make out a *Brady* claim without the benefit of his subsequent acquittal, and the Court were to accept the Warren's defendant's premise that the *Brady* claims accrued before the plaintiff was ultimately acquitted, the statue of limitations would not bar the *Brady* claim in this case.

**\*18** *Heck* makes clear that a plaintiff cannot assert all the elements of a claim based on an unconstitutional conviction or sentence until that conviction has been invalidated somehow once and for all. The trial court's order vacating the plaintiff's conviction and granting him a new trial certainly satisfies that requirement, but that order did not become final until the time for a prosecution appeal expired. *Cf. Gonzalez v.*

*Thaler,* ——U.S. ——, ——, 132 S.Ct. 641, 653, 181 L.Ed.2d 619 (2012) (citing *Clay v. United States,* 537 U.S. 522, 527, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003), and *Jimenez v. Quarterman,* 555 U.S. 113, 120–21, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009)). Until that time, the conviction was subject to reinstatement by the Michigan courts, and Heck's bar had not been extinguished. If the prosecutor had appealed, no new trial could have proceeded. *See People v. George,* 399 Mich. 638, 250 N.W.2d 491 (1977). Under Michigan law, the prosecutor has six months to appeal that order to the state court of appeals. *See* Michigan Court Rule 2.705(F)(3). Therefore, the order vacating the conviction did not become a final order until six months after it was entered, which was April 20, 2004. Accepting the Warren defendants' arguments, the plaintiff's Brady claim would not have accrued any earlier than that. The commencement of the lawsuit on March 15, 2007 was timely under the applicable three-year statute of limitations for section 1983 claims. *McCune v. City of Grand Rapids,* 842 F.2d 903, 905 (6th Cir.1988). The Court finds that the defendants are not entitled to summary judgment on statute of limitations grounds.

### III.

The Court finds that the Warren Police Department is not a discrete entity capable of being sued and it will be dismissed from the case. Defendant Ingles is not entitled to qualified immunity. The City of Warren can be held liable under a failure-to-train theory, but it cannot be held liable for the actions of Ingles as a final policy maker. Similarly, the City cannot be held liable for Michael Schultz's destruction of evidence. The Warren defendants can have no liability for conduct related to the States's second prosecution of the plaintiff. The statute of limitations does not bar the plaintiff's claims against the Warren defendants.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants Donald Ingles, Michael Schultz, Warren Police Department, and City of Warren [dkt. # 95] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the motions for summary judgment by defendants Macomb County Prosecutor, County of Macomb, and Alan Warnick [dkt. # 97, 100] are **DISMISSED AS MOOT.**

It is further **ORDERED** that defendant Alan Warnick's motion *in limine* [dkt. # 98] is **DISMISSED AS MOOT.**

It is further **ORDERED** that counts XXIII through XXVII of the complaint are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that counsel for the parties shall appear before the Court for a status conference on **December 17, 2012 at 3:00 p.m.** to schedule the case for trial.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5508369

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1099 Filed 04/05/21 Page 20 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

2017 WL 2985743
United States District Court,
N.D. Illinois, Eastern Division.

Patrick HAMPTON, Plaintiff,
v.
CITY OF CHICAGO, Michael Duffin,
and Thomas Ptak, Defendants.

Case No. 12-cv-5650
|
Signed 07/13/2017

**Attorneys and Law Firms**

Amanda C. Antholt, Equip for Equality, Christopher Rudolf
Smith, Smith, Johnson & Antholt, LLC, Jonathan Marshall
Brayman, Thomas Michael Breen, Todd S. Pugh, Breen &
Pugh, Chicago, IL, for Plaintiff.

Eileen Ellen Rosen, Catherine MacNeil Barber, James Bryan
Novy, John Joseph Rock, Stacy Ann Benjamin, Theresa
Berousek Carney, Rock Fusco & Connelly, LLC, George
John Yamin, Jr., City of Chicago, Alec Meacham McAusland,
Jason Michael Marx, Josh Michael Engquist, Victoria Rose
Benson, Lindsey M. Vanorny, City of Chicago, Department
of Law, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

**\*1** Plaintiff brings this action pursuant to 42 U.S.C. § 1983
and Illinois state law for alleged violations of his civil rights
stemming from his 1982 criminal conviction. This matter
is before the Court on Defendants' motion for summary
judgment [104]. For the reasons explained below, the Court
grants in part and denies in part Defendants' motion [104]. The
Court enters summary judgment in favor of Defendants and
against Plaintiff on Plaintiff's *Monell* claim against the City
of Chicago for violation of his right to Due Process (Count I)
and on Plaintiff's claims for Failure to Intervene (Count II),
Malicious Prosecution (Count IV), Intentional Infliction of
Emotional Distress (Count V), Civil Conspiracy (Count VI),
and Respondeat Superior (Count VII). Defendants' motion for
summary judgment is denied as to Plaintiff's Section 1983
claim against Defendant Duffin for violation of Plaintiff's

right to Due Process (Count I), Plaintiff's Section 1983
claim for Conspiracy (Count III), and Plaintiff's claim for
Indemnification (Count VIII). This case is set for status
hearing on July 26, 2017 at 9:30 a.m.

**I. Background**
The Court takes the relevant facts primarily from the
parties' Local Rule 56.1 statements and exhibits thereto,
[106], [107], [108], [122], [124], [125], [126], [142], and
[148]. In addition, the Court held an oral argument on
the summary judgment issues and accepted supplemental
briefing [157], [158] on various issues arising out of the
briefs and discussed further during the oral argument. The
following facts are undisputed except where otherwise noted.
The parties' evidentiary objections are discussed and ruled
upon where relevant throughout this section of the opinion.

**A. The Events of December 29, 1981**
This case begins with events that occurred more than thirty
years ago, on December 29, 1981. At that time, Plaintiff
Patrick Hampton ("Plaintiff") was 18 years old and living in
Chicago at 4429 South Federal in the Robert Taylor Homes.
Defendants Michael Duffin ("Duffin") and Thomas Ptak
("Ptak")[1] were employed by Defendant the City of Chicago
("City") as Detectives in the Chicago Police Department
("CPD"). They were both assigned to Area 3 violent crimes.

On December 29, 1981, Plaintiff attended the "Holiday
Jam" concert at the Chicago International Amphitheater
("Amphitheater"). Denise M. ("Denise"), her then-boyfriend
Hugo N. ("Hugo"), his younger sister Martha N. ("Martha"),
and her boyfriend Scott S. ("Scott") also attended the concert.
They were seated in the fifth row close to the stage. During the
concert, a large numbers of concertgoers—around 40 or 50
total, and all or mostly African-American men—moved down
the aisle toward the stage. Some of these individuals were
chanting or shouting gang slogans and making motions with
their hands in support of the "Black Gangster Disciples" gang.
While trying to leave the venue, Denise, Hugo, and Martha
were attacked by members of this group and struck with fists,
chairs, and other objects.

**\*2** Denise's clothes were ripped off by the attackers. Men
pushed their penises into her face while she was being beaten
and held down on the floor. All of her jewelry was ripped from
her body and stolen. Hugo was also stripped of his clothing
and jewelry, kicked in his back, and punched in his face and
all over his body. He was hit with chairs while he attempted

to shield Denise from the violence. Martha's hair was pulled and her clothing was partially removed. She described her attackers as hitting her and trying to get her to the ground while tearing off her pants and underwear. Her necklace was stolen and she was knocked unconscious, before regaining consciousness, getting up, and running away.[2] Following the attack, Denise, Hugo, and Martha were taken to Mercy Hospital.

The record includes a medical report that was prepared concerning Martha. See [124-10]. The "history" section reports that Martha stated "she was in ampi. and attacked by unknown [men] and past out [sic] for about 5 minutes, she is not sure if there was sexual assault." [124-10] at 3.

**B. The Police Investigation**
Detectives Duffin and Ptak were assigned to investigate the Amphitheater attacks. Duffin and Ptak went to Mercy Hospital and attempted to interview Denise. They were unable to conduct the interview because Denise was too emotionally upset. They were able to interview Hugo, who had been released from the hospital but was there visiting Denise. According to the police report, Hugo told Duffin and Ptak that he and his girlfriend were jumped by approximately twenty black males who were yelling "Disciples" and "get her." [122-1] at 5. Hugo also told the detectives that the black males who jumped him and his girlfriend tore their clothes off their bodies and took their jewelry and money. Hugo further stated that approximately ten of the men had their penises out and were attempting to insert them into his girlfriend's mouth and vagina. In an attempt to prevent the men from doing this, Hugo laid himself on top of Denise to shield her body; however, numerous men were still able to put their hands inside Denise's vagina.

On December 31, 1981, Keith Powell ("Powell"), who at the time was fourteen years old, contacted Officer Praski ("Praski") of the Fifth District with information regarding the incident at the Amphitheater. Praski reported that Powell stated that he was at the concert at the Amphitheater on December 29, 1981 and that the individual responsible for the attack of the girl was Ricky Knight ("Knight"). Knight was a local gang leader in the Black Disciples. Knight was the only individual who Powell identified to Praski.

Praski contacted Duffin and Ptak with the information that Powell had provided. Duffin and Ptak interviewed Powell at the Fifth District. They took him to the Gang Crimes office to review gang photographs. Duffin took notes during the interview with Powell. Duffin subsequently wrote a report regarding his interview with Powell, and destroyed his notes. The report that the detectives prepared following their interview with Powell states:

> "Keith Powell stated in essence but not verbatim the following. He attended the rock concert at the international amphitheater the night of the incident. Further that their [sic] were numerous people in attendance that he knew from his old neighborhood at 44th & Federal. He stated that the people that he knew there were members of the third world black gangster disciple street gang. As the concert was in progress he observed the people he knew from this gang attack a white girl and boy who were watching the concert. He saw them tear the clothes off this couple and observed the couple break loose a short time thereafter and run away. After leaving the concert [sic] he rode the 43rd Street bus east with the people he knew while on the bus he heard them bragging about sticking their penis's [sic] in the girls mouth and putting their hands in her vagina. He also hear [sic] them say that they robbed the couple of their jewelry money and clothing. He then gave r/d's the names and addresses of these offenders. **He stated that the offenders were Pat Hampton of 4429 S. Federal**, Ezra Garner and his brother Ron Garner of 4429 S. Federal, Ricky knight [sic] of 4410 S. State, Ron Mallory of 4429 S. Federal, Bird of 4500 S. State apt. 909 and Sandel Pool. He went on to relate that the leader of this gang was Rickt [sic] Knight. R/d's brought Keith Powell into A/1 Gang Suppression unit and showed him photos from the various gang books. He identified the Photo of Ricky Knight as the leader of the gang and one of the offenders."

**\*3** [125] at 8 (emphasis added).

Following the interview with Powell, Martha and the other victims signed complaints against Plaintiff and swore to the facts alleged in the complaints. Duffin also signed the complaints in the capacity of "Clerk," stating that the complaints were "subscribed to and sworn to before" him. [137] at 20-21. Duffin, Ptak, and other police officers arrested Plaintiff, Ezra Garner ("Ezra"), Robbie Garner ("Robbie"[3]), and Bobby Brooks ("Brooks") at the Robert Taylor Homes. Following those arrests, other suspects, including Knight, Ronald Mallory ("Mallory"), "Bird," and Sandel Pool ("Pool") were still wanted by the CPD.

103 Fed. R. Evid. Serv. 1177

Ptak and Duffin spoke with Plaintiff following his arrest. The detectives included the following statement about that conversation in their report:

> He [Plaintiff] later stated that he was at the Amphitheater during the assault and robberies of the victims. He went onto relate that [he] was sitting in the back of the Concert area when he saw a large group fighting near the stage and then later heard that some people were talking about a girl getting raped. [Plaintiff] went onto relate that he got on an Eastbound CTA bus to go home and while on the bus he overheard a subject by the nickname "Spoon" whose real name is Ronald Mallory state that he had kicked the white broad in her shit. He was asked what Spoon had meant when he said shit and he replied her vagina, he also added that Spoon was talking with Bud, Ezra Garner and Ronnie Garner. He related that Bud is also known as Budline and that he lives at 4429 So. Federal, Apt #1405. Hampton further stated that Spoon kept on bragging about what he did to the white broad and her boyfriend while he was apparently attempting to rape the girl.

[125] at 9-10.

Plaintiff denies the accuracy of several aspects of the report. Specifically, Plaintiff denies that he told the detectives that he was "sitting in the back of the Concert area when he saw a large group fighting near the stage and then later heard that some people were talking about a girl getting raped." [125] at 10. Plaintiff also denies that he told the detectives that he overheard Mallory talking with Ezra or Ronnie, but admits the accuracy of the remainder of the paragraph quoted above. [125] at 10.

On December 31, 1981 at approximately 9:10 p.m., Hugo and Martha viewed a line-up at Area 3 Violent Crimes. The line-up consisted of four suspects (Plaintiff, Brooks, Ronnie, and Ezra) and four "fillers." Hugo viewed the line-up and made no identifications. Martha then viewed the line-up and identified Plaintiff, Brooks, and Garner as the offenders who pulled her clothing off, Brooks as the person who stole her necklace, and Garner as the man who put his hand in her vagina. Martha also identified Donnell Howard as one of her attackers, but he was subsequently released from custody without charge. The detectives prepared a report stating that, following her viewing of the line-up, Martha stated the following "in essence but not verbatim": "[A]fter her boyfriend [Scott] was hit over the head with a crowbar and left the amphitheater she returned to where the[ir] seats were to tell her brother [Hugo] and his girlfriend [Denise] that they should leave. Upon returning to their seats she was

attacked by approximately 20 m/b's who tore her clothes off and beat her and attempted to rape her she managed to break loose and ran to a security guard.... After receiving no help from [the first security guard she spoke with] she managed to run to another security guard who escorted her to the first aid station." [122-1] at 7-8.

**\*4** Plaintiff objects to the Court considering this report on the basis that "[t]here is no statement in the supplementary reports of what Martha told the Detectives, other than the purported line-up identifications." [125-1] at 11. However, the statement quoted above does appear in the report that Defendants filed in the record, see [122-1] at 7-8, and addresses more than just Martha's identification of Plaintiff at the line-up. Plaintiff also objects to the use of contents of the report as hearsay on the basis that the detectives' reports are inaccurate and therefore not subject to the Rule 803(6) hearsay exception for business records. See Fed. R. Evid. 803(6). Plaintiff argues that he has demonstrated pursuant to Rule 803(6)(E) that the "method or circumstances of preparation" of the report "indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). The Court concludes that it would be premature to exclude the supplemental report from the record on the basis on Rule 803(6)(E) at the summary judgment stage. First, Plaintiff has not met his burden to show that "the evidence is inadmissible on all potential grounds" under the Federal Rules of Evidence. Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank, 602 F. Supp. 2d 928, 934 (N.D. Ill. 2009). Second, while Plaintiff has raised legitimate questions concerning the trustworthiness of the report's description of the interview with Powell—including by pointing to Powell's recent deposition testimony denying that he identified Plaintiff as an assailant—Plaintiff has not raised any specific concerns about the accuracy of the report's description of the detectives' interview with Martha. Although the report does not specifically mention that Martha lost consciousness for some time during the attack, it is not inconsistent with Martha's medical report or subsequent testimony and therefore does not indicate that the report is untrustworthy. Third, Plaintiff has not demonstrated that Martha would be unavailable to testify at trial. Cf. United States v. Anderson, 450 F.3d 294, 302 (7th Cir. 2006) (police officer's testimony about statements made to him during his investigation by three of the informants who testified at the trial was not hearsay where statements were consistent with informants' testimony, all three informants were subjected to cross-examination, and their credibility was attacked).

Case 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1102   Filed 04/05/21   Page 23 of 139
Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

On January 1, 1982, just after she was discharged from the hospital, Denise met with Ptak alone and viewed a stack of approximately ten to twenty photographs. After reviewing the photographs, Denise identified Plaintiff and Knight as two of her assailants. Subsequently, Denise viewed a line-up at Area 3 Headquarters and identified Plaintiff and Knight as two of her assailants. It is disputed whether Denise identified Plaintiff based on her own observation of Plaintiff during the attack or instead based on Ptak's use of suggestive techniques during the photo array, in particular re-inserting Plaintiff's photo multiple times into the stack of photos (as discussed below).

Felony Review Assistant States Attorneys ("ASAs") Kershner and Hyman reviewed the evidence and approved charging Plaintiff, Ezra, Robbie, and Brooks each with three counts of robbery, one count of deviate sexual assault, and one count of attempted rape. They also approved warrants for the arrest of Knight and Mallory. Plaintiff disputes these facts to the extent that they are based on Duffin's and Ptak's supplemental report and claims that they are hearsay. The Court is not persuaded by this argument because Plaintiff has not identified any out-of-court statements in the supplemental report that Defendants are using to prove the truth of the matter asserted, *i.e.*, that the prosecutors decided to charge Plaintiff and his co-defendants with certain crimes.

On January 3, 1982, the Chicago Sun Times reported in an article that a women from Cicero had reported to CPD on January 2 that she had been assaulted at the Amphitheater on December 29, 1981, as well, and that she identified as her assailant one of the four men who had already been arrested. The woman from Cicero is not referenced in any police reports relating to the attacks on Denise, Martha, and Hugo. The Sun Times also reported that other witnesses told Duffin and Ptak that they would have intervened in the attack but were too scared.

Within the next few days additional persons were arrested, line-ups were held, and felony review ASAs approved charges against Mallory, Kevin Tyler ("Tyler"), Michael Neal ("Neal"), and Kenneth Ford ("Ford"). On January 8, 1982, Knight was also arrested.

Following the arrests, Duffin and Ptak learned the names of the four security guards who were working around the main stage area of the Amphitheater during the incident. One of the guards was William Henrichs ("Henrichs"), who was also a Cook County Sheriff's deputy. Henrichs did not come forward as a witness until Detectives Duffin and Ptak contacted him. They interviewed Henrichs around January 8, 1982 and prepared a supplemental report reflecting the following:

> Williams Henrichs stated in essence but not verbatim the following: When the doors first opened I was standing by the Halstead street south entrance. I was searching people coming through the doors. At one point about fifty to one hundred people broke through and gained entrance by crashing the gate and not paying to get in. As the band came onto the stage I was transferred to a stationary assignment approximately ten feet south of the stage. Somewhere around mid-night a female latino [sic] came up to me she was crying hysterically stating that members of the audience tried to rape her. I observed that her shirt and her pants had been torn and her pants zipper was torn. I recognized her as a girl I had admitted through the gate. I told her to come with me to first aid she told me no they still have my brother and his girlfriend. I left her with the back stage security officer I don't know his name. I then proceeded north across the front of the stage and got Larry and three other security people to help me. We entered the disturbance and observed thirty to forty m/b's creating a disturbance. We pushed our way through and pulled numerous people off a pile. We then observed several m/b's holding down and beating a m/L and also a f/L being pinned to the floor with one m/b pulling at her breasts as if to be attempting to pull them off and another m/b on his knees jamming an object in and out of the girls vagina. The girl was curled up in a ball. Both latinos [sic] were nude. Larry pulled them back stage away from the crowd. We were unable to apprehend any of the m/b's as we were outnumbered six to one and further we were mainly concerned about getting the victims to safty [sic]. After arriving at the first aid station I observed that the girl had numerous bruises and contusions on her face, back, neck and legs and that the boy had a black eye and a cut on his cheek and bruises on his back. The girl was bleeding profusely. The nurse called for an ambulance and the police. Also some of the security called the police and the fire dept. A few days after the incident I was watching television and I saw the first four people who were arrested on television in custody. I recognized all of them as being in attendance at the concert the night of the incident. Further I recognized one of them as the person I saw jamming something into the girls vagina.

**\*5**  [125] at 13 (quoting [107-19] at 3). The supplemental report also states that Henrichs was shown "numerous photos" and "identified the photo of [Plaintiff] as the

103 Fed. R. Evid. Serv. 1177

person he observed jamming a foreign object into the girls vagina." [107-19] at 3. It further states that Henrichs identified Brooks, Ezra, and Ronnie "as people he saw enter through the gate he was watching," but that he did not recall Plaintiff passing through his gate. *Id.*

Plaintiff objects to Defendants' use of this supplemental report on the basis that it is "inherently unreliable and therefore is hearsay" under Federal Rule of Evidence 803(6)(E). [125] at 14. As evidence, he points to Hugo's 2013 deposition testimony, which is discussed in more detail below. When Hugo was asked whether "any security guards [came] to [his] aid while [he was] being punched and kicked," he testified: "No. After ... the crowd had—the only way I could describe it is like they had backed off to see what they had done to us. Only then is when I actually remember seeing a man in a yellow coat that was security." [124-11] at 3-4. When asked, "[d]id you ever see any security ripping people away from you or the scene," he responded: "No. Nobody came to help us, nobody." *Id.* at 4. The Court concludes that it will not exclude the supplemental report from the record on the basis on Rule 803(6)(E). The fact that Hugo did not (more than thirty years after the fact) recall seeing security guards pulling people off of him does not demonstrate that the supplemental report is inherently unreliable. Further, Hugo and Denise both testified at the time of the trial in 1982 that security guards pulled people off of them. [122-4] at 77, 103-04.

On January 24, 1982, Duffin and Ptak interviewed Garnett Dubose ("Dubose"), who was also in attendance at the Amphitheater on the evening of the incident. Dubose was under arrest on an unrelated charge at the time of the interview. The report that the detectives prepared stated that Dubose "stated in essence but not verbatim" that he was at the concert with Francine Harris ("Francine") and "observed between twenty to thirty m/b's attack a young white couple who were seated in front of him." [122-10] at 3. The report states further that Dubose and Francine were seated "about nine rows back from the incident" and that "Francine probably got a good look at the offenders as she was watching the incident through a pair of binoculars." *Id.* According to the report, the detectives showed Dubose "numerous photos and he identified the photos of [Plaintiff] and Ricky Knight as two of the m/b's who were attacking the young white couple" and stated that "he saw these two going in and out of the pile that was on top of the aforementioned couple." *Id.* At the subsequent suppression hearing, Dubose testified that he was shown a pile of photographs and picked out two photos and

told the detectives, "These are the two people I'm sure I saw at the Amphitheater." [123-13] at 30.

Plaintiff objects to the portion of the police report concerning Dubose as hearsay under Rule 803(6)(E). The Court is not persuaded because Plaintiff does not cite to any evidence in the record showing a lack of trustworthiness with the part of the report that recounts Dubose's testimony. The Court will not discount the entire report as hearsay simply because Plaintiff questions the accuracy of other parts of the report, such as its description of Powell's statement to police.

### C. Pre-Trial Proceedings

**\*6** On January 4, 1982, Duffin testified before the grand jury on charges against Plaintiff and seven other suspects. He testified that his investigation revealed that Plaintiff was a gang member; that Plaintiff and the other suspects approached the three victims as a group and attacked them; that they stole from the victims; that members of the group sexually assaulted Denise and Martha; that members of the group including Plaintiff were overheard admitting their participation in the attack; and that "a witness or all of the victims" identified each participant. [137] at 27.

The Grand Jury returned an indictment against Plaintiff for: 1) attempted rape, deviate sexual assault, three counts of aggravated battery, robbery, conspiracy to commit rape, and conspiracy to commit deviate sexual assault of Denise; 2) aggravated battery and robbery of Hugo; and 3) attempted rape, aggravated battery, robbery, and conspiracy to commit rape of Martha. Judge Strayhorn was the presiding judge.

Plaintiff retained Jack Rodgon ("Rodgon") as his defense attorney. Shortly after Hampton was indicted, Rodgon issued a subpoena *duces tecum* to CPD's keeper of records requesting "any and all police reports." [125] at 15. On April 22, 1982, while discovery was ongoing, Rodgon issued a subpoena *duces tecum* to the Commander of Area 3, Stibich, and to Lt. Joseph Curtin at Area 3 Violent Crimes requesting "any and all reports, records, memorandums, statements and any other documents you may have involving the investigation.... including but not limited to any and all street files that may have been prepared by officers in area 3." [125] at 16. On April 23, 1982, Judge Strayhorn entered an order instructing the Cook County State's Attorney and Superintendent of CPD to preserve all handwritten notes, memoranda, tape recordings, and other records prepared in connection with the case by arresting officers and investigative personnel, commonly known as a "street file." [125] at 16.

103 Fed. R. Evid. Serv. 1177

On May 7, 1982, the deadline for returning the subpoenas, ASA O'Connor represented to the Court that he "had a conversation with the detective that worked on this case" and "[t]here is no street file." [125] at 16. He further clarified that, "to our knowledge, there is no street file, now or ever," and that "[t]o our knowledge, ... we are giving [the defense] what we have." *Id.* Stibich and Curtin failed to appear at the scheduled hearing concerning the subpoenas. Four days later, on May 11, 1982, Rodgon filed petitions for rule to show cause against Stibich and Curtin for their failure to appear. The same day, Judge Strayhorn issued orders requiring Stibich and Curtin to appear on May 26, 1982 "to show cause why they should not be held in contempt of court." *Id.* at 17. The record does not reflect how the order to show cause was resolved.

During pre-trial proceedings, Plaintiff's attorney Rodgon made an oral motion to quash Plaintiff's arrest and the subsequent identifications by the state's witnesses. Rodgon followed this up on June 11, 1982, by filing a motion to suppress testimony concerning the line-up Plaintiff participated in and the in-court identification of Plaintiff by the state's witnesses. See [107-33]. He offered the following points in support of his motion to suppress: 1) prior to being placed in the line-up, Plaintiff was handcuffed and was presented to certain identification witnesses of the state, and police officials indicated to the identification witnesses that he was the perpetrator of the crime; 2) Plaintiff believed that the identification was induced by the activities of the police at the police headquarters; and 3) "the witness, prior to any corporal identification of [Plaintiff], observed photographs in a manner that was unnecessarily suggestive." [125] at 17-18 (quoting [107-33] at 3).

**\*7** While these motions were pending, six of Plaintiff's eight co-defendants pled guilty and received sentences of six months with credit for time served. [125] at 18. On July 30, 1982, Plaintiff's oral motion to quash Plaintiff's identification was heard. Plaintiff's counsel and Knight's counsel questioned Ptak. Ptak testified that Duffin had taken notes during his initial interview with Powell, that the notes were reduced to a written report, and that the notes were then destroyed. According to Ptak, he watched Duffin rip up the notes and throw them in the waste basket. *Id.* at 19. The Court denied Plaintiff's motion to quash.

On September 1, 1982, Judge Strayhorn heard argument on Plaintiff's written motion to suppress. Hugo, Denise, Martha, Powell, and Ptak also testified at the suppression hearing. Upon questioning by Knight's attorney, Gary Brownfield ("Brownfield"), Hugo testified that he went to the police station on December 31, 1981 and viewed a line-up, and that no police officer said anything to him prior to viewing the line-up. [136-1] at 105, 111. He further testified that after the line-up, he looked through a stack of about twenty color photographs and recognized one person from the photos. *Id.* at 106-108. Officers Duffin and Ptak handed him the photographs and told him to look at them, but did not tell him what he was looking for, who the photographs were of, or whether there was a suspect among the photos. *Id.* at 109. Hugo picked out one photo from the stack (Knight's) and handed it the officers. *Id.* at 110. Hugo testified that he viewed a second line-up at the police station on January 8, 1982, and identified the same person who he had identified in the photographs he viewed on December 31. *Id.* at 112, 116. According to Hugo, the officers did not tell him anything when he viewed the line-up. *Id.* at 116. Hugo further testified that he never identified Plaintiff in a line-up and that no one ever identified Plaintiff to him. *Id.* at 117.

At the suppression hearing, Rodgon and Brownfield also cross-examined Denise at length about the photographs that she viewed and the identifications that she made. Denise testified that she and Ptak did not have any conversation before she viewed the photo array. Brownfield examined Denise first. Specifically, Denise testified:

Q: And do you remember how many photographs they showed you?

A: It was about ten to twenty.

....

Q: Do you remember who showed you these photographs?

A: Detective Ptak.

Q: And where was this?

A: It was close to the lobby in a little square room near the lobby.

Q: And what date was this on again?

A: January 1st.

Q: And about what time was that?

A: It was in the morning?

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1105 Filed 04/05/21 Page 26 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

Q: Prior to Officer Ptak showing you these pictures, what, if anything, did he say to you?

A: Nothing, he just said to look at the pictures and see if I recognized anybody.

Q: Did he tell you that any of the offenders were in the photographs?

A: No.

[125] at 20; see also [136] at 8; [136-1] at 6-53. Denise further testified that when she looked at the photos, they were not spread out on a table, but "they were by hand, I was looking at them one at a time." [136-1] at 12. She then made in-court identifications of Plaintiff as one of the two people she recognized in the photographs. *Id.* at 13. Rodgon then questioned Denise. He asked her, "while you were looking at the pictures, was there any other conversation between yourself or Officer Ptak," and she responded, "No." [136-1] at 23-24. At the close of the testimony, the motion to suppress was denied on the basis that Plaintiff had not presented any evidence indicating that any illegal police activity lead to the witness identifications.

**\*8** On October 7, 1982, Rodgon issued a subpoena *duces tecum* to Officer Barberio and Officer Garmon of the CPD requesting any and all police records, reports, memoranda, and street files related to Plaintiff and involving the December 29, 1981 incident.

### D. Plaintiff's Criminal Trial and Direct Appeal

On October 12, 1982, Plaintiff's trial began. His case was tried simultaneously with the cases against Knight and Mallory, with three separate juries. Powell was called as a witness by the prosecution. He testified that, at the end of the concert, he saw a group of men coming down the aisle toward the stage making gang signs and chanting gang slogans. He identified Plaintiff, Knight, and Mallory as members of the group. [137] at 18. However, he did not testify that he saw Plaintiff do anything. Powell also testified that Plaintiff was in the group that got on the bus with Knight following the concert and that the group were heard "bragging about what they did to that girl" and talking about taking jewelry. [137] at 18. However, Powell did not testify about who specifically said what.

Henrichs testified at trial that he saw Plaintiff enter the concert gate and searched him. Henrichs stated that just after midnight, a woman with torn clothes approached him and told him that others were being attacked. He testified that he

approached the stage with other guards and saw a large crowd of black men in a circle. Henrichs further testified that he saw Plaintiff thrusting his arm toward a woman's vaginal area and that on January 6, 1982, he identified Plaintiff and three other participants in a photo array. According to Henrichs, another security guard pulled Plaintiff off of Denise.

Hugo testified at trial that when he, Martha, and Denise saw the men move toward the front of the stage, they attempted to leave but had their path blocked and then were attacked. Hugo further testified that he was hit, kicked, and punched and had his wallet, keys, and jewelry stolen. Hugo identified Knight in court as one of his and Denise's attackers and testified that he had identified Knight from a photo array and a line-up. Hugo testified that a "black guy in a yellow coat" (a security guard) came and pulled him out of the crowd and that "another guy in a yellow coat was taking Denise out." [122-4] at 103-04.

Martha testified at trial that she ducked when she saw Knight about to hit her with a chair and that a number of men then starting hitting and kicking her. She testified that there were as many as thirty or thirty-five men around her, grabbing at her clothes and jewelry. Martha further testified that Plaintiff was the man who tore her pants and "tried to put his hand in her vagina." [125] at 24. She also testified that she managed to get away, heard someone yell "get her," and saw Knight behind her. *Id.* at 24.

Denise testified at trial that she was beaten, sexually brutalized, and robbed of her clothing and jewelry. She testified specifically that Knight put his penis in her mouth and that Plaintiff attempted to put a cold, hard object in her vagina. [122-4] at 76. She further testified that a man in a yellow coat eventually pulled the men off of her and they scattered. *Id.* at 77. She also confirmed her earlier identifications of Plaintiff from the photo array and in the first line-up she viewed at the police station. Rodgon cross-examined Denise regarding her identification of Plaintiff.

**\*9** At the conclusion of trial, the jury was provided with instructions. One of the instructions informed the jury on a theory of accountability: "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." [125] at 25.

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1106 Filed 04/05/21 Page 27 of 139
Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

The jury found Plaintiff guilty of (1) attempted rape, deviate sexual assault, robbery, and aggravated battery of Denise; (2) robbery and aggravated battery of Hugo; and (3) robbery and aggravated battery of Martha. Plaintiff was found not guilty of attempted rape of Martha. See [106] at 18. On November 18, 1982, Plaintiff was sentenced to concurrent sentences of 60 years for deviate sexual assault, 15 years for attempted rape, 7 years for three counts of robbery, and 5 years for three counts of aggravated battery.

Plaintiff immediately filed a motion for new trial. The motion was denied. Plaintiff then filed an appeal to the Illinois Appellate Court, First District, which affirmed his conviction. See *People v. Knight*, 139 Ill. App. 3d 188 (Ill. App. 1985).

### E. Challenges in the 1980s to the City's Use of "Street Files"

The City's use of "street files" became the subject of litigation in the 1980s in at least two federal cases in this district, *Palmer* (No. 82-cv-2349) and *Evans* (No. 04-cv-3570). In 1983, Judge Shadur issued a preliminary injunction requiring police to preserve street files. See *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (concluding that class of plaintiffs who had been convicted of felonies in Cook County Circuit Court had alleged sufficient harm to establish standing for their requested preliminary injunctive relief to preserve their "street files," and holding that injunction would issue to preserve the "street files" now in existence for persons convicted of felonies and to allow those persons an opportunity to view content of files, upon the filing of a properly drafted, specific subpoena); *Evans v. City of Chicago*, 2006 WL 463041, at *14 (N.D. Ill. Jan. 6, 2006) (recognizing that "[t]here is ... little question that maintaining non-disclosed 'street files' was the custom of the City [in 1976] and until Judge Shadur issued a preliminary injunction in ... *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983)").

In 1981, Stibich was the commander of Area 3, in which Duffin and Ptak worked. Stibich testified in the *Palmer* litigation that in investigations of violent crimes in Area 3, there was an "office file" and, in some cases (but not all cases), a "working file." He testified that there would not necessarily be a working file for rape, aggravated assault, or robbery cases. According to Stibich, prior to entry of the temporary restraining order in *Palmer*, the practice in Area 3 was to destroy the street file or return it to the detectives once a closing report was written in a case. It was the Sergeant's job

to go through the working file to determine whether or not the memos and reports were put in supplemental reports.

Sergeant Owens was deposed in this case about the City's use of street files prior to the *Palmer* litigation. He testified that at the end of an investigation, the street file would be assembled and given to a secretary, who would pull out any duplicates and put anything that was pertinent into the regular file, if it was not already there. The secretary would go to a sergeant or lieutenant with any questions about whether or not something should be included in the regular file.

**\*10** The Superintendent is responsible for the management and control of the CPD. Chicago Police Superintendent Richard Brzeczek testified in the *Evans* litigation that he did not know if detectives purposefully withheld information in the street files as a matter of routine, but he knew of "situations where, just based on human nature, there would be detectives who would not turn over all information or exculpatory information." [137] at 34. He also acknowledged that some detectives did not memorialize all of their notes in official department reports. On April 19, 1982, Brzeczek issued Department Order 82-2, which provided: "Effective immediately, as a result of a [TRO] issued by federal district court judge Thomas R. McMillen, the contents of all police department investigative files known as office, unit, or working files and sometimes referred to as 'street or running' files will be kept intact. No documents, materials, or notes shall be removed from these files." [137] at 37. On September 19, 1982, the *Palmer* plaintiffs filed a motion to amend the temporary restraining order because they claimed that detectives were violating its letter and spirit by maintaining investigative writings and files as their own personal property to avoid the mandate of the TRO.

According to Duffin's deposition testimony in this case, in 1981 Area 3 used "progress files" for investigations that were followed from shift to shift. The progress files would include notes and reports. The purpose of the progress file was to inform other detectives working on a case what had been done and to give instructions on what needed to be done. Anyone working on the file was supposed to document what he or she did on that day on the case.

### F. Plaintiff's Post-Conviction Proceedings

In 1990, Plaintiff filed a *pro se* petition for post-conviction relief alleging that his constitutional rights were violated because: (1) he was arrested without probable cause; (2) he was subjected to a suggestive show-up and line-up

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1107 Filed 04/05/21 Page 28 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

identification; and (3) he was denied effective assistance of appellate counsel due to appellate counsel's failure to raise the first two issues. His petition was dismissed. The dismissal was affirmed by the Illinois Appellate Court, First District. See *People v. Hampton*, 296 Ill. App. 3d 1065 (Ill. App. 1998).

In 1999, Plaintiff petitioned the federal district court for a writ of *habeas corpus*, arguing that he received constitutionally ineffective assistance of counsel at trial and that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Judge Kennelly granted the writ on the basis of ineffective assistance of trial counsel due to counsel's failure to investigate and interview exculpatory witnesses. See *Hampton v. Leibach*, 290 F. Supp. 2d 905, 922-23 (N.D. Ill. 2001). The Seventh Circuit affirmed and remanded to the Cook County Circuit Court for a new trial. See *Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003).

The state initially indicated an intent to re-try Plaintiff on all counts. ASAs Maria McCarthy ("McCarthy") and Dan Groth ("Groth") were in charge of the case. As they were preparing to re-try Plaintiff, McCarthy and Groth met with Martha, Denise, Henrichs, and Hugo. Martha could not remember the events at the Amphitheater back in 1981. Hugo had not identified Plaintiff at that time. Henrichs' story remained the same but McCarthy questioned the strength of his testimony because he saw Plaintiff's face for only four or five seconds on the night of the attack and saw him for several minutes during the subsequent news coverage. McCarthy also felt that there were some inconsistencies between the police report prepared from Henrich's interview and Henrich's trial testimony. According to a report that McCarthy prepared, Denise was no longer sure that Plaintiff had physically done anything to her. Also according to the report, Denise told McCarthy that when she was shown the photo array, Ptak kept taking Plaintiff's photo out and putting it back in the pile, asking questions to the effect of, "does this look like the guy?" and "do you recognize him"? [124] at 3. According to the report, McCarthy asked Denise if she felt pressured to make the identification of Plaintiff, and Denise said yes, because she was young at the time and trusted the detectives. Further, according to the report, Denise told ASA McCarthy that her line-up identification of Plaintiff was based on the photograph and not on her own observation and that all of her subsequent identifications of Plaintiff were based on the photograph.[4]

**\*11** Ultimately, McCarthy and Groth decided not to re-try Plaintiff, concluding that the state could not meet its burden

of proof at trial. A *nolle prosequi* dismissal order was entered on October 5, 2011.

### G. This Lawsuit

On July 18, 2012, Plaintiff filed his complaint in the instant lawsuit against the City, Duffin, and Ptak. Plaintiff alleges that the City and the individual Defendants violated his due process rights, in violation of 42 U.S.C. § 1983, by deliberately withholding exculpatory evidence and fabricating false reports, false statements, and other evidence (Count I). Specifically, Plaintiff alleges that Duffin and Ptak authored and signed police reports falsely claiming that Powell had identified Plaintiff as one of the assailants and as a member of the Third World Black Gangster Disciples. [1] ¶ 25. Plaintiff also alleges that Duffin and Ptak manipulated and pressured Denise to identify Plaintiff as one of her attackers, by drawing her attention to Plaintiff's photograph, and falsely reported that Denise recognized Plaintiff based on his facial features and clothing. [1] at ¶¶ 28, 31. Plaintiff alleges that this misconduct was a result of the City's deliberate indifference to its policies and widespread practices, including 1) use of "street files"; 2) use of manipulated or fabricated evidence; and 3) the CPD's "code of silence." Plaintiff also alleges claims against the individual Defendants for failure to intervene (Count II), Section 1983 conspiracy (Count III), and state law claims for malicious prosecution (Count IV), intentional infliction of emotional distress (Count V), and civil conspiracy (VI). Finally, Plaintiff alleges claims against the City for respondeat superior (Count VII) and indemnification (Count VIII).

A number of depositions were taken in this litigation. The following deposition testimony is identified by the parties as relevant to resolving Defendants' motion for summary judgment.

**Plaintiff**—Plaintiff testified that he snuck into the theater and did not enter through the gates. During the concert, he saw a number of fights break out and, toward the end, saw a commotion near the front by the stage that looked like a big fight. Then the lights were turned on, security officers went into the crowd where there was a disturbance, and the concert ended. Plaintiff and his friends left the Amphitheater and took the bus home. As they were leaving, Plaintiff overheard someone say that two women and a man had been raped. On the bus ride home, he heard Mallory brag that he "kicked the lady in her stuff." He heard others bragging, too, but did not recognize their voices.

103 Fed. R. Evid. Serv. 1177

**Denise**—Denise was asked about her viewing of photos with Ptak, during which she made her first identification of Plaintiff. She was asked, "during that photo array ... d[id] Detective Ptak do anything to you during that process that leads you to believe today that you were wrong when you picked out [Plaintiff]?" [142] at 19, p. 56:13-17. Denise responded, "Not the way I think now, no," but that she "[p]robably" had waivered in that belief when she spoke to ASA McCarthy. *Id.*, pp. 56:17-57:7.

Denise was also asked about the truthfulness and accuracy of testimony she provided at Plaintiff's suppression hearing. At the suppression hearing, Denise answered "No" to the question, "Prior to viewing any of the lineups, did any of the members of the [CPD] or the office of the State's Attorney cause you to pick anyone out by any suggestions, comments, critiques?"; at the deposition she said this testimony was "true because that's what I believed back then to be true[, a]nd I still do." [142] at 17, pp. 48:19-49:5. At the suppression hearing, Denise testified that she identified Plaintiff from his photo "by [his] face" and because she "noticed [he] was wearing the same coat[ ]"; at the deposition, she stated that this testimony was "what I believed back then [a]nd now." *Id.* at 18, p. 52:12-23.

**\*12** Denise was further questioned about her conversation with ASA McCarthy and the contents of ASA McCarthy's report. When asked whether she was "truthful" when she "talked to Maria McCarthy in 2011," she answered "Yes, if— yes." [142] at 20, p. 60:10-12. Denise explained that when she told McCarthy that she felt "pressured during th[e] process of looking through ... photographs" with Ptak, she "didn't feel pressured like he was telling me to pick somebody out," but "just felt pressured like I didn't want to be in that situation" and did not mean to convey to McCarthy "that Detective Ptak pressured [her] to make an identification of [Plaintiff]." *Id.* at 19, pp. 55:14-56:3. Denise was asked if she "t[old] Maria McCarthy that [Plaintiff's] photograph was reinserted into the group of photographs several times" when she viewed them with Ptak. *Id.* at 20, p.60:18-20. She responded, "You know, I believe I saw that was down there [in the memo], but I do not recall telling her that. My memory right now does not recall telling her that." *Id.*, p. 60:21-24. When asked, "[a]nd do you have any recollection right now one way or another of whether you viewed [Plaintiff's] photograph more than one time when you looked at that group of pictures," she responded, "No, I don't have a recollection of that." *Id.*, p. 61:1-5. Likewise, she testified that she "d[id]n't remember" if Plaintiff's photo was reinserted into the group of photos

more than once by Ptak. *Id.*, p. 61:18-23. When asked if she told McCarthy that "Ptak said something like 'How about this guy?' " or " 'Do you recognize this one'?" when she got to Plaintiff's photo in the array, Denise responded, "If I did say that to her, than that should be true that I said that at that time, yes"; but Denise further stated that she did not "remember that now." *Id.* at 20-21, pp. 61:24-62:11. Finally, when asked whether she told McCarthy that she "w[as] not sure if [Plaintiff] actually did anything physically" to her, Denise said "[i]f it's down there [in the memo], then I said it," and "that would be my memory today." *Id.* at 21, p. 64:3-10.

Defendants object to Plaintiff's use of McCarthy's report or testimony to avoid summary judgment. Defendants argue that the report and testimony concerning what Denise said are hearsay and not admissible under any exceptions to the hearsay rule. Plaintiffs respond that McCarthy's report is admissible as substantive evidence on at least three grounds.

First, Plaintiff argues that the statements attributed to her by ASA McCarthy are not hearsay as defined in Federal Rule of Evidence 801(c) because Denise acknowledged under oath at her deposition that the statements were true. If Denise denies at trial that her statements to McCarthy were true, Plaintiff argues, then the deposition testimony admitting the truthfulness of those statement is admissible as a prior inconsistent statement under Rule 801(d)(1)(A). Plaintiff further argues that "[i]f Denise denies any recollection, her deposition testimony that the contents of McCarthy's report are true would be admissible as former testimony under Rule 804(b)(1)." [142] at 4. Defendants deny that Plaintiff affirmed the accuracy of McCarthy's report in her deposition; instead, they assert that Denise merely testified that she had told McCarthy the truth when the two spoke (during which time Denise was not under oath).

Both parties' are somewhat inaccurate in their characterization of Denise's deposition testimony. Denise testified that she was truthful when she spoke to McCarthy, but she did not affirm the accuracy of McCarthy's entire report. She also did not subscribe to or adopt McCarthy's statements about what Denise allegedly told her about Ptak reinserting Plaintiff's picture into the photo array or speaking to her during the photo array; instead, she testified that she could not remember what she told McCarthy or what actually happened during the photo array over thirty years earlier. But Denise did affirm certain discrete portions of McCarthy's report. In particular, in response to the question, "did you tell her, ... you were not sure if he [Plaintiff] actually did anything

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1109 Filed 04/05/21 Page 30 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

physically," Denise testified, "If it's down there [in the report], then I said it. And that would be my memory today." [142] at 21, p. 64:3-10. This small part of the report qualifies as a prior statement of Denise, and is not hearsay under Rule 801(c), because she testified that it is true. See *United States v. Schoenborn*, 4 F.3d 1424, 1427 (7th Cir. 1993) ("A third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." (quotation marks and citation omitted)). Certainly, this part of the report calls into question the basis for Denise's identification of Plaintiff as one of her assailants. But it does not attribute Denise's uncertainty to anything that Ptak (or Duffin) did, such as reinserting Plaintiff's photo into the array.

Contrary to Plaintiff's argument, the part of McCarthy's report that claims that Denise admitted that Ptak reinserted Plaintiff's photo into the array and that this influenced her identification would not be admissible at trial as a prior inconsistent statement under Rule 801(d)(1)(A), because Denise did not testify at her deposition that part of McCarthy's report was true, and because Denise's statement to McCarthy was not "given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." Fed. R. Evid. 801(d)(1)(A). And if Denise testifies at trial that she did not remember telling McCarthy that Ptak reinserted Plaintiff's photo into the array, the contents of McCarthy's report on this topic would not be admissible as former testimony under Rule 804(b)(1), because Denise's conversation with McCarthy was not "given as a witness at a trial, hearing, or lawful deposition." Fed. R. Evid. 804(b)(1)(A).

**\*13** Plaintiff's second argument in favor of admitting McCarthy's report is that Denise's statements were declarations against her interest and therefore excepted from the hearsay rule under Federal Rule of Evidence 804(b)(3). Plaintiff argues that Denise's statement to McCarthy about Ptak's use of suggestive techniques and their influence on her exposed Denise to potential perjury charges. Defendants respond that this concern is baseless, because Denise's deposition testimony does not reflect any concern that she gave perjured testimony in 1982 and ASA McCarthy has never testified or implied that she has contemplated perjury charges against Denise.

In cases where the declarant is unavailable, Rule 804(b)(3) excepts from the hearsay rule "[a] statement that: (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made,

it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3). "In assessing whether to admit evidence under Rule 804(b)(3), courts look to three factors: (1) whether the declarant is 'unavailable' to testify at trial; (2) whether the statement at issue was against the declarant's penal or pecuniary interest; and (3) whether corroborating circumstances exist that bolster the statement's trustworthiness." *United States v. Hawkins*, 2013 WL 11322824, at \*2 (N.D. Ill. Nov. 6, 2013), *aff'd*, 803 F.3d 900 (7th Cir. 2015). Plaintiff, as the proponent of the evidence, has the burden of showing that all three factors have been satisfied. See *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008).

In this case, the first factor is satisfied. A declarant is "unavailable" for purposes of this rule if she "testifies to not remembering the subject matter." Fed. R. Evid. 804(a)(3). Denise testified at her deposition that she did not remember telling McCarthy that Ptak used suggestive techniques during the photo array or what actually occurred at the photo array.

The second factor presents a closer call. The key question is whether Denise's alleged statements to McCarthy had a great tendency to expose her to civil or criminal liability, such that a reasonable person in her position would have made the statements only if they believed them to be true. Denise would be immune from civil liability for alleged perjured testimony provided during Plaintiff's criminal trial or in a deposition. See *Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004); *Mayes v. City of Hammond*, 442 F. Supp. 2d 587 (N.D. Ind. 2006) (a witness who commits perjury is granted absolute immunity from civil liability for trial and deposition testimony). But Denise hypothetically could have been exposed to criminal perjury charges after giving her statement to McCarthy. Under Illinois law, perjury committed with a person "under oath or affirmation ... makes a false statement, material to the issue or point in question, knowing the statement is false." 720 ILCS 5/32-2(a). While Denise's statement to McCarthy was not made under oath, her testimony at Plaintiff's criminal trial and suppression hearings was. At the trial and suppression hearing, Denise positively identified Plaintiff as one of her assailants. (She also testified at the suppression hearing that Ptak did not say anything to her during the photo array.) This testimony was

Case: 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1110   Filed 04/05/21   Page 31 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

clearly material to a key issue in question at the trial: who assaulted Denise? According to McCarthy's report, Denise told McCarthy that she was not sure that Plaintiff did anything to her physically, and also explained how she nonetheless came to identify Plaintiff as one of her assailants—through Ptak's repeated insertion of Plaintiff's photo into the array and questions during her viewing. Denise already admitted at her deposition that McCarthy's report was true to the extent that it said Denise was not sure Plaintiff did anything to her physically; this admission calls into question how Denise was then able to identify Plaintiff in a photo array. If Denise in fact told McCarthy that Ptak repeatedly inserted Plaintiff's photo into the array and talked to her during the array, and that this influenced her identification, those statements suggest that Denise's identification testimony at trial was knowingly false and made to ensure that Plaintiff was convicted.[5]

**\*14** The final question is whether there are corroborating circumstances that bolster the trustworthiness of Denise's alleged statements to McCarthy. The Seventh Circuit has identified three non-exclusive "factors for district courts to consider when determining whether corroborating circumstances exist for Rule 804(b)(3) purposes: (1) the relationship between the declarant and the exculpated party; (2) whether the statement was voluntary and given after Miranda warnings; and (3) whether there is any evidence the statement was made to curry favor with authorities." *United States v. Jackson*, 540 F.3d 578, 589 (7th Cir. 2008). In this case, Plaintiff was convicted of brutally assaulting Denise. According to her deposition testimony, Denise continues to believe that Plaintiff was one of her attackers and was upset when she learned that Plaintiff was granted post-conviction relief. She had no apparent incentive for helping Plaintiff avoid re-prosecution by calling into question her earlier identification testimony. Denise provided her statement to McCarthy voluntarily, and there is no evidence that Denise made her statement to curry favor with the State. Neither party suggests, for instance, that McCarthy was trying to get Denise to undermine the strength of the State's case to avoid having to re-try the case. Instead, the State initially elected to re-try Plaintiff on all charges, and dropped the charges only after interviewing witnesses and determining that they did not have a strong enough case. Another piece of corroborating evidence is Hugo's deposition testimony (discussed in more detail below) concerning his conversation with Denise shortly after she was released from the hospital. Hugo's testimony that Denise told him that Ptak kept reinserting certain photos into the photo array and that she thought all of the subjects looked alike, [137] at 7, is consistent with McCarthy's report. Hugo,

like Denise, had no apparent incentive to help Plaintiff avoid re-prosecution.

For these reasons, the Court concludes that Plaintiff has met his burden of showing that Denise's statements to McCarthy may be admissible at trial under Rule 804(b)(3), and therefore Defendants cannot show that McCarthy's report and her testimony concerning the same would be inadmissible for any purpose during the trial. The Court will consider McCarthy's report for purposes of summary judgment. This decision is without prejudice to the reconsideration of the issue prior to trial based on any motions in limine that the parties may file.

Plaintiff advances one more hearsay exception in support of admitting McCarthy's statement—Rule 807's residual hearsay clause. "The purpose of Rule 807 is to make sure that reliable, material hearsay evidence is admitted, regardless of whether it fits neatly into one of the exceptions enumerated in the Rules of Evidence." *United States v. Moore*, 824 F.3d 620, 624 (7th Cir. 2016). Under Rule 807, a "hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804" if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;

> (2) it is offered as evidence of a material fact;

> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). A statement is admissible under the residual hearsay rule "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, ... so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). The person who provided the statement must be unavailable in order for the residual hearsay exception to apply. *Moore*, 824 F.3d at 623. In general, the Seventh Circuit has "warned against the liberal admission of evidence under Rule 807," lest this exception become " 'the exception that swallows the hearsay rule.' " *Id.* at 624 (quoting *Akrabawi v. Carnes Co.*, 152 F.3d 688, 697 (7th Cir. 1998)).

Defendants argue that Rule 807 does not apply to the statements ascribed to Denise in McCarthy's report, because

Case: 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1111 Filed 04/05/21 Page 32 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

those statements lack sufficient guarantees of trustworthiness. (Defendants do not contest that the other requirements of Rule 807 are met.) Defendants assert that Plaintiff cannot overcome the presumption that hearsay statements are unreliable because Denise's statements were made in relation to a traumatic events that occurred over thirty years ago; they were not corroborated by her under oath at her deposition or in the criminal proceeding; they were not recorded; and Denise testified at her deposition that she felt pressured by McCarthy and frightened when she heard of Plaintiff's release. See [147] at 15.

The Seventh Circuit has identified a number of nonexclusive, nonexhaustive factors for the district courts to consider when evaluating the trustworthiness of a hearsay statement under Rule 807. See *Moore*, 824 F.3d at 623. These factors include "(1) the probable motivation of the declarant in making the statement; (2) the circumstances under which it was made; and (3) the knowledge and qualifications of the declarant." *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999) (quoting *Cook v. Hoppin*, 783 F.2d 684, 690–91 (7th Cir. 1986) (internal quotation marks omitted)). They also include "the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify ...; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability." *Moore*, 824 F.3d at 622–23.

**\*15** In this case, Denise would be "unavailable" to the extent that she denies (as she did at her deposition) having any memory of whether Ptak used suggestive techniques during the photo array or what she told McCarthy about that topic. Briefly considering the Rule 807 factors that Defendants do not dispute, evidence of Ptak's alleged use of suggestive techniques with Denise is evidence of a material fact and goes to the accuracy of Denise's identification of Plaintiff as her attacker. The report is more probative than any other evidence that Plaintiff could obtain through reasonable efforts, because it is the only evidence specifically addressing whether Ptak re-inserted photos into the array that he showed Denise. The transcripts from the criminal trial and suppression hearing do not address this exact issue, and Denise denied at her more recent deposition having any knowledge of the issue. It may also serve the interests of justice to admit the report and to

provide the jury with the full scope of relevant evidence on the issues that bear on Plaintiff's due process claims, which stem from his alleged wrongful conviction and decades-long incarceration.

The Court now turns to circumstantial trustworthiness of the McCarthy report under Rule 807. Denise's probable motivation does not appear to have been to help Plaintiff avoid re-prosecution. It seems more likely that her motivation was to truthfully answer McCarthy's questions. Defendants assert that Denise felt pressured by McCarthy at her deposition and frightened when she heard of Plaintiff's release from prison. But Defendants do not explain how this would motivate Denise to say that Ptak used suggestive techniques, if that was not really Denise's memory. Looking to other factors identified by the Seventh Circuit, Denise is the most knowledgeable person about what happened at the photo array with Ptak over thirty years ago (Ptak is now deceased), although the age of that incident may call into question the accuracy of Denise's memory. Denise gave her statement to McCarthy voluntarily, but was not under oath. At her subsequent deposition, she did not recant what she allegedly told McCarthy, but instead denied having any current memory of the discussion with McCarthy or the underlying photo identification procedure. Hugo's deposition testimony that Denise told him in 1982 that all the photos looked the same and that Ptak kept reinserting Plaintiff's photo into the array is consistent with and corroborates McCarthy's report (though Hugo's deposition testimony is subject to its own hearsay problems, which are discussed below). Considering the record as a whole, the Court concludes that it contains circumstantial guarantees of the trustworthiness of McCarthy's statement documenting what Denise told her about Ptak's use of suggestive techniques and their effect on her identifications. Therefore, the Court will not exclude these parts of McCarthy's report from its summary judgment analysis. Again, the Court's decision is without prejudice to its ability to reconsider the issue prior to trial when the parties brief motions in limine.

**Hugo**—Hugo testified that Denise told him shortly after she was released from the hospital that she was not sure about her witness identifications and that "they [the men in the photos] all look alike." [137] at 7. Defendants object on hearsay grounds to Plaintiff's use of Hugo's testimony concerning his conversations with Denise. In response, Plaintiff argues that Denise's January 1982 statements to Hugo will be admissible at trial as a prior consistent statement. Specifically, Plaintiff argues that Denise will first testify consistent with her

deposition that the statements in McCarthy's memo regarding Ptak's actions during the photo array and their influence on her were true. Second, Defendants will cross-examine Denise with her criminal court testimony that Ptak was silent during the photo array and did not influence her decision. Third, Plaintiff will then bring in Denise's statements to Hugo either 1) to rehabilitate her credibility under Rule 801(d)(1)(B)(ii), or 2) to rebut an express or implied charge of recent fabrication or improper influence or motive under Rule 801. Plaintiff's argument fails at the outset because at her deposition, Denise did not affirm the accuracy of McCarthy's memo to the extent that it recorded that Denise said Ptak used suggestive techniques during the photo array.

**\*16** Plaintiff also argues that Hugo's testimony concerning what Denise told him is admissible under Rule 804(b)(3) as a statement against interest and Rule 807, the residual hearsay clause. But Defendants have not demonstrated that Denise is unavailable for purposes of Hugo's statement. Denise was not questioned about Hugo's statement at her deposition and there is no evidence that she cannot remember what she told Hugo. Also, as to Rule 804(b)(3), it is unclear how Denise's statement to Hugo, which was made immediately after she was released from the hospital following the attack, could have possibly been against her interest in the sense of exposing her to potential civil or criminal liability.

Turning back to Hugo's deposition, Hugo testified that he viewed a photo array before seeing the line-up. According to Hugo, while he was viewing the photo arrays, Duffin and Ptak kept reinserting certain photos into the pile and referring back to them. Hugo further testified that during the line-up, the detectives kept coming back to certain numbers and asking questions like, "are you sure it wasn't three"? [137] at 8. Defendants object to Plaintiff's use of this testimony based on *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1169 (7th Cir. 1996), and *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517 (7th Cir. 1988). In *Bank of Illinois*, the Seventh Circuit held that a party cannot avoid summary judgment by creating a "sham" issue of fact by using later testimony from the party that directly contradicts the party's unambiguous prior statement made under oath. In *Adelman-Tremblay*, the Seventh Circuit extended the "sham" affidavit rule beyond parties to "the testimony and affidavit of the plaintiff's sole expert witness," reasoning that "[t]he purpose of summary judgment motions —to weed out unfounded claims, specious denials, and sham defenses—is served by a rule that prevents a party from

creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony." 859 F.2d at 521.

Defendants argue that Hugo's testimony that he viewed the photo array before viewing the line-up is contradicted by his earlier testimony that he viewed the line-up before being shown photos, and thus barred by the "sham affidavit" rule. [136-1] at 105-108, 11. Defendants also argue that Hugo's testimony that Duffin and Ptak kept reinserting certain photos into the pile and referring back to them is contradicted by his earlier testimony that Duffin and Ptak simply handed him the stack of photos, he looked through them, and he handed one to the detectives. [136-1] at 109-110. They further argue that Hugo's testimony that the detectives asked him questions during the line-up is contradicted by his earlier testimony that the officers did not tell him anything when he viewed the line-up. [136-1] at 116.

Defendants also object to the admission of Hugo's deposition testimony that he told Duffin and Ptak during his interview that toward the end of the beating, a woman was kicking him in the back, but that he "lost focus of that ... when they started showing as all of the pictures of all of these guys, and [he] just focused on the guys." [137] at 14. Defendants argue that this testimony is directly contradicted by the following testimony Hugo provided in the criminal proceeding: "Q: Could you tell us how many people were around you? A: There were a whole bunch of people. Q: Male or female? A: All males. [122-6] at 99-100. Hugo also testified that the person kicking him in the back was a "guy with a white coat," not a woman. [122-6] at 103.

The Court declines to apply the "sham affidavit" rule to bar Plaintiff's use of Hugo's deposition testimony in his response to the motion for summary judgment. Although the sham affidavit rule has been applied to parties and their own non-party witnesses, Hugo is not "one of [Plaintiff's] witnesses." *Adelman-Tremblay*, 859 F.2d at 521. Defendants have not identified, nor is the Court aware of, any cases in which the Seventh Circuit has applied the sham affidavit rule to disinterested witnesses, or to witnesses who are (or at least at one time were) aligned with the party who is seeking to take advantage of the rule. The Court agrees with the court's observation in *Newsome v. James*, 2000 WL 528475, at \*2 (N.D. Ill. Apr. 26, 2000), that the concerns underlying the rule—"that parties or witnesses aligned with them can defeat summary judgment on meritless claims by recanting prior sworn statements—is absent in the case of disinterested witnesses." Instead, "[v]ariations in the

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

testimony of disinterested witnesses ... raise questions about credibility" that are properly "answered by a jury, not by the Court." *Id.* (citing *Bank of Illinois*, 75 F.3d at 1170). In this case, Defendants do not argue that Hugo has any interest in Plaintiff prevailing in this suit, such that he might have had a motive to lie in his deposition to help Plaintiff defeat summary judgment. To the contrary, Hugo was himself a victim of the Amphitheater attacks and at the criminal trial he testified as a witness for the Government.

**\*17** The Court also finds persuasive Judge Kennelly's reasoning in *Rodriguez v. Woodall*, 2004 WL 2583883 (N.D. Ill. Nov. 12, 2004), that it would be inappropriate to apply the sham affidavit rule to a *Brady* claim to "preclude the Court, on summary judgment, or a jury, at trial, from considering a prosecution witness's testimony that he was coerced or convinced by the police to lie." *Id.* at \*4. Application of the rule in such a case could risk "immuniz[ing] from liability, or even scrutiny, dishonest law enforcement officers who coerce or otherwise fabricate evidence to frame an accused." *Id.* Given this risk, it is not surprising that Defendants have not cited, and the Court has not found, any cases in which the sham affidavit rule has been applied to bar a witness who testified in a criminal trial from later recanting his testimony. By contrast, Plaintiff cites to a number of cases in which *Brady* claims have been supported by statements from witnesses recanting their prior testimony. See [157] at 1-2; see also, e.g., *Whitlock v. Brueggemann*, 682 F.3d 567, 575-76 (7th Cir. 2012) (recognizing that, once admitted, statements of witnesses recanting their prior testimony that falsely implicated plaintiff in murder would preclude summary judgment for police defendants on plaintiff's *Brady* claim); *Taylor v. City of Chicago*, 80 F. Supp. 3d 817, 821–22 (N.D. Ill. 2015) (denying motion to dismiss due process and *Brady* claims brought by plaintiff who was wrongfully convicted of murder and related crimes, where complaint alleged, among other things, that the defendant police officers framed plaintiff for the murder by coercing a witness to provide false incriminating testimony through threats and promises of leniency on unrelated charges and that the witness "later recant[ed] this statement"). For these reasons, the Court will consider Hugo's deposition testimony (except the portion in which he recounts what Denise allegedly told him after viewing the lineup) in ruling on Defendants' motion for summary judgment.

**Martha**—Martha testified that she never provided detectives with a facial, physical, or clothing description of her attackers. [137] at 13.

**Powell**—Powell testified that he never told police that Plaintiff was involved in the attacks at the Amphitheater. According to Powell, he "associated Patrick Hampton as somebody who I know who was at the concert who may or may not know Ricky Knight," [124-12] at 9, but that "all [he] said [to detectives] was Ricky Knight doing something," *id.* at 10. He testified: "From the people I described were the only people I knew from my building. If you notice, everybody I knew was from my building. They took that and turned it around to be Ricky Knight's associates. How they did that, I don't know. But these were only supposed to be people that I identified whose names that I knew." *Id.* at 11.

Defendants argue that Court should apply the sham affidavit rule to bar Plaintiff from using Powell's testimony to defeat summary judgment. See *id.* at 18. Although Powell's deposition testimony does contradict his testimony at the criminal trial that Plaintiff was one of the men who Powell saw going down the aisle at the Amphitheater with Ricky Knight making gang signs and chanting gang slogans, the Court declines to apply the "sham affidavit" rule to Powell's deposition testimony. Powell, like Hugo, is a disinterested witness with no apparent incentive to lie to help Plaintiff defeat summary judgment. Indeed, Powell made clear at his deposition that he did not want to be involved in this lawsuit and wanted to "move on with [his] life." [157] at 4.

Powell further testified that he told the detectives the names of friends that he was with at the concert: Clinton Williams, Farod Poole, Lentin McGee, Freddie Fizer, and Kevin Powell (his older brother). These names are not contained in any CPD reports and Poole and Fizer were never questioned about the events at the Amphitheater.

**Duffin**—Duffin testified that as a matter of practice detectives would not want to show photos of the persons in custody to the victims or witness before the line-ups because it would influence their identification and "taint the lineup." [137] at 9-10. Duffin also testified that there can be "existential circumstances" that would permit the use of photo of a person in custody before a line up, such as when a victim is in the hospital and unable to view the line-up. [137] at 10. He further testified he understood in 1981 his duty to include exculpatory evidence in case reports.

Currently before the Court is Defendants' motion for summary judgment.

Case: 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1114 Filed 04/05/21 Page 35 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

## II. Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." Majors v. Gen. Elec. Co., 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

*18 To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Ellis v. CCA of Tennessee LLC, 650 F.3d 640, 646 (7th Cir. 2011) (quoting Celotex, 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252.

## III. Analysis

### A. Claims Against Duffin

#### 1. Due Process

##### a. Withholding of Exculpatory Evidence

To demonstrate a potential Brady violation based on the alleged withholding of potential exculpatory or impeachment evidence, "a defendant must point to specific evidence that was (1) favorable to the defense; (2) suppressed by the government; and (3) 'material to an issue at trial.' " United States v. Lawson, 810 F.3d 1032, 1042 (7th Cir. 2016) (quoting United States v. Shields, 789 F.3d 733, 746 (7th Cir. 2015)). Under the first prong, "[e]vidence is favorable to the defense when it is either exculpatory or could be used for purposes of impeachment." Lawson, 810 F.3d at 1042 (quoting Kyles v. Whitley, 514 U.S. 419, 433 (1995)). Under the second prong, "[e]vidence is suppressed when 'the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.' " Lawson, 810 F.3d at 1043 (quoting Shields, 789 F.3d at 746–47). "Although the Government has an affirmative duty to learn of and to disclose any favorable evidence, the defendant bears the burden of establishing a Brady violation by offering more than mere speculation or unsupported assertions that the Government suppressed evidence." Shields, 789 F.3d at 747 (citing United States v. Jumah, 599 F.3d 799, 808–09 (7th Cir. 2010)). Under the third prong, for evidence to be considered material, "there must be 'a reasonable probability that the suppressed evidence would have produced a different verdict.' " United States v. Morales, 746 F.3d 310, 314 (7th Cir. 2014) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

Plaintiff argues that Duffin violated his right to due process by withholding the following exculpatory or impeachment evidence from Plaintiff during the criminal trial: 1) notes from the detectives' interview with Powell; 2) notes from the detectives' initial interview with Martha; 3) Hugo's alleged statement to Duffin and Ptak that a female perpetrator kicked him in the back; 4) statements of the woman from Cicero and of witnesses who were too scared to intervene in the Amphitheater attacks, as reported in the Sun Times; 5) the "street file" for the investigation, as a whole; and 6) the unduly suggestive techniques that Duffin and Ptak used unsuccessfully with Hugo and that Ptak used successfully with Denise to obtain an identification of Plaintiff. The Court will consider each item of evidence in turn, and also will consider the cumulative effect of the alleged withholding of that evidence to determine whether Plaintiff's due process claim survives summary judgment. See Kyles, 514 U.S. at 421 ("the state's obligation under Brady ... to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government").

103 Fed. R. Evid. Serv. 1177

**i. Notes from Powell's interview**

**\*19**  There is evidence that the notes from Powell's interview with Duffin and Ptak were suppressed, namely Ptak's admission at the suppression hearing in the criminal trial that he watched Duffin tear the notes in half and throw them away. There is also evidence that these notes may have contained information that was favorable to the defense. Powell testified at his deposition in this case that he told Duffin and Ptak only that he saw Plaintiff at the concert and that Plaintiff may have known Knight, but not that Plaintiff was one of Knight's associates or a participant in the attacks.

However, to the extent that the official report documenting Powell's statement to police was inaccurate—in particular the statement that Powell identified Plaintiff as an "offender" who was part of the group of "people [Powell] knew" who he saw participate in the Amphitheater attack—this was disclosed and fully explored during trial through Rodgon's "exercise of reasonable diligence." *Lawson,* 810 F.3d at 1043; cf.*Holland v. City of Chicago,* 643 F.3d 248, 256 (7th Cir. 2011) ("A defendant in a criminal case that actually goes to trial has the 'responsibility to probe the witnesses and investigate their versions of the relevant events.' " (quoting *Carvajal v. Dominguez,* 542 F.3d 561, 567 (7th Cir. 2008))). Specifically, the transcript from the criminal trial shows that Rodgon elicited testimony from Powell acknowledging that he did not see Plaintiff participate in the physical attack of the victims or hear Plaintiff make any admissions regarding the attack on the bus ride home. See [136] at 10-11. Judge Strayhorn nonetheless allowed the testimony to go in against Plaintiff on the theory of accountability because "[t]his is a group that [Powell] has identified the three Defendants as being a part of." [136] at 11. Plaintiff does not challenge the correctness of this ruling or the use of the jury instruction on accountability, which provides that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." [125] at 25. The fact that the detectives' notes from their interview with Plaintiff were destroyed was also exposed at trial during the cross-examination of Duffin.

Indeed, Plaintiff acknowledges that "Defendants' tactics and misconduct with regard to Powell's identification

were exposed, to a certain extent, during the trial" and therefore "standing alone, the fabricated Powell report would not likely constitute an actionable due process claim." [127-1] at 27. Plaintiff argues, nonetheless, that this case is exceptional because Powell's identification gave the detectives justification to put Plaintiff in the photo array and line-ups, which witnesses used to implicate him. But Plaintiff has offered no evidence that the detectives' alleged "fabrications" were necessary for the detectives to investigate Plaintiff. In his more recent deposition, Powell acknowledged that he told the detectives that he saw Plaintiff at the event and he may be an associate of Knight, who Powell saw attacking the victims. This alone would lead the detectives to investigate Plaintiff further.

**ii. Notes from the initial interview with Martha**

Plaintiff has not presented any evidence that there were notes taken during the detectives' initial interview with Martha or that such notes might contain exculpatory or impeachment evidence that was not already included in the evidence that the Government turned over to Plaintiff's criminal attorney. The evidence suggests the opposite. At Plaintiff's criminal trial and in her deposition, Martha denied giving the detectives any physical description of her attackers, other than that they were black males, before she viewed Plaintiff's line-up. Plaintiff cannot avoid summary judgment on his due process claim based on "mere speculation [and] unsupported assertions" that exculpatory or impeachment evidence was suppressed. *Shields,* 789 F.3d at 747; see also *Jumah,* 599 F.3d at 811 ("unsupported assertions that the Government has suppressed evidence are insufficient to make out a *Brady* or *Giglio* violation").

**iii. Hugo's alleged statement regarding a female perpetrator**

**\*20**  Plaintiff argues based on Hugo's 2013 deposition testimony that Duffin failed to disclose Hugo's alleged statement to Duffin and Ptak that a female perpetrator repeatedly kicked him in the back during the Amphitheater attack. The Court concludes that the impeachment value of Hugo's alleged statement is too speculative to support a *Brady* violation. Plaintiff argues that he could have used this evidence to impeach Denise's testimony concerning the identification of her attackers. But Hugo testified only that the female perpetrator was kicking *him* in the back during the

Case: 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1116   Filed 04/05/21   Page 37 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

attack, not that she was kicking or otherwise attacking Denise. Further, the undisputed evidence is that Denise was on the ground being attacked and sexually assaulted by several men while this was occurring. It is not plausible to expect her to have observed the gender of one of Hugo's assailants in the midst of her own violent attack.

### iv. Statements of the woman from Cicero and witnesses who were too scared to intervene

Plaintiff argues, based on information published in the Chicago Sun Times shortly after the Amphitheater attacks, that Duffin must have obtained and was required to disclose statements from a woman in Cicero who filed a complaint about being robbed at the Amphitheater and from individuals who reportedly were witnesses to the attack but too scared to intervene. Plaintiff argues that "[t]he statements by these witnesses, any identifications that they made—or, more importantly for [Plaintiff], did not make—were *Brady* evidence that should have been turned over." [127-1] at 41. However, there is no testimony or evidence supporting Plaintiff's speculation that a statement by the woman from Cicero was given in the investigation or put in a street file, or that statements were even taken from other concertgoers mentioned in the articles.

Moreover, beyond arguing that those witnesses may have not identified Plaintiff, Plaintiff does not explain how this would demonstrate that he was not involved in the attack. There were hundreds, if not thousands, of people at the Amphitheater that night and dozens involved in the melee near the front of the stage. The Seventh Circuit has made clear that "a *Brady* violation does not arise due to nothing more than a possibility that the undisclosed item might have helped the defense," and that is all that Plaintiff has shown here. *United States v. Hamilton*, 107 F.3d 499, 510 (7th Cir. 1997); see also *Holland*, 643 F.3d at 256 ("The mere possibility that an item of evidence may have helped a defendant during his trial on criminal charges does not establish materiality.").

In addition, the existence of these other potential witnesses was public knowledge due to the Sun Times reports, and Plaintiff's counsel could through the exercise of reasonable diligence have sought discovery about these witnesses or impeached the detectives' investigation at trial on the basis that they did not explore potential leads with these witnesses. *Lawson*, 810 F.3d at 1043. While Plaintiff argues that Rodgon was diligent by asking for the "street files" for the case, they

fail to offer any evidence that, once Rodgon was informed that there was no street file, he took any further steps to try to identify such witnesses, such as serving specific discovery on the government or making an independent investigation. Indeed, the district court and Seventh Circuit both found in Plaintiff's habeas case that Rodgon provided ineffective assistance of counsel based on his failure to investigate and interview exculpatory witnesses. See *Hampton* 290 F. Supp. 2d 905, 922-23, *aff'd*, 347 F.3d 219.

### v. The "street file" generally

Plaintiff argues that "the 'street file,' as a whole, contained exculpatory and impeachment evidence," including: "eyewitnesses who were or 'would have been' interviewed; alibi witnesses who would have been interviewed; named suspects in the attacks who would [have] been investigated; and leads that Detective Duffin testified would have been followed." [127-1] at 42. Plaintiff posits that if he had been provided access to the street file, it would have either: (1) "depict[ed] the kind of 'slovenly' investigation that is ample grounds for impeachment is a criminal case," or (2) revealed that "pertinent" information was destroyed by the detectives. [127-1].

**\*21** Neither theory is persuasive. Plaintiff's counsel had an opportunity to explore the first theory during trial by cross-examining Duffin and Ptak about why their official reports contained no mention of interviewing alibi witnesses or following particular leads. As to the second theory, Plaintiff does not explain how any of these allegedly "undisclosed item[s] might have helped the defense," and therefore cannot survive summary judgment on his *Brady* claim. *Hamilton*, 107 F.3d at 510.

### vi. Evidence of suggestive witness identification procedures

Plaintiff argues that Duffin violated his due process rights by withholding evidence concerning his and Ptak's alleged use of unduly suggestive identification techniques with Denise and Hugo. Plaintiff points to ASA McCarthy's memoranda detailing her interview with Denise as evidence that Ptak used suggestive techniques to obtain Denise's initial identification of Plaintiff. In her deposition, ASA McCarthy testified that Denise told her that Ptak "ke[pt] taking [Plaintiff's] photo out and putting it back in and asking words to the effect of do

Case: 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1117 Filed 04/05/21 Page 38 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

you recognize him? Does this look like him? That type of thing." [124-12] at 26. McCarthy also testified that Denise said "Yes" when asked if "she felt pressured to identify" Plaintiff. *Id.* at 26. "McCarthy further testified that Denise told her that her identification of Plaintiff in the subsequent line-up was based on her identification from the photo array, rather than from her own observation." *Id.*

Plaintiff also relies on Hugo's deposition testimony. Hugo testified that he viewed a photo array with Duffin and Ptak before seeing the line-up of suspects. See [124-11] at 16. According to Hugo, when he viewed the photos, Duffin and Ptak kept reinserting certain photos into the pile and referring back to them. Also according to Hugo, during the line-up the detectives kept coming back to certain numbers and asking questions like, "are you sure it wasn't three"? [137] at 8.

Assuming that Denise told McCarthy what the report claims she said, that evidence clearly would have been favorable to the defense in the criminal trial, satisfying the first *Brady* prong. The case against Plaintiff was solely based on identifications, not physical evidence, and as a victim, Denise's identification was likely given great weight by the jury. Hugo's testimony about Ptak and Duffin's alleged use of suggestive techniques with him is of less direct relevance and importance to the defense, because Hugo ultimately did not identify Plaintiff as one of his or Denise's attackers. However, evidence of the use of suggestive techniques with Hugo might have been "used for purposes of impeachment" more generally to call into question the detectives' techniques for making photo identifications. *Lawson*, 810 F.3d at 1042. Such evidence may also have been used by defense counsel to probe more deeply into Denise's identification of Plaintiff and potentially obtain useful admissions. Therefore the Court concludes that, if disclosed, the "cumulative effect" of evidence that the detectives used the same suggestive technique with Denise and Hugo would have been favorable to the defense. *Kyles*, 514 U.S. at 421.

Under the second *Brady* prong, there is no question that evidence of the Detectives' alleged use of suggestive techniques was suppressed in the criminal prosecution. The Government did not disclose any notes, documents, or testimony that Ptak or Duffin used suggestive techniques with Denise or Hugo in order to obtain an identification of Plaintiff. Further, the Government has not demonstrated that the Detectives' alleged use of suggestive techniques with Denise or Hugo was available to Plaintiff through the exercise of reasonable diligence or exposed during trial. *Lawson*, 810

F.3d at 1043. Although Plaintiff's criminal attorney moved to suppress the identifications and he and the other criminal defendants' attorneys questioned how the victims arrived at their identifications, if the victims were not fully truthful in their testimony, the Court cannot say that this evidence was reasonably available.

**\*22** There is some evidence in the record suggesting that Denise and Hugo may not have been fully truthful and forthcoming in their testimony during the criminal prosecution. Denise's testimony at the suppression hearing might have led a listener to believe that Ptak simply handed her photos to look through, which she did until she identified Plaintiff and another suspect, without the listener comprehending that Ptak re-inserted the same photos back into the stack (which McCarthy reported Denise as saying). In response to questioning from one of Plaintiff's co-defendant's attorneys, Brownfield, Denise testified that Ptak "said to look at the pictures and see if I recognized anybody," [136-1] at 10, and that she looked at the photos "by hand," "one at a time" (rather than looking at all of the photos spread out on the table), *id.* at 12. Similarly, Hugo testified at the suppression hearing that Duffin and Ptak handed him "[a] stack" of about twenty photographs to look through, that he went through them, and that he picked out Knight's photo and handed it to the officers. *Id.* at 108-110. Hugo only testified at his later deposition that Duffin and Ptak kept reinserting Plaintiff's photo into the stack and directing him to it. In addition, Denise testified at the suppression hearing (contrary to what she allegedly told McCarthy) that Ptak did not say anything to her during her viewing of the photo array.

The transcript of the suppression hearing also suggests that Judge Strayhorn limited Rodgon's attempts to further explore with Denise how the photo array was conducted. For instance, Judge Strayhorn sustained the government's objection to Rodgon's question, "How many pictures did you go through before you picked out the first person?" [136-1] at 23. More generally, Judge Strayhorn told Rodgon, "I'm not going to let you repeat the same thing Mr. Brownfield went over. She [Denise] said when Brownfield asked her the question, 'He gave me the pictures and asked me to look through them and see if I could identify anyone in them.' " *Id.* at 22.

Under these circumstances, the Court is unable to conclude that Rodgon could have, through the exercise of reasonable diligence, exposed Duffin or Ptak's alleged use of suggestive witness identification techniques with Denise or Hugo. *Lawson*, 810 F.3d at 1043. The Seventh Circuit "regard[s] as

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1118 Filed 04/05/21 Page 39 of 139
Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). According to the court, "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses." *Id.* For instance, "a defense witness may be uncooperative or reluctant," or "the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement." *Id.* These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness. The Court finds instructive the following observations from Judge Kennelly in *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 444–45 (N.D. Ill. 2011):

> Defendants' argument seems to assume the existence of a *Perry Mason*-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

Defendants contend that this case is more like *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 915 (N.D. Ill. 2015), in which the court dismissed a *Brady* claim in part based on a finding that the plaintiff could with reasonable diligence have obtained exculpatory testimony from his former co-defendants, since he knew that he and his co-defendants were innocent and the plaintiff "d[id] not allege that his co-defendants ... were impossible for his defense counsel to interview or would have lied had Plaintiff questioned them." But this case is not like *Patrick*, because the evidence that was allegedly withheld was in the minds of the prosecution witnesses, not Plaintiff's former co-defendants, and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identification techniques with them. Therefore, drawing all "reasonable inferences in [Plaintiff's] favor as required on summary judgment, a reasonable jury could find that [Rodgon] could not have obtained the circumstances of [Denise and Hugo's witness identifications] through reasonable diligence." *Jimenez*, 830 F. Supp. 2d at 445.

**\*23** The Court now turns to the third *Brady* prong. Viewing the evidence and drawing all inferences in favor of Plaintiff, a reasonable jury could conclude that the failure to disclose Ptak's and Duffin's alleged use of suggestive techniques was material. The key identifications of Plaintiff were made by Denise, Martha, and Henrichs. Plaintiff has raised a number of concerns about the accuracy of Martha's and Henrichs' identifications. When Martha viewed the line-up, she identified Plaintiff as one of the men who pulled her clothing off; only later at trial did she identify Plaintiff as the man who tried to put his hand in her vagina. Martha also blacked out for some time during the attack and told medical personnel following the attack that she did not know if she had been sexually assaulted. Martha also did not provide any testimony concerning what Plaintiff did to Denise or Hugo. Henrichs came forward as a witness only after police identified and contacted him, even though he was a security guard and Cook County Sheriff's Deputy. By the time Henrichs came forward, he had already seen Plaintiff and three of the other suspects on television and knew that they had been arrested and were in custody. One inference that could be drawn from these facts is that Henrichs crafted his testimony to fit with the narrative already being developed that Plaintiff was involved in the attacks. Given the arguable weakness of these identifications, a reasonable jury might find that the criminal jury would have acquitted Plaintiff if it had known about Ptak's use of suggestive identification techniques to obtain Denise's identification and Ptak's and Duffin's unsuccessful use of the same techniques with Hugo. *Morales*, 746 F.3d at 314.

**b. Use of Allegedly Unduly Suggestive Identification Techniques**

"The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality." *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (citing *Hensley v. Carey*, 818 F.2d 646, 648, 650 (7th Cir. 1987)). "It does, however, guarantee the right to a fair trial[,] and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Id.* Under Seventh Circuit precedent, "a 'witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " *Lee v. Foster*, 750 F.3d 687, 691 (quoting *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009)).

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1119 Filed 04/05/21 Page 40 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

The Court engages in a "two-pronged analysis" to determine whether an identification procedure reaches "this substantial threshold." *Lee*, 750 F.3d at 691. First, the Court determines whether the identification procedure was "suggestive and unnecessary." *Id.* (citing *United States v. Sandersi*, 708 F.3d 976, 983 (7th Cir. 2013)). According to the Seventh Circuit, "scientific sources should generally accompany an argument that a particular procedure was unnecessarily suggestive." *United States v. Sanders*, 708 F.3d 976, 985 (7th Cir. 2013). "Lawyers' assertions that the effects of a photo spread are 'clear' or 'obvious' are no substitute for evidence." *United States v. Acox*, 595 F.3d 729, 730 (7th Cir. 2010). Second, the Court determines "under the totality of the circumstances whether the procedure was nonetheless reliable." *Lee*, 750 F.3d at 691. "Both suggestiveness and reliability are evaluated by reference to the totality of the circumstances." *Alexander*, 433 F.3d at 555.

Ultimately, to prevail on his Section 1983 due process claim, Plaintiff must show that the use of unduly suggestive identification techniques "made his trial unfair." *Alexander*, 433 F.3d at 555. An illustrative list of the questions the Court may consider in making this determination include: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Id.*

Construing all facts and making all inferences in Plaintiff's favor, the Court concludes that there are disputed questions of material fact concerning whether the identification procedures that Ptak used with Denise were suggestive and unnecessary, and whether they were nonetheless reliable. *Lee*, 750 F.3d at 691. ASA McCarthy's report concerning her conversation with Denise supports Plaintiff's theory that Ptak's use of suggestive techniques caused Denise to identify Plaintiff when she otherwise would have been unable to do so. According to McCarthy, Denise admitted that Ptak suggested to her who to identify in the photo array by "taking [Plaintiff's] photo out and putting it back in and asking words to the effect of do you recognize him? Does this look like the guy?" [124-12] at 26. According to McCarthy, Denise admitted that her subsequent identification of Plaintiff in the line-up was "based on her identification from the

photo array," rather than "on her own observations." *Id.* Further, according to McCarthy, Denise told her that she was "not sure" at the time she viewed the photo array "whether [Plaintiff] had actually done anything to her physically." *Id.* at 27.

**\*24** Further, the Court concludes that there are disputed questions of fact concerning whether Ptak's use of suggestive techniques with Denise made Plaintiff's trial unfair, *Alexander*, 433 F.3d at 555, for the same reasons that the Court discussed above in concluding that the nondisclosure of Ptak's use of suggestive techniques with Denise may have been material to the outcome of Plaintiff's trial.

As to Ptak's and Duffin's alleged use of suggestive identification techniques with Hugo, there is no evidence that this made Plaintiff's trial unfair because Hugo did not identify Plaintiff as one of the perpetrators of the Amphitheater attacks.

Ptak is not a defendant in this case, and Duffin did not participate in Ptak's interview with Denise and therefore cannot be held directly liable for Ptak's alleged due process violation. The Court therefore must consider whether Duffin can be held liable for Ptak's alleged violation of Plaintiff's due process rights based on a theory of failure to intervene or conspiracy, to which the Court now turns.

### c. Duffin's Liability for Ptak's Alleged Violations of Plaintiff's Constitutional Rights

#### i. Failure to Intervene

In order to impose liability under Section 1983, "a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right"; however, "a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). "[I]n some circumstances, a state actor's failure to intervene in a violation of an another's constitutional rights can serve as a basis for § 1983 liability." *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 754 (N.D. Ill. 2012). In order to impose liability on a police officer for failure to intervene, the plaintiff must demonstrate that (1) a " 'constitutional violation has been committed by a law enforcement official,' " and (2) the defendant " 'had a realistic opportunity to intervene to prevent

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

the harm from occurring.' " *Id.* (quoting *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994)).

In this case, the Court concludes that Duffin cannot be held liable for Ptak's use of suggestive identification techniques with Denise because Plaintiff has come forward with no competent evidence that Duffin had knowledge of Ptak's actions or a reasonable opportunity to intervene. Plaintiff's primary argument for inferring knowledge on Duffin's part is that Duffin and Ptak used the same suggestive techniques with Hugo the day before Ptak used them with Denise. Plaintiff cites to *Morfin v. City of E. Chicago,* 349 F.3d 989, 1001 (7th Cir. 2003), for the proposition that Duffin should be held responsible for turning a "blind eye" to Ptak's actions. *Morfin,* unlike this case, involved a supervisor's responsibility for the actions of his subordinate officers. Duffin was not Ptak's supervisor. Moreover, in *Morfin,* the court recognized that in order to hold the police chief liable for constitutional violations of his officers, the plaintiff would have to show that the chief "had *knowledge* of facts that would cause him to believe" that his officers were going to act in an unconstitutional manner but "failed to use his authority to stop the violation." 349 F.3d at 1001 (emphasis added). As in *Morfin,* the Court does not believe that "the record, even when read in the light most favorable to [Plaintiff], can support a conclusion" that Duffin knew that Ptak was using improperly suggestive identification techniques in violation of Plaintiff's constitutional rights or that Duffin had any opportunity to intervene during Ptak's interaction with Denise. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim for failure to intervene.

### ii. Section 1983 Conspiracy

**\*25** "Under Section 1983, a conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.' " *Moore v. Morales,* 445 F. Supp. 2d 1000, 1012 (N.D. Ill. 2006) (quoting *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir. 1988)). To establish a prima facie case of conspiracy, a plaintiff must show (1) " 'an express or implied agreement among defendants to deprive a plaintiff of his or her constitutional rights,' " and (2) "the 'actual deprivation of those rights in the form of overt acts in furtherance of the agreement.' " *Id.* (quoting *Scherer,* 840 F.2d at 442).

An agreement may be demonstrated by "establishing that the defendant officers 'underst[ood] the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further.' " *Spalding v. City of Chicago,* 186 F. Supp. 3d 884, 913 (N.D. Ill. 2016) (quoting *McCann v. Mangialardi,* 337 F.3d 782, 789–90 (7th Cir. 2003)). A conspirator "need not have agreed on the details of the conspiratorial scheme," *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir. 1988), and can be held liable for conspiracy " 'even though he was incapable of committing the substantive offense' himself," *Ocasio v. United States,* 136 S. Ct. 1423, 1430 (quoting *Salinas v. United States,* 522 U.S. 52, 64 (1997)). Further, "[b]ecause conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman v. Freesmeyer,* 776 F.3d 500, 511 (7th Cir. 2015).

In this case, Plaintiff points to the following evidence of an agreement between Duffin and Ptak to violate Plaintiff's right to due process by influencing victim identifications: (1) "Duffin worked with Ptak to use the very same suggestive techniques with Hugo as Ptak did with Denise in an investigation where they were jointly responsible," [127-1] at 35; (2) Duffin ripped up the notes from the Powell interview; (3) Duffin and Ptak wrote a false police report implicating Plaintiff as an offender and gang member; and (4) Duffin and Ptak were lead detectives responsible for the investigation of the Amphitheater attacks.

Taken as a whole, these facts are sufficient to allow Plaintiff's Section 1983 conspiracy claim against Duffin to survive summary judgment. Taking Plaintiff's version of the facts as true, Duffin and Ptak worked together using coercive techniques to attempt (without success) to get Hugo to identify Plaintiff as one of the perpetrators of the Amphitheater attacks. They did so only one day before Ptak allegedly used the same techniques (this time successfully) to persuade Denise to identify Plaintiff as one of her attackers. Duffin and Ptak also allegedly (falsely) stated in their official report that Powell told them that he saw Plaintiff (and the rest of the group that Powell identified) participate in the Amphitheater attacks and heard Plaintiff (and the rest of the group that Powell identified) brag about the attacks on the bus ride home that night. Cf. *Jones,* 856 F.2d at 993 (evidence was sufficient to enable jury to infer that supervisory police officer approved of unlawful concealment of exculpatory evidence by subordinates to obtain conviction

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1121 Filed 04/05/21 Page 42 of 139
Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

of defendant on charges of murder and rape, where supervisor signed a deceitful report for use by the prosecution); *Rainey v. City of Chicago*, 2013 WL 941968, at *10 (N.D. Ill. Mar. 11, 2013) (at summary judgment, plaintiff provided sufficient evidence of agreement among officers to conspire to cover up their use of excessive force against plaintiff by preparing police reports and misdemeanor complaints that contained allegedly "misleading, incomplete, and inaccurate information" to conceal the identities of officers). Duffin and Ptak then tore up their notes from their interview with Powell, which prevented Plaintiff's defense counsel from seeing any exculpatory evidence they might contain. Although the Court already found that the withholding of the Powell interview notes was not, by itself, sufficient to rise to the level of a due process violation, these acts may nonetheless serve as circumstantial evidence that Duffin and Ptak had an agreement to make sure that Plaintiff was identified as a suspect, regardless of the true facts developed during the investigation.

### 2. State Law Civil Conspiracy

 **\*26** Plaintiff's complaint also includes a claim against Duffin for civil conspiracy under Illinois law. Defendants argue that, pursuant to the Illinois Tort Immunity Act, Duffin cannot be held liable for any state law claims for an injury caused by the act or omission of another person, such as Ptak's use of unduly suggestive identification techniques with Denise or concealment of the use of those techniques. See [111] at 11 (citing 756 ILCS 10/2-204). Plaintiff does not respond to this argument or Defendant's other arguments for summary judgment on his state law civil conspiracy claim. Therefore, the Court concludes that Plaintiff has forfeited his claim for civil conspiracy and Defendants are entitled to summary judgment on this claim. See, e.g., *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 924 (7th Cir. 2007) ("a party forfeits any argument it fails to raise in a brief opposing summary judgment" (citing *Witte v. Wis. Dep't of Corrs.*, 434 F.3d 1031, 1038 (7th Cir. 2006))); *Boogaard v. Natl. Hockey League*, 126 F. Supp. 3d 1010, 1026-27 (N.D. Ill. 2015) (personal representative of estate of former professional hockey player forfeited any argument that hybrid contract/duty-of-fair-representation claims were timely under applicable statute of limitations by failing to make such argument in either response brief or surreply brief).

### 3. Malicious Prosecution

"In order to establish a claim of malicious prosecution, a plaintiff must demonstrate: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Szczesniak v. CJC Auto Parts, Inc.*, 21 N.E.3d 486, 490 (Ill. App. 2015).

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for malicious prosecution because "Duffin had an objectively reasonable belief that Plaintiff robbed and sexually assaulted the victims as well as attempted to rape Denise." [111] at 20. Since they had probable cause to charge Plaintiff, Defendants argue, no malice can be inferred, either.

There must be probable cause for each criminal charge brought against a defendant. See *Holmes v. Village of Hoffman Est.*, 511 F.3d 673 (7th Cir. 2007) (probable cause to believe an individual committed one crime, and even his conviction of that crime, does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge). As the Seventh Circuit has explained, "[i]n this respect, a malicious prosecution claim is treated differently from one for false arrest: whereas probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause, ... probable cause as to one charge will nor bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking." *Id.* at 682 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). "Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 266 (Ill. App. 2002). It is important to recognize that "there is a difference between evidence of the kind that negates proof beyond a reasonable doubt and that which is so significant as to undo the existence of probable cause." *Purvis v. Oest*, 614 F.3d 713, 723 (7th Cir. 2010). "[T]he evidence required to establish probable cause is considerably less than that required to sustain a criminal conviction." *Id.* (citing *Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir. 2003)). Thus, there may have been probable cause to charge a defendant even when the defendant is acquitted. See *id.* (officer had probable cause to arrest plaintiff, even though plaintiff was acquitted

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1122 Filed 04/05/21 Page 43 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)
103 Fed. R. Evid. Serv. 1177

following a bench trial). The existence of probable cause is "a complete defense to a malicious prosecution claim." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001).

**\*27** The Court concludes that Defendants had probable cause to charge Defendant with all of the charges that went to trial: attempted rape, deviate sexual assault, robbery, and aggravated battery of Denise; robbery and aggravated battery of Hugo; and attempted rape, robbery, and aggravated battery of Martha.

In evaluating whether there was probable cause of the charges brought against Plaintiff, it is necessary to keep in mind that the Government relied, and Judge Strayhorn allowed the case against Plaintiff to proceed, on a group theory of accountability. The jury was instructed that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." [125] at 25. Plaintiff does not challenge this theory of accountability or Judge Strayhorn's use of this instruction. Thus, in order to charge Plaintiff, the Government did not need evidence that Plaintiff himself engaged in all of the crimes for which he was charged, so long as it had evidence that Plaintiff intended to promote or facilitate the commission of those crimes by other persons. Defendants have come forward with evidence—beyond the allegedly tainted identification of Plaintiff by Denise—that Plaintiff directly participated in the commission of at least some of the crimes for which he was charged, including the eyewitness identifications of Martha and Henrichs. "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

When Martha viewed a line-up on December 31, 1981, she identified Plaintiff as one of the offenders who pulled off her clothing. Plaintiff asserts that the officers should not have relied on Martha's identification because it was tainted by the use of unduly suggestive identification techniques with the other victims. However, this is pure speculation, and therefore insufficient to show that the detectives should not have believed Martha. Martha viewed the line-up without viewing any photos, and (unlike Denise) there is no evidence that Martha's identification of Plaintiff was tainted in any way.

Plaintiff also argues that the detectives should not have relied on Martha's identification because she admitted to blacking out for a time in the middle of the attack. Plaintiff does not explain, however, why it would have been impossible for Martha to see some of her attackers before she blacked out, at least to an extent sufficient to provide the Government with an "honest and sound suspicion" that Plaintiff was one of the men involved in the attack. *Fabiano*, 784 N.E.2d at 266.

In addition, when Henrichs viewed the photo array, he identified Plaintiff as the person he saw violating Denise with a foreign object. Plaintiff argues that Henrich's statement does not support a finding of probable cause because "ASA McCarthy did not consider his testimony to be reliable evidence on which to base a prosecution." [127-1] at 49. But this argument improperly conflates the standards for obtaining a conviction (beyond a reasonable doubt) with the much lower standard for charging a defendant (probable cause). The Court is also not convinced that "the totality of the circumstances calls the identification by ... Henrichs into serious question" to such an extent that his identification could not form the basis for probable cause. [127-1] at 49. Plaintiff has come forward with no evidence that Henrich's statement was tainted by misconduct of the police. While Henrichs saw Plaintiff's photo on television before he identified Plaintiff in the photo array, there is no evidence that the television report contained the same level of detail that Henrichs provided in his alleged eye witness account. More specifically, Plaintiff has come forward with no evidence that Henrich could have known, except through personal observation, that one of the attackers put a foreign object into Denise's vagina. Therefore, the Court concludes that Henrichs' statement, in conjunction with Martha's consistent statement, were sufficient to provide Defendants with probable cause to bring all the charges against Plaintiff.[6]

### 4. Intentional Infliction of Emotional Distress

**\*28** Defendants argue that Duffin is entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress because Plaintiff failed to bring the claim within one year of his alleged injury, as required by 745 ILCS 10/8-101. Plaintiff offers no response to this argument, and therefore forfeits his claim for intentional infliction of emotional distress. See *Salas*, 493 F.3d at 924; *Boogaard*, 126 F. Supp. 3d at 1026-27.

Case: 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1123   Filed 04/05/21   Page 44 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

## 5. Qualified Immunity

" 'Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate *clearly established* statutory or constitutional rights that a reasonable person would know about.' " *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Once a defendant raises qualified immunity as a defense, "the plaintiff has the burden of establishing that his or her rights were violated and that the law concerning the proffered right 'was clearly established at the time the challenged conduct occurred.' " *Id.* (quoting *Mustafa*, 442 F.3d at 548). The Court must then determine "whether a reasonably competent official would know that the conduct was unlawful in the situation he confronted." *Mustafa*, 442 F.3d at 548.

" 'In determining qualified immunity at the summary judgment stage, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.' " *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 798 (7th Cir. 2016) (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013)). In conducting the second step of this analysis, the Court's "first task is to consider controlling Supreme Court and Seventh Circuit precedent." *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016). Courts typically conduct this analysis "by focusing on the 'specific context in the case,' rather than on a 'broad general proposition.' " *Kristofek*, 832 F.3d at 798 (quoting *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004)). Nonetheless, "general statements of the law are not inherently incapable of giving fair and clear warning, and in [certain] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); see also *Figgs v. Dawson*, 829 F.3d 895, 906 (7th Cir. 2016) ("While, to be clearly established, a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim, the very action in question need not have previously been held unlawful for a public official to have reasonable notice of the illegality of some action." (internal citations and quotation marks omitted)). In addition, "[w]hen allegations revolve around whether police officers failed to disclose *Brady* evidence, the qualified immunity question focuses on whether it was clearly established that the information that [the plaintiff] contends the Defendants failed to disclose had to be turned over as exculpatory or impeaching." *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 743 (N.D. Ill. 2016) (citing *Carvajal*, 542 F.3d at 569).

*\*29* As explained above, the Court has already determined that the facts, taken in the light most favorable to Plaintiff, make out a due process violation against Duffin based on his alleged conspiracy with Ptak to use suggestive techniques to obtain Denise's witness identification and the withholding of the use of suggestive techniques with Denise and Hugo from Plaintiff's criminal defense counsel. The next question is whether these alleged constitutional violations were clearly established at the time they occurred, in late 1981 and early 1982.

To determine whether qualified immunity applies to a conspiracy claim, the Court must determine "whether those who allegedly performed the acts in furtherance of the conspiracy are themselves shielded from liability for those acts." *Atkins v. Hasan*, 2015 WL 3862724, at \*5 (N.D. Ill. June 22, 2015). In *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), *abrogated on other grounds by* *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (U.S. 2017)—which Plaintiff cites but Defendants fail to address—the Seventh Circuit held that it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about ... the conduct of a lineup." *Id.* at 752; see also *Newsome v. McCabe*, 319 F.3d 301, 302 (7th Cir. 2003) ("Two years ago we held that officers McCabe and McNally are not entitled to qualified immunity if, as Newsome alleges, they not only induced witnesses to accuse him falsely but also concealed their improper activities."); *Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1207 (E.D. Wis. 2014) ("*Newsome* held it was clearly established in 1979 and 1980 'that police could not withhold from prosecutors exculpatory information about ... the conduct of a lineup.' " (quoting *Newsome*, 256 F.3d at 752)). Further, the Supreme Court recognized long before 1981 that "the conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." *Foster v. California*, 394 U.S. 440, 442 (1969).

While *Newsome* and *Foster* involved a suspect line-up, rather than a photo array containing the suspect's photos, the Court concludes that *Newsome* was sufficiently on point to put a

Case: 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1124   Filed 04/05/21   Page 45 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

police officer on reasonable notice that it would violate due process to signal to a witness during the viewing of a photo array the identity of the suspected offender.

In addition, the Seventh Circuit also recognized before 1981 that "a conspiracy may be used as the legal mechanism through which to impose liability on each and all the defendants without regard to the person doing the particular act." *Hostrop v. Bd. of Jr. College Dist. No. 515, Cook and Will Ctys. and State of Ill.*, 523 F.2d 569, 576 (7th Cir. 1975). Defendants argue, nonetheless, that Duffin is entitled to qualified immunity because he was "entitled to rely upon information furnished to him by other officers"—specifically, information provided by Ptak regarding Denise's identification of Plaintiff—pursuant to the theory of "collective knowledge." [136] at 33. The cases cited by Defendants, however, require an officer's reliance on information obtained from another officer to be "objectively reasonable" and "in good faith." See *Wilbon v. Plovanich*, 67 F. Supp. 3d 927, 940 (N.D. Ill. 2014) ("In a civil case for an arrest without probable cause, the collective knowledge doctrine means a defendant is entitled to qualified immunity if he relied in objective good faith on another officer as to the justification for the arrest." (internal citation and quotation marks omitted)); *Bibart v. Stachowiak*, 888 F. Supp. 864, 867 (N.D. Ill. 1995) (arresting officers who reasonably relied upon information obtained from another law enforcement official regarding outstanding arrest warrant are entitled to qualified immunity from suit if it subsequently appears that information that arresting officers received was erroneous); *Hardiman v. Ford*, 41 F.3d 1510, 1994 WL 585409, at *2 (7th Cir. Oct. 25, 1994) (explaining that "[s]o long as the officer's reliance on the 'collective knowledge' is objectively reasonable, he will be accorded qualified immunity" from suit arising from arrest without probable cause). Construing the facts in the light most favorable to Plaintiff, Ptak and Duffin may have engaged in a conspiracy to identify Plaintiff as a suspect regardless of what the evidence actually showed, in which case it was not objectively reasonable, or in good faith, for Duffin to rely on any statements that Ptak made concerning Denise's identification of Plaintiff in the photo array and line-up. Therefore, the Court concludes that Duffin is not entitled to the protections of qualified immunity.

**B. Claims Against The City**

**1. *Monell***

*30 Pursuant to *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658 (1978), "[a] local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). Under this standard, "[t]he governmental body's policies must be the *moving* force behind the constitutional violation before we can impose liability." *Id.* at 306. In addition, "[i]f the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations." *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015).

Plaintiff's *Monell* claim is based on the City's alleged widespread practice of withholding exculpatory materials contained in "street files" in felony criminal investigations during the time period involved in Plaintiff's criminal prosecution, 1981 to 1982. Plaintiff argues that the City should incur *Monell* liability based on Duffin and Ptak's alleged failure to disclose that they used improperly suggestive identification techniques when showing the photo array to Denise. However, Plaintiff has offered no evidence that the City's practice of withholding street files was the driving force behind that alleged constitutional violation.

As an initial matter, Plaintiff has not offered any evidence, beyond speculation, that a street file existed for Plaintiff's criminal case. More to the point, Plaintiff does not argue or offer any evidence that suggestive techniques used in a photo array would be the type of "evidence" that one would expect to be included in the street file, if one did exist. Indeed, Plaintiff states in his supplemental brief, [157] at 21, that he is "not proceed[ing] on a *Monell* theory for a widespread practice of suggestive witness identification techniques and has not submitted that evidence here." Instead, Plaintiff points to four other types of evidence that, he argues, would have been in the street file: (1) a witness statement from the woman from Cicero; (2) notes from Powell's interview; (3) Hugo's description of a female offender; and (4) Martha's initial witness statement. The closest Plaintiff comes to asserting a link between the withholding of information concerning the use of suggestive techniques and his injury is his argument that "[t]he evidence supports a finding that, since [CPD] authorized and condoned detectives to withhold exculpatory

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1125 Filed 04/05/21 Page 46 of 139

Hampton v. City of Chicago, Not Reported in Fed. Supp. (2017)

103 Fed. R. Evid. Serv. 1177

*witness statements*, the Detectives also felt unfettered to also withhold the information of how they obtained the false identifications." [127-1] at 65 (emphasis added). This is insufficient to establish causation under this Circuit's case law, which Plaintiff fails to discuss. There must be "a direct causal connection between the policy or practice and [the plaintiff's] injury." *Rice ex rel. Rice v. Correctional Med. Services*, 675 F.3d 650, 675 (7th Cir. 2012). And while the Seventh Circuit has not "adopt[ed] any bright-line rules defining a 'widespread custom or practice,' " the plaintiff "must demonstrate that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303; see also *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000) ("Ordinarily, one incident is not sufficient to establish a custom that can give rise to *Monell* liability."). Without any evidence that the City has a widespread practice of failing to disclose its use of unduly suggestive techniques with witnesses, Plaintiff cannot show that Defendants' alleged withholding of suggestive techniques in this case was anything more than a "random event." *Id.* Therefore, Plaintiff cannot establish a causal link between his injuries and the city's policies or practices and the City is entitled to summary judgment on Plaintiff's *Monell* claim.

### 2. Respondeat Superior

**\*31** Defendants' motion for summary judgment does not address Plaintiff's respondeat superior claim. Plaintiff argues only that, "[u]nder respondeat superior, the City may also [li]able for [Ptak's] actions, within the scope of his employment, in the malicious prosecution claim." [127-1] at 24, n.2. Since Defendants are entitled to summary judgment on the malicious prosecution claim for the reasons explained above, the Court concludes that the City is also entitled to summary judgment on Plaintiff's claim for respondeat superior.

### 3. Indemnification

None of the parties address Plaintiff's indemnification claim in their summary judgment briefs. In his complaint, Plaintiff states that "Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities." [1] at 18. Since the Court is allowing Plaintiff to proceed on his Section 1983 due process claim—a constitutional tort—against Duffin, the Court concludes that the City is not entitled to summary judgment on Plaintiff's claim for indemnification. See generally 745 ILCS 10/9-102; *Grayson*, 157 F. Supp. 3d at 748 (Section 1983 judgment qualifies as "tort judgment" within meaning of Illinois' indemnification statute so long as employee was acting within scope of his employment).

### IV. Conclusion

For the reasons explained above, the Court grants in part and denies in part Defendants' motion for summary judgment [104]. The Court enters summary judgment in favor of Defendants and against Plaintiff on Plaintiff's *Monell* claim against the City of Chicago for violation of his right to Due Process (Count I) and on Plaintiff's claims for Failure to Intervene (Count II), Malicious Prosecution (Count IV), Intentional Infliction of Emotional Distress (Count V), Civil Conspiracy (Count VI), and Respondeat Superior (Count VII). Defendants' motion for summary judgment is denied as to Plaintiff's Section 1983 claim against Defendant Duffin for violation of Plaintiff's right to Due Process (Count I), Plaintiff's Section 1983 claim for Conspiracy (Count III), and Plaintiff's claim for Indemnification (Count VIII). This case is set for status hearing on July 26, 2017 at 9:30 a.m.

### All Citations

Not Reported in Fed. Supp., 2017 WL 2985743, 103 Fed. R. Evid. Serv. 1177

### Footnotes

1    Ptak is now deceased. Plaintiff has not named Ptak's estate as a defendant.

2    The parties disagree about whether Martha was knocked unconscious for only a moment or for a longer period of time.

3    Robbie is also erroneously referred to as "Ronnie" is several documents in the record.

4    Defendants object on hearsay grounds to the introduction McCarthy's report to the extent that it reflects Denise's statements to McCarthy. The Court addresses Defendants' objections below in its discussion of the deposition testimony that Denise provided in this lawsuit.

103 Fed. R. Evid. Serv. 1177

5    To be sure, the likelihood that any prosecutor would seriously contemplate perjury charges against Denise given the facts of this case appears extremely remote. There is no dispute that Denise was the victim of a vicious attack in 1981. Any changes in her recollection of that traumatic event three decades later might be attributable to a number of factors —*i.e.*, confusion, mistake, lapse of memory, passage of time, even PTSD—and the notion of bringing criminal charges on account of such discrepancies seems far-fetched. There is no suggestion in the record that the prosecutors assigned to retry Plaintiff in this case ever contemplated any such charges.

6    It is unnecessary for the Court to reach the last issue raised by the parties—whether the entry of an order of *nolle prosequi* is considered to be the termination of the criminal proceeding in Plaintiff's favor. "The Court nonetheless notes that, under Illinois law, [f]or a *nolle prosequi* dismissal to satisfy the favorable termination element, '[t]he circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed *a lack of reasonable grounds to pursue the criminal prosecution.*' " *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 794 (N.D. Ill. 2013) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996)) (emphasis added); see also *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001). In this case, ASA McCarthy ultimately decided not to re-try Plaintiff based on her conclusion that the state would be unable to meet its burden of proof at trial, which would at least tend to suggest that the *nolle prosequi* dismissal in this case should qualify as a termination of the criminal proceeding in Plaintiff's favor.

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 12146384
Only the Westlaw citation is currently available.
United States District Court, N.D. Florida,
Pensacola Division.

Kamau KINIUN f/k/a Shaundel
Strickland, Plaintiff/Counter-Defendant,

v.

MINNESOTA LIFE INSURANCE
COMPANY, Defendant/Counter-Plaintiff,
and

Minnesota Life Insurance
Company, Third-Party Plaintiff,

v.

Ronald Strickland, Irma Stanton, Eddie
Lee Young, Frederick Broughton, Steve
Douglas Broughton, Austin Broughton,
Jr., Clarence Grandison, Michael
Grandison, Ike Grandison, and Adell
Grandison, Third-Party Defendants,
and

Clarence Grandison, Michael Grandison,
Ike Grandison and Adell Grandison,
Third-Party Defendants/Cross-Plaintiffs,

v.

Ronald Strickland, Irma Stanton,
Eddie Lee Young, Frederick Broughton,
Steve Douglas Broughton, and
Austin Broughton, Jr., Third-Party
Defendants/Cross-Defendants.

Case No. 3:10cv399/MCR/CJK
|
Signed 01/14/2013

**Attorneys and Law Firms**

J. Phillip Warren, Taylor Warren & Weidner PA, John Craig
Beroset, Beroset & Keene, Pensacola, FL, for Plaintiff/
Counter-Defendant.

**ORDER**

M. CASEY RODGERS, CHIEF UNITED STATES
DISTRICT JUDGE

*\*1* This case involves competing claims to life insurance
proceeds. The insured, Gloria Strickland, was murdered
on July 9, 2010, by a single gunshot wound to the
head. At the time of her death, Strickland (referred to
hereafter as "the decedent") was insured under a number
of life and accidental death and dismemberment policies,
all of which named her son, Kamau Kiniun, as the
beneficiary. Within a week of his mother's death, Kiniun
made claims for his mother's life insurance proceeds. During
their investigations of Kiniun's claims, Minnesota Life
Insurance Company ("Minnesota Life") and Metropolitan
Life Insurance Company ("MetLife") learned that Kiniun
was a suspect in his mother's murder; the insurers thus
refused to tender the proceeds of the policies to him.[1] Kiniun
filed separate lawsuits against the insurers in Escambia
County Circuit Court, seeking payment of the proceeds. The
insurers removed the actions to this court. Unsure as to
the individual(s) to whom the proceeds should be paid, the
insurers filed a counterclaim against Kiniun and a third-
party complaint for interpleader against the remaining potential
claimants, which included the decedent's purported surviving
spouse, Ronald Strickland, and the third-party defendants, all
of whom claimed to be siblings of the deceased.[2] The insurers
also filed motions to deposit the proceeds of the policies
into the court's registry. The court granted the motions to
deposit and dismissed the insurers from the actions, leaving
the remaining parties to litigate their claims to the proceeds.
The court then consolidated the two cases.[3] Discovery is now
complete, and the matter is set for trial beginning January 22,
2013. The parties have filed a number of motions *in limine*,
six of which currently are before the court.[4] The court will
address each motion in turn.

**1. Plaintiff's Fourth Motion *in Limine***
*\*2* In his fourth motion *in limine*, the plaintiff requests the
court to exclude evidence that he possessed a firearm prior
to the decedent's murder. In particular, the plaintiff seeks to
exclude alleged hearsay statements that the decedent found a
gun in his bedroom several weeks before her death. According
to the third-party defendants, the only such statement they
intend to introduce at trial is a statement the decedent made

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1128 Filed 04/05/21 Page 49 of 139

Kinfun v. Minnesota Life Insurance Company, Not Reported in Fed. Supp. (2013)

to a co-worker, Pam Steely, a couple of weeks before her death that she found a gun in her home while cleaning that she believed belonged to the plaintiff.[5] The third-party defendants acknowledge that the statement is an out-of-court statement offered for the truth of the matter asserted, but insist that it should be admitted pursuant to Fed. R. Evid. 807, a catch-all exception to the hearsay rule.[6] According to rule 807,

> [a] statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807. "Th[is] residual hearsay exception applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." U.S. v. Jayyousi, 657 F.3d 1085, 1113 (11th Cir. 2011) (internal marks omitted). The court finds that exceptional guarantees of trustworthiness exist with regard to the decedent's statement that she found a gun in her home. According to Steely's deposition testimony, she and the decedent were friends for more than twenty-five years. They worked together and confided in one another about various aspects of their personal lives, including their children. The decedent discussed various issues with Steely pertaining to the plaintiff, including the fact that he had been arrested, was a financial strain on her, attempted suicide, and engaged in threatening behavior.[7] There is no indication that the decedent fabricated—or had any incentive to fabricate—any of the alleged statements, including the statement that she found a gun in her house. Not only is the statement trustworthy, but it also is relevant to the only issue in this case—whether the plaintiff murdered the decedent. And the statement is the only evidence of which the court is aware that demonstrates that the plaintiff may have had access to a firearm at or near the time of the decedent's death. Finally, considering the circumstances of this case, including that the plaintiff is a suspect in his mother's murder and seeks to recover her life insurance proceeds, the court finds that the interests of justice will best be served by admission of the statement into evidence. The statement, therefore, will be admitted at trial.[8]

**\*3** The plaintiff also seeks to exclude statements by various witnesses that they were told that the plaintiff had a gun

or had been seen with a gun at some time prior to the decedent's death. The plaintiff argues that, to the extent the statements were made by third parties who have no personal knowledge of the contents thereof, the statements constitute inadmissible hearsay; to the extent the statements are based on personal knowledge or observations, the plaintiff argues that they constitute improper character evidence and should be excluded under Fed. R. Evid. 404. In the alternative, the plaintiff argues that the statements should be excluded under Rule 403 because their probative value is substantially outweighed by the danger of unfair prejudice. The only such statement the third-party defendants intend to introduce is a statement by the plaintiff's uncle, Eddie Young, who is a third-party defendant in this case, that he observed the plaintiff with a gun approximately one year before the decedent's death. The third-party defendants argue that the statement is admissible under Rule 404(b) to show that the plaintiff had the opportunity, preparation, and knowledge to murder his mother. While Rule 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that the person acted in conformity therewith, such evidence may be admitted for other purposes, including proof of motive, opportunity, intent, knowledge, and plan. See Fed. R. Evid. 404(b). In determining whether to admit evidence under Rule 404(b), the court considers several factors:

> "First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by the undue prejudice...."

U.S. v. Sawyer, 361 Fed. Appx. 96, 98-99 (11th Cir. 2010) (quoting United States v. Matthews, 431 F.3d 1296, 1310-11 (11th Cir. 2005), cert. denied, 549 U.S. 811 (2006)). Considering that the plaintiff lived with his mother and his mother died as a result of a single shotgun wound to the head, the court agrees that evidence that the plaintiff possessed a firearm is relevant to whether the plaintiff had the opportunity, preparation, and knowledge to murder his mother. The plaintiff has not challenged the sufficiency of the evidence, so the second factor is not at issue. Turning to the third factor, the court finds that the probative value of the statement outweighs any prejudicial effect it may have. Accordingly, the statement will be admitted at trial. See, e.g., U.S. v. Steel, U.S. v. Covelli, 738 F.2d 847, 855-56 (7th Cir. 1984) ("[E]vidence of prior possession of a weapon can be used to prove opportunity and identification even where it cannot be directly identified as the weapon used in the

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1129 Filed 04/05/21 Page 50 of 139

Kinfun v. Minnesota Life Insurance Company, Not Reported in Fed. Supp. (2013)

crime."); *U.S. v. Ravich*, 421 F.2d 1196, 1204 (2d Cir. 1970) (holding that direct evidence of gun possession at the time of arrest "would have been relevant to establish opportunity or preparation to commit the crime charged, and thus would have tended to prove the identity of the robbers, the only real issue in this trial"); *Simpson v. Bock*, No. 00-10079, 2002 WL 31938719, at *4 (E.D. Mich. Dec. 31, 2002) (quoting *Covelli* for the proposition that " 'evidence of prior possession of a weapon can be used to prove opportunity and identification even where it cannot be directly identified as the weapon used in the crime' ").

## 2. Plaintiff's Fifth Motion *in Limine*

Through his fifth motion *in limine*, the plaintiff seeks to exclude evidence of a petition for an injunction for protection against domestic violence the decedent filed against him in 1998. In the petition, the decedent stated that the plaintiff threatened her with a crystal candlestick after she cancelled a surgery he had scheduled and that the plaintiff had previously threatened to "blow [her] brains out." The plaintiff seeks to exclude the petition pursuant to Fed. R. Evid. 403 and 404. The third-party defendants oppose the motion, arguing that the petition is admissible to rebut the plaintiff's allegation that he had a good relationship with the decedent and to show that he had a motive to kill her. The third-party defendants also claim that the plaintiff intends to introduce evidence of a restraining order the decedent obtained against Alfred Thompson, who the plaintiff attempts to implicate in his mother's murder, shortly before her death and argue that it would be unfair to allow evidence of one restraining order without allowing evidence of the other. As set forth above, while Rule 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts to prove the character of a person in order to show that the person acted in conformity therewith, such evidence may be admitted for other purposes. *See* Fed. R. Evid. 404(b). In the event the plaintiff offers or elicits testimony at trial that he had a good relationship with his mother, evidence of the petition plainly will be relevant for rebuttal purposes. The court also finds evidence of the petition relevant to show the plaintiff's intent and motive. The first prong of the analysis thus is satisfied. The plaintiff has not challenged the sufficiency of the evidence of the petition or the statements contained therein; the second prong, therefore, is not at issue. *See Matthews*, 431 F.3d at 1311, n.14. Finally, even though the evidence is remote in time, considering the nature and circumstances of this action and the evidence the court anticipates will be introduced at trial, the court finds that the probative value of the evidence is not substantially outweighed by its prejudicial effect. The petition

for an injunction against the plaintiff thus will be admitted at trial.

## 3. Plaintiff's Sixth Motion *in Limine*

**\*4** In his sixth motion *in limine*, the plaintiff requests an order precluding the third-party defendants from referencing or introducing evidence of his 1999 conviction for carjacking.[9] Pursuant to Fed. R. Evid. 609, criminal convictions may be used to attack a witness's character for truthfulness. If more than ten years have passed since the conviction or release from confinement, whichever is later, evidence of the conviction may be admitted only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and the proponent of the evidence provides sufficient notice of his intent to use it.[10] Fed. R. Evid. 609(b) (1). Evidence of convictions older than ten years is presumptively inadmissible and will be admitted "very rarely and only in exceptional circumstances." *U.S. v. Tisdale*, 817 F.2d 1552, 1555 (11th Cir. 1987) (internal marks omitted). Here, the third-party defendants have presented no exceptional circumstances warranting admission of the plaintiff's carjacking conviction under Rule 609, particularly considering that two other felony convictions will be admitted for impeachment purposes. The fact that the conviction is not admissible under Rule 609 does not mean it cannot be admitted for other purposes, however, including "to prove motive, opportunity, intent, or other Rule 404(b) facts." 28 Wright & Gold at § 6133. The third-party defendants argue that evidence of the carjacking conviction is relevant to demonstrate that the plaintiff "had the knowledge to prepare for the pre-meditated murder of his mother and the stealth and surprise to accomplish his goal" and was more likely than Thompson to be the assailant. They apparently intend to introduce evidence of the details of the carjacking offense, arguing that they are similar in certain respects to the details of the decedent's murder. The court disagrees. Not only are the two offenses materially different, but even if evidence of the plaintiff's carjacking conviction were admitted at trial, details of the offense would not be admitted. *See Id.* at § 6134; *see also Doe v. Sullivan Cnty, Tenn.*, 956 F.2d 545, 551 (6th Cir. 1992). And the mere fact that the plaintiff was convicted of carjacking in 1999 has little probative value with respect to the plaintiff's ability to plan and accomplish the murder of the decedent more than ten years later. Evidence of the plaintiff's 1999 carjacking conviction, therefore, will not be admitted at trial. *See* Fed. R. Evid. 403.

**4. Plaintiff's Seventh Motion *in Limine***

In his seventh motion *in limine*, the plaintiff seeks to preclude the third-party defendants from referring to, commenting on, or presenting evidence that he refused to provide a DNA sample to law enforcement officials. According to the plaintiff, evidence that a person exercised his Fourth Amendment right to refuse to provide a DNA sample is not admissible unless the person attempts to use his Fourth Amendment right as both a shield and a sword. The plaintiff also argues that it would be improper to admit such evidence as consciousness of guilt because he was not under arrest at the time of the refusal. Finally, the plaintiff argues that the probative value of his refusal is substantially outweighed by the prejudicial effect. The plaintiff has provided—and the court has located—no authority for the proposition that a party's refusal to provide a DNA sample is inadmissible in a civil action. Even in a criminal case, such evidence may be admitted under certain circumstances. *See, e.g., United States v. Davis*, No. 1:10cr11, 2010 WL 2571356, at *3 (D. Virgin Islands June 15, 2010). The plaintiff instituted this action seeking to recover the proceeds of his mother's life insurance policies. In so doing, he placed his culpability for his mother's death at issue. In fact, he was first asked to provide a DNA sample only after he requested that law enforcement officials clear him as a suspect so he could receive the proceeds of his mother's life insurance policies. And while the plaintiff has never been arrested for his mother's murder, he has remained a prime—if not the only—suspect in the case. The court thus finds that evidence that the plaintiff refused to voluntarily submit a DNA sample is relevant to the plaintiff's consciousness of guilt. The evidence, therefore, will be admitted.

**5. Third-Party Defendants First Motion *in Limine***

**\*5** In their first motion *in limine*, the third-party defendants request that the court enter an order to "remind" the plaintiff's expert witness, Joshua Perper, M.D., of the constraints the court has imposed on his testimony and, in particular, the court's finding that he is not qualified to render an opinion as to who could or could not have killed the decedent. The plaintiff does not oppose the relief sought in the motion. The motion, therefore, is granted, and all parties are advised that the evidence and argument at trial shall conform to the court's rulings in the case.

**6. Third-Party Defendants Second Motion *in Limine***

Through their second motion *in limine*, the third-party defendants seek an order precluding certain of the plaintiff's witnesses from testifying at trial. Specifically, the third-party defendants urge the court to prohibit the testimony of Charles Culliver, Aundrell Sanders, Latrina Levine, Kallie Mobley, and Stacy Rose regarding Alfred Thompson, including Thompson's possession of firearms and threats and violence against women, arguing that the evidence is irrelevant and prohibited by Rule 404. The plaintiff opposes the motion, arguing that the evidence consists of an admission by Thompson that he murdered the decedent and otherwise is admissible to show that Thompson had the means, knowledge, and motive to commit the murder. The court will defer ruling on this motion until after it has had an opportunity to hear from the parties at the pre-trial conference as to the manner in which they anticipate such evidence being presented at trial.

Accordingly,

(1) Plaintiff's Fourth Motion *in Limine* (doc. 215) is **DENIED.**

(2) Plaintiff's Fifth Motion *in limine* (doc. 216) is **DENIED.**

(3) Plaintiff's Sixth Motion *in limine* (doc. 217) is **GRANTED.**

(4) Plaintiff's Seventh Motion *in limine* (doc. 220) is **DENIED.**

(5) Third-Party Defendants' Motion *in Limine* to Preclude Portions of the Testimony of Joshua Perper, M.D. (doc. 218) is **GRANTED.**

(6) Third Party Defendants' Motion for Separate Trials (doc. 219) and Third Party Defendants Unopposed Motion for Leave to Amend Third Party Defendants' Motion for Separate Trials (doc. 222) are **DENIED** as moot.

(7) The court reserves ruling on Third-Party Defendants' Motion *in Limine* to Testimony [*sic*] of the Alfred Thompson Witnesses (doc. 221).

**DONE AND ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2013 WL 12146384

Case 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1131   Filed 04/05/21   Page 52 of 139

Kinlun v. Minnesota Life Insurance Company, Not Reported in Fed. Supp. (2013)

Footnotes

1   Under Florida law, "[a] named beneficiary of a ... life insurance policy ... who unlawfully and intentionally kills the principal obligee or the person upon whose life the policy is issued is not entitled to any benefit under the ... policy ...; and it becomes payable as though the killer had predeceased the decedent." Fla. Stat. § 732.802(3). According to the policies, in the event Kiniun is ineligible to receive the proceeds, they are payable to the decedent's surviving spouse, if one exists, and if not, to her siblings.

2   The decedent's death certificate listed Ronald Strickland as her surviving spouse. However, Minnesota Life discovered a Release of Mortgage, dated February 13, 2008, which identified the mortgagor as Gloria Strickland, "an unmarried woman," thus calling into question Strickland's alleged status as the surviving spouse. The court also notes that the Grandisons are the decedent's biological siblings and the remaining third-party defendants, other than Austin Broughton, Jr., who has not made an appearance in this action and released any claim he may have to the benefits of the Minnesota Life policy, claim to be the decedent's siblings through "virtual adoption" by the decedent's parents.

3   After the cases were consolidated, a third insurer, Stonebridge Life Insurance Company, moved to intervene, which the court allowed (*see* doc. 171), and deposited additional life insurance proceeds into the court's registry.

4   The plaintiff filed seven motions *in limine*. The court has ruled on the first three motions; the other four remain pending. The third-party defendants filed two motions *in limine*, both of which remain pending. The third-party defendants also filed a motion to bifurcate the trial (doc. 219). The court indicated at a Rule 16 conference held on July 16, 2012, that the matter would be bifurcated in the manner requested by the third-party defendants. According to the parties' pre-trial stipulation (doc. 236), all parties consent to proceeding in the manner stated by the court, pursuant to which the jury will first decide whether the plaintiff is entitled to the proceeds at issue and, in the event it decides that he is not, then determine whether Ronald Strickland, one of the third-party defendants, is the plaintiff's surviving spouse and, as such, entitled to recover the proceeds. The third-party defendants' motion to bifurcate (doc. 219) and motion to amend motion to bifurcate (doc. 222) therefore are DENIED as moot.

5   The plaintiff and decedent were only occupant's of the decedent's home.

6   The third-party defendants also argue that the statement should be admitted to impeach the plaintiff's deposition testimony that he has never owned a gun. In the event the plaintiff testifies at trial that he never owned a gun, evidence of the decedent's statement will be admitted for impeachment purposes.

7   Specifically, the decedent discussed an instance in which she awoke to find the plaintiff standing over her; the plaintiff commented that he could bash the decedent's head in. The decedent also informed Steely that she locked the door to her bedroom.

8   Although the decedent's statement that she found a gun in her house is prejudicial, it also is highly probative and thus not subject to exclusion under Rule 403.

9   The plaintiff was convicted of carjacking on July 22, 1999, and sentenced to three years in state prison. He was released from confinement on February 2, 2002. The plaintiff was convicted of Forgery of Private Labels in 2005 and Counterfeiting of Private Labels in 2009. The plaintiff concedes that the forgery and counterfeiting convictions are admissible for impeachment purposes.

10   There is some dispute as to when the ten-year period ends. The plaintiff seems to presume that it ends as of the date of the witness's testimony; the third-party defendants argue that it ends at the time of the alleged offense at issue—in this case, the decedent's murder. The court agrees with the plaintiff's position and finds that the carjacking conviction is more than ten years old and thus is subject to Fed. R. Civ. P. 609(b)(1). *See* 28 Charles Alan Wright & Victor J. Gold, Federal Practice and Procedure § 6136 (1st ed. 2012).

---

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S.
                                                      Government Works.

2018 WL 1768072
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

PEOPLE of the State of
Michigan, Plaintiff–Appellee,

v.

David Douglas DAVIS,
Defendant–Appellant.

No. 335051
|
April 12, 2018

Oakland Circuit Court, LC No. 2015–256852–FC

Before: SAYWER, P.J., and MURRAY and STEPHENS, JJ.

**Opinion**

PER CURIAM.

*1  Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. He was sentenced to life imprisonment without parole for the first-degree murder conviction, 59 to 90 months' imprisonment for the felon-in-possession conviction, and two years' imprisonment for each of the felony-firearm convictions. We affirm.

I. FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from the shooting death of his girlfriend, Theresa Diamos, at their Royal Oak home. In the early morning hours of October 12, 2015, a Royal Oak police officer was dispatched to the home on a report of shots fired. As the officer and his partner approached, defendant exited the front door holding a shotgun. He refused to drop the gun, and told officers that there was a shooter inside the home, and

that the victim needed CPR. Defendant then ran in and out of the home twice before the police were able to take him into custody.

Defendant told police that an intruder, armed with a knife, had entered the home while he and the victim were sleeping, and that he accidentally shot the victim during a "fire fight" with the intruder. However, the police found no evidence of a break-in, and determined that all of the shotgun shells recovered from the scene had been fired from the same weapon. Further, the forensic pathologist assigned to the case testified that the victim was shot at close range from a downward trajectory, and that none of her injuries suggested a physical struggle.

II. ANALYSIS

A. OTHER–ACTS EVIDENCE

Defendant first challenges the trial court's decision to admit evidence of his other acts of domestic violence pursuant to MCL 768.27b and MRE 404(b). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. People v. Gursky, 486 Mich. 596, 606, 786 N.W.2d 579 (2010). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. People v. Unger, 278 Mich. App. 210, 217, 749 N.W.2d 272 (2008). Preliminary questions of law regarding admissibility, however, are subject to de novo review. Gursky, 486 Mich. at 606, 786 N.W.2d 579.

1. MCL 768.27b

*2  Defendant contends that the trial court abused its discretion in admitting the prior acts evidence pursuant to MCL 768.27b, because some of the acts admitted occurred more than ten years before the charged offense and the danger of unfair prejudice to defendant substantially outweighed the probative value, in violation of MRE 403.

MCL 768.27b provides, in relevant part, as follows:

(1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is

not otherwise excluded under Michigan rule of evidence 403.

* * *

(4) Evidence of an act occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that admitting this evidence is in the interest of justice.

Accordingly, if a defendant faces domestic violence charges, evidence of prior acts of domestic violence that occurred within 10 years of the crime are admissible unless excluded under MRE 403, while those that occurred more than 10 years from the date of the crime are admissible for any relevant purpose if admission is in the interest of justice (and otherwise meets the standards under MRE 403). Defendant asserts that he was charged in 2015 and the admission of events that occurred earlier than 2005 was not in the interest of justice because it gave the prosecution a platform from which to attack his character.

Contrary to defendant's argument, evidence of his prior acts of domestic violence can be admitted under the statute to attack his character. MCL 768.27b "allows trial courts to admit relevant evidence of other domestic assaults to prove any issue, even the character of the accused, if the evidence meets the standard of MRE 403." *People v. Pattison*, 276 Mich. App. 613, 615, 741 N.W.2d 558 (2007). However, in *Pattison*, this Court cautioned "trial courts to take seriously their responsibility to weigh the probative value of the evidence against its undue prejudicial effect in each case before admitting the evidence." *Id.* at 621, 741 N.W.2d 558. In *People v. Cameron*, 291 Mich. App. 599, 611, 806 N.W.2d 371 (2011), this Court explained the balancing test needed to evaluate the probative value and prejudicial effect of prior evidence of domestic violence:

> [T]his Court must make two distinct inquiries under the balancing test of MRE 403. First, this Court must decide whether introduction of Cameron's prior-bad-acts evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and "weigh the probativeness or relevance of the evidence" against the unfair prejudice. Upon completion of this second inquiry, this Court can determine whether the trial court abused its discretion in allowing Cameron's prior bad acts into evidence.

After the parties argued their respective positions on the admissibility, under the statute, of acts occurring more than 10 years before the charged crimes, the trial court (1) recognized

that because defendant claimed the shooting was an accident, motive and intent were relevant, (2) analyzed each incident (denoted by exhibits during the hearing), and (3) analyzed why the "interests of justice" called for admission of other acts of domestic violence that occurred 11 years prior to the charged crime, but not beyond 11 years:

> In connection with the incidents prior to February 15 of 2004, the Court finds that those are so remote in time and otherwise distinguishable that it would not serve the interest of justice to permit those incidents to be submitted before the jury for the reasons—some of the reasons articulated by defense counsel.

> **\*3** There—and I will note that there is a February 7 incident, which is E, and then there's a four year gap to February of 2004. I think that also supports the argument of the defendant that those are so remote that it would undermine the policy set forth in the legislative —legislators—legislation's decision and break of a bright line rule of 2000—of—ten years, and therefore, the able Plaint—prosecutor's argument in connection with incidents A through E, I agree that those should not be admitted, that it would undermine the interest of justice to admit those.

> With regard to incidents J through the end, because there's been some added, I agree that any incidents of domestic violence should be admitted. I agree with defense counsel that incidents K and L are not incidents of domestic violence, it's simply the violation—I understand the argument of the People that simply violating the personal protection order automatically converts into—or I don't know that they say automatically, but they're arguing that the violation of a personal protection order therefore almost inherently becomes domestic violence.

> I do not think that—at least what has been provided to the Court, there's no effect on—it shows no effect on the victim, it doesn't show why the context would somehow meet the statutory requirements of domestic violence. There is not a clear rule that a violation of a PPO automatically is considered domestic violence, and therefore, K and L would not be admitted.

> With regard to—so this amendment has really caused me quite a bit of pain.

*Mr. Pernick*: Judge, if I may, it's the—just—

*The Court*: I'm just telling you, so give me just a second. So, I'm admitting J and M because those are clearly domestic

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1134 Filed 04/05/21 Page 55 of 139

People v. Davis, Not Reported in N.W. Rptr. (2018)

violence and are clearly past the 2010—excuse me, the ten year time frame.

*With regard to F, G and H and I, I agree that although they fall outside of the ten year time frame, that they are sufficiently close in time with sufficient indicia of reliability and probative value in connection with motive, intent and propensity that they should be admitted, despite the fact they fall outside of the ten year time frame.* So that's F, G, H, I are admitted.

With regard to N, those—that is 1992 through 97. It's vague, I can't tell if there's anything after the 2004 incident. So at this point I would—I find it's not admissible.

*Also, the early 1990s for the reasons previously articulated would not be admissible. And the 1997 incident would also not be admissible for the reason previously articulated.* [Emphasis added.]

The court then turned to whether the acts that occurred more than 11 years before the charged crime would be admissible under MRE 404(b). After recognizing that, contrary to the statute, MRE 404(b) does not permit character evidence, but also that MRE 404(b) has no temporal limitations, the court admitted the prior acts under MRE 404(b) because they revealed a lack of mistake and motive:

*The Court*: Common scheme, okay. Common scheme has also been asserted. I don't find that common scheme is particularly persuasive under rule 403. I find that common scheme would not be permitted, but in connection with the lack of accident or mistake and with motive I find that this is a proper purpose. Under the second prong the Court has to determine whether it is relevant under 402 as enforced through rule 104(b). It is very relevant under these circumstances that have been—that are—that are before the Court.

The third is the probative value of the evidence is not substantially outweighed by unfair prejudice. I think this is the meat of the defendant's argument that the remoteness of time in connection with the defendant's incidents, that the break with regard to the Michigan Department of Corrections, that the alleged lack of domestic discord in connection with the victim, all undermine the probative value, and that it substantially outweighs—and that the probative value is substantially outweighed by unfair prejudice.

**\*4** I agree with the People that his litany of incidents reveals a great deal about the defendant's behavior and mindset, that it would not be substantially outweighed by unfair prejudice in connection with how this defendant has treated and views and acts towards those that he is in a dating or romantic relationship.

It's longstanding, it's from 1990—I think it's even longer than—it's longstanding, many, many repetitive incidents, many domestic relationships revealing his intent, his purposeful attempt to control people, to injure people, to threaten people, and that in light of that I find that that third prong has been met to prove intent, absence of mistake or accident.

With regard to the fourth prong, I certainly would be—I think it was requested, I will—I will certainly read the cautionary instruction.

In *People v. Rosa*, —— Mich. App. ——, ——, —— N.W.2d ——, 2018 WL 522065 (2018) (Docket No. 336445); slip op. at 3, this Court indicated that the "interest of justice" exception to the statute's 10–year rule should be narrowly construed. In *Rosa*, the prosecution argued that evidence of the defendant's prior acts occurring outside the 10–year–period was admissible under the "interest of justice" exception because it was probative of the defendant's pattern of behavior and did not violate MRE 403. This Court rejected that notion, stating that the exception must mean something more than the evidence meets the standard set forth in MCL 768.27b(1):

The difficulty with this standard is that if we read the "interest of justice" exception to apply merely because the evidence is probative of defendant's propensities and it survives MRE 403 review, the 10 year limitation has no meaning. All evidence admitted under MCL 768.27b, including evidence of acts falling within the ten-year window must be probative and must not violate MRE 403. Thus, to define "interest of justice" by such a standard means that evidence of beyond-ten-year-old prior acts is admissible simply by showing that it would be admissible had it occurred within the ten-year window. This renders the ten-year limit essentially nugatory, and it is well-settled that we must avoid any "construction that would render any part of the statute surplusage or nugatory." *People v. Peltola*, 489 Mich. 174, 181, 803 N.W.2d 140 (2011) (quotation marks omitted). [*Rosa*, —— Mich. App. at ——; slip op. at 3.]

This Court concluded that "evidence of prior acts older than 10 years are admissible under MCL 768.27b only if that evidence is uniquely probative or that without its admission, the jury is likely to be misled." *Id.* The prior acts of domestic violence that occurred in 2004 and were admitted by the court under the statute comprised a significant part of the prior acts of domestic violence, and were uniquely probative. As the trial court recognized, the acts underscored a history of abusive behavior, behavior which most often occurred when defendant was told something he did not like or went into a jealous rage. Faced with no witnesses to the crime, and a defense of accident, evidence that defendant had acted violently toward domestic partners when confronted with bad news was highly relevant to the issues presented to the jury. And this evidence revealed that defendant's acts were repeated again and again for a significant number of years. Without that evidence, the jury would not be presented with a complete picture of defendant's violent history with domestic partners. *Cameron,* 291 Mich. App. at 609, 806 N.W.2d 371.

**\*5**  For example, Tamara Campbell dated defendant in 2004 and testified about two physical altercations that occurred between her and defendant. One episode was spawned by defendant becoming jealous and not being able to contact Campbell. Lisa Wasil, who married defendant in 2004, testified that he was repeatedly physically abusive during their relationship, with most attacks arising from jealousy, a quick mood change, or when Wasil said something that defendant did not like.[1] Amy Collier, also a girlfriend of defendant's in 2004, testified about an incident of physical abuse that occurred while on vacation as a result of defendant's jealous rage. Evidence of each of these incidents provided the jury with relevant information regarding whether defendant shot the victim by accident or because he became jealous when informed by the victim that she wanted him out of the house.

Caselaw supports this conclusion. *People v. VanderVliet,* 444 Mich. 52, 74–75, 508 N.W.2d 114 (1993), amended on other grounds 445 Mich. 1205, 520 N.W.2d 338 (1994), for example, recognized the heightened relevance to other-acts evidence like this when accident is the defense. See also *Cameron,* 291 Mich. App. at 612, 806 N.W.2d 371 (reasoning that other acts "were relevant to show that [the defendant] acted violently toward [the victim] and that his actions were not 'accidental' at the time of the incident"). The frequency of these acts also weighs in favor of admission, *People v. Solloway,* 316 Mich. App. 174, 195, 891 N.W.2d 255 (2016),

and their admissibility is not diminished by the fact that some of the acts were not identical to the charged offense, *People v. Meissner,* 294 Mich. App. 438, 452, 812 N.W.2d 37 (2011). Nor does *Rosa* change our view as, unlike the victim here, the victim in *Rosa* survived the incident and, thus, was able to testify regarding what occurred and why. See *Rosa,* ––– Mich. App. at ––––; slip op. at 3. Here, the victim died and no one else witnessed the shooting.

For these same reasons, the trial court did not abuse its discretion by concluding that the probative value of these particular 2004 acts of domestic violence was not substantially outweighed by the prejudicial effect of their admission. MRE 403. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible." *People v. Mills,* 450 Mich. 61, 75, 537 N.W.2d 909 (1995). What is prohibited is the danger of unfair prejudice, and nothing in the record suggests that the trial court abused its discretion in determining that no *unfair* prejudice would occur to defendant with the admission of these 2004 acts.

Applying the deferential abuse of discretion standard of review, we hold that the trial court did not err in concluding that the 2004 episodes of domestic violence fell within the "interests of justice" exception of MCL 768.27b(4), or that their admission satisfied MRE 403, as their probative value was not substantially outweighed by the danger of unfair prejudice.

## 2. MRE 404(b)

Defendant also contends that the trial court abused its discretion when it determined that the remaining prior acts of domestic violence, those going even beyond the already-admitted prior acts from 2004, were admissible under MRE 404(b) because they were admitted for improper purposes, were irrelevant, and their prejudicial effect substantially outweighed their probative value.

The admission of other-acts evidence reflecting on a defendant's character is limited by MRE 404(b), to avoid the danger of conviction based on a defendant's history of other misconduct rather than on the evidence of his conduct in the case at issue. *People v. Starr,* 457 Mich. 490, 495, 577 N.W.2d 673 (1998). MRE 404(b)(1) provides:

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1136 Filed 04/05/21 Page 57 of 139

People v. Davis, Not Reported in N.W. Rptr. (2018)

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

**\*6** Evidence of other crimes or acts is admissible under MRE 404(b) if such evidence is offered for a proper purpose and not to prove the defendant's character or propensity to commit the crime, and is relevant to an issue or fact of consequence at trial per MRE 402, as enforced by MRE 104(b). *VanderVliet*, 444 Mich. at 74–75, 508 N.W.2d 114. Further, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice, and the trial court may, upon request, provide a limiting instruction to the jury. *Id.*

Contrary to defendant's arguments, the prosecution sought to admit this evidence for proper reasons, not to establish defendant's bad character. As the trial court concluded, the evidence was offered to show defendant's motive and intent, and to disprove his claim of accident. Although some of the evidence could also be viewed as alluding to defendant's character, that in and of itself is not sufficient to preclude its admission under MRE 404(b). See *People v. Mardlin*, 487 Mich. 609, 615–616, 790 N.W.2d 607 (2010) ("Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character" and is "*inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity.").

With respect to defendant's assertion that the prior acts were irrelevant, intent was a material issue at trial. The defense theory was that defendant intended to prevent an assault by an alleged intruder, and in doing so, accidentally shot the victim. The prosecution argued that defendant's prior assaults on his past wives and girlfriends, as well as on the victim, showed his purposeful intent to control these domestic partners through violence, from which a jury could infer that he was capable of premeditation, and that this was no accident. The admission of these acts was not an abuse of discretion. They were, as we stated earlier, probative of the fact that defendant had used physical force in other circumstances where he was displeased with domestic partners. And, although there were a significant number of these prior acts, they were not the sole focus of the evidence and their relevance far outweighed any potential prejudicial effect.

**B.** MRE 803(3)

Defendant next argues that the trial court abused its discretion by admitting, through the testimony of friends and family, statements the victim made about her relationship with defendant. He asserts that the statements were hearsay and not within the scope of the exception at MRE 803(3).

" 'Hearsay' is a statement, other than the one made by the declarant while testifying ..., offered in evidence to prove the truth of the matter asserted." MRE 801(c). Generally, hearsay is not admissible at trial, MRE 802, but an exception exists for statements of a declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)," MRE 803(3). However, the exception does not extend to statements of memory or belief offered to prove the fact remembered or believed, unless related to a declarant's will. MRE 803(3). A proper analysis under MRE 803(3) "requires that the nature of each statement be considered specifically, as well as the purpose for each statement's admission." *People v. Smelley*, 285 Mich. App. 314, 324, 775 N.W.2d 350 (2009), vacated in part on other grounds 485 Mich. 1023, 776 N.W.2d 310 (2010).

In *People v. Fisher*, 449 Mich. 441, 448–451, 537 N.W.2d 577 (1995), the Michigan Supreme Court held that a victim-wife's statements about her plans to divorce the defendant and visit her lover in Germany satisfied the hearsay exception at MRE 803(3), because they demonstrated her then-existing intent, plan, and mental feeling Further, in *People v. Ortiz*, 249 Mich. App. 297, 307, 310, 642 N.W.2d 417 (2001), this Court held that the trial court did not abuse its discretion in admitting, under MRE 803(3), statements made by the defendant's deceased wife that he had threatened to kill her and that she did not want to get back together with him. In so doing, the Court stated:

**\*7** Evidence of the victim's state of mind, evidence of the victim's plans, which demonstrated motive (the ending of the marriage and the tension between the victim and defendant), and evidence of statements that defendant made to cause the victim fear were admissible under MRE 803(3). They were relevant to numerous issues in the case, including the issues of motive, deliberation, and premeditation .... [*Id.* at 310, 642 N.W.2d 417.]

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1137 Filed 04/05/21 Page 58 of 139

People v. Davis, Not Reported in N.W. Rptr. (2018)

Similarly, the trial court in this case did not abuse its discretion by admitting the victim's statements regarding her relationship with defendant through the testimony of her friends and family. The victim's statements to her mother that she intended to break up with defendant, to her friends that she and defendant were having problems and that she did not want him to find out about an upcoming girls' trip to Florida, and to her cousin that she was afraid of defendant, were admissible under MRE 803(3) as evidence of the victim's state of mind leading up to her death. In light of defendant's accident defense and the lack of witnesses to the shooting, the victim's state of mind was relevant to defendant's intent, motive, and premeditation.[2] Her statements, for example, exposed the discord in her relationship with defendant and, when combined with the testimony of defendant's ex-wives and ex-girlfriends regarding defendant's history of violent behavior when confronted with bad news, served as evidence from which a jury could infer that he did not shoot the victim accidentally but, rather, intended to kill her.

Further, despite defendant's argument to the contrary, the overwhelming majority of the victim's statements did not relate to past events and, thus, need not have been excluded under MRE 803(3) as statements of "memory or belief to prove the fact remembered[.]" See *People v. Moorer*, 262 Mich. App. 64, 72–74, 683 N.W.2d 736 (2004) (holding that the victim's statements were not admissible under MRE 803(3) because they related to past events and were statements of memory and belief used to prove the fact remembered). Instead, the statements reflected the victim's state of mind at the time they were made or her future intentions. And the trial court found that those few statements that did not reflect her state of mind provided context for her feelings. Nor was the probative value of the statements substantially outweighed by the danger of unfair prejudice. " 'Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury.' " *People v. Danto*, 294 Mich. App. 596, 600, 822 N.W.2d 600 (2011), quoting *People v. McGhee*, 268 Mich. App. 600, 614, 709 N.W.2d 595 (2005). The victim's statements were clearly admitted to establish defendant's motive for the shooting and to prove intent, which was difficult to do in any manner other than through the introduction of the statements, in light of the victim's death and lack of witnesses to the shooting.

## C. PREMEDITATION

Defendant argues, in both his appellate and Standard 4 briefs, that insufficient evidence existed to support his first-degree murder conviction. Specifically, he asserts that the prosecution presented no evidence of deliberation or premeditation.

**\*8** We review sufficiency of the evidence arguments de novo. *People v. Harrison*, 283 Mich. App. 374, 377, 768 N.W.2d 98 (2009). The evidence must be viewed in a light most favorable to the prosecution to "determine whether a rational trier of fact could find that the essential elements of the crimes were proven beyond a reasonable doubt." *Id.* at 377–378, 768 N.W.2d 98.

"In order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998). Premeditation and deliberation require that the defendant thought about taking the victim's life beforehand, and pondered and evaluated the major aspects of this choice for some appreciable amount of time. *People v. Plummer*, 229 Mich. App. 293, 300, 581 N.W.2d 753 (1998). "Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id.* at 300–301, 581 N.W.2d 753.

The prosecution presented more than sufficient evidence to support an inference of premeditation and deliberation. The victim told multiple people not long before her death that she wanted to break up with, and was afraid of, defendant. For example, one of the victim's friends testified that the victim said she wanted to leave defendant, but he refused to give up on their relationship. Another friend testified that just weeks before her death, the victim said she would no longer pay defendant's child support or other bills, or support his membership in a motorcycle club. This testimony, combined with that of defendant's ex-wives and ex-girlfriends, supported the prosecution's theory that rather than shooting the victim accidentally, defendant purposely and deliberately killed her for threatening to leave and discontinue her financial support.

The testimony of neighbors served as further evidence of defendant's premeditation and deliberation. Barbara French

testified that she awoke to the sound of loud voices from a man and a woman before the shooting. And Margaret Eagan, another neighbor, testified that she heard arguing and doors slamming from the home defendant and the victim shared beginning at approximately 1:00 a.m. or 1:30 a.m. on October 12, 2015. As the evidence suggests the victim was shot around 2:45 a.m., defendant had ample time to ponder and evaluate his decision to react to the argument by shooting the victim.

Finally, the evidence presented by the prosecution rebutted defendant's assertion that an armed intruder entered the home, and that he shot the victim during a "fire fight" with that intruder. Police officers testified that they found no evidence of a break-in at the home, and the forensic pathologist assigned to the case found that the victim was shot at close range from a downward trajectory. In addition, because defendant refused to drop his shotgun at the request of the responding police officers, the officers were unable to immediately enter the home and assist the victim. From this evidence, a reasonable juror could conclude that defendant's decision to shoot the victim was premeditated and deliberate.

## D. PROSECUTORIAL ERROR

**\*9** Defendant next argues in his Standard 4 brief that the prosecutor committed misconduct by objecting during the testimony of Jeffrey Wright and Steven Willey, neighbors of the victim and defendant, and by misstating facts in evidence during her opening statement and closing arguments.

To preserve a prosecutorial error[3] argument, a defendant must contemporaneously object to the alleged error and ask for a curative instruction. *People v. Bennett*, 290 Mich. App. 465, 475, 802 N.W.2d 627 (2010). If a defendant fails to timely and specifically object below, review is generally precluded " 'except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice.' " *Unger*, 278 Mich. App. at 234–235, 749 N.W.2d 272, quoting *People v. Callon*, 256 Mich. App. 312, 329, 662 N.W.2d 501 (2003). Defense counsel failed to object to the prosecutor's alleged errors. Thus, the issue is not preserved for appellate review.

Unpreserved prosecutorial error arguments are reviewed for "outcome-determinative, plain error." *Unger*, 278 Mich. App. at 235, 749 N.W.2d 272. To establish plain error affecting substantial rights "three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or

obvious, 3) and the plain error affected substantial rights." *People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999). " 'Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings.' " *Unger*, 278 Mich. App. at 235, 749 N.W.2d 272, quoting *Callon*, 256 Mich. App. at 329, 662 N.W.2d 501.

"[T]he test for prosecutorial [error] is whether a defendant was denied a fair and impartial trial." *People v. Dobek*, 274 Mich. App. 58, 63, 732 N.W.2d 546 (2007). "[W]e consider issues of prosecutorial [error] on a case-by-case basis by examining the record and evaluating the remarks in context, and in light of defendant's arguments." *People v. Thomas*, 260 Mich. App. 450, 454, 678 N.W.2d 631 (2004).

With regard to the testimony of Jeffrey Wright and Steven Willey, defendant fails to demonstrate that the prosecutor's objections amounted to plain error affecting his substantial rights. The trial court overruled the prosecutor's objections to Wright's testimony, so no harm occurred as a result, and defense counsel acknowledged the validity of the prosecutor's objection to Willey's testimony, and withdrew the improper question.

Further, defendant's challenge to the statements made in the prosecutor's opening statement and closing arguments also lacks merit. "A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial ...." *Unger*, 278 Mich. App. at 241, 749 N.W.2d 272. However, "prosecutorial [error] cannot be predicated on good-faith efforts to admit evidence," *People v. Noble*, 238 Mich. App. 647, 660, 608 N.W.2d 123 (1999), and prosecutors "are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case," *People v. Mann*, 288 Mich. App. 114, 120, 792 N.W.2d 53 (2010) (quotation marks and citation omitted).

**\*10** Defendant asserts specifically that the prosecutor argued facts not in evidence when she stated that the victim was shot in the chest, that he fired three rounds, and that his actions delayed police assistance to the victim by 30 minutes. But the record evidence overwhelmingly supports these statements. Dr. Felicia Ivascu, the surgeon on call when the victim arrived at the hospital, testified that the victim "presented with an apparent shotgun wound to the upper right chest," and the forensic pathologist who performed the autopsy testified that the victim suffered damage to the chest.

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1139 Filed 04/05/21 Page 60 of 139

Deputy Rachel Grace testified that the police found three fired shell casings at the home defendant and the victim shared. And finally, a police officer testified that the police delayed entry into the home out of concern for officer safety because defendant told them a gunfight with a third party had occurred inside. Accordingly, the prosecutor's statements did not amount to plain error affecting defendant's substantial rights.

## E. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues in his Standard 4 brief that defense counsel provided ineffective assistance by failing to call res gestae and expert witnesses, and objecting to the prosecutor's request to introduce text messages between the victim and Dana Quesada. Generally, to preserve an ineffective assistance of counsel argument, a defendant must file a motion for a new trial or *Ginther*[4] hearing in the trial court to establish evidentiary support for the argument. *People v. Sabin (On Second Remand)*, 242 Mich. App. 656, 658–659, 620 N.W.2d 19 (2000). Defendant failed to raise these arguments in a motion for a new trial or *Ginther* hearing in the trial court, and this Court denied defendant's motion to remand. *People v. Davis*, unpublished order of the Court of Appeals, entered October 17, 2017 (Docket No. 335051). Accordingly, our review is limited to the appellate record. *Sabin*, 242 Mich. App. at 658–659, 620 N.W.2d 19.

"The question whether defense counsel performed ineffectively is a mixed question of law and fact[.]" *People v. Trakhtenberg*, 493 Mich. 38, 47, 826 N.W.2d 136 (2012). We review a trial court's findings of fact for clear error, and questions of constitutional law de novo *Id*

To evaluate whether counsel provided effective assistance, we use the standard established in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). *People v. Hoag*, 460 Mich. 1, 5–6, 594 N.W.2d 57 (1999), citing *People v. Pickens*, 446 Mich. 298, 521 N.W.2d 797 (1994). The defendant must show: "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich. at 51, 826 N.W.2d 136. The effective assistance of counsel is presumed, *People v. Roscoe*, 303 Mich. App. 633, 644, 846 N.W.2d 402 (2014), and the defendant must overcome the presumption that defense counsel's actions constituted sound trial strategy,

*Trakhtenberg*, 493 Mich. at 52, 826 N.W.2d 136. Further, the defendant must establish a factual predicate for his assertions. *Hoag*, 460 Mich. at 6, 594 N.W.2d 57.

We first hold that defendant failed to establish a factual predicate for his argument that defense counsel provided ineffective assistance by failing to call res gestae and other witnesses. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v. Payne*, 285 Mich. App. 181, 190, 774 N.W.2d 714 (2009). Generally, "the failure to call a witness can constitute ineffective assistance of counsel only when it 'deprives the defendant of a substantial defense.' " *Id.* (citation omitted). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v. Chapo*, 283 Mich. App. 360, 371, 770 N.W.2d 68 (2009) (quotation marks and citation omitted).

Defendant asserts that defense counsel should have called Quesada, Ohio State Trooper James Davis, and a third individual who may have seen defendant shooting at a white car with Ohio license plates on the morning of the victim's death, but fails to identify what information defense counsel should have coaxed out of Quesada and Davis, both of whom testified at trial, or the name of the supposed third res gestae witness. Further, he asserts that counsel should have introduced memory recollection, firearms, and forensic experts, but fails to demonstrate that such experts would have provided favorable testimony. Thus, he cannot show that counsel's performance fell below an objective standard of reasonableness for not calling these witnesses.

**\*11** Defendant's third ineffective assistance of counsel argument fails for similar reasons. He contends that defense counsel should not have objected to the prosecutor's attempt to introduce text messages sent by Quesada to the victim, but fails to offer any proof rebutting the presumption that counsel's actions constituted sound trial strategy. "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v. Garza*, 246 Mich. App. 251, 255, 631 N.W.2d 764 (2001).

## F. CUMULATIVE ERROR

Finally, in his Standard 4 brief, defendant argues that his conviction should be overturned due to the cumulative effect of errors that occurred. "[T]he cumulative effect of a number

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1140 Filed 04/05/21 Page 61 of 139

People v. Davis, Not Reported in N.W. Rptr. (2018)

of minor errors may in some cases amount to error requiring reversal[.]" *People v. Cooper*, 236 Mich. App. 643, 659–660, 601 N.W.2d 409 (1999). Because there was no error in any of the issues raised by defendant, there is no cumulative error that requires reversal. *People v. Mayhew*, 236 Mich. App. 112, 128, 600 N.W.2d 370 (1999).

Affirmed.

Stephens, J. (concurring in part and dissenting in part).
While I agree with my colleagues' analysis of most of the issues in this case, because we differ on the implications of *People v. Rosa*, —— Mich. App. ——, —— N.W.2d ——, 2018 WL 522065 (2018) (Docket No. 336445), I respectfully dissent. In *Rosa*, the prosecution argued that the evidence of the defendant's prior acts which occurred outside the 10–year–period were admissible under the "interest of justice" exception because they were probative of the defendant's pattern of behavior and did not violate MRE 403. This Court stated in relevant part that:

> The difficulty with this standard is that if we read the "interest of justice" exception to apply merely because evidence is probative of defendant's propensities and it survives MRE 403 review, the 10 year limitation has no meaning. All evidence admitted under MCL 768.27b, including evidence of acts falling within the ten-year window must be probative and must not violate MRE 403. Thus, to define "interest of justice" by such a standard means that evidence of beyond-ten-year-old prior acts is admissible simply by showing that it would be admissible had it occurred within the ten-year window. This renders the ten-year limit essentially nugatory, and it is well-settled that we must avoid any "construction that would render any part of the statute surplusage or nugatory." *People v. Peltola*, 489 Mich. 174, 181, 803 N.W.2d 140 (2011) (quotation marks omitted). [*Rosa*, —— Mich. App. at ——; slip op. at 3.]

This Court concluded that "evidence of prior acts older than 10 years were admissible under MCL 768.27b only if that evidence was uniquely probative or that without its admission, the jury is likely to be misled." *Id.*; slip op. at 2. The 10–year–old evidence in this case, as in *Rosa*, is not uniquely probative.

There is no dispute that this defendant has an almost uninterrupted pattern of physical and verbal abuse toward domestic partners. However, as the majority notes, this case differs from the litany of others in that there is a claim that the defendant acting in self-defense and that the death of the victim was a mistake. In other words, the intent issue in this case is "unique." The majority highlights the testimony of the defendant's former wife who testified at trial to both pre and post 2004 incidents. Her testimony provides a sad history of a man who acted out of jealousy, petty perturbance, and sudden mood changes often fueled by alcohol.

**\*12** The legislature made the policy determination that domestic abuse deserved a special admission rule. They crafted the statute with the temporal framework of MRE 609(c) and afforded an exception to that time limit "in the interests of justice." The *Rosa* Court noted that the exception to the time limit in the rule—that was itself an exception to our jurisprudence on character evidence—must be narrow, and that our analysis of such requests for exceptions be piercing. The unique issue in this case is one of mistake. Defendant's argument in relation to the charged act at issue here is that he shot the victim by accident during a home invasion in the early hours of October 12, 2015. In none of the prior acts, that occurred both within and outside of the 10–year-limit, is there even a hint of "mistake." Rather, all of the prior acts testimony given supported an inference that defendant's conduct was intentional in the context of a domestic violence situation. Accordingly, the prior acts evidence was not uniquely probative.

The prior acts testimony outside of the 10–year-limit was also not needed to assure that the jury was not misled as to any relevant issue in this case. They were fully aware that his abuse was long standing because Wasil testified to an incident that occurred on January 6, 2006, in which defendant punched her multiple times in the face and held a folding knife to her neck. That incident resulted in defendant being convicted of assault with intent to do great bodily harm less than murder and sentenced to prison in June 2006. They were aware that his abuse had not halted because the testimony regarding other incidents of domestic abuse that were properly admitted and detailed the volatile nature of defendant's domestic relationships were of incidents that occurred between 2013 and 2015. Testimony was, also admitted concerning the jealousy and discord in the relationship between the victim and the defendant.

Thus, the prior bad acts described by defendant's ex-wives and girlfriends occurring beyond the 10 year time limit were neither uniquely probative nor necessary to assure that

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1141 Filed 04/05/21 Page 62 of 139

People v. Davis, Not Reported in N.W. Rptr. (2018)

the jury was not misled. As in *Rosa*, the testimony was consistent with and cumulative to the testimony regarding the defendant's character and propensity.

**All Citations**

Not Reported in N.W. Rptr., 2018 WL 1768072

Footnotes

1    Wasil testified to two other acts that occurred within 10 years of the charged crime.

2    This case is distinguishable from *Smelley*, as this Court held that the victim's state of mind was not sufficiently at issue to justify the introduction of statements demonstrating her state of mind. *Smelley*, 285 Mich. App. at 325, 775 N.W.2d 350. The opposite is true here.

3    This Court has stated that "the term 'misconduct' is more appropriately applied to those extreme ... instances where a prosecutor's conduct violates the rules of professional conduct or constitutes illegal conduct," but that arguments "premised on the contention that the prosecutor made a technical or inadvertent error at trial" are "more fairly presented as claims of 'prosecutorial error[.]' " *People v. Cooper*, 309 Mich. App. 74, 87–88, 867 N.W.2d 452 (2015) (citation omitted). Accordingly, because the arguments here are limited to technical errors by the prosecutor, we will refer to them as prosecutorial error.

4    *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973).

---

**End of Document**                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3304121
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

PEOPLE of the State of
Michigan, Plaintiff-Appellee,

v.

Anthony Wayne HUBBARD,
Defendant-Appellant.

No. 256831.
|
Dec. 6, 2005.

Before: GAGE, P.J., and HOEKSTRA and MURRAY, JJ.

[UNPUBLISHED]

PER CURIAM.

**\*1** Following a jury trial, defendant was convicted of first-degree premeditated murder, MCL 750.316(1)(a), for which he was sentenced to serve a mandatory term of life imprisonment. Defendant appeals from his conviction as of right. We affirm.

In late August 2003, the badly decomposed body of a young female was found in an unoccupied house on East Biddle Street in the city of Jackson. Although initially not identifiable, the body was eventually determined to be that of defendant's girlfriend, seventeen-year-old Yatasha Bush. Further investigation into the matter led to defendant's arrest and the instant conviction. On appeal, defendant raises numerous allegations of error. None of these, however, warrant reversal of his conviction.

I. Evidentiary Claims

A. Hearsay Statements of the Victim

Defendant first argues that the trial court abused its discretion in allowing the prosecution to present testimony concerning statements made by Yatasha to others, wherein Yatasha indicated that she was fearful of and had been impregnated by defendant, that she had a new boyfriend and sought to end her relationship with defendant, and that during their relationship defendant had controlled and abused her while providing her with illegal drugs. Specifically, defendant argues that these statements were not admissible under MRE 803(3) and that, even if admissible under that rule, they were not relevant to any issue at trial.[1]

To properly preserve an evidentiary issue for review, "a party opposing the admission of evidence must object at trial and specify the same ground for objection that [he] asserts on appeal." People v. Aldrich, 246 Mich.App 101, 113; 631 NW2d 67 (2001), citing MRE 103(a)(1). Here, although counsel for defendant arguably challenged the admissibility of the subject statements on the grounds of relevancy, MRE 401, and unfair prejudice, MRE 403, he at no time asserted a failure of those statements to meet the requirements for admissibility under MRE 803(3). Thus, although defendant has preserved the issue whether the subject statements were relevant to the issues to be decided at trial, the issue whether those statements meet the requirements for admissibility under MRE 803(3) has not been preserved for this Court's review. Aldrich, supra. Where a defendant has preserved his challenge to the admissibility of evidence by appropriate objection at trial, this Court will review the trial court's decision whether to admit that evidence for an abuse of discretion. People v. Katt, 468 Mich. 272, 278; 662 NW2d 12 (2003). However, in the absence of a proper objection preserving the issue at trial, this Court's review of an evidentiary issue is limited to plain error affecting the defendant's substantial rights. People v. Carines, 460 Mich. 750, 761-763; 597 NW2d 130 (1999).

1. Relevancy

We first address defendant's challenge of the relevancy of the subject statements. The trial court found that Yatasha's statements concerning her fear of defendant, that she had obtained a new boyfriend, and that she sought to end her relationship with defendant were relevant to the issue of motive for the killing. As explained below, the trial court's ruling in this regard was not an abuse of discretion. Katt, supra.

**\*2** Although not an essential element of a crime, proof of motive in a prosecution for murder is always relevant. *People v. Rice (On Remand),* 235 Mich.App 429, 440; 597 NW2d 843 (1999). Moreover, a homicide victim's state of mind evincing discord in a relationship with the defendant can be relevant to issues such as the defendant's motive. *People v. Fisher,* 449 Mich. 441, 450-451; 537 NW2d 577 (1995). Here, Yatasha's statements regarding her fear of and desire to leave defendant evinced discord in their relationship and were, therefore, relevant to a possible motive and explanation for why defendant would kill Yatasha, i.e., the deterioration and possible end to a domestic relationship already filled with discord. That Yatasha had begun seeing someone else was similarly relevant to demonstrate the deteriorating state of her relationship with defendant and was thus also relevant to show motive for her killing. *Fisher, supra; Rice, supra.* Similarly, although not addressed by the trial court, defendant's abuse and control over the mother of his unborn child were also relevant to motive. Indeed, this Court has stated that a prior assault of a homicide victim is "highly probative" of a defendant's motive and intent to kill, and is properly admissible in a prosecution for murder. See *People v. Hill,* 167 Mich.App 756, 762-763; 423 NW2d 346 (1988). Moreover, when viewed in connection with Yatasha's miscarriage and purported desire to end the relationship, the fact of her pregnancy and the extreme control exhibited over her by defendant during the course of their relationship becomes highly relevant to the issue of motive for the killing, i.e., the loss of both that control and his unborn child. Similarly, although arguably less so, that defendant was at times the source from which Yatasha obtained the illegal drugs abused by both of them throughout the course of their relationship becomes relevant when viewed in connection with testimony that defendant would often receive the proceeds of Yatasha's prostitution activities, which he would then use to acquire drugs. Because the loss of this pecuniary benefit attendant his relationship with Yatasha holds the tendency to make the existence of a "fact of consequence" at trial, i.e., motive for the killing, more or less probable, such evidence was relevant. MRE 401.

### 2. Victim's State of Mind

However, that the substance of the extra-judicial statements at issue was relevant to an issue at trial does not alone warrant their admission into evidence. It is well settled that the statements of a person, other than those made while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted are not admissible unless they fall into one of the exceptions outlined in the Michigan Rules of Evidence. See MRE 801(c); see also MRE 802. MRE 803(3) provides one such exception to the general bar against hearsay for statements made regarding a declarant's then existing mental, emotional, or physical condition. Specifically, this rule states that the following are not excluded by the hearsay rule:

**\*3** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will. [MRE 803(3).]

Relying on MRE 803(3), our Supreme Court has made clear that evidence that "demonstrates an individual's state of mind will not be precluded by the hearsay rule," and that statements of murder victims as to plans or feelings are admissible where relevant to material issues, including motive. *Fisher, supra* at 449-450. As explained above, much of the challenged testimony served and was offered to show the victim's state of mind with regard to discord between defendant and herself shortly before she was killed, which in turn relevantly demonstrates motive for the killing. As such, the victim's statements that she feared and desired to end her relationship with defendant, and had begun seeing someone new, were admissible under MRE 803(3) as circumstantial evidence of motive. As a statement of her then-existing physical condition, the victim's claim of pregnancy was similarly both relevant to the issue of motive and admissible under MRE 803(3). See, e.g., *Robinson v. State,* 11 P3d 361, 371-372 (Wy, 2000) (statement of victim indicating fact of pregnancy by defendant was admissible as statement of "then-existing physical condition"). Accordingly, defendant has failed to show plain error in the admission of those statements into evidence.[2]

### 3. Abuse and Prostitution of Victim

The same cannot be said, however, for Yatasha's statements regarding her abuse and prostitution, and the provision to her of drugs by defendant. In *People v. Moorer,* 262 Mich.App 64, 69; 683 NW2d 736 (2004), this Court held that the trial court erred in admitting a victim's statements to others regarding the defendant's threats and actions because these

were statements of memory or belief expressly excluded from those statements excepted from the rule against hearsay under MRE 803(3). Specifically, the panel found that such statements "relate to past events and are specifically excluded under MRE 803(3) as statements of 'memory or belief to prove the fact remembered or believed....' They therefore do not fall within the parameters of MRE 803(3)." *Id.* at 73. In reaching this conclusion the panel noted that the exclusion from MRE 803(3) of a declarant's statements of memory or belief is necessary to preserve the purpose of the rule against hearsay by preventing statements evincing a state of mind from serving as the basis for an inference of the happening of the event that produced the state of mind.[3] *Id.* at 73-74, citing FRE 803(3), Advisory Committee's Note, 56 FRD 183, 305. As in *Moorer,* Yatasha's statements regarding her abuse and prostitution, and the provision to her of drugs by defendant, relate to events that she remembered having occurred rather than her state of mind. Consequently, admission of those statements into evidence at trial was error. Such error, however, does not require reversal of defendant's conviction.

 **\*4** Unpreserved evidentiary error, even if plain, does not warrant reversal unless it is affirmatively shown that the error affected the outcome of the trial. *Carines, supra* at 763. As discussed below, other non-hearsay testimony showing that Yatasha was subjected to abuse and prostitution at the hands of defendant was properly admitted at trial under MRE 404(b), thereby mitigating or otherwise rendering harmless any prejudicial effect of such testimony on the outcome of the trial. See *People v. Hill,* 257 Mich.App 126, 140; 667 NW2d 78 (2003) ("[a]n erroneous admission of hearsay evidence can be rendered harmless where corroborated by other competent testimony"). Moreover, even without these statements, the evidence against defendant was overwhelming.

Shaylene Clark testified that she was with Yatasha on the night she was killed and, in fact, witnessed her murder. According to Clark, after picking up both her and Yatasha from a party at the home of a man named "Timmy," defendant drove the girls in a green minivan to an unoccupied house where, during an argument regarding Yatasha having lost defendant's baby "and the things she was doing to get money," defendant murdered Yatasha by cutting her throat outside a bedroom located on the first floor of the home. Although defendant challenges the credibility of Clark's testimony on the basis of her admitted inability to vividly and consistently recall the events during the weeks following the murder, we note that Clark's recount of the murder itself was, nonetheless,

both detailed and consistent with other evidence admitted at trial.

With respect to the scene of the crime, although indicating that she had never before or since the murder visited the house in which Yatasha killed, Clark's testimony regarding the floor plan of the home and the location of the murder therein were consistent with the testimony and photographic evidence provided by the investigating officers who discovered Yatasha's body just inside the doorway of a first floor bedroom approximately two weeks after the killing. Clark's testimony that the three entered the unoccupied home through a rear entrance that had been boarded shut was also consistent with the condition of the home as testified to by the investigating officers, who recalled at trial that, with the exception of a rear door that had been boarded shut but appeared to at sometime have been pried open, the home was secure.

Clark's testimony concerning the manner in which Yatasha was killed was also strikingly consistent with that of the medical examiner who performed the autopsy on Yatasha's body. The medical examiner testified that a reddish-brown stain found on the carpeting inside the home near the neck of the body was shown through testing to be human blood that had soaked the carpeting near the area of the neck. The medical examiner further testified that this evidence, when viewed in combination with the excessive decomposition of the throat area, indicated "trauma" to the neck consistent with Yatasha's throat having been "cut [or] slashed so that a large amount of blood was lost from there," causing her death.

 **\*5** The condition of the scene and the evidence derived from the body were not, however, the only evidence to lend credence to Clark's testimony and support defendant's guilt independent of the erroneously admitted hearsay testimony. Indeed, Detective Gary Schuette of the Jackson Police Department testified that at the time Clark first relayed to him her account of the murder he had yet to positively identify either the body or a cause of death. Schuette further testified that before either of these facts were known to the public, defendant arrived at the police station requesting to speak with someone about a body recently found by the police in a house. Schuette testified that defendant thereafter indicated with extreme certainty that the body found by the police was that of his girlfriend, Yatasha Bush, who had been raped and then murdered by having her throat slashed. Although initially hypothesizing that Yatasha had been killed by her new boyfriend at the behest of her father, when presented with both a photograph of Yatasha and Schuette's theory of

defendant's involvement in her death, defendant began to cry uncontrollably before stating, "Fuck it. I'm just going to tell you what happened." After then describing having picked up both Clark and Yatasha from the home of a man named "Timmy" using a van borrowed from a friend, defendant paused momentarily before stating, "I ain't confessing. You gotta prove it. You can't place me in that house."

These inculpatory statements corroborating at least a portion of Clark's testimony and evincing knowledge of the identity of the victim prior in time to any public release of that information were not the only such statements made by defendant. Tammy Hurley testified that sometime in early August 2003 she observed defendant enter a green minivan being driven by a woman and that, as she entered the van, defendant stated that he was going to get Yatasha. Hurley also testified that on the day Yatasha's body was found she was approached by defendant while at a party store on Biddle Street. Hurley testified that as defendant approached her, he began to cry while telling her that Yatasha was dead and that it was her body that had been found in the house on Biddle Street. Hurley noted, however, that at the time defendant made this statement to her the police had not yet even brought the body out from the house.

In light of the foregoing evidence, including defendant's own statements evincing knowledge of the identity of the victim and the manner in which she was killed prior in time to any public release of that information, defendant cannot show that any error in the admission of Yatasha's extra-judicial statements was outcome determinative. *Carines, supra.*

B. Other Acts Evidence

Defendant also argues that the trial court erred in admitting, for the purpose of establishing motive, other, non-hearsay evidence indicating that defendant had abused, prostituted, and provided Yatasha with illegal drugs. We do not agree.

**\*6** MRE 404(b) prohibits evidence of prior bad acts to prove a person's character, but permits the admission of such evidence for other purposes, such as proof of motive. Thus, to be admissible, evidence of other bad acts must be offered to prove something other than a character or propensity theory, must be relevant under MRE 402, and the probative value of the evidence must not be substantially outweighed by unfair prejudice under MRE 403. *People v. Knox,* 469 Mich. 502, 509; 674 NW2d 366 (2004).

On appeal, defendant asserts only that the challenged evidence was not relevant to the issue of motive and that the trial court, therefore, erred in so finding. However, in challenging the admission of the subject evidence below, counsel for defendant conceded the relevance of defendant's prostitution and abuse of Yatasha to the issue of motive for the killing. As such, the question whether the challenged evidence was relevant to the issue of motive for the killing has been waived for purposes of appellate review. See *People v. Carter,* 462 Mich. 206, 215; 612 NW2d 144 (2000). Nonetheless, as noted above, this Court has previously held that evidence of a prior assault of a homicide victim is "highly probative" of a defendant's motive and is, therefore, properly admissible in a prosecution for murder under MRE 404(b). See *Hill, supra;* see also *Rice, supra.* Moreover, as also already discussed, to the extent that defendant's prior abuse of Yatasha evinces discord in their relationship, evidence of such abuse was highly relevant to the issue of motive and was, therefore, admissible under MRE 404(b).

Evidence that defendant prostituted and at times provided Yatasha with illegal drugs habitually abused by them both throughout their relationship becomes similarly relevant when viewed in connection with testimony that defendant would often use the proceeds of Yatasha's prostitution activities to acquire the drugs. Indeed, as noted above, the loss of this pecuniary benefit upon Yatasha's leaving defendant was relevant to explain a motive for the killing. MRE 401.

Defendant also challenges the relevancy of evidence that defendant engaged Clark in nonconsensual sexual intercourse and had similarly abused other young women. However, this Court has held that evidence of a defendant's prior bad acts is relevant to explain a victim's delay in reporting alleged abuse. See, e.g., *People v. Dunham,* 220 Mich.App 268, 273; 559 NW2d 360 (1996); see also, e.g., *People v. Peterson,* 450 Mich. 349, 352-353; 537 NW2d 857 (1995). In the instant case, defendant's prior conduct toward Clark and other similarly situated women was relevant to explain why Clark did not report the killing immediately after it occurred, but instead stayed with defendant at least for a period of time. Moreover, because such evidence was relevant and admissible, the prosecutor's failure to raise the fact of nonconsensual intercourse at the evidentiary hearing does not constitute plain error for lack of notice of the prosecutor's intent to admit that evidence at trial. See *People v. Hawkins,* 245 Mich.App 439, 455; 628 NW2d 105 (2001); see also MRE 404(b)(2) (requiring "reasonable notice in advance of

trial" of the intent to introduce evidence under MRE 404(b)). In any event, as with the admission of Yatasha's extra-judicial statements concerning her abuse and prostitution by defendant, any error in the admission defendant's prior bad acts was harmless in light of the weight and strength of the untainted evidence showing defendant's guilt.

## C. Limiting Instruction

**\*7** Defendant also argues that he was denied a fair trial as the result of the trial court's erroneous instruction regarding the permissible use of the other acts evidence by the jury. Specifically, defendant argues that despite having found such evidence relevant only to establish motive, the court instructed the jurors that the evidence of defendant's prior bad acts could also be used to determine the identity of Yatasha's killer. However, because counsel for defendant acquiesced in the instructions as given, defendant is entitled to no relief on this unpreserved claim of error.[4] *Carter, supra.* Indeed, this acquiescence by defense counsel served to extinguish any error with regard to the challenged instruction. *Id.*

In any event, even assuming that there had been no extinguishment of the alleged error, there is no basis for reversal under the plain error analysis applicable to unpreserved allegations of error. *Carines, supra.* As indicated above, to obtain relief under the plain error doctrine a defendant must demonstrate the existence of a clear or obvious error that affected the outcome of the case. *Id.* Here, regardless of the trial court's previous ruling, the identity of Yatasha's killer was placed into issue by defendant's general denial of the charge, and proof of identity is expressly provided for as proper purpose for the admission of other acts evidence. See MRE 404(b).

## D. Cumulative Effect of Evidentiary Error

Defendant also argues that the cumulative effect of the evidentiary and accompanying instructional errors alleged on appeal denied him a fair trial. However, although the cumulative effect of several minor errors may warrant reversal even where the individual errors in the case would not, see *Hill, supra* at 152, only actual errors are aggregated to evaluate their cumulative effect, *People v. Bahoda,* 448 Mich. 261, 292 n 64; 531 NW2d 659 (1995). Here, only the admission of Yatasha's extra-judicial statements concerning defendant's abuse, prostitution, and provision to her of illegal

drugs has been determined to be error. As noted above, however, the substance of that testimony was cumulative to evidence properly admitted at trial under MRE 404(b). Consequently, given the cumulative nature of the erroneously admitted testimony and the overwhelming evidence of defendant's guilt, as derived from the untainted evidence, these evidentiary errors were not outcome determinative and therefore do not require reversal of defendant's conviction. See *People v. Matuszak,* 263 Mich.App 42, 57; 687 NW2d 342 (2004).

## II. Prosecutorial Misconduct

Defendant next argues that he was denied a fair trial by several instances of prosecutorial misconduct at trial. Again, we disagree.

Generally, this Court reviews de novo claims of prosecutorial misconduct to determine whether defendant was denied a fair and impartial trial. *People v. Ackerman,* 257 Mich.App 434, 448; 669 NW2d 818 (2003). However, because defendant failed to object to the alleged instances of prosecutorial misconduct, this Court's review is again limited to plain error affecting defendant's substantial rights. *Id.*

**\*8** Defendant first asserts that the prosecutor improperly elicited testimony at trial concerning defendant's sexual assault of Shaylene Clark following the murder. Specifically, defendant asserts that because the fact of that assault was not raised at the pretrial evidentiary hearing on the prosecution's motion to admit other acts evidence, he was deprived of the opportunity to challenge or otherwise develop the foundation for such testimony. However, as previously discussed, evidence of defendant's sexual assault of Clark was both relevant and admissible under MRE 404(b) to explain Clark's delay in reporting the murder. As such, any challenge to its admission at trial would have been futile. Moreover, Clark's testimony concerning the assault was brief and was not mentioned by the prosecutor when arguing defendant's guilt at the close of trial. Consequently, defendant cannot demonstrate that the prosecutor's failure to earlier present this testimony affected the outcome of the trial. *Id.*

For this same reason, we reject defendant's claim that he is entitled to a new trial on the ground that, by introducing evidence that defendant provided Yatasha with illegal drugs, the prosecutor exceeded the scope of the trial court's pretrial ruling regarding admission of other act and hearsay testimony.

As previously discussed, such testimony by those witnesses who actually observed defendant provide Yatasha with illegal drugs was both relevant under MRE 401, and admissible to show motive under MRE 404(b). Moreover, although testimony concerning Yatasha's statements to that effect to others was improper, the prejudicial effect of that error was negated by the cumulative nature of such testimony and the weight of the overwhelming evidence of defendant's guilt.

Defendant also asserts that the prosecutor improperly argued during her opening statement that it was through defendant that Yatasha "found" both drugs and prostitution. In so arguing, defendant relies on the failure of the prosecutor to subsequently elicit testimony to support her statement in this regard at trial. However, contrary to defendant's assertion, Karla Wing and Angela Haynes both testified regarding the dramatic change in Yatasha's appearance, hygiene, and behavior after beginning her relationship with defendant. Haynes additionally testified that upon being confronted with these changes, Yatasha acknowledged the use of drugs provided to her by defendant and having prostituted herself "to survive." Although such evidence did not directly support the prosecutor's comment during her opening argument, it is well settled that a prosecutor's reference during opening statements to evidence that is not subsequently admitted at trial does not warrant reversal if the reference was made in good faith, and no prejudice resulted. *People v. Wolverton*, 227 Mich.App 72, 76-77; 574 NW2d 703 (1997). Here, given the testimony of both Wing and Haynes, and considering the trial court's instructions limiting the use of such other acts evidence, and admonishing the jury that the statements of the attorneys trying the case do not constitute evidence, we conclude that the challenged comment was made by the prosecutor in good faith and did not result in prejudice to defendant. Consequently, defendant has failed to demonstrate the plain error required for relief. *Ackerman, supra.*

**\*9** Defendant has similarly failed to demonstrate that he is entitled to relief as a result of the prosecutor's argument during her closing statement that defendant sought to use their unborn child as a "hold" over Yatasha, and that he "hunted" her down and killed her in order to teach both she and Shaylene Clark "a lesson." Our Supreme Court has held that prosecutors are free to argue the evidence and all reasonable inferences arising therefrom as it relates to their theory of the case. See *Bahoda, supra* at 282. Contrary to defendant's assertion, the inferences drawn by the prosecutor in making these arguments were supported by the testimony of Angela Haynes and Albert Bush, both of whom indicated at trial that

defendant seemingly could not accept that Yatasha wished to end her relationship with him and would continuously reappear at their homes each time Yatasha would separate herself from him for any period of time. Tammy Hurley also testified that shortly before Yatasha was found murdered, defendant indicated to her that he was upset that Yatasha had left him, that he was going to find her, and that he wished to take their unborn child from her. Several witnesses, including Angela Haynes and Jessica Turk, also testified regarding the control exhibited by defendant over Yatasha and the consequences suffered by her when she would defy that control. Given this evidence, we do not conclude that the prosecutor exceeded the bounds of appropriate inference by asserting that defendant pursued and killed Yatasha, at least in part, for having challenged that control.

It was similarly within the bounds of appropriate argument for the prosecutor to assert during her opening statement that after having killed Yatasha, defendant left her "to rot, just like so much garbage." Prosecutors are not required to use the blandest of all possible terms, and may use "hard language" when it is supported by the evidence. *People v. Ullah*, 216 Mich.App 669, 678; 550 NW2d 568 (1996). Contrary to defendant's assertion, this characterization of the circumstances in which Yatasha was left by defendant was more than a mere appeal to the sympathies of the jury. Indeed, the prosecutor's statement in this regard was supported by the evidence at trial, which included several photographs depicting the advanced state of decomposition at the time Yatasha's body was found. Consequently, the prosecutor's argument did not constitute misconduct.

That the prosecutor sought before trial to introduce evidence that defendant habitually carried a knife, but then argued during her closing statement that defendant's possession of a knife on the night of the murder evinced premeditation was similarly not misconduct. In challenging the prosecutor's conduct in this regard, defendant relies solely on *Stumpf v. Mitchell*, 367 F3d 594, 611 (CA 6, 2004), wherein the prosecution's "use of inconsistent, irreconcilable theories to convict two defendants" for the same murder was found to violate due process. However, unlike *Stumpf*, the theories advanced by the prosecutor in the instant case, although arguably inconsistent, were not also "irreconcilable." In other words, a finding that defendant habitually carried a knife does not necessarily foreclose the possibility that his possession of a knife on the night of the murder was the product of a premeditated intent to kill. *Stumpf* therefore does not provide a basis from which to conclude that

the prosecutor's varying theories at the differing stages of the prosecution was misconduct. Consequently, defendant has failed to show plain error affecting his substantial rights. *Ackerman, supra.* Moreover, because he has failed to demonstrate any misconduct by the prosecutor, defendant's claim of cumulative error stemming from such conduct must similarly fail. See *People v. LeBlanc,* 465 Mich. 475, 491-492 n 12; 640 NW2d 246 (2002).

## III. Effective Assistance of Counsel

 **\*10** Defendant next argues that he was denied his right to the effective assistance of counsel as a result of his trial counsel's failure to adequately challenge or otherwise object to the admission of the hearsay and other acts testimony proffered by the prosecution at trial. Defendant also argues that counsel was similarly ineffective for failing to object to the several instances of prosecutorial misconduct discussed above. However, because defendant has failed to establish any prejudicial error stemming from either of these alleged deficiencies of counsel, his challenge of the effectiveness of his trial counsel is, ultimately, without merit.

To establish a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance was deficient and that this deficient performance prejudiced his defense, i.e., that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 687; 104 S Ct 2052; 80 L.Ed.2d 674 (1984); *People v. Pickens,* 446 Mich. 298, 302-303; 521 NW2d 797 (1994). In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms. *People v. Rodgers,* 248 Mich.App 702, 714; 645 NW2d 294 (2001). However, because "the object of an ineffectiveness claim is not to grade counsel's performance," when evaluating a defendant's claim of ineffective assistance of counsel "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *People v. Reed,* 449 Mich. 375, 400-401; 535 NW2d 496 (1995). Thus, with respect to the alleged failure of his counsel to adequately challenge the admission of the hearsay and other acts testimony proffered by the prosecution at trial, this Court need not determine whether counsel's response to the admissibility or ultimate admission of such evidence fell within the realm of prevailing professional norms. *Rodgers,*

*supra.* As previously discussed, regardless whether such evidence was properly admitted, the strength and weight of the remainder of the evidence against defendant was overwhelming. Consequently, defendant cannot establish that his counsel's deficiencies in challenging the subject evidence, if any exist, prejudiced his defense. *Strickland, supra.* Moreover, as also previously discussed, defendant has failed to show any misconduct on the part of the prosecutor. Therefore, because counsel is not required to advocated a meritless position, see *People v. Snider,* 239 Mich.App 393, 425; 608 NW2d 502 (2000), his counsel was similarly not ineffective for failing to object to conduct of the prosecutor cited on appeal.

## IV. Premeditation and Deliberation

Defendant next asserts that the prosecution presented insufficient evidence of premeditation and deliberation to support his conviction of first-degree premeditated murder. We disagree.

 **\*11** In reviewing the sufficiency of the evidence to support a conviction, this Court must view the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v. Fennell,* 260 Mich.App 261, 270; 677 NW2d 66 (2004). The elements of first-degree murder are that the defendant killed the victim and that the killing was "willful, deliberate, and premeditated." *People v. Bowman,* 254 Mich.App 142, 151; 656 NW2d 835 (2002), citing MCL 750.316(1)(a). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Plummer,* 229 Mich.App 293, 300; 581 NW2d 753 (1998). Thus, to establish premeditation and deliberation, the prosecution must show the existence of time between the initial homicidal intent and the ultimate action sufficient to afford a reasonable person time to take a second look. *People v. Gonzalez,* 468 Mich. 636, 641; 664 NW2d 159 (2003). Moreover, where, as here, the evidence establishes a fight and then a killing, there must also be a showing of a thought process which is not disturbed by hot blood. *People v. Plummer,* 229 Mich.App 293, 301; 581 NW2d 753 (1998).

Here, when viewed in the light most favorable to the prosecution, the evidence at trial was sufficient to establish such process of thought despite the argument that precipitated the killing. In recounting the murder at trial, Shaylene Clark

testified that during the minute or so between the time that defendant first produced the knife and actually cut Yatasha's throat, defendant slid the blade lightly across Yatasha's neck while stating that he was going to kill her. Defendant's stated intention, when combined with the time period between his indication of that homicidal intent and the ultimate act of cutting his victim's throat, provided an opportunity for a second look sufficient to support a rational trier of fact in concluding that the killing was both premeditated and deliberate.

V. Voluntary Manslaughter

Finally, defendant argues that the trial court erred in denying his request that the jury be instructed on the lesser offense of voluntary manslaughter. Again, we disagree.

This Court reviews claims of instructional error de novo. See *People v. Walls,* 265 Mich.App 642, 644, 697 NW2d 535 (2005). Because voluntary manslaughter is a necessarily included lesser offense of murder, defendant was entitled to such instruction only if supported by a rational view of the evidence. *People v. Mendoza,* 468 Mich. 527, 542; 664 NW2d 685 (2003). "[T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable

person could control his passions." *Id.* at 535-536. Here, as previously discussed, despite evidence of a heated dispute between Yatasha and defendant, the interval of time between defendant's statement of his intention to kill Yatasha and the ultimate act of cutting her throat was sufficient for a reasonable person to regain control of his passions. Consequently, instruction on the lesser included offense of voluntary manslaughter was not supported by a rational view of the evidence and the trial court, therefore, did not err by refusing to instruct the jury on that offense.

**\*12** In any event, even were such instruction supported by the facts, "where a defendant is convicted of first-degree murder, and the jury rejects other lesser-included offenses, the failure to instruct on voluntary manslaughter is harmless." *People v. Sullivan,* 231 Mich.App 510, 520; 586 NW2d 578 (1998). Here, the trial court instructed the jury on the law concerning both first- and second-degree murder. Because the jury rejected the lesser included offense of second-degree murder, any error arising from the trial court's refusal to also instruct on voluntary manslaughter was harmless. *Id.*

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2005 WL 3304121

Footnotes

1    Defendant also argues that because the trial court addressed only the relevancy of such evidence and not the specific requirements for admission of testimony under MRE 803(3), the court failed to properly recognize and exercise its discretion when ruling on the admissibility of Yatasha's extra-judicial statements. However, there is no legal requirement that a trial court state on the record that it is exercising its discretion. See *People v. Beneson,* 192 Mich.App 469, 471; 481 NW2d 799 (1992). Moreover, absent clear evidence that a trial court incorrectly believed that it lacked discretion, the presumption that the trial court knows the law must prevail. See, e.g., *People v. Knapp,* 244 Mich.App 361, 389; 624 NW2d 227 (2001). Here, admission of the subject statements was expressly sought by the prosecution under MRE 803(3), the substance and requirements of which were detailed by the prosecution in its written motion. Furthermore, and perhaps more importantly, although defendant challenged the admissibility of the subject statements on the grounds of relevancy, MRE 401, and unfair prejudice, MRE 403, he at no time asserted a failure of those statements to meet the requirements for admissibility under MRE 803(3). Under such circumstances, there is no basis for this Court to conclude that the trial court failed to recognize or properly exercise its discretion. *Knapp, supra.*

2    In reaching this conclusion, we reject defendant's assertion that Yatasha's statements evincing her state of mind, e.g., her fear of and desire to leave defendant, were nonetheless inadmissible because he did not place Yatasha's state of mind at issue and there was no evidence at trial to indicate that defendant was aware of her plan to leave him or the fact that she had obtained a new boyfriend. This Court has expressly held that a victim's state of mind need not be at issue in order for such evidence to be admissible under MRE 803(3). *People v. Coy,* 258 Mich.App 1, 15-16; 669 NW2d 831 (2003). Moreover, contrary to defendant's assertion, testimony at trial showed that defendant was aware both that Yatasha had ended the relationship and that she had obtained a new boyfriend. Yatasha's new boyfriend testified that he informed defendant of his relationship with Yatasha only a short time before the murder. Tammy Hurley also testified

that she discussed with defendant the fact that he and Yatasha were no longer together, a fact that defendant indicated to Hurley upset him.

**3**     The *Moorer* panel also found the conclusory and "perfunctory analysis" of MRE 803(3) in *People v. Ortiz,* 249 Mich.App 297, 307-310; 642 NW2d 417 (2001), relied on by the prosecution both below and on appeal, to be unhelpful in determining whether similar statements found to be admissible in *Ortiz* were properly admitted. *Id.* at 69.

**4**     Further, this issue is not properly before this Court because it was not raised in the statement of questions presented. MCR 7.212(C)(5); *People v. Miller,* 238 Mich.App 168, 172; 604 NW2d 781 (1999).

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 782584
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

PEOPLE of the State of
Michigan, Plaintiff-Appellee,
v.
Timothy Roy NULL, Defendant-Appellant.

Docket No. 271597.
|
March 25, 2008.

Wayne Circuit Court; LC No. 05-007927.

Before: SERVITTO, P.J., and HOEKSTRA and MARKEY, JJ.

**Opinion**

PER CURIAM.

*1 Defendant appeals as of right his jury trial conviction of second-degree murder, MCL 750.317, for which he was sentenced to serve 130 months to 35 years' imprisonment. Because we conclude that defendant was not entitled to instruction on the offense of involuntary manslaughter, and that the admission of testimony concerning prior threats against the victim and those with which she was involved was not error, we affirm.

I. Basic Facts and Procedural History

This case arises from the death of Alicia Gyomory. At autopsy, the medical examiner discovered a high level of prescription medication in Gyomory's system. It was ultimately concluded, however, that she died of asphyxiation resulting from strangulation. During questioning by the police defendant acknowledged having choked Gyomory on the day of her death. However, he denied having done so with any intent to kill or otherwise harm her. Rather, he asserted that his actions were taken in an effort to cause Gyomory to vomit and thereby regurgitate an overdose of prescription medication

taken by her in an effort to commit suicide. At defendant's subsequent trial for first-degree premeditated murder, the trial court denied defendant's request for instruction on the lesser offense of involuntary manslaughter. Defendant was subsequently convicted and sentenced as stated above.

II. Analysis

A. Instruction on Involuntary Manslaughter

Defendant first argues that the trial court erred in failing to instruct the jury on the offense of involuntary manslaughter. We disagree.

Common law involuntary manslaughter is a necessarily included lesser offense of murder, as the sole element distinguishing the two offenses is malice. *People v. Mendoza,* 468 Mich. 527, 533, 536, 541, 664 N.W.2d 685 (2003). "If the homicide was committed with malice, it is murder. If it was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter." *People v. Holtschlag,* 471 Mich. 1, 21-22, 684 N.W.2d 730 (2004). "Consequently, when a defendant is charged with murder, an instruction for ... involuntary manslaughter must be given if supported by a rational view of the evidence." *Mendoza, supra* at 541, 664 N.W.2d 685; see also *People v. Cornell,* 466 Mich. 335, 357, 646 N.W.2d 127 (2002).

There are "three different theories giving rise to involuntary manslaughter liability." *People v. Datema,* 448 Mich. 585, 596, 533 N.W.2d 272 (1995). As explained by our Supreme Court, these include "the unintentional killing of another, without malice, during the commission of an unlawful act ... not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Mendoza, supra* at 536, 664 N.W.2d 685; see also *Holtschlag, supra* at 12, 684 N.W.2d 730. Defendant claims that the evidence supported instruction on involuntary manslaughter under each of these theories. Defendant argued at trial that instruction on involuntary manslaughter was warranted under the theory that Gyomory's death occurred during the commission of a lawful act negligently performed. Therefore, this portion of his claim of instructional error is preserved and will be reviewed de novo on appeal. See *People v. Walls,* 265 Mich.App. 642, 644, 697 N.W.2d 535 (2005), citing *People v. Lowery,* 258 Mich.App. 167, 173, 673 N.W.2d

107 (2003).[1] However, defendant did not request instruction under the remaining theories. Those portions of his claim of instructional error are therefore unpreserved and will be reviewed for plain error affecting his substantial rights. *People v. Gonzalez,* 468 Mich. 636, 642-643, 664 N.W.2d 159 (2003).

1. Negligent Performance of a Lawful Act

 **\*2**  Regarding instruction under the theory that the killing occurred during the commission of a lawful act negligently performed, defendant asserts that the jury could have concluded that although he did not intend to cause an injury by choking Gyomory, he was grossly negligent in doing so. However, a rational view of the evidence does not support this conclusion. At the outset, defendant's statement that he "tried to choke [Gyomory] to make her puke" is irrational on its face. Further, no evidence was presented that choking someone could induce vomiting. Rather, defendant's own expert explained that a chokehold would be used as a mechanism for strangulation. Thus, defendant's own words conflict with his conduct.

Regardless, even accepting that choking could induce vomiting, there is no evidence of gross negligence. *Holtschlag, supra* at 21-22, 684 N.W.2d 730. A defendant is grossly negligent where "he realizes the risk of his behavior and consciously decides to create that risk. As with negligence, however, the actor does not seek to cause harm, but is simply recklessly or wantonly indifferent to the results." *Datema, supra* at 604, 533 N.W.2d 272 (citation and internal quotation marks omitted). Here, if defendant's statement is believed, he was not recklessly or wantonly indifferent to the result of his action and did not consciously decide to create a risk of death. Rather, defendant intended the opposite result of what actually occurred, i.e., to prevent Gyomory from dying. Consequently, a rational view of the evidence does support an instruction under this theory and the trial court did not, therefore, abuse its discretion in refusing to so instruct the jury.

2. Unlawful Act Not Naturally Tending to Cause Great Bodily Harm

Defendant also asserts that a rational view of the evidence supports that he merely assaulted and battered Gyomory, and thereby "hastened her unconsciousness and the operation of

the drugs she had taken." However, even if Gyomory were not strangled and defendant's actions amounted to only an assault and battery, no evidence was presented supporting the inference defendant asserts. To the contrary, defendant's own expert concluded that any choking did not affect the cause of death, which the expert asserted was "a result of [a] self-inflicted overdose of ... the drugs [Gyomory] took." Further, no evidence was presented indicating that any external force affected Gyomory's consciousness or the effects of the drugs in her system. Consequently, the evidence does not support an instruction for involuntary manslaughter under this theory. Defendant has thus failed to establish plain error warranting relief.

3. Negligent Failure to Perform a Legal Duty

Defendant additionally argues that an involuntary manslaughter instruction was appropriate because defendant breached a duty to Gyomory created by the circumstances preceding Gyomory's death. As support for a such a duty, defendant relies on the fact that he and Gyomory were in a sexual relationship, that it was through him that Gyomory gained access to the prescription medication used in her suicide attempt, that he exerted control over the situation by initially notifying emergency services personnel of the suicide attempt, and that he returned to the house after emergency personnel could not help Gyomory. As defendant admits, however, no Michigan case law creates a duty under these circumstances. Thus, the general principle that the duty to protect against a wrong is a moral obligation rather than a legal duty is applicable here and the failure to provide an instruction for involuntary manslaughter under this theory was not error. *People v. Kevorkian,* 447 Mich. 436, 473, 527 N.W.2d 714 (1994).[2]

B. Evidentiary Claims

 **\*3**  Defendant next argues that he was denied a fair trial and his right to due process by the admission of "other acts" and hearsay testimony from witnesses Eric Beavers and Eric Smith, both of whom briefly dated Gyomory before her death. Although defendant preserved this issue on hearsay grounds below, he failed to raise this issue in the context of MRE 404(b). Therefore, we review the trial court's decision to admit evidence over a hearsay objection for an abuse of discretion, but review defendant's remaining assignment of error for plain error affecting his substantial rights. *People v.*

*Stampler,* 480 Mich. 1, 4, 742 N.W.2d 607 (2007); *People v. Carines,* 460 Mich. 750, 763, 597 N.W.2d 130 (1999).

On the first day of trial the prosecution noted its intention to present evidence that while Gyomory was with Beavers, defendant made threats and also grabbed Gyomory's purse, dragged her down the street, punched her in the head, and told her that she was a "dead bitch." The trial court ruled that although MRE 404(b) prohibited testimony that defendant assaulted Gyomory, defendant's threats were relevant and admissible. Beavers subsequently testified that defendant had not only threatened to kill Beavers and Gyomory, but that he also told Beavers to stay away from Gyomory and that he wanted to hurt Beavers because he was with her. On appeal, defendant argues that Beavers' testimony regarding these threats should also have been excluded under MRE 404 as improper character evidence. Defendant similarly asserts that Smith's testimony that defendant threatened to poison Gyomory's dog also violated MRE 404. We disagree.

MRE 404(b) generally precludes parties from introducing evidence of a person's bad character if offered to prove action in conformity with such character. However, a statement is not a prior bad act subject to analysis under MRE 404(b). *People v. Goddard,* 429 Mich. 505, 514-515, 418 N.W.2d 881 (1988). Rather, its admissibility is gauged by the traditional inquiries of relevance and prejudicial effect. *Id.* at 515, 418 N.W.2d 881. To this end, defendant claims that evidence of his threats toward Gyomory and the others was substantially more prejudicial than probative, and thus should have been excluded because they created the inference that defendant had a propensity for bad conduct. See MRE 403. However, defendant's intent in strangling Gyomory was material to the charge of first-degree premeditated murder, and his threats toward her were highly relevant and probative of such intent.

Proof of motive is also generally relevant as probative of the intent necessary for murder. See *People v. Herndon,* 246 Mich.App. 371, 412-413, 633 N.W.2d 376 (2001); see also *People v. Williams,* 143 Mich.App. 574, 585, 374 N.W.2d 158 (1985) ( "[w]hen a defendant claims lack of intent or accident, proof of motive is material to the case"). Here, the probative value of defendant's jealous contempt of Gyomory and those with whom she was involved or appeared to care for was similarly high in light of his statement that he loved Gyomory and merely sought to thwart her attempt at suicide by choking her. Thus, although damaging to the theory of defense offered at trial, the evidence challenged on appeal did not unfairly inject considerations extraneous to the merits of the case. Accordingly, we find no error in the admission of this evidence, plain or otherwise.

**\*4** Defendant also asserts that Smith's testimony that defendant threatened to poison Gyomory's dog was inadmissible hearsay. This argument is without merit. Hearsay is defined as an out-of-court statement offered in court to prove the truth of the matter asserted. MRE 801(c); *People v. Harris,* 201 Mich.App. 147, 150-151, 505 N.W.2d 889 (1993). Here, Gyomory's statement that defendant threatened to poison her dog was not admitted to show that defendant, in fact, poisoned her dog. Rather, it was admitted to show that defendant threatened Gyomory. Consequently, the statement was not offered for its truth, and therefore, did not constitute hearsay.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2008 WL 782584

Footnotes

1   We disagree with the prosecution's assertion that the question whether a rational view of the evidence supports a requested instruction on a necessarily lesser included offense is a matter left to the discretion of the trial court. To the contrary, the trial court has a duty to instruct the jury on the law applicable to the case, MCL 768.29, and an alleged error in failing to do so is a question of law reviewed de novo on appeal, see *People v. Riddle,* 467 Mich. 116, 124, 649 N.W.2d 30 (2002). See also Black's Law Dictionary (7th ed) (defining a "question of law" as "[a]n issue that, although it may turn on a factual point, is reserved for the court....").

2   In reaching this conclusion, we reject defendant's reliance on the California Court of Appeals decision in *People v. Oliver,* 210 Cal.App.3d 138, 144-144, 258 Cal.Rptr. 138 (1989). Notwithstanding that cases from foreign jurisdictions are not binding on this Court, *People v. Hanks,* 276 Mich.App. 91, 95, 740 N.W.2d 530 (2007), the facts of this case are distinguishable from those in *Oliver,* where the defendant removed the victim "from a public place where others might have taken care to prevent him from injuring himself to a private place ... where only she could provide such care," then failed to provide or seek out such care. Here, defendant exerted no similar control over Gyomory and, at the outset,

attempted to garner emergency medical services for her. Thus, even accepting *Oliver* as persuasive, the facts of this case created no duty.

---

**End of Document**                                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2004 WL 840226
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

PEOPLE of the State of
Michigan, Plaintiff-Appellee,
v.
David Wade JOHNSON,
Defendant-Appellant.

No. 245503.
|
April 20, 2004.

Before: COOPER, P.J., and GRIFFIN and BORELLO, JJ.

[UNPUBLISHED]

PER CURIAM.

 *1  Defendant appeals as of right his jury trial convictions for three counts of assault with intent to do great bodily harm less than murder, MCL 750.84, and arson, MCL 750.72. He was sentenced to fifty-seven months to ten years' imprisonment for each of the three assault convictions, and ninety-six months to twenty years' imprisonment for the arson conviction, the four sentences to run concurrently. We affirm.

Defendant first argues on appeal that the trial court erred in instructing the jury regarding flight, because either the instruction was not supported by the evidence, or the evidence of defendant's flight was used as substantive evidence, which defendant contends is an improper purpose. We disagree.

"Claims of instructional error are reviewed de novo." *People v. Milton,* 257 Mich.App 467, 475; 668 NW2d 387 (2003). In doing so, this Court examines the jury instructions as a whole. *People v. Aldrich,* 246 Mich.App 101, 124; 631 NW2d 67 (2001). Jury instructions must include all the elements of the charged offense and must not exclude material issues, defenses, and theories if the evidence supports them. *Milton, supra* at 475; *People v. Canales,* 243 Mich.App 571, 574;

624 NW2d 439 (2000). Instructions must be not extracted piecemeal to establish error. *Aldrich, supra* at 101. "Even if somewhat imperfect, instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights." *Canales, supra* at 574.

In the case at bar, the trial judge gave the jury the following instruction, which paraphrases CJI2d 4.4:[1]

Now there has been some evidence that the defendant ran away after the allege [sic] offense. That evidence does not prove guilt. A person may run or hide for innocent reasons such as panic, mistake or fear. Or the person may run because of consciousness of guilt. You have to decide if it was the defendant and if he ran and if so whether that shows consciousness of guilt.

Though he substituted the phrase "consciousness of guilt" at the end, this was a proper substitution. *People v. Coleman,* 210 Mich.App 1, 4; 532 NW2d 885 (1995); *People v. Cutchall,* 200 Mich.App 396; 504 NW2d 666 (1993).

"It is well established that jurors are presumed to follow their instructions." *People v. Graves,* 458 Mich. 476, 486; 581 NW2d 229 (1998). Defendant's bare assertion that "the evidence was used as substantive of his guilt," is insufficient to overcome the presumption that the jurors in the case at bar followed the judge's instruction. *Id.*

Furthermore, there was sufficient evidence to justify giving a jury instruction on flight. A witness who was familiar with defendant testified that within a short time after the fire started in the house in which she was sleeping, she saw defendant "running away from the side window" of the burning house, through which a "firebomb" had just come. That witness further testified that she saw defendant's face. Another witness testified that after the fire she saw nearby the tan van that defendant had been driving for some time. The owner of the firebombed house testified that immediately after the fire, she saw a beige or tan van driving down the street past her home as it burned. Given this evidence, it cannot be said that the trial court erred in instructing the jury.

 *2  Defendant next argues that the trial judge demonstrated prejudice and bias against him, and the trial court erred in failing to disqualify the judge. We disagree.

This Court reviews for an abuse of discretion the factual findings made by a chief judge (during his de novo review of the trial judge's decision on a motion for disqualification).

However, it reviews de novo the applicability of the facts to the relevant law. *Cain v Michigan Dept of Corrections,* 451 Mich. 470, 503; 548 NW2d 210 (1996); *Van Buren Twp v. Garter Belt, Inc,* 258 Mich.App 594, 598; 673 NW2d 111 (2003). "[A]n abuse of discretion exists when an unprejudiced person, considering the facts on which the trial court acted, would conclude that there was no justification or excuse for the ruling made." *People v. Tate,* 244 Mich.App 553, 559; 624 NW2d 524 (2001). The party moving for disqualification bears the burden of proving actual bias or prejudice. *People v. Bero,* 168 Mich.App 545, 549; 425 NW2d 138 (1988). "[D]isqualification is not warranted unless the bias or prejudice is both personal and extrajudicial. Thus, the challenged bias must have its origin in events or sources of information gleaned outside the judicial proceeding." *Cain, supra* at 495-496.

Based on the evidence defendant adduced, he did not meet his burden of establishing that the trial judge had a personal bias or prejudice against him originating in events or sources of information gleaned outside the judicial proceeding, and consequently, Chief Judge Kenny did not err in denying defendant's motion for disqualification.

MCR 2.003(B)(1) states that a judge is disqualified when the judge cannot impartially bear a case, including, but not limited to, instances in which the judge is personally biased or prejudiced for or against a party or attorney. Defendant argues on appeal that the trial judge's conduct at the hearing on his motion to appoint new counsel evinced personal bias or prejudice. We disagree.

At the hearing on defendant's motion to disqualify, the trial judge stated that he did not bear defendant any animosity and gave the following explanation of his actions at the earlier hearing:

My comments to Mr. Johnson were directed to his failure to disclose to the attorney that he was dissatisfied with him and the failure to disclose the grievance, all of which made it appear that if what he was doing was just trying to manipulate that result and there's good precedent for those observations. I don't have anything against Mr. Johnson.

On de novo review of the trial judge's decision, the chief judge noted that that the trial judge had granted defendant's motion for appointment of new counsel at the hearing at which defendant alleged he revealed his bias. The chief judges stated:

In this particular matter I think it's true that [the trial judge] was less than happy with what I think he viewed as a less than substantial reason being offered by [defendant] in order to get [a new] attorney ... I think it is clear to me from reading the transcript that [the trial judge] thought that in addition to his knowing [defendant's original attorney] and knowing that [he] is an excellent attorney, felt that the reasons bring [sic]offered were pretty weak, and I think [the trial judge] was very candid in his saying that.... I think that [the trial judge] has not demonstrated a bias in fact toward defendant that will impact on this trial.

**\*3** This Court, relying heavily on *Cain, supra,* stated in *Schellenberg v Rochester Michigan Lodge No 2225, of Benev and Protective Order of Elks of USA,* 228 Mich.App 20, 39; 577 NW2d 163 (1998):

Absent actual personal bias or prejudice, a judge will not be disqualified. Opinions formed by a judge on the basis of facts introduced or events occurring during the course of the current proceedings, or of prior proceedings, do not constitute bias or partiality unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Likewise, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. Moreover, a party who challenges a judge on the basis of bias must overcome a heavy presumption of judicial impartiality. [Citations omitted.]

Defendant has not presented any evidence that the alleged bias or prejudice originated in events or sources of information gleaned outside the judicial proceedings. His allegations are based solely on statements made by the judge during the hearing on defendant's motion to appoint new counsel. The judge's comments appear to be nothing more than remarks "critical or disapproving of, or even hostile to [defendant], ... or [his] case[ ]," or "expressions of impatience, dissatisfaction, annoyance, and even anger" that are equally ineffective for the purpose of establishing bias or prejudice. *Cain, supra* at 497 n 30. While it is true that events originating in the proceedings can be characterized as "bias" or "prejudice," if they "display a deep-seated favoritism or antagonism that would make fair judgment impossible[,]" *Cain, supra* at 496, in the case at bar, the alleged comments by the trial court judge cannot reasonably be said to do this. On this point, it is significant that defendant does not allege that the trial judge made an unfair decision at the hearing on the

motion for appointment of new counsel, which it seems likely he would have done had he actually felt such antagonism.

Given that defendant did not meet his burden of establishing that the trial judge had a personal bias or prejudice against him, it cannot reasonably be said that an unprejudiced person, considering the facts on which the trial court acted, would conclude that there was no justification or excuse for the chief judge's finding that the trial judge was not biased.

Defendant next contends that the trial court erred in granting the prosecution's motion to consolidate in a single trial the assault he committed on December 31, 2001, and the assaults and arson he committed on January 6, 2002. He contends that the offenses were not "related" and therefore had to be tried in separate trials. We disagree.

This Court reviews de novo whether joined offenses are related as a matter of law and subsequently eligible for joinder. MCR 6.120(B); *People v. Tobey*, 401 Mich. 141, 153; 257 NW2d 537 (1977). A trial court's decision to deny a defendant's motion for severance of related offenses is reviewed for an abuse of discretion. *People v. Duranseau*, 221 Mich.App 204, 208; 561 NW2d 11 (1997). For purposes of MCR 6.120, two offenses are related if they are based on the same conduct, or a series of connected acts or acts constituting part of a single scheme or plan. MCR 6.120(B)(1) and (B)(2); *Tobey, supra* at 153.

 **\*4** MCR 6.120 provides that "An information or indictment may charge a single defendant with any two or more offenses. Each offense must be stated in a separate count. Two or more informations or indictments against a single defendant may be consolidated for a single trial." MCR 6.120(B) provides an unqualified right to severance of unrelated offenses: "On the defendant's motion, the court must sever unrelated offenses for separate trials. For purposes of this rule, two offenses are related if they are based on (1) the same conduct, or (2) a series of connected acts or acts constituting part of a single scheme or plan." MCR 6.120(C) sets out the procedure for joining or severing charges other than those severed pursuant to defendant's right to severance of unrelated offenses. It states: "On the motion of either party, except as to offenses severed under subrule (B), the court may join or sever offenses on the ground that joinder or severance is appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense." The remainder of MCR 6.120(C) lists factors relevant to

promoting fairness to the parties and a fair determination of the defendant's guilt or innocence.

In granting the prosecution's motion, the trial judge stated: "There's nothing legally prejudicial about it and the offenses are related and you don't have a right to have related offenses severed, but I do have the discretion to join them and I find that they're related and I can consolidate them in a single trial when he could have been charged in the same information." Read in context, this holding appears to be based on finding that the arson was a continuation of the argument that initially erupted during the incident that culminated in the December 31, 2001, assault. The trial judge stated:

Well, the incidents themselves-it's not the same transaction, but she's saying they're related. What she just said indicates they are related. She's saying there's a felonious assault and an argument and then they moved out and the defendant tracked them down ... and firebombed the house so that's a relation.

Nowhere does he expressly state on which of the grounds listed in MCR 6.120(B)(2) his determination of "relatedness" was based. However, the offenses were related for the purposes of MCR 6.120 because they were based on "a series of connected acts or acts constituting part of a single scheme or plan." MCR 6.120(B)(2). In the case at bar, it appears possible that less time elapsed between the offenses in the case at bar than between those in *People v. Miller*, 165 Mich.App 32, 45; 418 NW2d 668 (1987), aff'd 186 Mich.App 660; 465 NW2d 47 (1991).[2] Testimony was presented to indicate that defendant on December 31, 2001, was planning, at some unspecified future date, to kill everyone present during the assault. One of the witnesses testified that after committing the assault, defendant said: "I'mma kill all of y'all." Defendant's wife was presumably an object of defendant's threat that day, since she was present. She was also present during the arson. The prosecution also presented evidence that the plan to kill continued during the time between December 31, 2001, and January 6, 2002, the date of the later assaults and arson. Defendant's wife testified that on January 2, 2002, "[defendant] said he was going to kill all of us in the house." She also testified that at some unspecified point before the assaults and arson, defendant had told her: "If your family ever cross me any kind of way, I'm gonna kill them and I'm going to blow their house up." The evidence presented demonstrates that defendant committed the arson in fulfillment of a plan to kill his wife, and possibly her sisters as well, and that the plan had existed at least from the time of the December 31, 2001, assault.

**\*5** Defendant argues that the offenses were unrelated because the offenses themselves were different, occurred on different dates, at different locations, and involved different victims. Defendant cites no authority for his proposition that these factors are determinative. As noted above, this Court has found offenses related under MRC 6.120 when the victims were different, the locations where they occurred were different, and when they happened at different times. See *People v. Abraham,* 256 Mich.App 265, 272; 662 NW2d 836 (2003). Defendant does not clearly present an argument that, assuming the offenses were related, the trial court abused its discretion in joining them. Consequently, we do not address this argument.

Defendant next argues that the trial court erred in admitting evidence of defendant's actions between the assault on December 31, 2001, and the assaults and arson on January 6, 2002, for the purpose of showing a propensity to commit bad acts. We disagree.

We note at the outset that defendant has not preserved this issue for appeal since he did not object at trial to its introduction. MRE 103(a)(1); *Aldrich, supra* at 113; *People v. Griffin,* 235 Mich.App 27, 44; 597 NW2d 176 (1999). Consequently, this Court's review is for a plain error that affected defendant's substantial rights. *People v. Carines,* 460 Mich. 750, 774; 597 NW2d 130 (1999). "To avoid forfeiture of an unpreserved, nonconstitutional plain error, the defendant bears the burden of establishing that: (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected substantial rights." *People v. Jones,* 468 Mich. 345, 355; 662 NW2d 376 (2003), citing *People v. Grant,* 445 Mich. 535, 551; 520 NW2d 123 (1994); *Carines, supra* at 763.

Whether evidence of a defendant's other crimes, wrongs, or acts is admissible is governed by MRE 404(b). Evidence is admissible under this rule if it: (1) is offered for a proper purpose, i.e., one other than to prove the defendant's character or propensity to commit the crime, (2) is relevant to an issue or fact of consequence at trial, and (3) is sufficiently probative to outweigh the danger of unfair prejudice under MRE 403. *People v. Starr,* 457 Mich. 490, 496-497; 577 NW2d 673 (1998). The admissibility of evidence under MRE 404(b) necessarily hinges on the relationship of the elements of the charge, the theories of admissibility, and the defenses asserted. *People v. VanderVliet,* 444 Mich. 52, 75; 508 NW2d 114 (1993), amended 445 Mich. 1205 (1994).

MRE 404(b)(1) provides a list of "other purposes," for which other acts evidence might be admissible. Among them are: "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case." This list of proper purposes is not exclusive. *VanderVliet, supra* at 65.

**\*6** Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. MRE 401; *People v. Martzke,* 251 Mich.App 282, 293; 651 NW2d 490 (2002). "Logical relevance is the touchstone of the admissibility of uncharged misconduct evidence." *Id.* (internal citations omitted). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

Applying the above criteria to the evidence defendant claims was inadmissible, we find that it was offered for a proper purpose, material, relevant, and more probative than prejudicial. The prosecution claims that it offered the evidence of the January 4, 2002, incident "to show that [sic] the defendant's intent to kill at the time of the firebombing." The record indicates this contention is no mere after-the-fact justification. During its closing, the prosecution, referring to defendant's actions on January 4, 2002, argued: "Those actions of his tell me what is in this man's mind. And this case he was going to get [his wife's] family." Showing intent is one of the proper purposes expressly listed in MRE 404(b)(1).

The evidence was also material, as required by MRE 404(b) (1). "Evidence probative of a matter 'in issue' is material." *Miller, supra,* 186 Mich.App 663. The elements of assault with intent to commit murder are: "(1) an assault, (2) with the specific intent to commit murder, (3) which, if successful, would make the killing murder." *People v. Rockwell,* 188 Mich.App 405, 411; 470 NW2d 673 (1991). That defendant had the requisite intent to kill was "in issue" in the case at bar because defendant argued in closing that: "There is no showing at all, no evidence at all that [defendant] intended to kill anybody in this case."

Case 2:19-cv-12718-PDB-EAS  ECF No. 40, PageID.1159  Filed 04/05/21  Page 80 of 139

The evidence is also relevant, because the fact that defendant unequivocally expressed an intent to kill someone makes the existence of an intent to kill his wife and her sisters more probable than it would be absent such a statement. His violent actions and possession of a crowbar during those visits are also relevant to the issue of whether he intended to kill.

Given the nature of the evidence to which defendant objects-that defendant visited two houses (one of them the very house he later firebombed), armed with what could reasonably be seen as a weapon (a crowbar), shouting out clear statements of an intent to kill someone-has great probative value. Defendant, beyond his contention that the evidence was used only to show his character, does not indicate how its probative value was substantially outweighed by the danger of unfair prejudice under MRE 403.

Because the evidence concerning defendant's acts and statements on January 4, 2002, was offered for a proper purpose and its probative value was not substantially outweighed by the danger of unfair prejudice, it was not plain error for the trial court to admit this evidence.

**\*7** Finally, defendant contends that his attorney's failure to object to the introduction of evidence concerning his actions between the offenses for which he was convicted constitutes ineffective assistance of counsel. Again, we disagree.

We note as a preliminary issue that defendant has not fully preserved this issue for review, because he did not move for a new trial or for an evidentiary hearing. *People v. Sabin (On Second Remand),* 242 Mich.App 656, 658; 620 NW2d 19 (2000). Consequently, our Court's review is limited to the mistakes apparent on the record. If the appellate record does not support defendant's assertions, he has waived the issue. *Id.* at 658-659.

We review a trial court's findings of fact for clear error, while questions of constitutional law are reviewed de novo. *People v. LeBlanc,* 465 Mich. 575, 579; 640 NW2d 246 (2002). "To establish ineffective assistance of counsel, a defendant must show that counsel's performance was below an objective standard of reasonableness under prevailing professional norms and there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v. Effinger,* 212 Mich.App 67, 69; 536 NW2d 809 (1995). In applying this test, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *LeBlanc, supra* at 578. "Trial counsel is not required to advocate a meritless position." *People v. Snider,* 239 Mich.App 393, 425; 608 NW2d 502 (2000).

As noted above, the evidence of defendant's actions between December 31, 2001, and January 6, 2002, was admissible to prove defendant's intent. We note also that our Supreme Court has held that, "MRE 404(b) does not apply to a defendant's prior statements of intent." *People v. Goddard,* 429 Mich. 505, 518; 418 NW2d 881 (1988). Thus, an even stronger case is made for the admissibility of the statements defendant made during this period. Given the likely admissibility of the evidence, his attorney's failure to object to it will not support a claim of ineffective assistance of counsel. See *Snider, supra* at 424.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2004 WL 840226

Footnotes

1    CJI2d 4.4 reads:
     (1) There has been some evidence that the defendant [tried to run away / tried to hide / ran away / hid] after [the alleged crime / (he / she) was accused of the crime / the police arrested (him / her) / the police tried to arrest (him / her) ].
     (2) This evidence does not prove guilt. A person may run or hide for innocent reasons, such as panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt.
     (3) You must decide whether the evidence is true, and, if true, whether it shows that the defendant had a guilty state of mind.

2    "[T]he prosecutor, after conducting a thorough investigation, could not specify the exact date and time of the offenses." *Miller, supra* at 47.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5008586
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

PEOPLE of the State of
Michigan, Plaintiff–Appellee,

v.

Joseph Damian SUSALLA,
Defendant–Appellant.

Docket No. 299402.
|
Oct. 20, 2011.

Oakland Circuit Court; LC No.2009–228601–FC.

Before: FORT HOOD, P.J., and HOEKSTRA and METER,
JJ.

**Opinion**

PER CURIAM.

 **\*1** Following a jury trial, defendant was convicted of
first-degree premeditated murder, MCL 750.316(1)(a), and
sentenced to life imprisonment without the possibility of
parole. He appeals as of right. We affirm.

I. BASIC FACTS

Defendant's conviction arises from the murder of Kelley
Duberg. Defendant did not dispute that he killed Duberg, his
girlfriend, but claimed that he killed her while in a fit of rage,
and not with premeditation and deliberation.

On the morning of May 23, 2009, which was the Saturday
before Memorial Day, defendant asked his stepfather and
mother, Roger and Karen Wickstrom, if it was okay if he
camped on their property in Crawford County. He planned
to take Duberg with him. Defendant also borrowed a shovel
and an ax from the Wickstroms. The Wickstroms next saw
defendant the following evening, May 24, 2009, when he

returned the shovel and ax. Defendant told the Wickstroms
that he and Duberg had not camped because Duberg was
drunk.

Based on defendant's history of violence with women, Karen
Wickstrom became concerned about Duberg's safety. She told
defendant that she wanted to see or talk with Duberg, to
which defendant gave varying responses, such as Duberg was
drunk, sleeping, or not answering her telephone, and had left
with another man. Karen tried calling Duberg on her cellular
telephone over the next two days, but Duberg never answered
her telephone. Finally, on Wednesday, May 27, 2009, Karen
called the Michigan State Police to report Duberg missing.

Sergeant Melinda Logan, who took the missing person report,
went to Duberg's apartment to conduct a welfare check. Logan
did not find Duberg. Logan also sent a police officer to
Duberg's place of employment; her coworkers reported that
Duberg had not appeared for work that week.

That same day, Logan received information that defendant
was at Doug Fletcher's house on Bentler Street in Detroit.
Defendant was taken into custody. After waiving his
*Miranda*[1] rights, defendant told two Michigan State Police
officers that he had last seen Duberg on Saturday and that
he believed she was with someone named Ian. Duberg's
car, which defendant was known to drive, was found at a
convenience store approximately nine blocks from Fletcher's
house. The car had been backed into the parking spot, such
that the car's license plate was not visible.

According to Fletcher, he saw Duberg's car on his property
on May 25, 2009. He sent Bruce Cousins across the street
to Karen McCartney's house to ask defendant to move the
car. Defendant asked to speak to Cousins alone. He told
Cousins that he had killed someone and buried the body.
He explained that he had hit the person and the person had
urinated and defecated. Defendant further told Cousins that
his girlfriend was passed out at home. Sean Voegler was also
at McCartney's house. Defendant told Voegler that he had
murdered and buried his girlfriend. He explained that he was
jealous over his girlfriend. Defendant stated that his girlfriend
deserved everything that she had received and that he also
wanted to take care of the other man.

 **\*2** On June 5, 2009, the Michigan State Police received
consent from the Wickstroms to search their property in
Crawford County. With the aid of a cadaver dog, the officers
found the buried remains of Duberg. Duberg's body was

wrapped in a shower curtain, tied with extension cords and twine, and several garbage bags. According to the medical examiner, Duberg suffered blunt force trauma to her face, which caused swelling and bruising around her eyes, but the cause of death was ligature strangulation. The medical examiner testified that it generally takes ten to 15 seconds for a person being choked to lose consciousness, but that it takes a few minutes of strangulation for irreversible brain damage and death to occur. After defendant was arrested for the killing of Duberg, he made a telephone call to his mother from jail in which he stated, "I'm going to try to get it down."

Defendant testified that he and Duberg argued during the evening of May 22, 2009. Duberg told defendant that she hated him, and when he asked her what her problem was, she did not respond; she just glared at him. Defendant attempted to give her a hug, but she kicked him in the groin. According to defendant, he then went into a rage and lost control of himself; he stated that he just "blacked out." He put his hands around Duberg's neck and strangled her. When Duberg urinated on him, defendant hit her three times in the face. And then, after Duberg just laid there for about two hours, defendant realized that she was dead. He wrapped her up and buried her the next day. Defendant denied that he ever planned to kill Duberg.

On cross-examination, defendant admitted that he put a piece of twine around Duberg's neck. After he punched Duberg, he walked to the kitchen and took the twine from a drawer. Defendant first claimed that the twine broke as soon as he placed it around Duberg's neck and pulled, but then he admitted that he pulled the twine hard enough to break through the cartilage in Duberg's neck and applied pressure long enough for Duberg to lose consciousness and die.

Defendant admitted that he was jealous and controlling with regard to women and, especially, to the women that he dated. Barbara Polson and Kenneth McCray, who lived in the apartment above Duberg's apartment, testified that they often heard defendant and Duberg argue. They also heard sounds related to shoving and pushing. Two weeks before Memorial Day, Polson saw defendant "pulling" Duberg by the arm. Jeffrey Saucerman, who knew defendant from AA, testified that it seemed defendant was jealous in his relationship with Duberg. Defendant told Saucerman that he checked Duberg's panties for semen. Telephone records established that on May 12, 2009, defendant called Duberg's cellular telephone 74 times and that on May 13, 2009, he called 78 times. Two of Duberg's coworkers testified that, based

on conversations with Duberg about defendant, they were concerned for Duberg's safety. Gregory Barber, Duberg's boss, testified that he received a note from Duberg on April 22, 2009, stating that she had broken up with her boyfriend and that she needed to take the day off because she needed to change the lock on her door and because she needed to go to Verizon to get a battery for her cellular telephone to replace the one that defendant had taken. According to Janet Sylvester, who attended AA with Duberg, Duberg told her two weeks before she went missing that she was afraid that defendant was going to kill her.

**\*3** Deborah Aquilina, defendant's sister, testified that she called 911 on a day in March 2005 because defendant had "kicked [her] ass." She had a bloody nose and a black eye. Robin Susalla, defendant's wife, testified that defendant punched her in the face on four or five occasions. Fletcher testified that he had seen defendant beat a former girlfriend in the head with a tire iron.

## II. VICTIM'S STATEMENT OF FEAR OF DEFENDANT

Defendant claims that the trial court erred in allowing Sylvester to testify to Duberg's out of-court statement that Duberg was afraid that defendant was going to kill her.

Defendant did not object that Duberg's out-of-court statement to Sylvester was inadmissible under MRE 803(3). Although defendant objected to the admission of Duberg's out-of-court statements to Duberg's boss and coworkers, those objections were not sufficient to preserve a challenge to the victim's out-of-court statement that was testified to by Sylvester. See *People v. Metamora Water Serv, Inc,* 276 Mich.App 376, 382; 741 NW2d 61 (2007) ("For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court."); *People v. Stimage,* 202 Mich.App 28, 30; 507 NW2d 778 (1993) ("An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground."). Accordingly, the issue whether Duberg's statement to Sylvester was admissible under MRE 803(3) is unpreserved, and we review defendant's claim of error for plain error, i.e., clear or obvious error, affecting defendant's substantial rights. *People v. Seals,* 285 Mich.App 1, 4; 776 NW2d 314 (2009); *People v. Coy,* 258 Mich.App 1, 12; 669 NW2d 831 (2003).

Hearsay, which is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered

in evidence to prove the truth of the matter asserted," is inadmissible except as provided by the Michigan rules of evidence. MRE 801(c); MRE 802. Under MRE 803(3), an out-of-court statement of the declarant's then existing mental, emotional, or physical condition is not precluded by the hearsay rule. *People v. Moorer,* 262 Mich.App 64, 68; 683 NW2d 736 (2004). MRE 803(3) provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

In support of his argument, defendant cites *Moorer,* 262 Mich.App 64. In *Moorer,* this Court held that the out-of-court statements by the victim that he had a confrontation with the defendant, that the defendant wanted to kill him, that the defendant had threatened to kill him, that the defendant said he had a bullet for him, and that defendant had a gun and was looking for him were not admissible under MRE 803(3) because the statements related to past events. *Id.* at 73. Duberg's out-of-court statement is distinguishable from the statements ruled inadmissible in *Moorer.* Duberg's statement that she was scared that defendant was going to kill her did not describe the past actions of defendant. See *id.* Rather, the statement was a statement of her then existing mental feeling. In addition, based on defendant's testimony, Duberg's state of mind was relevant. Defendant testified that he killed Duberg because of the rage he experienced after Duberg kicked him in the groin. Duberg's statement of fear of defendant made it less probable that Duberg provoked defendant as he claimed. Under the circumstances, defendant has failed to establish plain error in the admission of Duberg's out-of-court statement.[2]

## III. EVIDENCE OF DEFENDANT'S ACTS OF PRIOR DOMESTIC VIOLENCE

**\*4** Defendant argues that the trial court erred in admitting evidence of his prior acts of domestic violence under MCL 768.27b and MRE 404(b) because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Defendant also claims that the trial court erred in denying his request for a limiting instruction and

instructing the jury that it could consider the evidence in determining whether defendant killed Duberg.

We review a trial court's evidentiary decisions for an abuse of discretion. *People v. Unger,* 278 Mich.App 210, 216; 749 NW2d 272 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* at 217. We review de novo issues of law arising from the jury instructions, but we review for an abuse of discretion a trial court's determination whether a jury instruction was applicable to the facts of the case. *People v. Waclawski,* 286 Mich.App 634, 675; 780 NW2d 321 (2009).

Under MRE 404(b), evidence of a defendant's other crimes, wrongs, or acts is not admissible to prove the defendant's propensity to commit a crime. *People v. Railer,* 288 Mich.App 213, 219; 792 NW2d 776 (2010). However, in cases involving domestic violence, MCL 768.27b allows the admission of evidence of prior acts of domestic violence to prove a defendant's character or propensity to commit the same crime. *Id.* at 219–220. MCL 768.27b(1) provides:

> Except as provided in subsection (4) [3], in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

Here, defendant does not claim that the present case is not "a criminal action in which [he] is accused of an offense involving domestic violence," nor does he claim that the evidence of him beating up his sister, punching his wife in the face, and striking a former girlfriend in the face with a tire iron is not "evidence of [his] commission of other acts of domestic violence." He claims that the evidence of his prior acts of domestic violence should have been excluded under MRE 403.

Under MRE 403, relevant evidence may be excluded if its probative value is substantially outweighed by unfair prejudice. *People v. Cameron,* ——Mich.App ——; —— NW2d —— (2011). All relevant evidence is damaging to some extent, and the fact that evidence is prejudicial does not make its admission unfair. *People v. Murphy (On Remand),* 282 Mich.App 571, 582–583; 766 NW2d 303 (2009). Unfair prejudice "refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g.,

People v. Susalla, Not Reported in N.W.2d (2011)

the jury's bias, sympathy, anger, or shock." *Cameron,* ——
Mich.App at —— (quotation marks and citations omitted).
Unfair prejudice also exists where marginally probative
evidence will be given undue or preemptive weight by the
jury. *Id.*

**\*5** Defendant claims that the evidence of his prior acts of
domestic violence was unfairly prejudicial because, given
his admission that he killed Duberg, the probative value
of the evidence was minimal. However, a defendant's not
guilty plea places all elements of the crime "at issue." *People
v. Crawford,* 458 Mich. 376, 389; 582 NW2d 785 (1998).
The prosecutor has the burden to prove each element of the
crime beyond a reasonable doubt, regardless of whether the
defendant specifically disputes or offers to stipulate to any
of the elements. *Id.* In addition, a prosecutor does not have
to use the least prejudicial evidence in presenting the case to
the jury. *Cameron,* ——Mich.App at ——. Defendant does not
dispute that the evidence of his prior acts of domestic violence
was not relevant to the issue whether he killed Duberg. Where
the testimony of defendant's sister, his wife, and Fletcher
concerning defendant's prior acts was brief and limited in
detail, MRE 403 did not preclude the admission of the prior
acts evidence. While the evidence was prejudicial, it did not
prevent the jury from logically weighing all the evidence to
determine whether defendant acted with premeditation and
deliberation in killing Duberg. See *Railer,* 288 Mich.App
at 220–221. Accordingly, the trial court did not abuse its

discretion in admitting the evidence of defendant's prior acts
of domestic violence.

Because the evidence was admissible under MCL 768.27b,
the trial court did not abuse its discretion in denying
defendant's request for a limiting instruction and instructing
the jury that the evidence of defendant's prior acts of
domestic violence could be used to determine whether
defendant committed the charged offense of first-degree
murder. Evidence that is admitted under MCL 768.72b may
be used to prove a defendant's propensity to commit a crime.
*People v. Pattison,* 276 Mich.App 613, 615; 741 NW2d
558 (2007) ( "We first note that the Legislature [with the
enactment of MCL 768 .27b] now allows trial courts to admit
relevant evidence of other domestic assaults to prove any
issue, even the character of the accused ...."); see also *People
v. Schultz,* 278 Mich.App 776, 778; 754 NW2d 925 (2008)
("This statute [MCL 768.27b] stands in stark contrast to MRE
404(b)(1), which requires a proponent to offer more than
the transparency of a person's character as justification for
admitting evidence of other crimes or wrongs.").

Affirmed.

### All Citations

Not Reported in N.W.2d, 2011 WL 5008586

---

Footnotes

1    *Miranda v. Arizona,* 384 U.S. 436; 86 S Ct 1602; 16 L.Ed.2d 694 (1966).

2    Even if the admission of Duberg's out-of-court statement constituted plain error, defendant fails to carry the burden that
     the error prejudiced him, i.e., that the error affected the outcome of the proceedings. *People v. Carines,* 460 Mich. 750,
     763; 597 NW2d 130 (1999); *Seals,* 285 Mich.App at 4. Given all the evidence concerning the relationship of defendant
     and Duberg, which indicated defendant's jealousy and discord between the two, and the evidence that Duberg died from
     ligature strangulation, we cannot conclude that the error, if there was error, affected the outcome of defendant's trial.

3    Subsection 4 provides: "Evidence of an act occurring more than 10 years before the charged offense is inadmissible
     under this section, unless the court determines that admitting this evidence is in the interest of justice." MCL 768.27b(4).

---

© 2021 Thomson Reuters. No claim to original U.S.
Government Works.

2020 WL 1640166
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Desmond RICKS, Akilah Cobb,
and Desire'a Ricks, Plaintiffs,

v.

David PAUCH, Donald Stawiasz,
and Robert B. Wilson, Defendants.

Case No. 17-12784
|
Signed 04/02/2020

**Attorneys and Law Firms**

James J. Harrington, IV, Milica Filipovic, Sima G.
Patel, Fieger, Fieger, Kenney, Giroux & Harrington, P.C.,
Southfield, MI, for Plaintiffs.

Brandon McNeal, Jacob M. Satin, Patrick M. Cunningham,
Jerry L. Ashford, City of Detroit Law Department, Detroit,
MI, for Defendants David Pauch, Donald Stawiasz.

Jacob M. Satin, Patrick M. Cunningham, Jerry L. Ashford,
City of Detroit Law Department, Detroit, MI, for Defendant
Robert B. Wilson.

**OPINION AND ORDER (1) DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO.
91), AND (2) DENYING PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT (ECF NO. 92)**

Paul D. Borman, United States District Judge

**\*1** Plaintiff Desmond Ricks ("Ricks") was released from
prison in 2017 after serving 25 years on a wrongful conviction
for murder. Ricks and his two adult daughters have filed this
suit under 42 U.S.C. § 1983 against the City of Detroit and
three City of Detroit police officers alleging violations of
Ricks' constitutional rights based upon alleged fabrication
and withholding of evidence. The City of Detroit has since
been dismissed with prejudice pursuant to a Stipulated
Order of Dismissal. Now before the Court are cross-motions
for summary judgment: (1) Plaintiffs' Motion for Partial
Summary Judgment as to Defendants David Pauch and

Robert Wilson; and (2) Defendants' Motion for Summary
Judgment. These motions were fully briefed and the Court
held a hearing on November 13, 2019. For the reasons that
follow, the Court DENIES both motions.

**I. FACTUAL BACKGROUND**

**A. Plaintiff Desmond Ricks' 1992 Conviction**

**1. Gerry Bennett's Murder**

On March 3, 1992, at approximately 4:45 p.m., Gerry Bennett
was shot to death in the parking lot of a Top Hat restaurant
located at 16101 James Couzens, in the City of Detroit. (ECF
No. 37, First Amended Complaint ("FAC") ¶ 9; ECF 91-31,
Homicide Scene Investigation.) Plaintiff Desmond Ricks, a
friend of Bennett's, had accompanied Bennett to the Top Hat
restaurant in a red Ford Escort, driven by Bennett. (FAC ¶
10; ECF No. 91-10, Desmond Ricks Deposition Tr. at p. 132.)
The parties dispute whether Ricks accompanied Bennett into
the restaurant and Ricks' possible involvement in Bennett's
murder.

**a. Plaintiffs' version of the events leading to Bennett's
murder**

According to Ricks, shortly after arriving at Top Hat, a yellow
Chevrolet Monte Carlo pulled up next to the Ford Escort he
and Bennett were in. Bennett got out of the Escort and entered
the restaurant with a light-skinned black man of medium
height who got out of the back seat of the Monte Carlo. (Ricks
Dep. at pp. 137-42; Homicide Scene Investigation at pp. 3-4.)
Ricks remained in the front passenger seat of the Escort.
(Ricks Dep. at p. 142.) When Bennett and the other man exited
the restaurant about five to ten minutes later, Ricks saw the
light-skinned black man point a chrome handgun at Bennett
and shoot him in the stomach. (*Id.* at pp. 144-45.) As Ricks
got out of the Escort, he saw the other man shoot Bennett in
the head, then turn to shoot at Ricks. (*Id.* at p. 146.)

**b. Defendants' version of the events leading to Bennett's
murder**

According to Defendants, Ricks was Bennett's middleman
who arranged drug deals for Bennett, but the Top Hat drug
deal was a set up. (ECF No. 91, Defs.' Mot. S.J. at p. 2, citing

ECF No. 91-3, Trial Tr. Vol. 2, Cheryl Thomas Testimony at p. 60; ECF Nos. 91-11 & 91-12, Prison phone call recordings.) When Bennett and Ricks arrived at Top Hat, Bennett had cocaine on his person and more cocaine in a Girl Scout cookie box hidden under Ricks' seat in the car. (Defs.' Mot. S.J. at p. 3, citing ECF Nos. 91-6, 91-25 through 91-29, Prison phone call recordings.) Defendants contend that Ricks accompanied Bennett into the restaurant, where Bennett ordered food. (Trial Tr. Vol. 2, Ollie McAdoo Testimony at pp. 85-87.) After Ricks and Bennett stepped back outside the restaurant, they engaged in an argument and Bennett was shot. (Trial Tr. Vol. 2, Howard Dillworth Testimony at pp. 104-05; Homicide scene investigation; ECF No. 91-32, Prelim. Exam Tr. Dillworth Testimony at pp. 26-27; ECF No. 91-34, Trial Tr. Vol. 3, P.O. Kimber Testimony at p. 9, Arlene Strong Testimony at pp. 66, 80; ECF No. 91-35, P.O. Donald Robertson Homicide Report; ECF No. 91-36, P.O. Welborn Griggs Prelim. Compl. Record; ECF No. 91-37, P.O. Bradley Belcher Prelim. Compl. Record.) Defendants assert that at the time of the shooting, Bennett's vehicle was the only vehicle in the parking lot. (Defs.' Mot. S.J. at p. 4, citing Prelim Exam. Tr. Dillworth Testimony at pp. 26-27; Trial Tr. Vol. 2 Dillworth Testimony at pp. 104-05, 117; ECF No. 91-39 Cheryl Thomas Witness Statement at p. 2.)

## 2. Events Following the Shooting

 **\*2**  The parties agree that immediately following the shooting, Ricks ran into an adjacent neighborhood, shedding his winter coat as he ran. (FAC ¶ 12; Prelim. Exam. Tr. Dillworth Testimony at pp. 27-28; Trial Tr. Vol. 2 Dillworth Testimony at pp. 99, 105; ECF No. 91-30, Ollie McAdoo Witness Statement; ECF No. 91-38, Trial Tr. Vol. 4 Ricks Testimony at pp. 23, 63.) Ricks asserts that he shed his coat to avoid it being caught in bushes as he ran (Ricks Dep. at p. 153), while Defendants contend that Ricks discarded his coat and hat in an attempt to hide his identity. (Prelim. Exam. Tr. Dillworth Testimony at pp. 27-28; Trial Tr. Vol. 2 Dillworth Testimony at pp. 99, 105; Ollie McAdoo Witness Statement at p. 2; Homicide Scene Investigation; ECF No. 91-33, Police Officer Chimene Irvin Prelim. Compl. Record; Trial Tr. Vol. 4 Ricks Testimony at pp. 23, 63.) Defendants state that Ricks made no attempt to notify the police of the shooting but instead hid and did not initially tell his friends or family that he was present when Bennett was shot. (Trial Tr. Vol. 4 Ricks Testimony at pp. 26-28, 82-84, 94; Ricks Dep. at p. 160.) The parties agree that Ricks' coat was later found by Detroit Police Department ("DPD") officers, and

that it contained Ricks' visitor's pass to Hutzel Hospital in the jacket pocket, where his girlfriend had just given birth to their daughter, Plaintiff Desire'a. The coat also contained a phone book and a picture of his newborn baby. (Ricks Dep. at p. 165; Homicide Scene Investigation; ECF No. 91-40, Evid. Prop. Sheet at p. 3; ECF No. 91-41, Evid. Tech. Rpt. at p. 1; Trial Tr. Vol. 4 Ricks Testimony at pp. 5-6.)

## 3. The March 4, 1992 Autopsy

A hospital physician declared Bennett "dead on arrival." (Police Officer Bradley Belcher Prelim. Compl. Record.) Assistant Medical Examiner, Dr. Sawait Kanluen, performed an autopsy on Bennett's body on March 4, 1992. (ECF No. 91-60, Med. Examrs.' Rpt. at p. 1.) Dr. Kanluen described two gunshot wounds. He retrieved one bullet from Bennett's brain, where it lodged after penetrating his skull, and retrieved a second bullet lodged in Bennett's spine. (*Id.*) Dr. Kanluen placed each bullet (or slug) in a separate, small bullet envelope, and turned those evidence bullets over to the liaison DPD officer assigned to the Medical Examiner's Office, homicide sergeant James Covington. (Trial Tr. Vol. 3 Covington Testimony at pp. 18-19.) Covington in turn delivered the bullets to Defendant Donald Stawiasz, assigned as the Officer-In-Charge of the investigation. (*Id.*; ECF No. 91-47, Donald Stawiasz Deposition Tr. at p. 62.) Stawiasz placed the smaller bullet envelopes into larger evidence envelopes, with the slug recovered from the head on evidence tag #923409, and the slug recovered from the spine on evidence tag #923410. (Trial Tr. Vol. 3 Stawiasz Testimony at pp. 31-32; Stawiasz Dep. at p. 111; Prelim. Exam. Tr. Covington Testimony at p. 36.) Those slugs were delivered, on Stawiasz's request, to Defendant Pauch, a firearm and tool-mark examiner in the Detroit Crime Lab. (ECF No. 91-61, Pauch & Wilson Firearms Identification Report.)

## 4. Ricks' March 5, 1992 Arrest

On March 5, 1992, Detroit Police Officers, a federal ATF agent, and a Deputy U.S. Marshal, none of whom are defendants in this case, arrived at Ricks' mother's house at 16500 Hubbell Street in Detroit. (ECF Nos. 91-43, Police Officer James Fleming Prelim. Compl. Record; 91-44, ATF Special Agent Curtis Brunson Rpt. of Interview with Fleming; 91-45, Statement of ATF Special Agent Anthony Primak.) The officers did not have an arrest warrant or search warrant, but Mary Ricks, Plaintiff Desmond Ricks' mother, allowed

the officers into the residence. (*Id.*; Prelim. Exam. Tr. P.O. Fleming Testimony at p. 34.) Ricks was arrested without incident. (Police Officer James Fleming Prelim. Compl. Record; ATF Special Agent Curtis Brunson Rpt. of Interview with Fleming; Statement of ATF Special Agent Anthony Primak.) Ricks' mother stated that her son was not involved in any murder and that the only firearm in the house was a gun she owned, which she kept in her bedroom under her pillow. (*Id.*) Ms. Ricks allowed the officers to take her handgun, a Rossi .38 Special, 5-shot revolver, serial # D373334 ("the Rossi handgun"). (*Id.*) The officers placed the Rossi handgun on evidence tag #923423. (*Id.*) Ricks was conveyed to the Homicide Section for questioning, and the Rossi handgun was turned over to the Homicide Section for ballistics testing. (Primak Statement.)

### 5. Firearm Testing

#### a. Pauch and Wilson's March 6, 1992 Firearm Identification Report

On March 6, 1992, the day after Ricks was arrested, Defendant Stawiasz requested that firearm testing be conducted on the Rossi handgun taken from Ricks' home, to compare test-fired bullets to the slugs removed from Gerry Bennett's body. (ECF No. 92-5, Request for Lab. Serv.) As Defendants explain:

> **\*3** The forensic evidence at issue, the evidence bullets or slugs, is known as firearms and tool mark evidence. Tool mark identification seeks to determine if a tool mark was produced by a particular tool. Firearm identification is a sub-category of tool mark identification to determine if a bullet was fired by a particular firearm. When a bullet is fired in a gun, the lands and grooves in the gun barrel cut into the bullet's softer metal leaving discernible markings. Firearms examiners attempt to determine whether a bullet recovered from a crime scene or victim's body was fired by a particular gun by comparing microscopic markings on the recovered bullet to the markings on a bullet fired from that gun.

> In the field of firearms identification, there are four evaluation outcomes: (1) unsuitable for examination; (2) inconclusive; (3) elimination; or (4) positive for a match. A firearms examiner's conclusion of "unsuitable" means the bullet is too damaged to examine. The examiner may also use "inconclusive" if the bullets are too damaged to

> examine. This occurs when a bullet hits a hard object. Bullets fired into bone tend to be unsuitable more often than those fired into soft tissue

(Defs.' Mot. S.J. at p. 9 (citing *"What is Firearm and Tool Mark Identification?"* Association of Firearms and Toolmark Examiners, https://AFTE.org).)

Stawiasz submitted the Rossi handgun to the Detroit Crime Lab for testing, which had previously received the slugs from Bennett's body. (Request for Lab. Serv.) Defendant David Pauch was the assigned examiner, and Defendant Robert Wilson was his immediate supervisor. (Pauch and Wilson Firearms Id. Rpt.; ECF No. 91-62, David Pauch Deposition Tr. at p. 39.) Defendants assert that Pauch, Wilson and Stawiasz did not actually transport the slugs from the property room to the Crime Lab. (Pauch & Wilson Firearms Id. Rpt.; Pauch Dep. at pp. 35, 109-11.)

On March 6, 1992, Pauch, with Stawiasz present, test fired bullets from the Rossi handgun and compared those test-fired bullets to the bullets removed from Bennett's body. (*Id.*; Prelim. Exam. Tr. Pauch Testimony at p. 39; Trial Tr. Vol. 3 Pauch Testimony at p. 53.) Wilson, as Pauch's supervisor, also independently examined the bullets and compared them to the test-fired bullets from the Rossi handgun. (ECF No. 91-63, Robert Wilson Deposition Tr. at pp. 45-46; Pauch Dep. at p. 110.)

As explained more fully below, bullets and guns are classified by the number of lands and grooves of a gun and the direction of twist (right-hand or left-hand) of the barrel. By examining the lands and grooves and the direction of twist of a firearm or bullet, these "class characteristics" can help to determine whether a certain bullet was fired from a certain gun. *See* Section I.C.1, Overview of Firearms Identification, below.

Pauch states that he could not count or measure the lands and grooves of the evidence bullets because they were too damaged. (Pauch Dep. at pp. 78, 84, 99.) He thus could not identify the general rifling characteristics or class of gun that fired the evidence bullets. (*Id.* at pp. 78, 103, 106.) He indicated on the lab report that the evidence bullets had "traces of lands and grooves." (Pauch & Wilson Firearms Id. Rpt.) Pauch further noted on the report that the Rossi handgun was classified as a "6-R", which means that the barrel of the gun would cut six grooves (and corresponding lands) into the surface of a bullet when fired, while the "R" designation signifies a right-hand rotation or twist. Pauch compared the evidence slugs with the test-fired bullets

from the Rossi handgun and opined in the firearm report that the comparison "yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon." (*Id.* (capitalization in original).) Wilson states that he performed a microscopic examination, confirmed the match found by Pauch, and signed the report. (Wilson Dep. at p. 45; Pauch & Wilson Firearms Id. Rpt.) The evidence was then returned to the property room. (Wilson Dep. at pp. 70-71; Pauch Dep. at p. 103.)

**\*4** Plaintiff was arraigned on Murder II on March 7, 1992, pleaded not guilty, and was remanded to jail. (ECF Nos. 91-64, Case Control Card; 91-65, Information for Arraignment on Warrant.) Plaintiff's Preliminary Examination was held on March 19, 1992, and the Judge found that probable cause existed. (Prelim. Exam. Tr. at pp. 42-43.)

### b. David Townshend firearm testing

On June 5, 1992, the trial court granted Ricks' motion to appoint a firearms identification expert and ordered that all tests be performed at the Detroit Police facilities. (ECF No. 91-66, Mot. and Final Conf. Tr. at pp. 18, 23-24.) Plaintiff retained David Townshend, a retired Michigan State Police firearms examiner, to serve as the appointed expert. (ECF No. 91-74, David Townshend Deposition Tr. at pp. 85, 87.)

On July 15, 1992, the trial court entered an Order that the physical evidence, specifically, the slugs removed from Bennett's body and the Rossi handgun, be examined by Townshend, and that Townshend shall be allowed to test fire the Rossi handgun. (ECF No. 91-68, July 15, 1992 Court Order.) That Order further provided that Defendant Stawiasz be present during the entire time the tests are performed and that "[t]he tests will be conducted at the Detroit Police Department." (*Id.*) Townshend received a copy of the Pauch and Wilson Firearms Identification Report on July 20, 1992. (ECF No. 91-72, Townshend Invoice.)

On August 6, 1992, the trial court issued a new Order that Townshend's examination take place at Townshend's lab in Mason, Michigan instead of the Detroit Police Department, and directing Defendant Stawiasz to transport the evidence to and from Townshend's lab. (ECF No. 91-69, August 6, 1992 Court Order.)[1]

Stawiasz transported the evidence to Townshend's lab for testing on August 16, 1992. (Stawiasz Dep. at p. 68.) Townshend test-fired the Rossi handgun provided by Stawiasz, microscopically examined the "evidence bullets" provided by Stawiasz, compared those "evidence bullets" to the bullets Townshend test-fired from the Rossi handgun, and concluded that the bullets represented by Stawiasz to have come from the victim's body matched the Rossi handgun. (ECF No. 91-77, Townshend 8/17/92 Firearms Identification Report.) Townshend testified that he was concerned that the two "evidence bullets" he was given to examine were "too pristine" to have been recovered from the victim's body, but that when he questioned Stawiasz about this, Stawiasz assured Townshend that the bullets provided to him were in fact from the victim's body. (Townshend Dep. at pp. 127-28.) However, Townshend did not note this concern in his report. (*See* Townshend 8/17/92 Firearms Id. Rpt.)

### 6. Ricks' Conviction

**\*5** Ricks' jury trial began on September 16, 1992. Pauch and Wilson's and Townshend's firearms identification evidence was admitted. Defendants contend that, at trial, the prosecutor, Ken Simon, and several witnesses opened up the small bullet envelopes and observed the slugs. (ECF No. 67, Kenneth Simon Deposition Tr. at pp. 33-38; Trial Tr. Vol. 2, Kanluen Testimony at pp. 39-41; Trial Tr. Vol. 3, Pauch Testimony at p. 51; Townshend Testimony at pp. 88-90.) Assistant Medical Examiner Kanluen testified he had removed the slugs from Bennett's body, and Townshend identified the slugs as the evidence bullets he had examined and compared to test shots. (Trial Tr. Vol. 2 Kanluen Testimony at pp. 39-41; Trial Tr. Vol. 3 Townshend Testimony at pp. 88-89; Simon Dep. at pp. 33-34, 37-38.) Specifically, Kanluen testified:

Q. [By Simon] Could you open up the envelope [Evidence Tag #923049] and tell us if you recognize the contents of it?

A. [By Kanluen] Inside the envelope is the one that I was talking about is the bullet envelope, and marked in front of the envelope is the name of the deceased black, 22 years old male and also my name. The doctor who did the autopsy. Date of the autopsy, March 4th and where the contents come from. One inside the head. Also, I put down our medical examination file number 1994—92.

Q. All right. And could you look at the inside of that envelope?

A. This is the spent slug or bullet that come [sic] from the deceased' [sic] head.

\* \* \*

Q. Could you open up that envelope [Tag #923410] and tell us if you recognize the contends [sic]?

A. Again this is the similar bullet envelope that we used, and I marked down the deceased' [sic] name. Gerry Bennett, 22 year old black male. Signed my name in front of envelope. Date of the autopsy March 4, 1992. This was the contents coming from the back bone and also the same medical examiner file number 1994 – 92.

Q. Could you open that envelope please.

A. This is a spent slug, a bullet that I retrieve[d] from the back bone of the deceased.

(Trial Tr. Vol. 2, Kanluen Testimony at pp. 40-41.)

And, Townshend testified as follows:

Q. [By Simon] All right. Now I'm going to have you open up the envelope [for Tag #9234109] if you can and see if you recognize a smaller envelope that's inside?

A. [By Townshend] Contained in evidence tag number 923409 is sealed with a tie string. Wayne County Medical Examiner bullet evidence envelope, and I marked in the corner of the envelope my initials, D.T. written in this corner.

Q. Let me open this up and ask you is this slug that's in here the one that you put your initials on? Is that the slug that you used in your comparison?

A. That's correct. Yes, sir.

Q. For the record we have just been looking at the contents of People's Exhibit Number Two. Let's go on to People's Exhibit Number Three which is 923410. Could you open up that and see if you recognize the smaller envelope in there?

A. Yes, sir. Contained in People's Exhibit Number Three is also a sealed with a tie string Wayne County Medical Examiner's bullet envelope. In the corner of the envelope I marked my initials, D.T. upon the corner.

Q. Can you open up the smaller envelope? Is that one of the slugs you used, the second of the two slugs you used in doing your comparison work?

A. Yes, sir, it is.

(Trial Tr. Vol. 3 at pp. 88-89.)[2]

Pauch testified during the 1992 trial that the match between the evidence bullets he examined and the test-fired bullets was like a "fingerprint" and that "[t]hese bullets were fired from this weapon and no other weapon." (Trial Tr. Vol. 3, Pauch Testimony at pp. 52, 53.) The prosecutor, Simon, stressed the physical evidence at his closing:

> **\*6** This case, ladies and gentlemen, comes down to really one thing, one piece of evidence, and that is this gun here. Because this is the one ... inescapable fact of this case is that this gun is the weapon that killed Gerry Bennett. And this gun ... was found at the defendant's house. That's the one inescapable fact. No matter how the defendant tries to escape it, he can't. This gun that killed Gerry Bennett was found at his house.

(Trial Tr. Vol. 4, Prosecutor Simon's Closing at p. 107.)

A jury convicted Ricks of second-degree murder and felony firearm on September 23, 1992. (ECF No. 92-19, Judgment of Sentence, 10/12/92.) Ricks was sentenced to serve 42-62 years in prison. (*Id.*) His direct appeals to the Michigan Court of Appeals and Michigan Supreme Court were unsuccessful, as was his first Motion for Relief from Judgment. (ECF No. 91-85, Stipulated Order Granting Defendant's Successive Motion for Relief from Judgment.)

**B. Reconsideration of the Evidence**

**1. Ricks Contacts Townshend**

While imprisoned, Ricks contacted Townshend and requested his help. (Ricks Dep. at pp. 38-40.) In April 2015, Townshend examined digital photographs of the evidence bullets that had been received by the Michigan Innocence Project, and he signed an affidavit on July 8, 2015 stating that the photographs showed "lead bullets that are severely mutilated and extensively damaged." (Townshend Aff. at p. 3.) He further stated that those evidence bullets depicted in the photographs "are not the fired bullets [he] received and microscopically examined on August 15, 1992." (*Id.*) He continued that "[t]he fired bullets exhibited in the digital

photographs are in such a mutilated and damaged condition it is doubtful that a positive identification with a suspect firearm would be possible." (*Id.*) Townshend opined that "[a] new examination of the evidence on this case is warranted." (*Id.*)

## 2. Ricks' Successive Motion for Relief from Judgment and Molnar's Examination of the Evidence Bullets

On June 1, 2016, Ricks filed a Successive Motion for Relief from Judgment, relying primarily on Townshend's July 8, 2015 affidavit. (Stip'd Order Granting Def.'s Successive Mot. for Relief, ¶ 6.) During the post-conviction proceedings, the court ordered, and the parties agreed, to have the slugs re-evaluated by the Michigan State Police Crime Lab. (*Id.* ¶¶ 11-12.)

Michigan State Police Sergeant Dean Molnar was assigned to conduct the evaluation. The Detroit Police Department had retained the slugs, but the Michigan State Police had previously destroyed the Rossi handgun after Ricks' appeal and initial motion for relief from judgment were denied. (*Id.* ¶ 11; ECF No. 91-86, Evidence Tag Audit History for ET#923423.) Molnar thus cold not fire test shots from the Rossi handgun and compare those test-fired bullets to the evidence bullets. Instead, Molnar was asked to analyze the evidence bullets themselves and identify the slugs to the *class* of the revolver (the Rossi handgun) reported by Pauch in his Report (6 lands and grooves with a right twist – a "6R"). (ECF No. 91-87, Dean Molnar Deposition Tr. at pp. 15-17; Pauch & Wilson Firearms Id. Rpt.)

In his examination, Molnar measured the caliber of the bullets, weighed them, and noted visible land and groove markings with a right twist. He concluded that both evidence bullets were too deformed to make a positive match with each other, meaning that he could not positively identify that the bullets were fired from the same gun. (Molnar Dep. at p. 22; ECF No. 91-88, Molnar April 2017 Firearms Identification Report.) The Wayne County Court noted that Molnar's "inconclusive comparative findings ... could not corroborate DPD's match, but his classification of the spent projectiles was largely consistent with that reported by the DPD Lab – the spent projectiles were members of the .38 with traces of lands and grooves." (Stip'd Order Granting Def.'s Successive Mot. for Relief, ¶ 15.)

**\*7** However, after submitting his findings to a supervisor, Molnar was instructed to: (1) go through his measurements

and make any more specific classification findings, if possible, on the individual bullets; (2) utilize the Association of Firearm and Toolmark Examiners ("AFTE") Chart; and (3) conduct an analysis of the evidence bullets to FBI General Rifling Characteristics ("GRC") Standards. (Molnar Dep. at pp. 58, 72-73; Stip'd Order Granting Def.'s Successive Mot. for Relief, ¶¶ 17-18.) When he did so, Molnar again found that the slug removed from the head wound (Slug #1, ET#923409) was too distorted to identify any number of lands and grooves and remained "inconclusive." But Molnar was able to make a positive classification that the second evidence bullet (ET#923410) has five lands and grooves with a right twist (a "5R" classification). (Molnar Dep. at p. 31; ECF No. 91-90, Molnar May 2017 Corrected Firearms Identification Report.) Molnar testified that, based on his examination of the evidence bullets in April of 2017, the evidence bullet (classified as "5R") did not come from the Rossi handgun (classified as "6R"). (Molnar Dep. at p. 31.)

On May 26, 2017, the Wayne County Circuit Court granted Plaintiff's successive Motion for Relief from Judgment, vacated Ricks' convictions and judgment, and ordered a new trial. (Stip'd Order Granting Def.'s Successive Mot. for Relief at p. 4.) An Order of Nolle Prosequi was subsequently entered on June 1, 2017 and the case against Ricks was dismissed with prejudice. (ECF No. 91-92.)

## C. Experts' Testimony

### 1. Overview of Firearms Identification

The court in *United States v. McCluskey*, No. 10-2734, 2013 WL 12335325 (D.N.M. Feb. 7, 2013) provides a helpful overview of firearms and toolmark identification:

> Forensic toolmark identification is a discipline that is concerned with the matching of a toolmark to the specific tool that made it. Firearm identification is a specialized area of toolmark identification dealing with firearms, which involve a specific category of tools. Gov't Ex. 5, Richard Grzybowski, et al., *Firearm/Toolmark Identification: Passing the Reliability Test Under Federal and State Evidentiary Standards*, at 3. "Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object." Gov't Ex. 1 and Deft. Ex. E, National Research Council, *Strengthening Forensic Science in the United States: A Path Forward*, at 150 (National Academies Press 2009). Toolmarks associated with a firearm may occur in the commission of a crime

when "the internal parts of a firearm make contact with the brass and lead that comprise ammunition." *Id.* "The manufacture and use of firearms produces an extensive set of specialized toolmarks." *Id.* at 150–51.

In *United States v. Otero*, 849 F. Supp. 2d 425, 427-28 (D.N.J. 2012), the court provided a helpful and concise description of the "AFTE" (Association of Firearms and Toolmark Examiners) theory of firearm identification. Toolmark identification is based on the theory that tools used in the manufacture of a firearm leave distinct marks on various firearm components, such as the barrel, breech face, or firing pin. The theory further posits that the marks are individualized to a particular firearm through changes the tool undergoes each time it cuts and scrapes metal to create an item in the production of the weapon. Toolmark identification thus rests on the premise that any two manufactured products, even those produced consecutively off the same production line, will bear microscopically different marks. With regard to firearms, these toolmarks are transferred to the surface of a bullet or cartridge casing in the process of firearm discharge. Depending on the tool and the type of impact it makes on the bullet or casing, these surface marks consist of either contour scratch lines, known as striations (or striae), or impressions. For example, rifling (spiraled indentations) inside of a gun barrel will leave raised and depressed striae, known as lands and grooves, on the bullet as it is fired from the weapon, whereas the striking of the firing pin against the base of the cartridge, which initiates discharge of the ammunition, will leave an impression but not striae.

**\*8**  Comparing a test bullet or cartridge fired from a firearm of known origin to another bullet or cartridge of unknown origin, the examiner seeks to determine congruence in the pattern of marks left on the examined specimens. This process is known as "pattern matching." When the marks consist of striations, the identification process can involve a method that observes and counts consecutively matching striae ("CMS"). When one is comparing striated tool marks, CMS is a convenient way to describe for other examiners the extent of agreement the examiner has observed. Gov't Ex. 6, Ronald Nichols, "The Scientific Foundations of Firearms and Tool Mark Identification—A Response to Recent Challenges." An examiner observes three types of characteristics on spent bullets or cartridges: class, subclass and individual. Class characteristics are features common to most if not all bullets and cartridge cases fired from a type of firearm—for example, the caliber and the number of lands and grooves

on a bullet. Individual characteristics are microscopic markings produced in the manufacturing process by the random imperfections of tool surfaces (the constantly changing tool as described above) and by use of and/ or damage to the gun post-manufacture. According to the theory of toolmark identification espoused by AFTE, individual characteristics "are unique to that tool and distinguish it from all other tools." *Theory of Identification as it Relates to Toolmarks*, AFTE Journal, Vol. 30, No. 1, Winter 1998, at 87. Subclass characteristics generally fill the gap between the class and individual characteristics categories. They are produced incidental to manufacture but apply only to a subset of the firearms produced, for example, as may occur when a batch of barrels is formed by the same irregular tool.

The firearms examiner uses a comparison microscope to examine the markings on at least two cartridge casings, one of which is known to have been test fired from a particular weapon. If the individual markings on the two casings show sufficient similarity, the examiner can conclude that the cartridges were fired from the same weapon. Sufficient similarity exists when the casings, viewed by a trained and experienced firearms examiner, evince sufficient duplication of markings that they can be considered individual characteristics, and the likelihood that another gun could have made them is so remote that it can be discounted.

*Id.* at \*3-4.

## 2. Plaintiffs' Expert David Balash

David Balash, a former firearms identification expert for the Michigan State Police, examined the evidence bullets on November 15, 2017, and issued an expert report on June 18, 2018. (ECF No. 93-14, Balash Report.) Balash states that when he was shown photographs of the evidence bullets, he "immediately knew/identified the bullets as having 5 lands and grooves with a right twist rifling." (*Id.* at p. 3.) He concluded, on examination of the bullets, that although they were "badly damaged," they "both clearly display class rifling specifications of 5 land[s] and groove[s] with a right twist rifling." (*Id.* at pp. 3-4.) However, "[d]ue to the damage sustained to these bullets, [Balash] did not attempt to identify them with each other without a suspect firearm from which [he] could obtain pristine tests [sic] shots for that comparison." (*Id.* at p. 4.)

He testified that the evidence bullets are classified as "5-Right" (or "5R") while the Rossi handgun is classified as a "6-Right" (or "6R"), and that a bullet with 5R characteristics cannot have been fired from a gun with 6R characteristics. (ECF No. 92-22, David Balash Deposition Tr. at pp. 100-01.) He further testified that a positive identification (or "match") between the evidence bullets and the Rossi handgun is "exceptionally unbelievable" and could only have been the result of gross incompetence or intentional false conclusion. (*Id.* at pp. 57, 67-68, 97.)

### 3. Plaintiffs' Expert David Townshend

Townshend stated in his July 8, 2015 Affidavit that the bullets provided to him in 1992 by Defendant Stawiasz were not the same "evidence bullets" he saw in photographs in April 2015. (Townshend Aff. at p. 3.) Townshend stated that he examined the actual evidence bullets for the first time on April 23, 2018. (Townshend Dep. at p. 204.) He opined that the evidence bullets "exhibit class rifling characteristics of 5 lands and grooves with a right twist," and that the two evidence bullets "were probably fired from the same revolver," but that "without having the revolver to fire test shots, it is not possible to make a positive identification." (ECF No. 92-25, June 16, 2018 Townshend Report at p. 2.) He then opined that "the 5-shot Rossi revolver with serial number D373334 has class rifling characteristics of 6 lands and grooves with a right twist and could not have fired the 2-38 Special caliber fired bullets identified as ET#923409 and ET#923410." (*Id.*) According to Townshend, the "misidentification" of the evidence bullets as having been fired by the Rossi handgun is a "catastrophic error" that "would never be made by a competent qualified firearms examiner, let alone two firearm examiners," and that mistake "could only have been caused by incompetency of the firearms examiners, or a deliberate attempt to mislead on the part of" Defendants Pauch and Wilson. (*Id.* at p. 4.) Townshend testified that "a couple minute examination" of the bullets would have yielded a conclusion that the "rifling doesn't line up, there's – there's no way that the lands and grooves line up to where could be fired from the same gun." (Townshend Dep. at pp. 263-64.)

### 4. Defendants' Expert Jay Jarvis

**\*9** Jay Jarvis is a forensic firearms expert who worked for the Georgia Bureau of Investigations ("GBI") for 32 years as an expert in firearms identification, and he was the Director of

the American Society of Crime Laboratory Directors. (ECF No. 92-26, Jarvis C.V.)

Jarvis examined the evidence bullets on November 27, 2017, and issued his "Official Report" on November 30, 2017. (ECF No. 92-27, Jarvis Official Rpt.) He explained that "[d]ue to damage, the rifling characteristics [of the two evidence bullets] were determined by dividing the bullet circumference by the combined widths of the best available land and groove impressions." (*Id.* at 1-2.) He further explained in his deposition that this is a "simple calculation" and "pretty basic," one of the first things he learned when training in the field and that he would expect every firearms examiner to know this calculation early on. (ECF No. 91-89, Jay Jarvis Deposition Tr. at pp. 33-35, 38-39.) He concluded in his Official Report that:

> The item 1 bullet from the decedent's head was compared microscopically with the item 2 bullet from the decedent's back. There were sufficient corresponding individual characteristics on both the land and groove impressions on multiple areas of the bullets to conclude the two bullets were fired from the same firearm barrel.

> Based on data in the 2010 version of the General Rifling Characteristics File published by the FBI Laboratory and the undersigned's previous experience, the rifling characteristics of five lands and grooves with a right twist exhibited on the item 1 and 2 bullets are commonly found in Smith & Wesson, Ruger, and Taurus .38 Special and .357 Magnum revolvers. This does not preclude the possibility that a firearm produced by a different manufacturer with the same rifling characteristics could have fired the two bullets.

(Jarvis Official Report at p. 2.)

Jarvis testified that the evidence bullets are classified as "5-Right," that a bullet with 5R characteristics cannot have been fired from a gun with 6R characteristics, and that "based on [his] experience, ... every Rossi [handgun] that [he has] ever seen has six lands and grooves with a right twist." (Jarvis Dep. at pp. 45, 54.) He further testified that he "would expect that someone who was competent would not have made" the error Pauch and Wilson did in finding that the 5R bullets were fired from a 6R gun, and that he would be "shocked that two individuals that went through the entire process could come to the same wrong conclusion." (*Id.* at pp. 57-58.) He stated that such an error is "one of two things, either they're – it was a horrible mistake or it was deliberate, I don't know of any other way it can be." (*Id.* at p. 58.)

**D. Procedural History**

Plaintiffs filed their Motion for Partial Summary Judgment as to Defendants Pauch and Wilson on February 6, 2019. (ECF No. 92.) Defendants filed their Response on March 6, 2019. (ECF No. 97.) Plaintiffs filed their reply on March 27, 2019. (ECF No. 102.)

**\*10** Defendants also filed their Motion for Summary Judgment on February 6, 2019. (ECF No. 91.) Plaintiffs filed their Response on March 6, 2019 (ECF No. 99), and Defendants filed their reply on March 27, 2019. (ECF No. 101.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "[A]

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote and internal quotation marks omitted).

**\*11** In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). " 'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by

relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

When the Court is faced with cross-motions for summary judgment, each motion must be evaluated on its merits and in light of the applicable burdens at the summary judgment stage:

> The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

* * *

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both

the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

**\*12** *Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such " 'evidence submitted in opposition to a motion for summary judgment must be admissible.' " *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). That is why " '[h]earsay evidence ... must be disregarded.' " *Ibid.* It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## III. ANALYSIS

### A. Plaintiffs' Constitutional Fabrication of Evidence Claims Against Defendants Stawiasz, Pauch and Wilson

Plaintiffs allege that Defendants Stawiasz, Pauch and Wilson violated Ricks' Fourth Amendment and Fourteenth Amendment constitutional rights by "deliberately and knowingly fabricat[ing] evidence to create probable cause, including the 'positive ID,' to suggest that the bullets from the victim's body had come from the handgun retrieved from Ricks' mother's house, which was material to a finding of probable cause that Plaintiff had committed the crime of murder, and would otherwise have been lacking." (FAC ¶ 93,

PgID 381.) Plaintiffs further allege that Defendant Stawiasz "fabricated evidence, in deliberate and knowing fashion, to secure a conviction, including switching the bullets provided to expert, David Townshend[.]" (*Id.*)

Defendants argue that they are entitled to summary judgment on these claims because they did not suppress exculpatory evidence or fabricate evidence, and Plaintiffs argue that they are entitled to summary judgment on these claims against Defendants Pauch and Wilson because Pauch and Wilson are not entitled to qualified immunity.

### 1. Fabrication of Evidence Claims

"The basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury."). Lack of probable cause is not an element of a fabrication of evidence claim. *See Stemler*, 126 F.3d at 872 ("A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant.").

### 2. Plaintiffs' Fabrication of Evidence Claim Against Defendants Pauch and Wilson

 **\*13** Defendants argue in their motion for summary judgment that they are entitled to summary judgment on Plaintiffs' fabrication of evidence claim against Pauch and Wilson because Pauch and Wilson did not suppress evidence or hide their findings in their Firearms Identification Report, but instead correctly reported that the Rossi handgun was classified as a "6R" and that they were only able to see "traces of lands and grooves" on the evidence bullets. (Defs.' Mot. S.J. at p. 26.) Based on this, Defendants argue, Townshend "knew the evidence bullets were deformed" and neither he nor anyone present at trial could have expected to see "pristine" bullets. (*Id.*) Defendants concede that the recent expert opinions "impugn the quality" of Pauch and Wilson's investigation, but contend that there is no evidence that Pauch

and Wilson's Firearm Identification Report was "knowingly" or "intentionally" fabricated and, "[a]t worst," "Pauch and Wilson made a mistake in professional judgment," which is insufficient to support a fabrication claim. Without evidence that Pauch and Wilson knowingly and deliberately provided an inaccurate report, Defendants assert that they are entitled to qualified immunity. (*Id.* at p. 27.)

Plaintiffs respond that, when viewed in a light most favorable to Plaintiffs, there is ample evidence that Pauch and Wilson falsified and fabricated the Firearm Identification Report. The recent firearms identification experts have testified that the conclusions independently reached by Wilson and Pauch are wrong and could only be the product of gross incompetence or intentionally done. Wilson and Pauch assert that they are competent and that their conclusions were not the result of a mistake. Thus, Plaintiffs argue, the only conclusion is that the erroneous "Positive ID" was made intentionally. (Pls.' Resp. to Mot. S.J. at pp. 22-23.)

Plaintiffs also argue in their motion for summary judgment that Defendants Pauch and Wilson are not entitled to qualified immunity for Plaintiffs' fabrication of evidence claim. (Pls.' Mot. S.J. at pp. 17-21.) Plaintiffs argue that this false firearm identification report affected the judgment of the jury as evidenced by both Pauch's trial testimony that the match between the evidence bullets and the bullets test-fired from the Rossi handgun were like a "fingerprint" and that "[t]hese bullets were fired from this weapon and no other weapon," and by prosecutor Ken Simon's closing statements, including that the gun was "the most powerful evidence in this case." (*Id.* at 19.) Plaintiffs further argue that Ricks' right to be free from fabrication of evidence was clearly established in 1992. (*Id.*)

### a. The Pauch & Wilson Firearm Identification Report's conclusion is wrong

Pauch and Wilson's March 5, 1992 Report classified the Rossi gun as "class 6R" and concluded that:

> A microscopic comparison of the test shots from weapon on ET#923423 against the fired evidence on Tag#s 923409, 923410 yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon.

(Pauch & Wilson Firearms Id. Rpt. (capitalization in original).) However, the Wayne County Circuit Court granted Ricks' Successive Motion for Relief from Judgment,

which eventually resulted in the dismissal with prejudice of all charges against Ricks, because the Molnar Report "contradicts the conclusion reported by DPD" in the Pauch & Wilson Firearms Identification Report, and thus "undermines the reliability of the firearms evidence used to convict Defendant" and thus "Defendant must be given a new trial." (Stip'd Order Granting Def.'s Successive Mot. for Relief, Conclusion ¶¶ 1-4.)

Dean Molnar of the Michigan State Police, defense expert Jay Jarvis and Plaintiffs' experts David Balash and David Townshend have all since examined the evidence bullets recovered from Bennett's body and determined that the bullets indisputably have five lands and grooves with a right twist and are thus classified as "class 5R." (Molnar May 2017 Corrected Report; Jarvis Official Report; Balash Dep. at pp. 100-01; Townshend 6/16/18 Report at p. 2.) The experts all testified that the evidence bullets could not have been fired by the Rossi handgun. (Molnar Dep. at p. 31; Jarvis Dep. at p. 45; Balash Dep. at pp. 100-01; Townshend 6/16/18 Report at p. 2.)

 **\*14**  There is therefore overwhelming evidence that the conclusion reached in the Pauch & Wilson Firearms Identification report that the evidence bullets were fired from the Rossi handgun is wrong. In fact, Pauch now admits that because the Rossi handgun is class 6R, the evidence bullets (since classified as class 5R) were not fired by the Rossi handgun. (Pauch Dep. at p. 102 ("Q. So you would agree with me, that gun [the Rossi handgun] could not fire that [evidence] bullet? A. That's right, sir.").) Thus, it is undisputed that the conclusion in the Pauch & Wilson Firearms Identification Report, identifying the evidence bullets as being fired by the Rossi handgun, is inaccurate or false.

### b. Whether the erroneous conclusion was negligent or intentional is a question of fact

The parties agree that the key issue here is whether Pauch and Wilson knowingly or intentionally provided false or inaccurate information in their report, or whether their error can be more readily classified as a mistake, or merely negligent. See *Gregory*, 444 F.3d at 737 (requiring a showing that "evidence is knowingly fabricated"). Plaintiffs argue that because "[i]t is undisputed that the bullets from the victim's body do not match Desmond Ricks' gun ..., the inquiry shifts to whether the Defendants' incorrect result was the product of negligence or intent." (Pls.' Mot. S.J. at p.

17.) Defendants similarly argue that "[e]ven if [Pauch and Wilson's] conclusions may have been inaccurate, there is no evidence that Pauch and Wilson *knowingly* provided false evidence." (Defs.' Resp. to Mot. S.J. at p. 7.)

According to Plaintiffs, "[b]ased on the testimony of the party defendants and expert witnesses in this case, it is undisputed that Pauch and Wilson's incorrect conclusions were reached intentionally, not by mistake or negligence." (Pls.' Mot. S.J. at p. 17.) Specifically, Plaintiffs point to Wilson's and Pauch's responses in their depositions and to requests to admit in which they assert they are competent and well-trained. (*Id.* at p. 15, citing Pauch Dep. at pp. 43, 108; Wilson Dep. at pp. 18-19, 46-47; Defs.' Resp. to RFAs at ECF Nos. 92-29, 92-30.) Plaintiffs further assert that Wilson and Pauch have both stated that their conclusions in the Firearms Identification Report were not the result of a mistake or negligence, and Pauch testified that his decision to write "Positive ID" on the report was intentional. (Pls.' Mot. S.J. at p. 17, citing Wilson Dep. at pp. 67-68 ("We didn't make any mistakes"); Pauch Dep. at p. 146 (admitting it was his intentional choice to write "positive ID" on the report and testify that the bullets matched the gun "like a fingerprint").) In addition, Plaintiffs' firearms toolmark experts, Balash and Townshend, both testified that the conclusions independently reported by Pauch and Wilson could only be the product of gross incompetence or intentionally done (Pls.' Mot. S.J. at pp. 17-18, citing Balash Dep. at pp. 67-68; Townshend Dep. at p. 233), and Defendants' own firearms toolmark expert Jarvis testified that he would not expect any competent expert to come to the same conclusion as Pauch and Wilson, which conclusion could only be deemed intentional if the examiners were competent. (*Id.* citing Jarvis Dep. at pp. 57-58.) Thus, Plaintiffs conclude, "the false 'Positive ID' was made intentionally." (*Id.* at p. 18.)

In support of their motion for summary judgment, Plaintiffs rely on *Mills v. Barnard*, 869 F.3d 473 (6th Cir. 2017), a case in which the plaintiff claimed that the forensic expert "falsified the [DNA] report and data to make the DNA from the underwear appear consistent with Mills's own." *Id.* at 484. According to Plaintiffs, "the *Mills* court noted that the defendant forensic investigator, Jenkins, claimed she had not made a mistake, which supported an inference that her results were intentionally falsified." (Pls.' Mot. S.J. at p. 16, citing *Mills*, 869 F.3d at 482 ("If the DNA clearly exonerated Mills and Jenkins did not make a mistake, then it is plausible that she intentionally misidentified the DNA in order to support the prosecution.").) The *Mills* court went on to find

that "the knowing requirement of fabrication-of-evidence claims is satisfied for the same reason as in the malicious-prosecution claim: according to the complaint, the DNA results [ ] provided by Jenkins were unmistakably exonerating but Jenkins chose to report that they were consistent with Mills's liability in order to support the prosecution's case and a guilty verdict." *Mills,* 869 F.3d at 485. However, *Mills* involved a motion to dismiss, not a motion for summary judgment, and thus the *Mills* court's finding of "plausibility" based solely on allegations in a complaint, which allegations the court was required to accept as true, does not necessarily meet the finding necessary here on summary judgment, that Plaintiffs have provided evidence that Defendants Pauch and Wilson "knowingly fabricated evidence."

 **\*15** Defendants counter that Plaintiffs have failed to provide any evidence of intentional fabrication, but rather are simply asking the Court to *infer* the knowing requirement from the inaccuracy of the report. (Defs.' Resp. to S.J. at p. 7.) Defendants state that both Pauch and Wilson testified that their conclusions were based on a comparison of the Bennett evidence bullets to the test-fired bullets from the Rossi handgun. (*Id.* at p. 6.) They further point out that the recent experts, who opined that the evidence bullets are classified as 5R and thus could not have been fired from the Rossi handgun, classified as 6R, did not have an opportunity to compare test shots fired by the gun to the evidence bullets because the Rossi handgun and the Pauch test bullets had been destroyed by the Michigan State Police in 2001, and thus they "cannot legitimately question the conclusions of Pauch, Wilson and Townshend (in 1992), and there is no admissible evidence that Pauch or Wilson fabricated any evidence." (*Id.* at pp. 6-7.) Defendants argue that even if Pauch's and Wilson's conclusions are inaccurate, there is no evidence that they *knowingly* provided false evidence. (*Id.* at p. 7.)

Defendants direct the Court to *Caminata v. County of Wexford,* 664 F. App'x 496 (6th Cir. 2016) to support their argument. In *Caminata,* a suspicious house fire was separately investigated by a county fire investigator and a State Police fire investigator. *Id.* at 498. Michael Jenkinson, the State Police examiner, conducted an investigation and drafted two reports. *Id.* He first conducted a reconstruction of the chimney's since-collapsed wood frame ("the board reconstruction") and determined that the chimney's thimble hole had been covered by a wood board, which was not fire-damaged, thus concluding that a chimney fire was an unlikely cause of the house fire. *Id.* Jenkins concluded in his

supplemental incident report that the fire was caused by arson. *Id.* Caminata was convicted of arson and sent to prison. *Id.*

The University of Michigan Innocence Clinic subsequently secured Caminata's release through undermining Jenkinson's board reconstruction. *Id.* at 498-99. The Innocence Project alleged that Jenkinson's board reconstruction was done improperly, and that he incorrectly analyzed the isolated pockets of burning wood, and Caminata's motion for relief from judgment was subsequently granted. *Id.* at 499.

Caminata then filed a civil suit alleging fabrication of evidence and malicious prosecution. The Sixth Circuit affirmed a grant of summary judgment for defendant Jenkinson on both counts, finding that "although Jenkinson's investigation and conclusions may have been flawed, there is no evidence to suggest that his report contained deliberate omissions or reckless falsehoods." *Id.* at 501. The court noted that "Caminata's primary evidence supporting his claims is expert testimony characterizing aspects of Jenkinson's investigation as 'huge mistakes' that would not be expected of someone with his level of experience," but "[a]lthough this testimony impugns the quality of Jenkinson's investigation, it is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence." *Id.* at 501.

In reaching its holding, the *Caminata* court distinguished *Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir. 2006), relied on by Plaintiffs here, a case involving a forensic examiner's inaccurate report regarding the number of hairs the examiner recovered from the scene of a rape and whether any of those hairs "matched" the plaintiff. Although the examiner testified that she had "found five hairs," and that these hairs matched the plaintiff's hair, a later deposition revealed that the examiner had actually recovered seven hairs, two of which were non-matching, but she omitted that fact from her report. *Id.* at 732, 734. In addition, the plaintiff's expert testified that the examiner's findings of a match were "far afield of what any reasonable forensic examiner would find from the evidence[.]" *Id.* at 744. The court concluded that summary judgment was inappropriate because a reasonable jury could conclude that the examiner "deliberately withheld the existence of those two nonmatching hairs" and "fabricated her report." *Id.* Thus, the *Gregory* court found that *Gregory* did not arise from a "flawed investigation" but rather from the investigator knowing there were seven hairs but choosing to report only five. *Caminata,* 664 F. App'x at 500.

**\*16** According to Defendants, Plaintiffs make essentially the same arguments here that the plaintiff did in *Caminata*, relying almost exclusively on expert testimony to attack the reliability of the firearms toolmark examination performed by Pauch and Wilson. Defendants argue, however, that there is simply no evidence of *intentional* fabrication in this case because Pauch and Wilson accurately reported that the Rossi gun was classified as a 6R and provided this evidence to the prosecutor, to Ricks' counsel and expert witness Townshend, and introduced that finding into evidence at trial. Pauch and Wilson also reported that they were only able to see "traces of lands and grooves" on the evidence bullets, and Defendants note that Molnar similarly initially stated that he was unable to count the number of lands and grooves and thus his initial finding was inconclusive. Defendants argue that Plaintiffs' experts' opinions impugning the quality of Pauch and Wilson's investigation is "insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence." (Defs.' Resp. to S.J. at p. 10, citing *Caminata*, 664 F. App'x at 501.) Rather, Defendants argue that "the record in this case at worst shows that Pauch and Wilson negligently investigated the firearms toolmarks, but such a conclusion 'does not establish a constitutional violation." (*Id.*) *See also Seigel v. City of Germantown*, 25 F. App'x 249, 250 (6th Cir. 2001) ("The facts in this case supported at most a finding of incompetent or negligent investigation, which is insufficient to establish a constitutional violation.").

The Court finds the Sixth Circuit's decision in *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) instructive. In that case, Gregory was arrested and convicted on charges of rape, attempted rape and burglary, based in part on a report by Dawn Katz, an Examiner with the Kentucky State Police Crime Laboratory, who examined hairs found in pantyhose that one victim's attacker had worn as a mask during a rape. *Id.* at 732. Katz's records noted "5 HHs" (head hairs) that were found to be similar in color and microscopic characteristics to Gregory's hair. *Id.* Katz's later deposition revealed that she actually found seven head hairs in the pantyhose, only five of which she found similar to Gregory's. *Id.* Later DNA tests established that in fact *none* of the hairs recovered from the pantyhose came from Gregory, and all charges were dismissed (after Gregory had spent more than seven years in custody). *Id.* at 735.

Gregory then brought a lawsuit under § 1983 against various members of the investigatory team, including Katz. Gregory alleged, in part, that Katz "knowingly withheld

the existence of two 'non-matching' head hairs from the recovered pantyhose, or in the alternative, that she withheld knowledge that none of the hairs 'matched.' " *Id.* at 744. Gregory's experts opined that Katz's findings that Gregory's hairs "matched" the hairs in the pantyhose "are far afield of what any reasonable forensic examiner would find from the evidence" and the court found that "this is sufficient evidence from which jury might reasonably infer that Katz fabricated her report." *Id.* at 744 & n.8, 9 (noting that Gregory's experts opined "that the evidence presented to Katz for analysis does not and could not support the conclusions that Katz reached" and "provide[d] proper testimony as to what a reasonable forensic examiner would do with hair examinations and an expert assessment of the evidence presented to Katz"). The Court noted that "Katz's sole argument for qualified immunity ... is that her 'failure to disclose [the other two hairs],' if any, amounts only to negligence." *Id.* The Sixth Circuit found that "Katz's culpability [regarding this claim] is an issue of fact for a jury." *Id.* Katz similarly argued that her opinion that the five found hairs "matched" Gregory's head hair is "at most ... only a negligent performance of her duties." *Id.* at 744. The Sixth Circuit explained that "[b]y arguing that the evidence establishes at most a negligent performance of her duties, Katz is arguing disputed issues of fact to this Court." *Id.* at 744-45.

Here, as in *Gregory*, both Plaintiffs' and Defendants' experts have offered opinion evidence "that the evidence presented to [Pauch and Wilson] for analysis does not and could not support the conclusions that [they] reached" and have provided testimony "as to what a reasonable [firearms toolmarks expert] would do with the [evidence bullets] and an expert assessment of the evidence presented to [Pauch and Wilson]." *See Gregory*, 444 F.3d at 745 n.9.

**\*17** Pauch and Wilson's Firearm Identification Report's conclusion that the evidence bullets were a "Positive ID" with the Rossi handgun has not simply been "impugned," as the expert report was in *Caminata*, but rather has been indisputably shown to be wrong. Plaintiffs have shown more than a mere "professional disagreement" or "good faith difference of opinion" among experts, as was found to be insufficient to sustain a fabrication of evidence claim in *Ferris v. City of Cadillac*, 726 F. App'x 473 (6th Cir. 2018). In *Ferris*, defendant medical examiners and forensic pathologists opined that a child's death was homicide rather than accidental, which led to Ferris' continued detention on murder charges, which were eventually dropped. *Ferris*, 726 F. App'x at 475-77. Ferris subsequently brought suit against

the examiners under 42 U.S.C. § 1983, and the parties filed cross-motions for summary judgment. Ferris argued that the defendants' opinions were recklessly made and supported his motion with two expert opinions that the child's death could not be determined (although the reports did not go as far as to opine that the death should be classified as "accidental"). *Id.* 477-78. The Court granted summary judgment in favor of the defendants, finding that Ferris's evidence "evinces nothing more than a professional disagreement over what conclusions can properly be drawn from the medical evidence; what the evidence does not do is support the assertion that Defendants fabricated evidence." *Id.* at 483.

Thus, drawing all reasonable inferences in favor of Plaintiffs, Plaintiffs have established that there is a question of fact as to whether Pauch and Wilson "intentionally" or, at least, "recklessly" falsified or fabricated the conclusion in their report sufficient to defeat Defendants' motion for summary judgment. As in *Gregory*, "[Pauch and Wilson's] culpability is an issue of fact for a jury" *See Gregory*, 444 F.3d at 744-45 ("By arguing that the evidence establishes at most a negligent performance of her duties, Katz is arguing disputed issues of fact to this Court.").

However, Plaintiffs have failed to meet their burden, on their motion for summary judgment, to conclusively establish this claim against Defendants Pauch and Wilson – a fact issue remains – and therefore Plaintiffs' motion for summary judgment is denied. *See Ely*, 150 F.Supp.3d at 849-50.

### c. Whether Pauch & Wilson's Report affected the judgment

To establish their fabrication of evidence claim, Plaintiffs must also demonstrate that the false evidence could have affected the judgment. *See Gregory*, 444 F.3d at 737 ("It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated *and* a reasonable likelihood exists that the false evidence would have affected the decision of the jury.") (emphasis added).

In support of this prong, Plaintiffs point to Pauch's trial testimony, in which he describes his qualifications and experience as an expert witness in firearms identification and his testimony that the evidence bullets were like a "fingerprint" and that "[t]hese bullets were fired from this weapon [the Rossi handgun] and no other weapon." (Pls.' Mot. S.J. at pp. 18-19, citing ECF No. 92-9, Pauch's Trial

Test. at pp. 49, 52-53.) Plaintiffs also rely on the prosecutor's closing argument, in which he emphasized that there is but one "inescapable fact" that Ricks' gun matched the bullets from the victim, that "[t]he gun speaks louder than any eye witness could about what happened on March 3rd," and that the gun was "the most powerful evidence in this case." (Pls.' Mot. S.J. at p. 19, citing ECF No. 92-18, Simons' Closing Arg. at pp. 107, 109, 112, 129, 143.) Plaintiffs argue that the fabricated evidence – that the evidence bullets matched the Rossi handgun – was central to the case and readily "could have affected the judgment."

Defendants do not address this argument in their response brief or in their motion for summary judgment, for good reason. They cannot make a good faith argument that Pauch and Wilson's firearms identification report, and Pauch's testimony at the trial consistent with that report, did not significantly affect the judgment. Accordingly, Defendants' motion for summary judgment on Plaintiff's fabrication of evidence claims against Pauch and Wilson is denied.

### d. Qualified immunity analysis

Defendants Pauch and Wilson argue they are entitled to the defense of qualified immunity, and Plaintiffs argue that they are not. Plaintiffs bear the burden of demonstrating that the Defendants are not entitled to qualified immunity. *Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007). The Sixth Circuit recently explained:

**\*18** Responding to the many and varied suits brought under § 1983, the judiciary recrafted that limited version of the doctrine of qualified immunity in an effort to protect public officials "from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S. Ct. 1019, 127 L.Ed.2d 344 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). We therefore no longer "attempt[ ] to locate [the qualified immunity] standard in the common law as it existed in 1871," *Ziglar v. Abbasi*, ––– U.S. ––––, 137 S. Ct. 1843, 1871, 198 L.Ed.2d 290 (2017) (Thomas, J., concurring), but instead attempt to determine whether a defendant, by his conduct, "violate[d] clearly established statutory or constitutional rights[s] of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S. Ct. 2727.

*Jackson v. City of Cleveland*, 925 F.3d 793, 822 (6th Cir. 2019).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

"In determining whether the government officials in this case are entitled to qualified immunity, we ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir. 2008). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. at 223, 236, 129 S.Ct. 808 (2009). All facts and factual inferences are drawn in favor of the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1866, 188 L.Ed.2d 895 (2014). If multiple officers are alleged to have violated a plaintiff's constitutional rights, each officer's conduct must be analyzed individually. "Each defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (citing *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir. 2008)).

The Sixth Circuit has adopted the following familiar analysis for determining whether a right is clearly established:

> For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining

whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011) (citing *Saucier*, 533 U.S. at 201–02, 121 S.Ct. 2151). Thus, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citing *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

**\*19** "We look first to the decisions of the Supreme Court, and then to the case law of this circuit in determining whether the right claimed was clearly established when the action complained of occurred." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citing *Black v. Parke*, 4 F.3d 442, 445 (6th Cir. 1993)). "[T]he case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.' " *Id.* (quoting *Saylor v. Bd. of Educ. of Harlan Cnty.*, 118 F.3d 507, 515 (6th Cir. 1997)). Plaintiffs bear the burden of showing the claimed right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

*Clemente v. Vaslo*, 679 F.3d 482, 490 (6th Cir. 2012). " 'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Flying Dog Brewery, LLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 353 (6th Cir. 2015) (quoting *al-Kidd*, 131 S. Ct. at 2083). The inquiry requires the Plaintiff to point to "controlling authority" or "a robust consensus of cases of persuasive authority" to demonstrate that the right was clearly established. *Hidden Village, LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013).

As discussed above, there is a question of material fact as to whether Defendants Pauch and Wilson knowingly or intentionally fabricated evidence, thus defeating the first prong of Defendants' qualified immunity defense. However, Plaintiffs have not conclusively established this claim so that they would be entitled to a directed verdict at trial.

With regard to the second prong of the qualified immunity analysis, "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct" *Pearson*, 555 U.S. at 232, 129 S.Ct. 808 (citations omitted), Plaintiffs argue that a criminal defendant's right to be free from prosecution based on fabricated evidence existed before 1992. (Pls.' Mot.

S.J. at p. 21, citing *Miller v. Pate*, 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle. There can be no retreat from that principle here.") (internal citations omitted); *Spurlock v. Satterfield*, 167 F.3d 995, 1006-07 (6th Cir. 1999) ("a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual was fabricated, would also be unlawful" in April of 1990, when the defendant's fabrication occurred).).

Defendants do not attempt to argue otherwise. The Sixth Circuit previously stated that "[u]nder law that was clearly established in 1992, [the defendant] would have violated Plaintiff's constitutional rights if [he] 'knowingly fabricated evidence against [him], and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *See Gregory*, 444 F.3d at 744 n.8. Thus, because there remains a question of material fact as to whether Defendants Pauch and Wilson knowingly or intentionally fabricated evidence, Defendants Pauch and Wilson have failed to establish that they are entitled to qualified immunity on Plaintiffs' fabrication of evidence claim.

### 3. Plaintiffs' Fabrication of Evidence Claim Against Defendant Stawiasz

Plaintiffs allege that Defendant Stawiasz "further fabricated evidence, in deliberate and knowing fashion, to secure a conviction, including switching the bullets provided to expert, David Townshend, which was material to the jury's decision that Plaintiff had committed the crime of murder, and which otherwise would have been lacking." (FAC ¶ 93, PgID 381.) Specifically, Plaintiffs allege that Stawiasz switched the evidence slugs from Bennett's body with the test-fired bullets from the Rossi handgun and marked the test-fired bullets as Evidence Tags 923409 and 923410 when he transported the slugs and gun to Townshend for testing on August 16, 1992. (*Id.* ¶ 68, PgID 372.)

**\*20** Defendants argue in their Motion for Summary Judgment that Defendant Stawiasz did not suppress exculpatory evidence by withholding the evidence bullets from the prosecutor or fabricate evidence by knowingly giving "pristine" bullets to Townshend for examination. (Defs.' Mot. S.J. at p. 23.) They argue that there is no

evidence that Stawiasz knowingly and intentionally gave the wrong bullets to Townshend for examination in 1992, and that Plaintiffs "have no evidence that the bullets were switched, who did it, when, where or how it was done." (*Id.* at pp. 23-24, 87 S.Ct. 785.) According to Defendants, Townshend, Kanluen and Pauch all examined the evidence bullets during the trial and agreed that those were the bullets they had previously examined, and Townshend never complained in 1992 that the bullets were "near pristine." (*Id.* at pp. 24-25, 87 S.Ct. 785.)[3]

Plaintiffs respond that the evidence, viewed in the light most favorable to them, can lead to the reasonable inference that Stawiasz tampered with the evidence and provided Townshend with the wrong bullets for examination in 1992 (the test-fired bullets from the Rossi handgun instead of the evidence bullets recovered from Bennett). (Pls.' Resp. to S.J. at p. 23.) The evidence bullets have now been indisputably classified as "5R" and thus cannot have been fired by the Rossi handgun, classified as "6R." (*Id.*) Plaintiffs argue that Townshend recalls the bullets he examined in 1992 as being almost pristine, but that, when questioned, Stawiasz assured him they were the evidence bullets. (*Id.* at p. 24, 87 S.Ct. 785.) According to Plaintiffs, Stawiasz had the means and the opportunity to swap out the evidence bullets (which were kept in manila envelopes sealed with nothing more than a string tie) with the previously test-fired bullets when he alone delivered them to Townshend in 1992. (*Id.* at pp. 24-25, 87 S.Ct. 785, citing Stawiasz Dep. at p. 123.)

### a. Analysis of fabrication claim

As explained above, "[t]he basis of a fabrication-of-evidence claim under § 1983 is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills*, 869 F.3d at 484.

Defendants argue that there is no evidence that any person in the chain of evidence switched the bullets, much less evidence that Stawiasz did so, and that Plaintiffs instead rely on only speculation and conjecture that Stawiasz had the "means and opportunity" to do so. Plaintiffs argue in response that Townshend averred in his sworn affidavit that the bullets he examined in 1992 are not the same bullets he examined in 2018. It is undisputed that Stawiasz is the person who transported those bullets to Townshend in 1992, and thus he had "means and opportunity" to switch the bullets. Indeed,

Stawiasz conceded in his deposition that he had both the means and the opportunity to switch the evidence bullets with the bullets test-fired from the Rossi handgun by Defendants Pauch. (Stawiasz Dep. at pp. 123, 125, 127.) Townshend testified that he remembers remarking to Stawiasz, during the examination of the bullets in 1992, that the bullets looked undamaged, but that Stawiasz assured Townshend that the bullets he was examining were in fact the evidence bullets. (Townshend Dep. at pp. 115, 127.) And, Defendants concede that Townshend might have examined the previously obtained "test" bullets instead of the actual evidence bullets in 1992. (Defs.' Mot. S.J. at 25.)

**\*21** Viewing all of this evidence in the light most favorable to Plaintiffs, although a jury might ultimately find that Stawiasz did not switch the evidence bullets with the test-fired bullets from the Rossi handgun when he brought them to Townshend for testing in 1992, it would not be unreasonable in finding that he had. And as explained above, there is more than a reasonable likelihood that this fabricated bullet evidence "could have affected the judgment." Thus, a fact question remains, and Defendants are not entitled to summary judgment on Plaintiffs' fabrication of evidence claim against Defendant Stawiasz.

### B.  Plaintiff's Constitutional Malicious Prosecution Claims Against Defendants Stawiasz, Pauch and Wilson

Plaintiffs allege that Defendants Pauch and Wilson "influenced or participated in the initiation of criminal prosecution when they deliberately and knowingly supplied false information (that the bullets from Gerry Bennett's body matched Ricks' gun) that was relied upon by the prosecutor in bringing criminal charges, and was material to a finding of probable cause that Plaintiff had committed the crime of murder, which otherwise would have been lacking," in violation of the Fourth Amendment. (FAC ¶ 93, PgID 381.) Plaintiffs also claim that Defendant Stawiasz "influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly supplied false evidence by switching bullets to be provided to David Townshend, and supplied false information and omitted material information which showed a reckless disregard for the truth in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause." (*Id.*)

### 1. Malicious Prosecution

"The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction and incarceration.' " *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709 715-16 (6th Cir. 2006) (internal quotation marks omitted)). "To succeed on a Fourth Amendment malicious prosecution claim ... a plaintiff must prove the following: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014). Although actual "malice" is not required to succeed on a constitutional malicious prosecution claim, the defendant's participation "must be marked by some kind of blameworthiness," i.e., the defendant must have made "deliberate or reckless falsehoods," and "mere negligence" will not create liability. *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). A police officer violates a person's clearly established right to be free from malicious prosecution when the officer's "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014); *see also Robertson*, 753 F.3d at 617 ("Allegations of negligence or innocent mistake are insufficient.").

### 2.  Plaintiffs' Malicious Prosecution Claims Against Defendants

The third and fourth prongs of a constitutional malicious prosecution claim are not meaningfully in dispute in this case, as Ricks clearly suffered a deprivation of liberty when he was incarcerated for 25 years, and the criminal proceeding against him was ultimately resolved in his favor. Thus, at issue here are prongs one and two – whether Defendants influenced or participated in the decision to prosecute Ricks (the "participation" prong) and whether there was probable cause for the prosecution (the "no probable cause" prong).

### a. The "participation" prong

**\*22**  The first element of the malicious prosecution claim is met when an officer "could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty" and the misconduct actually does so. *Sykes*, 625 F.3d at 316. The term "participated" is construed "within the context of tort causation principles." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (quoting *Sykes*, 625 F.3d at 311). "Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials ... ultimately influenced [a plaintiff's] continued detention.' " *Sykes*, 625 F.3d at 316. "[T]he fact that [Defendants] did not *make* the decision to prosecute does not per se absolve them from liability." *Id.* (emphasis in original). "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge or otherwise 'ultimately influenced [a plaintiff's] continued detention,' and (2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth." *Meeks v. City of Detroit, Mi.*, 727 F. App'x 171, 178-79 (6th Cir. 2018) (internals citations omitted).

Defendants do not directly address this prong in their motion for summary judgment. However, a reasonable jury could find that Defendants' misconduct influenced the decision to bring charges against Plaintiff. Plaintiffs assert that the evidence in this case "undeniably demonstrates that the bullet evidence from Pauch and Wilson 'influenced' or 'participated' in the initiation of the prosecution and the continuation of detention." (Pls.' Resp. to SJ at pp. 26, PgID 5250.) And, Stawiasz, as the officer in charge, was also involved in the initiation and prosecution of this case. Plaintiffs cite *Mills, supra*, for the proposition that "[t]he prototypical case of malicious prosecution involves an official who fabricates evidence that leads to wrongful arrest or indictment of an innocent person." (*Id.* citing *Mills*, 869 F.3d at 480.)

Plaintiffs have provided evidence that the bullet evidence 'influenced' or 'participated' in the initiation of the prosecution and the continuation of detention. In this case, Pauch testified at the Preliminary Examination hearing, in support of the prosecution, that the two bullets recovered from Bennett's body had been fired from Ricks' gun. (ECF No. 92-31, Pauch Prelim. Exam. Test., 3/19/92 at p. 39.) Plaintiffs

also contend that "[b]ut for [Wilson's] knowing fabrication of evidence, there would have been no agreement on the test results, which would have destroyed probable cause for Stawiacz [sic] to seek an arrest warrant." (Pls.' Resp. at p. 28, PgID 5252.) And Defendant Stawiasz, as the officer in charge, also plainly participated in the initiation of the prosecution and continuation of detention of Ricks.

Plaintiffs' claim of malicious prosecution against Pauch and Wilson is predicated on the conclusion in their Firearms Identification Report that there is a "Positive ID" between the Rossi handgun and the evidence bullets, and their claim against Defendant Stawiasz is predicated on the allegations that he switched the evidence bullets provided to Townshend. Defendants ignore that the "short analysis of the evidence bullets," as they put it, played a significant role in Ricks' continued detention. *See Sykes*, 625 F.3d at 316-17; *Gregory*, 444 F.3d at 749-50. Prosecutor Simon agreed that "[t]he bullets were that critical to the case" and testified that if he knew the true evidence – that the evidence bullets did not match the Rossi handgun – he is "not sure there would never have been a case getting past exam, but [he] do[es]n't think there would have been a trial." (Simon Dep. at 9, PgID 3820.)

A reasonable juror could find that this evidence, and Pauch and Stawiasz's trial testimony regarding the bullet evidence, influenced the decision to prosecute Ricks. *See Sykes*, 625 F.3d at 317 (finding that "a reasonable jury could have found that Sgt. Anderson participated in or influenced the decision to prosecute the Plaintiffs such that liability for malicious prosecution is proper" because the officer's investigatory materials were in the prosecutor's possession and he relied on many of the falsehoods in proceeding against the plaintiffs). While Defendants did not make the decision to prosecute Ricks, it is reasonable to infer that the bullet evidence – which the prosecutor agreed was "critical" - influenced the decision to bring charges against Ricks. As the *Sykes* court explained, "[i]n short, the fact that Sgt. Anderson did not *make* the decision to initiate the criminal proceedings against the Plaintiffs is of no moment, as the record contains ample evidence that Sgt. Anderson influenced or participated in the ultimate decision to prosecute the Plaintiffs by way of his knowing misstatements to the prosecutor." *Sykes*, 625 F.3d at 317; *see also Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.").

### b. The "probable cause" prong

**\*23** Defendants argue that re-litigation of probable cause is foreclosed because probable cause was determined at the preliminary examination hearing. *See Smith v. Thornburg,* 136 F.3d 1070, 1077 (6th Cir. 1998) ("Where the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining magistrate or state judge should foreclose re-litigation of that finding in a subsequent § 1983 action."). However, "[i]t is well established in this circuit that '[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause [to absolve them of liability] when that determination was premised on an officer's own material misrepresentations to the court.' " *Sykes,* 625 F.3d at 312 (quoting *Gregory,* 444 F.3d at 758). Thus, to establish that Defendants were responsible for commencing a criminal proceeding for purposes of a malicious-prosecution claim, Plaintiffs must present evidence that Defendants "(1) stated a deliberate falsehood or showed reckless disregard for the truth [at the hearing] and (2) that the allegedly false or omitted information was material to the [court's] finding of probable cause." *Id.*

As discussed above, Plaintiffs have raised a material question of fact as to whether Defendants Pauch and Wilson intentionally or deliberately falsified their Firearms Identification Report and as to whether Defendant Stawiasz switched the evidence bullets provided to Townshend for examination. The issue then is whether this false or omitted information was material to the finding of probable cause. *Sykes,* 625 F.3d at 312. According to Plaintiffs, Stawiasz testified that probable cause was lacking until the bullet evidence came back positive for a match to Desmond Ricks' gun. (Stawiasz Dep. at pp. 116-17.) Pauch testified at the Preliminary Exam in support of the prosecution that the two bullets recovered from Bennett's body had been fired from Ricks' Rossi handgun. (Prelim. Exam. Tr., Pauch Testimony at p. 39.) And, Prosecutor Simon stressed at the Preliminary Examination that "the strongest piece of circumstantial evidence is that the gun that was used to kill the deceased, Gerry Bennett, came from the house where the Defendant lived." (Prelim. Exam. Tr., Simon Closing at p. 42.) And, as stated above, Prosecutor Simon later testified that if he knew the true evidence – that the evidence bullets did not match the Rossi handgun – he is "not sure there would never have been a case getting past exam, but [he] do[es]n't think there would have been a trial." (Simon Dep. at 9.) A

reasonable jury could therefore find that the bullet evidence was therefore material to the ultimate prosecution of Ricks.

Defendants argue that there was sufficient other evidence supporting probable cause for Ricks' arrest and prosecution. While Ricks' coat was found at the scene, it is well-settled that "mere presence [at the crime scene] is not sufficient to meet the probable-cause threshold." *Sykes,* 625 F.3d at 307-08 (citing *Harris v. Bornhorst,* 513 F.3d 503, 515 (6th Cir. 2008) ("[I]t is well-established that an individual's mere presence at a crime scene does not constitute probable cause for an arrest.")). Defendants argue that there was sufficient probable cause without the Pauch & Wilson Firearms Identification Report, contending that it played only a "limited" or "smaller" role in the prosecution. (Defs. Resp. to S.J. at pp. 15-16.) However, the Court finds that this argument presents a question of fact as to whether an accurate report might have resulted in a conclusion that there was insufficient evidence of probable cause, defeating Defendants' motion for summary judgment. *See Gregory,* 444 F.3d at 749 n.11 ("It is not our job to find whether or not probable cause would have been dissolved had Katz revealed the exculpatory evidence; this is the precise province of the jury.").

### c. Qualified immunity

For the reasons explained above, Plaintiffs' have established a question of material fact as to their malicious prosecution claims against Defendants, thus satisfying the first prong of the qualified immunity analysis. However, Plaintiffs have not conclusively established this claim so that they would be entitled to a directed verdict at trial and thus are not entitled to summary judgment in their favor on this claim. With regard to the second prong, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct," *Pearson,* 555 U.S. at 232, 129 S.Ct. 808 (citations omitted), Plaintiffs argue that the right to be free from illegal seizure resulting from knowingly false statements or those made with reckless disregard for the truth was clearly established by March of 1992. (Pls.' Mot. S.J. at p. 26, citing *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *see also Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942) (knowing use of false testimony to obtain conviction violates Fourteenth Amendment); *Mooney v. Holohan,* 294 U.S. 103, 112-13, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (same).)

**\*24** Defendants do not attempt to argue otherwise. Thus, Defendants' motion for summary judgment on Plaintiffs' malicious prosecution claim against Defendants based on qualified immunity is denied.

### C. Plaintiffs' Constitutional *Brady*-Derived Claims Against Defendants Stawiasz and Pauch

Plaintiffs claim that Defendants Stawiasz and Pauch "were under an unwavering legal duty ("*Brady*" duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, including, but not limited to, the evidence that they fabricated the test results to state that the examination "*yielded a POSITIVE ID. Meaning the fired evidence was fired from the above weapon*," when, in fact, the bullets did not match the Rossi .38 Special caliber revolver." (FAC ¶ 90, PgID 379; *see also id.* ¶ 93, PgID 381, ***Brady* Violations**.)[4]

### 1. *Brady* Claims

A *Brady* claim has three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). "Reversal is only required ... where 'there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.' " *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994) (citations omitted).

Police officers are obligated to turn over potentially exculpatory evidence to the prosecutor's office. *Moldowan v. City of Warren*, 578 F.3d 351, 378-79 (6th Cir. 2009). However, a police officer need only disclose evidence "when its exculpatory value is 'apparent' to the officer, that is, when the officer is aware that the evidence 'could form a basis for exonerating the defendant.' " *D'Ambrosio v. Marino*, 747 F.3d 378, 389-90 (6th Cir. 2014) (internal citations omitted) (quoting *Moldowan*, 578 F.3d at 384, 388 n.14). Bad faith is not required where "materially exculpatory" evidence has been withheld, regardless of whether the claim involves a failure-to-preserve, or failure-to-disclose evidence.

*Moldowan*, 578 F.3d at 385. In such an instance, "where the evidence withheld or destroyed by the police falls into that more serious category [materially exculpatory evidence], the [criminal] defendant is not required to make any further showing regarding the mental state of the police." *Id.* at 386.

### 2. Defendants' Motion for Summary Judgment

In their motion for summary judgment, Defendants argue only that they are entitled to qualified immunity on Plaintiffs' *Brady*-derived claims because "Plaintiffs cannot identify any controlling authority establishing a *Brady* obligation imposed on officers acting under similar circumstances – delivering the wrong evidence or providing an incorrect firearms identification conclusion *to a retained defense expert*" (possibly referring to Townshend). (Defs.' Mot. S.J. at pp. 30-31 (emphasis added).)

**\*25** Contrary to Defendants' contention, Plaintiffs complain in their First Amended Complaint of Defendants' failure to disclose exculpatory/impeachment evidence *to the prosecutor*, not failure to disclose to such evidence to "a retained defense expert." (*See* FAC ¶¶ 90, 93, PgID 379, 381.) As Plaintiffs correctly state in their response to Defendants' motion, this Court has previously ruled that it was clearly established in 1992 that police officers have a *Brady*-derived obligation to disclose exculpatory evidence. (Pls.' Resp. to S.J. at pp. 28-29, citing ECF No. 41, May 30, 2018 Opinion & Order Denying Defendants' Motion for Partial Judgment on the Pleadings.) Specifically, this Court has already found in this case that it was clearly established in 1992 that police officers had a "*Brady*-derived" obligation to disclose exculpatory evidence, and that Plaintiffs' Complaint plausibly alleges a *Brady*-derived Section 1983 claim "that Pauch and Stawiasz failed to disclose to the prosecutor the existence of the exculpatory bullets that were removed from Bennett's body and also did not disclose that they had fabricated evidence that would inculpate, and indeed was used to convict, Ricks." (May 30, 2018 Opinion & Order at pp. 29-30.)

Defendants motion otherwise fails to justify the grant of summary judgment on this claim. Courts routinely decline to consider perfunctory arguments of the sort made by Defendants here. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (holding that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quoting

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293 (1st Cir. 1995))). It is not enough for a party to "mention a possible argument in the most skeletal way" and leave the court to "put flesh on its bones." *Id.* at 995-96 (quoting *Citizens Awareness Network*, 59 F.3d at 293-94). Defendants were obligated to explain why they are entitled to summary judgment, but their brief makes no attempt to do so. But it is not for the court to search the record and construct arguments. Parties must do that for themselves. *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008). Accordingly, Defendants' motion for summary judgment with regard to Plaintiffs' *Brady*-derived claims against Pauch and Stawiasz is denied.

**3. Plaintiffs' Motion for Summary Judgment**

Plaintiffs argue in their motion for partial summary judgment that they are entitled to summary judgment on their *Brady*-derived claim against Defendant Pauch because, even taking the facts in the light most favorable to Defendant Pauch, there is no genuine issue of material fact regarding any of the *Brady* elements. (Pls.' Mot. S.J. at p. 28.)[5] According to Plaintiffs, Pauch violated Ricks' due process rights by withholding that he falsified the bullet evidence report from the prosecutor, Ken Simon, and Simon has testified that if he had known the bullets did not match the gun in 1992, there would have been no trial, and if he had learned of fabricated evidence during the trial, "it may have" resulted in a dismissal in the middle of trial. (*Id.* at 28-29, 87 S.Ct. 785.) Plaintiffs further assert that the Court has already recognized that Defendants' "*Brady*-derived" obligation to turn over material exculpatory and impeachment evidence pre-dated March 6, 1992. (*Id.* at p. 29, 87 S.Ct. 785.)

Defendants argue in response to Plaintiffs' motion for summary judgment that Plaintiffs improperly attempt to "bootstrap" their fabrication of evidence claim as a *Brady* claim and that they have no evidentiary basis for their claim that the firearms report was fabricated. (Defs.' Resp. to S.J. at pp. 18-19.) This Court previously addressed, and rejected, this same argument by Defendants and explained that the Sixth Circuit has recognized that a plaintiff can logically plead a *Brady*-derived "withholding of evidence claim" alongside a "fabrication-of-evidence" claim." (May 30, 2018 Opinion & Order at p. 22, citing *Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017).)

Defendants also argue in response to Plaintiffs' motion that the issue is "whether the materiality of the allegedly inaccurate firearms report would have been 'apparent' to Officers Pauch and Wilson, given the state of the case at the time." (*Id.* at p. 19, 87 S.Ct. 785.) Defendants contend that it was not "apparent" to Pauch and Wilson that the report was fabricated, as both testified that they did not make an error and believed their report was accurate. (*Id.* at pp. 19-20, 87 S.Ct. 785.) According to Defendants, both Pauch and Wilson deny intentionally making an error or being aware of an error, and instead testified that they believed their report was accurate. (Wilson Dep. at pp. 73-75 ("So, therefore, the bullets from the body, whether you can determine it or not, were compared against the bullets from the gun. Therefore, that bullet you're claiming, and others are claiming, is a 5-right is a 6-right, and cannot be anything else."); Pauch Dep. at pp. 107-08 (agreed that he made his "Positive ID" determination by matching the various striations on the evidence bullets and the test-fired bullets).) Thus, Defendants argue, Plaintiffs' motion for summary judgment should be denied because there is no evidence that Pauch and Wilson fabricated their findings.

**\*26** Although this Court has already found that there is a clearly established obligation to turn over apparent exculpatory and impeachment evidence to the prosecutor, as explained above, there is a question of material fact as to whether Defendant Pauch intentionally falsified the Firearm Identification Report and subsequently withheld this information from the prosecutor, thus precluding summary judgment for Plaintiffs on their *Brady* claim against Defendant Pauch.

**D. Common Law Malicious Prosecution**

Plaintiffs allege a claim for malicious prosecution under Michigan law. (FAC Count II, ¶¶ 99-108, PgID 383-85.) To succeed on a common law malicious prosecution claim under Michigan law, a plaintiff must prove that:

[T]he defendant has initiated a criminal prosecution against him, (2) the criminal proceedings terminated in his favor, (3) the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Walsh v. Taylor*, 263 Mich. App. 618, 689 N.W.2d 506 (2004). Thus, Plaintiffs must show an absence of probable cause and must show "malice." *Newman v. Township of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014). "That requires evidence that

the officer 'knowingly sw[ore] to false facts ... without which there is no probable cause,' a standard more than establishing mere recklessness." *Id.*

In their motion for summary judgment, Defendants' only argument with respect to Plaintiffs' state law malicious prosecution claim is:

Plaintiff [sic] also asserts a state claim of malicious prosecution and has the burden of proving lack of probable cause and malice. *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365, 378, 572 N.W.2d 603 (1998). For the reasons cited above, in the absence of any evidence of these elements, defendants are entitled to governmental immunity under *Odom v. Wayne County*, 482 Mich. 459, 468, 480-82, 760 N.W.2d 217 (2008), and the State malicious prosecution claim must be dismissed.

(Defs.' Mot. S.J. at 29-30.)

Plaintiffs wholly fail to respond regarding this claim. However, as noted above, Defendants are obligated to explain why they are entitled to summary judgment and it is not for the Court to search the record and construct arguments. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See McPherson*, 125 F.3d at 995. Thus, Defendants' motion for summary judgment as to Plaintiffs' common law malicious prosecution claim is denied for failure to explain *why* they are entitled to summary judgment.

Alternatively, as explained above, the Court finds that there is a question of fact as to whether an accurate report might have resulted in a conclusion that there was insufficient evidence of probable cause, creating a fact issue on this claim, and Defendants' motion for summary judgment is denied for that reason as well.

### E. Intentional Infliction of Emotional Distress

Plaintiffs claim that Defendants intentionally inflicted emotional distress on them. (FAC Count III, ¶¶ 109-112, PgID 386.) An intentional infliction of emotional distress claim "requires a plaintiff to show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Jones v. Muskegon Cty.*, 625 F.3d 935, 948 (6th Cir. 2010) (quoting *Vredevelt v. GEO Group, Inc.*, 145 F. App'x 122, 135 (6th Cir. 2005) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905 (1985)).). "Such conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Id.* (quoting *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713 (1999)). Indeed,

**\*27** [i]t is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.... The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

*Id.* (internal citations omitted) (quoting *Graham*, 237 Mich. App. at 674-75, 604 N.W.2d 713).

In their motion, Defendants cursorily assert, without any further analysis or explanation, that:

there is no evidence defendant officers engaged in extreme or outrageous conduct, intended to cause severe emotional distress, and actually caused emotional distress. Therefore, summary judgment is proper, the officers are entitled to governmental immunity under *Odom*, and this Court must dismiss Plaintiff's claim with prejudice.

(Defs.' Mot. S.J. at 31.)

In response, Plaintiffs simply assert that:

Defendants Stawiasz, Pauch and Wilson's intentional concerted actions to fabricate evidence against Mr. Ricks, and to withhold exculpatory firearms examination results, was extreme and outrageous by any standard. Mr. Ricks was deprived of his freedom for 25 years based on the Defendants' wrongful conduct. Summary judgment on this claim must be denied.

(Pls.' Resp. to S.J. at 29-30.)

As explained above, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See McPherson*, 125 F.3d at 995. It is not for the court to search the record and construct arguments. Parties must do that for themselves. *Magnum Towing & Recovery*, 287 F. App'x at 449. Defendants' arguments are deemed waived and their motion for summary judgment on this claim is therefore denied. Further, construing the evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude that Plaintiffs' allegations against Defendants could be construed

as sufficiently "outrageous" to support a claim for intentional infliction of emotional distress.

### F. Punitive Damages

Defendants acknowledge that punitive damages are available in § 1983 cases for constitutional violations that involve reckless or callous indifference or evil motive or intent. (Defs.' Mot. S.J. at 32, citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).) Defendants then summarily assert that they did not engage in any deliberate, malicious conduct, but instead acted in good faith, and thus Plaintiffs' claim for punitive damages should be dismissed. (*Id.*)

In response, Plaintiffs assert "this case is a perfect example for when punitive damages are warranted under § 1983" because "[v]iewing the evidence in a light favorable to Plaintiffs, Defendants engaged in deliberate, malicious misconduct, and caused Mr. Ricks to be wrongfully imprisoned as a result for 25 years." (Pls.' Resp. to S.J. at 30.)

As explained above, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *See McPherson*, 125 F.3d at 995. It is not for the court to search the record and construct arguments. Parties must do that for themselves. *Magnum Towing & Recovery*, 287 F. App'x at 449. Defendants' argument with regard to Plaintiffs' punitive damages claim is deemed waived and their motion for summary judgment on this claim is denied.

### G. Statute of Limitations

Defendants argue that Plaintiffs' federal and state claims are time-barred by the two- or three-year statutes of limitations applicable to Plaintiffs' § 1983 claims, intentional infliction of emotional distress ("IIED") claim, and state law malicious prosecution claim because "[i]n 1992, there was no bar to Plaintiff bringing suit against the City of Detroit and its police officers." (Defs.' Mot. S.J. at pp. 34-35.) Plaintiffs respond that the § 1983 and state law malicious prosecution claims do not accrue until the sentence or conviction has been invalidated. (Pls.' Resp. to S.J. at p. 33, citing *Heck v. Humphrey*, 512 U.S. 477, 489-90, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and *Parisi v. Michigan Twps. Ass'n*, 123 Mich. App. 512, 519, 332 N.W.2d 587 (1983).)

**\*28** The statute of limitations for constitutional fabrication of evidence and malicious prosecution claims accrue at the

date of termination of proceedings in a criminal defendant's favor. *See Mills*, 869 F.3d at 484; *Heck*, 512 U.S. at 489-90, 114 S.Ct. 2364. The same is true for the state law malicious prosecution claim. *See Parisi*, 123 Mich. App. at 519, 332 N.W.2d 587. Accordingly, these claims accrued on the date the Order of Nolle Prosequi was entered, June 1, 2017, and are not time-barred.

Plaintiffs' intentional infliction of emotional distress claim is different. Such a claim is governed by a three-year statute of limitations, Mich. Comp. Laws 600.5805(10), and the issue is whether this claim accrued at the time of the alleged conduct in 1992 or when the criminal proceedings terminated in his favor in 2017. Defendants cite to *Killian v. Fuller*, 162 Mich. App. 210, 412 N.W.2d 698 (1987) for the proposition that the claim accrues "at the time of misconduct, not at time of acquittal or release." (Defs.' Mot. S.J. at 35.) The court in *Killian* found that the statute of limitations for an IIED claim arising out of an arrest accrued on the date of the arrest and not the date that the Supreme Court denied the state leave to appeal from the Court of Appeals' decision reversing the criminal conviction on entrapment grounds. *Killian*, 162 Mich. App. at 216, 412 N.W.2d 698. Plaintiffs argue that *Killian* is "miscite[d]" because in that case the plaintiff pleaded guilty before a subsequent acquittal based on entrapment, and the court held that the guilty plea nullified any claim for malicious prosecution. (Pls.' Resp. to S.J. at 33.)

The Court finds the decision in *Peterson v. Heymes*, 277 F. Supp. 3d 913 (W.D. Mich. 2017), *rev'd in part on other grounds*, 931 F.3d 546 (6th Cir. 2019) instructive. The plaintiff in *Peterson* brought a wrongful conviction civil action against various law enforcement officers, prosecutors and municipalities, asserting claims for § 1983 violations and state law claims, including malicious prosecution and intentional infliction of emotional distress. The defendants argued that the statute of limitations barred plaintiff's state law claims for intentional infliction of emotional distress and civil conspiracy, and the Court explained that the "issue requires the Court to determine whether the claims could have been brought when the conduct occurred. If yes, then the claims are time barred. If, however, [plaintiff's] conviction prevented him from bringing the claims, then the claims would not be time barred." *Id.* at 930. The Court held that the IIED claim did not accrue until the plaintiff's conviction was vacated, explaining:

> A claim accrues when the act upon which the claim is based was done, not when the damage occurs. Mich. Comp. Laws § 600.5827; *Nelson*, 564 N.W.2d at 487. A limitations

period does not begin to run until the plaintiff "has a 'complete and present cause of action.' " *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California, Inc.,* 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (quoting *Rawlings v. Ray,* 312 U.S. 96, 98, 61 S.Ct. 473, 85 L.Ed. 605 (1941)). "[A]s a general rule, a limitation period is tolled only by a substantive restriction on the plaintiff's ability to bring an action in a timely manner, not by mere procedural or technical irregularities whose correction is within the control of the plaintiff." *Turner v. Mercy Hosp. & Health Servs. of Detroit,* 210 Mich. App. 345, 533 N.W.2d 365, 368 (1995) (citation omitted).

**\*29** MSP Defendants are not entitled to dismissal of the claims as time barred. Peterson explains that his intentional infliction of emotional distress claim "is a predicate for the civil conspiracy claim." (ECF No. 46 Pl. Resp. at 30 n.8 PageID.839.) *The conduct giving rise to Peterson's intentional infliction claim is the defendants' allegedly coercive interrogation and alleged fabrication of evidence. Peterson could not raise these claims before his conviction was vacated.* He had already filed motions in his criminal case challenging the voluntariness of his confession. That matter was resolved against him. To find that his confession was voluntary, the court had to consider the conduct of MSP Defendants during the interrogation. Peterson would have been estopped from relitigating that issue in a civil case. Until the conviction was vacated, Peterson was operating under a substantive restriction that prevented him from litigating these two state torts.

*Id.* (emphasis added). Following *Peterson,* Plaintiffs' IIED claim did not accrue until Ricks' conviction was vacated on

June 1, 2017, and thus Defendants are not entitled to dismissal of Plaintiffs' claims as time barred.

### H. Loss of Consortium Claims

Defendants argue that Plaintiffs Desire'a Ricks' and Akilah Cobb's claims for loss of society and companionship are dependent on Ricks' claims, and that because his claims fail, theirs do as well. (Defs.' Mot. S.J. at 35, citing *Hall v. Wooten,* 506 F.2d 564 (6th Cir. 1974); *Berger v. Weber,* 411 Mich. 1, 17, 303 N.W.2d 424 (1981).) Plaintiffs respond simply that because summary judgment of Ricks' claims is not warranted, his daughters' loss of consortium claims remain viable. (Pls.' Mot. S.J. at 34.)

Because the Court finds that Defendants are not entitled to summary judgment on Plaintiffs' claims, Plaintiffs' Desire'a Ricks and Akilah Cobb's claims for loss of society and companionship remain.

### IV. CONCLUSION

For all of the reasons stated above:

(1) Plaintiffs' motion for partial summary judgment (ECF No. 92) is **DENIED**; and

(2) Defendants' motion for summary judgment (ECF No. 91) is **DENIED**.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2020 WL 1640166

Footnotes

1  Townshend surmises that this location change was a result of "animosity" towards him by the Detroit Police Department as a result of his microscopic examination results and trial testimony in a prior shooting case that conflicted with the testimony of the Detroit Police Department firearms examiner regarding the positive identification of the evidence bullet. (ECF No. 91-83, David Townshend Affidavit at p. 1.) He asserts that this animosity is "exemplified in a letter written by Deputy Chief Gloria Reynolds[,] the Director of the D.P.D. Crime Lab[,] and the Assistant Prosecuting Attorney Kenneth E. Simon." (*Id.*) This letter was not attached as an exhibit to Townshend's Affidavit filed in support of Plaintiffs' Motion for Summary Judgment but was discussed during Townshend's deposition. (Townshend Dep. at pp. 110-16.) According to Townshend's testimony, the "Reynolds letter" requests that the Michigan State Police evaluate the evidence in this case instead of Townshend because Reynolds claims that Townshend invariably concludes that the evidence is such that no conclusion can be made as to whether there is a match. (*Id.*)

2  Townshend subsequently testified in his July 19, 2018 deposition that the bullets he looked at during the 1992 trial had "[v]ery little damage," "very little distortion at all," and "looked like a test bullet." (Townshend Dep. at pp. 177-79.) He

testified that he did not comment that the bullets looked "pristine" in 1992 because he "answered the questions that [he] was asked," and he had been told that those were the evidence bullets and he proceeded on that belief. (*Id.*)

3    Defendants, seemingly tacitly acknowledging that Townshend did not examine the actual "evidence bullets" in 1992, posit in their motion that:

> The mere fact that Townshend stated [in July 2018 that] the bullets he examined [in 1992] were "pristine" does not necessarily mean that he did not have possession of the evidence bullets. Instead of comparing those evidence bullets in evidence folders #923409 and #923410, however, he may have mistakenly compared Pauch's test bullets in evidence folder #923423 to his own test shots.

(*Id.* at 25.) However, Townshend testified that there were no "test-fired bullets" in the envelopes provided to him in 1992, as reflected in his draft report (Townshend Dep. at pp. 129-30; ECF No. 91-75, Townshend Draft of Firearms *Id.* Rpt.), only what were purported to be the "evidence bullets."

4    Plaintiff does not allege a claim for a *Brady*-derived violation against Defendant Wilson. (FAC ¶ 93, PgID 381 (alleging only that "Defendants, STAWIASZ and PAUCH" engaged in "conduct constituting a claim for a "*Brady* violation" under the Fifth Amendment); *see also* Pls.' Mot. S.J. at 26 (arguing only that Plaintiffs' *Brady*-derived claim against Defendant Pauch warrants summary judgment).)

5    Plaintiffs do not move for summary judgment on their *Brady*-derived claim against Defendant Stawiasz.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1191 Filed 04/05/21 Page 112 of 139

Sims v. United States, Not Reported in Fed. Supp. (2006)

2006 WL 8435527

2006 WL 8435527
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Deshawn SIMS, Petitioner,

v.

UNITED STATES of America, Respondent.

Civil No. 04-70474
|
Crim. No. 99-80102
|
Signed 01/18/2006

**Attorneys and Law Firms**

Elizabeth A. Stafford, Kevin Mulcahy, U.S. Attorney's Office, Detroit, MI, for Respondent.

**Report and Recommendation**

Steven D. Pepe, United States Magistrate Judge

### I. Background

**\*1** Petitioner Deshawn Sims was convicted on four drug-related counts on March 24, 2000. On October 11, 2000, he was sentenced to 262 months imprisonment.[1] On September 6, 2002, his conviction and sentence was affirmed by the Sixth Circuit. On February 10, 2004, he filed a motion under 28 U.S.C. § 2255 to vacate his conviction or to correct his sentence claiming ineffective assistance of counsel and requesting an evidentiary hearing, which was provided by Judge Feikens on August 18, 2005.

His § 2255 motion asserts, among other things, that his trial attorney, Marvin Barnett, was ineffective in his representation by failing to explain Petitioner's sentencing exposure of 210-262 months in prison and specifically in failing to inform him of a Rule ll plea offer with a sentence recommendation of 210 months. Petitioner claims he would not have gone to trial had he known of the plea offer and sentencing exposure. He asserts that the reason Barnett never told him was because Barnett was determined to take this case to trial in order to justify the "exorbitant" fee he charged Petitioner.

**\*2** In a February 11, 2004, affidavit supporting his § 2255 motion, Petitioner contends that his attorney, Mr. Marvin Barnett, never had a "serious discussion" with him concerning settlement of the case or the possibility of settling the case by a plea (*Id.* at ¶ 2). He noted further that Mr. Barnett never told him the AUSA (Margaret E. Davis) was pursuing a negotiated settlement, nor told him of any proposals (*Id.* at ¶ 8-9).[2] He contends that he believes a Rule 11 Plea Agreement was made by the AUSA, but he was never told of it, never had it explained nor shown to him (*Id.* at ¶ 11). Nor was he informed of the significance of a Notice of Sentence Enhancement and its effect on his sentence (*Id.* at ¶ 8). When he asked Mr. Barnett about his likely sentencing if he were convicted, he states that Mr. Barnett told him he "would likely receive a sentence of '90 something' months" (*Id.* at ¶ 4). He contends that the Federal Sentencing Guidelines were never explained to him and was never told what his sentencing range would be if he was convicted or if he pled guilty. Before trial, Petitioner never knew that it was possible he could receive a sentence of 262 months on each count (*Id.* at ¶ 6).

Government's Exhibit E opposing Petitioner's § 2255 motion is a facsimile transmission cover sheet from AUSA Davis to Mr Barnett on September 7, 1999, with a draft proposed Rule 11 Plea Agreement recommending a maximum sentence of 210 months in exchange for a plea to count one of the indictment: knowingly and intentionally distributing a controlled substance on February 25, 1997, involving approximately one kilogram of cocaine to a DEA confidential informant (Government Exhibit E to its May 24, 2005, Opposition to § 2255 Motion).

Exhibit 2 to Petitioner's September 12, 2005, Memorandum on the current motion (Dkt. # 168) is a September 8, 2005, affidavit from Petitioner's current counsel stating that: (1) he first became aware of this document when he received the government's May 24, 2005, Opposition; (2) in preparation for Petitioner's appeal he received Petitioner's file from Mr. Barnett's office on or about December 6, 2000, with a cover letter listing the contents; (3) he has maintained the file unaltered since that time; and (4) neither the cover letter nor the file contain Exhibit E or any reference to it.

On August 18, 2005, Judge Feikens held an evidentiary hearing regarding Petitioner's claims of ineffective assistance of counsel made in his § 2255 petition. At that hearing, Petitioner's current counsel sought to cross examine attorney Marvin Barnett about certain conversations he had with some of Petitioner's relatives and a friend. He had these

2006 WL 8435527

individuals, Mack Mitchell, Doris Sims, Ilinda Coleman and Lakita Miller, available as potential witnesses. In order to support his claim that he was never informed about any Rule 11 plea agreement or of his potential sentencing guideline exposure to 262 months, Petitioner wants to present witnesses who will testify that (1) Barnett told them there was no plea offer, when in fact the government had offered a plea; (2) Barnett told them Petitioner's maximum sentence was ten years, when in fact his maximum was more than twice that and that he thought Petitioner might prevail.

After adjourning the evidentiary hearing for supplemental briefing on this evidentiary issue, and receiving such briefing, Judge Feikens on November 17, 2005, referred the question of the relevance of these four witnesses for a report and recommendation. A copy of the August 18, 2005, evidentiary hearing was provided in December, which along with the briefs the parties filed has been reviewed.

## II. **Legal Standard**

Fed. R. Evid. 401 defines relevant evidence as: "Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In considering such probabilities it is often useful to ask two questions: (1) If the fact asserted is true, what other facts are likely to have occurred, and (2) the opposite logical proposition, if the fact asserted is untrue, what other facts are likely to be true.

## III. **The Disputed Issues**

 **\*3**  To determine the parameters of relevant evidence, a court must first identify the material disputed facts "of consequence" that are asserted as true. In the present case, the contested material issues of fact include: (1) whether Mr. Barnett received the faxed Rule 11 agreement; and the related question of (2) whether he met with Petitioner and discussed it and its 210 months recommended sentence; (3) whether he told Petitioner that, if convicted, he would likely receive " '90 something' months"; (4) whether he told Petitioner about the Federal Sentencing Guidelines and what his sentencing range would be if convicted or if he pled guilty; and (5) whether he told Petitioner about the significance of the Sentence Enhancement information and its effect on his sentence.

These are material facts because, at a minimum, if the Court finds that defense counsel did not discuss with his client a Rule 11 plea agreement that was faxed to his office, that would establish ineffective assistance of counsel[3] under the first prong of the *Strickland*[4] test. If the Court determines it probable that it would have accepted the 210 month recommended sentence if Petitioner had accepted the Rule 11 proposal, the prejudice prong of *Strickland* is established.

## IV. **The Existing Evidence and Contentions:**

While Petitioner has not yet testified, he claims in his motion and supporting affidavit that Mr. Barnett never had serious discussions about a settlement; indicated that if convicted he would likely get a sentence of 90 some months; did not see, know about or have explained to him any Rule 11 Plea proposal, nor any likely Sentencing Guidelines ranges if he pled or was found guilty. He asserts that he never knew he faced a sentence of 262 months, and that had he known of the sentence, after his wife decided to testify against him he would have accepted any proposed Rule 11 plea agreement under the Sentencing Guidelines that did not include the sentence enhancement.

Mr. Barnett submitted a signed but unnotarized affidavit acknowledging that he had no recollection as to whether or not a Rule 11 plea agreement was sent ("mailed") to his office from the U.S. Attorney in Petitioner's case. The statement adds that he has a business practice of always discussing with every criminal client the charges and possible penalties that could occur and "did most certainly discuss the same with Mr. Sims." The statement also states that he has a business practice of always discussing with every criminal client any Rule 11 plea agreement, and if one was sent ("mailed") to his office in Petitioner's case "then I would have most certainly discussed it with him" (Government Exhibit E to its May 24, 2005, Opposition to § 2255 Motion).

At the August 18, 2005, evidentiary hearing, Mr. Barnett testified that his firm, Marvin Barnett and Associates PC, is one of the largest law firms in Michigan (August 18, 2005, transcript of Marvin Barnett, at p. 12). Mr. Barnett practices civil rights litigation involving police abuse and he handles over a hundred criminal cases a year. Mr. Barnett says he has handled thousands over his 23 years of practice (*Id.* at 11-12). He has never been disciplined for failing to inform a client adequately nor had an ineffective assistance of counsel claim succeed against him (*Id.* at 16). He testified that when Petitioner signed the acknowledgment of indictment, he recalled having discussions with him over whether to plead guilty or go to trial, although he could not recall the specifics other than joking about the several million dollar fine (*Id.* at

2006 WL 8435527

17).[5] He later discussed it with Petitioner at his office when he met with co-defendant, Sonya Thomas (who apparently married Petitioner in 1999 (*Id.* at 50) ) and her attorney, Alicia Jones, but again could not recall the specifics. (*Id.* at 20). Ms. Thomas had entered a plea agreement, and agreed to testify against Petitioner (*Id.* at 20). The meeting with Mr. Barnett was to discuss the impact of that on Petitioner's case.[6] When asked what he told Petitioner about the strength of the government's case, Mr. Barnett responded that the government had problems with witness unavailability and a tape, but it was a case that could be won or lost, and while Ms. Thomas' plea agreement and involvement strengthened the government's case, he always thought it could be won or lost. (*Id.* at 21). He stated that he discussed the possible penalty after the sentence enhancement information was filed. (*Id.* at 22).

 **\*4**  When shown the draft Rule 11 agreement (Exhibit E) (which came from the government's file) Mr. Barnett said "I recall receiving it but I can't as to this specific document" (*Id.* at 25). He said he discussed it as well as the sentencing guidelines with Petitioner. He said Petitioner's reaction was "to go to trial under any and all circumstances" (*Id.*). He noted that Petitioner seemed upset about Mr Barnett bringing up possible resolution and was surprised Petitioner wanted to go to trial.

On cross examination, Mr. Barnett noted that after being told about Petitioner filing his § 2255 motion, he had not checked to see if he had retained any documents on Petitioner's case, nor did he recall if anyone in his office had done so (*Id.* at 30-32). When asked if Mr. Barnett had received Petitioner's subpoena for his records he said he had not and had brought no records.[7] Regarding Government's Exhibit E, he had seen it the day before, and it seemed that he had seen it before but could not specifically recall. (*Id.* at 33). Regarding the earlier time he could not recall if he saw it at a meeting with the AUSA or had it faxed or delivered to his office. (*Id.* at 34.) When asked if he had made an effort to determine if he has a copy of Exhibit E in his office, Mr. Barnett responded by saying that he was not a record keeper but rather general counsel and that he had other people go through records. (*Id.*) He could recall that when the case was over "I remember gathering up that entire file and making sure that Counsel John Royal and his representative had it. (*Id.* at 34-35). He could not stipulate that Exhibit E was not among those records sent to Petitioner's counsel (as Mr. Royal's September 8, 2005, affidavit asserts). (Exhibit 2 to Petitioner's September 12, 2005, Memorandum on the current motion (Dkt. # 168) ). He

also could not deny or dispute that Exhibit E was faxed to his office on September 7, 1999, as the cover sheet notes, but he responded stating: "I have no personal knowledge, Mr. Royal. I'm not trying to be difficult but things come to my office such as your subpoena and I don't see everything that comes to my office, I'm not denying anything or admitting anything, I just don't know" (*Id.* at 35).

Mr. Barnett's undated and unnotarized statement (Government Exhibit E to its May 24, 2005, Opposition to § 2255 Motion) was identified, acknowledged as true and admitted (*Id.* at 41-42). He could not recall if any Rule 11 agreement regarding Petitioner was discussed with Petitioner at the meeting of Mr. Barnett, Petitioner, Ms. Thomas and Ms. Jones after Mr. Thomas had agreed to testify (*Id.* at 46). Mr. Bennett also could not recall prior to trial making any notes regarding sentencing guideline calculations for Petitioner if he were to be convicted at trial (*Id.* at 47-48). If he made them they would likely have gone into Petitioner's file, although sometimes Mr. Barnett throws them away. He could not recall the specifics of what he told Petitioner regarding sentencing, but it would have been either what the guidelines required or what the Rule 11 agreement called for (*Id.*). Mr. Barnett was not allowed to respond to the question as to his defense strategy once he knew Sonya Thomas was going to testify against Petitioner (*Id.* at 49). Mr Barnett said he did not recall Mack Mitchell coming to his office shortly after Petitioner married Ms. Thomas and asking if the government had offered a plea agreement to Petitioner. He was asked if he told Mr. Mitchell that Petitioner was not facing any more than 10 years (*Id.* at 51). The government objected to these questions and those related to other witnesses on the grounds of relevance (*Id.* at 50–52).

V. **Analysis of The Existing Evidence and Contentions:**
 **\*5**  Again, the central issues in dispute relevant to this order of reference are (1) whether Mr. Barnett received the faxed September 7, 1999, Rule 11 agreement; the related question of (2) whether he met with Petitioner and discussed it and its 210 months recommended sentence; (3) whether he told Petitioner that, if convicted, he would likely receive " '90 something' months"; (4) whether he told Petitioner about the Federal Sentencing Guidelines and that his sentencing range could exceed 20 years if convicted or 210 months if he pled guilty and the Rule 11 recommendation was accepted; and (5) whether he told Petitioner about the significance of the Sentence Enhancement information and its effect on his sentence.

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1194 Filed 04/05/21 Page 115 of 139
Sims v. United States, Not Reported in Fed. Supp. (2006)
2006 WL 8435527

The present state of the evidence indicates that Mr. Barnett is an extremely busy attorney handling civil rights police brutality cases and an excess of 100 criminal cases annually. Understandably, at the August 2005, hearing, he had no specific recollection of receiving the September 7, 1999, Rule 11 agreement faxed to his office from AUSA Davis. It was not listed as a document nor was it found in the Petitioner's files provided to Mr. Royal on or about December 6, 2000, (which Mr. Barnett contended at the hearing was the "entire file"). Mr. Barnett acknowledged "I don't see everything that comes to my office," noting as an example his not seeing the subpoena for Petitioner's file that had been delivered to Mr. Barnett's receptionist four days before the hearing. Mr. Royal's brief on this motion (but not his affidavit) contends that those documents he received for the appeal in December 2000 contained no reference to any settlement negotiations with the government[8] (Petitioner's September 12, 2005, Memorandum, Dkt. # 168, at p. 4).

The evidence indicates Mr. Barnett's general practice is to discuss charges and possible penalties with clients, which he was sure he did with Petitioner, and it is also his practice to discuss Rule 11 agreements, which he was sure he did *if* he received the Rule 11 agreement. The record, however, only contains information that Mr. Barnett talked with Petitioner about the charges and penalties and whether to plead at one or both arraignments when Petitioner signed the acknowledgment of the indictment (either April 13, 1999, or March 6, 2000, it is not clear which date). He again believes he talked about this issue of penalties and pleas when he and Petitioner met with co-defendant, Sonya Thomas and her attorney, Alicia Jones, sometime in early 2000 after Ms. Thomas decided to plead and cooperate. Again, Mr. Barnett could not recall specifics. The critical window of opportunity to accept the Rule 11 proposal was from the time it was made (September 7, 1999) until when the notice of Sentence Enhancement was filed (March 13, 2000).

Unfortunately, the record does not contain any notes from Mr. Barnett's file for Petitioner nor from Mr. Barnett's calendar indicating any other meetings with Petitioner in which me might have discussed pleas and potential penalties. Nor does the record contain any notes from Mr. Barnett's file showing any Sentencing Guideline calculations, any reference to the Rule 11 proposal, any discussions concerning pleading or going to trial, any indication of what warnings and risks were explained to Petitioner either before or after Petitioner's wife agreed to testify against him, nor any notes of Petitioner's choice, following such discussions, to go to trial. While

Petitioner's counsel's current briefing is seeking any such notes from Mr. Barnett's file asking this Court to enforce his August 15, 2002, subpoena for Mr. Barnett's records not formerly produced, that matter regarding the subpoena was not referred for report and recommendation.[9]

**\*6** Given (i.) the somewhat equivocal nature, (ii.) the lack of specifics and lack corroborative notes or other evidence regarding Mr. Barnett's testimony, (iii.) his admission that he does not always get documents that are delivered to his office, and (iv.) the clear conflict between his testimony and that of the Petitioner—(v.) as well as the fact that each might have a reason for a self serving memory[10]—the fact finding process would be served by any additional evidence that may assist in resolving the factual disputes in issue.

## VI. Analysis of The Relevance of the Proffered Testimony of Petitioner's Witnesses:

Petitioner wants to interrogate Mr. Barnett about, and if needed—as will be likely—call four witnesses:

(1) Petitioner's uncle, Mack Mitchell, will testify that during a meeting with Mr. Barnett in the fall of 1999, after the AUSA Davis draft Rule 11 agreement had been faxed to Mr. Barnett's office on September 7, 1999, he asked Mr. Barnett if the government offered Petitioner a plea deal, and Mr. Barnett replied that they had not. Also, Mitchell will testify that Mr. Barnett told him Petitioner's maximum sentence was ten years.

(2) Petitioner's mother, Doris Sims, and (3) a family friend, Ilinda Coleman both will testify that during the trial in March 2000, Barnett told them Petitioner's maximum sentence was ten years.

(4) Petitioner's aunt, Lakita Miller, will testify that during the trial Barnett told her that he would win the trial and Petitioner would not spend any time in prison.

As with similar circumstances evidence where prior similar events[11] or the lack thereof[12] have been deemed relevant and admissible evidence under Fed. R. Evid. 401, so too prior similar statements of a party or witness have, in certain contexts, been found relevant and admissible. Similar prior inconsistent statements strengthened evidence in a case for a new trial in *United States v. Robinson*, 303 F. Supp. 2d 231 (N.D.N.Y., 2004).[13] If, in the present case, Mr. Barnett is cross examined and denies telling anyone that there was

2006 WL 8435527

no plea agreement or denies telling anyone that if convicted Petitioner would likely receive a sentence of ten or fewer years, then any prior statements that there was no plea offer, or that Petitioner's sentence would be 10 years would be inconsistent. Alternatively, if the Court were to find that Mr. Barnett did get the Rule 11 proposal from AUSA Davis, then Mr. Barnett's testimony was that he discussed it and the 210–262 month range with Plaintiff. Again any prior statements that there was no plea offer, or that Petitioner's sentence would be 10 years would be inconsistent with this portion of Mr. Barnett's testimony. Thus, evidence of his inconsistent statements to Mack Mitchell, Doris Sims and Ilinda Coleman would, at a minimum, be relevant to impeach the uncorroborated testimony of Mr. Barnett. Yet, for reasons noted below, in addition to the statements made to Mitchell, Doris Sims and Coleman possibly being admissible as *prior inconsistent statements* to impeach Mr. Barnett, the consistency of these statements Mr. Barnett allegedly made to Mitchell, Doris Sims and Coleman with Petitioner's version of what Mr. Barnett told him makes these statements also admissible on the merits of the factual dispute between Petitioner and Mr. Barnett.

**\*7** Similar statements have been considered relevant in a Court's determination on trustworthiness and whether to admit evidence under Fed. R. Evid. 807, the residual hearsay exception.[14] Also, prior similar statements are considered relevant to counter an assertion that current testimony is a recent fabrication.[15]

**\*8** Thus, it is clear that statements allegedly made by Mr. Barnett to Mitchell, Doris Sims and Coleman being similar to those Petitioner contends Mr. Barnett made to him, are relevant. Using the Rule 401 relevancy syllogism noted above,[16] if it is true that Mr. Barnett *did not get the Rule 11* faxed on September 7, 1999, and *did not discuss it with Petitioner*, then it is more likely or "more probable" that he might have told others that there was no plea agreement. If, on the other hand, Mr. Barnett did receive the plea agreement offering 210 months imprisonment and if he did discuss it with Petitioner, then it is less likely he would have told anyone in the Fall of 1999 there was no plea agreement or that Petitioner's likely sentence was 10 years when the Rule 11 statement clearly said it would be a minimum of 210 months.

Similarly, if it is true that Mr. Barnett *did not do Sentencing Guideline calculations* and *did* suggest to Petitioner that he was facing under ten years in prison if convicted (" '90 something' months"), then it would be more likely or

more probable that Mr. Barnett might have told others that Petitioner, if convicted, was facing 10 years. If on the other hand Mr. Barnett did the Sentencing Guideline calculations accurately and did discuss the resulting sentencing range of 200+ months with Petitioner, then it is less likely Mr. Barnett would needlessly raise the expectations of Petitioner's relatives by telling them Petitioner likely faced roughly 50% of a realistic estimate on sentencing.[17]

Thus, the statements Mr. Barnett allegedly made to Mark Mitchell, Doris Sims and Ioinda Coleman are relevant to material issues in dispute because these statements, if credited, have a tendency to make it "more probable" under Rule 401 that Mr. Barnett did not receive the Rule 11 agreement, or did not discuss it or other accurate Sentencing Guidelines computations with Petitioner, and "more probable" that Mr. Barnett told Petitioner that, if convicted, he would get a sentence of "90 something." Thus, these statements would be admissible on the disputed questions under Fed. R. Evid. 402 unless otherwise excludable.

Fed. R. Evid 403 sets certain exceptions to admissibility:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If Mr. Barnett, on further cross-examination, admits making such statements, the testimony of the other witnesses, Mark Mitchell, Doris Sims and Ioinda Coleman, is not needed under Rule 403 because his undisputed testimony admitting this would make their testimony cumulative and a waste of time. If Mr. Barnett denies making the statement, then these statements are admissible to impeach Mr. Barnett's credibility as well as evidence in chief on Petitioner's contentions as to what he claims he was and was not told by Mr. Barnett.[18] Unlike many out of court statements that are excludable under Fed. R. Evid. 802 as hearsay, these statements are not being proffered for the truth of their content, but rather to demonstrate that Mr. Barnett made statements to Mitchell, Doris Sims and Coleman consistent with the similar statements Plaintiff alleges were made to him and the statements to these three individual are such that it is not likely that Mr. Barnett would have made them after September 7, 1999, if he had received the faxed Rule 11 agreement with its recommended 210 months minimum

2006 WL 8435527

sentence and had discussed it with Petitioner or had done his own Sentencing Guideline calculations.

 **\*9**  Nor are these statements to Mitchell, Doris Sims and Coleman excludable because of the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay. The testimony is brief and the fact finder is an experienced jurist. While it could be asserted the statements are self-serving in some regard to help a relative or friend, in the present case that issue should go to the weight to be given the evidence and not to the admissibility of the statements.[19]

The statements Mr. Barnett allegedly made to Petitioner's aunt, Lakita Miller, that he would win the trial and Petitioner would not spend any time in prison, is not consistent with any statements that Petitioner claims Mr. Barnett told him. Again the facts of this case indicate (I.) a DEA Special Agent recording of a February 25, 1997, telephone conversation of CI Jones arranging to meet Petitioner at 1469 Atkinson Street with a followup monitoring of Jones meeting and giving Petitioner $3,000 for a narcotics debt and receiving from Petitioner a kilogram of cocaine on consignment; (ii.) another recorded call and monitoring of a $3,000 drug debt payment to Petitioner on March 7, 1997; and (iii.) Petitioner's co-defendant friend, and later wife, agreeing to testify that he called her on March 11, 1997, and told her to "take that stuff out [of] the stove and put it in [a bag]" which the agents seized and found to contain two kilograms of cocaine and at least one bag of crack. While C/I Jones may have died and the two calls and drug pay-offs as well as the fronted kilogram of cocaine would have to be established by the DEA agent, this is not a case on which any reasonable defense counsel would likely assure anyone that "we are going to win." Regardless of whether he said this to Lakita Miller, there is no foundation laid or proffered for its relevance unless Petitioner claims Mr. Barnett told him the same or a similar thing to induce him to go to trial. Mr. Barnett has testified that he consistently told Petitioner that this was a case he could win or lose. Petitioner in his affidavit and § 2255 motion makes no contrary assertion that Mr. Barnett ever told him he would win the trial and would not spend any time in prison. Thus, unlike the prior consistent statements Mr. Barnett allegedly made to Mitchell, Doris Sims and Coleman that make "more probable" the fact that Mr. Barnett did not receive the Rule 11 agreement, and/ or that he did not discuss it or any independently calculated

Sentencing Guideline figures with Petitioner (as Petitioner contends is the case), anything Mr. Barnett may have said to Lakita Miller is not relevant to confirm anything Petitioner alleges he was told by Mr. Barnett. In the absence of such an assertion by Petitioner that Mr. Barnett told him similar things to induce him to go to trial, this asserted statement to Lakita Miller by Mr. Bennett is too remote to make more probable any contentions in dispute, and as such it is not relevant under Rule 401.

## VII. **Recommendation**

 **\*10**  For the reasons stated above, It Is Recommended that at the continued hearing, unless the attorneys can agree to an acceptable written stipulation as to Mr. Barnett's testimony, Petitioner's counsel be allowed to continue cross-examination of Mr. Barnett regarding the purported statements he made to Mark Mitchell and to Doris Sims and Ioinda Coleman and if Mr. Barnett denies making any of the alleged statements or if he cannot recall any such statements that Petitioner's counsel be allowed to call and examine Mark Mitchell, Doris Sims and Ioinda Coleman on these statements. It Is Further Recommended that in the absence of a suitable foundation, no questions be asked of Mr. Barnett regarding Lakita Miller nor any testimony be taken from her.

Any objections to this Report and Recommendation must be filed within ten (10) days of its service. 28 U.S.C. § 636(b)(1); E.D. Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ivey v. Wilson*, 832 F.2d 950, 957-58 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

## All Citations

Not Reported in Fed. Supp., 2006 WL 8435527

Footnotes

---

Sims v. United States, Not Reported in Fed. Supp. (2006)

2006 WL 8435527

1    Petitioner was convicted and sentence for one count of distribution of a controlled substance, one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and two counts of aiding and abetting in the possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The evidence in the case was simple and straightforward. On February 25 1997, DEA Special Agent Daniel Krause February 25, 1997, recorded a telephone conversation in which cooperating individual Jeff Jones ("CI") arranged to meet Petitioner at 1469 Atkinson Street where Jones paid Petitioner $3,000 in prerecorded funds for a narcotics debt and received a kilogram of cocaine on consignment. On March 7, 1997, Jones arranged in another recorded telephone conversation to make a $3,000 payment to Petitioner at 19972 Hawthorne Street.

Krause then obtained search warrants for the Atkinson and Hawthorne addresses and planned to arrest Petitioner. On March 11, 1997, in yet another recorded telephone conversation, Jones arranged to meet Petitioner at 19972 Hawthorne Street at around 4:30 p.m. At 4:45 p.m. Krause and his team executed the search warrant at the Hawthorne address, but did not find any drugs, money, or the Petitioner. At about this time, co-defendant Sonya L. Thomas testified Petitioner called her at 1469 Atkinson Street and told her to "take that stuff out [of] the stove and put it in [a bag]." She placed the contents of the stove in a backpack, left the house, and started to drive away. Informed that someone was leaving the Atkinson address, Krause directed agents to stop Thomas. Thomas's backpack was later found to contain two kilograms of cocaine and at least one bag of crack that she had removed from the stove at Petitioner's directions.

*United States. v. Sims.* 46 Fed.Appx. 807, at 809-810, 2002 WL 31012124,1 (6th Cir. 2002).

*UnitedStates v. Sims,* 113 F.Supp. 2d 1130, 1131 (E.D. Mich., 2000).

2    Apparently AUSA Davis in Petitioner's presence at his October 11, 2000, sentencing described her efforts to achieve a pretrial settlement and to facilitate that she held off filing the Sentencing Enhancement information until March 13, 2000, (Dkt. #82) shortly before he beginning of the trial on March 16, 2000.

3    Michigan Rule of Professional Conduct 1.4(a) on Communications, made applicable to attorneys practicing in this Court by LR 83.22(b), directs that "A lawyer shall notify the client promptly of all.... proposed plea bargains" and after adequate consultation abide by the client's decision under Rule 1.2(a).

Mich. Rules of Prof'l Conduct 1.4(a) (1988).

ABA Standards for Defense Function, Standard 4-5.2 Control and Direction of the Case:

   (a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel include:

      (i.) what pleas to enter;

      (ii) whether to accept a plea agreement;

      (iii) whether to waive jury trial;

      (iv) whether to testify in his or her own behalf; and

      (v) whether to appeal.

ABA Standards for Criminal Justice: *Defense Function*, 4-5.2 (3d ed. 1993).

4    *Strickland v. Washington*, 466 U.S. 668 (1984).

5    Petitioner was arraigned April 13, 1999, on first indictment (Dkt. # 11) and March 6, 2000, on Superceding Indictment (Dkt. # 77).

6    Ms. Thomas entered into a Rule 11 plea to use of a communication facility in furtherance of a controlled substance felony, in violation of 21 U.S.C. § 843(b), on February 25, 2000. Petitioner's Sentence Enhancement Information was filed March 13, 2000 (Dkt. # 82), and his trial began March 16, 2000.

7    Petitioner's current counsel indicates that the subpoena was delivered to Mr Barnett's office receptionist on Monday, August 15, 2005, at 2:00 PM, prior to the August 18 evidentiary hearing (Exhibit 1 to Petitioner's September 12, 2005, Memorandum on the current motion (Dkt. # 168) ).

8    Mr. Royal's affidavit at ¶ 6 does make it clear that the cover letter and documents in Petitioner's file do not list the Rule 11 Agreement nor include it among the documents received.

9    While government counsel objects to enforcement of the subpoena, Mr. Barnett, who has standing to do so, has not objected. "A motion to quash, or for a protective order, should be made by the person from whom the documents or things are requested. ***Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action*** [footnote omitted] unless the party claims some personal right or privilege with regard to the documents sought. [emphasis supplied & footnotes omitted]" Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2459 (1995), cited in *Mann v. University of Cincinnati*, 1997 U.S. App. LEXIS 12482, 12-13 (6th Cir. 1997). See also *De Boer Structures (U.S.A.) v. Shaffer Tent & Awning Co.*, 2002 U.S. Dist. LEXIS 23816, 6-7 (D. Ohio 2002).

2006 WL 8435527

10    Petitioner hopes to get his sentence vacated, or at least reduced from 262 months to 210 months. Mr. Barnett has an interest in avoiding a finding that a lost document in his office or his failing to discuss it adequately with his client constituted ineffective assistance of counsel and tarnish a formerly unblemished record.

11    In *Ramos v. Liberty Mut. Ins Co.*, 615 F. 2d 334 (5th Cir. 1980), an action arising out of the collapse of a mast of an offshore oil-drilling rig, the Fifth Circuit found it an error under Fed. R. Evid. 401 and 403 for the lower court to exclude evidence of a similar collapse of a mast of an offshore oil-drilling rig two years earlier where nothing in the record indicated its admission would result in unfair prejudice. In addition to the evidence being relevant to manufacturer's notice of a defect, and its ability to correct the defect, the court found the prior similar collapse relevant to the mast's safety under foreseeable conditions, the strength of the mast and causation (*Id.* at 339).

12    In a case where there was serious doubt whether plaintiff produced sufficient evidence from which a jury could reasonably infer that an "accident" occurred within the purview of the Warsaw Convention, the Second Circuit reversed a district court ruling in plaintiff's favor and noted that under Fed. R. Evid. 401 proof of absence of other claims by other passengers tended to prove absence of other injuries and was comparably relevant to plaintiff's injuries being proof of an accident. Thus the evidence of no other claims—no prior similar circumstances—should be admitted, despite the possibility that other persons might have sustained injuries without filing claims, which possibility affected the weight rather than admissibility of the evidence. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3rd Cir. 1978).

The Court reasoned:

> The proffered proof of an absence of other claims tends to prove the absence of other injuries and is, therefore, comparably relevant. The possibility that persons may have sustained injuries without filing claims should not prevent the admission of pertinent evidence, and its negative aspect merely goes to the weakness and weight of such evidence rather than its admissibility. Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it tends to make the existence of a fact more probable or less probable than it would be without the evidence. If *other claims had been made against KLM, evidence of those claims would have been relevant to make the existence of an accident more probable. Proof of the absence of claims, though not carrying as much weight, makes the existence of the fact of the "accident" less probable than it would be without the evidence.* We believe it was error to have excluded it. See *Becker v. American Airlines, Inc.*, 200 F.Supp. 243 (S.D.N.Y. 1961); cases cited in Annot. 31 A.L.R.2d 190 (1953 Supp.); C. McCormick, Law of Evidence s 200 (2d ed. 1972).

(Emphasis supplied).

13    The district court did not abuse its discretion in granting defendant a new trial on one count for causing death of another in course of using a firearm and on one count of use of a firearm in furtherance of a marijuana distribution conspiracy, on basis that, inter alia, uncorroborated testimony of government witness identifying defendant as the shooter was contrary to the witness's statement to police immediately after the shooting that he did not know who the shooter was and to his similar statement a few days later to a police detective, and that he changed his story only after his girlfriend discussed the potential benefits he could receive in exchange for his identification of the shooter. Fed. R. Crim.P. 33.

*United States. v. Robinson*, 303 F.Supp.2d 231 (N.D.N.Y., 2004).

14    The residual hearsay exception under Fed. R. Evid. Rule 807 should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice; circumstantial guarantees of trustworthiness are those that existed at the time the statement was made and do not include those that may be added by hindsight.

To be admissible under the residual hearsay exception under Fed.R. Evid. 807, each single declaration or remark of narrative must have particularized guarantees of trustworthiness, must relate to material fact, must be the most probative evidence reasonably available, and its admission must further the purposes of Federal Rules of Evidence and the interests of justice. *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995).

District courts have considerable discretion in applying the residual exception to the hearsay rule; factors considered in determining whether to apply the residual exception are the declarant's disinterest, declarant's motivation to lie, whether the statement was made under oath, declarant's probable motivation, extent of declarant's personal knowledge, probable accuracy of the witness' recounting of the declarant's statement, witness' knowledge of the statement's contents, declarant's age and character for truthfulness and honesty, **frequency with which declarant has made similar statements**, whether declarant recanted the statement, the statement's temporal proximity to the event related, and corroborative evidence. *Amcast Indus. Corp. v. Detrex Corp.*, 779 F.Supp. 1519, 1529, (N.D. Ind. 1991) (citations omitted), *affirmed in part, reversed in part on other grounds*, 2 F.3d 746 (7 Cir. 1993) (Emphasis supplied).

*United.States v. Vretta*, 790 F.2d 651, 659 (7th Cir. 1986), noted:

2006 WL 8435527

A trial judge has considerable discretion, within the parameters of the rules of evidence, in determining whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness. See *United States v. Howard*, 774 F.2d 838, 845 (7th Cir. 1985); *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir. 1979). In this case, **Hauser told a number of people about Vretta's threats toward him, thus lending credibility to the fact that Hauser made the statements concerning the threats.** *See Howard*, 774 F.2d at 845 (noting that the **defendant made the same statement "not only once, but twice" to witnesses).**

(Emphasis supplied).

15    Corroboration of witness by prior consistent statements; Recent contrivance:

If it appears that the purpose of counsel for the other party is to show that the story as told by the witness is a recent invention, or that the witness is laboring under strong bias, or is under the influence of others, the party calling the witness, in order to rebut these inferences, **may show that the witness made similar statements shortly after the event testified to, or at a time when the witness was free from the alleged bias or undue influence.**

MAPOC EVIDENCE § 92:3 (Emphasis supplied).

16    (1) If the fact asserted is true, what other facts are likely to have occurred, and (2) the opposite logical proposition, if the fact asserted is untrue, what other facts are likely to be true.

17    While counsel for the government has suggested some plausible reasons why a defense counsel would not speak candidly with certain relatives of a client, such suggestions would be arguments going to the weight of the evidence, and not preclude the evidence's admissibility. In addition, the wisdom of the adversary system has traditionally been to develop such evidence from witness testimony and not from speculation by counsel, and the record in the present case is not complete on Mr. Barnett's responses. Yet, the relevance of the proffered statements to Mitchell, Doris Sims and Coleman is the fact that it is counterintuitive that a defense counsel who did not want to speak with non-client relatives would provide *incorrect* information to them instead of a panoply of truthful but avoiding responses such as "I can't say", "I'd rather not speculate", or "I need to check with my client before talking in depth with you about his case."

18    If Mr. Barnett cannot recall whether he did or did not make these statements to Mitchell or to Doris Sims and Coleman, then they would need to testify, not as impeachment witnesses, but to establish that the statements were made, which would be relevant evidence to the disputed issues in this hearing.

19    **As noted in McCormick on Evidence** § 274:

**[S]elf-serving statements are not categorically excluded under the Federal Rule. More generally, trial courts are not empowered, except as specifically authorized by the hearsay rules, to exclude statements because of judicial doubts about credibility. See Advisory Committee Introductory Note: The Hearsay Problem, 56 F.R.D. 183, 290** ("For a judge to exclude evidence because he does not believe it has been described as 'altogether atypical, extraordinary,' " (quoting Chadbourn, Bentham and the Hearsay Rule—A Benthamic View of Rule 63(4)(c) of the Uniform Rules of Evidence, 75 Harv.L.Rev. 932, 947 (1962) ) ). Second, **Rule 403 grants authority to exclude statements of questionable probative value.** Through this rule, the self-serving nature of the statement, **in combination with other factors indicating questionable value**, may provide a basis for exclusion." MCMK—EVID § 274 (Emphasis supplied).

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

109 Fed. R. Evid. Serv. 376

2019 WL 2028367
United States District Court, D. Utah.

Kelly STAPLEY, Plaintiff,

v.

MINNESOTA LIFE
INSURANCE CO., Defendant.

Case No. 2:17-cv-653
|
Signed 05/08/2019

**Attorneys and Law Firms**

J. Angus Edwards, Jones Waldo Holbrook & McDonough, Salt Lake City, UT, for Plaintiff.

Ann-Martha Andrews, Ogletree Deakins Nash Smoak & Stewart PC, Phoenix, AZ, Jason M. Kerr, Price Parkinson & Kerr PLLC, Salt Lake City, UT, for Defendant.

**MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART MOTION TO EXCLUDE TESTIMONY OF DR. ROTHFEDER**

Clark Waddoups, United States District Judge

**\*1** Before the court is Defendant Minnesota Life Insurance Co.'s Motion to Exclude Testimony of Dr. Robert Rothfeder (ECF No. 32). The motion has been fully briefed, and the court heard argument on the same on April 17, 2019. Having reviewed the pleadings and materials submitted and considered the arguments of counsel, the court now enters this order **DENYING IN PART AND GRANTING IN PART** Defendant's motion.

**BACKGROUND**

Plaintiff is the daughter of the late Conrad Jahries. (ECF No. 2, at ¶ 1, Compl.) Mr. Jahries died in his home on October 17, 2015, at the age of 84. *Id.* at ¶ 5. His body was found by his hospice nurse, Penny Johnson, who is now deceased. Nurse Johnson reported that she found Mr. Jahries "in the doorway to his bathroom ... with his head against the door jam [sic]" and with "copious amounts of dried blood coming from his mouth and nose." (ECF No. 32-3.) No one witnessed

Mr. Jahries's death, and an autopsy was not performed on his body. On Mr. Jahries's death certificate, his cause of death was attributed to a stroke. (ECF No. 33-7.)

Mr. Jahries was the owner of an accidental death and dismemberment insurance policy (the "Policy"), which Defendant sold to him. (ECF No. 2, at ¶ 6, Compl.) Plaintiff is the beneficiary of the Policy. The Policy states that Defendant will only provide benefits "when the insured's loss results directly—and independently—from all other causes, from an accidental bodily injury which was unintended, unexpected and unforeseen." (ECF No. 33-2, at p. 4.) The Policy further states that "[t]he bodily injury must be evidenced by a visible contusion or wound" and that it "must be the sole cause of the insured's loss." *Id.* The Policy excludes payment "where the insured's loss or injury is caused directly or indirectly by, results from, or there is contribution from ... bodily or mental infirmity, illness or disease ...." *Id.* at p. 5.

Plaintiff made a claim under the Policy. By letter dated May 25, 2016, Defendant denied Plaintiff's claim because Mr. Jahries's death was "caused directly or indirectly by, resulted from or there was contribution from bodily or mental infirmity, illness or disease." (ECF No. 33-10, at p. 2.) Defendant's denial letter further stated that it had not been provided any information to support the conclusion that Mr. Jahries's death resulted from an accidental bodily injury. *Id.* On March 17, 2017, Plaintiff, through her counsel, sent Defendant a letter appealing its denial and offering evidence to support her assertion that Mr. Jahries's death was the result of an accidental bodily injury. (ECF No. 33-12.) Enclosed with this letter were: 1) a statement prepared by Nurse Johnson, stating that she found Mr. Jahries "in the doorway to his bathroom ... with his head against the door jam [sic]" and with "copious amounts of dried blood coming from his mouth and nose" and a letter written by Dr. Rothfeder, stating that it was his "medical opinion in this matter is that Mr. Jahries suffered a slip and fall ambulating to the bathroom, blunt cranial trauma, and a fatal traumatic brain injury" and that he "found no evidence that any of Mr. Jahries' [sic] chronic medical conditions contributed in any way to his sudden death." *Id.*

**\*2** Defendant received and reviewed Mr. Jahries's medical records and referred the file to its own doctor, Dr. Dennis Lee. Dr. Lee opined that the available records were both "consistent and supportive" of the cause of death listed on the death certificate (a stroke) and "supportive of a medical event that cause[d] Mr. Jahries to collapse and be later found

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1201 Filed 04/05/21 Page 122 of 139

Sims v. United States, Not Reported in Fed. Supp. (2006)

2006 WL 8435527

M

2006 WL 8435527
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Deshawn SIMS, Petitioner,

v.

UNITED STATES of America, Respondent.

Civil No. 04-70474
|
Crim. No. 99-80102
|
Signed 01/18/2006

**Attorneys and Law Firms**

Elizabeth A. Stafford, Kevin Mulcahy, U.S. Attorney's Office, Detroit, MI, for Respondent.

**Report and Recommendation**

Steven D. Pepe, United States Magistrate Judge

### I. **Background**

**\*1** Petitioner Deshawn Sims was convicted on four drug-related counts on March 24, 2000. On October 11, 2000, he was sentenced to 262 months imprisonment.[1] On September 6, 2002, his conviction and sentence was affirmed by the Sixth Circuit. On February 10, 2004, he filed a motion under 28 U.S.C. § 2255 to vacate his conviction or to correct his sentence claiming ineffective assistance of counsel and requesting an evidentiary hearing, which was provided by Judge Feikens on August 18, 2005.

His § 2255 motion asserts, among other things, that his trial attorney, Marvin Barnett, was ineffective in his representation by failing to explain Petitioner's sentencing exposure of 210-262 months in prison and specifically in failing to inform him of a Rule ll plea offer with a sentence recommendation of 210 months. Petitioner claims he would not have gone to trial had he known of the plea offer and sentencing exposure. He asserts that the reason Barnett never told him was because Barnett was determined to take this case to trial in order to justify the "exorbitant" fee he charged Petitioner.

**\*2** In a February 11, 2004, affidavit supporting his § 2255 motion, Petitioner contends that his attorney, Mr. Marvin Barnett, never had a "serious discussion" with him concerning settlement of the case or the possibility of settling the case by a plea (*Id.* at ¶ 2). He noted further that Mr. Barnett never told him the AUSA (Margaret E. Davis) was pursuing a negotiated settlement, nor told him of any proposals (*Id.* at ¶ 8-9).[2] He contends that he believes a Rule 11 Plea Agreement was made by the AUSA, but he was never told of it, never had it explained nor shown to him (*Id.* at ¶ 11). Nor was he informed of the significance of a Notice of Sentence Enhancement and its effect on his sentence (*Id.* at ¶ 8). When he asked Mr. Barnett about his likely sentencing if he were convicted, he states that Mr. Barnett told him he "would likely receive a sentence of '90 something' months" (*Id.* at ¶ 4). He contends that the Federal Sentencing Guidelines were never explained to him and was never told what his sentencing range would be if he was convicted or if he pled guilty. Before trial, Petitioner never knew that it was possible he could receive a sentence of 262 months on each count (*Id.* at ¶ 6).

Government's Exhibit E opposing Petitioner's § 2255 motion is a facsimile transmission cover sheet from AUSA Davis to Mr Barnett on September 7, 1999, with a draft proposed Rule 11 Plea Agreement recommending a maximum sentence of 210 months in exchange for a plea to count one of the indictment: knowingly and intentionally distributing a controlled substance on February 25, 1997, involving approximately one kilogram of cocaine to a DEA confidential informant (Government Exhibit E to its May 24, 2005, Opposition to § 2255 Motion).

Exhibit 2 to Petitioner's September 12, 2005, Memorandum on the current motion (Dkt. # 168) is a September 8, 2005, affidavit from Petitioner's current counsel stating that: (1) he first became aware of this document when he received the government's May 24, 2005, Opposition; (2) in preparation for Petitioner's appeal he received Petitioner's file from Mr. Barnett's office on or about December 6, 2000, with a cover letter listing the contents; (3) he has maintained the file unaltered since that time; and (4) neither the cover letter nor the file contain Exhibit E or any reference to it.

On August 18, 2005, Judge Feikens held an evidentiary hearing regarding Petitioner's claims of ineffective assistance of counsel made in his § 2255 petition. At that hearing, Petitioner's current counsel sought to cross examine attorney Marvin Barnett about certain conversations he had with some of Petitioner's relatives and a friend. He had these

2006 WL 8435527

individuals, Mack Mitchell, Doris Sims, Ilinda Coleman and Lakita Miller, available as potential witnesses. In order to support his claim that he was never informed about any Rule 11 plea agreement or of his potential sentencing guideline exposure to 262 months, Petitioner wants to present witnesses who will testify that (1) Barnett told them there was no plea offer, when in fact the government had offered a plea; (2) Barnett told them Petitioner's maximum sentence was ten years, when in fact his maximum was more than twice that and that he thought Petitioner might prevail.

After adjourning the evidentiary hearing for supplemental briefing on this evidentiary issue, and receiving such briefing, Judge Feikens on November 17, 2005, referred the question of the relevance of these four witnesses for a report and recommendation. A copy of the August 18, 2005, evidentiary hearing was provided in December, which along with the briefs the parties filed has been reviewed.

## II. **Legal Standard**

Fed. R. Evid. 401 defines relevant evidence as: "Evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In considering such probabilities it is often useful to ask two questions: (1) If the fact asserted is true, what other facts are likely to have occurred, and (2) the opposite logical proposition, if the fact asserted is untrue, what other facts are likely to be true.

## III. **The Disputed Issues**

**\*3**  To determine the parameters of relevant evidence, a court must first identify the material disputed facts "of consequence" that are asserted as true. In the present case, the contested material issues of fact include: (1) whether Mr. Barnett received the faxed Rule 11 agreement; and the related question of (2) whether he met with Petitioner and discussed it and its 210 months recommended sentence; (3) whether he told Petitioner that, if convicted, he would likely receive " '90 something' months"; (4) whether he told Petitioner about the Federal Sentencing Guidelines and what his sentencing range would be if convicted or if he pled guilty; and (5) whether he told Petitioner about the significance of the Sentence Enhancement information and its effect on his sentence.

These are material facts because, at a minimum, if the Court finds that defense counsel did not discuss with his client a Rule 11 plea agreement that was faxed to his office, that

would establish ineffective assistance of counsel[3] under the first prong of the *Strickland*[4] test. If the Court determines it probable that it would have accepted the 210 month recommended sentence if Petitioner had accepted the Rule 11 proposal, the prejudice prong of *Strickland* is established.

## IV. **The Existing Evidence and Contentions:**

While Petitioner has not yet testified, he claims in his motion and supporting affidavit that Mr. Barnett never had serious discussions about a settlement; indicated that if convicted he would likely get a sentence of 90 some months; did not see, know about or have explained to him any Rule 11 Plea proposal, nor any likely Sentencing Guidelines ranges if he pled or was found guilty. He asserts that he never knew he faced a sentence of 262 months, and that had he known of the sentence, after his wife decided to testify against him he would have accepted any proposed Rule 11 plea agreement under the Sentencing Guidelines that did not include the sentence enhancement.

Mr. Barnett submitted a signed but unnotarized affidavit acknowledging that he had no recollection as to whether or not a Rule 11 plea agreement was sent ("mailed") to his office from the U.S. Attorney in Petitioner's case. The statement adds that he has a business practice of always discussing with every criminal client the charges and possible penalties that could occur and "did most certainly discuss the same with Mr. Sims." The statement also states that he has a business practice of always discussing with every criminal client any Rule 11 plea agreement, and if one was sent ("mailed") to his office in Petitioner's case "then I would have most certainly discussed it with him" (Government Exhibit E to its May 24, 2005, Opposition to § 2255 Motion).

At the August 18, 2005, evidentiary hearing, Mr. Barnett testified that his firm, Marvin Barnett and Associates PC, is one of the largest law firms in Michigan (August 18, 2005, transcript of Marvin Barnett, at p. 12). Mr. Barnett practices civil rights litigation involving police abuse and he handles over a hundred criminal cases a year. Mr. Barnett says he has handled thousands over his 23 years of practice (*Id.* at 11-12). He has never been disciplined for failing to inform a client adequately nor had an ineffective assistance of counsel claim succeed against him (*Id.* at 16). He testified that when Petitioner signed the acknowledgment of indictment, he recalled having discussions with him over whether to plead guilty or go to trial, although he could not recall the specifics other than joking about the several million dollar fine (*Id.* at

17).[5] He later discussed it with Petitioner at his office when he met with co-defendant, Sonya Thomas (who apparently married Petitioner in 1999 (*Id.* at 50) ) and her attorney, Alicia Jones, but again could not recall the specifics. (*Id.* at 20). Ms. Thomas had entered a plea agreement, and agreed to testify against Petitioner (*Id.* at 20). The meeting with Mr. Barnett was to discuss the impact of that on Petitioner's case.[6] When asked what he told Petitioner about the strength of the government's case, Mr. Barnett responded that the government had problems with witness unavailability and a tape, but it was a case that could be won or lost, and while Ms. Thomas' plea agreement and involvement strengthened the government's case, he always thought it could be won or lost. (*Id.* at 21). He stated that he discussed the possible penalty after the sentence enhancement information was filed. (*Id.* at 22).

**\*4** When shown the draft Rule 11 agreement (Exhibit E) (which came from the government's file) Mr. Barnett said "I recall receiving it but I can't as to this specific document" (*Id.* at 25). He said he discussed it as well as the sentencing guidelines with Petitioner. He said Petitioner's reaction was "to go to trial under any and all circumstances" (*Id.*). He noted that Petitioner seemed upset about Mr Barnett bringing up possible resolution and was surprised Petitioner wanted to go to trial.

On cross examination, Mr. Barnett noted that after being told about Petitioner filing his § 2255 motion, he had not checked to see if he had retained any documents on Petitioner's case, nor did he recall if anyone in his office had done so (*Id.* at 30-32). When asked if Mr. Barnett had received Petitioner's subpoena for his records he said he had not and had brought no records.[7] Regarding Government's Exhibit E, he had seen it the day before, and it seemed that he had seen it before but could not specifically recall. (*Id.* at 33). Regarding the earlier time he could not recall if he saw it at a meeting with the AUSA or had it faxed or delivered to his office. (*Id.* at 34.) When asked if he had made an effort to determine if he has a copy of Exhibit E in his office, Mr. Barnett responded by saying that he was not a record keeper but rather general counsel and that he had other people go through records. (*Id.*) He could recall that when the case was over "I remember gathering up that entire file and making sure that Counsel John Royal and his representative had it. (*Id.* at 34-35). He could not stipulate that Exhibit E was not among those records sent to Petitioner's counsel (as Mr. Royal's September 8, 2005, affidavit asserts). (Exhibit 2 to Petitioner's September 12, 2005, Memorandum on the current motion (Dkt. # 168) ). He

also could not deny or dispute that Exhibit E was faxed to his office on September 7, 1999, as the cover sheet notes, but he responded stating: "I have no personal knowledge, Mr. Royal. I'm not trying to be difficult but things come to my office such as your subpoena and I don't see everything that comes to my office, I'm not denying anything or admitting anything, I just don't know" (*Id.* at 35).

Mr. Barnett's undated and unnotarized statement (Government Exhibit E to its May 24, 2005, Opposition to § 2255 Motion) was identified, acknowledged as true and admitted (*Id.* at 41-42). He could not recall if any Rule 11 agreement regarding Petitioner was discussed with Petitioner at the meeting of Mr. Barnett, Petitioner, Ms. Thomas and Ms. Jones after Mr. Thomas had agreed to testify (*Id.* at 46). Mr. Bennett also could not recall prior to trial making any notes regarding sentencing guideline calculations for Petitioner if he were to be convicted at trial (*Id.* at 47-48). If he made them they would likely have gone into Petitioner's file, although sometimes Mr. Barnett throws them away. He could not recall the specifics of what he told Petitioner regarding sentencing, but it would have been either what the guidelines required or what the Rule 11 agreement called for (*Id.*). Mr. Barnett was not allowed to respond to the question as to his defense strategy once he knew Sonya Thomas was going to testify against Petitioner (*Id.* at 49). Mr Barnett said he did not recall Mack Mitchell coming to his office shortly after Petitioner married Ms. Thomas and asking if the government had offered a plea agreement to Petitioner. He was asked if he told Mr. Mitchell that Petitioner was not facing any more than 10 years (*Id.* at 51). The government objected to these questions and those related to other witnesses on the grounds of relevance (*Id.* at 50–52).

## V. **Analysis of The Existing Evidence and Contentions:**
**\*5** Again, the central issues in dispute relevant to this order of reference are (1) whether Mr. Barnett received the faxed September 7, 1999, Rule 11 agreement; the related question of (2) whether he met with Petitioner and discussed it and its 210 months recommended sentence; (3) whether he told Petitioner that, if convicted, he would likely receive " '90 something' months"; (4) whether he told Petitioner about the Federal Sentencing Guidelines and that his sentencing range could exceed 20 years if convicted or 210 months if he pled guilty and the Rule 11 recommendation was accepted; and (5) whether he told Petitioner about the significance of the Sentence Enhancement information and its effect on his sentence.

Case 2:19-cv-12718-PDB-EAS  ECF No. 40, PageID.1204  Filed 04/05/21  Page 125 of 139

Sims v. United States, Not Reported in Fed. Supp. (2006)

2006 WL 8435527

The present state of the evidence indicates that Mr. Barnett is an extremely busy attorney handling civil rights police brutality cases and an excess of 100 criminal cases annually. Understandably, at the August 2005, hearing, he had no specific recollection of receiving the September 7, 1999, Rule 11 agreement faxed to his office from AUSA Davis. It was not listed as a document nor was it found in the Petitioner's files provided to Mr. Royal on or about December 6, 2000, (which Mr. Barnett contended at the hearing was the "entire file"). Mr. Barnett acknowledged "I don't see everything that comes to my office," noting as an example his not seeing the subpoena for Petitioner's file that had been delivered to Mr. Barnett's receptionist four days before the hearing. Mr. Royal's brief on this motion (but not his affidavit) contends that those documents he received for the appeal in December 2000 contained no reference to any settlement negotiations with the government[8] (Petitioner's September 12, 2005, Memorandum, Dkt. # 168, at p. 4).

The evidence indicates Mr. Barnett's general practice is to discuss charges and possible penalties with clients, which he was sure he did with Petitioner, and it is also his practice to discuss Rule 11 agreements, which he was sure he did *if* he received the Rule 11 agreement. The record, however, only contains information that Mr. Barnett talked with Petitioner about the charges and penalties and whether to plead at one or both arraignments when Petitioner signed the acknowledgment of the indictment (either April 13, 1999, or March 6, 2000, it is not clear which date). He again believes he talked about this issue of penalties and pleas when he and Petitioner met with co-defendant, Sonya Thomas and her attorney, Alicia Jones, sometime in early 2000 after Ms. Thomas decided to plead and cooperate. Again, Mr. Barnett could not recall specifics. The critical window of opportunity to accept the Rule 11 proposal was from the time it was made (September 7, 1999) until when the notice of Sentence Enhancement was filed (March 13, 2000).

Unfortunately, the record does not contain any notes from Mr. Barnett's file for Petitioner nor from Mr. Barnett's calendar indicating any other meetings with Petitioner in which me might have discussed pleas and potential penalties. Nor does the record contain any notes from Mr. Barnett's file showing any Sentencing Guideline calculations, any reference to the Rule 11 proposal, any discussions concerning pleading or going to trial, any indication of what warnings and risks were explained to Petitioner either before or after Petitioner's wife agreed to testify against him, nor any notes of Petitioner's choice, following such discussions, to go to trial. While

Petitioner's counsel's current briefing is seeking any such notes from Mr. Barnett's file asking this Court to enforce his August 15, 2002, subpoena for Mr. Barnett's records not formerly produced, that matter regarding the subpoena was not referred for report and recommendation.[9]

*6 Given (i.) the somewhat equivocal nature, (ii.) the lack of specifics and lack corroborative notes or other evidence regarding Mr. Barnett's testimony, (iii.) his admission that he does not always get documents that are delivered to his office, and (iv.) the clear conflict between his testimony and that of the Petitioner—(v.) as well as the fact that each might have a reason for a self serving memory[10]—the fact finding process would be served by any additional evidence that may assist in resolving the factual disputes in issue.

## VI. **Analysis of The Relevance of the Proffered Testimony of Petitioner's Witnesses:**

Petitioner wants to interrogate Mr. Barnett about, and if needed—as will be likely—call four witnesses:

(1) Petitioner's uncle, Mack Mitchell, will testify that during a meeting with Mr. Barnett in the fall of 1999, after the AUSA Davis draft Rule 11 agreement had been faxed to Mr. Barnett's office on September 7, 1999, he asked Mr. Barnett if the government offered Petitioner a plea deal, and Mr. Barnett replied that they had not. Also, Mitchell will testify that Mr. Barnett told him Petitioner's maximum sentence was ten years.

(2) Petitioner's mother, Doris Sims, and (3) a family friend, Ilinda Coleman both will testify that during the trial in March 2000, Barnett told them Petitioner's maximum sentence was ten years.

(4) Petitioner's aunt, Lakita Miller, will testify that during the trial Barnett told her that he would win the trial and Petitioner would not spend any time in prison.

As with similar circumstances evidence where prior similar events[11] or the lack thereof[12] have been deemed relevant and admissible evidence under Fed. R. Evid. 401, so too prior similar statements of a party or witness have, in certain contexts, been found relevant and admissible. Similar prior inconsistent statements strengthened evidence in a case for a new trial in *United States v. Robinson*, 303 F. Supp. 2d 231 (N.D.N.Y., 2004).[13] If, in the present case, Mr. Barnett is cross examined and denies telling anyone that there was

2006 WL 8435527

no plea agreement or denies telling anyone that if convicted Petitioner would likely receive a sentence of ten or fewer years, then any prior statements that there was no plea offer, or that Petitioner's sentence would be 10 years would be inconsistent. Alternatively, if the Court were to find that Mr. Barnett did get the Rule 11 proposal from AUSA Davis, then Mr. Barnett's testimony was that he discussed it and the 210–262 month range with Plaintiff. Again any prior statements that there was no plea offer, or that Petitioner's sentence would be 10 years would be inconsistent with this portion of Mr. Barnett's testimony. Thus, evidence of his inconsistent statements to Mack Mitchell, Doris Sims and Ilinda Coleman would, at a minimum, be relevant to impeach the uncorroborated testimony of Mr. Barnett. Yet, for reasons noted below, in addition to the statements made to Mitchell, Doris Sims and Coleman possibly being admissible as *prior inconsistent statements* to impeach Mr. Barnett, the consistency of these statements Mr. Barnett allegedly made to Mitchell, Doris Sims and Coleman with Petitioner's version of what Mr. Barnett told him makes these statements also admissible on the merits of the factual dispute between Petitioner and Mr. Barnett.

**\*7** Similar statements have been considered relevant in a Court's determination on trustworthiness and whether to admit evidence under Fed. R. Evid. 807, the residual hearsay exception.[14] Also, prior similar statements are considered relevant to counter an assertion that current testimony is a recent fabrication.[15]

**\*8** Thus, it is clear that statements allegedly made by Mr. Barnett to Mitchell, Doris Sims and Coleman being similar to those Petitioner contends Mr. Barnett made to him, are relevant. Using the Rule 401 relevancy syllogism noted above,[16] if it is true that Mr. Barnett *did not get the Rule 11* faxed on September 7, 1999, and *did not discuss it with Petitioner*, then it is more likely or "more probable" that he might have told others that there was no plea agreement. If, on the other hand, Mr. Barnett did receive the plea agreement offering 210 months imprisonment and if he did discuss it with Petitioner, then it is less likely he would have told anyone in the Fall of 1999 there was no plea agreement or that Petitioner's likely sentence was 10 years when the Rule 11 statement clearly said it would be a minimum of 210 months.

Similarly, if it is true that Mr. Barnett *did not do Sentencing Guideline calculations* and *did* suggest to Petitioner that he was facing under ten years in prison if convicted (" '90 something' months"), then it would be more likely or

more probable that Mr. Barnett might have told others that Petitioner, if convicted, was facing 10 years. If on the other hand Mr. Barnett did the Sentencing Guideline calculations accurately and did discuss the resulting sentencing range of 200+ months with Petitioner, then it is less likely Mr. Barnett would needlessly raise the expectations of Petitioner's relatives by telling them Petitioner likely faced roughly 50% of a realistic estimate on sentencing.[17]

Thus, the statements Mr. Barnett allegedly made to Mark Mitchell, Doris Sims and Ioinda Coleman are relevant to material issues in dispute because these statements, if credited, have a tendency to make it "more probable" under Rule 401 that Mr. Barnett did not receive the Rule 11 agreement, or did not discuss it or other accurate Sentencing Guidelines computations with Petitioner, and "more probable" that Mr. Barnett told Petitioner that, if convicted, he would get a sentence of "90 something." Thus, these statements would be admissible on the disputed questions under Fed. R. Evid. 402 unless otherwise excludable.

Fed. R. Evid 403 sets certain exceptions to admissibility:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

If Mr. Barnett, on further cross-examination, admits making such statements, the testimony of the other witnesses, Mark Mitchell, Doris Sims and Ioinda Coleman, is not needed under Rule 403 because his undisputed testimony admitting this would make their testimony cumulative and a waste of time. If Mr. Barnett denies making the statement, then these statements are admissible to impeach Mr. Barnett's credibility as well as evidence in chief on Petitioner's contentions as to what he claims he was and was not told by Mr. Barnett.[18] Unlike many out of court statements that are excludable under Fed. R. Evid. 802 as hearsay, these statements are not being proffered for the truth of their content, but rather to demonstrate that Mr. Barnett made statements to Mitchell, Doris Sims and Coleman consistent with the similar statements Plaintiff alleges were made to him and the statements to these three individual are such that it is not likely that Mr. Barnett would have made them after September 7, 1999, if he had received the faxed Rule 11 agreement with its recommended 210 months minimum

2006 WL 8435527

sentence and had discussed it with Petitioner or had done his own Sentencing Guideline calculations.

 **\*9** Nor are these statements to Mitchell, Doris Sims and Coleman excludable because of the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay. The testimony is brief and the fact finder is an experienced jurist. While it could be asserted the statements are self-serving in some regard to help a relative or friend, in the present case that issue should go to the weight to be given the evidence and not to the admissibility of the statements.[19]

The statements Mr. Barnett allegedly made to Petitioner's aunt, Lakita Miller, that he would win the trial and Petitioner would not spend any time in prison, is not consistent with any statements that Petitioner claims Mr. Barnett told him. Again the facts of this case indicate (I.) a DEA Special Agent recording of a February 25, 1997, telephone conversation of CI Jones arranging to meet Petitioner at 1469 Atkinson Street with a followup monitoring of Jones meeting and giving Petitioner $3,000 for a narcotics debt and receiving from Petitioner a kilogram of cocaine on consignment; (ii.) another recorded call and monitoring of a $3,000 drug debt payment to Petitioner on March 7, 1997; and (iii.) Petitioner's co-defendant friend, and later wife, agreeing to testify that he called her on March 11, 1997, and told her to "take that stuff out [of] the stove and put it in [a bag]" which the agents seized and found to contain two kilograms of cocaine and at least one bag of crack. While C/I Jones may have died and the two calls and drug pay-offs as well as the fronted kilogram of cocaine would have to be established by the DEA agent, this is not a case on which any reasonable defense counsel would likely assure anyone that "we are going to win." Regardless of whether he said this to Lakita Miller, there is no foundation laid or proffered for its relevance unless Petitioner claims Mr. Barnett told him the same or a similar thing to induce him to go to trial. Mr. Barnett has testified that he consistently told Petitioner that this was a case he could win or lose. Petitioner in his affidavit and § 2255 motion makes no contrary assertion that Mr. Barnett ever told him he would win the trial and would not spend any time in prison. Thus, unlike the prior consistent statements Mr. Barnett allegedly made to Mitchell, Doris Sims and Coleman that make "more probable" the fact that Mr. Barnett did not receive the Rule 11 agreement, and/or that he did not discuss it or any independently calculated

Sentencing Guideline figures with Petitioner (as Petitioner contends is the case), anything Mr. Barnett may have said to Lakita Miller is not relevant to confirm anything Petitioner alleges he was told by Mr. Barnett. In the absence of such an assertion by Petitioner that Mr. Barnett told him similar things to induce him to go to trial, this asserted statement to Lakita Miller by Mr. Bennett is too remote to make more probable any contentions in dispute, and as such it is not relevant under Rule 401.

## VII. **Recommendation**

 **\*10** For the reasons stated above, It Is Recommended that at the continued hearing, unless the attorneys can agree to an acceptable written stipulation as to Mr. Barnett's testimony, Petitioner's counsel be allowed to continue cross-examination of Mr. Barnett regarding the purported statements he made to Mark Mitchell and to Doris Sims and Ioinda Coleman and if Mr. Barnett denies making any of the alleged statements or if he cannot recall any such statements that Petitioner's counsel be allowed to call and examine Mark Mitchell, Doris Sims and Ioinda Coleman on these statements. It Is Further Recommended that in the absence of a suitable foundation, no questions be asked of Mr. Barnett regarding Lakita Miller nor any testimony be taken from her.

Any objections to this Report and Recommendation must be filed within ten (10) days of its service. 28 U.S.C. § 636(b)(1); E.D. Mich. LR 72.1(d)(2). Failure to file objections within the specified time constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ivey v. Wilson*, 832 F.2d 950, 957-58 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

## All Citations

Not Reported in Fed. Supp., 2006 WL 8435527

Footnotes

2006 WL 8435527

1    Petitioner was convicted and sentence for one count of distribution of a controlled substance, one count of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and two counts of aiding and abetting in the possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The evidence in the case was simple and straightforward. On February 25 1997, DEA Special Agent Daniel Krause February 25, 1997, recorded a telephone conversation in which cooperating individual Jeff Jones ("CI") arranged to meet Petitioner at 1469 Atkinson Street where Jones paid Petitioner $3,000 in prerecorded funds for a narcotics debt and received a kilogram of cocaine on consignment. On March 7, 1997, Jones arranged in another recorded telephone conversation to make a $3,000 payment to Petitioner at 19972 Hawthorne Street.

    Krause then obtained search warrants for the Atkinson and Hawthorne addresses and planned to arrest Petitioner. On March 11, 1997, in yet another recorded telephone conversation, Jones arranged to meet Petitioner at 19972 Hawthorne Street at around 4:30 p.m. At 4:45 p.m. Krause and his team executed the search warrant at the Hawthorne address, but did not find any drugs, money, or the Petitioner. At about this time, co-defendant Sonya L. Thomas testified Petitioner called her at 1469 Atkinson Street and told her to "take that stuff out [of] the stove and put it in [a bag]." She placed the contents of the stove in a backpack, left the house, and started to drive away. Informed that someone was leaving the Atkinson address, Krause directed agents to stop Thomas. Thomas's backpack was later found to contain two kilograms of cocaine and at least one bag of crack that she had removed from the stove at Petitioner's directions.

    *United States. v. Sims.* 46 Fed.Appx. 807, at 809-810, 2002 WL 31012124,1 (6th Cir. 2002).

    *UnitedStates v. Sims,* 113 F.Supp. 2d 1130, 1131 (E.D. Mich., 2000).

2    Apparently AUSA Davis in Petitioner's presence at his October 11, 2000, sentencing described her efforts to achieve a pretrial settlement and to facilitate that she held off filing the Sentencing Enhancement information until March 13, 2000, (Dkt. #82) shortly before he beginning of the trial on March 16, 2000.

3    Michigan Rule of Professional Conduct 1.4(a) on Communications, made applicable to attorneys practicing in this Court by LR 83.22(b), directs that "A lawyer shall notify the client promptly of all.... proposed plea bargains" and after adequate consultation abide by the client's decision under Rule 1.2(a).

    Mich. Rules of Prof'l Conduct 1.4(a) (1988).

    ABA Standards for Defense Function, Standard 4-5.2 Control and Direction of the Case:

      (a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel include:

        (i.) what pleas to enter;

        (ii) whether to accept a plea agreement;

        (iii) whether to waive jury trial;

        (iv) whether to testify in his or her own behalf; and

        (v) whether to appeal.

    ABA Standards for Criminal Justice: *Defense Function*, 4-5.2 (3d ed. 1993).

4    *Strickland v. Washington,* 466 U.S. 668 (1984).

5    Petitioner was arraigned April 13, 1999, on first indictment (Dkt. # 11) and March 6, 2000, on Superceding Indictment (Dkt. # 77).

6    Ms. Thomas entered into a Rule 11 plea to use of a communication facility in furtherance of a controlled substance felony, in violation of 21 U.S.C. § 843(b), on February 25, 2000. Petitioner's Sentence Enhancement Information was filed March 13, 2000 (Dkt. # 82), and his trial began March 16, 2000.

7    Petitioner's current counsel indicates that the subpoena was delivered to Mr Barnett's office receptionist on Monday, August 15, 2005, at 2:00 PM, prior to the August 18 evidentiary hearing (Exhibit 1 to Petitioner's September 12, 2005, Memorandum on the current motion (Dkt. # 168) ).

8    Mr. Royal's affidavit at ¶ 6 does make it clear that the cover letter and documents in Petitioner's file do not list the Rule 11 Agreement nor include it among the documents received.

9    While government counsel objects to enforcement of the subpoena, Mr. Barnett, who has standing to do so, has not objected. "A motion to quash, or for a protective order, should be made by the person from whom the documents or things are requested. ***Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action*** [footnote omitted] unless the party claims some personal right or privilege with regard to the documents sought. [emphasis supplied & footnotes omitted]" Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2459 (1995), cited in *Mann v. University of Cincinnati,* 1997 U.S. App. LEXIS 12482, 12-13 (6th Cir. 1997). See also *De Boer Structures (U.S.A.) v. Shaffer Tent & Awning Co.,* 2002 U.S. Dist. LEXIS 23816, 6-7 (D. Ohio 2002).

2006 WL 8435527

10    Petitioner hopes to get his sentence vacated, or at least reduced from 262 months to 210 months. Mr. Barnett has an interest in avoiding a finding that a lost document in his office or his failing to discuss it adequately with his client constituted ineffective assistance of counsel and tarnish a formerly unblemished record.

11    In *Ramos v. Liberty Mut. Ins Co.*, 615 F. 2d 334 (5th Cir. 1980), an action arising out of the collapse of a mast of an offshore oil-drilling rig, the Fifth Circuit found it an error under Fed. R. Evid. 401 and 403 for the lower court to exclude evidence of a similar collapse of a mast of an offshore oil-drilling rig two years earlier where nothing in the record indicated its admission would result in unfair prejudice. In addition to the evidence being relevant to manufacturer's notice of a defect, and its ability to correct the defect, the court found the prior similar collapse relevant to the mast's safety under foreseeable conditions, the strength of the mast and causation (*Id.* at 339).

12    In a case where there was serious doubt whether plaintiff produced sufficient evidence from which a jury could reasonably infer that an "accident" occurred within the purview of the Warsaw Convention, the Second Circuit reversed a district court ruling in plaintiff's favor and noted that under Fed. R. Evid. 401 proof of absence of other claims by other passengers tended to prove absence of other injuries and was comparably relevant to plaintiff's injuries being proof of an accident. Thus the evidence of no other claims—no prior similar circumstances—should be admitted, despite the possibility that other persons might have sustained injuries without filing claims, which possibility affected the weight rather than admissibility of the evidence. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3rd Cir. 1978).

The Court reasoned:

> The proffered proof of an absence of other claims tends to prove the absence of other injuries and is, therefore, comparably relevant. The possibility that persons may have sustained injuries without filing claims should not prevent the admission of pertinent evidence, and its negative aspect merely goes to the weakness and weight of such evidence rather than its admissibility. Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it tends to make the existence of a fact more probable or less probable than it would be without the evidence. If **other claims had been made against KLM, evidence of those claims would have been relevant to make the existence of an accident more probable. Proof of the absence of claims, though not carrying as much weight, makes the existence of the fact of the "accident" less probable than it would be without the evidence.** We believe it was error to have excluded it. See *Becker v. American Airlines, Inc.*, 200 F.Supp. 243 (S.D.N.Y. 1961); cases cited in Annot. 31 A.L.R.2d 190 (1953 Supp.); C. McCormick, Law of Evidence s 200 (2d ed. 1972).

(Emphasis supplied).

13    The district court did not abuse its discretion in granting defendant a new trial on one count for causing death of another in course of using a firearm and on one count of use of a firearm in furtherance of a marijuana distribution conspiracy, on basis that, inter alia, uncorroborated testimony of government witness identifying defendant as the shooter was contrary to the witness's statement to police immediately after the shooting that he did not know who the shooter was and to his similar statement a few days later to a police detective, and that he changed his story only after his girlfriend discussed the potential benefits he could receive in exchange for his identification of the shooter. Fed. R. Crim.P. 33.

*United States. v. Robinson*, 303 F.Supp.2d 231 (N.D.N.Y., 2004).

14    The residual hearsay exception under Fed. R. Evid. Rule 807 should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice; circumstantial guarantees of trustworthiness are those that existed at the time the statement was made and do not include those that may be added by hindsight.

To be admissible under the residual hearsay exception under Fed.R. Evid. 807, each single declaration or remark of narrative must have particularized guarantees of trustworthiness, must relate to material fact, must be the most probative evidence reasonably available, and its admission must further the purposes of Federal Rules of Evidence and the interests of justice. *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995).

District courts have considerable discretion in applying the residual exception to the hearsay rule; factors considered in determining whether to apply the residual exception are the declarant's disinterest, declarant's motivation to lie, whether the statement was made under oath, declarant's probable motivation, extent of declarant's personal knowledge, probable accuracy of the witness' recounting of the declarant's statement, witness' knowledge of the statement's contents, declarant's age and character for truthfulness and honesty, **frequency with which declarant has made similar statements**, whether declarant recanted the statement, the statement's temporal proximity to the event related, and corroborative evidence. *Amcast Indus. Corp. v. Detrex Corp.*, 779 F.Supp. 1519, 1529, (N.D. Ind. 1991) (citations omitted), *affirmed in part, reversed in part on other grounds*, 2 F.3d 746 (7 Cir. 1993) (Emphasis supplied).

*United.States v. Vretta*, 790 F.2d 651, 659 (7th Cir. 1986), noted:

2006 WL 8435527

A trial judge has considerable discretion, within the parameters of the rules of evidence, in determining whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness. See *United States v. Howard*, 774 F.2d 838, 845 (7th Cir. 1985); *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir. 1979). In this case, **Hauser told a number of people about Vretta's threats toward him, thus lending credibility to the fact that Hauser made the statements concerning the threats.** *See Howard*, 774 F.2d at 845 (noting that the **defendant made the same statement "not only once, but twice" to witnesses.**

(Emphasis supplied).

15    Corroboration of witness by prior consistent statements; Recent contrivance:

If it appears that the purpose of counsel for the other party is to show that the story as told by the witness is a recent invention, or that the witness is laboring under strong bias, or is under the influence of others, the party calling the witness, in order to rebut these inferences, **may show that the witness made similar statements shortly after the event testified to, or at a time when the witness was free from the alleged bias or undue influence.**

MAPOC EVIDENCE § 92:3 (Emphasis supplied).

16    (1) If the fact asserted is true, what other facts are likely to have occurred, and (2) the opposite logical proposition, if the fact asserted is untrue, what other facts are likely to be true.

17    While counsel for the government has suggested some plausible reasons why a defense counsel would not speak candidly with certain relatives of a client, such suggestions would be arguments going to the weight of the evidence, and not preclude the evidence's admissibility. In addition, the wisdom of the adversary system has traditionally been to develop such evidence from witness testimony and not from speculation by counsel, and the record in the present case is not complete on Mr. Barnett's responses. Yet, the relevance of the proffered statements to Mitchell, Doris Sims and Coleman is the fact that it is counterintuitive that a defense counsel who did not want to speak with non-client relatives would provide *incorrect* information to them instead of a panoply of truthful but avoiding responses such as "I can't say", "I'd rather not speculate", or "I need to check with my client before talking in depth with you about his case."

18    If Mr. Barnett cannot recall whether he did or did not make these statements to Mitchell or to Doris Sims and Coleman, then they would need to testify, not as impeachment witnesses, but to establish that the statements were made, which would be relevant evidence to the disputed issues in this hearing.

19    **As noted in McCormick on Evidence** § 274:

**[S]elf-serving statements are not categorically excluded under the Federal Rule. More generally, trial courts are not empowered, except as specifically authorized by the hearsay rules, to exclude statements because of judicial doubts about credibility. See Advisory Committee Introductory Note: The Hearsay Problem, 56 F.R.D. 183, 290** ("For a judge to exclude evidence because he does not believe it has been described as 'altogether atypical, extraordinary,' " (quoting Chadbourn, Bentham and the Hearsay Rule—A Benthamic View of Rule 63(4)(c) of the Uniform Rules of Evidence, 75 Harv.L.Rev. 932, 947 (1962) ) ). Second, **Rule 403 grants authority to exclude statements of questionable probative value.** Through this rule, the self-serving nature of the statement, **in combination with other factors indicating questionable value**, may provide a basis for exclusion." MCMK—EVID § 274 (Emphasis supplied).

---

End of Document                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

109 Fed. R. Evid. Serv. 376

deceased." (ECF No. 33-16, at p. 2–3.) Defendant therefore upheld its denial of Plaintiff's claim.

Plaintiff thereafter initiated this action, seeking payment of benefits and asserting that Defendant breached the Policy and acted in bad faith in handling and denying its claim. The parties have conducted discovery, including the depositions of Dr. Rothfeder, Dr. Lee, and Dr. Joseph, who was the hospice physician who signed Mr. Jahries's death certificate. Dr. Rothfeder's testimony and reports focus on three separate opinions: 1) that Mr. Jahries fell as a result of slipping or tripping; 2) that the fall caused Mr. Jahries to suffer blunt cranial trauma and a fatal traumatic brain injury; and 3) that none of Mr. Jahries's medical conditions contributed in any way to his death. (*Id.*; ECF No. 39-3 at p. 10.) These opinions, and the information that Dr. Rothfeder relied on in reaching them, are the focus of Defendant's motion to exclude.

## ANALYSIS

Defendant provides three arguments as to why Dr. Rothfeder's testimony should be excluded: first, because it is based off the hearsay of Nurse Johnson; second, because Dr. Rothfeder is not qualified to offer an opinion about the cause of the trip and fall that he alleges Mr. Jahries suffered; and third, because it is unreliable.

### A. The court cannot find that Nurse Johnson's statements are inadmissible hearsay.

Defendant first argues that Dr. Rothfeder's testimony should be excluded because it is based off the hearsay statements of Nurse Johnson. Defendant also argues, in the alternative, that if Dr. Rothfeder is allowed to testify, he should be excluded from offering these hearsay statements to support his testimony. Two statements made by Nurse Johnson are at issue. The first is her written memo in which she stated that she found Mr. Jahries "in the doorway to his bathroom ... with his head against the door jam [sic]" and with "copious amounts of dried blood coming from his mouth and nose." (ECF No. 32-3.) The second are statements that she made to Dr. Rothfeder during a November 7, 2017 telephone conversation. Dr. Rothfeder took notes of this conversation, which indicate that Nurse Johnson told him that there was no imminent risk to Mr. Jahries's health, that he was a "major fall risk" and "was supposed to use a walker or cane to ambulate," and that on October 17, 2015, she "found him on the floor with his head against the [bathroom] door jamb, obviously

moribund [with] a lot of blood on his face, apparently from the mouth and nose, with no obvious laceration." (ECF No. 32-4.) These notes further state that Nurse Johnson's "assumption was that [Mr. Jahries] had ambulated to the [bathroom] without his walker and had taken a fall striking his head on the way down." *Id.*

Defendant asserts that these statements are "classic hearsay" under Rule 801 of the Federal Rules of Evidence. The court agrees; Nurse Johnson's statements were made out of court and are now being offered for their truth—that Nurse Johnson found Mr. Jahries's body lying with his head against the bathroom door jamb and that she assumed he had fallen while walking to the bathroom and died as a result of hitting his head. Plaintiff responds that the statements are nonetheless admissible under Rule 803(4)'s exception for statements made for medical treatment. Rule 803(4) only applies to " 'statements made by the one actually seeking or receiving medical treatment' " and is therefore inapplicable to statements that Nurse Johnson made concerning Mr. Jahries's heath. *Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1187, n.3 (D. Utah 2012) (quoting *Field v. Trigg County Hosp., Inc.*, 386 F.3d 729 (6th Cir.2004) ).

 **\*3** The court cannot, however, rule as a matter of law that Nurse Johnson's statements would not be admitted under either Rule 804 or 807. Rule 804(4) makes admissible an unavailable witness's statement regarding another's death "if the declarant ... was so intimately associated with the person's family that the declarant's information is likely to be accurate." Fed. R. Evid. 804(4)(B). Testimony was offered at the April 17 hearing to show that Nurse Johnson became close with Mr. Jahries's family after his death and before she made her statements. Nurse Johnson clearly had personal knowledge of the information that she wrote into her memo and discussed with Dr. Rothfeder, and there is no reason to doubt that information's accuracy.

Under Rule 807, a hearsay statement is admissible if 1) it "has equivalent circumstantial guarantees of trustworthiness;" 2) "it is offered as evidence of a material fact;" 3) "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts;" and 4) "admitting it will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807. Nurse Johnson's statements satisfy all four categories. First, she is simply stating what she observed as the medical professional who found Mr. Jahries's body; there is nothing to suggest that her statements are untrustworthy. Second,

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1211 Filed 04/05/21 Page 132 of 139

Stapley v. Minnesota Life Insurance Co., Not Reported in Fed. Supp. (2019)

109 Fed. R. Evid. Serv. 376

the statements are offered for a material fact—the state and positioning of Mr. Jahries's body when she found it. Third, it is the only evidence of this fact, as Nurse Johnson was the one who found Mr. Jahries's body and was the only witness to see the volume of blood he lost, since she cleaned up the scene for the sake of his family. (ECF No. 32-4, at p. 2.) Further, because Nurse Johnson is now deceased, these statements are the only evidence that exists as to her observations. Fourth, Plaintiff's assertion that Mr. Jahries's death was accidental and therefore covered by the Policy is highly, if not exclusively, dependent on the evidence contained in Nurse Johnson's statements. Given that Nurse Johnson's statements are the only form of this evidence, a just determination of this case requires that they not be excluded. *See* Fed. R. Evid. 102. Because the court cannot determine as a matter of law that Nurse Johnson's statements are inadmissible hearsay, it will not exclude Dr. Rothfeder's testimony for relying on them. The court similarly cannot, at this point, bar Dr. Rothfeder from offering those statements to support his testimony.

B. Dr. Rothfeder is not qualified to opine as to the mechanism of Mr. Jahries's fall and is therefore barred from offering testifying as to the cause of that fall.

Under Rule 702 of the Federal Rules of Evidence, an expert witness is permitted to offer testify as to topics which he has "scientific, technical, or other specialized knowledge." Dr. Rothfeder practiced emergency medicine for thirty years and is therefore qualified to offer opinions as to an individual's cause of death. However, some of the opinions he offers in this case extend beyond his qualifications. Again, Dr. Rothfeder offers three opinions: 1) that Mr. Jahries fell as a result of slipping or tripping; 2) that the fall caused Mr. Jahries to suffer blunt cranial trauma and a fatal traumatic brain injury; and 3) that none of Mr. Jahries's medical conditions contributed in any way to his death. (ECF No. 39-3 at p. 10; ECF No. 32-1, at p. 4.)

Dr. Rothfeder's experience in emergency medicine, coupled with his review of Mr. Jahries's medical records, qualifies him to offer his second and third opinions. His experience even qualifies him to opine that Mr. Jahries fell because people of his age often do. (*See* ECF No. 39-2, at 48:20–61:25.) His experience does not, however, qualify him to give his first opinion—that Mr. Jahries fell because he "slipped."[1] Understanding, and offering an opinion as to, the mechanism and cause of Mr. Jahries's fall does not require medical expertise; it requires expertise in forensic investigation. Dr. Rothfeder is not an expert in forensics and

cannot therefore opine as to the cause of Mr. Janries's fall. Dr. Rothfeder acknowledged his inadequacy in this area during his deposition, where he admitted that he does not have "any idea about the mechanism of [Mr. Jahries's] fall" as "there really wasn't a forensic investigation at the scene from which to further opine." (ECF No. 39-2 at 61:22–25.) Dr. Rothfeder is not qualified to testify as to the cause of Mr. Jahries's fall, and his opinion that Mr. Jahries fell because he slipped or tripped is therefore barred.

C. While Dr. Rothfeder's testimony as to the cause of Mr. Jahries's fall is unreliable and inadmissible, he may testify as to Mr. Jahries's cause of death and whether Mr. Jahries's other medical conditions contributed to his death.

**\*4** Defendant also asserts that Dr. Rothfeder's testimony should be excluded because it is unreliable. To be admissible, an expert's opinion " 'must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation ....'" *Goebel v. Denver & Rio Grande W. R. Co., 346* F.3d 987, 991 (10th Cir. 2003) (quoting *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir.1995) ).

As discussed above, Dr. Rothfeder's first opinion, that Mr. Jahries slipped or tripped, is inadmissible because Dr. Rothfeder is not qualified to offer it. The court also finds that this opinion is pure conjecture and unsupported by the record, as is shown in the following exchange from Dr. Rothfeder's deposition:

Q. Okay. So, in this particular case, you concluded that Mr. Jahries suffered a slip and fall accident?

A. Slip and fall, trip and fall. A fall.

Q. But you're suggesting that he fell down because he either slipped on something or he tripped on something?

A. That's correct.

Q. What did he slip on or trip on?

A. I don't know.

Q. You do not have any idea about the mechanism of the fall?

A. I don't. There really wasn't a forensic investigation at the scene from which to further opine.

(ECF No. 39-2 at 61:14–25.) Dr. Rothfeder suggests that Nurse Johnson's statements support his opinion that Mr.

Jahries slipped, but neither Nurse Johnson's written statement nor his notes from their conversation suggest that she gave an opinion as to what caused Mr. Jahries to fall. (*See* ECF Nos. 32-3 & 32-4.) Rather, his notes only state that it was Nurse Johnson's "assumption" that Mr. Jahries had "taken a fall striking his head on the way down." (ECF No. 32-4, at p. 2.) Dr. Rothfeder has no basis for his conclusion that Mr. Jahries slipped or tripped. That opinion is therefore unreliable and inadmissible. While Dr. Rothfeder may state that Mr. Jahries fell, he cannot offer an opinion as to what caused that fall.

Dr. Rothfeder's second opinion, that Mr. Jahries's fall caused him to suffer blunt cranial trauma and a fatal traumatic brain injury, does not suffer from the same inadequacies. As discussed above, Dr. Rothfeder's experience in emergency medicine qualifies him to testify as to an individual's cause of death. Here, he relies on that experience to opine that Mr. Jahries died as the result of blunt trauma and a fatal traumatic brain injury. In reaching this opinion, he relied on Nurse Johnson's statement that she found Mr. Jahries "with his head against the door jam [sic]" with "copious amounts of dried blood coming from his mouth and nose." (ECF No. 32-3.) In both his written report and deposition, Dr. Rothfeder testified that in his experience, this evidence made it unlikely that Mr. Jahries died from a stroke. (ECF No. 32-1, at p. 5; ECF No. 39-2, at p. 68:19–79:5.) While Dr. Rothfeder's support for his opinion might be slight, it is enough to "enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation ...." *Goebel*, 346 F.3d at 991 (quoting *Gomez,* 50 F.3d at 1519).

Dr. Rothfeder's third opinion, that none of Mr. Jahries's medical conditions contributed in any way to his death, similarly survives Defendant's motion to exclude. Dr.

Rothfeder testified that Mr. Jahries's death was a surprise and that "he wasn't in bad shape for his age." (ECF No. 39-2, at p. 80:14–82:6.) As such, he relied on statements made by Nurse Johnson that Mr. Jahries's "vital signs were excellent the day prior to his death" and that she "had no expectation of imminent death" and applied his medical experience to those facts to reach the opinion that Mr. Jahries's death was sudden and solely caused by the hitting his head after he fell. (ECF No. 32-1, at p. 5.) Again, while this support is slight, it is nonetheless sufficient to allow Dr. Rothfeder to testify. Defendant's attacks on Dr. Rothfeder's opinion are more appropriate for cross examination. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

## CONCLUSION

**\*5** For the reasons stated above, the court **HERBY DENIES IN PART AND GRANTS IN PART** Defendant's Motion to Exclude Testimony of Dr. Robert Rothfeder (ECF No. 32). While Dr. Rothfeder may offer testimony that Mr. Jahries fell, that the fall caused him to suffer blunt cranial trauma and a fatal traumatic brain injury, and that none of his medical conditions contributed in any way to his death, Dr. Rothfeder is **HEREBY EXCLUDED** from offering any opinion or testimony as to the cause of Mr. Jahries's fall.

### All Citations

Not Reported in Fed. Supp., 2019 WL 2028367, 109 Fed. R. Evid. Serv. 376

---

Footnotes

1    Dr. Rothfeder uses the terms "slipped" and "tripped" interchangeably. In his deposition, when pressed regarding his conclusion that Mr. Jahries "suffered a slip and fall accident, he responded "Slip and fall, trip and fall. A fall." and clarified that his opinion was really that Mr. Jahries "fell down because he either slipped on something or he tripped on something." (*See* ECF No. 39-2 at 61:14–19.)

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-12718-PDB-EAS ECF No. 40, PageID.1213 Filed 04/05/21 Page 134 of 139

Wright v. Beard, Not Reported in Fed. Supp. (2016)
102 Fed. R. Evid. Serv. 73

2016 WL 7173787
United States District Court, W.D. Kentucky,
Bowling Green Division.

Ashley WRIGHT, Plaintiff

v.

Robert BEARD, Defendant.

CIVIL ACTION NO: 1:14-CV-00090-GNS-HBB
|
Signed December 7, 2016
|
Filed 12/08/2016

**Attorneys and Law Firms**

Andrew J. Horne, Anderson & Horne, PLLC, Daniel J. Canon, Clay Daniel Walton Adams PLC, Louisville, KY, for Plaintiff.

Aaron D. Smith, Charles E. English, Jr., English, Lucas, Priest & Owsley LLP, Bowling Green, KY, for Defendant.

**MEMORANDUM OPINION & ORDER**

Greg N. Stivers, Judge

*1 This matter is before the Court on Plaintiff's Motion in Limine (DN 42), which is ripe for adjudication. For the reasons stated below, the motion is **DENIED**.

**I. STATEMENT OF FACTS**

This case arises out of the tragic death of Pamela Moore ("Pamela") and the events surrounding it. Barry Moore ("Barry") and Pamela lived in Green County, Kentucky. (2d Am. Compl. ¶ 5, DN 16). Plaintiff Ashley Wright ("Wright") lived behind them with her grandmother, Barbara Wright. (2d Am. Compl. ¶ 5). On May 22, 2013, Defendant Green County Sheriff Robert Beard ("Beard") and a Kentucky State Police ("KSP") officer went to the Moorees' home in response to a 911 call reporting domestic abuse perpetrated by Barry on Pamela. (Wright Dep. 55:10-14, Feb. 24, 2016, DN 42-2). After speaking initially with Pamela and Barry, Beard and the KSP officer spoke to Wright at her grandmother's house. (Wright Dep. 55:10-13, 57:3-25, 62:16-24). Wright

told Beard and the KSP officer about disputes between Barry and Pamela, which involved Barry threatening Pamela, firing a gun in the home, and throwing knives and bricks at Pamela. (Wright Dep. 57:3-25, 58:1-3). Plaintiff cannot recall what, if anything, Beard said in response to this information. (Wright Dep. 58:4-59:1).

After speaking with Wright, Beard and the KSP officer proceeded to talk again with Pamela and Barry. In her deposition, Plaintiff described that event as follows:

Q: Okay. Let's talk about that. So who was in front of the front porch?

A: The law enforcement and Pam and Barry as I recall.

Q: Okay. Pam and Barry, Sherriff Beard and the KSP trooper were in your front yard basically.

A: My grandma's, yeah.

Q: Okay. And could you hear their conversation?

A: No.

Q: All right. Could you see them talking?

A: I could see them for like the first little bit, and then I just went about my business.

...

Q: Okay. Were they animated or angry conversations or pretty normal?

A: Barry was always fairly animated. And from Pam just statue.

(Wright Dep. 62:1-63:14).

The statements addressed in Wright's motion stem from a conversation between her and Pamela a day or two later, in which Pamela recounted to Wright statements allegedly made by Beard on May 22. (Pl.'s Mot. Lim. & Mem. Supp. 2-3, DN 42 [hereinafter Pl.'s Mot.] ). Wright testified that during their conversation, Pamela, who "[w]as really shaky" and scared, told Wright, " 'I was afraid [Barry] was going to hurt you then,' because [Beard] told [Barry] ... '[y]ou better watch out for [Wright]. She had a lot to say about you.' " (Wright Dep. 63:23-64:20). Wright further testified that Pamela repeated Beard's alleged statements again to her a few days after their initial conversation. (Wright Dep. 64:24-65:17). Wright never personally witnessed or overheard any conversations between

Beard and Barry, and Barry never mentioned Beard's alleged statements to Wright. (Wright Dep. 65:18-21, 66:2-7).

Roughly six weeks later, on July 12, 2013, Barry fatally shot Pamela. (Wright Dep. 83:14-22; 2d Am. Compl. ¶ 15). Barry then entered the Wright house, shot Wright and her grandmother, and then killed himself. (Wright Dep. 84:23-87:1).

 **\*2** The Court previously dismissed Wright's claims against Beard in his official capacity under 42 U.S.C. § 1983 and state law. (Order 3-4, DN 14). It also dismissed Wright's claim against Beard for negligence *per se* under KRS 446.070 based on an alleged violation of KRS 522.030. (Order 8, DN 24). Wright's claim against Beard in his individual capacity for negligence is the sole remaining cause of action.

## II. JURISDICTION

The Court had federal-question jurisdiction over Wright's civil rights claims against Beard under 42 U.S.C. §§ 1983 and 1988. 28 U.S.C. § 1331. Those claims have been dismissed, but the Court retains supplemental jurisdiction over Plaintiffs' remaining state-law claim. *See* 28 U.S.C. § 1367.

## III. DISCUSSION

Wright's motion asks the Court to rule *in limine* that Pamela's statements to her are admissible. The first question is whether Pamela's statements are hearsay, which is generally inadmissible. Fed. R. Evid. 802. Of course, hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). "[T]he hearsay rule bans in-court repetition of extrajudicial utterances only when they are offered to prove the truth or falsity of their contents." *United States v. Gibson*, 675 F.2d 825, 834 (6th Cir. 1982) (citing *United States v. Miriani*, 422 F.2d 150, 153 (6th Cir. 1970)). The rule does not apply to statements offered merely to show that they were made or had some effect on the hearer. *Miriani*, 422 F.3d at 153; *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990); *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007).

Pamela's statements to Wright must be separated before the Court can determine their admissibility. Pamela's first out-of-court statement to Wright was: "I was afraid [Barry] was going to hurt you then...." Pamela's other out-of-court

statements to Wright were: "[Beard] told [Barry] ... '[y]ou better watch out for [Wright]. She had a lot to say about you.' " These other statements actually consist of two layers of potential hearsay: (1) the alleged statements by Beard to Barry; and (2) Pamela's out-of-court statements to Wright recounting Beard's statements to Barry.

Pamela's first statement is offered to prove the truth of the matter asserted—i.e., Pamela was afraid that Barry was going to hurt Wright (presumably because of Beard's admonition). This statement would be inadmissible as an expression of Pamela's state of mind because Pamela was referring to a past mental condition, not her then-existing mental condition. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 803.05 (Mark S. Brodin ed., Matthew Bender 2d ed. 1997) (collecting cases and stating that one requirement of the exception is, "[t]he declarant's state of mind must be relevant to an issue in the case."). Federal Rule of Evidence ("FRE") 803 does not cover "[a] statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." Fed. R. Evid. 803(3). This first statement, thus, is not admissible because no hearsay exception applies. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.50[2] [e] (5th ed. 2013).

Beard's alleged statements to Barry that "[y]ou better watch out for [Plaintiff]. She had a lot to say about you" is not hearsay because it is not offered for its truth or falsity. Beard's statement to "watch out" for Wright is merely a suggestion or advice to Barry, which is not capable of being true or false. As the Sixth Circuit has recognized, "[a] suggestion or an order is not subject to verification at all because such utterances do not assert facts." *Gibson*, 675 F.2d at 833-34. Further, whether Wright actually "had a lot to say" about Barry is of no consequence. Wright offers the statement for the effect it had on Barry, not to prove that Wright actually had a lot to say about him. Thus, these statements would be admissible as non-hearsay. *Gibson*, 675 F.2d at 833-34; Lawson, *supra*, § 8.05[1][b].

 **\*3** The crucial portion of the proffered evidence is Pamela's comment repeating to Wright what Beard said to Barry. The problem is that Wright did not hear Beard's supposed statement to Barry. The only proof on this point is Pamela's recount to Wright. Thus, Wright is offering Pamela's statement as evidence that Beard actually told Barry these things—i.e., for the truth of the matter asserted. Indeed, she has no other proof; Plaintiff never personally witnessed or

overheard any conversation between Defendant and Barry.[1] Because Pamela's statements to Wright are hearsay, they are not admissible unless an exception exists under the FRE.

### A. FRE 803(2)—Excited Utterance

Plaintiff contends that Pamela's statements are admissible under FRE 803(2), which is the excited utterance exception to the hearsay rule. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). The rationale behind this exception is that "a person under the sway of excitement precipitated by an external startling event will be bereft of the reflective capacity essential for fabrication and that, consequently, any utterance [he or she] makes will be spontaneous and trustworthy." *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983) (citation omitted). For a statement to qualify as an excited utterance, three elements must be met. *Id.* at 1057. "First, there must be an event startling enough to cause nervous excitement. Second, the statement must be made before there is time to contrive or misrepresent. And, third, the statement must be made while the person is under the stress of excitement caused by the event." *Id.* All of these elements concern one ultimate question, "[w]hether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." *Id.* at 1058 (internal quotation marks omitted) (citation omitted).

While the Sixth Circuit applies the three-element test above, it has recognized that "[t]here are no rigid guidelines for determining whether a statement is spontaneous." *Id.* at 1057. Depending on the case, any number of factors can bear on spontaneity—one of the most relevant being the length of time between the event and the statement. *Id.* at 1057-58.

> Probably the most important of the many factors entering into this determination is the time factor.... Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in reflective though process. Testimony that the declarant still appeared 'nervous' or 'distraught' and that there was a reasonable basis for continuing emotional upset will often suffice.

*Id.* at 1058 (citation omitted).

On the first element, McCormick's treatise refers to a startling event or condition as one "sufficiently startling to render inoperative the normal reflective thought processes of the observer." 2 George E. Dix et al., *McCormick on Evid.* § 272 (Kenneth S. Broun ed., 7th ed. 2013). Defendant maintains that Pamela simply overhearing his alleged statements to Barry does not qualify as a startling event or condition. Beard relies on *Estate of Tierney v. Shelberg*, No. l:08-cv-866-HJW, 2011 U.S. Dist. LEXIS 111576 (S.D. Ohio Sept. 29, 2011), and *Bowers v. State Farm Ins. Co.*, No. 3:09-CV-290, 2011 U.S. Dist. LEXIS 39296, 2011 WL 1362168 (W.D. Ky. Apr. 11, 2011), to support his position. The Sixth Circuit has recognized that the statement of a declarant alone may not be sufficient to establish the existence of a startling event for purposes of Rule 803(2). *See United States v. Arnold*, 486 F.3d 177, 185-86 (6th Cir. 2007); *see also Gainer v. Wal-Mart Stores E., L.P.*, 933 F. Supp. 2d 920, 931 (E.D. Mich. 2013). While Plaintiff contends that the startling event was Beard telling Barry that Wright had been "telling on" him, there is no non-hearsay proof corroborating that Beard made these statements. The only evidence is Pamela's statements to Wright. While it may be arguable whether Beard's comment to Barry in Pamela's presence was itself a startling event, it is unnecessary for the Court to resolve this issue directly because Wright has failed to establish the second and third elements of the excited-utterance test.

**\*4** As to the second element, Pamela approached Wright at her grandmother's home a day or more after the visit by law enforcement to the Moores' residence. Wright testified that Pamela "[a]lways waited until things cooled back down" before approaching her about incidents with Barry. (Wright Dep. 63:23-24). Thus, it appears Pamela revealed Beard's comments to Wright after the typical cooling-off period. Under these circumstances it cannot be said that Pamela made her statements before there was an opportunity to reflect upon what Beard allegedly said.

In analyzing the third element—whether the statement was made under the stress of the event—"[r]elevant factors ... include (1) the lapse of time between the event and the declarations; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements." *Biegas v. Quickway Carriers Inc.*, 573 F.3d 365, 380 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Maggard v. Ford Motor Co.*, 320 Fed.Appx. 367, 374 (6th Cir. 2009)). The Sixth Circuit has recognized that "[its] cases do not demand a precise showing of the lapse of time between the startling

Case 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1216   Filed 04/05/21   Page 137 of 139

*Wright v. Beard*, Not Reported in Fed. Supp. (2016)

102 Fed. R. Evid. Serv. 73

event and the out-of-court statement." *Arnold*, 486 F.3d at 185. Indeed, it has held that the excited-utterance exception sometimes permits the admission of statements made hours after the startling event.[2] Ultimately, courts should "[f]ocus on whether the declarant had the opportunity to fabricate or misrepresent in light of the circumstances of the event." *Maggard*, 320 Fed.Appx. at 373 (citing Fed. R. Evid. 803(2) advisory committee's note).

The time factor, however, is still an important consideration, and the Court is hard pressed to find cases where other courts have found the excited-utterance exception applicable to statements made a day or more after the startling event. Beard's alleged statements to Barry and the surrounding circumstances may have been unsettling, but not enough to remove the questions created by the lapse of time. In *United States v. Winters*, 33 F.3d 720 (6th Cir. 1994), the Sixth Circuit affirmed a finding that a gunshot victim's statements two days after the shooting "[w]ere the product of conscious reflection and not made under the stress and excitement caused by the shooting." *Id.* at 723. While there were other factors at play in *Winters*, such as the victim changing his story on multiple occasions, the time factor was nonetheless important to the conclusions of both courts. *See id.*

 **\*5** Here, at least a day passed between Beard's alleged statements and Pamela's conversation with Wright. Pamela was an adult. The only evidence of Pamela's physical and mental state at the time she spoke with Wright is Wright's testimony that she was "really shaky" and scared, which indicates that Pamela may have been under the stress of excitement when she talked with Wright. *See United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003) (noting that in analyzing the third element, "[t]estimony that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing [to be] emotional[ly] upset will often suffice." (quoting *Haggins*, 715 F.2d at 1058)). Given the significant lapse between Beard's alleged statements and Pamela's conversations with Wright, it is unclear why Pamela was really shaky and scared. It could have been related to Beard's alleged statements to Barry, or it could have been something else. Ultimately, there is not enough evidence to conclude that Pamela was under the stress of excitement created by Beard's supposed statements to Barry versus Barry's conduct towards Pamela that necessitated the police intervention in the first place. Here, the lapse of time and attendant circumstances of Pamela's comments to Wright after Pamela had "cooled off" indicate a lack of spontaneity such that these statements do not

qualify as an excited utterance. *See* 2 Dix et al., *supra*, § 272 n.30 (providing cases illustrative of whether declarant still under stress of excitement when statement made); Lawson, *supra*,§ 8.60[3][d].

Overall, Plaintiff has shown that, at most, one element of the excited utterance test is met. Therefore, FRE 803(2) does not apply.

 **B. FRE 807—Residual Exception**

Plaintiff maintains that Pamela's statements are nevertheless admissible under the residual exception to the hearsay rule. Hearsay evidence inadmissible under any other exception may still be admissible under FRE 807, the residual hearsay exception, if it possesses sufficient guarantees of trustworthiness. *United States v. Laster*, 258 F.3d 525, 530 (6th Cir. 2001). In relevant part, FRE 807 provides:

> Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:
>
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a).

The legislative history of the residual exception indicates it was intended to have limited application. Senate Comm. on Judiciary, S. Rep. No 1277 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7065-66 ("It is intended that residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee did not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804...."). The Sixth Circuit has recognized, "[t]here is a lack of Sixth Circuit case law on the residual exception's trustworthiness requirement outside of the context of the Confrontation Clause...." *Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013). Most courts apply a "[b]road inquiry,"

Wright v. Beard, Not Reported in Fed. Supp. (2016)

102 Fed. R. Evid. Serv. 73

Case 2:19-cv-12718-PDB-EAS   ECF No. 40, PageID.1217   Filed 04/05/21   Page 138 of 139

looking to the totality of the circumstances that surround the statement when determining whether it possesses the requisite guarantees of trustworthiness. Weinstein & Berger, *supra*, § 807.03. The Seventh Circuit, for example, has considered numerous factors, including: (1) "the probable motivation of the declarant in making the statement," (2) "the circumstances under which the statement was made," (3) "the knowledge and qualifications of the declarant," (4) the existence of corroborating evidence, (5) "the character of the declarant for truthfulness and honesty and the availability of evidence on the issue," (6) "whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury," and (7) "whether the witness ever recanted his testimony." *United States v. Hall*, 165 F.3d 1095, 1110-11 (7th Cir. 1999) (internal quotation marks omitted) (citations omitted). The factors "[a]re neither exhaustive nor necessary prerequisites for admissibility of hearsay under [the residual exception], [but] they shed light on the sort of consideration a district court should take into account when evaluating the 'trustworthiness' of a hearsay statement." *Id.* at 1111.

**\*6** The present circumstances show that Pamela's fear for Wright's safety apparently motivated her to relate Beard's alleged statements to Wright. The record indicates that Pamela was frequently abused by Barry, who was without question a violent person. True, Pamela waited a day or more before relaying Beard's alleged statements to Wright, but Barry's volatile nature and the fact that Pamela typically allowed things to cool off indicates that she had good reason to wait. Pamela relayed Beard's alleged statements to Wright more than once—she told her again a few days after their initial conversation during an afternoon walk. (Wright Dep. 64:24-65:17). There is no evidence questioning Pamela's motivation, and Pamela had little reason to lie about whether she was afraid for Wright or what Beard had said. There is likewise no indication that Pamela bore any animus towards Beard, and she approached Wright, apparently a close friend, out of fear for Wright's safety. Thus, there exist under these circumstances some indicia of trustworthiness.

Importantly, however, there is no evidence corroborating Beard's alleged statements. The only proof that Beard made inflammatory comments to Barry is Wright's version of what Pamela told her. Barry never mentioned Beard's alleged statements to Wright, and Wright has not indicated that Barry ever said anything to Pamela about the statements. Further, Wright has failed to show that these statements are more probative on the point than any other evidence that she could obtain through reasonable efforts. Beard is available to testify, and Wright has not indicated whether she made any effort to contact the KSP officer who was present for the conversation between Beard and Barry. While Pamela had little reason to lie about being afraid for Wright's safety or what Beard said to Barry on May 22, Wright has failed to meet her burden of establishing all of the elements of FRE 807. Indeed, her argument on this issue consists merely of reproducing FRE 807 and concluding that Pamela's statements meet its requirements. Given the lack of any corroborating proof and the intended limited applicability of the residual exception, Pamela's statements to Wright are not admissible under FRE 807.

## IV. CONCLUSION

For the reasons above, Pamela's statements are inadmissible hearsay. Plaintiff's Motion in Limine (DN 42) is **DENIED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7173787, 102 Fed. R. Evid. Serv. 73

---

Footnotes

1   Defendant is incorrect in asserting that Pamela's statements present "hearsay within hearsay" and must comply with FRE 805 to be admitted. As discussed above, the first layer—Beard's alleged comments to Barry—is not hearsay. Thus, the fact that Pamela repeated it does not create hearsay within hearsay.

2   *See, e.g., United States v. Baggett*, 251 F.3d 1087, 1090 n.1 (6th Cir. 2001) (finding statements made several hours after startling event were excited utterances); *United States v. McCullough*, 150 Fed.Appx. 507, 510 (6th Cir. 2005) (applying exception to statement made approximately two-and-a-half hours after startling event); *United States v. Green*, 125 Fed.Appx. 659, 662 (6th Cir. 2005) (finding statement made three hours after startling event to be admissible as excited utterance because "trauma and anxiety ... do not suddenly dissipate when the assailant leaves the scene."); *United States v. Tabaja*, 91 Fed.Appx. 405, 410 (6th Cir. 2004) (holding that a statement made up to eleven hours after the startling event was an excited utterance). *But see United States v. McGhee*, 161 Fed.Appx. 441, 445 (6th

102 Fed. R. Evid. Serv. 73

Cir. 2005) (concluding that a "nervous" statement made seven minutes after a police search and arrest not to be within the excited-utterance exception because the arrest would not create excitement for that period).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.