# EXHIBIT BB

```
1            IN THE DISTRICT COURT OF THE UNITED STATES

2              FOR THE EASTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4

5     KENDRICK SCOTT,

6             Plaintiff,

7        vs.            Case No. 19-Civ.12718 (PDB)

8                       Hon. Paul D. Borman

9     DETROIT POLICE DEPARTMENT

10    ("DPD") SERGEANT WAYNE

11    PRITCHETT; DPD OFFICER

12    CATHERINE ADAMS; DPD OFFICER

13    BARBARA SIMON; and DPD

14    OFFICER RODNEY JACKSON,

15            Defendants.

16    -----------------------------------/

17    JUSTLY JOHNSON, Individually,

18            Plaintiff,

19        -against-      Case No. 19 Civ 12331 (PDB)

20                       Hon: Paul D. Borman

21    CATHERINE ADAMS, in her

22    individual capacity; and

23    BARBARA SIMON, in her individual

24    capacity;

25            Defendants.
```

1                              /

2

3

4          The Remote Deposition of

5          OFFICER BARBARA JEAN SIMON,

6          REMOTE PROCEEDING,

7          Commencing at 10:21 a.m.,

8          Monday, July 20, 2020,

9          Before Sabrina Smith, CSR-2129.

10

11    REMORE APPEARANCES:

12

13    NICK BOURLAND

14    ZOE SALZMAN

15    Emery, Celli, Brinckerhoff, Abady, Ward & Maazel, LLP

16    600 Fifth Avenue

17    10th Floor

18    New York, New York 10020

19    212.763.5000

20    nbourland@ecbalaw.com

21    zsalzman@ecbalaw.com

22       Appearing on behalf of the Plaintiff

23       Kendrick Scott.

24

25

```
 1
 2      WOLFGANG MUELLER
 3      Mueller Law Firm
 4      41850 W. 11 Mile Road
 5      Suite 101
 6      Novi, Michigan 48375
 7      248.489.9653
 8      wolf@wolfmuellerlaw.com
 9          Appearing on behalf of the Plaintiff
10          Justly Johnson.
11
12      MICHAEL M. MULLER
13      City of Detroit Law Department
14      2 Woodward Avenue
15      Suite500
16      Detroit, Michigan 48226
17      313.237.5052
18      mullm@detroitmi.gov
19          Appearing on behalf of the Defendants.
20
21
22
23
24
25
```

1                    TABLE OF CONTENTS

2

3        WITNESS                          PAGE

4        OFFICER BARBARA JEAN SIMON

5

6        EXAMINATION

7        BY MS. SALZMAN:                      6

8        EXAMINATION

9        BY MR. MUELLER:                    106

10       EXAMINATION

11       BY MR. MULLER:                     115

12       RE-EXAMINATION

13       BY MS. SALZMAN:                    120

14

15                       EXHIBITS

16

17       EXHIBITS                         PAGE

18       (Exhibits retained.)

19

20       DEPOSITION EXHIBIT 61             37

21       DEPOSITION EXHIBIT 85             52

22       DEPOSITION EXHIBIT 64             63

23       DEPOSITION EXHIBIT 65             65

24       DEPOSITION EXHIBIT 66             71

25       DEPOSITION EXHIBIT 67             80

1      DEPOSITION EXHIBIT 68            89

2      DEPOSITION EXHIBIT 63            95

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    Oakland County, Michigan

 2    Monday, July 20, 2020

 3    10:21 a.m.

 4          THE COURT REPORTER:  The attorneys

 5    participating in this deposition acknowledge that I am

 6    not physically present in the deposition room and that

 7    I will be reporting this deposition remotely.  They

 8    further acknowledge that, in lieu of an oath

 9    administered in person, the witness will verbally

10    declare her testimony in this matter is under penalty

11    of perjury.  The parties and their counsel consent to

12    this arrangement and waive any objections to this

13    manner of reporting.

14          Please indicate your agreement by stating

15    your name and your agreement on the record.

16          MS. SALZMAN:  On behalf of the plaintiff,

17    Kendrick Scott, this is Jodi Salzman, and we agree.

18          MR. MULLER:  On behalf of the defense, Mike

19    Muller, Consent.

20          OFFICER BARBARA JEAN SIMON,

21    Was thereupon called as a witness herein, and after

22    having first been duly sworn to testify to the truth,

23    the whole truth and nothing but the truth, was

24    examined and testified as follows:

25                EXAMINATION

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                     Page 7

1    BY MS. SALZMAN:

2    Q.   Good morning, Ms. Simon.

3    A.   Good morning.

4    Q.   My name is Zoe Salzman.  I'm a lawyer in a law firm

5         called Emery, Celli, Brinckerhoff, Abady, Ward and

6         Maazel, and with me on the deposition today is my

7         colleague, Nick Bourland.  We represent a man named

8         Kendrick Scott who is the plaintiff on this matter.

9         Also one the line is --

10            MR. MULLER:  Before you go any further, can

11        I just put something on the record?

12            MS. SALZMAN:  Sure.

13            MR. MULLER:  Last night we received

14        deposition exhibits.  My colleague, Pat Cunningham,

15        got an email giving him deposition exhibits, one of

16        which is a deposition transcript from the Sanford

17        case, which is like 350 pages long.  My client has not

18        had an opportunity to review that 350 pages, and

19        neither have I, having just received it this morning.

20        So I just want the record to be clear regarding that

21        and that we object to that being used as an exhibit.

22            MS. SALZMAN:  Okay.  Well, for the record,

23        we're doing this deposition remotely, which is why

24        exhibits were emailed to you in advance.  And if we

25        were doing this in the traditional format and I was in

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                Page 8

1      the room with you, you wouldn't have received any of

2      the exhibits in advance, so your objection is noted

3      for the record, but I don't believe it has any

4      foundation.

5   BY MS. SALZMAN:

6   Q.   Also on the line, Ms. Simon, is Wolf Mueller who

7      represents a man named Justly Johnson who's the other

8      plaintiff in this case.  I'm going to start by asking

9      you some questions and then Mr. Mueller may ask some

10     questions as well, okay?

11  A.   Okay.

12  Q.   Now, you've been sued before, Ms. Simon, correct?

13  A.   Yes.

14  Q.   In your capacity as a DPD officer, am I right that

15     you've been sued at least 16 times for civil rights

16     violations?

17  A.   I don't know how many.

18          MR. MULLER:  Alleged civil rights

19     violations.

20          THE WITNESS:  And I don't know how many

21     times.  I don't know.

22  BY MS. SALZMAN:

23  Q.   You don't have any way of keeping track of those?

24  A.   No, ma'am.

25  Q.   Okay.  Does that sound about right to you, though, 16

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                          Page 9

```
1        times?

2    A.   I don't know.

3    Q.   Have you ever sued anyone before?

4    A.   Have I ever sued anyone?

5    Q.   Correct.

6    A.   No.

7    Q.   Okay.  How many times have you given a deposition like

8        this?

9    A.   Two times, I believe.

10   Q.   Were both those times in connection with your work as

11       a DPD officer?

12   A.   Yes.

13   Q.   And were both those times in cases where you were

14       alleged to have committed civil rights violations in

15       your work as a DPD officer?

16   A.   Yes.

17   Q.   So you understand that you took an oath to tell the

18       truth today, correct?

19   A.   I just did, ma'am.

20   Q.   Pardon me?

21   A.   I just did.

22   Q.   Okay.  And you understand that oath has the same

23       effect as if you were testifying in court, correct?

24   A.   I realize that, yes.

25   Q.   Okay.  Is there any reason, sitting here today, why
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 10

1      you can't testify truthfully?

2    A.   No.

3    Q.   Have you ever testified in court before?

4    A.   Of course.

5    Q.   How many times?

6    A.   Dozens of times, ma'am.  I don't keep a record of how

7         many times I went to court.

8    Q.   Was that all in your capacity as a DPD officer?

9    A.   Yes, ma'am.

10   Q.   Okay.  Have you ever testified in court other than in

11        your capacity as a DPD officer?

12   A.   I don't think so.  I don't recall.

13   Q.   Have you ever been found to have provided untruthful

14        testimony under oath?

15   A.   No, ma'am.

16   Q.   What'd you do to prepare for today's deposition,

17        Ms. Simon?

18   A.   What'd you mean, what'd I do to prepare?

19   Q.   What did you do to prepare for today's deposition?

20   A.   Came down here for the deposition.

21   Q.   Did you meet with your attorneys before the

22        deposition?

23   A.   No, ma'am.  Well, this morning, I'm sorry, this

24        morning I did.  I'm sorry.

25   Q.   How long did you meet with your attorneys this

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                            Page 11

1       morning?

2    A.   About a half an hour.

3    Q.   Other than this morning, have you met with your

4        attorneys on any other occasion to prepare for today's

5        deposition?

6    A.   No, ma'am.

7    Q.   Did you review any documents to prepare for the

8        deposition?

9    A.   I have no documents, ma'am.

10   Q.   All right.  Leaving aside whether you have any

11       documents in your personal possession, have you

12       reviewed any documents to prepare for today's

13       deposition?

14   A.   I reviewed one, yes.

15   Q.   What was that?

16   A.   It was a witness statement that was dated for

17       5-10-1999.

18   Q.   Who gave that --

19   A.   I just --

20   Q.   I'm sorry, go ahead, ma'am.

21   A.   Justin Johnson.

22   Q.   Justly Johnson?

23   A.   Justly, Justly Johnson, I'm sorry.

24   Q.   Is that a witness statement you filled out?

25   A.   Yes, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                        Page 12

1    Q.   And is that a witness statement that you filled out

2         the top portion and the rest of it is blank?

3    A.   That's correct.

4    Q.   So we're going to take a look at that document later

5         today, but for now let me just ask you:  Other than

6         that witness statement, are there any other statements

7         you prepared to give a deposition today?

8    A.   No, ma'am.

9    Q.   Have you ever been arrested, Ms. Simon?

10   A.   No, ma'am.

11   Q.   Have you ever pled guilty to a crime?

12   A.   No ma'am.

13   Q.   Have you ever been convicted of a crime?

14   A.   No, ma'am.

15   Q.   What is your highest level of education?

16   A.   Associate' degree.

17   Q.   When did you earn that?

18   A.   Oh, I don't know.  Years ago, ma'am.

19   Q.   What did you get the degree in?

20   A.   Law enforcement.

21   Q.   Where did you get it, what school?

22   A.   Wayne County Community College.

23   Q.   Did you get that degree before you started working for

24        DPD?

25   A.   Yes, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                          Page 13

1   Q.  Did you go to the police academy?

2   A.  Yes.

3   Q.  When was that?

4   A.  July 18, 1977.

5   Q.  1977?

6   A.  Yes, ma'am.

7   Q.  Okay.  Is that when you graduated?

8   A.  That's when I started the academy.

9   Q.  When did you graduate?

10  A.  I think it was 8 and a half weeks later.  I don't

11     remember.

12  Q.  Was this the Detroit Police Department Academy?

13  A.  Yes.

14  Q.  And your best recollection is that training at the

15     academy was about 8 and a half weeks, is that correct?

16  A.  I believe it was 8 and a half weeks, ma'am.

17  Q.  Did you go straight from the academy to working for

18     the Detroit Police Department?

19  A.  Yes.

20  Q.  Have you ever applied to work in any other law

21     enforcement agency?

22  A.  Yes.

23  Q.  When was that?

24  A.  When I retired from DPD.

25  Q.  Okay.  We'll talk about that in a second.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                      Page 14

```
 1              So did you join DPD in 1977 then?

 2    A.   Yes.

 3    Q.   So by the time of the Lisa Kindred homicide in 1999,

 4         you'd been on the force about 22 years, is that right?

 5    A.   Yes.

 6    Q.   So you were a very experienced officer by that time?

 7    A.   Yes.

 8    Q.   Okay.  Give me a chronology, if you can, of the

 9         positions you've held at the Detroit Police Department

10         starting when you first joined in 1977, your rank and

11         where you were stationed.

12    A.   Police officer.  I believe when I first started I was

13         walking the beat from the 1st Precinct, and then I

14         went to the 13th precinct.  I got laid off.  I think

15         when I came back, I think I went to 10 for, I don't

16         know how long I was at 10.  Then I went back to 13.

17         Then I went to Sex Crimes.  I got promoted to

18         investigator.  I went to Number 4, left Number 4 and

19         went to Homicide.

20    Q.   When did you go to Homicide?

21    A.   I don't remember the year, ma'am.

22    Q.   Do you remember approximately when it was?

23    A.   No.

24    Q.   Is there anything that would refresh your

25         recollection?
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                          Page 15

```
 1    A.   Not as I can recall.

 2    Q.   Okay.  What was your rank when you went to Homicide?

 3    A.   Investigator.

 4    Q.   Did you stay with Homicide until you retired?

 5    A.   Yes.

 6    Q.   Did you ever get promoted above investigator?

 7    A.   No.

 8    Q.   Did you ever apply for promotion and get denied?

 9    A.   No.  Let me go back.  Once we -- they were making

10         investigators sergeants, but, you know, you had the

11         title but we didn't have the rank, you know, to run a

12         precinct or a squad or anything, so, and I was still

13         at Homicide.

14    Q.   So were you made a sergeant?

15    A.   No.  It was just on paper, you know.

16    Q.   So on paper you were made a sergeant?

17    A.   I was the investigator, but we were getting sergeant's

18         pay, let me put it that way.

19    Q.   Understood.  When was that?

20    A.   I can't recall.

21    Q.   Okay.  Have you ever been demoted while working for

22         the Detroit Police Department?

23    A.   No.

24    Q.   Now, you testified a moment ago that you retired from

25         the DPD, is that correct?
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                                    Page 16

 1    A.   That's correct.

 2    Q.   When did you retire?

 3    A.   2010.

 4    Q.   Was it your decision to retire or were you asked to

 5         retire?

 6    A.   It was my decision to retire.

 7    Q.   Why'd you retire?

 8    A.   I retired.  I retired.

 9    Q.   Did you get a pension?

10    A.   Yes.

11    Q.   Did you retire as soon as you were eligible for the

12         pension?

13    A.   No.

14    Q.   So what prompted you to retire in that specific year?

15    A.   I retired, ma'am.  I was, wanted to do something else,

16         so I retired and I went to work for the Attorney

17         General.

18    Q.   So when I asked you earlier if you ever applied to

19         work for another law enforcement agency, was that your

20         work for the Attorney General?

21    A.   That's correct.

22    Q.   When did you start working for the Attorney General?

23    A.   January of 2011.

24    Q.   Are you still working there today?

25    A.   Yes.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 17

1    Q.   And what is your position?

2    A.   Special agent.

3    Q.   Have you been a special agent since 2011?

4    A.   Yes.

5    Q.   How tall are you, Ms. Simon?

6    A.   5'7 and a half.

7    Q.   Okay.  Fair to say you were the same height back in

8         May, 1999?

9    A.   I guess, yes.

10   Q.   Most of us don't grow too much at our age, right?

11   A.   True.

12              MR. MULLER:  We do shrink.

13              MS. SALZMAN:  That is true, Mike.  I

14        haven't gotten there yet myself.

15              MR. MULLER:  I hope not.

16   BY MS. SALZMAN:

17   Q.   How much did you weigh in May, 1999 Ms. Simon?

18   A.   I have no idea.

19   Q.   Can you give me an approximation?

20   A.   I don't remember, ma'am.

21   Q.   Did you weigh more or less than you do now?

22   A.   Probably more.

23   Q.   Ms. Simon, did you hear me?

24   A.   I answered you.  Did you hear me?

25   Q.   I did not hear you.  Could you say it again?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                      Page 18

1    A.   I said probably more.

2    Q.   And how much do you weigh now?

3    A.   I don't know.  I haven't got on the scale in a while.

4         I have no idea.

5    Q.   Were there any other black female officers in the

6         Homicide Department in 1999 who had the approximate

7         same height and weight as you?

8    A.   I'm quite sure.  I'm quite sure.  It was black females

9         there.  Now, we didn't go around asking how much you

10        weigh and all that.

11   Q.   But from what you saw, from what you observed with

12        your own eyes, were there any other black female

13        officers in the Homicide Department in 1999 who had

14        approximately the same weight as you?

15   A.   I'm going to put it this way:  There was black female

16        officers in 1999 that was in Homicide.  I don't know

17        how much they weighed or -- I can't answer that.  I

18        don't know.

19   Q.   Okay.  What were the names of these black female

20        officers?

21   A.   Kari Russell, Monica, I can't remember her last name.

22   Q.   Is that Monica Childs?

23   A.   Yes.  I believe Sherri Oliver.

24   Q.   Say that name again for me?

25   A.   Sherri Oliver.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 19

1    Q.   Sherri Oliver, okay?

2    A.   I can't, I can't recall all of them, ma'am.

3    Q.   What about Beryl Curry, do you recall her?

4    A.   What.

5    Q.   Beryl Curry?

6    A.   I don't recall.

7    Q.   Were you in Squad -- sorry, go ahead.

8    A.   I don't recall.  I don't recall her.  I don't know.

9    Q.   Were you in Squad 7 at Homicide, Ms. Simon?

10   A.   Yes.

11   Q.   Were any of these other female officers you just named

12        for me in Squad 7?

13   A.   I don't, I don't remember.  I don't think so.  I don't

14        remember.

15   Q.   Do you think you were the only female black officer in

16        Squad 7 in May, 1999?

17   A.   I don't know, ma'am.

18   Q.   Can you think of any other black female officers who

19        were in Squad 7 with you in May, 1999?

20   A.   Not offhand, no.

21   Q.   Would you say that back in May, 1999, that you weighed

22        more or less than Kari Russell?

23   A.   I have no idea.

24   Q.   All right.  Would you say that in May, 1999, you

25        weighed more or less than Monica Childs?

```
 1   A.  I have no idea.

 2   Q.  And would you say in May of 1999, you weighed more or

 3       less than Sherri Oliver?

 4   A.  No idea.

 5   Q.  Would you describe any of those women as tall and

 6       slim, either Kari Russell, Monica Childs or Sherri

 7       Oliver?

 8   A.  I believe that, I think Sherri Oliver was tall.  I

 9       believe she was tall.

10   Q.  Was she slim as well?

11   A.  Possible.

12   Q.  Now, Catherine Adams was also in Squad 7, right?

13   A.  Yes.

14   Q.  And was she the only white female officer in Squad 7

15       in May, 1999?

16   A.  I believe so.  I'm not for sure.  I believe so.

17   Q.  So back in May, 1999, was Squad 7 your regular

18       assignment?

19   A.  I was assigned to Squad 7, yes.

20   Q.  How many years were you in Squad 7?

21   A.  I have no idea.

22   Q.  Any approximation?

23   A.  No.

24   Q.  Did you work with a regular partner in Squad 7?

25   A.  No, we was just a squad that you might work with one
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                            Page 21

1        person one day, another person the next day, so.

2    Q.   Who else was in Squad 7 with you in May, 1999?

3    A.   If I'm not mistaken, I believe Billy Jackson was the

4        officer in charge of Squad 7.  I believe James Fisher,

5        Terry Shaw, Cathy Adams.  It was several more.  I

6        don't remember.  Henry, I don't remember his last

7        name.

8    Q.   Ellis?

9    A.   Yes.

10   Q.   What was --

11   A.   I don't remember --

12   Q.   I'm sorry, go ahead.

13   A.   I don't remember anyone else, ma'am.

14   Q.   Anytime I cut you off like that, you just let me know.

15       I want to make sure you complete your answer, and

16       likewise I'll ask you to let me finish my question

17       before you begin answering.  It'll make the Court

18       Reporter's job much easier.

19            Now, let me ask you -- did you have

20       something you wanted to say?

21   A.   No.

22   Q.   It's a little bit weird on this Zoom platform, right?

23       There's a little bit of delay sometimes.

24            Let me ask you, Monica Childs, the officer

25       you mentioned before, she wasn't in Squad 7?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 22

1    A.   She could have been.  I don't, I don't know.

2    Q.   Now, Billy Jackson was the lieutenant, right?

3    A.   Yes.

4    Q.   What'd he look like?

5    A.   What'd you mean, what'd he look like?

6    Q.   What was his physical appearance?

7    A.   Black male.  I don't know how tall he was.  I don't

8         know how much he weighed.

9    Q.   Hair style?

10   A.   Low cut Afro.

11   Q.   Now, when you --

12   A.   Medium complexion.

13   Q.   Now, when you tell me you don't know, you don't have

14        any idea how tall someone was or how much someone

15        weighed, you're a trained Homicide investigator,

16        correct?

17   A.   Yes.

18   Q.   And one of the jobs of a Homicide investigator is to

19        provide witness and subject descriptions, correct?

20   A.   Yes.

21   Q.   So when I ask you to give me an approximate height or

22        weight, you're not able to do that for these folks you

23        worked with for all those years?

24   A.   No, ma'am.  Do you know how long that's been?  I did

25        not go around asking them, "Well, how much you weigh,"

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 23

1         you know, no.  I'm quite sure you can't tell me the

2         weight of everybody you worked with in 1999.

3    Q.   I'm not being deposed here today, ma'am, so I'll ask

4         the questions and you'll do your best to answer them.

5    A.   I just answered.  I don't remember, ma'am.

6    Q.   All right.  What about James Fisher, what was his

7         physical description?

8    A.   Black male, medium complexion, and I think, I don't

9         know for sure, I think he wore glasses.  I don't know

10        for sure.

11   Q.   What about his hair style?

12   A.   I think he had an Afro, I believe.

13   Q.   Was he a tall man?

14   A.   I don't know.  Medium height for a man.  I'm going to

15        stay 5'9, 5'10.  I don't know.

16   Q.   Was he a well-built, muscled man?

17   A.   He could have been.  No, I don't think he was well

18        built.  I don't think he was husky or nothing like

19        that.  I don't remember him being husky.

20   Q.   What about Terry Shaw, what did he look like?

21   A.   Black male, light complexion, kind of curly hair.

22        Medium, well, like I said for a man, medium height,

23        5'9, I believe.  Medium built, I think.

24   Q.   What about Henry Ellis, what did he look like?

25   A.   Black male.  I remember, I remember Henry was tall.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 24

1          Medium built, I believe.  And crewcut, Afro crewcut.

2          I don't know.

3     Q.   Did you work with an officer named Wayne Pritchett?

4     A.   Yes, Pritchett was assigned to Homicide.

5     Q.   Was he in Squad 7?

6     A.   He could have been.  He could have been.  I'm not for

7          sure.

8     Q.   Did you work cases with him?

9     A.   It's possible.

10    Q.   What'd he look like?

11    A.   Black male.  I think Wayne was kind of stocky.  I

12         don't -- I think.  Medium to dark complexion.  That's

13         all I can remember about him.

14    Q.   Do you remember his hair style?

15    A.   I think it was an Afro, I believe.

16    Q.   What about Anthony Jackson, did he work in Homicide

17         with you?

18    A.   Yes, he was assigned, yes, he was in Homicide.

19    Q.   Was he in Squad 7?

20    A.   It's possible.

21    Q.   Did you work cases with him?

22    A.   It's possible, yes.

23    Q.   What did he look like?

24    A.   Black male.  I think Anthony wore glasses, I do

25         believe, medium to dark complexion, same hair, Afro.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                          Page 25

```
 1    Q.   What about Arlie Lovier, did you work with him in
 2         Homicide?
 3    A.   Who?
 4    Q.   Arlie Lovier?
 5    A.   Lovier, is that who you're talking about?
 6    Q.   Thank you for correcting me.  Did you work with
 7         Mr. Lovier?
 8    A.   Yes.
 9    Q.   Was he in Squad 7?
10    A.   I don't know if Arlie was in Squad 7.  I don't know.
11    Q.   What did he look like?
12    A.   He was a white male.  I think he had brown hair, tall.
13         That's all I can remember, ma'am.  Because he's
14         deceased.  I don't remember.
15    Q.   What about John Faulk, did you work with him in
16         Homicide?
17    A.   Yes.
18    Q.   Was he in Squad 7?
19    A.   He could have been.  White male, I think John had
20         brown hair, medium height.  That's all I remember.
21    Q.   That's all you remember?  How'd you wear your hair
22         back in 1999, Ms. Simon?
23    A.   I have no idea.  I have changed my hair hundreds of
24         times.  I don't remember what I, how I was wearing it
25         back in 1999.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 26

1    Q.   Are you friendly with Cathy Adams?

2    A.   I know Cathy.  We worked together.  I know Cathy.  I

3         had, before this, I hadn't seen Cathy in several

4         years.  I don't know, but as far as friendly, I knew

5         her.  You know, she knows me, you know.

6    Q.   You worked a lot of cases with her?

7    A.   We worked together.  I can't tell you how many cases

8         we worked together, you know.  We worked together.

9    Q.   Multiple cases, though, right?

10   A.   Yes.  If a case was assigned to a squad, you know, we

11        worked the case.  I can't say, you know, how many.

12   Q.   Now, you said that it had been years since you've seen

13        her until this.  Have you seen her recently?

14   A.   It was a few months ago when I was down here, I

15        believe, a few months ago.

16   Q.   When you were down at the Law Department?

17   A.   Yes.

18   Q.   Did you meet with your attorneys together?

19   A.   I don't think so.  I don't believe so.

20   Q.   Did you and Cathy talk outside the presence of your

21        attorneys?

22   A.   Yes.

23   Q.   What'd you talk about?

24   A.   Oh, Lord.  Her family, my family.  She wanted to know

25        about my daughter.  General talk.  That's all.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 27

1    Q.   Did you talk about this case at all?

2    A.   No, ma'am.

3    Q.   No mention of the fact that you were both being sued

4         as defendants in this case?

5    A.   She, she mentioned, you know -- we didn't sit down and

6         talk-talk about the case, you know, no.

7    Q.   But it came up, right?

8    A.   Well, she knew why I was here and I knew why she was

9         here.  Let me put it that way.  And after we left

10        here, we walked to the elevator.  Like I said, she

11        asked about my family, I asked about her family and we

12        went down the elevator.  She went one way and I went

13        the other way.

14   Q.   So I understand you both know that you've been sued as

15        defendants in this case.  My question is:  Did that

16        come up at all, even if you didn't talk about it at

17        length when you saw her in the Law Department?

18   A.   Can you repeat that?

19   Q.   When you saw Cathy Adams in the Law Department a few

20        months ago, did either one of you discuss at all in

21        any way this case?

22   A.   No.  We didn't -- we did mention it, but we didn't

23        discuss it, you know, like you sit down and discuss

24        something.

25   Q.   What was said about it?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                    Page 28

1    A.   She was saying something.  I told her I do not

2         remember this case.  I don't know what this case is

3         about.  I don't remember.

4    Q.   What did she say?

5    A.   And she left it alone.  That's what she said.  We

6         started talking about our families.

7    Q.   What did she say about the case before you said you

8         didn't remember it?

9    A.   She just said "Oh, okay," and we started talking about

10        our families.

11   Q.   No, before you said "I don't recall anything about

12        this case," what did she say to you about the case

13        that prompted you to say that?

14   A.   What she said was about this case, what -- I told her

15        I did not remember this case, I don't, which I still

16        don't remember the case.  She said that she was like

17        the officer in charge, and I still told her "I don't

18        remember any of this."  And she said "Oh, okay."  And

19        we started talking about her son, my daughter.

20   Q.   When you and Cathy Adams worked together in the past,

21        did you talk about your families like that?

22   A.   Well, when we worked in the past together, Cathy was

23        not married at the time, so we talked about her mom

24        and stuff like that because she was taking care of her

25        mom, and she knew that I had a daughter, yes.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 29

1    Q.   Did you ever grab lunch or coffee or a drink with

2         Cathy Adams?

3    A.   At what time, ma'am?

4    Q.   At any time when you worked together at DPD.

5    A.   Yes.

6    Q.   How often?

7    A.   I don't know, ma'am.  I have no idea.

8    Q.   Many times, right?

9    A.   No, I'm not going to say many times.  I'm not going to

10        say that.  We had lunch.  We would go -- the squad

11        would go to lunch.  Our supervisor would take us to --

12        Christmas we all got together, so I can't, you know, I

13        can't sit here and tell you "Well, we went to lunch 10

14        times, 20," I don't know.

15   Q.   Have you ever been to her house?

16   A.   No, ma'am.

17   Q.   Has she ever been to your house?

18   A.   No.

19   Q.   Are you friends on social media with Cathy Adams?

20   A.   I'm not on social media, ma'am.  Get you in trouble.

21   Q.   I agree with you about that.

22             What about Wayne Pritchett, how well did

23        you know him?

24   A.   I knew him from Homicide.

25   Q.   Did you guys ever grab lunch or coffee or a drink

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 30

1      together?

2   A.   It's possible when we were working.

3   Q.   Did you ever see him outside of work?

4   A.   No.

5   Q.   What about Anthony Jackson, did you ever see him

6        outside of work?

7   A.   I seen Anthony once or twice.  That's when he was no

8        longer at Homicide.  That's when his partner was shot

9        and killed, and I went to the memorial and to the

10       funeral, so yes, I have seen him.

11  Q.   Did you speak to him at those events?

12  A.   Yes, ma'am.

13  Q.   When was that approximately?

14  A.   This was some time ago when his partner was checking a

15       B&E at a house, and the person there shot and killed

16       him.

17  Q.   Have you ever discussed this case with Anthony

18       Jackson?

19  A.   No, ma'am.

20  Q.   When was the last time you saw or spoke with Anthony

21       Jackson?

22  A.   Once again, I just told you, at a funeral and memorial

23       service.

24  Q.   I just wanted to make sure that was the last time.

25  A.   That's the last time, yes, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                      Page 31

1    Q.   When was the last time you saw or spoke with Wayne

2         Pritchett?

3    A.   I haven't talked to Wayne and seen Wayne Pritchett

4         since I left the department.

5    Q.   Have you ever discussed this case with Mr. Pritchett?

6    A.   No, ma'am.

7    Q.   So back in 1999 when you're working Homicide, you had

8         a lot of cases, right?

9    A.   Yes.

10   Q.   And there was pressure to close your cases quickly or

11        they would pile up, correct?

12   A.   We worked our cases.  I don't know what you mean under

13        pressure.

14   Q.   Okay.  Well, Officer Adams testified at her deposition

15        last week that there was pressure to close cases in

16        two or three days or you would just end up with a big

17        backlog of cases on your desk, do you agree with that?

18            MR. MULLER:  I object to that.  That's a

19   specific mischaracterization of her testimony.  She

20   specifically said she wasn't under any pressure.

21            MS. SALZMAN:  You're mischaracterizing her

22   testimony.

23            MR. MULLER:  No, I'm not.  You are

24   mischaracterizing her testimony.

25            MS. SALZMAN:  Excuse me.

1          MR. MULLER:  Quote her testimony or don't

2     mischaracterize.

3          MS. SALZMAN:  Mike, you need to confine

4     your objections to form and foundation.

5          MR. MULLER:  I'm not going to let you lie

6     on the record.

7          MS. SALZMAN:  I'm not lying.

8          MR. MULLER:  It's not going to happen.

9          MS. SALZMAN:  And it's completely improper

10     for you to accuse me of that.  If you want to take me

11     to court, we could do that right now.  You need to

12     stop coaching your witness with speaking objections.

13          MR. MULLER:  I'm not coaching anyone.

14          MS. SALZMAN:  So conform yourself to the

15     rules which are form and foundation objections.

16     BY MS. SALZMAN:

17     Q.   Ms. Simon, can you answer my question?

18     A.   What was your question?

19     Q.   My question was:  If Officer Adams testified that you

20          had to close cases in Homicide back in 1999, you had

21          to close cases in two or three days or they would pile

22          up on a big backlog on your desk, you would agree with

23          that?

24     A.   No, ma'am.  I don't know what she testified to.  I'm

25          not going to sit here and say that's what she said,

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                        Page 33

1         no, ma'am.

2    Q.   I'm not asking you to disagree with what she said.

3         I'm asking if that was your experience as a Homicide

4         investigator.  Did you have a lot of cases?

5    A.   No, ma'am.  I was not under any pressure, and I'm not

6         going to sit here and say that Cathy Adams said that,

7         no.

8    Q.   Listen carefully to my question, Ms. Simon.

9    A.   Ma'am, I answered your question.

10   Q.   Did you have a lot of cases?

11   A.   Ma'am, I answered your question.  I had a lot of

12        cases.  I was not under any directive to close this

13        case.  You want me to say that Cathy Adams said this,

14        that and the other.  No, I'm not going to say that.  I

15        don't know what she said.

16   Q.   I'm not asking you to say that.

17             How long on average did you take to close a

18        case in Homicide in 1999?

19   A.   I have no idea.

20   Q.   Did you work long hours?

21   A.   Yes.

22   Q.   Did it feel like there weren't enough officers to do

23        the job right?

24   A.   No, I'm not going to say that, ma'am.

25   Q.   Did you feel like you did your best job in 1999?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 34

```
 1    A.   I did my job, ma'am.

 2    Q.   I'm asking did you do your best job?

 3    A.   Ma'am, that's what I'm going to leave it at.  I did my

 4         job.  I did the best that I could.  I'm leaving it

 5         like that.

 6    Q.   Did you ever feel like you wished you had time to

 7         investigate other leads or explore other angles and

 8         you didn't have time?

 9    A.   Ma'am, I did the best I could.

10    Q.   Can you answer my question?

11    A.   I just did.

12    Q.   Did you feel like you didn't have time to explore a

13         lead or investigate an angle to a case?

14    A.   Ma'am, I did my job to the best of my ability, and I'm

15         leaving it like that.  I answered your question.

16    Q.   Do you understand my question?

17    A.   I answered your question.

18    Q.   You didn't.  Are you unable to answer it?

19    A.   Ma'am, I did my job the best of my ability, and I'm

20         going to keep saying it so you can keep asking.

21    Q.   So you're unable to answer that question, if there was

22         ever a time when you had other evidence you wished you

23         could pursue, another lead you could investigate,

24         you're not able to answer that question?

25    A.   Ma'am, I did my job the best of my ability.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 35

```
 1    Q.   What do you remember about the murder of Lisa Kindred
 2         on May 9, 1999?
 3    A.   I don't remember this case at all.
 4    Q.    Do you remember it was known as the Mother's Day
 5         murder?
 6    A.   I don't remember this case, ma'am.
 7    Q.    Do you remember about some attention in the press?
 8    A.   I don't remember.
 9    Q.    Okay.  Let's take a look at Plaintiff's Exhibit 61.
10              MS. SALZMAN:  Do you have that, Mike?
11              MR. MULLER:  Hang on.  I have 63 through
12         73.  What would be the exhibit?
13              MS. SALZMAN:  Plaintiff's Exhibit 61 is an
14         article from the Detroit Free Press.
15              MR. MULLER:  I don't have it.
16              MS. SALZMAN:  Okay.  It's on the One Drive,
17         so I'm going to ask if you can, at the next break,
18         have that printed.  We'll move on and cover some other
19         ground until then.
20              MR. MULLER:  I will go ahead and text Pat
21         to print out -- what's 62?
22              MS. SALZMAN:  I'm not going to sit here and
23         read them all to you, but you're going to need 61
24         through 66.  If you don't have them and Pat can print
25         those out, that'd be great.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 36

1    BY MS. SALZMAN:

2    Q.   Ms. Simon, you just testified you don't have any

3         memory of this case at all?

4    A.   That's correct.

5              MS. SALZMAN:  Mike, do you have Exhibit 85?

6              MR. MULLER:  I have exhibit -- I have

7    through Exhibit 74.

8              MS. SALZMAN:  Okay, so when you text Pat,

9    ask him to print out Exhibits 61 through 66 as well

10   as 75 through 85.

11             MR. MULLER:  So that you understand, I have

12   Exhibits 63 through 74.  I have them right in front of

13   me.  I don't have 61 or 62 and I don't have anything

14   past 74, and you're telling me that there are

15   exhibits?

16             MS. SALZMAN:  Yes.

17             MR. MULLER:  After 74?

18             MS. SALZMAN:  Correct.  I'm saying that

19   when you ask Pat to print exhibits, please ask him to

20   print all the exhibits on the One Drive from 61 to 85.

21             MR. MULLER:  Okay.  Can I do this?  Can we

22   take a minute so that I can go to his office and tell

23   him I need those exhibits?

24             MS. SALZMAN:  Sure.  Do you want to take a

25   5 minute break?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 37

1          MR. MULLER:  Sure, thanks.

2          (Off the record at 11:05 a.m.)

3          (Back on the record at 11:08 a.m.)

4          MARKED FOR IDENTIFICATION:

5          DEPOSITION EXHIBIT 61

6          11:08 a.m.

7    BY MS. SALZMAN:

8    Q.   All right, Officer Simon, if you can take a look at

9         Exhibit 61.  Take a moment to read it to yourself.

10   A.   Okay.

11   Q.   Does this article refresh your recollection at all

12        about the Lisa Kindred case?

13   A.   No, ma'am.

14   Q.   Does it refresh your recollection this case got some

15        attention in the press?

16   A.   No, ma'am.  Just what I just read.  I don't remember

17        this case.

18   Q.   Do you remember any aspect of your work on this case?

19   A.   No, ma'am.

20   Q.   Now, back in May, 1999, approximately how long had you

21        been at Homicide?

22   A.   I don't remember.

23   Q.   Several years by then?

24   A.   I don't remember, ma'am.

25   Q.   It wasn't your first homicide investigation back in

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                          Page 38

1           May, 1999, right?

2     A.   I'm quite sure it wasn't, but I don't remember how

3           long I had been in Homicide.

4     Q.   Were you involved at all in this case in the

5           interrogation of a witness named Raymond Jackson?

6     A.   Not as I can recall, no.

7     Q.   Do you have any knowledge about what happened during

8           Raymond Jackson's interrogation?

9     A.   No.

10    Q.   So you have no personal knowledge one way or the other

11          whether DPD officers used force or threats with

12          Mr. Jackson, correct?

13    A.   That's correct.

14    Q.   Were you involved at all in the interrogation of

15          Jodi Gonterman, the victim's sister?

16    A.   As I can recall, no.

17    Q.   So you don't have any personal knowledge about what

18          Ms. Gonterman told Detroit Police Department, correct?

19    A.   That's correct.

20    Q.   And you don't have any personal knowledge about what

21          was written down in her statement, correct?

22    A.   That is correct.

23    Q.   And you don't have any personal knowledge whether

24          anything was omitted from her statement, correct?

25    A.   That's correct.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 39

1    Q.   Did you ever speak with Will Kindred, the victim's

2         husband?

3    A.   No, not as I can recall.

4    Q.   So you don't have any personal knowledge about what he

5         might have said or not said to the Detroit Police

6         Department, correct?

7    A.   That's correct.

8    Q.   Did you ever speak to CJ Skinner, the 8 year old son

9         of the victim who was in the car when she was shot?

10   A.   Ma'am, not as I can recall.  I don't remember this

11        case at all.

12   Q.   So you don't have any personal knowledge about what

13        CJ Skinner may or may not have been asked by the

14        Detroit Police Department, correct?

15   A.   That is correct.

16   Q.   And you don't have any knowledge about what CJ Skinner

17        may or may not have said to the Detroit Police

18        Department, correct?

19   A.   That's correct.

20   Q.   Did you participate in any witness interviews in this

21        case?

22   A.   Just what we see at the top of the page with

23        Mr. Johnson.

24   Q.   Okay.  You're looking at the Justly Johnson statement

25        you testified about earlier, right?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 40

 1   A.   That's correct.

 2   Q.   Do you have a recollection of interrogating

 3        Mr. Johnson or you're just looking at that piece of

 4        paper?

 5   A.   I'm just looking at that piece of paper, ma'am.

 6   Q.   Did you help execute any search warrants in this case?

 7   A.   No, I don't remember.

 8   Q.   Did you help obtain any search warrants in this case?

 9   A.   Not as I can recall.

10   Q.   Did you attend the trials of either Mr. Scott or

11        Mr. Johnson?

12   A.   Not as I can recall, ma'am.

13   Q.   But you did go out to the scene of the crime in this

14        case, right?

15   A.   I don't believe so.

16   Q.   You participated in canvassing the neighborhood after

17        the shooting, right?

18   A.   No, ma'am, I don't believe so.

19   Q.   Do you think you didn't do that or do you just not

20        recall one way or the other whether you did that?

21   A.   I don't think I did it.  I don't recall.

22   Q.   So you don't know one way or the other?  It could have

23        happened, it could not have happened, it's just one

24        case among many, correct?

25   A.   No, ma'am, that's what you said.  I said I don't

1      recall.  I don't remember going out to any scene

2      canvassing.  I don't remember.  I don't recall at all.

3   Q.   Do you recall finding a boy named Antonio Burnett

4      asleep in the car near the scene of this shooting?

5   A.   No, ma'am.  I don't recall.  I don't remember this

6      case at all.

7          MS. SALZMAN:  Let's take a look at

8      Exhibit 44, Mike, which we marked last week.

9          MR. MULLER:  Let me go get those exhibits.

10     Got it.

11   BY MS. SALZMAN:

12   Q.   Take a look at that, Officer Simon, if you can.  Now,

13     this is a Preliminary Complaint Report filled out on

14     May 9, 1999, right?

15   A.   Yes.

16   Q.    Okay.  And do you see on the first page there towards

17     the bottom where it says "Writer observed the above

18     subject asleep in an unregistered vehicle parked on

19     street."  I think in front of 4468 Hurlbut, do you see

20     that?

21   A.   Yes, fell asleep in the vehicle, is that what you're

22     talking about?

23   Q.   Right.

24   A.   Are you down to the circumstances where the C is?

25   Q.   Exactly.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 42

1    A.  Okay.

2    Q.  Read through that section of the document if you can.

3        Let me know when you've read those, it looks like 5 or

4        6 lines.

5    A.  Okay.

6    Q.  Does this refresh your recollection that you were

7        present when this juvenile witness, Antonio Burnette,

8        was found asleep in the car on Hurlbut Street?

9    A.  No, ma'am.  I don't believe I was there.  This report

10       was by Rodney Jackson and Kevin Littlejohn, not

11       Barbara Simon.

12   Q.  No, right.  I know you didn't write the report, ma'am.

13       I'm asking if you were there on the street --

14   A.  I do not, no, ma'am, I do not believe so, no, ma'am.

15   Q.  Did you participate in many canvassing of the scenes

16       during your time at Homicide?

17   A.  Of this particular scene?

18   Q.  No, I'm asking generally in the Homicide Department,

19       in the many years you were there, have you done a lot

20       of canvassing the scene after a shooting?

21   A.  Yes, ma'am.

22   Q.  And you're out there looking for evidence, witnesses,

23       correct?

24   A.  Correct.

25   Q.  Is it hard for you to recall the times you canvassed

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 43

1       the scene of a homicide?

2   A.   Ma'am, I canvassed many, many scenes.  I don't recall

3       this scene here.

4   Q.   Let's take a look at Plaintiff's Exhibit 41.  Oh,

5       that's not the right one.  I'm sorry.  I don't think

6       that's the right one.  No.  That's Raymond Jackson.

7             MR. MULLER:  Which one?

8             MS. SALZMAN:  I wanted the statement of

9       Antonio Burnette and that's the photo of Raymond

10      Jackson.  Nick, can you tell me --

11            MR. MULLER:  Wasn't 41 Burnette?

12            MS. SALZMAN:  I thought so, but I think

13      it's Jackson.  We'll pull it up.  Just give us a

14      second.

15            MR. BOURLAND:  It's Plaintiff's 47, 4-7.

16            MR. MULLER:  47?

17            MS. SALZMAN:  Yes, that's it.

18            MR. MULLER:  47.

19            MS. SALZMAN:  Yes.  Got that.

20            MR. MULLER:  Got it.

21   BY MS. SALZMAN:

22   Q.   Ma'am, take a look at Exhibit 47 and tell me if you've

23      ever seen or have any recollection of ever seeing the

24      individual in this photograph.

25   A.   I don't remember, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 44

 1   Q.   Okay.  So you don't remember if you participated in

 2        arresting this individual, correct?

 3   A.   No, I don't remember.

 4   Q.   And you don't remember if you saw him being

 5        interrogated at the Homicide Department, right?

 6   A.   That's correct.

 7   Q.   And you don't recall if you participated in some way

 8        in his interrogation, correct?

 9   A.   I don't remember.

10   Q.   I'll show you one other document.

11            MS. SALZMAN:  Mike, can you give her

12        Exhibit 46, please?

13            MR. MULLER:  Statement of Burnette?

14            MS. SALZMAN:  Correct.

15   BY MS. SALZMAN:

16   Q.   And if you could take a look at that, Officer Simon,

17        and let me know when you've had a chance to review it

18        yourself and then I'll just ask you a few questions

19        about this one.

20   A.   Okay, I'm ready.

21   Q.   And does looking at this witness statement of Antonio

22        Burnette refresh your recollection that you were

23        present for his interrogation at Homicide on May 9,

24        1999?

25   A.   No, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                      Page 45

```
 1    Q.   You just don't recall one way or the other, correct?

 2    A.   I don't, I don't remember this at all, ma'am.

 3    Q.   So you don't have any personal knowledge whether any

 4         Detroit Police Department officers made any threats to

 5         Antonio Burnette that day, correct?

 6    A.   No, ma'am.

 7    Q.   And you don't have any personal knowledge whether any

 8         Detroit police officers made any promises to Antonio

 9         Burnette that day, right?

10    A.   No, I don't know.

11    Q.   And you don't have any personal knowledge whether any

12         force was used by Detroit Police officers

13         interrogating Antonio Burnette, correct?

14    A.   That's correct.

15    Q.   Do you see on that document the second question on the

16         first page, what does "hit a lick" mean?

17    A.   Yes.

18    Q.   Are you familiar with that expression, "hit a lick"?

19    A.   Yes.

20    Q.   What does it mean?

21    A.   Rob somebody, robbery.

22    Q.   And you're familiar with that expression from your

23         over 22 years on the force by the time May, 1999

24         rolled around, right?

25    A.   Yes.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 46

1    Q.   Have you heard other suspects or witnesses say that in

2         other investigations?

3    A.   Very possible, yes, ma'am.

4    Q.   Have you heard other DPD officers say that?

5    A.   Possible.

6    Q.   Have you yourself said it?

7    A.   I could have.  I don't know.

8    Q.   Have you had many cases involving that expression,

9         "hit a lick"?

10   A.   I'm quite sure.

11   Q.   Have you ever told a witness -- you can set that

12        document aside, Ms. Simon.

13   A.   Oh, it's aside.  Thank you.

14   Q.   Very good.  Have you ever told a witness, Officer

15        Simon, they had to give you a statement or they would

16        be charged with a crime?

17   A.   No, ma'am.

18   Q.   You agree with me it would be against DPD procedure to

19        tell a witness that?

20   A.   Yes.

21   Q.   You agree with me that that would be illegal coercion,

22        to tell a witness that, right?

23   A.   I haven't told a witness that, ma'am.

24   Q.   But my question is:  Do you agree that if you or any

25        other Detroit Police Department officer told a witness

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                Page 47

1        they would be charged with a crime if they didn't give

2        a statement, that would be illegal coercion, wouldn't

3        it?

4    A.   I can only speak for myself, ma'am.  I wouldn't do it.

5        I can't speak for other officers, what they did or

6        said at DPD.  I can only speak for one individual, me.

7    Q.   Have you ever seen other officers threaten a witness

8        with prosecution of a crime if they didn't give a

9        statement?

10   A.   I haven't, no, ma'am.

11   Q.   You don't recall one way or another?

12   A.   I haven't, no ma'am.

13   Q.   You agree with me that if an officer did threaten to

14       charge a witness with a crime, that would be illegal,

15       right?

16   A.   Yes, ma'am.

17   Q.   And that's why you wouldn't do it, right?

18   A.   I wouldn't do it, no.

19   Q.   What about, have you ever used force to get a witness

20       to sign a statement, physical force?

21   A.   No, ma'am.

22   Q.   And you agree with me that if a Detroit Police

23       Department officer used physical force to get a

24       witness to sign a statement, that would be against

25       department policy, right?

1    A.  Yes, ma'am.

2    Q.  And you agree with me that if a Detroit Police

3        Department officer used force to get a witness to sign

4        a statement, that would be illegal, right?

5    A.  Like I said, I can only speak for me, ma'am, yes.

6    Q.  Have you ever seen --

7    A.  I wouldn't do it.

8    Q.  You wouldn't do it.

9            Have you ever seen other Detroit Police

10       officers use any force with any witnesses?

11   A.  Not as I can recall, ma'am, no.

12   Q.  You just don't recall one way or the other?

13   A.  I don't recall seeing it, no.

14   Q.  It could have happened, it could not have happened?

15       You just don't have a recollection, correct?

16           MR. MULLER:  I'm going to object.  That's

17       not what she's testified to.  She said she didn't

18       recall seeing it.

19           MS. SALZMAN:  Again, Mike, you need to

20       stop.

21           MR. MULLER:  Why do you mischaracterize her

22       answers?

23           MS. SALZMAN:  Mike, I am asking the

24       questions as I'm entitled to do.  You are entitled to

25       make a form or foundation objection.

1           MR. MULLER:  You're mischaracterizing.  You

2       are not entitled to mischaracterize her testimony.

3           MS. SALZMAN:  You are not entitled to

4       ongoing speaking objections coaching the witness.  If

5       we have to go to the judge to tell you to stop, we

6       will do so.  Is that necessary?

7           MR. MULLER:  Do what you want to do.

8    BY MS. SALZMAN:

9    Q.   Officer Simon, is it your testimony you don't have any

10       recollection one way or the other whether you ever saw

11       an officer use force with a witness?

12   A.   Once again, I told you, ma'am, I answered this three

13       times.  I don't recall.  I don't know what other

14       officers do.  I can only speak for me.

15   Q.   Okay.  Now, back in 1999, it was Detroit Police

16       Department policy that if an officer was interviewing

17       a juvenile, a minor, they had to do so in the presence

18       of the juvenile's parent, correct?

19   A.   That was the policy, yes, ma'am.

20   Q.   And that's the policy you followed, right?

21   A.    If I was talking to a juvenile, I would have the

22       parent present to sign the form, or if the parent

23       waived it, you called them and they waived it and said

24       you could talk to them, yes, yes, ma'am.

25   Q.   So when you said you would have the parents sign the

1      form, you mean you would have the parent sign the

2      witness statement form like Exhibit 46 we're just

3      looking at?

4   A.   Yes, ma'am, I would have the witness sign it and have

5      the parents also sign it.

6   Q.   Because you would want proof that the parents were

7      there in the room while you took that witness

8      statement, correct?

9   A.   That's why the parents would be there, ma'am, yes.

10  Q.   Okay.  And then you said if the parent waived the

11      right to be there, you could go ahead with the

12      interrogation, is that right?

13  A.   If the parent gave you permission.

14  Q.   Are you done with your answer?

15  A.   Yes.

16  Q.   All right.  If the parent gave you permission, you

17      could interrogate a juvenile without the parent being

18      there, is that your testimony?

19  A.   If the parent gave you permission, yes.

20  Q.   And where would you document that if the parent gave

21      you permission do that?

22  A.   In his statement.

23  Q.   In the witness statement?

24  A.   That's correct.

25  Q.   So on page, Exhibit 46, if you were the one writing

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                          Page 51

```
1        this statement, you would have written either parents

2        were there or parents waived the right to be there,

3        right?

4    A.  That's correct.

5    Q.  Have you ever seen a Detroit Police Department officer

6        interview a juvenile without a parent present?

7    A.  It's possible, yes.

8    Q.  How many times have you seen that happen?

9    A.  Ma'am, I don't know.

10   Q.  Have you ever done it?

11   A.  It's possible.

12   Q.  How many times would you say that happened?

13   A.  I don't recall.

14   Q.  More than 10?

15   A.  Once again, I don't recall.

16   Q.  Now, you testified a moment ago, Officer Simon, that

17       you personally never threatened to charge a witness

18       with a crime if they wouldn't give you a statement,

19       right?

20   A.  When did I -- what'd you say?

21   Q.  Did you testify a few minutes ago in your deposition

22       today that you personally never threatened to charge a

23       witness with a crime if they wouldn't give you a

24       statement?

25   A.  That's correct.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                     Page 52

1    Q.   But that's exactly what you did with Falynn Kenner in

2         this case, isn't it, Officer Simon?

3    A.   Who?

4    Q.   You don't have any recollection of Falynn Kenner?

5    A.   No, who's that?

6              MS. SALZMAN:  Mike, do you have Exhibit 85

7         now?

8              MR. MULLER:  I should.  All right.  Here it

9         is.

10             MS. SALZMAN:  Do you have that?

11             MR. MULLER:  Answers to Interrogatories?

12             MS. SALZMAN:  Correct.

13             MARKED FOR IDENTIFICATION:

14             DEPOSITION EXHIBIT 85

15             11:32 p.m.

16   BY MS. SALZMAN:

17   Q.   Ms. Simon, Officer Simon, these are your answers to

18        the Interrogatories we served in this case, correct?

19   A.   I have no idea, ma'am.  Are you going to give me a

20        chance to read this?

21   Q.   Take your time, flip through it and I'll direct your

22        attention to certain ones I want to talk to you about,

23        and on the last page you should see your signature

24        there.

25   A.   Okay, I see my signature.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 53

1    Q.   That is your signature on the page, on the last page

2         of this document, correct?

3    A.   That's correct.

4    Q.   Okay.  And you signed this document under penalty of

5         perjury, and that "The foregoing is true and correct

6         to the best of my knowledge, information and belief,"

7         correct?

8    A.   What page are you?

9    Q.   The very last one right above your signature.  Do you

10        see where it says "I verify under penalty of perjury

11        that the following" --

12   A.   Yes.

13   Q.   Yes?  So you agree with me you signed this document

14        under oath?

15   A.   I signed it, yes, ma'am.

16   Q.   And you signed it under oath?

17   A.   I signed it, yes.

18   Q.   But my question, Officer Simon, is whether you signed

19        it under oath?

20   A.   I'm going to tell you once again, I signed it.  It had

21        to be under oath.  I see other people's names on here,

22        a Notary Public, so I guess I did, yes.

23   Q.   And that's the same oath you took today to tell the

24        truth, correct?

25   A.   Yes.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                          Page 54

```
1    Q.   And you take that oath seriously, right, Officer
2         Simon?
3    A.   Of course.
4    Q.    Okay.  So let's take a look at Interrogatory Number 5.
5         It's on Page 3.  You were asked in Interrogatory
6         Number 5, "Describe your role in the investigation."
7         And you responded, after various objections, without
8         waiving that objection, "I was an investigator
9         involved in the investigation.  My involvement
10        included advising Justly Johnson of his Constitutional
11        Rights on May 10th, 1999, and involvement with a
12        statement by Falynn Kenner on May 11, 1999."  Do you
13        see that response, Officer Simon?
14   A.   Yes.
15   Q.   Did you review that response before you signed this
16        document under oath?
17   A.   It's possible.
18   Q.    Is it possible you signed this document under oath
19        under penalty of perjury without reading it?
20   A.    Ma'am, I signed it.  You asked me -- can I finish?
21        You asked me to go back, and I signed it in March of
22        2020, and I answered your question, yes.
23   Q.    And I'm now asking you did you read this document
24        before you signed it under oath and under penalty of
25        perjury?
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 55

 1    A.   I'm quite sure I did, ma'am.

 2    Q.   Is it true what you swore to in this Interrogatory

 3         response, that you "had involvement with a statement

 4         by Falynn Kenner on May 11th, 1999"?

 5    A.   Let me put -- okay, I see what you're saying.  The

 6         statement was taken by another officer, and I was the

 7         investigator then and as a supervisor, I signed the

 8         officer at the bottom as you see.  I did not write out

 9         this statement.  I only signed the bottom after the

10         officer presented it to me.

11    Q.   What document are you looking at right now, Officer

12         Simon?

13    A.   I'm looking at one detained, murder -- what's his

14         name?  Falynn Kenner, black female.

15              MR. MULLER:  Let me identify it for her.

16         It's a document dated May 11th, 1999 executed by

17         Antonio, I can't even read his name, some police

18         officer, and it has to do with picking Falynn Kenner

19         up at Wayne County Community College on the 11th of

20         May, and it's signed by Supervisor, Ms. Simon.

21    BY MS. SALZMAN:

22    Q.   So I'm, Officer Simon, I'm going to ask you about that

23         document and a bunch of other documents in a minute,

24         but right now I'm asking about your sworn testimony,

25         about whether you have any recollection of

1          "involvement with a statement by Falynn Kenner?"

2     A.   Once again, ma'am, I signed it, and I will go back to

3          the PCR.  I don't see any statement.  I signed it.

4          And you keep asking me the same question over and over

5          and over and over.  Please, stop.

6     Q.   Officer Simon, you testified a minute ago that you had

7          no idea who Falynn Kenner is, correct?

8     A.   And I still don't know who she is, ma'am.  If she walk

9          in this door today, I would not know who she was.

10    Q.   Okay.  And sitting here today under oath, you have no

11         recollection of taking any kind of statement from her,

12         correct?

13    A.   How many times you want me to answer that?

14    Q.   You're going to have to answer it again so the record

15         is clear.

16    A.   I'll answer it one more time for you.  I don't

17         remember, so move on.  Don't ask me that again.

18    Q.   So when you answered your Interrogatory responses just

19         a couple months ago in March, 2020 and you swore under

20         oath that you had involvement with taking a statement

21         by Falynn Kenner, that was false?  You have no

22         recollection of that?

23              MR. MULLER:  I'm going to interpose an

24         objection.  It was true.  She just can't recall it

25         now.  I don't understand --

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 57

1          MS. SALZMAN:  Mike, that is improper.  You

2     are coaching been the witness.

3          MR. MULLER:  I don't understand it.  You

4     asked the question a hundred times, all right.

5          MS. SALZMAN:  And I'm entitled to make my

6     record.  You need to stop, you need to stop talking,

7     Mike, and let the witness testify.  You can state an

8     objection if you think there's something wrong with my

9     form or foundation.  Any other objections are

10     preserved.

11          MR. MULLER:  Objection, form.  Objection,

12     form, asked and answered.

13     BY MS. SALZMAN:

14     Q.   Officer Simon, in March, 2020, just a couple months

15          ago when you signed this Interrogatory response under

16          oath, was it false that you had any recollection of

17          taking a statement by Falynn Kenner?

18          MR. MULLER:  I'm going to object, form.

19     BY MS. SALZMAN:

20     Q.   You need to answer the question, Officer Simon.

21     A.   Ma'am, one more time, please don't ask me again.  I

22          don't remember, okay?  I don't remember.  So please,

23          why don't you move on?  I don't remember.

24     Q.   So it was not true to swear under oath --

25     A.   Excuse me, excuse me.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                      Page 58

1    Q.   -- in March, 2020 --

2    A.   Excuse me, ma'am.  I don't remember.

3    Q.   So I'm going to ask another question now.

4         MR. MULLER:  Wait a minute.  Time out.

5    This is getting out of control.  It's getting out of

6    control.  You're arguing back and forth, all right?

7    That's an objection.  Argumentative.  Form.

8    BY MS. SALZMAN:

9    Q.   Officer Simon, when you signed this Interrogatory

10   response in March, 2020 under oath, the truthful

11   answer would have been you have no recollection of

12   taking a statement from Falynn Kenner, correct?

13   A.   Ma'am, once again, I don't remember.  I don't

14   remember.  We can do this all day.  You're going to

15   get the same answer.

16   Q.   So your answer to Interrogatory Number 5 under oath --

17   A.   I don't remember.

18   Q.   -- was false?

19   A.   I don't remember.  I don't remember.

20   Q.   For the record, my question is:  Your answer to

21   Interrogatory Number 5 under oath was false, correct?

22   A.   I don't remember, ma'am.

23   Q.   Did you answer Interrogatory Number 5 by saying "I

24   don't remember what I did on this investigation"?

25        MR. MULLER:  I'm going to object.  The

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Page 59

```
1      Interrogatory does not require that answer.  It does

2      not say "based on your independent recollection."  It

3      simply says "What role did you play?"  She had to look

4      through documents and find out her role even though

5      she doesn't remember.  That's the truth.  What is

6      going on here?

7            MS. SALZMAN:  Mike, you need to stop.  Get

8      yourself under control.  This is questioning a

9      witness.  It's a prior statement --

10           MR. MULLER:  Are we going to do this all

11     day?

12           MS. SALZMAN:  It's a prior statement she

13     made under oath.  This is standard for me to question

14     a witness like this.  I don't know why you're

15     exploding.  It's completely appropriate.

16           MR. MULLER:  Because you didn't say "based

17     on your recollection."  The Interrogatory says "What

18     role did you play?"

19     BY MS. SALZMAN:

20     Q.  Officer Simon, the truthful answer to the question of

21         what role did you play in this investigation would

22         have been "I don't recall," right?

23     A.  Ma'am, ma'am, for the what, 10th time, I don't

24         remember.

25     Q.  So the truthful answer to the Interrogatory --
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                          Page 60

 1   A.   Oh, Lord have Mercy, ma'am, please.  I don't remember.

 2   Q.   I understand your testimony.

 3   A.   Okay.  Why don't you --

 4   Q.   I'm asking you another question which I want you to

 5        listen carefully to.  When you answer it, I'll move

 6        on.

 7             MR. MULLER:  We're going to move on.

 8        You're going to move on.  You can file a Motion to

 9        Compel her to testify to that particular question.

10             MS. SALZMAN:  I am going to ask my

11        question --

12             MR. MULLER:  If you're certain that she's

13        not giving you an answer, then you can file a motion

14        in front of the judge to compel an answer.

15             MS. SALZMAN:  I'm going to ask the question

16        one last time.  Mike, if you're going to instruct the

17        witness not to answer, that's fine.  We'll have motion

18        practice.  I'm very comfortable in doing that.

19             MR. MULLER:  She's given you an answer for

20        the last 25 questions that you repeated.

21   BY MS. SALZMAN:

22   Q.   Officer Simon, when you answered Interrogatory

23        Number 5 in March, 2020, the truthful answer about

24        what role you had in this investigation would have

25        been "I don't recall," correct?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                        Page 61

 1    A.   Once again, 11th time, I don't recall.  I don't

 2         remember.

 3    Q.   And that is not what you wrote in your Interrogatory

 4         answer, correct?

 5    A.   Where's this woman come in?  I don't remember, ma'am.

 6         I'm done.  I don't remember.

 7    Q.   Does it say "I don't remember" in the Interrogatory

 8         response to Interrogatory Number 5?

 9    A.   No.  I don't recall.  How's that?

10    Q.   Does it say "I don't recall" in the Interrogatory

11         response to Number 5?

12    A.   Ma'am, ma'am, ma'am.

13              MR. MULLER:  Hey, you know what, I object

14         as to form.  This is out of control.  I've never seen

15         anything like this in 40 years of practice.  I've

16         never seen anything like this.  All right.  I'm going

17         to terminate this deposition because it has come down

18         to you just being harassing.  You are harassing my

19         witness.  That's what you're doing.

20              MS. SALZMAN:  If you want to go to the

21         Court, Mike --

22              MR. MULLER:  You're harassing.  We'll read

23         this back to the judge.

24              MS. SALZMAN:  If you want to go to the

25         judge and say it's improper to ask your witness about

1      a sworn Interrogatory response she gave three months

2      ago --

3              MR. MULLER:  It's improper to ask --

4              MS. SALZMAN:  -- that is very different

5      than what she answered today.

6              MR. MULLER:  It's very improper to ask her

7      15 or 20 times and then argue about it.

8              MR. MUELLER:  Mike, you don't have to yell.

9      We can hear you.

10             MS. SALZMAN:  No, I'm literally 7 feet away

11     from the microphone.

12             MR. MUELLER:  Well, we can hear you in a

13     regular voice.  Just speak in that regular voice.

14             MR. MULLER:  Well, okay.  I thought I had

15     to raise my voice to get across.

16     BY MS. SALZMAN:

17     Q.   Let's look at some other documents, Officer Simon,

18          because I think it's very clear you did not review

19          that Interrogatory response before you signed it.

20          Let's move on to Plaintiff's Exhibit 64, please.

21             MR. MULLER:  When were you sworn in to

22     testify?

23             MS. SALZMAN:  Mike, if you don't contain

24     yourself and stop talking.  I cannot imagine that this

25     is the record you want for this deposition.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 63

```
 1                  MARKED FOR IDENTIFICATION:

 2                  DEPOSITION EXHIBIT 64

 3                  11:47 p.m.

 4    BY MS. SALZMAN:

 5    Q.   Officer Simon, do you have Exhibit 64?

 6    A.   I have 64.

 7    Q.   This is a statement by Falynn J. Kenner given on

 8         May 9th, 1999, correct?

 9    A.   Yes.

10    Q.   Did you have any involvement in this statement?

11    A.   No, ma'am.

12    Q.   Did you ever review this statement before today?

13    A.   Not as I can recall, no.

14    Q.   And do you see that it says that Falynn Kenner is

15         16 years old?

16    A.   That's what it says, yes, ma'am.

17    Q.   And you see that beneath her signature is the

18         signature of her mother, Candy Brown?

19    A.   I see a signature here, yes, ma'am.

20    Q.   And you see at the top it says her mother is Candy

21         Brown?

22    A.   Yes.

23    Q.   Now, this statement was typed, right?

24    A.   Yes.

25    Q.   And it was typed up by an Officer Richard Ivey?
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                   Page 64

```
 1    A.   Yes.

 2    Q.   Do you recall Mr. Ivey?

 3    A.   Yes.

 4    Q.   What did he look like?

 5    A.   Black male, average built.

 6    Q.   Tall?

 7    A.   I think so.

 8    Q.   Was he bald?

 9    A.   Not as I can recall.  He's deceased now, ma'am.  I

10         don't know.

11    Q.   Okay.  Now, if Officer Ivey typed this up, does that

12         mean he had a typewriter with him when he took the

13         statement, or does that mean he took some notes and

14         then he used them to type up a statement after?

15    A.   Evidently he must have had a typewriter.

16    Q.   Did Falynn Kenner say anything in this statement about

17         Kendrick Scott giving her a gun?

18    A.   I don't know.  Ma'am, you want me to read the

19         statement?

20    Q.   Sure.

21    A.   What was your question?

22    Q.   Does this statement say anything about Kendrick Scott

23         giving Falynn Kenner a gun?

24    A.   I don't see anything in here about anyone giving

25         anyone a gun.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                Page 65

1    Q.   I'm sorry, can you say that again?  I didn't hear you.

2         You don't see anything in here about anyone

3    giving anyone a gun?

4         MR. MULLER:  That's what she said.

5         THE WITNESS:  Yes.

6    BY MS. SALZMAN:

7    Q.   Okay.  It's a little hard to hear you.

8         And you agree with me there's nothing in

9    this statement that Falynn, on May 9, 1999, at 4:45

10   p.m., that in any way implicated Kendrick Scott in a

11   crime, correct?

12   A.   What name did you say?

13   Q.   Kendrick Scott.

14   A.   I don't know Kendrick Scott's name in this statement.

15   Q.   After she gave the statement, Falynn Kenner went home,

16   correct?

17   A.   Ma'am, I was not there.  That statement was taken by

18   Investigator Ricky Ivey.  I don't know.

19        MARKED FOR IDENTIFICATION:

20        DEPOSITION EXHIBIT 65

21        11:52 a.m.

22   BY MS. SAZLMAN:

23   Q.   Take a look at plaintiff's Exhibit 65.

24        MR. MULLER:  She's got it.

25   BY MS. SALZMAN:

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 66

1   Q.   Okay.  This is the document you were describing

2        looking at a few moments ago, correct?

3   A.   Yes.

4   Q.   You signed this document, right?

5   A.   As a supervisor checking the report, yes, ma'am.

6   Q.   Okay.  And this report is dated May 11th, 1999 at 7:25

7        p.m., correct?

8   A.   Correct.

9   Q.   And it documents the arrest of Falynn Kenner, correct?

10  A.   Yes.

11  Q.   It says she was arrested at Wayne County Community

12       College, correct?  Do you see that at the top?

13  A.   Oh, yes, yes, yes.

14  Q.   So she was at school, right?

15  A.   I believe so.

16  Q.   And she was arrested there at your direction, correct?

17  A.   I don't know if I directed them to pick her up.  They

18       got my name on it, but I don't recall.

19  Q.   You see on the form about, in the sort of bottom

20       section of the form, where it says Info Follow-Up, I

21       can't read the next part, Investigator Simon?

22  A.   Yes, I see that.

23  Q.   What does that say?

24  A.   What you just said.

25  Q.   What's the word before Investigator Simon?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 67

1    A.  I have no idea.

2    Q.  Okay.  So does that refresh your recollection she was

3         arrested at your direction?

4    A.  No, ma'am.

5    Q.  Do you think that's what this form means, even if you

6         don't recall it?

7    A.  If she was arrested, I don't, I don't remember it.  I

8         don't remember.

9    Q.  My question is:  What this form says is that these

10        officers went out and arrested Falynn Kenner at your

11        direction, correct?

12   A.  I couldn't say if I gave them the information or

13        someone else gave the information.  I don't know.

14   Q.  They said, according to this paperwork, they got the

15        information from you, right?

16   A.  It's possible.

17   Q.  That's what the paperwork says.  I understand you

18        don't recall one way or the other, but that's what the

19        paperwork says, right?

20   A.  That's what the paperwork says.  I don't recall.

21   Q.  And you don't have any basis to dispute the paperwork,

22        right?

23   A.  Right.  I don't recall, ma'am.

24   Q.  And the paperwork also says Kirk wanted for homicide,

25        right?

SIMON, OFFICER BARBARA JEAN
07/20/2020

Page 68

1    A.   Where you see Kirk wanted?

2    Q.   Next line?

3    A.   Yes.

4    Q.   So according to this paperwork, that's also

5         information that these officers got from you, right?

6    A.   I can't say that, ma'am. I don't know.

7    Q.   But that's what the paperwork says, right?

8    A.   That's what the paperwork says, but I don't know if I

9         gave the information or not.

10   Q.   But again, you don't have any basis to dispute the

11        paperwork that was prepared back in 1999, right?

12   A.   Ma'am, I don't remember.

13   Q.   And then it says "The writers made location and

14        detained Kirk. Conveyed to Homicide without incident,

15        Squad 7," right?

16   A.   Yes.

17   Q.   According to this paperwork again, you sent these guys

18        out to pick up Falynn Kenner at Wayne County Community

19        College and bring her back down to Homicide, correct?

20   A.   Once again, I don't remember. That was back in 1999.

21        I don't remember.

22   Q.   But you agree with me that's what the paperwork says,

23        right?

24   A.   That's what it says.

25   Q.   Why was she picked up at school?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 69

1    A.   Ma'am, I don't know.  Why you asking me something -- I

2         don't know.  I don't know.  I have no idea.

3    Q.   Did you want her picked up at school because her mom

4         wouldn't be with her?

5    A.   Once again, I have no idea.

6    Q.   Okay.  And did you try to have Falynn Kenner arrested

7         earlier?

8    A.   Once again, I have no idea.

9    Q.   You wanted Falynn arrested because you wanted her to

10        give a new statement, correct?

11   A.   Once again, I have no idea.

12   Q.   Since she was last questioned on May 9th, Squad 7 had

13        gotten a new statement from Raymond Jackson, correct?

14   A.   I have no idea.

15   Q.   Well, let's take a look at Plaintiff's Exhibit 49 and

16        see if that refreshes your recollection.

17             MR. MULLER:  49, is that from Cathy's dep,

18        Cathy Adams?

19             MS. SALZMAN:  Yes, correct.

20             MR. MULLER:  This has got to be it.  I hope

21        it's it

22             MS. SALZMAN:  It's Raymond Jackson's

23        statement from may 10th, 1999.

24             MR. MULLER:  6 o'clock p.m.?

25             MS. SALZMAN:  Right.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 70

1           MR. MULLER:  It's the only one that's not

2      marked.

3           MS. SALZMAN:  I think it's marked on the

4      second page, Mike.  Turn to the second page, you'll

5      see Exhibit 69.

6           MR. MULLER:  Yes.

7      BY MS. SALZMAN:

8      Q.   So Officer Simon, take a minute to look at that

9           statement.  And I'm going to ask you if it refreshes

10          your recollection about Raymond Jackson's statement

11          that's memorialized here.

12     A.   Okay.

13     Q.   Does this refresh your recollection about a statement

14          that Raymond Jackson gave to the Detroit Police

15          Department on May 10, 1999?

16     A.   No, ma'am.

17     Q.   Do you see on the first page in the second paragraph

18          about 6 lines down, "I saw Snooky down by his

19          girlfriend's.  Her name is Falynn, and she lives about

20          4 days doors away from me towards Canfield.  Him and

21          Falynn were on her porch and I saw him pass her

22          something long which was wrapped up in something that

23          looked like clothing."  Do you see that?

24     A.   Yes.

25     Q.   Do you recall learning that during the course of your

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                          Page 71

1        work on this case?

2    A.   No, ma'am, I don't remember none of this at all.

3    Q.   Okay.  You had Falynn Kenner arrested to try to

4        corroborate that statement, correct?

5    A.   I don't remember this at all, ma'am.

6    Q.   You wanted Falynn to tell you that Kendrick Scott had

7        handed her a gun, correct?

8    A.   I don't remember this at all, ma'am.

9    Q.   Now, Raymond Jackson didn't say anywhere in this

10       statement that Falynn had anything to do with the

11       murder, did he?

12   A.   Ma'am, I don't know anything.  I did not take this

13       statement.  Sergeant Lovier took this statement.  I do

14       not know.  I have no idea.  I don't know.

15            MARKED FOR IDENTIFICATION:

16            DEPOSITION EXHIBIT 66

17            12:02 p.m.

18   BY MS. SALZMAN:

19   Q.   Okay.  So let's take a look at Plaintiff's Exhibit 66.

20       You got that one?

21   A.   Yes.

22   Q.   This is a Constitutional Rights Certificate of

23       Notification, correct?

24   A.   Yes.

25   Q.   Standard Department of, Detroit Police Department

1     form, right?

2   A.   Yes.

3   Q.   And you signed it, correct?  That's your signature at

4     the bottom?

5   A.   Yes.

6   Q.   And it's for Falynn Kenner, correct?

7   A.   Yes.

8   Q.   From May 11, 1999 at 7:35 p.m., right?

9   A.   Yes.

10  Q.   And you gave Ms. Kenner her rights when she was

11    conveyed down to Homicide after you had her arrested,

12    right?

13  A.   That's what the form says, I gave her her

14    Constitutional Rights.

15  Q.   And you did that before you proceeded to interrogate

16    her, correct?

17  A.   Yes.

18  Q.   And when you interrogated her, you asked her if

19    Kendrick Scott gave her a gun, correct?

20  A.   I don't remember that, ma'am.  I don't remember that

21    at all.  No, I don't remember that.

22  Q.   Okay.  And her mother was with her again, right, Candy

23    Brown, signed next to Falynn Kenner on the form there?

24  A.   That's correct.

25  Q.   So by the time they got Falynn Kenner down to Homicide

SIMON, OFFICER BARBARA JEAN
07/20/2020

1     to meet with you, her mother had joined her, correct?

2   A.  Her mother had to be there.  She signed the form.

3   Q.  Okay.  And you asked -- when you asked Ms. Kenner if

4     Kendrick Scott gave her a gun, she said no, right?

5   A.  Ma'am, that's a Constitutional Rights form.  I don't

6     know what you're talking about.  I don't remember.

7     This is a Constitutional Rights form that I have here.

8     It's not a statement or anything.  So I don't

9     remember.  I don't recall.

10  Q.  Well, you didn't write a statement documenting your

11    interview of Falynn Kenner on May 11, 1999, did you?

12  A.  I don't remember.  I don't have the statement in front

13    of me.

14  Q.  Well, let's take a minute, and let me tell you that

15    having reviewed the entire Homicide file produced in

16    this case, there's no witness statement authored by

17    you for your interrogation of Falynn Kenner on May 11,

18    1999.  Do you have any basis to dispute that?

19  A.  You want me to take your word for it.  I don't

20    remember.  I don't know, ma'am.  I don't remember.

21    That's you stating.

22  Q.  You don't have any recollection of filling out a

23    witness statement form for Falynn Kenner on May 11,

24    1999, right?

25  A.  I don't recall any of this, no, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                Page 74

```
 1    Q.   So you interrogated a witness without writing a
 2         witness statement for them, correct?
 3    A.   Ma'am, third time, I don't remember.  I don't recall.
 4    Q.   Well, is it possible that you interviewed a witness
 5         without writing a witness statement for her just in
 6         your general practice and experience?
 7    A.   Ma'am, I don't remember.  I don't recall.
 8    Q.   Okay.  As an investigator who was with the department
 9         for how many years total?
10    A.   Ma'am, I know where you're going.  I don't remember.
11         I don't recall.  I was with the department for a
12         number of years.  I'm not going to -- I don't have a
13         statement in front of me, and you're not going to get
14         me to say something that I don't, I don't remember.
15    Q.   Well, by May, 1999, you told me you had 22 years on
16         the force, correct?
17    A.   No, you said that.  You added it up, so.
18    Q.   Well, you agree with me, right?  It's 22 years from
19         1977 to 1999?
20    A.   Yes, ma'am, and I still don't recall.
21    Q.   So what I'm asking -- I understand you don't recall
22         with this particular witness in this particular case.
23         I'm asking about your general practice right now.
24              As an investigator on the Homicide
25         Department around that time, May, 1999, was it your
```

```
 1        practice not to necessarily write a witness statement

 2        every time you interviewed a witness?

 3   A.   It's possible.

 4   Q.   Okay.  Because you're not like a Court Reporter, hired

 5        to write down every word a witness says, right?

 6   A.   If I take a witness statement I write it down as the

 7        witness tell me what happened.  The witness has the

 8        opportunity to read it and make any corrections.  And

 9        no, I'm not a Court Reporter.

10   Q.   Okay.  You didn't write a witness statement here

11        because it wouldn't have helped build a case against

12        Kendrick Scott, correct?

13   A.   Ma'am, I don't recall.  I don't remember writing a

14        statement.

15   Q.   You agreed with me if Falynn Kenner told you that

16        Kendrick Scott didn't give her a gun, that'd be

17        exculpatory information, right?

18   A.   Ma'am, if she had told me, gave a statement, I would

19        have wrote it down.

20   Q.   But I'm asking a different question.

21              If she told you that Kendrick Scott did not

22        give her a gun, that would be exculpatory evidence,

23        correct?

24   A.   Ma'am, if she told me that, I would have wrote it down

25        and had her sign it.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Page 76

1    Q.  Do you know what exculpatory evidence is?

2    A.  You know what, I don't remember this case.  I don't

3        remember this woman, and you can't make me remember

4        something I don't remember.

5    Q.  I understand.  I'm asking you a different question

6        now, Officer Simon.  If you could listen to my

7        questions and just try to answer my questions as I'm

8        asking them, it'll speed this up for you, okay?  What

9        I'm asking right now is whether --

10   A.  Excuse me.  Excuse me.  Excuse me.  Can I take a break

11       so I can go to the restroom, please?

12           MR. MULLER:  She needs to go to the

13       restroom.

14           MS. SALZMAN:  There's a pending question,

15       so I'd like you to answer it.  And once that's

16       answered, you can go to the restroom and take a break.

17           MR. MULLER:  That sounds really weird.  It

18       sounds like you're Mother Hubbard giving her

19       permission to go to the bathroom.

20           MS. SALZMAN:  When there's a pending

21       question, Mike, the witness needs to answer the

22       pending question before she takes a break.  It'll take

23       her all of 5 minutes to answer the question and she

24       can take a break.

25           MR. MULLER:  Wait a minute.  What was the

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 77

 1      question?

 2      BY MS. SALZMAN:

 3      Q.   The question was:  Was it your general practice -- I'm

 4           sorry, no.  I forgot my own question.

 5                Here's the question.  The question is:  Do

 6           you know what exculpatory evidence is?

 7      A.   What's exculpatory evidence, ma'am?  Why don't you

 8           explain it to me again.

 9      Q.   Again, Officer Simon, you just have to answer my

10           question, yes or no.

11      A.   No, no, no, no.

12      Q.   You don't know what exculpatory evidence is?

13      A.   No, no, no, no.

14                MS. SALZMAN:  Okay.  You can take a break.

15                THE WITNESS:  Thank you.  Lord, this woman.

16                (Off the record at 12:09 p.m.)

17                (Back on the record at 12:20 p.m.)

18      BY MS. SALZMAN:

19      Q.   Do you know what Brady evidence is, Officer Simon?

20      A.   I heard of Brady evidence.  I don't remember.  I don't

21           recall exactly what Brady is.  I don't remember.

22      Q.   What's your general understanding of what Brady

23           evidence is?

24      A.   I don't recall.

25      Q.   You have no understanding at all?

1    A.  No, I heard it.  I don't remember.

2    Q.   Did you get training on that when you were at the

3         department?

4    A.   It's possible.  I don't remember.

5    Q.   Were you trained that the prosecutor had to turn over

6         to defense counsel any evidence that might help build

7         a defense?

8    A.   I don't remember.  I don't recall that.

9    Q.   Did you understand that if you had a statement from a

10        witness that said she didn't get a gun from a suspect,

11        that is evidence that would have to be turned over to

12        defense counsel?

13   A.   My understanding, ma'am, it has to be turned, the

14        prosecutor has to turn everything over to the defense

15        counsel, not DPD.

16   Q.   So DPD turns it over to the prosecutor first, correct?

17   A.   If it's a case, yes.

18   Q.   And then the prosecutor turns the file over to defense

19        counsel, right?

20   A.   From my understanding, yes.

21   Q.   And if you had written up a statement for Falynn

22        Kenner that said Kendrick Scott did not give her a gun

23        and that statement was in the file, it would have been

24        turned over to defense counsel, right?

25   A.   By the prosecutor.

1    Q.   First to the prosecutor and then to defense counsel,

2         correct?

3    A.   That's my understanding.

4    Q.   That's why you didn't write a statement for Falynn

5         Kenner, because you knew it would go to defense

6         counsel, right?

7    A.   No, ma'am.  I don't remember about taking a statement.

8         I don't remember any of that, and you're not going to

9         have me sit here and say that's correct.  No, I don't

10        remember.

11   Q.   You don't remember why you didn't write a statement

12        for Falynn Kenner that night, correct?

13   A.   That's correct.

14   Q.   Okay.  Now, you did threaten to charge Falynn Kenner

15        with murder if she didn't give you a statement saying

16        Kendrick Scott gave her a gun, right?

17   A.   I didn't threaten anyone, ma'am.

18   Q.   You did actually charge Falynn Kenner with murder,

19        didn't you?

20   A.   I didn't charge anyone, ma'am.

21   Q.   Well, let's take a look at Plaintiff's Exhibit 67.

22             MR. MULLER:  Look, police officers don't

23        charge anyone.

24             MS. SALZMAN:  Mike, you're not testifying

25        today, so you can say objection if you don't like my

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                    Page 80

1          question, that's it.

2                    Will you give the witness Exhibit 67.

3                    MR. MULLER:  Fine, fine, fine.  Objection.

4                    MS. SALZMAN:  It's going to go a lot faster

5          for everybody if we stop fighting about that, Mike.

6                    Can you give the witness Exhibit 67,

7          please?

8                    MR. MULLER:  Okay.  I got 67.  It's a

9          Complaint, Request For Action?

10                   MS. SALZMAN:  Correct, 2 pages?

11                   MR. MULLER:  Correct.

12                   MS. SALZMAN:  Great, thank you.

13                   MR. MULLER:  That's what I have.

14                   MARKED FOR IDENTIFICATION:

15                   DEPOSITION EXHIBIT 67

16                   12:23 p.m.

17         BY MS. SALZMAN:

18         Q.   This is a Complaint, Request For Action signed by you,

19              Officer Simon, correct?

20                   MR. MULLER:  I can't tell.  It looks like

21              yours.

22                   THE WITNESS:  It looks like mine, yes, it

23              looks like mine.

24                   MR. MULLER:  Our copy of the exhibit is

25              really very, very difficult to see the signature, but

1        it looks like hers.

2                    MS. SALZMAN:  Again, I need the witness to

3            testify, not you, Mike.  It's not admissible evidence

4            if you say it looks like her.

5     BY MS. SALZMAN:

6     Q.   Take a look at the statement --

7     A.   Ma'am, excuse me.  It's very, very light.  It's

8            possible, yes, it could be my signature.

9     Q.   And that's your name beneath it, right, Investigator

10           Barbara Simon?

11    A.   Yes.

12    Q.   You don't have any basis to dispute you signed this,

13           correct?

14    A.   My name is at the bottom, but it's typed in, yes.

15    Q.   And as far as you can tell, it looks like your

16           signature, correct?

17    A.   Yes.

18    Q.   And this is a complaint against Falynn Kenner,

19           correct?

20    A.   Yes.

21    Q.   And it says the Basis For Referral, do you see that

22           section on the first page?  It says "Murder.

23           Defendant was given a gun that was used in a homicide

24           on May 9th, 1999.  Defendant stated that she was not

25           going to tell where she put the gun," right?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Page 82

1    A.   That's what it says.

2    Q.   You wrote that, right?

3    A.   I don't remember this, writing this, ma'am, no.

4    Q.   If you signed this form, you either wrote it or you

5         approved it before you signed it, right?

6    A.   I don't remember writing it, but my signature's at the

7         bottom, yes, ma'am.

8    Q.   So you either wrote it or someone else wrote it for

9         you and you approved it before you put your signature

10        on the form, correct?

11   A.   My signature is on the form, yes, ma'am.

12   Q.   So that was your statement to the Court, right, about

13        Falynn Kenner?

14   A.   It's a statement, ma'am.  I don't know if it went to

15        the Court or what.  I was not the officer in charge of

16        the case.

17   Q.   Well, you see that this is a form, a State of

18        Michigan, County of Wayne Probate Court, what does it

19        say?  What does it say up there on the side?  It's

20        hard to read that, but it's the Juvenile Division of

21        the court, correct?

22   A.   It says -- where you see Juvenile Court?

23   Q.   Very top of the page.

24   A.   Yes, yes.

25   Q.   So it was a complaint that was filed with the Court,

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 83

1          correct?

2     A.   As far as I know, yes, ma'am.

3     Q.   And I mean this is a standard form you filled out

4          countless times as a DPD, correct?

5     A.   I'm not going to say countless times, ma'am.  It could

6          have been -- I'm not going to say countless times.  I

7          have filled them out, yes.

8     Q.   And when you filled them out, you understood they were

9          getting filed with the Court, correct?

10    A.   Yes, ma'am.

11    Q.   What's the purpose of this form?

12    A.   That's part of the form, that Homicide form, so --

13    Q.   The purpose is to charge a juvenile with homicide?

14    A.   No, I didn't say that.  I said it's part of the

15         Homicide file.

16    Q.   But my question is:  Why did you fill out this form?

17    A.   I don't remember, ma'am.  I don't know.

18    Q.   Why would you generally fill out this standard form as

19         a DPD officer?

20    A.   I don't remember, ma'am.

21    Q.   What action could you get the Court to take when you

22         filled out a form like this?

23    A.   It all depends on the Court, ma'am.  The Court can see

24         it and blame the person for it or they can deny it, so

25         I don't know.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                              Page 84

1    Q.   So what are your options?

2    A.   It's -- I wasn't the officer in charge of the case.

3    Q.   What are the options, when the Court gets this form,

4         what do they do?

5    A.   They can bring this person forward or they can deny

6         it.

7    Q.   What does bring the person forward mean?

8    A.   In front of the juvenile judge.  She went to, here it

9         say she went to Wayne County Youth Home.

10   Q.   Where are you reading from?

11   A.   Second page?

12   Q.   Yes, at the bottom there, "Detention:  Alternative

13        placement"?

14   A.   Yes.

15   Q.   So was the purpose of this paperwork to place Falynn

16        in a group home?

17   A.   It's possible, yes.  I don't remember, ma'am.

18   Q.   I understand you don't remember, but I'm just asking

19        as an officer familiar with this kind of paperwork

20        who's filled it out multiple times.

21   A.   It could be to place her in the Wayne County Youth

22        Home.

23   Q.   Is that what it looks like to you from looking at this

24        paperwork?

25   A.   Yes.  She was placed in a Wayne County Youth Home,

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                        Page 85

1          yes, and it was authorized by Ms. Norcross.

2     Q.   And do you see the section above Section 29, Custody,

3          same page of the exhibit?

4     A.   What number?

5     Q.   29.  It says Custody in the header.

6     A.   Yes.

7     Q.   Okay.  Do you see it's the box checked off, it says

8          "It was reasonably believed the child was evading

9          legal custodian"?

10    A.   "Condition endangering the child's health, safety and

11         welfare," yes, ma'am.

12    Q.   But you didn't check that box off.  You checked the

13         box off above it.  It was "Reasonably believed the

14         child was evading legal custodian"?

15    A.   That's correct.

16    Q.   What does that mean?

17    A.   It could mean a lot of things.  It could mean she was

18         endangered -- something happened at home, things that

19         wasn't going right at home.  I don't remember, ma'am.

20    Q.   What basis did you have to believe on May 11, 1999,

21         that Falynn Kenner was evading her legal custodian?

22    A.   I don't remember.

23    Q.   Her legal custodian would be her mother, right, who

24         attended two police interviews with her?

25    A.   Yes, and her mother was also notified.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 86

1    Q.   Did you see any evidence in the papers we've looked at

2         so far that Falynn Kenner was evading her mother's

3         custody?

4    A.   It could be.  I don't remember, ma'am.  I don't

5         remember why she was conveyed to the juvenile home.  I

6         don't remember.

7    Q.   You wanted her in a juvenile home so you could get her

8         away from her mother, right?

9    A.   Ma'am, I don't want anybody in juvenile home, no one.

10        I don't remember, and you're not going to sit here and

11        make me say "Oh, yes, I wanted her from her mother."

12        I don't remember.

13   Q.   But you asked the Court to separate her from her

14        mother, according to this paperwork, right?

15   A.   I don't remember, ma'am.

16   Q.   I understand you don't remember, but according to the

17        paperwork you're looking at here, you asked the Court

18        to take action and put her in a youth home away from

19        her mother, correct?  That's what the paperwork says?

20   A.   The paperwork says she was conveyed to Wayne County

21        Youth Home.  The paperwork doesn't say she was taken

22        away from her mother.

23   Q.   Well, if she was in a youth home, she was away from

24        her mother, right?

25   A.   She was in the Wayne County Youth Home, ma'am.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 87

1    Q.   And that's not her mother's house, correct?

2    A.   I don't think so.

3    Q.   Different place entirely, Wayne County Youth Home,

4         right?

5    A.   You know it is, yes.

6    Q.   And you know so, too, right?

7    A.   I just answered your question.  Are you listening?

8         Are you listening?

9    Q.   I'm listening very carefully, Officer Simon, don't you

10        worry about that.

11   A.   I said you know it is, and yes.  So you asked me the

12        same thing over again.  Yes, it's the Wayne County

13        Youth Home.

14   Q.   So was the Request For Action, according to this

15        paperwork -- I understand you don't recall anything

16        about this case, but according to the paperwork we're

17        looking at now, is it your understanding that this

18        Request For Action, the action that was being

19        requested by you, was that the Juvenile Court placed

20        Falynn Kenner in the Wayne County Youth Home?

21   A.   She was in the Wayne County Youth Home, ma'am, yes.

22   Q.   Was that the request you asked the Court, was that the

23        action you requested the Court to take?

24   A.   Ma'am, she was in the Wayne County Youth Home, yes.

25   Q.   Are you listening to me now, Officer Simon?  I'm

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                     Page 88

1          asking a different question.

2     A.   Are you listening to me?  Are you listening to me?

3          You asked me that, but you changed the wording.

4     Q.   No, I'm asking a different question now, so listen

5          carefully.  I think you're misunderstanding me.  I

6          understand she ended up in the Youth Home.  I'm on the

7          same page with you about that, but I'm asking, this

8          form is called a Request For Action, right?

9     A.   Once again, yes.

10    Q.   Okay.  And my question, listen carefully, was the

11         action you were requesting Juvenile Court take, was

12         that action to place Falynn Kenner in the Youth Home?

13    A.   She was, yes, she was placed in the Wayne County Youth

14         Home.

15    Q.   And was that the purpose of submitting this paperwork

16         to the Court?

17    A.   We had to submit this report to the Wayne County Youth

18         Home.

19    Q.   And why did you write at the top of the paperwork that

20         she was a murder defendant?

21    A.   I don't remember writing that, ma'am.  As a matter of

22         fact, it was typed.  I don't remember typing that.

23    Q.   Well, why did you sign the form that says she was a

24         murder defendant?

25    A.   Ma'am, I don't remember.  I don't remember.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 89

1    Q.   What would be the purpose in informing the Juvenile

2         Court that she was a murder defendant?

3    A.   Ma'am, I don't remember.  You have to talk to the

4         officer in charge of the case.  I don't remember.

5    Q.   Okay.  We did talk to the officer in charge of the

6         case, but this is paperwork you filled out, right?

7    A.   Yes, right.  I signed it.  I'm not going to say I

8         typed that in there.  I signed it.  I don't remember.

9    Q.   So sitting here today under oath, you don't recall at

10        all one way or the other whether you had Falynn Kenner

11        placed in a group home, is that your testimony?

12   A.   That's my testimony, I don't remember.

13                MARKED FOR IDENTIFICATION:

14                DEPOSITION EXHIBIT 68

15                12:34 p.m.

16   BY MS. SALZMAN:

17   Q.   Okay.  Take a look, please, at Exhibit 68.  You got

18        that one?

19   A.   Yes.

20   Q.   This is another standard court form, correct?

21   A.   Yes.

22   Q.   And it's dated May 12th, 1999, right?

23   A.   Dated what?

24   Q.   May 12th, 1999.  That's the date at the very top?

25   A.   Yes.

1    Q.   Okay.  So it's the very next day after you signed that

2         Request For Action form, correct?

3    A.   No, I didn't sign this form.

4    Q.   No.  My question is:  It's the very next day after you

5         signed the Request For Action form, Plaintiff's

6         Exhibit 67 that we were just looking at, right?

7    A.   Yes, yes.

8    Q.   And you got this from the Court, correct?

9    A.   I don't remember this file, ma'am, this paper.  I

10        don't remember it.

11   Q.   Well, it's addressed "Dear Barbara Simon, Homicide,"

12        right?

13   A.   Yes, but that don't mean I remember it.  I don't

14        remember it.

15   Q.   So it's addressed to you, but you're not sure if you

16        got it, correct?

17   A.   That's correct.

18   Q.   And it says that it's about Falynn Kenner, right?

19   A.   Yes.

20   Q.   And it says "Charge:  Murder," right?

21   A.   That's what it says.

22   Q.   And that's because you had told the Court in your

23        paperwork the day before that she was a murder

24        defendant, right?

25   A.   I don't remember saying she was a murder defendant,

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 91

1        ma'am.  And you're not going to make me say that.  I

2        don't remember.

3     Q.   Well, the form you signed, Plaintiff's Exhibit 67,

4        said she was a murder defendant, right?

5     A.   The form said it, but I don't remember putting

6        anything like that on the form, ma'am.  I didn't type

7        that form.

8     Q.   Are you disputing the accuracy of that form, or are

9        you just telling me "It says what it says but I don't

10        remember"?

11     A.   I don't remember.

12     Q.   But you're not disputing that that is, in fact, the

13        form you signed, correct?

14     A.   I signed it, but I don't remember the form.

15     Q.   Okay.  And the action the Court took on your Request

16        For Action was petition dismissed, denied, right?

17     A.   It says "Petition dismissed, denied.  Reason:

18        Investigation continuing."  That's what it says.

19     Q.   So the Court found you had no evidence to charge

20        Falynn Kenner with murder, correct?

21     A.   It says investigation continuing, ma'am.  It does not

22        say you have no information.  No, that's not what it's

23        saying, no.

24     Q.   But your position to have her charged with murder at

25        this time was dismissed, correct?

```
 1    A.   Continue, investigation continuing.

 2    Q.   Sitting here today under oath, you don't have any

 3         reason to think you had probable cause charging Falynn

 4         Kenner with murder, do you?

 5    A.   Ma'am, I don't remember this.  I'm reading what's on

 6         the paper.  The investigation's continuing.  What part

 7         of this, what part of this that you don't understand?

 8         It says investigation continuing.  You want me to

 9         say -- I don't even know -- you know what, wait a

10         minute.  Let me calm down.  I don't remember this

11         case.  I do not remember this person, and I'm not

12         going to agree with you on something that I don't

13         remember.

14    Q.   It's possible you arrested Falynn Kenner without

15         probable cause, right?

16    A.   I don't remember.

17    Q.   It's possible, right?

18    A.   I don't remember.

19    Q.   Back in 1999 it was commonplace for Detroit Police

20         officers to detain people without probable cause,

21         correct?

22    A.   Say what?

23    Q.   Back in 1999 it was commonplace for Detroit Police

24         officers to detain people without probable cause,

25         right?
```

1   A.   I don't recall that.

2   Q.   You don't know one way or the other?

3   A.   I don't recall it.

4   Q.   How long did Falynn Kenner spend in the Youth Home?

5   A.   I have no idea.

6   Q.   Never checked into that?

7   A.   I don't recall.

8   Q.   Did you make any other efforts to prosecute her for

9        murder?

10  A.   I don't recall.

11  Q.   You're aware that the Department of Justice found, a

12       year after this case in 2000, that the Detroit Police

13       Department had a problem with seizing individuals

14       without reasonable suspicion, you've heard of that?

15            MR. MULLER:  I'm going to interpose an

16       objection based on form and foundation.

17  BY MS. SALZMAN:

18  Q.   Officer Simon, you can answer the question.

19  A.   I don't remember.  I don't recall, ma'am.

20  Q.   You don't recall that a consent judgment was entered

21       into between the Department of Justice and the City of

22       Detroit?

23  A.   No, ma'am.

24  Q.   When you interrogated Falynn Kenner and had her sign

25       that Constitutional Rights Notification form, she was

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                 Page 94

1      in handcuffs, right?

2   A.   I don't recall, but I believe so, ma'am.  I don't

3      recall.

4   Q.   She would have been placed in handcuffs when she was

5      arrested, right?

6   A.   You would have to ask the arresting officers that.  I

7      don't know.

8   Q.   But that's standard DPD practice, right, to place

9      someone in handcuffs when they're arrested?

10  A.   She could have been.  I can't recall if she was, if

11     they put handcuffs on her.  I don't know.

12  Q.   What was your training, when you arrested someone as a

13     DPD officer, did you put them in handcuffs?

14  A.   It all depends, ma'am.

15  Q.   And she was conveyed downtown to Homicide in a police

16     squad car, right?

17  A.   It could have been a plain car.  It could have been a

18     police car.  I don't know.

19  Q.   It was definitely a police car, right?

20  A.   I beg your pardon?

21  Q.   It was definitely a police car, right?

22  A.   It could have been marked or unmarked.

23  Q.   But marked or unmarked, it was a police vehicle,

24     correct?

25  A.   As far as I know, yes, ma'am.

1    Q.   Let's go back to your Interrogatory response, 85,

2         please.  Do you have that in front of you?

3    A.   Yes, I do.

4    Q.    And we're back to Interrogatory Number 5, the one we

5         were discussing before, Page 3.  Do you see where you

6         said that your involvement included advising Justly

7         Johnson of his Constitutional Rights on May 10th,

8         1999?

9    A.   Yes.

10   Q.   And you did more than just advise Justly Johnson of

11        his Constitutional Rights, didn't you, Officer Simon?

12   A.   It's possible.

13   Q.   You also interrogated him, right?

14   A.   Only thing I see, I took information from him, ma'am.

15   Q.   You're looking at that witness statement now?

16   A.   Yes.

17                  MARKED FOR IDENTIFICATION:

18                  DEPOSITION EXHIBIT 63

19                  12:43 p.m.

20   BY MS. SALZMAN:

21   Q.    Okay.  So let's take a look at that.  Actually, before

22        we get to that, let's look at Plaintiff's Exhibit 63.

23                  MR. MULLER:  Constitutional Rights

24        Notification?

25                  MS. SALZMAN:  Yes.

```
 1                    MR. MULLER:  There you go.

 2                    THE WITNESS:  Yes, ma'am.

 3      BY MS. SALZMAN:

 4      Q.   This is the same standard Constitutional Rights

 5           Notification paperwork, correct?

 6      A.   Yes, it's a copy of a Constitutional notification

 7           right.

 8      Q.   And this one is for Justly Johnson on May 10th, 1999

 9           at 7:45 p.m., right?

10      A.   Yes.

11      Q.   And you signed this, right?

12      A.   Yes, I did.

13      Q.   Okay.  And you gave Mr. Johnson his Constitutional

14           Rights because you were going to question him, right?

15      A.   That's correct.

16      Q.   Okay.  And by the time you got to questioning

17           Mr. Johnson on May 10th at 7:45 in the evening, he'd

18           been locked up for a good part of the day, right?

19      A.   I have no idea.

20      Q.   Was it your practice, before you interrogated a

21           witness, to go back and look through the file and see

22           if they'd made any statements before?

23      A.   I don't know if I did or not, ma'am.  I don't know.

24      Q.   Well, let's take a look at Justly Johnson's earlier

25           statement.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Page 97

1              MS. SALZMAN:  Mike, that's Defense

2      Exhibit B.  Do you have that?

3              MR. MULLER:  I have a generic copy of it.

4              MS. SALZMAN:  That's fine.

5              THE WITNESS:  I have it.

6      BY MS. SALZMAN:

7      Q.   Okay.  So do you see that this is a witness statement

8          for the same witness, Justly Johnson, signed earlier

9          that day on May 10th, 1999 at 10:55 a.m.?

10     A.   Yes.

11     Q.   Were you involved in taking this statement at all?

12     A.   No, ma'am.

13     Q.   Had you reviewed it before you read him his rights

14         8 hours later?

15     A.   I don't remember.

16     Q.   Was it your practice to review something like this

17         before you read someone their rights and started

18         questioning them?

19     A.   It could be possible.

20     Q.   Now, after Mr. Johnson gave his statement in defense

21         Exhibit B at 10:55 a.m., he was locked up on the 9th

22         floor of Homicide, right?

23     A.   I have no idea.

24     Q.   Well, when you went and got him to read him his

25         rights, you got him out of a cell, right?

 1   A.   I don't remember.

 2   Q.   Okay.  Let's take a look at Defense Exhibit C.

 3   A.   Who?

 4   Q.   C as in Charlie?

 5              MR. MULLER:  What is it?

 6              MS. SALZMAN:  It's the one she was looking

 7        at before where she wrote out the information for

 8        Justly Johnson and then it's black.

 9              THE WITNESS:  Okay.

10              MR. MULLER:  We've got it.

11   BY MS. SALZMAN:

12   Q.   Okay.  So this is your handwriting, Officer Simon, on

13        Defense Exhibit C, correct?

14   A.   Correct.

15   Q.   And you filled out this form on May 10th, 1999 at 7:47

16        p.m.?

17   A.   Yes.

18   Q.   And so you did that right after reading Justly Johnson

19        his rights, correct?  Plaintiff's Exhibit 63 is the

20        rights notification?

21   A.   Yes, ma'am.

22   Q.   Just a minute later, right?

23   A.   Yes.

24   Q.   And you filled that out because you were going to

25        interrogate Justly Johnson and you were going to take

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                      Page 99

1       a statement from him, right?

2    A.   I believe so, yes.

3    Q.   And you didn't write anything down, correct?

4    A.   Correct.

5    Q.   Didn't write down a single question you asked him,

6        correct?

7    A.   I didn't take a statement from him.

8    Q.   But my question is:  You didn't write down any

9        questions you asked him, correct?

10   A.   I didn't take any, write down any questions, or I

11       didn't take a statement from him.

12   Q.   Okay.  And that's because what Justly Johnson told you

13       at 7:47 p.m. on May 10th, 1999, is he didn't have

14       anything to do with this murder, right?

15   A.   I don't remember.

16   Q.   And you didn't want to write that down because it

17       wasn't helpful for the case that the Detroit Police

18       Department was building, right?

19   A.   I don't remember.

20   Q.   Justly Johnson told you over and over again that night

21       that he didn't have anything to do with this murder,

22       didn't he?

23   A.   I'm telling you over and over again, I don't remember.

24   Q.   You didn't write that down on this witness statement,

25       did you?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                Page 100

```
 1    A.   I wrote nothing down.  I don't remember.

 2    Q.   Okay.  And Justly Johnson told you over and over again

 3         that night that he had an alibi, didn't he?

 4    A.   I'm telling you over and over again, I don't remember.

 5    Q.   And you didn't write that down on this witness

 6         statement either, did you?

 7    A.   I wrote nothing down.  I don't remember.

 8    Q.   You told Justly Johnson he should confess to second

 9         degree murder and that he could go home, right?

10    A.   I don't remember saying anything.  I don't remember

11         this case at all.

12    Q.   Okay.  So you just don't know what you told Justly

13         Johnson that night, is that right?

14    A.   I don't remember.  I don't remember this case at all.

15    Q.   Sitting here today, Officer Simon, do you have any

16         recollection at all of advising Justly Johnson of his

17         Constitutional Rights?

18    A.   No, ma'am, I don't remember this case at all.  I don't

19         remember anything about this case.

20    Q.   So when you answered Interrogatory Number 5 and said

21         that you had advised Justly Johnson of his rights,

22         that's not a truthful statement, correct?

23    A.   I evidently had advised him of his rights.  I just

24         don't remember, ma'am.  I have a Constitutional Rights

25         form in front of me that he signed and I signed.  I
```

1      just don't remember this case, and it's nothing you

2      can say that's going to make me remember this case.  I

3      don't remember it.

4   Q.   Okay.  So when you answered the Interrogatory, your

5      truthful answer should have been "I just don't

6      remember anything about this case," correct?

7   A.   I don't remember this case at all, ma'am.

8   Q.   And that's not what you said in the Interrogatory,

9      correct?

10            MR. MULLER:  She based that on documents.

11      She had no independent recollection.  I mean, how many

12      times do we have to go over --

13   BY MS. SALZMAN:

14   Q.   Did you say that in your Interrogatory response,

15      Officer Simon, "I have no recollection of this case"?

16            MR. MULLER:  You know what, answer whatever

17      you want to answer.  I don't know what to say to you.

18            THE WITNESS:  I don't remember.  I don't

19      remember.

20   BY MS. SALZMAN:

21   Q.   You don't remember what you said in your Interrogatory

22      response?  You're looking at your Interrogatory

23      response right now, right?

24   A.   Would you let me read this, please?  What's --

25   Q.   What are you reading."

```
 1   A.  Nothing, I'm not reading anything.  I don't remember.

 2       I don't remember.  I don't remember.  I'm not reading

 3       anything.  Nothing.  Go ahead.

 4   Q.  Well, take a minute again to read Interrogatory

 5       Number 5 in Exhibit 85 and tell me, after reading it

 6       again, if you agree with me, it doesn't say "I don't

 7       recall."

 8   A.  No, it don't say that, but you're not going to make me

 9       remember this case either.  I don't remember this

10       case.  This was 20 some years ago.  I don't remember.

11   Q.  Officer Simon, I just want to be totally clear about

12       this.

13                  Now that we have looked at all of these

14       documents in your deposition today, has your

15       recollection about your work on this case been

16       refreshed at all?

17   A.  Ma'am, what's your name?

18   Q.  Can you answer my question, Officer Simon?

19   A.  What's your name?

20   Q.  I'm asking the questions.  I told you my name at the

21       beginning.  It's a simple question --

22   A.  Miss, I don't remember.  I don't remember.  I was

23       going to say Miss whoever.  I don't remember.  So

24       you're asking me the same thing.  I don't remember.

25       What part of "I don't remember" you don't understand?
```

1       I don't remember.  I don't remember this case at all.

2   Q.  Is there anything else I could show you today to help

3       refresh your recollection further?

4   A.  No, ma'am.

5           MS. SALZMAN:  Give me just a minute to

6       check in with my team.  I may be done.

7           THE WITNESS:  Thank you.

8           MS. SALZMAN:  Do you want to take a break,

9       use the restroom?

10          THE WITNESS:  I want you to check your

11      notes so we can be done.

12          MR. MULLER:  We're not going to be done.

13      Wolf has a bunch of questions.

14          THE WITNESS:  Better than her.

15          (Off the record at 12:52 p.m.)

16          (Back on the record at 12:53 p.m.)

17          MS. SALZMAN:  Mike, if you're trying to

18      have a privileged conversation with your client,

19      you're doing it in front of us, so the privilege is

20      waived and I'm going to have to ask her about that.

21      Please stop coaching her.  It's just not proper, okay?

22          MR. MULLER:  I'm not coaching anybody.

23   BY MS. SALZMAN:

24   Q.  I do have a few more questions, Officer Simon, and

25      then I'm going to turn it over to Mr. Mueller who --

```
 1    A.   Go ahead, honey, go ahead.

 2    Q.   Okay.  Have you ever been disciplined at the Detroit

 3         Police Department?

 4    A.   Yes.

 5    Q.   Okay.  What for?

 6    A.   When my weapon was stolen.

 7    Q.   When your weapon was stolen?

 8    A.   Yes, ma'am.

 9    Q.   Anything else?

10    A.   Not that I can recall.

11    Q.   I want to ask you about one other exhibit.

12              MS. SALZMAN:  Mike, do you have Exhibit 69

13         there?

14              MR. MULLER:  I'm sure I do.  Hang on.  What

15         the heck are you doing with this?  Did my colleague

16         produce it?

17              MS. SALZMAN:  Yes.

18              MR. MULLER:  This is privileged.

19              MS. SALZMAN:  I don't think so.  It was

20         produced to us and it was subject to a motion with

21         redactions.

22              MR. MULLER:  Do you want to go to the

23         second page?  What page do you want to go on in that

24         exhibit?

25              MS. SALZMAN:  Yes, the second page.  Is
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                      Page 105

1          that -- can you hear me now, Mike?

2                  MR. MULLER:  Yes.

3                  MS. SALZMAN:  Okay, second page, please,

4          the section Investigator Barbara Simon.

5                  THE WITNESS:  Yes, ma'am, and I got 5 days

6          suspension, too.

7     BY MS. SALZMAN:

8     Q.   I want to direct your attention -- you see the section

9          that says Old History, File Number 000187?

10    A.   Yes.

11    Q.   Okay.  And you see it says "Officer Simon received an

12         official reprimand on March 15th, 2000 for violation

13         of Homicide standard procedures interview,

14         interrogation of defendant.  Charges dismissed on

15         May 9th, 2000 by COP," do you see that?

16    A.   Yes.

17    Q.   What was the official reprimand for?

18    A.   I have no idea.

19    Q.   Did it have anything to do with the Lisa Kindred case?

20    A.   I have no idea.

21    Q.   Do you have any recollection of this discipline?

22    A.   No.

23                 MR. MULLER:  Well, it was, the charges

24         were dismissed.

25    BY MS. SALZMAN:

1   Q.  That was going to be my next question, what was your

2        defense?

3   A.  I don't even remember this, ma'am.

4   Q.   Do you know how you got the charged dismissed?

5   A.  I do not know.  I don't know what COP is.

6            MR. MULLER:  I've never heard of COP.

7            MS. SALZMAN:  Chief of Police, maybe.

8            MR. MULLER:  Oh, yes.

9            THE WITNESS:  Oh, okay.

10  BY MS. SALZMAN:

11  Q.   You don't know what this incident is, correct?

12  A.  No, I don't.

13  Q.   Do you have any documents that would refresh your

14       recollection about what this incident was?

15  A.  No, ma'am.

16            MS. SALZMAN:  I'm going to turn it over to

17       Mr. Mueller now.  Thank you, Officer Simon.

18                    EXAMINATION

19  BY MR. MUELLER:

20  Q.   Thank you.  Let me just ask you a few questions.  I

21       represent Justly Johnson here.  I wanted to ask just a

22       couple of clean-up questions.

23            If we look at Exhibit 64, I think we talked

24       about that earlier, of Falynn Kenner's statement taken

25       by Richard Ivey on May 9th at 4:45 p.m., do you see

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                              Page 107

```
1        that?

2   A.   Yes.

3   Q.   You read that over.  Maybe just take a quick glance at

4        it to look it over again, but you've had a lot of

5        training in your career and know what probable cause

6        is, correct?

7   A.   Yes.

8   Q.   You understand that before somebody can be arrested,

9        you need probable cause to arrest them, correct?

10  A.   Are you asking me if this is in this statement?

11  Q.   No, just a general question.

12  A.   Oh, yes.

13  Q.   You need probable cause for an arrest?

14  A.   Yes, I see what you're saying.  I thought you were

15       asking about what's in the statement.

16  Q.   People have a Constitutional right not to be seized

17       without probable cause, correct?

18  A.   Correct.

19  Q.   And as you look at Exhibit 64, Falynn Kenner's

20       statement of May 9th, is there anything in here that

21       you read that would suggest that there would be

22       probable cause for her to be arrested for murder, just

23       this statement?

24  A.   You want me to answer something that's, speculate on

25       something that Investigator Rick Ivey wrote, sir?
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                Page 108

```
 1    Q.  No, ma'am.

 2    A.   I don't know what was in his mind at the time or why,

 3         but I don't see anything, but I can't give you "Oh,

 4         yes," "oh, no," because I didn't do this statement.

 5    Q.   I understand, but you've read countless witness

 6         statements in your career as a homicide investigator,

 7         correct?

 8    A.   That's correct, but I can't, I can't say what was in

 9         Investigator Ivey's, you know, mind or something, sir.

10         Only he can answer that, and he can't answer that

11         because he's deceased, so I can't, I can't answer

12         that.

13    Q.   Okay.  Listen to my question very, very carefully.  My

14         question is:  You've been a homicide investigator for

15         probably 20 years, correct?

16    A.   Yes.

17    Q.   You were officer in charge of countless cases in

18         Homicide, correct?

19    A.   That's correct.

20    Q.   Okay.  You have read witness statements countless

21         times in determining whether or not you had probable

22         cause to charge somebody, correct?

23    A.   That's correct.

24    Q.   So if you read this witness statement, you don't need

25         to know what Richard Ivey had in mind because all this
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                 Page 109

1        is just a question, answer, question, answer,

2        question, answer, right?

3   A.   That's correct.

4   Q.   So as you read this statement of Falynn Kenner's, is

5        there anything that would suggest in this statement

6        that there's probable cause to arrest her for murder?

7   A.   Not in this statement, no, sir.

8   Q.   Okay.  Then if we go to Exhibit Number 49 that I

9        believe Mr. Muller --

10            MR. MUELLER:  Mike, do you have a copy of

11       that, that's Raymond Jackson's statement, Number 2?

12            THE WITNESS:  Okay.

13  BY MR. MUELLER:

14  Q.   That's the one where he said he saw, if you read

15       through that, I'm paraphrasing, but basically he saw

16       Kendrick Scott give something long wrapped up in what

17       looked to be clothing to Falynn Kenner on her porch,

18       do you see that?

19  A.   Where he passed her something?

20  Q.   Right.  Do you see that?

21  A.   Yes.

22  Q.   Okay.  He doesn't mention a gun, correct, in terms of

23       what is being passed from Kendrick Scott to Falynn

24       Kenner?

25  A.   Well, I didn't read the whole statement.  I don't know

1       if a weapon, if a gun was mentioned.  On that little

2       part where you say he passed her something, it doesn't

3       say what it was.

4    Q.   It doesn't mention a gun specifically, correct?

5    A.   Not in that part of the paragraph you asking me to

6       look at.  I don't know what else is in this statement.

7    Q.   Well, you can read the whole statement.  It's pretty

8       short.

9    A.   Oh, okay.  What was your question?

10   Q.   The question is:  Do you see anything where, in that

11      whole statement, Raymond Jackson mentioned the gun

12      being passed from Kendrick Scott to Falynn Kenner?

13   A.   No.

14   Q.   In fact, there's no mention of any weapon being passed

15      from Kendrick Scott to Falynn Kenner, correct?

16   A.   No.

17   Q.   Am I right?

18   A.   You're right.

19   Q.   So that statement would not give you any probable

20      cause to charge Falynn Kenner with murder, would it?

21   A.   I did not write the statement, sir.  I don't know what

22      other evidence they had.  I don't know.

23   Q.   Listen to my question very carefully.  That statement

24      from Raymond Jackson wouldn't give anybody probable

25      cause to charge Falynn Kenner with murder, would it?

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                 Page 111

```
 1    A.   I can only speak for Barbara Simon.  I can't speak for

 2         other people.  Not for me, no.  Other people, I don't

 3         know.  You have to ask them.

 4    Q.   You, as an experienced Homicide detective reading that

 5         statement, would not have probable cause to charge

 6         Falynn Kenner with murder, correct?

 7    A.   Once again, I said I wouldn't, but I can't speak for

 8         other people.

 9    Q.   If you look at Exhibit Number 67, that complaint that

10         we talked about --

11              MR. MULLER:  Hang on:  She's got it.

12    BY MR. MUELLER:

13    Q.   Okay.  That's for the Juvenile Court, correct?

14    A.   Correct.

15    Q.   All right.  And that says Complainant's Signature,

16         which you said is your signature.  It looks like your

17         signature, right?

18    A.   Correct.

19    Q.   Typically that would be your signature because right

20         under that is your printed name, correct?

21    A.   No, it's my name typed, not printed.

22    Q.   I'm sorry.  Your name is typed, correct?

23    A.   Yes.

24    Q.   And it looks like your signature right above it,

25         correct?
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Page 112

1    A.   Like I said, it looks like it, correct.

2    Q.   It says complainant.  What is a complainant?

3    A.   Like a complainant, like a complainant, defendant,

4         complainant.

5    Q.   What does that mean in terms of a police officer?

6    A.   Okay, let's start over.  A defendant, say someone --

7         you're a complainant, someone robbed you and shot you,

8         you are the complainant.

9    Q.   Then why are you the complainant in this Complaint?

10   A.   I don't remember.  I don't know, sir.

11   Q.   Would the complainant be the person who's bringing the

12        request or the charge?

13   A.   It could.  The person that -- I don't remember typing

14        this.  I signed it.  I don't remember this, but she

15        went to the Wayne County Youth Home and I was the

16        complainant.  I don't know why she went.  It could

17        have been on somebody else's order.  I don't know.

18   Q.   Well, it was on your order as a murder, charging her

19        with murder, requesting that she be arrested for

20        murder and sent to the juvenile home, correct?

21   A.   No, no, no, no, no.  Like, again, like I told your

22        other colleague, whatever her name was, I don't

23        remember this.  I didn't charge anyone with murder.

24        You have to ask the, talk to the officer in charge of

25        the case.  I don't remember this, sir.

1   Q.   Okay.  You would have been the person who would have

2        brought this complaint to the attention of the

3        Juvenile Court, wouldn't you?

4   A.   Once again, she went to the Wayne County Youth Home.

5        I don't know if I conveyed her.  I don't remember

6        typing this up.  I don't remember this at all, sir.

7   Q.   I understand you don't have any specific recollection

8        of this case, you've told us that 100 times probably

9        today.  Is this case, as you look back on this case,

10       would you think you did a good job?

11  A.   Well, I did, I believe so.

12  Q.   Would this case be typical of how you handled all your

13       investigations that you were part of?

14  A.   No, I'm not going to say that, sir.  I was not the

15       officer in charge of this case.

16  Q.   I asked investigations that you were a part of, is

17       this typical of how you would have handled all your

18       investigations as a Homicide detective?

19  A.   And once again, I told you, no, I was not the officer

20       in charge of the case.  All cases are handled

21       differently.

22  Q.   I'm just talking about --

23  A.   All homicides, excuse me, all homicides are different.

24       I'm going to speak for me, okay?  No, I don't remember

25       this case.  I probably could have handled it, if it

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Page 114

1        was my case, differently.  I am not the officer in

2        charge of the case.  I don't know.

3    Q.  Well, you agree you participated in the investigation.

4        We've seen your name on plenty of documents, right?

5            MR. MULLER:  I'm going to object to the

6        word "plenty."  If plenty means 2 or 3, yes.

7    BY MR. MUELLER:

8    Q.  We've seen your name on documents.  You have no reason

9        to disagree that you participated in this homicide

10       investigation, would that be correct?

11   A.  You've seen my name on a couple documents.  I could

12       have had some part, they asked me to do something.  I

13       don't remember this case, and I'm going to keep saying

14       it.  If I said it 100 times, it's 105 so far.  I don't

15       remember this case.

16   Q.  You have no reason to think that this case is atypical

17       for how you participated in other investigations,

18       right?

19   A.  Sir, I can't speak, I can't answer that because I

20       don't know what was going on with this case.  I don't

21       know what the officer in charge was doing with this

22       case.  I can't speak on that.

23           MR. MUELLER:  Okay.  I don't have any other

24       questions for you.

25           THE WITNESS:  Thank you.

```
 1                   MS. SALZMAN:  Let me just double-check real

 2         quick on my end.  Mike, you go if you have anything,

 3         but I'm just going to double-check I don't have

 4         anything on my end.  Mike, you doing anything?

 5                   EXAMINATION

 6    BY MR. MULLER:

 7    Q.   Ms. Simon, there was a lot to-do about your

 8         Interrogatory answer where it said, it said "Describe

 9         your role in the investigation," okay?

10                   And it said "My involvement," your answer

11         to Number 5, "My involvement included advising Justly

12         Johnson of his Constitutional Rights on May 10th, 1999

13         and involvement with the statement by Falynn Kenner on

14         May 11, 1999."  Now, first of all, you've testified

15         that you have no independent recollection of any of

16         that, correct?

17    A.   Correct.

18    Q.   Okay.  But we did show you documents where you did, in

19         fact, do something, correct?

20    A.   Right, but I don't --

21    Q.   And that's why you answered it the way you did and

22         signed those under oath, correct?

23    A.   Right.

24                   MS. SALZMAN:  Objection to form.

25    BY MR. MULLER:
```

1    Q.   Okay.  So you had no independent recollection of

2         having worked on it, but we showed you documents that

3         you had duly signed which indicated that you did have

4         that involvement, so you put it down and signed that

5         under oath as a complete and truthful answer to the

6         Interrogatories, is that fair?

7              MS. SALZMAN:  Objection to form.  And Mike,

8         I'm going to warn you, you're waiving the privilege

9         here.  I'm going to go back over that.

10             MR. MULLER:  You can.  Why not?  You

11        already spent a couple hours on it.

12   BY MR. MULLER:

13   Q.   Do you have any independent recollection of Raymond

14        Jackson at all?

15   A.   Of Raymond Jackson, no.

16   Q.   Let me -- do you need the question repeated?

17             MS. SALZMAN:  I think she said no.

18             THE WITNESS:  I said no.  I do not know who

19        Raymond Jackson is at all.  I do not know who Raymond

20        Jackson is.

21   BY MR. MULLER:

22   Q.   Okay.  So you're unaware whether he's alive or dead

23        right now?

24   A.   No.

25   Q.   Do you know who Antonio Burnette is, do you recall him

```
1        at all?

2    A.  No.

3    Q.  Do you know whether or not he's alive or dead?

4    A.  No.

5    Q.  Do you know that Mr. Johnson and Mr. Scott had their

6        cases dismissed by the judge, their convictions

7        dismissed, were you aware of that?

8    A.  I was told, yes.  And then he asked me who told me.

9        Well, to be honest with you, how I found out, well,

10       how I found out was I guess the attorney I just

11       finished talking to, sent papers to a house that I did

12       not stay at.  He sent it to my sister's house.

13   Q.  When he was trying to serve you with the Complaint?

14   A.  Right.

15   Q.  That's when you found out?

16   A.  That's when I found out, because whoever the server

17       was insisted my sister -- it was me, and I did not

18       stay there.  They went to a house that I owned where

19       my sister stay at.  That's when I found out.  And then

20       it was -- he went to the news media.  It was in the

21       paper.  It was in the paper, and my supervisor from

22       the State called me and told me about it also.  That's

23       how I found out, because he went to the paper.

24   Q.  Are you familiar with people that do long stents of

25       prison, and by law I'm talking anywhere from 10 to
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                    Page 118

1        30 years, and then get out?  Have you encountered that

2        situation before as a Homicide detective?

3                MS. SALZMAN:  Objection to form and to

4        soliciting expert testimony from this witness.

5     BY MR. MULLER:

6     Q.   Go ahead, you can answer.

7     A.   Yes.

8     Q.   In over 20 years, you would agree with me that over

9        20 years, a lot of critical evidence for retrying the

10       case disappears, is that fair?

11               MS. SALZMAN:  Objection to form.

12               THE WITNESS:  Yes.

13    BY MR. MULLER:

14    Q.   In other words, witnesses die?

15    A.   Yes.

16               MS. SALZMAN:  Objection.

17    BY MR. MULLER:

18    Q.   Witnesses' memories fade, correct?

19               MS. SALZMAN:  Objection.

20               THE WITNESS:  Yes.

21    BY MR. MULLER:

22    Q.   And a lot of times it becomes very difficult for a

23       prosecutor to retry someone after 20, 30 years for a

24       murder, is that fair?

25               MS. SALZMAN:  Objection.

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                               Page 119

```
 1              THE WITNESS:  That's fair.

 2   BY MR. MULLER:

 3   Q.   So a lot of times when these cases are dismissed,

 4        there's never an adjudication of whether they were

 5        really guilty, is that correct?

 6              MS. SALZMAN:  Objection to form.

 7              THE WITNESS:  True.

 8   BY MR. MULLER:

 9   Q.   Do you have any independent recollection -- I know you

10        answered this a million times, but I just want to be

11        clear -- of this Falynn Kenner?

12   A.   No, I do not.  If she walked through that door right

13        now, I wouldn't know who she was.  I have no idea.

14   Q.   Let me ask you something:  We asked, we asked Cathy

15        Adams, former Commander Adams about, about being

16        present at an interview with Antonio Burnette, and you

17        were asked the same thing, and she testified the same

18        way as you, she has no recollection of having been

19        present.  You don't either, right?

20   A.   No.

21              MS. SALZMAN:  Objection to the form of the

22        question.

23   BY MR. MULLER:

24   Q.   Then she was asked whether or not, in her time as a

25        police officer, she was ever present at an interview
```

1       where a witness was beaten, physically beaten so that

2       he's bleeding to get, as a form of coercion, to get

3       statements out of him.  Let me ask you that same

4       question.  Have you ever been present at an

5       interrogation where fellow police officers or yourself

6       have beaten a witness physically to get testimony from

7       them?

8                   MS. SALZMAN:  Objection to form.

9       BY MR. MULLER:

10      Q.   If, if you were present and two or three police

11           officers started pounding on a witness, beating him in

12           the face, and his face was bleeding, what would you

13           do?

14      A.   Number 1, I would advise the supervisor if it was a

15           homicide.  After that, I would have went and got the

16           officer in charge or the supervisor, and they would

17           have dealt with the officers and rendered medical aid

18           to the injured person.

19      Q.   All right.  So you wouldn't have let it slide?

20      A.   No.

21                  MS. SALZMAN:  Objection to form.

22                  MR. MULLER:  Thank you.  I have no further

23           questions.

24                       RE-EXAMINATION

25      BY MS. SALZMAN:

```
 1   Q.   All right.  Ms. Simon, I have a few more.

 2            First of all, are you being paid for your

 3        proprietary interests and your expert opinions by the

 4        City of Detroit?

 5   A.   Say what?

 6            MR. MULLER:  She's asking --

 7   BY MS. SALZMAN:

 8   Q.   Are you getting paid by the City of Detroit to give

 9        opinions in this case?

10   A.   No, ma'am.

11   Q.   And if I asked you to give your expert opinions in

12        this case, would you do that without me paying you?

13   A.   I gave you every opinion you asked me.

14   Q.   But you're not testifying as an expert in this case,

15        correct?

16   A.   No.

17   Q.   Now, you just testified with your lawyer about a

18        meeting you had with him to look at your Interrogatory

19        responses.  Do you recall that testimony?

20   A.   Yes.

21   Q.   Okay.

22            MR. MULLER:  You can inquire about it, but

23   I'm interposing the privilege.

24            MS. SALZMAN:  Pardon me?

25            MR. MULLER:  It's your privilege.  I can't
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                          Page 122

```
 1      waive it.

 2              She's the only one that can waive it.

 3              MS. SALZMAN:  Oh, she waived it, too.  She

 4      answered questions about it, Mike.

 5   BY MS. SALZMAN:

 6   Q.   Officer Simon, who was present for that meeting?

 7   A.   What meeting?

 8   Q.   The meeting you just described between you and your

 9        lawyers to look at your Interrogatory responses.

10   A.   I don't know all these people, people's name down

11        here, ma'am.  The attorney here.

12   Q.   Mr. Muller --

13              MR. MULLER:  No, I wasn't there.

14   BY MS. SALZMAN:

15   Q.   Mr. Muller is sitting next to you?  No?

16              MR. MULLER:  I was not there.

17   BY MS. SALZMAN:

18   Q.   Mr. Cunningham, Pat Cunningham?

19              MR. MULLER:  The tall, good looking guy.

20              THE WITNESS:  Yes.

21              MR. MULLER:  Pat Cunningham.

22              THE WITNESS:  Yes.

23   BY MS. SALZMAN:

24   Q.   Was anyone else?

25              MR. MULLER:  Probably my legal assistant.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                                    Page 123

1              MS. SALZMAN:  You're not testifying.

2              THE WITNESS:  A lady.  I don't know who she

3       is.

4    BY MS. SALZMAN:

5    Q.   And did your lawyer show you typed-up answers to those

6         Interrogatories that he had typed up in advance?

7    A.   I believe I seen it.  I don't, I believe so, ma'am.

8    Q.   Did you tell Mr. Cunningham what you told us here

9         today under oath, that you have no independent

10        recollection of your role in this case?

11   A.   Yes, ma'am.

12   Q.   Did you tell him you were concerned about signing a

13        document under oath that said you had a recollection

14        of your role in this case when, in fact, you didn't?

15   A.   I don't remember that, ma'am.  I don't know.

16   Q.   Did you sign this document because he put it in front

17        of you and told you to?

18             MR. MULLER:  Wolf, don't go to sleep.

19             THE WITNESS:  I don't remember, ma'am.

20   BY MS. SALZMAN:

21   Q.   Did it matter to you that this document was being

22        sworn to under oath by you?

23   A.   Ma'am, all I know is, I don't know.  I don't know.  I

24        don't recall.

25   Q.   You don't recall if it mattered to you that you were

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                      Page 124

```
 1      signing it under oath?

 2   A.   All I remember signing -- ma'am --

 3   Q.   Sorry, if you answered.  I didn't hear you.  You're

 4      going to have to say it again.

 5   A.   I don't know, ma'am.

 6   Q.   You don't know if it mattered to you?

 7   A.   Ma'am, you're going to -- I don't remember this case.

 8      I don't know.  Please, I don't remember.

 9   Q.   Okay, but I'm not asking you about the case now.  I'm

10      asking you about the meeting with your lawyers back in

11      March, 2020 that you just answered.  Do you remember

12      that meeting?

13   A.   No, I don't remember that meeting.

14   Q.   So when Mr. Muller asked you all those questions about

15      what happened in that meeting and the documents said

16      that, you don't remember any of that?

17          MR. MULLER:  Are you eavesdropping on us,

18      counsel?  Don't assume.  You were listening in.

19          MS. SALZMAN:  You just did this all on the

20      record, Mike.

21          MR. MULLER:  No, it's not on the record.

22      You asked the Court Reporter if it was on the record.

23      She said no.  So what you are doing, you eavesdropped

24      on me and you're trying to say, because you

25      eavesdropped, we somehow waived the privilege.
```

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                        Page 125

1            MS. SALZMAN:  No, I'm asking about the

2       questions you just asked the witness on the record,

3       Mike.  It was also me who warned you that you were not

4       muted when you were talking before.

5    BY MS. SALZMAN:

6    Q.   So Ms. Simon, again my question is:  Is it your

7       testimony now that, in fact, you do not remember the

8       March, 2020 meeting with your lawyers?

9    A.   No, ma'am, I do not remember the meeting.  Ma'am, you

10      have -- let me explain something to you right now.

11      When this meeting came up, I came down here.  I was

12      just getting out of the hospital with pneumonia and I

13      came down here.  I don't remember.

14           MS. SALZMAN:  Very good.  Thank you.

15           MR. MULLER:  Is there anything else today?

16           MS. SALZMAN:  Wolf, do you have any other

17      questions?  You're on mute.

18           MR. MULLER:  You're on mute.

19           MR. MUELLER:  I am finished.

20           MS. SALZMAN:  So Officer Simon is done.  We

21      can go off the record and talk about the schedule for

22      the rest of the depositions, Mike.

23           MR. MULLER:  All right.

24           (The deposition was concluded at 1:22 p.m.

25           Signature of the witness was not requested by

1    counsel for the respective parties hereto.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   CERTIFICATE OF NOTARY

2        STATE OF MICHIGAN )

3                      ) SS

4        COUNTY OF OAKLAND )

5

6                   I, SABRINA SMITH, certify that this

7        deposition was taken before me on the date

8        hereinbefore set forth; that the foregoing questions

9        and answers were recorded by me stenographically and

10       reduced to computer transcription; that this is a

11       true, full and correct transcript of my stenographic

12       notes so taken; and that I am not related to, nor of

13       counsel to, either party nor interested in the event

14       of this cause.

15

16

17

18

19

20

21

22                   SABRINA SMITH, CSR 2129

23                   Notary Public,

24                   Oakland County, Michigan.

25       My Commission expires: August 16, 2024

SIMON, OFFICER BARBARA JEAN
07/20/2020

## 0

**000187** 105:9

## 1

**1** 120:14

**10** 14:15,16 29:13 51:14 70:15 117:25

**100** 113:8 114:14

**105** 114:14

**10:21** 6:3

**10:55** 97:9,21

**10th** 54:11 59:23 69:23 95:7 96:8, 17 97:9 98:15 99:13 115:12

**11** 54:12 72:8 73:11,17,23 85:20 115:14

**11:05** 37:2

**11:08** 37:3,6

**11:32** 52:15

**11:47** 63:3

**11:52** 65:21

**11th** 55:4,16,19 61:1 66:6

**12:02** 71:17

**12:09** 77:16

**12:20** 77:17

**12:23** 80:16

**12:34** 89:15

**12:43** 95:19

**12:52** 103:15

**12:53** 103:16

**12th** 89:22,24

**13** 14:16

**13th** 14:14

**15** 62:7

**15th** 105:12

**16** 8:15,25 63:15

**18** 13:4

**1977** 13:4,5 14:1,10 74:19

**1999** 14:3 17:8, 17 18:6,13,16 19:16,19,21,24 20:2,15,17 21:2 23:2 25:22,25 31:7 32:20 33:18, 25 35:2 37:20 38:1 41:14 44:24 45:23 49:15 54:11,12 55:4,16 63:8 65:9 66:6 68:11,20 69:23 70:15 72:8 73:11, 18,24 74:15,19, 25 81:24 85:20 89:22,24 92:19, 23 95:8 96:8 97:9 98:15 99:13 115:12,14

**1:22** 125:24

**1st** 14:13

## 2

**2** 80:10 109:11 114:6

**20** 6:2 29:14 62:7 102:10 108:15 118:8,9,23

**2000** 93:12 105:12,15

**2010** 16:3

**2011** 16:23 17:3

**2020** 6:2 54:22 56:19 57:14 58:1, 10 60:23 124:11 125:8

**22** 14:4 45:23 74:15,18

**25** 60:20

## 29 85:2,5

## 3

**3** 54:5 95:5 114:6

**30** 118:1,23

**350** 7:17,18

## 4

**4** 14:18 70:20

**4-7** 43:15

**40** 61:15

**41** 43:4,11

**44** 41:8

**4468** 41:19

**46** 44:12 50:2,25

**47** 43:15,16,18, 22

**49** 69:15,17 109:8

**4:45** 65:9 106:25

## 5

**5** 36:25 42:3 54:4, 6 58:16,21,23 60:23 61:8,11 76:23 95:4 100:20 102:5 105:5 115:11

**5'10** 23:15

**5'7** 17:6

**5'9** 23:15,23

**5-10-1999** 11:17

## 6

**6** 42:4 69:24 70:18

**61** 35:9,13,23 36:9,13,20 37:5,9

**62** 35:21 36:13

**63** 35:11 36:12 95:18,22 98:19

**64** 62:20 63:2,5,6 106:23 107:19

**65** 65:20,23

**66** 35:24 36:9 71:16,19

**67** 79:21 80:2,6, 8,15 90:6 91:3 111:9

**68** 89:14,17

**69** 70:5 104:12

## 7

**7** 19:9,12,16,19 20:12,14,17,19, 20,24 21:2,4,25 24:5,19 25:9,10, 18 62:10 68:15 69:12

**73** 35:12

**74** 36:7,12,14,17

**75** 36:10

**7:25** 66:6

**7:35** 72:8

**7:45** 96:9,17

**7:47** 98:15 99:13

## 8

**8** 13:10,15,16 39:8 97:14

**85** 36:5,10,20 52:6,14 95:1 102:5

## 9

**9** 35:2 41:14

44:23 65:9

**9th** 63:8 69:12 81:24 97:21 105:15 106:25 107:20

## A

**a.m.** 6:3 37:2,3,6 65:21 97:9,21

**Abady** 7:5

**ability** 34:14,19, 25

**able** 22:22 34:24

**academy** 13:1, 8,12,15,17

**accuracy** 91:8

**accuse** 32:10

**acknowledge** 6:5,8

**action** 80:9,18 83:21 86:18 87:14,18,23 88:8, 11,12 90:2,5 91:15,16

**Adams** 20:12 21:5 26:1 27:19 28:20 29:2,19 31:14 32:19 33:6, 13 69:18 119:15

**added** 74:17

**addressed** 90:11,15

**adjudication** 119:4

**administered** 6:9

**admissible** 81:3

**advance** 7:24 8:2 123:6

**advise** 95:10 120:14

**advised** 100:21,23

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**advising** 54:10
95:6 100:16
115:11

**Afro** 22:10 23:12
24:1,15,25

**age** 17:10

**agency** 13:21
16:19

**agent** 17:2,3

**ago** 12:18 15:24
26:14,15 27:20
30:14 51:16,21
56:6,19 57:15
62:2 66:2 102:10

**agree** 6:17
29:21 31:17
32:22 46:18,21,
24 47:13,22 48:2
53:13 65:8 68:22
74:18 92:12
102:6 114:3
118:8

**agreed** 75:15

**agreement**
6:14,15

**ahead** 11:20
19:7 21:12 35:20
50:11 102:3
104:1 118:6

**aid** 120:17

**alibi** 100:3

**alive** 116:22
117:3

**alleged** 8:18
9:14

**Alternative**
84:12

**angle** 34:13

**angles** 34:7

**answer** 18:17
21:15 23:4 32:17
34:10,18,21,24
50:14 56:13,14,
16 57:20 58:11,
15,16,20,23 59:1,
20,25 60:5,13,14,

17,19,23 61:4
76:7,15,21,23
77:9 93:18 101:5,
16,17 102:18
107:24 108:10,11
109:1,2 114:19
115:8,10 116:5
118:6

**answered**
17:24 23:5 33:9,
11 34:15,17
49:12 54:22
56:18 57:12
60:22 62:5 76:16
87:7 100:20
101:4 115:21
119:10 122:4
124:3,11

**answering**
21:17

**answers** 48:22
52:11,17 123:5

**Anthony**
24:16,24 30:5,7,
17,20

**Antonio** 41:3
42:7 43:9 44:21
45:5,8,13 55:17
116:25 119:16

**anybody** 86:9
103:22 110:24

**Anytime** 21:14

**appearance**
22:6

**applied** 13:20
16:18

**apply** 15:8

**appropriate**
59:15

**approved**
82:5,9

**approximate**
18:6 22:21

**approximately** 14:22 18:14
30:13 37:20

**approximation** 17:19 20:22

**argue** 62:7

**arguing** 58:6

**Argumentative** 58:7

**Arlie** 25:1,4,10

**arrangement**
6:12

**arrest** 66:9
107:9,13 109:6

**arrested** 12:9
66:11,16 67:3,7,
10 69:6,9 71:3
72:11 92:14 94:5,
9,12 107:8,22
112:19

**arresting** 44:2
94:6

**article** 35:14
37:11

**aside** 11:10
46:12,13

**asked** 16:4,18
27:11 39:13 54:5,
20,21 57:4,12
72:18 73:3 86:13,
17 87:11,22 88:3
99:5,9 113:16
114:12 117:8
119:14,17,24
121:11,13
124:14,22 125:2

**asking** 8:8 18:9
22:25 33:2,3,16
34:2,20 42:13,18
48:23 54:23
55:24 56:4 60:4
69:1 74:21,23
75:20 76:5,8,9
84:18 88:1,4,7
102:20,24
107:10,15 110:5
121:6 124:9,10
125:1

**asleep** 41:4,18,
21 42:8

**aspect** 37:18

**assigned**
20:19 24:4,18
26:10

**assignment**
20:18

**assistant**
122:25

**Associate'**
12:16

**assume** 124:18

**attend** 40:10

**attended** 85:24

**attention** 35:7
37:15 52:22
105:8 113:2

**attorney** 16:16,
20,22 117:10
122:11

**attorneys** 6:4
10:21,25 11:4
26:18,21

**atypical** 114:16

**authored**
73:16

**authorized**
85:1

**average** 33:17
64:5

**aware** 93:11
117:7

**B**

**B&e** 30:15

**back** 14:15,16
15:9 17:7 19:21
20:17 25:22,25
31:7 32:20 37:3,
20,25 49:15
54:21 56:2 58:6
61:23 68:11,19,
20 77:17 92:19,
23 95:1,4 96:21
103:16 113:9
116:9 124:10

**backlog** 31:17
32:22

**bald** 64:8

**Barbara** 6:20
42:11 81:10
90:11 105:4
111:1

**based** 59:2,16
93:16 101:10

**basically**
109:15

**basis** 67:21
68:10 73:18
81:12,21 85:20

**bathroom**
76:19

**beat** 14:13

**beaten** 120:1,6

**beating** 120:11

**beg** 94:20

**beginning**
102:21

**behalf** 6:16,18

**belief** 53:6

**believe** 8:3 9:9
13:16 14:12
18:23 20:8,9,16
21:3,4 23:12,23
24:1,15,25 26:15,
19 40:15,18 42:9,
14 66:15 85:20
94:2 99:2 109:9
113:11 123:7

**believed** 85:8,
13

**beneath** 63:17
81:9

**Beryl** 19:3,5

**best** 13:14 23:4
33:25 34:2,4,9,
14,19,25 53:6

**Better** 103:14

**big** 31:16 32:22

**Billy** 21:3 22:2

**bit** 21:22,23

**black** 18:5,8,12, 15,19 19:15,18 22:7 23:8,21,25 24:11,24 55:14 64:5 98:8

**blame** 83:24

**blank** 12:2

**bleeding** 120:2,12

**bottom** 41:17 55:8,9 66:19 72:4 81:14 82:7 84:12

**Bourland** 7:7 43:15

**box** 85:7,12,13

**boy** 41:3

**Brady** 77:19,20, 21,22

**break** 35:17 36:25 76:10,16, 22,24 77:14 103:8

**Brinckerhoff** 7:5

**bring** 68:19 84:5,7

**bringing** 112:11

**brought** 113:2

**brown** 25:12,20 63:18,21 72:23

**build** 75:11 78:6

**building** 99:18

**built** 23:18,23 24:1 64:5

**bunch** 55:23 103:13

**Burnett** 41:3

**Burnette** 42:7 43:9,11 44:13,22 45:5,9,13 116:25 119:16

**C**

**called** 6:21 7:5 49:23 88:8 117:22

**calm** 92:10

**Candy** 63:18,20 72:22

**Canfield** 70:20

**canvassed** 42:25 43:2

**canvassing** 40:16 41:2 42:15, 20

**capacity** 8:14 10:8,11

**car** 39:9 41:4 42:8 94:16,17,18, 19,21

**care** 28:24

**career** 107:5 108:6

**carefully** 33:8 60:5 87:9 88:5,10 108:13 110:23

**case** 7:17 8:8 26:10,11 27:1,4, 6,15,21 28:2,7, 12,14,15,16 30:17 31:5 33:13, 18 34:13 35:3,6 36:3 37:12,14,17, 18 38:4 39:11,21 40:6,8,14,24 41:6 52:2,18 71:1 73:16 74:22 75:11 76:2 78:17 82:16 84:2 87:16 89:4,6 92:11 93:12 99:17 100:11,14,18,19 101:1,2,6,7,15 102:9,10,15 103:1 105:19 112:25 113:8,9, 12,15,20,25 114:1,2,13,15,16, 20,22 118:10

121:9,12,14 123:10,14 124:7, 9

**cases** 9:13 24:8,21 26:6,7,9 31:8,10,12,15,17 32:20,21 33:4,10, 12 46:8 108:17 113:20 117:6 119:3

**Catherine** 20:12

**Cathy** 21:5 26:1,2,3,20 27:19 28:20,22 29:2,19 33:6,13 69:18 119:14

**Cathy's** 69:17

**cause** 92:3,15, 20,24 107:5,9,13, 17,22 108:22 109:6 110:20,25 111:5

**cell** 97:25

**Celli** 7:5

**certain** 52:22 60:12

**Certificate** 71:22

**chance** 44:17 52:20

**changed** 25:23 88:3

**charge** 21:4 28:17 47:14 51:17,22 79:14, 18,20,23 82:15 83:13 84:2 89:4,5 90:20 91:19 108:17,22 110:20,25 111:5 112:12,23,24 113:15,20 114:2, 21 120:16

**charged** 46:16 47:1 91:24 106:4

**charges** 105:14,23

**charging** 92:3 112:18

**Charlie** 98:4

**check** 85:12 103:6,10

**checked** 85:7, 12 93:6

**checking** 30:14 66:5

**Chief** 106:7

**child** 85:8,14

**child's** 85:10

**Childs** 18:22 19:25 20:6 21:24

**Christmas** 29:12

**chronology** 14:8

**circumstances** 41:24

**City** 93:21 121:4,8

**civil** 8:15,18 9:14

**CJ** 39:8,13,16

**clean-up** 106:22

**clear** 7:20 56:15 62:18 102:11 119:11

**client** 7:17 103:18

**close** 31:10,15 32:20,21 33:12, 17

**clothing** 70:23 109:17

**coaching** 32:12,13 49:4 57:2 103:21,22

**coercion** 46:21 47:2 120:2

**coffee** 29:1,25

**colleague** 7:7, 14 104:15 112:22

**College** 12:22 55:19 66:12 68:19

**come** 27:16 61:5,17

**comfortable** 60:18

**Commander** 119:15

**committed** 9:14

**commonplace** 92:19,23

**Community** 12:22 55:19 66:11 68:18

**compel** 60:9,14

**complainant** 112:2,3,4,7,8,9, 11,16

**Complainant's** 111:15

**complaint** 41:13 80:9,18 81:18 82:25 111:9 112:9 113:2 117:13

**complete** 21:15 116:5

**completely** 32:9 59:15

**complexion** 22:12 23:8,21 24:12,25

**concerned** 123:12

**concluded** 125:24

**Condition** 85:10

**confess** 100:8

**confine** 32:3

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**conform** 32:14

**connection** 9:10

**consent** 6:11, 19 93:20

**Constitutional** 54:10 71:22 72:14 73:5,7 93:25 95:7,11,23 96:4,6,13 100:17, 24 107:16 115:12

**contain** 62:23

**Continue** 92:1

**continuing** 91:18,21 92:1,6,8

**control** 58:5,6 59:8 61:14

**conversation** 103:18

**conveyed** 68:14 72:11 86:5, 20 94:15 113:5

**convicted** 12:13

**convictions** 117:6

**COP** 105:15 106:5,6

**copy** 80:24 96:6 97:3 109:10

**correct** 8:12 9:5,18,23 12:3 13:15 15:25 16:1, 21 22:16,19 31:11 36:4,18 38:12,13,18,19, 21,22,24,25 39:6, 7,14,15,18,19 40:1,24 42:23,24 44:2,6,8,14 45:1, 5,13,14 48:15 49:18 50:8,24 51:4,25 52:12,18 53:2,3,5,7,24 56:7,12 58:12,21 60:25 61:4 63:8 65:11,16 66:2,7, 8,9,12,16 67:11

68:19 69:10,13, 19 71:4,7,23 72:3,6,16,19,24 73:1 74:2,16 75:12,23 78:16 79:2,9,12,13 80:10,11,19 81:13,16,19 82:10,21 83:1,4,9 85:15 86:19 87:1 89:20 90:2,8,16, 17 91:13,20,25 92:21 94:24 96:5, 15 98:13,14,19 99:3,4,6,9 100:22 101:6,9 106:11 107:6,9,17,18 108:7,8,15,18,19, 22,23 109:3,22 110:4,15 111:6, 13,14,18,20,22, 25 112:1,20 114:10 115:16, 17,19,22 118:18 119:5 121:15

**correcting** 25:6

**corrections** 75:8

**corroborate** 71:4

**counsel** 6:11 78:6,12,15,19,24 79:1,6 124:18

**countless** 83:4,5,6 108:5, 17,20

**County** 6:1 12:22 55:19 66:11 68:18 82:18 84:9,21,25 86:20,25 87:3,12, 20,21,24 88:13, 17 112:15 113:4

**couple** 56:19 57:14 106:22 114:11 116:11

**course** 10:4 54:3 70:25

**court** 6:4 9:23 10:3,7,10 21:17

32:11 61:21 75:4, 9 82:12,15,18,21, 22,25 83:9,21,23 84:3 86:13,17 87:19,22,23 88:11,16 89:2,20 90:8,22 91:15,19 111:13 113:3 124:22

**cover** 35:18

**crewcut** 24:1

**crime** 12:11,13 40:13 46:16 47:1, 8,14 51:18,23 65:11

**Crimes** 14:17

**critical** 118:9

**Cunningham** 7:14 122:18,21 123:8

**curly** 23:21

**Curry** 19:3,5

**custodian** 85:9,14,21,23

**custody** 85:2,5 86:3

**cut** 21:14 22:10


**D**


**dark** 24:12,25

**date** 89:24

**dated** 11:16 55:16 66:6 89:22, 23

**daughter** 26:25 28:19,25

**day** 21:1 35:4 45:5,9 58:14 59:11 90:1,4,23 96:18 97:9

**days** 31:16 32:21 70:20 105:5

**dead** 116:22 117:3

**dealt** 120:17

**Dear** 90:11

**deceased** 25:14 64:9 108:11

**decision** 16:4, 6

**declare** 6:10

**defendant** 81:23,24 88:20, 24 89:2 90:24,25 91:4 105:14 112:3,6

**defendants** 27:4,15

**defense** 6:18 78:6,7,12,14,18, 24 79:1,5 97:1,20 98:2,13 106:2

**definitely** 94:19,21

**degree** 12:16, 19,23 100:9

**delay** 21:23

**demoted** 15:21

**denied** 15:8 91:16,17

**deny** 83:24 84:5

**dep** 69:17

**department** 13:12,18 14:9 15:22 18:6,13 26:16 27:17,19 31:4 38:18 39:6, 14,18 42:18 44:5 45:4 46:25 47:23, 25 48:3 49:16 51:5 70:15 71:25 74:8,11,25 78:3 93:11,13,21 99:18 104:3

**depends** 83:23 94:14

**deposed** 23:3

**deposition** 6:5,6,7 7:6,14,15, 16,23 9:7 10:16, 19,20,22 11:5,8, 13 12:7 31:14 37:5 51:21 52:14 61:17 62:25 63:2 65:20 71:16 80:15 89:14 95:18 102:14 125:24

**depositions** 125:22

**describe** 20:5 54:6 115:8

**described** 122:8

**describing** 66:1

**description** 23:7

**descriptions** 22:19

**desk** 31:17 32:22

**detain** 92:20,24

**detained** 55:13 68:14

**detective** 111:4 113:18 118:2

**Detention** 84:12

**determining** 108:21

**Detroit** 13:12, 18 14:9 15:22 35:14 38:18 39:5, 14,17 45:4,8,12 46:25 47:22 48:2, 9 49:15 51:5 70:14 71:25 92:19,23 93:12, 22 99:17 104:2 121:4,8

**die** 118:14

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**different** 62:4
75:20 76:5 87:3
88:1,4 113:23

**differently**
113:21 114:1

**difficult** 80:25
118:22

**direct** 52:21
105:8

**directed** 66:17

**direction**
66:16 67:3,11

**directive** 33:12

**disagree** 33:2
114:9

**disappears**
118:10

**discipline**
105:21

**disciplined**
104:2

**discuss** 27:20,
23

**discussed**
30:17 31:5

**discussing**
95:5

**dismissed**
91:16,17,25
105:14,24 106:4
117:6,7 119:3

**dispute** 67:21
68:10 73:18
81:12

**disputing**
91:8,12

**Division** 82:20

**document**
12:4 42:2 44:10
45:15 46:12
50:20 53:2,4,13
54:16,18,23
55:11,16,23 66:1,
4 123:13,16,21

**documenting**

73:10

**documents**
11:7,9,11,12
55:23 59:4 62:17
66:9 101:10
102:14 106:13
114:4,8,11
115:18 116:2
124:15

**doing** 7:23,25
60:18 61:19
103:19 104:15
114:21 115:4
124:23

**door** 56:9
119:12

**doors** 70:20

**double-check**
115:1,3

**downtown**
94:15

**Dozens** 10:6

**DPD** 8:14 9:11,
15 10:8,11 12:24
13:24 14:1 15:25
29:4 38:11 46:4,
18 47:6 78:15,16
83:4,19 94:8,13

**drink** 29:1,25

**Drive** 35:16
36:20

**duly** 6:22 116:3

---

**E**

**earlier** 16:18
39:25 69:7 96:24
97:8 106:24

**earn** 12:17

**easier** 21:18

**eavesdroppe
d** 124:23,25

**eavesdroppin
g** 124:17

**education**
12:15

**effect** 9:23

**efforts** 93:8

**either** 20:6
27:20 40:10 51:1
82:4,8 100:6
102:9 119:19

**elevator** 27:10,
12

**eligible** 16:11

**Ellis** 21:8 23:24

**else's** 112:17

**email** 7:15

**emailed** 7:24

**Emery** 7:5

**encountered**
118:1

**endangered**
85:18

**endangering**
85:10

**ended** 88:6

**enforcement**
12:20 13:21
16:19

**entered** 93:20

**entire** 73:15

**entirely** 87:3

**entitled** 48:24
49:2,3 57:5

**evading** 85:8,
14,21 86:2

**evening** 96:17

**events** 30:11

**everybody**
23:2 80:5

**evidence**
34:22 42:22
75:22 76:1 77:6,
7,12,19,20,23
78:6,11 81:3 86:1
91:19 110:22

118:9

**evidently**
64:15 100:23

**exactly** 41:25
52:1 77:21

**EXAMINATIO
N** 6:25 106:18
115:5

**examined**
6:24

**exculpatory**
75:17,22 76:1
77:6,7,12

**excuse** 31:25
57:25 58:2 76:10
81:7 113:23

**execute** 40:6

**executed**
55:16

**exhibit** 7:21
35:9,12,13 36:5,
6,7 37:5,9 41:8
43:4,22 44:12
50:2,25 52:6,14
62:20 63:2,5
65:20,23 69:15
70:5 71:16,19
79:21 80:2,6,15,
24 85:3 89:14,17
90:6 91:3 95:18,
22 97:2,21 98:2,
13,19 102:5
104:11,12,24
106:23 107:19
109:8 111:9

**exhibits** 7:14,
15,24 8:2 36:9,
12,15,19,20,23
41:9

**experience**
33:3 74:6

**experienced**
14:6 111:4

**expert** 118:4
121:3,11,14

**explain** 77:8
125:10

118:9

**exploding**
59:15

**explore** 34:7,
12

**expression**
45:18,22 46:8

**eyes** 18:12

---

**F**

**face** 120:12

**fact** 27:3 88:22
91:12 110:14
115:19 123:14
125:7

**fade** 118:18

**fair** 17:7 116:6
118:10,24 119:1

**false** 56:21
57:16 58:18,21

**Falynn** 52:1,4
54:12 55:4,14,18
56:1,7,21 57:17
58:12 63:7,14
64:16,23 65:9,15
66:9 67:10 68:18
69:6,9 70:19,21
71:3,6,10 72:6,
23,25 73:11,17,
23 75:15 78:21
79:4,12,14,18
81:18 82:13
84:15 85:21 86:2
87:20 88:12
89:10 90:18
91:20 92:3,14
93:4,24 106:24
107:19 109:4,17,
23 110:12,15,20,
25 111:6 115:13
119:11

**familiar** 45:18,
22 84:19 117:24

**families** 28:6,
10,21

**family** 26:24
27:11

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020

**far** 26:4 81:15 83:2 86:2 94:25 114:14

**faster** 80:4

**Faulk** 25:15

**feel** 33:22,25 34:6,12

**feet** 62:10

**fell** 41:21

**fellow** 120:5

**female** 18:5,12, 15,19 19:11,15, 18 20:14 55:14

**females** 18:8

**fighting** 80:5

**file** 60:8,13 73:15 78:18,23 83:15 90:9 96:21 105:9

**filed** 82:25 83:9

**fill** 83:16,18

**filled** 11:24 12:1 41:13 83:3,7,8,22 84:20 89:6 98:15, 24

**filling** 73:22

**find** 59:4

**finding** 41:3

**fine** 60:17 80:3 97:4

**finish** 21:16 54:20

**finished** 117:11 125:19

**firm** 7:4

**first** 6:22 14:10, 12 37:25 41:16 45:16 70:17 78:16 79:1 81:22 115:14 121:2

**Fisher** 21:4 23:6

**flip** 52:21

**floor** 97:22

**folks** 22:22

**Follow-up** 66:20

**followed** 49:20

**following** 53:11

**follows** 6:24

**force** 14:4 38:11 45:12,23 47:19, 20,23 48:3,10 49:11 74:16

**foregoing** 53:5

**forgot** 77:4

**form** 32:4,15 48:25 49:22 50:1, 2 57:9,11,12,18 58:7 61:14 66:19, 20 67:5,9 72:1, 13,23 73:2,5,7,23 82:4,10,11,17 83:3,11,12,16,18, 22 84:3 88:8,23 89:20 90:2,3,5 91:3,5,6,7,8,13, 14 93:16,25 98:15 100:25 115:24 116:7 118:3,11 119:6, 21 120:2,8,21

**format** 7:25

**former** 119:15

**forth** 58:6

**forward** 84:5,7

**found** 10:13 42:8 91:19 93:11 117:9,10,15,16, 19,23

**foundation** 8:4 32:4,15 48:25 57:9 93:16

**Free** 35:14

**friendly** 26:1,4

**friends** 29:19

**front** 36:12 41:19 60:14 73:12 74:13 84:8 95:2 100:25 103:19 123:16

**funeral** 30:10, 22

**further** 6:8 7:10 103:3 120:22

**G**

**general** 16:17, 20,22 26:25 74:6, 23 77:3,22 107:11

**generally** 42:18 83:18

**generic** 97:3

**getting** 15:17 58:5 83:9 121:8 125:12

**girlfriend's** 70:19

**give** 12:7 14:8 17:19 22:21 43:13 44:11 46:15 47:1,8 51:18,23 52:19 69:10 75:16,22 78:22 79:15 80:2, 6 103:5 108:3 109:16 110:19,24 121:8,11

**given** 9:7 60:19 63:7 81:23

**giving** 7:15 60:13 64:17,23, 24 65:3 76:18

**glance** 107:3

**glasses** 23:9 24:24

**go** 7:10 11:20 13:1,17 14:20 15:9 18:9 19:7 21:12 22:25 29:10,11 35:20 36:22 40:13 41:9

49:5 50:11 54:21 56:2 61:20,24 76:11,12,16,19 79:5 80:4 95:1 96:1,21 100:9 101:12 102:3 104:1,22,23 109:8 115:2 116:9 118:6 123:18 125:21

**going** 8:8 12:4 18:15 23:14 29:9 32:5,8,25 33:6, 14,24 34:3,20 35:17,22,23 41:1 48:16 52:19 53:20 55:22 56:14,23 57:18 58:3,14,25 59:6, 10 60:7,8,10,15, 16 61:16 70:9 74:10,12,13 79:8 80:4 81:25 83:5,6 85:19 86:10 89:7 91:1 92:12 93:15 96:14 98:24,25 101:2 102:8,23 103:12,20,25 106:1,16 113:14, 24 114:5,13,20 115:3 116:8,9 124:4,7

**Gonterman** 38:15,18

**good** 7:2,3 46:14 96:18 113:10 122:19 125:14

**gotten** 17:14 69:13

**grab** 29:1,25

**graduate** 13:9

**graduated** 13:7

**great** 35:25 80:12

**ground** 35:19

**group** 84:16 89:11

**grow** 17:10

**guess** 17:9 53:22 117:10

**guilty** 12:11 119:5

**gun** 64:17,23,25 65:3 71:7 72:19 73:4 75:16,22 78:10,22 79:16 81:23,25 109:22 110:1,4,11

**guy** 122:19

**guys** 29:25 68:17

**H**

**hair** 22:9 23:11, 21 24:14,25 25:12,20,21,23

**half** 11:2 13:10, 15,16 17:6

**handcuffs** 94:1,4,9,11,13

**handed** 71:7

**handled** 113:12,17,20,25

**handwriting** 98:12

**Hang** 35:11 104:14 111:11

**happen** 32:8 51:8

**happened** 38:7 40:23 48:14 51:12 75:7 85:18 124:15

**harassing** 61:18,22

**hard** 42:25 65:7 82:20

**header** 85:5

**health** 85:10

**hear** 17:23,24, 25 62:9,12 65:1,7

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

14

105:1 124:3

**heard** 46:1,4
77:20 78:1 93:14
106:6

**heck** 104:15

**height** 17:7
18:7 22:21 23:14,
22 25:20

**held** 14:9

**help** 40:6,8 78:6
103:2

**helped** 75:11

**helpful** 99:17

**Henry** 21:6
23:24,25

**Hey** 61:13

**highest** 12:15

**hired** 75:4

**History** 105:9

**hit** 45:16,18 46:9

**home** 65:15
84:9,16,22,25
85:18,19 86:5,7,
9,18,21,23,25
87:3,13,20,21,24
88:6,12,14,18
89:11 93:4 100:9
112:15,20 113:4

**homicide**
14:3,19,20 15:2,
4,13 18:6,13,16
19:9 22:15,18
24:4,16,18 25:2,
16 29:24 30:8
31:7 32:20 33:3,
18 37:21,25 38:3
42:16,18 43:1
44:5,23 67:24
68:14,19 72:11,
25 73:15 74:24
81:23 83:12,13,
15 90:11 94:15
97:22 105:13
108:6,14,18
111:4 113:18
114:9 118:2
120:15

**homicides**
113:23

**honest** 117:9

**honey** 104:1

**hope** 17:15
69:20

**hospital**
125:12

**hour** 11:2

**hours** 33:20
97:14 116:11

**house** 29:15,17
30:15 87:1
117:11,12,18

**How'd** 25:21

**How's** 61:9

**Hubbard** 76:18

**hundred** 57:4

**hundreds**
25:23

**Hurlbut** 41:19
42:8

**husband** 39:2

**husky** 23:18,19

---

**I**

**idea** 17:18 18:4
19:23 20:1,4,21
22:14 25:23 29:7
33:19 52:19 56:7
67:1 69:2,5,8,11,
14 71:14 93:5
96:19 97:23
105:18,20 119:13

**IDENTIFICATI
ON** 37:4 52:13
63:1 65:19 71:15
80:14 89:13
95:17

**identify** 55:15

**illegal** 46:21
47:2,14 48:4

**imagine** 62:24

**implicated**
65:10

**improper** 32:9
57:1 61:25 62:3,6

**incident** 68:14
106:11,14

**included** 54:10
95:6 115:11

**independent**
59:2 101:11
115:15 116:1,13
119:9 123:9

**indicate** 6:14

**indicated**
116:3

**individual**
43:24 44:2 47:6

**individuals**
93:13

**Info** 66:20

**information**
53:6 67:12,13,15
68:5,9 75:17
91:22 95:14 98:7

**informing**
89:1

**injured** 120:18

**inquire** 121:22

**insisted**
117:17

**instruct** 60:16

**interests** 121:3

**interpose**
56:23 93:15

**interposing**
121:23

**interrogate**
50:17 72:15
98:25

**interrogated**
44:5 72:18 74:1
93:24 95:13
96:20

**interrogating**
40:2 45:13

**interrogation**
38:5,8,14 44:8,23
50:12 73:17
105:14 120:5

**Interrogatorie
s** 52:11,18 116:6
123:6

**Interrogatory**
54:4,5 55:2 56:18
57:15 58:9,16,21,
23 59:1,17,25
60:22 61:3,7,8,10
62:1,19 95:1,4
100:20 101:4,8,
14,21,22 102:4
115:8 121:18
122:9

**interview** 51:6
73:11 105:13
119:16,25

**interviewed**
74:4 75:2

**interviewing**
49:16

**interviews**
39:20 85:24

**investigate**
34:7,13,23

**investigation**
37:25 54:6,9
58:24 59:21
60:24 91:18,21
92:1,8 114:3,10
115:9

**investigation'
s** 92:6

**investigations**
46:2 113:13,16,
18 114:17

**investigator**
14:18 15:3,6,17
22:15,18 33:4
54:8 55:7 65:18
66:21,25 74:8,24
81:9 105:4
107:25 108:6,9,

**investigators**
15:10

**involved** 38:4,
14 54:9 97:11

**involvement**
54:9,11 55:3
56:1,20 63:10
95:6 115:10,11,
13 116:4

**involving** 46:8

**it'll** 21:17 76:8,22

**Ivey** 63:25 64:2,
11 65:18 106:25
107:25 108:25

**Ivey's** 108:9

---

**J**

**Jackson** 21:3
22:2 24:16 30:5,
18,21 38:5,12
42:10 43:6,10,13
69:13 70:14 71:9
110:11,24
116:14,15,19,20

**Jackson's**
38:8 69:22 70:10
109:11

**James** 21:4
23:6

**January** 16:23

**JEAN** 6:20

**job** 21:18 33:23,
25 34:1,2,4,14,
19,25 113:10

**jobs** 22:18

**Jodi** 6:17 38:15

**John** 25:15,19

**Johnson** 8:7
11:21,22,23
39:23,24 40:3,11
54:10 95:7,10
96:8,13,17 97:8,
20 98:8,18,25
99:12,20 100:2,8,

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SIMON, OFFICER BARBARA JEAN
07/20/2020                                                                    Index: Johnson's..ma'am

13,16,21 106:21
115:12 117:5

**Johnson's**
96:24

**join** 14:1

**joined** 14:10
73:1

**judge** 49:5
60:14 61:23,25
84:8 117:6

**judgment**
93:20

**July** 6:2 13:4

**Justice** 93:11,
21

**Justin** 11:21

**Justly** 8:7
11:22,23 39:24
54:10 95:6,10
96:8,24 97:8
98:8,18,25 99:12,
20 100:2,8,12,16,
21 106:21 115:11

**juvenile** 42:7
49:17,21 50:17
51:6 82:20,22
83:13 84:8 86:5,
7,9 87:19 88:11
89:1 111:13
112:20 113:3

**juvenile's**
49:18

---

**K**

**Kari** 18:21 19:22
20:6

**keep** 10:6 34:20
56:4 114:13

**keeping** 8:23

**Kendrick** 6:17
7:8 64:17,22
65:10,13,14 71:6
72:19 73:4 75:12,
16,21 78:22
79:16 109:16,23
110:12,15

**Kenner** 52:1,4
54:12 55:4,14,18
56:1,7,21 57:17
58:12 63:7,14
64:16,23 65:15
66:9 67:10 68:18
69:6 71:3 72:6,
10,23,25 73:3,11,
17,23 75:15
78:22 79:5,12,14,
18 81:18 82:13
85:21 86:2 87:20
88:12 89:10
90:18 91:20 92:4,
14 93:4,24
109:17,24
110:12,15,20,25
111:6 115:13
119:11

**Kenner's**
106:24 107:19
109:4

**Kevin** 42:10

**killed** 30:9,15

**kind** 23:21 24:11
56:11 84:19

**Kindred** 14:3
35:1 37:12 39:1
105:19

**Kirk** 67:24 68:1,
14

**knew** 26:4 27:8
28:25 29:24 79:5

**know** 8:17,20,
21 9:2 12:18
14:16 15:10,11,
15 18:3,16,18
19:8,17 21:14
22:1,7,8,13,24
23:1,9,14,15 24:2
25:10 26:2,4,5,8,
10,11,24 27:5,6,
14,23 28:2 29:7,
12,14,23 31:12
32:24 33:15
40:22 42:3,12
44:17 45:10 46:7
49:13 51:9 56:8,9
59:14 61:13
64:10,18 65:14,
18 66:17 67:13

68:6,8 69:1,2
71:12,14 73:6,20
74:10 76:1,2
77:6,12,19 82:14
83:2,17,25 87:5,
6,11 92:9 93:2
94:7,11,18,25
96:23 100:12
101:16,17 106:4,
5,11 107:5 108:2,
9,25 109:25
110:6,21,22
111:3 112:10,16,
17 113:5 114:2,
20,21 116:18,19,
25 117:3,5 119:9,
13 122:10 123:2,
15,23 124:5,6,8

**knowledge**
38:7,10,17,20,23
39:4,12,16 45:3,
7,11 53:6

**known** 35:4

**knows** 26:5

---

**L**

**lady** 123:2

**laid** 14:14

**law** 7:4 12:20
13:20 16:19
26:16 27:17,19
117:25

**lawyer** 7:4
121:17 123:5

**lawyers** 122:9
124:10 125:8

**lead** 34:13,23

**leads** 34:7

**learning** 70:25

**leave** 34:3

**leaving** 11:10
34:4,15

**left** 14:18 27:9
28:5 31:4

**legal** 85:9,14,21,
23 122:25

**length** 27:17

**let's** 35:9 41:7
43:4 54:4 62:17,
20 69:15 71:19
73:14 79:21 95:1,
21,22 96:24 98:2
112:6

**level** 12:15

**lick** 45:16,18
46:9

**lie** 32:5

**lieu** 6:8

**lieutenant**
22:2

**light** 23:21 81:7

**likewise** 21:16

**line** 7:9 8:6 68:2

**lines** 42:4 70:18

**Lisa** 14:3 35:1
37:12 105:19

**listen** 33:8 60:5
76:6 88:4,10
108:13 110:23

**listening** 87:7,
8,9,25 88:2
124:18

**literally** 62:10

**little** 21:22,23
65:7 110:1

**Littlejohn**
42:10

**lives** 70:19

**location** 68:13

**locked** 96:18
97:21

**long** 7:17 10:25
14:16 22:24
33:17,20 37:20
38:3 70:22 93:4
109:16 117:24

**longer** 30:8

**look** 12:4 22:4,5
23:20,24 24:10,
23 25:11 35:9

37:8 41:7,12
43:4,22 44:16
54:4 59:3 62:17
64:4 65:23 69:15
70:8 71:19 79:21,
22 81:6 89:17
95:21,22 96:21,
24 98:2 106:23
107:4,19 110:6
111:9 113:9
121:18 122:9

**looked** 70:23
86:1 102:13
109:17

**looking** 39:24
40:3,5 42:22
44:21 50:3 55:11,
13 66:2 84:23
86:17 87:17 90:6
95:15 98:6
101:22 122:19

**looks** 42:3
80:20,22,23 81:1,
4,15 84:23
111:16,24 112:1

**Lord** 26:24 60:1
77:15

**lot** 26:6 31:8
33:4,10,11 42:19
80:4 85:17 107:4
115:7 118:9,22
119:3

**Lovier** 25:1,4,5,
7 71:13

**Low** 22:10

**lunch** 29:1,10,
11,13,25

**lying** 32:7

---

**M**

**ma'am** 8:24
9:19 10:6,9,15,23
11:6,9,20,25
12:8,10,12,14,18,
25 13:6,16 14:21
16:15 17:20 19:2,
17 21:13 22:24
23:3,5 25:13 27:2

29:3,7,16,20
30:12,19,25 31:6
32:24 33:1,5,9,
11,24 34:1,3,9,
14,19,25 35:6
37:13,16,19,24
39:10 40:5,12,18,
25 41:5 42:9,12,
14,21 43:2,22,25
44:25 45:2,6
46:3,17,23 47:4,
10,12,16,21 48:1,
5,11 49:12,19,24
50:4,9 51:9 52:19
53:15 54:20 55:1
56:2,8 57:21
58:2,13,22 59:23
60:1 61:5,12
63:11,16,19 64:9,
18 65:17 66:5
67:4,23 68:6,12
69:1 70:16 71:2,
5,8,12 72:20
73:5,20,25 74:3,
7,10,20 75:13,18,
24 77:7 78:13
79:7,17,20 81:7
82:3,7,11,14
83:2,5,10,17,20,
23 84:17 85:11,
19 86:4,9,15,25
87:21,24 88:21,
25 89:3 90:9
91:1,6,21 92:5
93:19,23 94:2,14,
25 95:14 96:2,23
97:12 98:21
100:18,24 101:7
102:17 103:4
104:8 105:5
106:3,15 108:1
121:10 122:11
123:7,11,15,19,
23 124:2,5,7
125:9

**Maazel** 7:6

**making** 15:9

**male** 22:7 23:8,
21,25 24:11,24
25:12,19 64:5

**man** 7:7 8:7
23:13,14,16,22

**manner** 6:13

**March** 54:21
56:19 57:14 58:1,
10 60:23 105:12
124:11 125:8

**marked** 37:4
41:8 52:13 63:1
65:19 70:2,3
71:15 80:14
89:13 94:22,23
95:17

**married** 28:23

**matter** 6:10 7:8
88:21 123:21

**mattered**
123:25 124:6

**mean** 10:18
22:5 31:12 45:16,
20 50:1 64:12,13
83:3 84:7 85:16,
17 90:13 101:11
112:5

**means** 67:5
114:6

**media** 29:19,20
117:20

**medical** 120:17

**medium** 22:12
23:8,14,22,23
24:1,12,25 25:20

**meet** 10:21,25
26:18 73:1

**meeting**
121:18 122:6,7,8
124:10,12,13,15
125:8,9,11

**memorial**
30:9,22

**memorialized**
70:11

**memories**
118:18

**memory** 36:3

**mention** 27:3,
22 109:22 110:4,
14

**mentioned**
21:25 27:5 110:1,
11

**Mercy** 60:1

**met** 11:3

**Michigan** 6:1
82:18

**microphone**
62:11

**Mike** 6:18 17:13
32:3 35:10 36:5
41:8 44:11 48:19,
23 52:6 57:1,7
59:7 60:16 61:21
62:8,23 70:4
76:21 79:24 80:5
81:3 97:1 103:17
104:12 105:1
109:10 115:2,4
116:7 122:4
124:20 125:3,22

**million** 119:10

**mind** 108:2,9,25

**mine** 80:22,23

**minor** 49:17

**minute** 36:22,
25 55:23 56:6
58:4 70:8 73:14
76:25 92:10
98:22 102:4
103:5

**minutes** 51:21
76:23

**mischaracteri
zation** 31:19

**mischaracteri
ze** 32:2 48:21
49:2

**mischaracteri
zing** 31:21,24
49:1

**mistaken** 21:3

**misundersta
nding** 88:5

**mom** 28:23,25
69:3

**moment** 15:24
37:9 51:16

**moments** 66:2

**Monday** 6:2

**Monica** 18:21,
22 19:25 20:6
21:24

**months** 26:14,
15 27:20 56:19
57:14 62:1

**morning** 7:2,3,
19 10:23,24 11:1,
3

**mother** 63:18,
20 72:22 73:1,2
76:18 85:23,25
86:8,11,14,19,22,
24

**mother's** 35:4
86:2 87:1

**motion** 60:8,13,
17 104:20

**move** 35:18
56:17 57:23 60:5,
7,8 62:20

**Mueller** 8:6,9
62:8,12 103:25
106:17,19
109:10,13 111:12
114:7,23 125:19

**Muller** 6:18,19
7:10,13 8:18
17:12,15 31:18,
23 32:1,5,8,13
35:11,15,20 36:6,
11,17,21 37:1
41:9 43:7,11,16,
18,20 44:13
48:16,21 49:1,7
52:8,11 55:15
56:23 57:3,11,18
58:4,25 59:10,16
60:7,12,19 61:13,
22 62:3,6,14,21
65:4,24 69:17,20,
24 70:1,6 76:12,
17,25 79:22 80:3,

8,11,13,20,24
93:15 95:23 96:1
97:3 98:5,10
101:10,16
103:12,22
104:14,18,22
105:2,23 106:6,8
109:9 111:11
114:5 115:6,25
116:10,12,21
118:5,13,17,21
119:2,8,23 120:9,
22 121:6,22,25
122:12,13,15,16,
19,21,25 123:18
124:14,17,21
125:15,18,23

**multiple** 26:9
84:20

**murder** 35:1,5
55:13 71:11
79:15,18 81:22
88:20,24 89:2
90:20,23,25 91:4,
20,24 92:4 93:9
99:14,21 100:9
107:22 109:6
110:20,25 111:6
112:18,19,20,23
118:24

**muscled** 23:16

**mute** 125:17,18

**muted** 125:4

---

**N**

**name** 6:15 7:4
18:21,24 21:7
55:14,17 65:12,
14 66:18 70:19
81:9,14 102:17,
19,20 111:20,21,
22 112:22 114:4,
8,11 122:10

**named** 7:7 8:7
19:11 24:3 38:5
41:3

**names** 18:19
53:21

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**near** 41:4

**necessarily** 75:1

**necessary** 49:6

**need** 32:3,11 35:23 36:23 48:19 57:6,20 59:7 81:2 107:9, 13 108:24 116:16

**needs** 76:12,21

**neighborhood** 40:16

**neither** 7:19

**never** 51:17,22 61:14,16 93:6 106:6 119:4

**new** 69:10,13

**news** 117:20

**Nick** 7:7 43:10

**night** 7:13 79:12 99:20 100:3,13

**Norcross** 85:1

**Notary** 53:22

**noted** 8:2

**notes** 64:13 103:11

**notification** 71:23 93:25 95:24 96:5,6 98:20

**notified** 85:25

**number** 14:18 54:4,6 58:16,21, 23 60:23 61:8,11 74:12 85:4 95:4 100:20 102:5 105:9 109:8,11 111:9 115:11 120:14

**O**

**o'clock** 69:24

**Oakland** 6:1

**oath** 6:8 9:17,22 10:14 53:14,16, 19,21,23 54:1,16, 18,24 56:10,20 57:16,24 58:10, 16,21 59:13 89:9 92:2 115:22 116:5 123:9,13, 22 124:1

**object** 7:21 31:18 48:16 57:18 58:25 61:13 114:5

**objection** 8:2 48:25 54:8 56:24 57:8,11 58:7 79:25 80:3 93:16 115:24 116:7 118:3,11,16,19, 25 119:6,21 120:8,21

**objections** 6:12 32:4,12,15 49:4 54:7 57:9

**observed** 18:11 41:17

**obtain** 40:8

**occasion** 11:4

**offhand** 19:20

**office** 36:22

**officer** 6:20 8:14 9:11,15 10:8,11 14:6,12 19:15 20:14 21:4, 24 24:3 28:17 31:14 32:19 37:8 41:12 44:16 46:14,25 47:13, 23 48:3 49:9,11, 16 51:5,16 52:2, 17 53:18 54:1,13 55:6,8,10,11,18, 22 56:6 57:14,20 58:9 59:20 60:22 62:17 63:5,25 64:11 70:8 76:6 77:9,19 80:19 82:15 83:19 84:2, 19 87:9,25 89:4,5

93:18 94:13 95:11 98:12 100:15 101:15 102:11,18 103:24 105:11 106:17 108:17 112:5,24 113:15,19 114:1, 21 119:25 120:16 122:6 125:20

**officers** 18:5, 13,16,20 19:11, 18 33:22 38:11 45:4,8,12 46:4 47:5,7 48:10 49:14 67:10 68:5 79:22 92:20,24 94:6 120:5,11,17

**official** 105:12, 17

**oh** 12:18 26:24 28:9,18 43:4 46:13 60:1 66:13 86:11 106:8,9 107:12 108:3,4 110:9 122:3

**okay** 7:22 8:10, 11,25 9:7,22,25 10:10 13:7,25 14:8 15:2,21 17:7 18:19 19:1 28:9, 18 31:14 35:9,16 36:8,21 37:10 39:24 41:16 42:1, 5 44:1,20 49:15 50:10 52:25 53:4 54:4 55:5 56:10 57:22 60:3 62:14 64:11 65:7 66:1,6 67:2 69:6 70:12 71:3,19 72:22 73:3 74:8 75:4,10 76:8 77:14 79:14 80:8 85:7 88:10 89:5,17 90:1 91:15 95:21 96:13,16 97:7 98:2,9,12 99:12 100:2,12 101:4 103:21 104:2,5 105:3,11 106:9 108:13,20 109:8, 12,22 110:9 111:13 112:6

113:1,24 114:23 115:9,18 116:1, 22 121:21 124:9

**old** 39:8 63:15 105:9

**Oliver** 18:23,25 19:1 20:3,7,8

**omitted** 38:24

**once** 15:9 30:7, 22 49:12 51:15 53:20 56:2 58:13 61:1 68:20 69:5, 8,11 76:15 88:9 111:7 113:4,19

**ones** 52:22

**ongoing** 49:4

**opinion** 121:13

**opinions** 121:3,9,11

**opportunity** 7:18 75:8

**options** 84:1,3

**order** 112:17,18

**outside** 26:20 30:3,6

**owned** 117:18

**P**

**p.m.** 52:15 63:3 65:10 66:7 69:24 71:17 72:8 77:16, 17 80:16 89:15 95:19 96:9 98:16 99:13 103:15,16 106:25 125:24

**page** 39:22 41:16 45:16 50:25 52:23 53:1, 8 54:5 70:4,17 81:22 82:23 84:11 85:3 88:7 95:5 104:23,25 105:3

**pages** 7:17,18 80:10

**paid** 121:2,8

**paper** 15:15,16 40:4,5 90:9 92:6 117:21,23

**papers** 86:1 117:11

**paperwork** 67:14,17,19,20, 21,24 68:4,7,8, 11,17,22 84:15, 19,24 86:14,17, 19,20,21 87:15, 16 88:15,19 89:6 90:23 96:5

**paragraph** 70:17 110:5

**paraphrasing** 109:15

**pardon** 9:20 94:20 121:24

**parent** 49:18,22 50:1,10,13,16,17, 19,20 51:6

**parents** 49:25 50:5,6,9 51:1,2

**parked** 41:18

**part** 66:21 83:12,14 92:6,7 96:18 102:25 110:2,5 113:13, 16 114:12

**participate** 39:20 42:15

**participated** 40:16 44:1,7 114:3,9,17

**participating** 6:5

**particular** 42:17 60:9 74:22

**parties** 6:11

**partner** 20:24 30:8,14

**pass** 70:21

**passed** 109:19, 23 110:2,12,14

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**Pat** 7:14 35:20, 24 36:8,19 122:18,21

**pay** 15:18

**paying** 121:12

**PCR** 56:3

**penalty** 6:10 53:4,10 54:19,24

**pending** 76:14, 20,22

**pension** 16:9, 12

**people** 92:20, 24 107:16 111:2, 8 117:24 122:10

**people's** 53:21 122:10

**perjury** 6:11 53:5,10 54:19,25

**permission** 50:13,16,19,21 76:19

**person** 6:9 21:1 30:15 83:24 84:5, 7 92:11 112:11, 13 113:1 120:18

**personal** 11:11 38:10,17,20,23 39:4,12 45:3,7,11

**personally** 51:17,22

**petition** 91:16, 17

**photo** 43:9

**photograph** 43:24

**physical** 22:6 23:7 47:20,23

**physically** 6:6 120:1,6

**pick** 66:17 68:18

**picked** 68:25 69:3

**picking** 55:18

**piece** 40:3,5

**pile** 31:11 32:21

**place** 84:15,21 87:3 88:12 94:8

**placed** 84:25 87:19 88:13 89:11 94:4

**placement** 84:13

**plain** 94:17

**plaintiff** 6:16 7:8 8:8

**plaintiff's** 35:9,13 43:4,15 62:20 65:23 69:15 71:19 79:21 90:5 91:3 95:22 98:19

**platform** 21:22

**play** 59:3,18,21

**please** 6:14 36:19 44:12 56:5 57:21,22 60:1 62:20 76:11 80:7 89:17 95:2 101:24 103:21 105:3 124:8

**pled** 12:11

**plenty** 114:4,6

**pneumonia** 125:12

**police** 13:1,12, 18 14:9,12 15:22 38:18 39:5,14,17 45:4,8,12 46:25 47:22 48:2,9 49:15 51:5 55:17 70:14 71:25 79:22 85:24 92:19,23 93:12 94:15,18,19,21, 23 99:17 104:3 106:7 112:5 119:25 120:5,10

**policy** 47:25 49:16,19,20

**porch** 70:21 109:17

**portion** 12:2

**position** 17:1 91:24

**positions** 14:9

**possession** 11:11

**possible** 20:11 24:9,20,22 30:2 46:3,5 51:7,11 54:17,18 67:16 74:4 75:3 78:4 81:8 84:17 92:14, 17 95:12 97:19

**pounding** 120:11

**practice** 60:18 61:15 74:6,23 75:1 77:3 94:8 96:20 97:16

**precinct** 14:13, 14 15:12

**Preliminary** 41:13

**prepare** 10:16, 18,19 11:4,7,12

**prepared** 12:7 68:11

**presence** 26:20 49:17

**present** 6:6 42:7 44:23 49:22 51:6 119:16,19, 25 120:4,10 122:6

**presented** 55:10

**preserved** 57:10

**press** 35:7,14 37:15

**pressure** 31:10,13,15,20 33:5

**pretty** 110:7

**print** 35:21,24 36:9,19,20

**printed** 35:18 111:20,21

**prior** 59:9,12

**prison** 117:25

**Pritchett** 24:3, 4 29:22 31:2,3,5

**privilege** 103:19 116:8 121:23,25 124:25

**privileged** 103:18 104:18

**probable** 92:3, 15,20,24 107:5,9, 13,17,22 108:21 109:6 110:19,24 111:5

**probably** 17:22 18:1 108:15 113:8,25 122:25

**Probate** 82:18

**problem** 93:13

**procedure** 46:18

**procedures** 105:13

**proceeded** 72:15

**produce** 104:16

**produced** 73:15 104:20

**promises** 45:8

**promoted** 14:17 15:6

**promotion** 15:8

**prompted** 16:14 28:13

**proof** 50:6

**proper** 103:21

**proprietary** 121:3

**prosecute** 93:8

**prosecution** 47:8

**prosecutor** 78:5,14,16,18,25 79:1 118:23

**provide** 22:19

**provided** 10:13

**Public** 53:22

**pull** 43:13

**purpose** 83:11, 13 84:15 88:15 89:1

**pursue** 34:23

**put** 7:11 15:18 18:15 27:9 55:5 81:25 82:9 86:18 94:11,13 116:4 123:16

**putting** 91:5

---

**Q**

**question** 21:16 27:15 32:17,18, 19 33:8,9,11 34:10,15,16,17, 21,24 45:15 46:24 53:18 54:22 56:4 57:4, 20 58:3,20 59:13, 20 60:4,9,11,15 64:21 67:9 75:20 76:5,14,21,22,23 77:1,3,4,5,10 80:1 83:16 87:7 88:1,4,10 90:4 93:18 96:14 99:5, 8 102:18,21 106:1 107:11 108:13,14 109:1, 2 110:9,10,23 116:16 119:22

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

120:4 125:6

**questioned** 69:12

**questioning** 59:8 96:16 97:18

**questions** 8:9, 10 23:4 44:18 48:24 60:20 76:7 99:9,10 102:20 103:13,24 106:20,22 114:24 120:23 122:4 124:14 125:2,17

**quick** 107:3 115:2

**quickly** 31:10

**quite** 18:8 23:1 38:2 46:10 55:1

**Quote** 32:1

**R**

**raise** 62:15

**rank** 14:10 15:2, 11

**Raymond** 38:5,8 43:6,9 69:13,22 70:10, 14 71:9 109:11 110:11,24 116:13,15,19

**RE-EXAMINATIO N** 120:24

**read** 35:23 37:9, 16 42:2,3 52:20 54:23 55:17 61:22 64:18 66:21 75:8 82:20 97:13,17,24 101:24 102:4 107:3,21 108:5, 20,24 109:4,14, 25 110:7

**reading** 54:19 84:10 92:5 98:18 101:25 102:1,2,5

111:4

**ready** 44:20

**real** 115:1

**realize** 9:24

**really** 76:17 80:25 119:5

**reason** 9:25 91:17 92:3 114:8, 16

**reasonable** 93:14

**reasonably** 85:8,13

**recall** 10:12 15:1,20 19:2,3,6, 8 28:11 38:6,16 39:3,10 40:9,12, 20,21 41:1,2,3,5 42:25 43:2 44:7 45:1 47:11 48:11, 12,13,18 49:13 51:13,15 56:24 59:22 60:25 61:1, 9,10 63:13 64:2,9 66:18 67:6,18,20, 23 70:25 73:9,25 74:3,7,11,20,21 75:13 77:21,24 78:8 87:15 89:9 93:1,3,7,10,19,20 94:2,3,10 102:7 104:10 116:25 121:19 123:24,25

**received** 7:13, 19 8:1 105:11

**recollection** 13:14 14:25 37:11,14 40:2 42:6 43:23 44:22 48:15 49:10 52:4 55:25 56:11,22 57:16 58:11 59:2, 17 67:2 69:16 70:10,13 73:22 100:16 101:11,15 102:15 103:3 105:21 106:14 113:7 115:15 116:1,13 119:9, 18 123:10,13

**record** 6:15 7:11,20,22 8:3 10:6 32:6 37:2,3 56:14 57:6 58:20 62:25 77:16,17 103:15,16 124:20,21,22 125:2,21

**redactions** 104:21

**Referral** 81:21

**refresh** 14:24 37:11,14 42:6 44:22 67:2 70:13 103:3 106:13

**refreshed** 102:16

**refreshes** 69:16 70:9

**regarding** 7:20

**regular** 20:17, 24 62:13

**remember** 13:11 14:21,22 17:20 18:21 19:13,14 21:6,11, 13 23:5,19,25 24:13,14 25:13, 14,20,21,24 28:2, 3,8,15,16,18 35:1,3,4,6,7,8 37:16,18,22,24 38:2 39:10 40:7 41:1,2,5 43:25 44:1,3,4,9 45:2 56:17 57:22,23 58:2,13,14,17,19, 22,24 59:5,24 60:1 61:2,5,6,7 67:7,8 68:12,20, 21 71:2,5,8 72:20,21 73:6,9, 12,20 74:3,7,10, 14 75:13 76:2,3,4 77:20,21 78:1,4,8 79:7,8,10,11 82:3,6 83:17,20 84:17,18 85:19, 22 86:4,5,6,10, 12,15,16 88:21,

22,25 89:3,4,8,12 90:9,10,13,14,25 91:2,5,10,11,14 92:5,10,11,13,16, 18 93:19 97:15 98:1 99:15,19,23 100:1,4,7,10,14, 18,19,24 101:1,2, 3,6,7,18,19,21 102:1,2,9,10,22, 23,24,25 103:1 106:3 112:10,13, 14,23,25 113:5,6, 24 114:13,15 123:15,19 124:2, 7,8,11,13,16 125:7,9,13

**remotely** 6:7 7:23

**rendered** 120:17

**repeat** 27:18

**repeated** 60:20 116:16

**report** 41:13 42:9,12 66:5,6 88:17

**Reporter** 6:4 75:4,9 124:22

**Reporter's** 21:18

**reporting** 6:7, 13

**represent** 7:7 106:21

**represents** 8:7

**reprimand** 105:12,17

**request** 80:9, 18 87:14,18,22 88:8 90:2,5 91:15 112:12

**requested** 87:19,23 125:25

**requesting** 88:11 112:19

**require** 59:1

**responded** 54:7

**response** 54:13,15 55:3 57:15 58:10 61:8, 11 62:1,19 95:1 101:14,22,23

**responses** 56:18 121:19 122:9

**rest** 12:2 125:22

**restroom** 76:11,13,16 103:9

**retire** 16:2,4,5,6, 7,11,14

**retired** 13:24 15:4,24 16:8,15, 16

**retry** 118:23

**retrying** 118:9

**review** 7:18 11:7 44:17 54:15 62:18 63:12 97:16

**reviewed** 11:12,14 73:15 97:13

**Richard** 63:25 106:25 108:25

**Rick** 107:25

**Ricky** 65:18

**right** 8:14,25 11:10 14:4 17:10 19:24 20:12 21:22 22:2 23:6 26:9 27:7 29:8 31:8 32:11 33:23 36:12 37:8 38:1 39:25 40:14,17 41:14,23 42:12 43:5,6 44:5 45:9, 24 46:22 47:15, 17,25 48:4 49:20 50:11,12,16 51:2, 3,19 52:8 53:9

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

54:1 55:11,24
57:4 58:6 59:22
61:16 63:23 66:4,
14 67:15,19,22,
23,25 68:5,7,11,
15,23 69:25 72:1,
8,12,22 73:4,24
74:18,23 75:5,17
76:9 78:19,24
79:6,16 81:9,25
82:2,5,12 85:19,
23 86:8,14,24
87:4,6 88:8 89:6,
7,22 90:6,12,18,
20,24 91:4,16
92:15,17,25 94:1,
5,8,16,19,21
95:13 96:7,9,11,
14,18 97:22,25
98:18,22 99:1,14,
18 100:9,13
101:23 107:16
109:2,20 110:17,
18 111:15,17,19,
24 114:4,18
115:20,23 116:23
117:14 119:12,19
120:19 121:1
125:10,23

**rights** 8:15,18
9:14 54:11 71:22
72:10,14 73:5,7
93:25 95:7,11,23
96:4,14 97:13,17,
25 98:19,20
100:17,21,23,24
115:12

**Rob** 45:21

**robbed** 112:7

**robbery** 45:21

**Rodney** 42:10

**role** 54:6 59:3,4,
18,21 60:24
115:9 123:10,14

**rolled** 45:24

**room** 6:6 8:1
50:7

**rules** 32:15

**run** 15:11

**Russell** 18:21
19:22 20:6

---

**S**

**safety** 85:10

**Salzman** 6:16,
17 7:1,4,12,22
8:5,22 17:13,16
31:21,25 32:3,7,
9,14,16 35:10,13,
16,22 36:1,5,8,
16,18,24 37:7
41:7,11 43:8,12,
17,19,21 44:11,
14,15 48:19,23
49:3,8 52:6,10,
12,16 55:21 57:1,
5,13,19 58:8
59:7,12,19 60:10,
15,21 61:20,24
62:4,10,16,23
63:4 65:6,25
69:19,22,25 70:3,
7 71:18 76:14,20
77:2,14,18 79:24
80:4,10,12,17
81:2,5 89:16
93:17 95:20,25
96:3 97:1,4,6
98:6,11 101:13,
20 103:5,8,17,23
104:12,17,19,25
105:3,7,25 106:7,
10,16 115:1,24
116:7,17 118:3,
11,16,19,25
119:6,21 120:8,
21,25 121:7,24
122:3,5,14,17,23
123:1,4,20
124:19 125:1,5,
14,16,20

**Sanford** 7:16

**saw** 18:11
27:17,19 30:20
31:1 44:4 49:10
70:18,21 109:14,
15

**saying** 28:1
34:20 36:18 55:5
58:23 79:15

90:25 91:23
100:10 107:14
114:13

**says** 41:17
53:10 59:3,17
63:14,16,20
66:11,20 67:9,17,
19,20,24 68:7,8,
13,22,24 72:13
75:5 81:21,22
82:1,22 85:5,7
86:19,20 88:23
90:18,20,21 91:9,
17,18,21 92:8
105:9,11 111:15
112:2

**SAZLMAN**
65:22

**scale** 18:3

**scene** 40:13
41:1,4 42:17,20
43:1,3

**scenes** 42:15
43:2

**schedule**
125:21

**school** 12:21
66:14 68:25 69:3

**Scott** 6:17 7:8
40:10 64:17,22
65:10,13 71:6
72:19 73:4 75:12,
16,21 78:22
79:16 109:16,23
110:12,15 117:5

**Scott's** 65:14

**search** 40:6,8

**second** 13:25
43:14 45:15 70:4,
17 84:11 100:8
104:23,25 105:3

**section** 42:2
66:20 81:22 85:2
105:4,8

**see** 30:3,5 39:22
41:16,19 45:15
52:23,25 53:10,
21 54:13 55:5,8
56:3 63:14,17,19,

20 64:24 65:2
66:12,19,22 68:1
69:16 70:5,17,23
80:25 81:21
82:17,22 83:23
85:2,7 86:1 95:5,
14 96:21 97:7
105:8,11,15
106:25 107:14
108:3 109:18,20
110:10

**seeing** 43:23
48:13,18

**seen** 26:3,12,13
30:7,10 31:3
43:23 47:7 48:6,9
51:5,8 61:14,16
114:4,8,11 123:7

**seized** 107:16

**seizing** 93:13

**sent** 68:17
112:20 117:11,12

**separate** 86:13

**sergeant**
15:14,16 71:13

**sergeant's**
15:17

**sergeants**
15:10

**seriously** 54:1

**serve** 117:13

**served** 52:18

**server** 117:16

**service** 30:23

**set** 46:11

**Sex** 14:17

**Shaw** 21:5
23:20

**Sherri** 18:23,25
19:1 20:3,6,8

**shooting**
40:17 41:4 42:20

**short** 110:8

**shot** 30:8,15
39:9 112:7

**show** 44:10
103:2 115:18
123:5

**showed** 116:2

**shrink** 17:12

**side** 82:19

**sign** 47:20,24
48:3 49:22,25
50:1,4,5 75:25
88:23 90:3 93:24
123:16

**signature**
52:23,25 53:1,9
63:17,18,19 72:3
80:25 81:8,16
82:9,11 111:15,
16,17,19,24
125:25

**signature's**
82:6

**signed** 53:4,13,
15,16,17,18,20
54:15,18,20,21,
24 55:7,9,20
56:2,3 57:15 58:9
62:19 66:4 72:3,
23 73:2 80:18
81:12 82:4,5
89:7,8 90:1,5
91:3,13,14 96:11
97:8 100:25
112:14 115:22
116:3,4

**signing** 123:12
124:1,2

**Simon** 6:20 7:2
8:6,12 10:17 12:9
17:5,17,23 19:9
25:22 32:17 33:8
36:2 37:8 41:12
42:11 44:16
46:12,15 49:9
51:16 52:2,17
53:18 54:2,13
55:12,20,22 56:6
57:14,20 58:9
59:20 60:22
62:17 63:5 66:21,

25 70:8 76:6 77:9,19 80:19 81:10 87:9,25 90:11 93:18 95:11 98:12 100:15 101:15 102:11,18 103:24 105:4,11 106:17 111:1 115:7 121:1 122:6 125:6,20

**simple**  102:21

**simply**  59:3

**single**  99:5

**sir**  107:25 108:9 109:7 110:21 112:10,25 113:6, 14 114:19

**sister**  38:15 117:17,19

**sister's**  117:12

**sit**  27:5,23 29:13 32:25 33:6 35:22 79:9 86:10

**sitting**  9:25 56:10 89:9 92:2 100:15 122:15

**situation**  118:2

**Skinner**  39:8, 13,16

**sleep**  123:18

**slide**  120:19

**slim**  20:6,10

**Snooky**  70:18

**social**  29:19,20

**soliciting**  118:4

**somebody**  45:21 107:8 108:22 112:17

**son**  28:19 39:8

**soon**  16:11

**sorry**  10:23,24 11:20,23 19:7 21:12 43:5 65:1

77:4 111:22 124:3

**sort**  66:19

**sound**  8:25

**sounds**  76:17, 18

**speak**  30:11 39:1,8 47:4,5,6 48:5 49:14 62:13 111:1,7 113:24 114:19,22

**speaking**  32:12 49:4

**special**  17:2,3

**specific**  16:14 31:19 113:7

**specifically**  31:20 110:4

**speculate**  107:24

**speed**  76:8

**spend**  93:4

**spent**  116:11

**spoke**  30:20 31:1

**squad**  15:12 19:7,9,12,16,19 20:12,14,17,19, 20,24,25 21:2,4, 25 24:5,19 25:9, 10,18 26:10 29:10 68:15 69:12 94:16

**standard**  59:13 71:25 83:3, 18 89:20 94:8 96:4 105:13

**start**  8:8 16:22 112:6

**started**  12:23 13:8 14:12 28:6, 9,19 97:17 120:11

**starting**  14:10

**state**  57:7 82:17

117:22

**stated**  81:24

**statement**  11:16,24 12:1,6 38:21,24 39:24 43:8 44:13,21 46:15 47:2,9,20, 24 48:4 50:2,8, 22,23 51:1,18,24 54:12 55:3,6,9 56:1,3,11,20 57:17 58:12 59:9, 12 63:7,10,12,23 64:13,14,16,19, 22 65:9,14,15,17 69:10,13,23 70:9, 10,13 71:4,10,13 73:8,10,12,16,23 74:2,5,13 75:1,6, 10,14,18 78:9,21, 23 79:4,7,11,15 81:6 82:12,14 95:15 96:25 97:7, 11,20 99:1,7,11, 24 100:6,22 106:24 107:10, 15,20,23 108:4, 24 109:4,5,7,11, 25 110:6,7,11,19, 21,23 111:5 115:13

**statements**  12:6 96:22 108:6, 20 120:3

**stating**  6:14 73:21

**stationed**  14:11

**stay**  15:4 23:15 117:12,18,19

**stents**  117:24

**stocky**  24:11

**stolen**  104:6,7

**stop**  32:12 48:20 49:5 56:5 57:6 59:7 62:24 80:5 103:21

**straight**  13:17

**street**  41:19 42:8,13

**stuff**  28:24

**style**  22:9 23:11 24:14

**subject**  22:19 41:18 104:20

**submit**  88:17

**submitting**  88:15

**sued**  8:12,15 9:3,4 27:3,14

**suggest**  107:21 109:5

**supervisor**  29:11 55:7,20 66:5 117:21 120:14,16

**sure**  7:12 18:8 20:16 21:15 23:1, 9,10 24:7 30:24 36:24 37:1 38:2 46:10 55:1 64:20 90:15 104:14

**suspect**  78:10

**suspects**  46:1

**suspension**  105:6

**suspicion**  93:14

**swear**  57:24

**swore**  55:2 56:19

**sworn**  6:22 55:24 62:1,21 123:22

---

**T**

**take**  12:4 29:11 32:10 33:17 35:9 36:22,24 37:8,9 41:7,12 43:4,22 44:16 52:21 54:1, 4 65:23 69:15 70:8 71:12,19

73:14,19 75:6 76:10,16,22,24 77:14 79:21 81:6 83:21 86:18 87:23 88:11 89:17 95:21 96:24 98:2,25 99:7,10,11 102:4 103:8 107:3

**taken**  55:6 65:17 86:21 106:24

**takes**  76:22

**talk**  13:25 26:20, 23,25 27:1,16 28:21 49:24 52:22 89:3,5 112:24 125:21

**talk-talk**  27:6

**talked**  28:23 31:3 106:23 111:10

**talking**  25:5 28:6,9,19 41:22 49:21 57:6 62:24 73:6 113:22 117:11,25 125:4

**tall**  17:5 20:5,8,9 22:7,14 23:13,25 25:12 64:6 122:19

**team**  103:6

**tell**  9:17 22:13 23:1 26:7 29:13 36:22 43:10,22 46:19,22 49:5 53:20,23 71:6 73:14 75:7 80:20 81:15,25 102:5 123:8,12

**telling**  36:14 91:9 99:23 100:4

**terminate**  61:17

**terms**  109:22 112:5

**Terry**  21:5 23:20

**testified** 6:24
10:3,10 15:24
31:14 32:19,24
36:2 39:25 48:17
51:16 56:6
115:14 119:17
121:17

**testify** 6:22
10:1 51:21 57:7
60:9 62:22 81:3

**testifying** 9:23
79:24 121:14
123:1

**testimony**
6:10 10:14 31:19,
22,24 32:1 49:2,9
50:18 55:24 60:2
89:11,12 118:4
120:6 121:19
125:7

**text** 35:20 36:8

**thank** 25:6
46:13 77:15
80:12 103:7
106:17,20 114:25
120:22 125:14

**thanks** 37:1

**that'd** 35:25
75:16

**they'd** 96:22

**thing** 87:12
95:14 102:24
119:17

**things** 85:17,18

**think** 10:12
13:10 14:14,15
19:13,15,18 20:8
23:8,9,12,17,18,
23 24:11,12,15,
24 25:12,19
26:19 40:19,21
41:19 43:5,12
57:8 62:18 64:7
67:5 70:3 87:2
88:5 92:3 104:19
106:23 113:10
114:16 116:17

**third** 74:3

**thought** 43:12
62:14 107:14

**threaten** 47:7,
13 79:14,17

**threatened**
51:17,22

**threats** 38:11
45:4

**three** 31:16
32:21 49:12 62:1
120:10

**time** 14:3,6
28:23 29:3,4
30:14,20,24,25
31:1 34:6,8,12,22
42:16 45:23
52:21 56:16
57:21 58:4 59:23
60:16 61:1 72:25
74:3,25 75:2
91:25 96:16
108:2 119:24

**times** 8:15,21
9:1,7,9,10,13
10:5,6,7 25:24
29:8,9,14 42:25
49:13 51:8,12
56:13 57:4 62:7
83:4,5,6 84:20
101:12 108:21
113:8 114:14
118:22 119:3,10

**title** 15:11

**to-do** 115:7

**today** 7:6 9:18,
25 12:5,7 16:24
23:3 51:22 53:23
56:9,10 62:5
63:12 79:25 89:9
92:2 100:15
102:14 103:2
113:9 123:9
125:15

**today's** 10:16,
19 11:4,12

**told** 28:1,14,17
30:22 38:18
46:11,14,23,25
49:12 74:15
75:15,18,21,24

**thought** 43:12

**top** 12:2 39:22
63:20 66:12
82:23 88:19
89:24

**total** 74:9

**totally** 102:11

**track** 8:23

**traditional**
7:25

**trained** 22:15
78:5

**training** 13:14
78:2 94:12 107:5

**transcript**
7:16

**trials** 40:10

**trouble** 29:20

**true** 17:11,13
53:5 55:2 56:24
57:24 119:7

**truth** 6:22,23
9:18 53:24 59:5

**truthful** 58:10
59:20,25 60:23
100:22 101:5
116:5

**truthfully** 10:1

**try** 69:6 71:3
76:7

**trying** 103:17
117:13 124:24

**turn** 70:4 78:5,
14 103:25 106:16

**turned** 78:11,
13,24

**turns** 78:16,18

**twice** 30:7

**two** 9:9 31:16
32:21 85:24

90:22 99:12,20
100:2,8,12
102:20 112:21
113:8,19 117:8,
22 123:8,17

120:10

**type** 64:14 91:6

**typed** 63:23,25
64:11 81:14
88:22 89:8
111:21,22 123:6

**typed-up**
123:5

**typewriter**
64:12,15

**typical** 113:12,
17

**Typically**
111:19

**typing** 88:22
112:13 113:6

**U**

**unable** 34:18,
21

**unaware**
116:22

**understand**
9:17,22 27:14
34:16 36:11
56:25 57:3 60:2
67:17 74:21 76:5
78:9 84:18 86:16
87:15 88:6 92:7
102:25 107:8
108:5 113:7

**understandin**
**g** 77:22,25 78:13,
20 79:3 87:17

**understood**
15:19 83:8

**unmarked**
94:22,23

**unregistered**
41:18

**untruthful**
10:13

**use** 48:10 49:11
103:9

**V**

**various** 54:7

**vehicle** 41:18,
21 94:23

**verbally** 6:9

**verify** 53:10

**victim** 39:9

**victim's** 38:15
39:1

**violation**
105:12

**violations**
8:16,19 9:14

**voice** 62:13,15

**W**

**wait** 58:4 76:25
92:9

**waive** 6:12
122:1,2

**waived** 49:23
50:10 51:2
103:20 122:3
124:25

**waiving** 54:8
116:8

**walk** 56:8

**walked** 27:10
119:12

**walking** 14:13

**want** 7:20 21:15
32:10 33:13
36:24 49:7 50:6
52:22 56:13 60:4
61:20,24 62:25
64:18 69:3 73:19
86:9 92:8 99:16
101:17 102:11
103:8,10 104:11,
22,23 105:8
107:24 119:10

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**wanted** 16:15
21:20 26:24
30:24 43:8 67:24
68:1 69:9 71:6
86:7,11 106:21

**Ward** 7:5

**warn** 116:8

**warned** 125:3

**warrants** 40:6,
8

**wasn't** 21:25
31:20 37:25 38:2
43:11 84:2 85:19
99:17 122:13

**way** 8:23 15:18
18:15 27:9,12,13,
21 38:10 40:20,
22 44:7 45:1
47:11 48:12
49:10 65:10
67:18 89:10 93:2
115:21 119:18

**Wayne** 12:22
24:3,11 29:22
31:1,3 55:19
66:11 68:18
82:18 84:9,21,25
86:20,25 87:3,12,
20,21,24 88:13,
17 112:15 113:4

**We'll** 13:25
35:18 43:13
60:17 61:22

**we're** 7:23 12:4
50:2 60:7 87:16
95:4 103:12

**we've** 86:1
98:10 114:4,8

**weapon** 104:6,
7 110:1,14

**wear** 25:21

**wearing** 25:24

**week** 31:15 41:8

**weeks** 13:10,
15,16

**weigh** 17:17,21
18:2,10 22:25

**weighed** 18:17
19:21,25 20:2
22:8,15

**weight** 18:7,14
22:22 23:2

**weird** 21:22
76:17

**welfare** 85:11

**well-built**
23:16

**went** 10:7 14:14,
15,16,17,18,19
15:2 16:16 27:12
29:13 30:9 65:15
67:10 82:14 84:8,
9 97:24 112:15,
16 113:4 117:18,
20,23 120:15

**weren't** 33:22

**what'd** 10:16,
18 22:4,5 24:10
26:23 51:20

**white** 20:14
25:12,19

**Why'd** 16:7

**wished** 34:6,22

**witness** 6:9,21
8:20 11:16,24
12:1,6 22:19
32:12 38:5 39:20
42:7 44:21 46:11,
14,19,22,23,25
47:7,14,19,24
48:3 49:4,11
50:2,4,7,23
51:17,23 57:2,7
59:9,14 60:17
61:19,25 65:5
73:16,23 74:1,2,
4,5,22 75:1,2,5,6,
7,10 76:21 77:15
78:10 80:2,6,22
81:2 95:15 96:2,
21 97:5,7,8 98:9
99:24 100:5
101:18 103:7,10,
14 105:5 106:9
108:5,20,24
109:12 114:25
116:18 118:4,12,

20 119:1,7 120:1,
6,11 122:20,22
123:2,19 125:2,
25

**witnesses**
42:22 46:1 48:10
118:14

**Witnesses'**
118:18

**Wolf** 8:6 103:13
123:18 125:16

**woman** 61:5
76:3 77:15

**women** 20:5

**word** 66:25
73:19 75:5 114:6

**wording** 88:3

**words** 118:14

**wore** 23:9 24:24

**work** 9:10,15
13:20 16:16,19,
20 20:24,25 24:3,
8,16,21 25:1,6,15
30:3,6 33:20
37:18 71:1
102:15

**worked** 22:23
23:2 26:2,6,7,8,
11 28:20,22 29:4
31:12 116:2

**working** 12:23
13:17 15:21
16:22,24 30:2
31:7

**worry** 87:10

**wouldn't** 8:1
47:2,4,17,18
48:7,8 51:18,23
69:4 75:11
110:24 111:7
113:3 119:13
120:19

**wrapped** 70:22
109:16

**write** 42:12 55:8
73:10 75:1,5,6,10
79:4,11 88:19

99:3,5,8,10,16,24
100:5 110:21

**Writer** 41:17

**writers** 68:13

**writing** 50:25
74:1,5 75:13
82:3,6 88:21

**written** 38:21
51:1 78:21

**wrong** 57:8

**wrote** 61:3
75:19,24 82:2,4,8
98:7 100:1,7
107:25

---

**Y**

**year** 14:21 16:14
39:8 93:12

**years** 12:18
14:4 20:20 22:23
26:4,12 37:23
42:19 45:23
61:15 63:15 74:9,
12,15,18 102:10
108:15 118:1,8,9,
23

**yell** 62:8

**youth** 84:9,21,
25 86:18,21,23,
25 87:3,13,20,21,
24 88:6,12,13,17
93:4 112:15
113:4

---

**Z**

**Zoe** 7:4

**Zoom** 21:22

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy