UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENDRICK SCOTT,

               Plaintiff,

v.

DETROIT POLICE DEPARTMENT
(DPD) SERGEANT WAYNE
PRITCHETT; DPD OFFICER
CATHERINE ADAMS; DPD OFFICER
BARBARA SIMON; and DPD OFFICER
ANTHONY JACKSON,

               Defendants.

_____/

Case No. 19-cv-12718

Paul D. Borman
United States District Judge

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 38)

Based on post-conviction investigation, culminating in a 2018 Michigan Supreme Court decision reversing convictions, and the prosecution's decision not to re-prosecute, Plaintiff Kendrick Scott was released from prison in November 2018 after serving over two decades in prison, including over four years in solitary confinement, for the 1999 murder of Lisa Kindred. Justly Johnson, also convicted of the murder of Lisa Kindred, whose conviction was also reversed, was also released from prison the same day.

1

Plaintiff Kendrick Scott filed this suit under 42 U.S.C. § 1983 against four City of Detroit police officers alleging violations of his constitutional rights based upon alleged coercion of witness testimony to falsely inculpate Plaintiff Scott and Justly Johnson, and withholding of evidence. Justly Johnson filed a separate lawsuit against two of those City of Detroit Police officers, alleging essentially the same violations of his constitutional rights. (Case No. 19-cv-12331.) Defendants filed a Motion for Partial Summary Judgment (ECF No. 38), and Plaintiff Scott has filed a Response in opposition (ECF No. 39.) Defendants did not file a reply brief. The Court held a hearing on Defendants' motion on Thursday, December 9, 2021. For the reasons that follow, Defendants' Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Lisa Kindred is murdered between midnight and 1:00 a.m. on Sunday, May 9, 1999

On May 8, 1999, William Kindred, his wife Lisa Kindred, Mr. Kindred's eight-year-old stepson, Charmous (C.J.) Skinner, Jr., and the Kindreds' daughter Shelby (two years old) and son Dakota (a 10-day-old newborn), who lived in Roseville, Michigan, went to see the movie "Life" at a drive-in theater in Dearborn,

2

Michigan. (ECF No. 41-11, Deposition of Charmous (C.J.) Skinner (Skinner Dep.) at pp. 5-6, PageID.2051-52.) After the movie ended, at approximately 11:30 p.m., Mr. Kindred announced that he wanted to stop by the home of his sister, Lillie Harris, who lived on Bewick Street on the east side of Detroit, to talk to her boyfriend, Verlin Miller, about purchasing a motorcycle. (*Id*. at p. 27, PageID.2073) (ECF No. 41-12, William Kindred Witness Statement (Kindred Statement) at p. 1, PageID.2133) (ECF No. 38-2, Investigator's Report at p. 1, PageID.344.) When the Kindred family arrived on Bewick Street, Lisa, who was driving, parked their minivan across the street from Miller's home and waited in the van with the three children while Mr. Kindred went inside the house. (Skinner Dep. at pp. 26-27, PageID.2072-73) (Kindred Statement at 1, PageID.2133.)

After about 20 to 30 minutes, Lisa Kindred grew impatient, walked up to the house, and spoke with Mr. Kindred about returning to the van. (Skinner Dep. at pp. 8, 27, PageID.2054, 2073.) Mr. Kindred said that he would be out shortly, and Lisa then returned to the minivan. (*Id.* at p. 9, PageID.2055) (Kindred Statement at PageID.2133.) As Lisa was opening the minivan's driver's-side door, her son C.J., Jr., who was sitting in the front passenger seat, heard a loud bang and saw a flash and the glass shatter. (Skinner Dep. at pp. 9-11, PageID.2055-57.) Lisa Kindred had been shot, but she managed to put the car in gear and speed up the street to a nearby

3

gas station. (*Id*. at p. 15, PageID.2061.) Lisa then got out of the car and collapsed. (*Id*.) She was later pronounced dead at the hospital. (Investigator's Report at p. 1, PageID.344.)

According to Mr. Kindred, a few minutes after he told Lisa that he would be right out, he heard a noise that sounded like a car-door slamming. (Kindred Statement at p. 1, PageID.2133) When he and Mr. Miller opened the door of the house, they saw the minivan quickly speeding away and Mr. Kindred states that he saw an individual running across a vacant lot adjacent to where the van had been parked. (*Id*.) Mr. Kindred chased this fleeing person but failed to catch him or her. (*Id*.) Mr. Miller got in his pickup truck and drove around the area first looking for the individual, and then went to the gas station on the corner of Bewick and East Warren, where the minivan was parked. (ECF No. 38-2, Verlin Miller, Witness Statement (Miller Statement) at pp. 1-2, PageID.357-58.)

The medical examiner's report revealed that Lisa's death was caused by a single gunshot wound to the chest. (Investigator's Report at p. 1, PageID.344.) The minivan's driver's side window had been shattered, but nothing had been stolen from the minivan, and the children were not harmed, but were still in the vehicle when the police arrived at the scene. (ECF No. 41-17, Preliminary Complaint Record (Officer Scola), 5/9/1999, PageID.2574.) A .22 caliber spent casing was found in the street

4

at the scene of the shooting on Bewick Street. (ECF No. 41-19, Deposition of Defendant Catherine Tuttle (formerly Adams) on July 16, 2020 (Adams Dep. II), at pp. 81-82, PageID.2748-49.)

### 2.   Plaintiffs Kendrick Scott and Justly Johnson - at the time of the shooting

#### a.   Plaintiff Scott

Somewhere between 11:00 p.m. on May 8, 1999 and 12:00 a.m. on May 9th, Plaintiff Kendrick Scott walked from his home on Hurlbut Street to his girlfriend Falynn Kenner's house on Bewick to obtain a cell phone. (ECF No. 38-4 Deposition of Kendrick Scott (Scott Dep.) at pp. 33-34, PageID.404-05.) Once at Ms. Kenner's house, Plaintiff Scott saw two persons, one of whom was carrying a rifle, walking in the alley near Ms. Kenner's home. (*Id.* at pp. 35-37, PageID.406-08.) Ms. Kenner let Plaintiff Scott into her home, and the two individuals with the rifle were seen walking by the home, toward the site of the shooting. (*Id.* at pp. 39-41, PageID.410-12.)

Plaintiff Scott then left Ms. Kenner's home and went in the opposite direction of the two men, to the home of his nephew, Quinton Billingslea, and Billingslea's girlfriend, Lakeniya Hicks, on Hurlbut, the street immediately west of Bewick. (*Id.*

5

at p. 43, PageID.414.)[1] Plaintiff Scott stated that he went there because of the two suspicious men walking through the alley carrying a rifle. (*Id.*) (ECF No. 38-5, Deposition of Lakeniya Hicks (Hicks Dep.) at pp. 8-9, PageID.497-98.)

While Plaintiff Scott was inside Ms. Hicks's and Mr. Billingslea's home, they all heard a gunshot and then a car speed off. (Hicks Dep. at pp. 10-12, PageID.499-501) (Scott Dep. at p. 43, PageID.414.) Plaintiff Scott and Mr. Billingslea got into Mr. Billingslea's car and drove down to Bewick to see what had happened. (Scott Dep. at pp. 45-46, PageID.415-16) (Hicks Dep. at p. 11, PageID.500.) They stopped and spoke with Mr. Kindred's sister, Lillie Harris, who was pacing back and forth outside her house. (Scott Dep. at pp. 45-46, PageID.416-17.) Scott testified at his deposition that he could not remember what Ms. Harris said at that time (*id.*), but stated in his May 9, 1999 witness statement to the police that she had reported that one of her relatives had been kidnapped in a van with her kids. (Scott Statement, PageID.654.) Plaintiff Scott and Mr. Billingslea then drove around the block and

---

[1] This information that Scott visited Mr. Billingslea's house at the time of the murder is not in Plaintiff Scott's statement to the police. (See ECF No. 38-7, Kendrick Scott Witness Statement, 5/9/1999, PageID.654-55.) According to Defendants, Plaintiff Scott never told anyone with the Detroit Police Department that he was at the home of Mr. Billingslea at the time of the shooting, and this information instead was first revealed during Mr. Scott's March 12, 2020 deposition in this case. (Defs.' Mot. at p. 2, PageID.267.)

Plaintiff Scott was dropped off at his home on Hurlbut. (Scott Dep. at p. 50, PageID.421.)

Plaintiff Scott then walked first to Ms. Kenner's house and then went four to five houses down to the home of Raymond Jackson. (Scott Dep. at pp. 54-55, PageID.425-26.) The two men walked to the gas station where Lisa Kindred had driven the minivan to see what was going on, and then walked to Plaintiff Scott's house. (*Id.* at pp. 56-57, PageID.427-28.) According to Plaintiff Scott, Justly Johnson and Antonio Bernette arrived at Scott's home shortly thereafter. (*Id.* at pp. 59-60, PageID.430-31.)

### b.    Justly Johnson

Justly Johnson testified that he was away from the neighborhood at the time of the shooting, driving around and attending several parties with his friends Antonio Bernette and Mike (last name unknown), starting at a little before midnight. (ECF No. 38-6, Deposition of Justly Johnson (Johnson Dep.) at pp. 29-33, PageID.576-79) (ECF No. 41-15, Deposition of Antonio Bernette (Bernette Dep.) at pp. 18-20, PageID.2263-65.) Around 1:15 am, Mike dropped Mr. Johnson and Mr. Bernette off near the gas station where Lisa Kindred had driven the minivan after the shooting. (Johnson Dep. at pp. 32-33, PageID.579-80.) The two men approached the gas

7

station, but were told by police to get back, so they ended up walking to Mr. Scott's home on Hurlbut. (*Id.* at p. 33, PageID.580.)

When Mr. Johnson and Mr. Bernette got to Plaintiff Scott's house, they told Scott that something was occurring at the gas station, and Scott responded that something happened on Bewick and ended up at the gas station. (*Id.* at p. 34, PageID.581.) Mr. Johnson then called his girlfriend to come and pick him up and take him home, and Mr. Bernette crawled into Plaintiff Scott's car parked in front of Scott's house and went to sleep.  Plaintiff Scott and Mr. Jackson went back to Mr. Jackson's house. (Scott Dep. at pp. 61-62, PageID.432-33) (Johnson Dep. at p. 34, PageID.581.)

### 3.    The Detroit Police Department (DPD) responds and investigates Lisa Kindred's murder

At approximately 1:00 a.m. on May 9, 1999, DPD Officer Frank Scola and his partner responded to the scene of the shooting. (ECF No. 41-16, Deposition of Frank Scola (Scola Dep.) at pp. 16-17, PageID.2498-99) (Preliminary Complaint Record (Initial – Officer Scola) at PageID.2574.) Upon their arrival at the gas station and seeing Lisa Kindred's body, the officers notified the dispatcher and EMS immediately, and then secured the scene until the homicide detectives could arrive. (Scola Dep. at pp. 24-25, PageID.2506-07.)

After the other units arrived on the scene, Officer Scola left the gas station and canvassed the neighborhood, where he eventually saw Plaintiff Scott and Raymond Jackson, who were standing in front of Mr. Jackson's house on Bewick. (*Id*. at pp. 33-35, PageID.2515-17) (Scott Dep. at p. 63, PageID.434.) During this time period, the DPD is alleged to have had a practice of "rounding up witnesses, arresting them, [and] keeping them even though there might not be probable cause for their arrest." (ECF No. 41-18, Deposition of Defendant Catherine Tuttle (formerly Adams) (Adams Dep. I), April 15, 2019, at pp. 17-18, PageID.2592-93.) Defendant Adams explained: "if somebody were at the scene where somebody got killed, everybody would go to jail." (Adams Dep. II at pp. 273-274, PageID.2940-41.) Seemingly consistent with that practice, DPD rounded up Plaintiff Scott and Mr. Jackson and took them to headquarters around 1:30 a.m. (Scola Dep. at pp. 35, 41, PageID.2517, 2523) (Scott Dep. at p. 63, PageID.434) (Preliminary Complaint Record (Scola) 5/9/1999, PageID.2574.) Plaintiff Scott "never got released again." (Scott Dep. at p. 63, PageID.434.)

### a.   Raymond Jackson's First Witness Statement, Sunday May 9, 1999 at 5:10 a.m.

Once at DPD headquarters, Mr. Jackson was interviewed and he gave a witness statement to Sgt. John Falk at around 5:00 a.m. (ECF No. 41-20, Raymond

Jackson Statement May 9, 1999, 5:10 a.m. (Jackson Statement No. 1), PageID.3037-39.) Mr. Jackson stated that he was sleeping in the front living room of his house when he heard a gunshot and a car "squeal off." (*Id.*) He put on his clothes, and went outside around 1:05 to 1:10 a.m., and the police were already there. (*Id.*) Jackson told the police that he heard one gunshot, but that he did not see anyone with a gun. (*Id.*) He stated that he saw Plaintiff Scott at his girlfriend, Ms. Kenner's, house and that Scott then came over to his house and told him about seeking the two men with a rifle before the shooting (*Id.*)

Mr. Jackson was allowed to go home after giving his statement.

### b. Plaintiff Scott's Witness Statement, Sunday May 9, 1999 at 6:55 a.m.

Plaintiff Scott gave his witness statement to an Officer Kirk at about 6:55 a.m. on May 9th. (Scott Statement, PageID.654-55.) Scott denied any involvement in the crime and explained that while he was outside of his girlfriend's house, he saw two men walking in the alley and that the taller man had a rifle down by his side. (*Id.*) He stated that he had been waiting for a ride at his girlfriend's house and that when the ride showed up and he went outside, he found out that a neighbor's relative had been kidnapped in a van with kids in it. (*Id.*) Scott stated that he had seen the white van earlier parked on Bewick, with its parking lights on. (*Id.*)

10

### c.   Antonio Bernette's Witness Statement, Sunday May 9, 1999 at 2:20 p.m.

Later in the morning of May 9th, DPD officers found juvenile Antonio Bernette sleeping in a car parked in front of Plaintiff Scott's house. (ECF No. 38-8, Preliminary Complaint Record (Bernette), 5/9/99, 11:20 a.m., PageID.666) (Bernette Dep. at pp. 21, 25, PageID.2266, 2270.)[2] Officers searched the car and found some marijuana and crack cocaine. (Bernette Dep. at pp. 31-32, PageID.2276-77.) Mr. Bernette was detained, handcuffed, and taken to headquarters for questioning in connection with Lisa Kindred's murder. (PCR (Bernette) at 1, PageID.666) (Bernette Dep. at pp. 34-35, PageID.2277-78.) Mr. Bernette testified that he had consumed large quantities of alcohol and marijuana the night before and was so "drunk and high" that he was still intoxicated when he was arrested, and that

---

[2] Mr. Bernette is sometimes referred to in the record, and in some pleadings, as "Antonio Burnette." Mr. Bernette's exact age at the time he was questioned is a bit unclear in the record. As the Michigan Supreme Court noted in its opinion:

> Burnette testified at Scott's trial that he was 14 years old when the shooting occurred and was 15 years old at the time of the trial. However, at the evidentiary hearing, Burnette testified that he was born in 1982, which would have made him 16 or 17 years old when the shooting occurred and 17 or 18 years old at the time of the trial. Jackson was 22 years old at the time of the preliminary examination. Johnson was 24 years old at the time of the shooting, and Scott was 20 years old.

*People v. Johnson*, 502 Mich. 541, 549 n.2 (2018).

11

he reeked of alcohol when he was questioned at headquarters. (Bernette Dep. at pp. 23, 25, 32, PageID.2268, 2270, 2277) (ECF No. 41-23, Deposition of Wayne Pritchett (Pritchett Dep.) at p. 81, PageID.3126.)

At headquarters, officers took Mr. Bernette to a small interrogation room where he was handcuffed to a table. (Bernette Dep. at pp. 35-36, PageID.2280-81.) He was only a middle school student (*id*. at p. 60, PageID.2305), but he testified post-trial that he was forced to spend seven or eight hours in the interrogation room (*id*. at pp. 39-40, PageID.2284-85), where he was interrogated by multiple officers, including Defendant Pritchett. (*Id.* at pp. 35-37, PageID.2280-82) (Pritchett Dep. at p. 74, PageID.3119.) Mr. Bernette told Defendant Pritchett and the other officers that he was a juvenile, he did not understand what was going on, he could not read, and that he wanted his mother and father, but Mr. Bernette stated that Defendant Pritchett told him that his parents "can't help you here." (Bernette Dep. at pp. 35, 37-38, PageID.2280, 2282-83.) Defendant Pritchett testified that he tried to call Mr. Bernette's father two times, but did not get an answer. (Pritchett Dep. at p. 91, PageID.3136.)

Mr. Bernette testified that during his interrogation, Defendants Pritchett, Simon, and Adams threatened him and told him he would be charged with murder if he did not tell them what they wanted to hear and sign a statement. (Bernette Dep.

12

at pp. 48-55, 78-80, PageID.2293-2300, 2323-25.) Mr. Bernette further testified that Officer Pritchett punched him eight to ten times in his lower body and that Defendant Simon slapped him, and that not a single officer tried to intervene to stop the abuse. (*Id.* at pp. 53-55, PageID.2298-2300.) At 2:15 p.m. on May 9th, Mr. Bernette signed a notification of rights form, even though he has testified that he could barely read or write. (*Id.* at pp. 57-58, 60, PageID.2302-03, 2305) (ECF No. 41-24, A. Bernette Constitutional Notification of Rights Form, May 9, 1999, 2:15 p.m., PageID.3277.)

Mr. Bernette subsequently signed a witness statement drafted by Officer Pritchett. (Bernette Dep. at pp. 62-66, PageID.2307-11) (ECF No. 41-25, A. Bernette Witness Statement, 5/9/99, 2:15 p.m., PageID.3279-80.) Mr. Bernette did not write anything on this form; Defendant Pritchett wrote it all. (Bernette Dep. at pp. 62-64, PageID.2307-09) (Pritchett Dep. at p. 74, PageID.3119.) Mr. Bernette testified that he "couldn't read" the statement. (Bernette Dep. at p. 63, PageID.2308.)

The witness statement said that Plaintiff Scott (whom Mr. Bernette refers to as "Snoopy") told Mr. Bernette the previous night at 2:30 a.m. that he had shot a woman named Lisa after trying to "hit a lick" (i.e., rob her) with Mr. Johnson because he was "trying to get some money. He had a phone bill to pay." (Bernette

13

Statement, PageID.3279-80.)[3] The statement then added that "Stank [Mr. Johnson] and Snoop agreed to kidnap this bitch named Lisa. She owed Snoop some money. Snoop sells rocks (crack cocaine)," and that Plaintiff Scott and Mr. Johnson told Mr. Bernette that they had a "rifle and a AK." (*Id.*)

Mr. Bernette later testified at his deposition, however, that he never said "hit a lick," that he had never heard of "Lisa" before Defendant Simon told him that name, and that the officers "wrote up everything, and [] just had [Mr. Bernette] sign and initial" the statement. (Bernette Dep. at pp. 63-66, PageID.2308-11.) After signing the statement, Mr. Bernette was transferred to juvenile detention, where he was held for about a year, until sometime just before Plaintiff Scott's trial. (*Id.* at pp. 34, 45-46, PageID.2279, 2290-91.)

### d. Justly Johnson's Witness Statement, Monday May 10, 1999 at 10:55 a.m.

Sometime on the morning of Sunday, May 9th, after Mr. Jackson returned to his grandmother's house from being questioned by the police, Justly Johnson went to Mr. Jackson's grandmother's house to see him. (Johnson Dep. at pp. 37-38, PageID.584-85.) The police subsequently showed up at Mr. Jackson's house, told

---

[3] While Mr. Bernette's statement said that he talked to Plaintiff Scott at around 2:30 a.m. on the 9th, records show that Plaintiff Scott was already in police custody at that time. (PCR (Scola) at PageID.2574.)

Mr. Johnson that they wanted to talk to him about the shooting the night before, handcuffed him, took him downtown to homicide for questioning, interrogated him, and then placed him in cell until the following day. (*Id.* at pp. 38-41, PageID.585-88.)

Mr. Johnson subsequently made a witness statement the next day, on May 10, 1999, to Defendant Officer Anthony Jackson. (ECF No. 38-7, Justly Johnson Witness Statement, 5/10/99 at 10:55 a.m., PageID.659-62.) Mr. Johnson denied knowing anything about the shooting on Bewick and said that he was with Mr. Bernette (aka "Shorty") and Mr. Bernette's friend Mike from around midnight to 1:00 a.m. on the 9th, riding around in Mike's car. (*Id.*) Mr. Johnson stated that, after being dropped off by Mike near the gas station where the minivan ended up, he and Mr. Bernette went to Plaintiff Scott's house, and they talked about the police and the minivan. (*Id.*) Mr. Johnson said that he stayed at Plaintiff Scott's house until his girlfriend picked him up around 2:00 a.m. (*Id.*) He stated that Mr. Bernette went into the car in front of Plaintiff Scott's house and went to sleep. (*Id.*)

> ### e. Jodi Gonterman's Witness Statement, Monday 5/10/99 at 12:10 p.m.

At the time of Lisa Kindred's death, her sister, Jodi Gonterman, lived in Albuquerque, New Mexico, where she worked as a police officer. (ECF No. 38-14,

Deposition of Jodi Gonterman (Gonterman Dep.) at p. 22, PageID.924.) She flew home to Detroit on May 9, 1999, after learning of Lisa's murder. (*Id*. at p. 37, PageID.939.) The next day, Ms. Gonterman went to DPD headquarters, where she was interviewed by Defendant Officer Anthony Jackson. (*Id*. at p. 39, PageID.941.) (ECF No. 38-13, Jodi Gonterman Witness Statement (Gonterman Statement), PageID.900-01.) (ECF No. 41-7, Defendant Anthony Jackson Deposition (A. Jackson Dep.) at p. 27, PageID.1799). Defendant Jackson testified in his deposition in this case that he has "no recollection of this case" or Ms. Gonterman. (A. Jackson Dep. at pp. 9-10, PageID.1781-82.)

Ms. Gonterman testified that she went to the Homicide Section that day with one specific goal: she wanted to tell the police about a phone conversation she had with her sister Lisa a year prior. (Gonterman Dep. at pp. 39-40, PageID.941-42.) She told Defendant Jackson that her sister, Lisa Kindred, had told her during a phone conversation in 1998 that William Kindred should be a suspect if anything ever happened to her. (*Id*. at p. 48, PageID.950.) As a police officer herself, Ms. Gonterman testified that she knew this information was "important and [she] needed to relay that information to [the DPD]." (*Id*. at pp. 40-41, PageID.942-43.) But this information was not included in Ms. Gonterman's witness statement. (See Gonterman Statement, PageID.900-01.) Defendant Jackson offered no explanation

16

for why the information is missing, and repeatedly testified at his deposition in this case that he "[doesn't] recall anything in regards to this case." (A. Jackson Dep. at p. 43, PageID.1815.) As a result, the information regarding Lisa's statement to her sister was never turned over to the prosecutor or the defense, Ms. Gonterman never spoke with anyone in the prosecutor's office, and she was not called as a witness at either Plaintiff Scott's or Mr. Johnson's trials, by the government or either defendant. (Gonterman Dep. at pp. 67, 70, PageID.969, 972) (See ECF No. 41-2, Deposition of Prosecutor Elizabeth Walker (Walker Dep.) at pp. 62-63, PageID.1404-05) (ECF No. 41-3, Deposition of Defense Attorney Curtis Williams (Williams Dep.) at pp. 24-26, PageID.1520-22.)

### f.   Raymond Jackson's Second Witness Statement, Monday May 10, 1999 at 6:00 p.m.

Later in the day on May 10, 1999, DPD officers picked up Mr. Jackson again and brought him downtown a second time for more questioning. (See ECF No. 41-27, Raymond Jackson Witness Statement No. 2, 5/10/99, 6:00 p.m., PageID.3342-43.) According to Mr. Jackson, he had severe mental health issues and was taking prescription medications used to treat schizophrenia, depression, and alcohol abuse, which made him "see blurry," "forget a lot of things," and have hallucinations. (ECF No. 41-26, J. Johnson Trial Tr. 1/11/2000 (Raymond Jackson testimony), at pp. 87-

17

88, PageID.3304-05.) He also testified that when he saw Plaintiff Johnson on the morning of May 9th at his grandmother's house, Johnson was drunk and that he was too, having consumed marijuana and three 40-ounce bottles of beer. (Raymond Jackson Testimony at pp. 73, 92-93, PageID.3290, 3309-10.)

DPD Officer A. Lovier wrote out a second witness statement for Mr. Jackson at 6:00 p.m. on the 10th, which differed from his first statement made the day before. (R. Jackson Statement No. 2, PageID.3342-43.) In this second statement, made 36 hours after his first statement, Mr. Jackson stated that it took him about ten minutes to go outside after he heard the gunshot and a vehicle drive off. (*Id.*) Once outside, he stated he saw Plaintiff Scott on the porch at his girlfriend Falynn's house, and saw Scott pass something long to Falynn that looked like it was wrapped up in clothing, and that Falynn took the object inside her house and she did not come back outside. (*Id.*) Plaintiff Scott came down to Mr. Jackson's house a short time later. (*Id.*) According to Mr. Jackson's second statement, "Stank" (Justly Johnson) had come to Mr. Jackson's house the day before (on May 9th), about 15 to 20 minutes before the police arrived to pick Mr. Johnson up, and told Mr. Jackson "we hit a lick last night and I fucked up and had to shoot" "outside by the field next to [Mr. Jackson's] house." (*Id.*) Mr. Jackson stated that Mr. Johnson told him said that he was with "Snoky" (Plaintiff Scott) at the time of the shooting. (*Id.*)

18

### 4.   Plaintiff Scott and Justly Johnson are convicted for Lisa Kindred's murder in separate trials

Plaintiff Scott and Justly Johnson were tried separately before Wayne County

Circuit Judge Prentis Edwards for Lisa Kindred's murder, with Mr. Johnson electing

a bench trial and Plaintiff Scott choosing to be tried before a jury.

### a.   Justly Johnson's Bench Trial

In January of 2000, Justly Johnson was tried before Judge Prentis Edwards.

Mr. Bernette and Mr. Jackson were the key prosecution witnesses; Justly Johnson

also testified on his own behalf. (ECF No. 38-9, J. Johnson Trial Tr. (Closing),

1/12/2000, at pp. 10-12, 21, 24-26, 28, PageID.677-79, 688, 691-63, 695 (Judge

Edwards stating "The question here is of credibility. And again, the key witnesses

are Jackson and Barnett [sic].").) Prosecutor Elizabeth Walker stressed in her closing

argument that Mr. Bernette and Mr. Jackson had not been coerced or forced into

giving their testimony:

> Now, what's curious is, both Antonio Barnett and Raymond Jackson, who don't appear to have any connection with each other whatsoever other than through Snoop and Stank, both say these individuals hit a lick or told them that they had, and that there was a shooting that occurred in connection with hitting that lick. Both these individuals make reference to the statements being made after the shooting on Bewick, the evening, early morning hours of the shooting and the next one the next day after the shooting. That's the crux of this case, that's what connects this defendant to the shooting on Bewick, his own lips, his own words he says to friends of his under circumstances which he

19

has no reason to lie to them. It's not a question of any kind of police coercion, nobody's forced him to make these statements. He's talking to people that he believes for one reason or another he can trust. Why would he say this if it wasn't so?

(Johnson Trial Tr. at p. 11, PageID.678.) Judge Edwards found Mr. Johnson guilty of first degree murder, assault with intent to rob while armed, and carrying or possessing a firearm when committing or attempting to commit a felony (felony-firearm). (*Id.* at pp. 30-31, PageID.697-98.) Mr. Johnson was sentenced to spend the rest of his life in prison without the possibility of parole.

### b.    Plaintiff Scott's Jury Trial

In June of 2000, Plaintiff Scott had a jury trial in the Wayne County Circuit Court, before Judge Prentis Edwards. (ECF No. 38-10, Kendrick Scott Jury Trial Tr., PageID.701-78.) The trial lasted two days and the jury found Plaintiff Scott guilty of the murder of Lisa Kindred. (*Id.* at pp. 74-78, PageID.773-77.) Scott was sentenced to life in prison without the possibility of parole. The prosecutor, Elizabeth Walker, again stressed the importance of Mr. Bernette's and Mr. Jackson's credibility in her closing argument, claiming they were the key witnesses who had not been coerced:

We have the testimony of Raymond Jackson and Antonio Burnette and it's no secret. I told you at the beginning those were going to be some of the key players, some of the key witnesses in this case.

20

***

> Though Antonio and Raymond may not be the nicest people you've ever seen, the question you have to ask is whether or not the testimony they have given to you is reliable and credible. Now, if you find that it is, then there's not going to be a whole lot of talk. If so then it means he's telling you the truth about Snook – they're telling you the truth about what Snook and Stank said. Now, why would they say it if it wasn't so. They're not under any compulsion. This is not some TV type police rubber hose interrogation out of a 1930 late night movie. These are people [Plaintiffs Johnson and Scott] talking to their friends in what they believe is a safe and secured environment.

(*Id.* at pp. 26, 34-35, PageID.726, 734-35).

Plaintiff Scott and Mr. Johnson spent the next 19 years of their lives incarcerated for the murder of Lisa Kindred.

### 5.    Post-conviction proceedings/events

Following years of unsuccessful appeals,[4] the University of Michigan Innocence Clinic took over Plaintiff Scott's and Mr. Johnson's cases and filed

---

[4] Both Defendants appealed by right. The Michigan Court of Appeals affirmed Mr. Johnson's convictions. *People v. Johnson*, Case No. 228547, 2002 WL 484610 (Mich. Ct. App. Mar. 26, 2002). The same Court of Appeals panel vacated on double-jeopardy grounds Plaintiff Scott's conviction of assault with intent to rob while armed but otherwise affirmed his convictions and sentences. *People v. Scott*, Case No. 228548, 2002 WL 483420 (Mich. Ct. App. Mar. 26, 2002). The Michigan Supreme Court denied both defendants' applications for leave to appeal. *People v. Johnson*, 467 Mich. 911 (Table) (2002); *People v. Scott*, 467 Mich. 911 (Table) (2002).

Mr. Johnson thereafter filed three motions for relief from judgment. In his second motion for relief from judgment, Mr. Johnson presented, as a claim of newly

21

motions for relief from judgment (Justly Johnson's fourth such motion and Plaintiff Scott's first), and sought a new trial based, in large part, on newly discovered evidence in the form of the eyewitness testimony of Lisa Kindred's son, Charmous (C.J.) Skinner, Jr., who was eight years old and in the vehicle at the time Lisa's death, as well as Mr. Bernette's recantations, testimony that Mr. Jackson had lied at the trials, and the police reports regarding domestic violence disputes between William and Lisa Kindred. The trial court denied Plaintiffs' motions for relief from judgment, and the Michigan Court of Appeals denied leave to appeal. The Michigan Supreme Court granted leave to appeal and reversed the Court of Appeals' decision supporting the trial court's denial of the motions for relief from judgment, and ordered the case remanded for an evidentiary hearing. *People v. Johnson*, 497 Mich. 897 (2014); *People v. Scott*, 497 Mich. 897 (2014).

---

discovered evidence, Mr. Bernette's recantation and an affidavit from Mr. Jackson's relative that Mr. Jackson lied at the trials. The trial court denied the motion, and the Court of Appeals and the Michigan Supreme Court denied leave to appeal. *People v. Johnson*, unpublished order of the Court of Appeals, entered February 11, 2009 (Docket No. 287529); *People v. Johnson*, 485 Mich. 893 (2009). Mr. Johnson's third motion for relief from judgment presented additional newly discovered evidence, which included police reports regarding domestic violence disputes between William and Lisa Kindred. Again, the trial court denied the motion, and the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal. *People v. Johnson*, unpublished order of the Court of Appeals, entered December 2, 2010 (Docket No. 298189); *People v. Johnson*, 489 Mich. 990 (2011).

The trial court held an evidentiary hearing in the spring of 2015. Newly discovered evidence presented to the judge included Lisa Kindred's now-adult son, C.J., Jr., who testified that he could not forget the face of the man who shot his mother and that he was sure that Justly Johnson and Kendrick Scott were not the shooters. *People v. Johnson*, 502 Mich. 541, 558-59 (2018). C.J., Jr. testified that he was never contacted by the police, the prosecution, or defense counsel regarding the shooting until years later, when Innocence Project investigator, Scott Lewis, contacted him. *Id.* at 550-60.

Defendant Adams testified in her July 2020 deposition that she did speak with C.J., Jr. at his house, the morning after the shooting. (Adams Dep. II, at pp. 228-29, PageID.2895-96.) She testified that C.J. said he was sleeping when the shooting occurred. (*Id.*) Defendant Adams did not write down what C.J. said, or make a note in her record that she had spoken with him. (*Id.* at pp. 229-31, PageID.2896-98.)

Antonio Bernette also testified at the evidentiary hearing. *People v. Johnson*, 502 Mich. at 561. He recanted his prior identification and testimony that Plaintiff Scott and Mr. Johnson confessed to robbing and shooting a woman, and also recanted his previous testimony that the police had not threatened him, saying he was threatened by the police into falsely implicating Johnson and Scott. *Id.*

23

Further, although Raymond Jackson had died in 2008, his cousin, Lameda Thomas, testified that Mr. Jackson had told her, on two separate occasions, that he had lied on the stand out of fear of prosecution, and specifically lied about Mr. Johnson telling him he "hit a lick" and had to shoot. *Id.*

Following the evidentiary hearing, the trial court denied both Scott's and Johnson's motions for relief from judgment, concluding that there was no reasonable probability of a different result if C.J. Skinner, Jr., testified on retrial. *Johnson*, 502 Mich. at 561-62. The trial judge discredited C.J. Skinner, Jr.'s testimony, finding that C.J. was likely asleep, and that he could not have seen outside of the minivan where the shooter stood because the dome light was illuminating the interior of the vehicle. *Id.* The trial court stated that the prior trial testimony by Mr. Bernette and Mr. Jackson were consistent, and the allegation that Mr. Bernette was "coached by the police" was "illogical, reasoning that the police would not be able to predict what would be asked of Burnette." *Id.* The trial court then concluded that "it could not find 'any reasonable probability that there would be a different result in this case, even if Mr. Skinner was allowed to give testimony in regard to this matter, nothing.'" *Id.*

On May 31, 2016, the Michigan Court of Appeals affirmed the trial court's denial of relief from judgment. *People v. Johnson*, Nos. 311625, 317915, 2016 WL

24

3067684 (Mich. Ct. App. May 31, 2016). The Michigan Supreme Court granted leave to appeal and, in an opinion authored by Justice Richard Bernstein on July 23, 2018, reversed the lower courts and vacated the convictions, granting a new trial based on the newly discovered evidence. *People v. Johnson*, 502 Mich. 541 (2018). The Michigan Supreme Court held that the trial court clearly erred in finding that C.J. Skinner, Jr. was asleep during the shooting and in concluding that C.J.'s testimony regarding witnessing both the shooting and the shooter was entirely incredible, and found that his testimony would make a different result probable on retrial. *Id.*

On November 28, 2018, the Wayne County Prosecutor's Office dismissed the criminal charges against Justly Johnson and Kendrick Scott.

### B.    Procedural History

In 2019, Plaintiff Kendrick Scott and Justly Johnson filed separate lawsuits asserting that defendant DPD officers were liable to them for violating their civil rights. Specifically, Plaintiff Scott brought this suit against Defendant DPD Officers Wayne Pritchett, Catherine Adams, Barbara Simon, and Rodney Jackson on September 17, 2019, asserting claims under 42 U.S.C. § 1983 for malicious prosecution, fabrication of evidence, withholding material exculpatory evidence in violation of *Brady v. Maryland*, and failure to intervene. (ECF No. 1, Compl.)

25

Scott filed a First Amended Complaint on November 18, 2019, substituting Defendant Anthony Jackson for Rodney Jackson, and asserting the same four claims. (ECF No. 14, First Amended Compl. (FAC).) Plaintiff Scott alleges that these defendants manufactured probable cause by and through coercing Mr. Bernette's testimony through physical abuse and threats, and coercing Mr. Jackson's testimony through threats. Plaintiff further alleges that Defendants withheld exculpatory evidence given by Ms. Gonterman, and that defendants had a duty to intervene and otherwise stop each other from committing misconduct.

Defendants filed a motion for partial summary judgment after the close of discovery. (ECF No. 38, Defs.' Mot.)

Defendants argue that they are entitled to summary judgment on Plaintiff's malicious prosecution claim because they had probable cause to initiate and pursue a criminal case against Plaintiff Scott based on the statements of Mr. Bernette and Mr. Jackson. Defendants argue that even though Mr. Bernette has since recanted his testimony, because Mr. Jackson died in 2008, any testimony or evidence that he has recanted his testimony is inadmissible hearsay that cannot create a question of fact defeating summary judgment.

Defendants argue that Plaintiff's *Brady* claim fails on the ground that Ms. Gonterman's statement that Lisa told her, if anything ever happened to her, people

26

should look at her husband Will as a suspect, is not exculpatory because Mr. Kindred had an "airtight alibi," and the alleged statement is inadmissible hearsay.

Defendants assert that Defendant Anthony Jackson is entitled to qualified immunity on Plaintiff's malicious prosecution claim because his only involvement in this case was taking Ms. Gonterman's statement, and he was not on the "homicide team headed by Defendant OIC, Cathy Adams."

Finally, Defendants contend that all defendants, apart from Defendant Jackson, are entitled to qualified immunity on Plaintiff's *Brady* claim because only Officer Jackson took down the statement from Ms. Gonterman and there is no evidence that Defendant Jackson told the other defendant officers that he omitted anything from Ms. Gonterman's statement.

Defendants did not move for summary judgment on Plaintiff Scott's fabrication of evidence claim (Count II), on his *Brady* claim related to the alleged coerced statements of Mr. Bernette and Mr. Jackson (Count III), or his failure to intervene claim (Count IV).

Plaintiff Scott filed a response in opposition to Defendants' motion. (ECF No. 39, Pls.' Resp.) Plaintiff Scott contends that his malicious prosecution claim should not be dismissed because Defendants had no probable cause to prosecute Plaintiff as both Mr. Bernette's and Mr. Jackson's statements were coerced, and Mr. Jackson's

multiple recantations to third parties are admissible under Fed. R. Evid. 807, the Residual Exception to the hearsay rule. Plaintiff further argues that his *Brady* claim against Defendant Jackson related to the omitted information from Ms. Gonterman's statement survives summary judgment because the omitted statement was exculpatory and impeaching, and is admissible under Fed. R. Evid. 803(3) as evidence of Lisa Kindred's state of mind, and would have led to other admissible evidence. Plaintiff next argues that all defendants other than Defendant Jackson are not entitled to qualified immunity on Plaintiff's *Brady* claim because that claim is not based solely on Defendant Jackson's suppression of Ms. Gonterman's statement, but also on the remaining defendants' failure to inform the prosecutor that they had coerced Mr. Bernette and Mr. Jackson into making false statements, and that Defendants Adams, Pritchett and Simon all participated in this suppression. Finally, Plaintiff contends that Defendant Jackson is not entitled to qualified immunity on Plaintiff's malicious prosecution claim because Defendant Jackson worked on the criminal case against Scott and Johnson, relayed all information to the OIC, Defendant Cathy Adams, and thus influenced the decision to prosecute Plaintiff Scott.

Defendants did not file a reply brief.

28

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley*

29

*Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.  ANALYSIS

**A.    Plaintiff Scott's Constitutional Malicious Prosecution Claim (Count I)**

Plaintiff Scott asserts a malicious prosecution claim under the Fourth and Fourteenth Amendments to the United States Constitution against all four defendants. (FAC, First Cause of Action, PageID.110-11.) Plaintiff alleges in his FAC that Defendants "knew they lacked probable cause to prosecute Plaintiff because of the evidence provided by Jodi Gonterman that Will Kindred had committed the murder, which they suppressed, and because they fabricated Antonio Burnette's and Raymond Jackson's statements." (*Id.* ¶ 108, PageID.110-11.) Plaintiff further alleges that all charges against him were terminated in his favor upon the November 18, 2018 dismissal of the indictment against him. (*Id.* ¶ 110, PageID.111.)

### 1.    Constitutional malicious prosecution claim

A claim for malicious prosecution under the Fourth Amendment "encompasses wrongful investigation, prosecution, conviction, and incarceration," *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (internal quotation marks and citation omitted), and has four elements: (1) the defendant "made, influenced, or participated in the decision to prosecute" the plaintiff; (2) the prosecution lacked

31

probable cause; (3) the proceeding caused the plaintiff to experience a deprivation of liberty; and (4) the proceeding was "resolved in the plaintiff's favor." *Jones v. Clark Cnty.*, 959 F.3d 748, 756 (6th Cir. 2020) (quoting *Sykes*, 625 F.3d at 308-09); *see also Sykes*, 625 F.3d at 310 (explaining that the constitutional malicious prosecution claim is distinct from the similarly named state law tort and may be better described as a claim for "unreasonable prosecutorial seizure" (citation omitted)); *Lester v. Roberts*, 986 F.3d 599, 606-07 (6th Cir. 2021) (criticizing the "malicious-prosecution label" and suggesting that the court "focus on the *seizure* … rather than the *prosecution*") (emphasis in original). Although actual "malice" is not required to succeed on a constitutional malicious prosecution claim, the defendant's participation "must be marked by some kind of blameworthiness," i.e., the defendant must have made "deliberate or reckless falsehoods," and "mere negligence" will not create liability. *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). A police officer violates a person's clearly established right to be free from malicious prosecution when the officer's "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).

### 2.    Whether Defendants had probable cause

In their motion for partial summary judgment, Defendants dispute the second prong of the constitutional malicious prosecution claim – that there was a  lack of probable cause. (See Defs.' Mot. at pp. 11-15, PageID.276-80.) Defendants assert that "[p]robable cause is created by the statements of Antonio Bernette and Raymond Jackson." (*Id.* at p. 11, PageID.276, citing Investigator's Report, PageID.344-45.) Plaintiff responds that Defendants did not have probable cause to prosecute him because both Mr. Bernette's and Mr. Jackson's statements were coerced. (Pl.'s Resp. at p. 9, PageID.1062.)

A warrantless arrest violates the Fourth Amendment if no "probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). Defendants cannot rely on "information obtained as a result of a coerced statement to furnish probable cause." *United States v. Whitlock*, 418 F. Supp. 138, 142 (E.D. Mich. 1976), *aff'd*, 556 F.2d 583 (6th Cir. 1977) (Table). As the United States Supreme Court long ago explained, "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall

33

not be used at all." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

The Supreme Court defines probable cause as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *DeFillippo*, 443 U.S at 37; *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (adding that probable cause "depends on the *totality of the circumstances*" (emphasis added)). The Sixth Circuit cautions that neither "a bare allegation of criminal wrongdoing," *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008), nor "an individual's mere presence at a crime scene," *Harris v. Bornhorst*, 513 F.3d 503, 515 (6th Cir. 2008), constitutes probable cause for arrest. And the Sixth Circuit requires an officer to consider "both the inculpatory *and* exculpatory evidence[ ] before determining if he has probable cause." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis original); *see also Parsons*, 533 F.3d at 501 ("Police officers may not make hasty, unsubstantiated arrests with impunity, nor simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." (internal citations and quotation marks omitted)).

34

The United States Supreme Court has explained that probable cause "is not a high bar," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (internal citations and quotation marks omitted). And, the Sixth Circuit has held that "probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989). "But once a police officer *has* sufficient probable cause to arrest, he need not investigate further." *Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001) (emphasis original)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire*, 205 F.3d at 315). However, the Sixth Circuit has recently clarified that "the ultimate question of probable cause (separate from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020).

Defendants state that "[p]robable cause [to prosecute Plaintiff] is created by the statements of Antonio Bernette and Raymond Jackson." (Defs.' Mot. at p. 11, PageID.276, citing Investigator's Report, PageID.344-45.) Defendants note that

35

these two witnesses "also testified at the Preliminary Examination wherein 36th District Court Judge Claudia Gartin found probable cause an[d] bound over the case for trial." (*Id.* citing ECF No. 38-11, Prelim. Exam. Tr. Vol. II, 6/4/1999, at pp. 68-69, PageID.847-48.) Defendants acknowledge that Mr. Bernette has since recanted his testimony and that he has testified that his prior statement and testimony were coerced when Defendants physically beat and threatened him, and Defendants concede that, for purposes of this summary judgment motion, Mr. Bernette must be believed and his statement must be removed from the investigator's report as a basis for probable cause. (*Id.* at p. 12, PageID.277.)

Defendants assert that the issue then is whether Mr. Jackson's statement and testimony, alone, is sufficient to create probable cause justifying the prosecution of Plaintiff Scott. Defendants state that because Mr. Jackson died in August of 2008, "all that is left is his signed statements given to DPD, his Preliminary Examination testimony, and [his] testimony at the trials of plaintiffs." (*Id.*)

Plaintiff Scott asserts in response that Mr. Jackson's statements and testimony were coerced, like Mr. Bernette's, and thus his testimony cannot furnish probable cause for his prosecution. (Pl.'s Resp. at p. 9, PageID.1062.) Plaintiff contends that Mr. Jackson recanted his testimony three times before he died in 2008. First, Lakeniya Hicks has provided sworn testimony that, just before Plaintiff Scott's June

36

2000 trial, Mr. Jackson came to Mr. Billingslea's and Ms. Hicks' house and that "he was kind of nervous" because the prosecutor wanted him to testify as to his second statement, and that she overheard Mr. Jackson tell Mr. Billingslea that his witness statement "was a lie and he wanted to recant but he, he was scared because the prosecutor was going to put him in jail," and that the police had "coerced him to talk." (Hicks Dep. at pp. 14-16, 33, PageID.503-05, 522.) Mr. Billingslea, who is alive, was not deposed by Plaintiff. (*See id.* at pp. 24-25, PageID.1888-89.)

Plaintiff further contends that Mr. Jackson also recanted two more times to his cousin, Lameda Thomas – at a family gathering or barbecue at Ms. Thomas' mother's house in June or July of 2002, and at a birthday party at a relative's house in 2006. Mr. Jackson allegedly told Ms. Thomas that he "messed up and he lied" when he made his statement and testified, which "weren't true," and explained that "[h]e was scared because he was under a lot of pressure from the police, who told him he and his grandmother could go to jail if he did not cooperate with [them]." (ECF No. 38-12, Deposition of Lameda Thomas (Thomas Dep.) at pp. 10-14, PageID.860-64.) Ms. Thomas testified that Mr. Jackson said that the police "were yelling at him and threatening him," but she does not remember him saying that the police were physically abusing him. (*Id.* at pp. 17-18, PageID.867-68.)

37

Defendants argue that Ms. Hicks' and Ms. Thomas' testimony regarding Mr. Jackson's purported recantations is inadmissible hearsay. Defendants assert in their motion that they believe Plaintiff will contend that the testimony is admissible as an admission against penal interest under Fed. R. Evid. 804(b)(3). (Defs.' Mot. at pp. 13-15, PageID.278-80.) Defendants assert that, as explained by the United States Supreme Court in *Williamson v. United States*, 512 U.S. 594, 600-01 (1994), Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Following this analysis, Defendants concede that "Mr. Jackson's self-inculpatory comments that he lied at trial may be admissible FRE 804(b)(3)," but argue that his self-exculpatory statements immediately thereafter that the "police pressured me, threatened me etc…." are inadmissible hearsay. (Defs.' Mot. at p. 14, PageID.279.)

As Defendants concede, Mr. Jackson's alleged statement that he testified falsely against Plaintiff Scott could clearly subject him to perjury charges or a civil lawsuit from Plaintiff Scott. (*Id.*) *See Beckett v. Ford*, 384 F. App'x 435, 444 (6th Cir. 2010) (holding that a declarant's statement that he "had no prior knowledge of the involvement of Dale Beckett in the murder he now stands convicted of," clearly subjected the declarant to perjury charges or civil lawsuit by Beckett because the declarant "testified at Beckett's murder trial implicating Beckett in the murder")

(punctuation modified). By contrast, Mr. Jackson's alleged statements as to *why* he lied – that the police coerced or threatened him to lie – is not a statement against interest. (Defs.' Mot. at p. 14, PageID.279.) *See Beckett*, 384 F. App'x at 444 (holding that the declarant "did not incur any criminal or civil liability by stating that he was threatened by Forrester[, a police officer], that Forrester and Anderson[, the prosecutor] coached his testimony, or that Anderson promised that he would be released from prison in exchange for testifying falsely"). Defendants state that coercion or duress is a defense to perjury, and thus Mr. Jackson's self-exculpatory statements that he was threatened or coerced into making the false statements do not expose him to criminal liability. (Defs.' Mot. at p. 14, PageID.279.) Defendants argue that because Mr. Jackson's self-exculpatory statements that the police "pressured or threatened" him are inadmissible hearsay, they cannot be used to create a fact issue defeating summary judgment, and that Mr. Jackson's statements that Plaintiff Johnson told him that he and Mr. Scott were "hitting a lick" and had to "shoot the woman" are sufficient, alone, to create probable cause to prosecute Plaintiff Scott even without the statement of Mr. Bernette. (*Id.* at pp. 14-15, PageID.279-80.)

In his response to Defendants' motion, Plaintiff first notes that, even before considering Mr. Jackson's recantations of his statements, a jury is likely to conclude

that Mr. Jackson's inculpatory statement against Mr. Scott was coerced because (1)
his first statement did not contain any inculpatory information; (2) officers coerced
Mr. Bernette's statement prior to obtaining Mr. Jackson's second statement, which
contained the identical "hit a lick" language; (3) officers tried to coerce Plaintiff's
then-girlfriend, Falynn Kenner, into making an inculpatory statement by having her
arrested for murder, and when she refused, she was sent to juvenile detention, only
to have the charges dismissed by the court the very next day, and (4) officers decided
to frame Plaintiff Scott even *before* Mr. Bernette's coerced statement was obtained
because they searched his home earlier that day, admittedly without any probable
cause. (Pl.'s Resp. at p. 9, PageID.1062, citing Jackson Statement No. 1; Bernette
Statement; Jackson Statement No. 2;  ECF No. 41-28, Deposition of Barbara Simon
(Simon Dep.) at p. 109, PageID.3453; ECF No. 41-29, Complaint (Request for
Action) signed by Simon, for Falynn Kenner, PageID.3489-90; ECF No. 41-30,
Order of Circuit Court, Family Division, PageID.3492; Adams Dep. II, pp. 136-37,
PageID.2803-04.) As to Plaintiff's fourth point, the Court finds that Plaintiff's
suggested theory about the reason for the search does not "track," because Plaintiff
Scott was one of the individuals already in custody being investigated, and obtaining
a search warrant for his house would be standard operating procedure and not
necessarily an intent to frame him. The Court notes that Defendants concede that

Mr. Jackson's subsequent statement that he lied when making his second witness statement and when testifying at trial, may be admissible under Rule 804(b)(3) as a statement against interest, leaving only his statements as to why he lied (that he was threatened/coerced) at issue.[5]

Plaintiff also alleges that the officers knew they lacked probable cause to prosecute him because of the evidence provided by Jodi Gonterman that Lisa previously told her, if anything happens to her, to look at her husband Will, which was allegedly suppressed. (FAC ¶ 108, PageID.110-11.) Ms. Gonterman did state in her witness statement, in response to the question of whether she thought that Will Kindred "had knowledge of what might happen prior to" the shooting, that she "can't say for sure." (Gonterman Statement, PageID.1770.) In addition, Ms. Gonterman testified in her deposition, when asked about that response in her witness statement, "So do I think that he had prior knowledge of what was going to happen to Lisa? I didn't think so. I can't say for sure that's on here. [sic] I didn't have enough

---

[5] The Michigan Supreme Court in *People v. Johnson*, 502 Mich. at 577 n.18, opined that Mr. Jackson's recantation "would be admissible because defendant has the right, per MRE 806 ["Attacking and Supporting Credibility of Declarant"], to attack the credibility of Jackson's former testimony." (citing MRE 806 ("When a hearsay statement … has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.").

41

information to give a thorough answer, I didn't know how this – what went down. I didn't know what took place." (Gonterman Dep. at p. 116, PageID.1744; *see id.* at p. 117, PageID.1745 ("And I really don't have any information to believe that he did. Either way, I was just trying to provide the factual information.").) Taking all this record evidence in the light most favorable to Plaintiff Scott and drawing all reasonable inferences in his favor, including Mr. Bernette's recantation of his statement inculpating Plaintiff Scott and Justly Johnson, coupled with evidence that Mr. Jackson lied when he gave his second witness statement to police and testified about inculpating Scott and Johnson, a jury could reasonably conclude that Defendants did not have probable cause to prosecute Plaintiff (which probable cause Defendants state was based solely on the Bernette and Jackson statements), thus defeating Defendants' motion for summary judgment, even without Mr. Jackson's additional statements regarding *why* he lied.[6]

Turning to the admissibility of those statements – that Mr. Jackson told Ms. Thomas and Ms. Hicks that he lied because he was coerced and threatened by Defendants to make the second witness statement inculpating Plaintiff Scott and

---

[6] The Michigan Supreme Court noted in *People v. Johnson*, 502 Mich. at 579, that "[e]ven if Jackson's recantation is not presented, considering Jackson's previous testimony in light of the other evidence that would be presented at retrial, we believe that defendants have a reasonably likely chance of acquittal."

Justly Johnson – Plaintiff does not argue that these statements are admissible under Rule 804(b)(3), and instead argues only that the statements are admissible under the Residual Exception to hearsay, Fed. R. Evid. 807 – a rule Defendants do not address in their motion.

The Sixth Circuit has held that, "the analysis of a hearsay statement should not end when a statement" is inadmissible under the hearsay exceptions in Rule 803 or 804, "but should be evaluated under the residual hearsay exception" in Rule 807. *United States v. Laster*, 258 F.3d 525, 530 (6th Cir. 2001); *see also Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 578 (6th Cir. 2013) (noting that Rule 807 allows the admission of a hearsay statement that does not fall under the exception to hearsay found in Rules 803 and 804, if certain criteria are met). Defendants did not file a reply brief, and thus did not specifically address the admissibility of Mr. Jackson's recantations under Rule 807. At the hearing on Defendants' motion, counsel for Defendants argued only that an analysis of the statements under Rule 807 is not appropriate when there is clear guidance under Rule 803, and the that self-exculpatory statements do not bear the same indicia of trustworthiness as self-inculpatory statements.

A hearsay statement is admissible under Rule 807 if:

(1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Plaintiff bears the burden of proving that the hearsay fits within Rule 807's residual hearsay exception. *United States v. Kendrick*, 853 F.2d 492, 496 n.3 (6th Cir. 1988) ("[T]he proponent of a hearsay statement bears the burden of proving that the statement fits squarely within a hearsay exception or exclusion.") (citation omitted). While the residual hearsay exception "should be used only in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice," "[d]istrict courts have considerable discretion in applying the residual exception to the hearsay rule[.]" *Sims v. United States*, Nos. 04-70474, 99-80102, 2006 WL 8435527, at *7 n.14 (E.D. Mich. Jan. 18, 2006), *Magistrate Judge's Report and Recommendation adopted*, 2006 WL 800844 (E.D. Mich. Fed. 28, 2006); *see also United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016) ("Trial courts have a 'considerable measure of discretion' in determining whether evidence should be admitted under Rule 807.") (citations omitted).

Plaintiff Scott provides a lengthy discussion supporting the admissibility of Mr. Jackson's three recantation statements under Rule 807. (Pl.'s Resp. at pp. 10-15, PageID.1063-68.) Plaintiff first argues that the recantations are supported by sufficient guarantees of trustworthiness. "Most courts apply a '[b]road inquiry,' looking to the totality of the circumstances that surround the statement when determining whether it possesses the requisite guarantees of trustworthiness." *Wright v. Beard*, No. 14 Civ. 90, 2016 WL 7173787, at \*5 (W.D. Ky. Dec. 8, 2016) (citation omitted). "In assessing the totality of the circumstances, the Court may consider the declarant's relationship to the parties, the motive of the declarant in making the statement, the extent to which the statement reflects the declarant's personal knowledge, and the consistency of any past statements by the declarant." *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2020 WL 614698, at \*2 (S.D. Ohio Feb. 10, 2020) (citing *United States v. Barlow*, 693 F.2d 954, 961-63 (6th Cir. 1982)); *see also Wright*, 2016 WL 7173787, at \*5 (discussing seven factors considered by the Seventh Circuit, including "(1) the probable motivation of the declarant in making the statement, (2) the circumstances under which the statement was made, (3) the knowledge and qualifications of the declarant, (4) the existence of corroborating evidence, (5) the character of the declarant for truthfulness and honesty and the availability of evidence on the issue, (6) whether the testimony was

given voluntarily, under oath, subject to cross-examination and a penalty for perjury, and (7) whether the witness ever recanted his testimony.") (internal quotation marks omitted) (quoting *United States v. Hall*, 165 F.3d 1110-11 (7th Cir. 1999)). However, the Advisory Committee Notes to Rule 807 provide that "[t]he credibility of the witness relating the statement is not a part of either inquiry" under the Rule because "[t]o base admission or exclusion of a hearsay statement on the witness's credibility would usurp the jury's role of determining the credibility of testifying witnesses." Fed. R. Evid. 807, 2019 Advisory Committee Notes.

There is also a requirement that the statement contain sufficient indicia of reliability or trustworthiness. Plaintiff argues that the three recantation statements are supported by "sufficient guarantees of trustworthiness." Plaintiff explains that Mr. Jackson made essentially the same statements recanting his testimony on three separate occasions to two different people: first to Mr. Billingslea, in Ms. Hicks' presence, in 2000, and two more times to Ms. Thomas, in 2002 and 2006, and that this frequency lends credibility to the inference that Mr. Jackson's earlier statements were coerced. (Pl.'s Resp. at p. 11, PageID.1064.) *See United States v. Vretta*, 790 F.2d 651, 659 (7th Cir. 1986) ("[Declarant] told a number of people about [defendant's] threats toward him, thus lending credibility to the fact that [declarant] made the statements concerning the threats.") (citing *United States v. Howard*, 774

F.2d 838, 845 (7th Cir. 1985) (noting that the defendant made the same statement "not only once, but twice" to witnesses)). And, as Plaintiff further contends, Mr. Bernette's testimony that he was coerced and threatened by the same officers into making a very similar statement (that Scott and Johnson "hit a lick") to inculpate Plaintiffs Scott and Johnson, after Mr. Jackson's first statement but prior to his second statement, further lends credibility to the testimony regarding Mr. Jackson's recantations. (Pl.'s Resp. at pp. 11-12, PageID.1064-65.) *See F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir. 1993) (noting that "[t]he fact that [the letters] all reported roughly similar experiences suggests their truthfulness.").

Plaintiff also contends that Mr. Jackson's statements had circumstantial guarantees of trustworthiness because Mr. Jackson made the statements to persons with whom he had a close relationship – Ms. Thomas was Mr. Jackson's cousin, and Mr. Jackson was close friends with Mr. Billingslea and his girlfriend Ms. Hicks. (Pl.'s Resp. at pp. 12-13 & fn. 7, PageID.1065-66.) *See Brumley*, 727 F.3d at 578 ("[T]he statements should be considered more reliable than not given that Brumley, Sr. and Brumley, Jr. are father and son and not strangers."); *Kiniun v. Minnesota Life Ins. Co.*, No. 3:10cv399, 2013 WL 12146384, at *2 (N.D. Fla. Jan. 14, 2013) (out-of-court statement by deceased declarant to a long-time friend in whom she confided was trustworthy and admissible under Rule 807). Thus, it appears that Mr. Jackson

was close with the persons he confided in, lending further support to the circumstances of trustworthiness of the statements. In addition, the first statement to Mr. Billingslea, overheard by Ms. Hicks, was made about a year after he made the inculpatory statements to police and around the same time as he was supposed to testify at Mr. Scott's jury trial, and the second and third statements in 2002 and 2006 were consistent, and appear to be voluntary. There is no indication that Mr. Jackson was under any duress to recant his earlier statement, or that he had an improper motivation to tell his cousin and friends that he lied and his statement had been coerced. *See Vretta*, 790 F.2d at 659 ("[T]he fact that [the declarant] informed these disinterested third parties of the threats rebuts and contradicts [defendant's] argument that [the declarant] could have been making these statements to gain sympathy from those who were investigating him.").[7] The Court finds, based on all

---

[7] Plaintiff also argues that "Mr. Kindred's invocation of the Fifth Amendment at his deposition further corroborates Mr. Jackson's recantations." (Pl.'s Resp. at p. 12, PageID.1065.) A non-party's invocation of the Fifth Amendment can give rise to an adverse inference against a party to a civil action. *See Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 384-85 (6th Cir. 1993) ("The refusal of these two witnesses to answer any questions about actions they had taken on behalf of FIA support a rational inference that they had participated in activity that they feared would subject them to liability."). In the instant case, the Court questions the application of the adverse inference because Mr. Kindred had many reasons for invoking his Fifth Amendment right at his deposition, including allegations regarding how he spent settlement proceeds recovered from an automobile accident, and how he treated Lisa and his stepson C.J., Jr. in the past.

of the above, that Mr. Jackson's alleged statements to Ms. Hicks and Ms. Thomas are supported by sufficient guarantees of trustworthiness, as required by Rule 807.

Plaintiff further argues that Mr. Jackson's recantations are more probative than other evidence that can be obtained through reasonable efforts. Mr. Jackson's statements to Ms. Hicks and Ms. Thomas were relayed, under oath, during two separate depositions, at which the declarants were subject to Defendants' cross-examination, and they are the only evidence of Mr. Jackson's recantations of his statements because of coercion by the police, because Mr. Jackson is deceased. Mr. Jackson's out-of-court statements to Ms. Hicks and Ms. Thomas thus are "more probative on the point for which [they] [are] offered than any other evidence that [Plaintiff] can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2).

Thus, considering Mr. Bernette's and Mr. Jackson's recantations of their witness statements, the Court finds that there is a material question of fact as to whether Defendants had probable cause to arrest and prosecute Plaintiff Scott, defeating Defendants' motion for partial summary judgment on Plaintiff's malicious prosecution claim. *See Gregory v. City of Louisville*, 444 F.3d 725, 749 n.11 (6th Cir. 2006) ("It is not our job to find whether or not probable cause would have been

49

dissolved had Katz revealed the exculpatory evidence; this is the precise province of the jury.").[8]

### B.    Plaintiff's *Brady* Violation Claim (Count III)

Plaintiff Scott asserts a cause of action against all defendants for withholding material exculpatory evidence in violation of his rights established by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. (FAC, Third Cause of Action, PageID.113-14.) Specifically, Plaintiff Scott alleges that Ms. Gonterman's full statement that Lisa Kindred said "if anything happens to [Lisa] she wanted [Jodi] to look at Will as a suspect," is material exculpatory evidence, and that Defendant Officer Anthony Jackson only recorded a partial statement that omitted any reference to Lisa's fear of being killed or injured by Will, and that he then produced only that partial statement to the prosecution. (FAC ¶¶ 122-24, PageID.113.)

Plaintiff further contends that Defendants Pritchett, Adams, and Simon "were all aware that they had assaulted, threatened, and coerced Antonio B[e]rnette into signing his statement," and that they had a "duty to report the true circumstances of

---

[8] The Court notes that, "[a]s with any hearsay statement offered under an exception, the court's threshold finding that admissibility requirements are met merely means that the jury may consider the statement and not that it must assume the statement to be true." Fed. R. Evid. 807, 2019 Advisory Committee Notes. Defendants will have an opportunity at trial to discredit Mr. Jackson, and introduce evidence, under Fed. R. Evid. 806, to attack his credibility.

Antonio B[e]rnette's interrogation to the prosecutor [including the coercion] so that it could be disclosed to the defense," but they failed to do so. (*Id.* ¶¶ 125-26, PageID.113-14.) Plaintiff also alleges that Defendants Adams and Simon "were all aware that they had threatened and coerced Raymond Jackson into signing his statement," and that they "all had a duty to report the true circumstances surrounding Raymond Jackson's interrogation to the prosecutor so that it could be disclosed to the defense," but they failed to do so. (*Id.* ¶¶ 126-28, PageID.114.)

In their motion for partial summary judgment, Defendants address only Plaintiffs' *Brady* claim regarding the Jodi Gonterman statement, and do not argue that they are entitled to summary judgment on the *Brady* claim regarding Mr. Bernette's and Mr. Jackson's statements. (See Defs.' Mot. at pp. 15-17, PageID.280-82.)

A *Brady* claim has three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "The third component is sometimes referred to as the 'materiality' requirement." *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014). "Reversal is only required … where

'there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.'" *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994) (citations omitted).

Police officers are obligated to turn over potentially exculpatory evidence to the prosecutor's office. *Moldowan v. City of Warren*, 578 F.3d 351, 378-79 (6th Cir. 2009). However, a police officer need only disclose evidence "when its exculpatory value is 'apparent' to the officer, that is, when the officer is aware that the evidence 'could form a basis for exonerating the defendant.'" *D'Amborsio v. Marino*, 747 F.3d 378, 389-90 (6th Cir. 2014) (internal citations omitted) (quoting *Moldowan*, 578 F.3d at 384, 388 n.14). Bad faith is not required where "materially exculpatory" evidence has been withheld, regardless of whether the claim involves a failure-to-preserve, or failure-to-disclose evidence. *Moldowan*, 578 F.3d at 385. In such an instance, "where the evidence withheld or destroyed by the police falls into that more serious category, the defendant is not required to make any further showing regarding the mental state of the police." *Moldowan*, 578 F.3d at 386.

Defendants argue in their motion that, even assuming Lisa Kindred's statement to Ms. Gonterman was relayed to Defendant Jackson, and that Defendant Jackson failed to include it in Ms. Gonterman's written statement (as the Court must

on a motion for summary judgment), Defendants are entitled to summary judgment on this *Brady* claim because the statement was not "material." (Defs.' Mot. at pp. 16-17, PageID.281-82.) Specifically, Defendants contend that: (1) Ms. Gonterman's statement to Defendant Jackson, that Lisa told her in a 1998 telephone conversation that if something happened to her, to look at her husband Will as a suspect, which was not put in Ms. Gonterman's written witness statement, was "simply not exculpatory with respect to the two plaintiffs" because "Will had an airtight alibi via his sister and Verlin Miller whom he was with when the shoot[ing] occurred;" (2) once probable cause was established, there was no duty by DPD to investigate further to prove that Will hired the persons who killed his wife; and (3) the alleged statement is inadmissible hearsay. (Defs.' Mot. at pp. 16-17, PageID.281-82.)

Plaintiff responds that the statement was both exculpatory and impeaching because Lisa Kindred's warning tended to incriminate an alternative suspect for her murder, and it could have been used to impeach Mr. Kindred at Plaintiff Scott's trial. (Pl.'s Resp. at pp. 15-16, PageID.1068-69). Plaintiff further argues that Lisa Kindred's statement to her sister is subject to *Brady* because it would have led directly to other admissible evidence – the 17 domestic violence complaints against

Will Kindred, the personal protection order obtained by Lisa Kindred, and Lisa

Kindred's prior divorce complaint. (*Id.* at pp. 19-20, PageID.1072-73.)[9]

---

[9] One significant issue the Court notes is whether Jodi Gonterman's statement regarding Lisa's warning was "withheld" or "suppressed" for purposes of a *Brady* violation, which requires that the evidence be in the exclusive control of the state. *McNeill v. Bagley*, 10 F.4th 588, 600 (6th Cir. 2021) (citing *United States v. Graham*, 484 F.3d 413, 414-15 (6th Cir. 2007)). Plaintiff contends that the information from Ms. Gonterman to the police, that Lisa said if anything happened to her that Will should be a suspect, was "suppressed" because it was not "disclose[d]." (Pl.'s Resp. at p. 16, PageID.1069.) Ms. Gonterman, Lisa Kindred's sister, was available to the defense and could have shared this same evidence with the defense. Plaintiff's defense counsel, Mr. Williams, admitted that he was aware of Ms. Gonterman and her witness statement prior to trial, and that there was not anything keeping him from contacting her. (Williams Dep. at p. 66, PageID.1562.) Similarly, the records of the domestic violence incidents and divorce complaint involving the Kindreds were not in the exclusive control of the State.

     Defense counsel had an obligation to prepare an adequate defense, which would presumably include looking to other potential suspects. Ms. Gonterman was not called as a witness by either party at either Plaintiff Scott's or Justly Johnson's trials. (Gonterman Dep. at pp. 67, 70, PageID.969, 972) "There can be no *Brady* violation where a defendant 'knew *or should have known* the essential facts permitting him to take advantage of any exculpatory information.'" *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018) (emphasis added) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)). Moreover, information discoverable with "minimal investigation" cannot give rise to a *Brady* claim. *Jalowiec v. Bradshaw*, 657 F.3d 293, 311 (6th Cir. 2011) (quoting *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001)). "[T]he *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue," such as when the evidence in question "would have been discoverable with minimal investigation by [defense] counsel." *Coleman,* 268 F.3d at 438; *see also Benge v. Johnson,* 474 F.3d 236, 243 (6th Cir. 2007) (finding no *Brady* violation because evidence about what the witness could testify to was not suppressed by the state); *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (holding government's failure to disclose FBI reports containing exculpatory

The Court notes that, at this stage of the proceedings, it must consider the facts in the light most favorable to Plaintiff and draw all reasonable inferences in his favor. Accordingly, this Court finds that this statement could be considered potential exculpatory evidence, and thus it is material. Evidence is material for purposes of *Brady* if the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The United States Supreme Court has emphasized that a defendant is not required to show that the disclosure of the evidence would have ultimately led to an acquittal. *Id.* at 434–35. In fact, a defendant is not even required

---

information was not a *Brady* violation because the defendant was aware of the identities of two witnesses who could provide the same information). *But see United States v. Paulus*, 952 F.3d 717, 725 (6th Cir. 2020) ("*Brady* 'does not allow the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs.'") (alteration and citation omitted). In deciding whether evidence was suppressed, the relevant question is whether the defendant "would have had to follow a long trail of crumbs to get the missing details or whether he could have gotten the same information with minimal investigation." *Paulus*, 952 F.3d at 725 (explaining that "minimal investigation" is limited to "a simple search or request," such as an easy search of public records, and does not include subpoenaing information). On the other hand, Ms. Gonterman's statement to the police does not include any allegations that Mr. Kindred was violent toward Lisa (only to C.J. and himself), and thus an argument can be made that it would not have put defense counsel on notice that Mr. Kindred could be a possible suspect associated with Lisa's murder, or lead to the discovery of the multiple domestic violence charges. Indeed, Ms. Gonterman testified that she did not think that Will Kindred had anything to do with Lisa's murder. (Gonterman Dep. at pp. 111-12, PageID.1739-40.)

to show that he "would more likely than not have received a different verdict with the evidence[.]" *Smith v. Cain,* 565 U.S. 73, 75-76 (2012). Rather, he must show "only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.*; *see also United States v. Bagley,* 473 U.S. 667, 682 (1985) (adopting and applying the "prejudice" standard from *Strickland v. Washington,* 466 U.S. 668 (1984)). Further, to that effect, the Supreme Court has made clear that it is not necessary that "every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed." *Kyles,* 514 U.S. at 451 (granting habeas relief where the "evidence remaining unscathed" would not have amounted to "overwhelming proof" of the defendant's guilt). "*Bagley* materiality ... is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35; *see also Strickler v. Greene,* 527 U.S. 263, 290 (1999). And "[w]hen the State fails to turn over numerous pieces of favorable evidence … the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial." *Bies*, 775 F.3d at 399 (citing *Kyles*, 514 U.S. at 436-37); *see also Kyles*, 514 U.S. at 421 ("the state's obligation under *Brady* … to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the

56

government"). As Plaintiff states in his Response brief, "the entire case against Plaintiff was built on the testimony of two witnesses who were coerced by Defendants into giving false statements (another *Brady* violation…)" and "[a]ny evidence attacking the victim's husband's credibility and implicating him in the murder – especially when presented in conjunction with the evidence of Defendants' coercion of the two key witnesses, as *Kyles* instructs – would have reasonably produced a different verdict at trial." (Pl.'s Resp. at p. 17, PageID.1070.)

Evidence of a second suspect is generally material. *Bies*, 775 F.3d at 400 ("While the State is not necessarily required to disclose every stray lead and anonymous tip, it must disclose the existence of "legitimate suspect[s.]"). "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'" *United States v. Jernigan*, 492 F.3d 1050, 1056-57, (9th Cir. 2007) (en banc) (quoting *Kyles*, 514 U.S. at 440). Mr. Kindred's purported "airtight alibi" – based only statements by his sister and her boyfriend – does not affect this analysis, as the omitted statement by Lisa could tend to implicate Mr. Kindred in Lisa's murder, either directly or indirectly by hiring others. *See Cristini v. City of Warren*, No. 07-11141, 2012 WL 5508369, at *10 (E.D. Mich. Nov. 14, 2012) ("[A]

statement directly implicating others in the attack on the victim could have been expected to play a significant role in the plaintiff's defense. There is little doubt that a jury could find that the withheld evidence was apparently exculpatory[.]"). Neither does Defendants' assertion that they had no duty to investigate further once probable cause was established, impact this *Brady* issue. Ms. Gonterman's statement was made before Raymond Jackson's second statement inculpating Plaintiff. And, as Plaintiff explains, "[e]vidence of Ms. Kindred's fear that her husband might harm or kill her would also have 'raised opportunities to attack the thoroughness and even the good faith of the investigation' … which failed to investigate Mr. Kindred and uncover at least 17 incidents of prior domestic abuse." (Pl.'s Resp. at p. 16, PageID.1069, quoting *Bies*, 775 F.3d at 400.) Indeed, Plaintiff's trial counsel in the state court, Curtis Williams, testified that such evidence would have changed his examination of Mr. Kindred at trial. (Williams Dep. at pp. 25-26, PageID.1521-22 (stating that "[Mr. Kindred's] credibility could have been brought very seriously into question if we had had information about his being a threat and a possible suspect in the killing.").).

The issue remains whether Ms. Gonterman's testimony regarding Lisa Kindred's statement to her is inadmissible hearsay. Defendants summarily assert in their motion, without any further argument or analysis, that "the alleged statement

is rank hearsay, which is totally inadmissible, and as such, simply not material."

(Defs.' Mot. at p. 17, PageID.282, citing *Wood v. Bartholomew*, 516 U.S. 1 (2012).)

Defendants similarly failed to substantively address this argument during the hearing

on Defendants' motion.  Courts routinely decline to consider perfunctory arguments

of the sort made by Defendants here. *See McPherson v. Kelsey*, 125 F.3d 989, 995

(6th Cir. 1997) (holding that "[i]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived"

(quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59

F.3d 284, 293 (1st Cir. 1995)). It is not enough for a party to "mention a possible

argument in the most skeletal way" and leave the court to "put flesh on its bones."

*Id.* at 995-96 (quoting *Citizens Awareness Network*, 59 F.3d at 293-94). Defendants

were obligated to explain why the statement is inadmissible hearsay, but they made

no attempt to do so.

Further, *Wood v. Bartholomew*, cited by Defendants, fails to support

Defendants' blanket assertion. In *Wood*, the Supreme Court held that the suppressed

evidence – a witness's failed polygraph test – was inadmissible, and the petitioner

could offer only speculation that disclosure of such evidence would have led to

"additional evidence that could have been utilized." *Wood*, 516 U.S. at 6-7 (noting

petitioner's own trial counsel testified that the suppressed evidence would not have

"affected the outcome of the case"). Here, Plaintiff's counsel has testified that "[Mr. Kindred's] credibility could have been brought very seriously into question if we had had information about his being a threat and a possible suspect in the killing." (Williams Dep. at pp. 25-26, PageID.1521-22.)

Plaintiff argues that Lisa Kindred's statement to her sister would have been admissible in the trial court as substantive evidence under Michigan law, even though Lisa was deceased and unable to testify, as a "statement of the [unavailable] declarant's then existing state of mind." (Pl.'s Resp. at pp. 17-18, PageID.1070-71, citing MRE 803(3).) The Michigan Supreme Court has "made clear … that statements of murder victims as to plans or feelings are admissible where relevant to material issues, including motive." *People v. Hubbard*, No. 256831, 2005 WL 3304121, at *3 (Mich. Ct. App. Dec. 6, 2005) (citing *People v. Fisher*, 449 Mich. 441, 449-50 (Mich. 1995)); *see also People v. Davis*, No. 335051, 2018 WL 1768072, at *7 (Mich. Ct. App. Apr. 12, 2018) ("The victim's statements to her mother that she intended to break up with defendant, to her friends that she and defendant were having problems and that she did not want him to find out about an upcoming girls' trip to Florida, and to her cousin that she was afraid of defendant, were admissible under MRE 803(3) as evidence of the victim's state of mind leading up to her death."); *People v. Ortiz*, 249 Mich. App. 297, 307, 310 (2001) (holding

60

that the trial court did not abuse its discretion by admitting, under MRE 803(3), statements made by the defendant's deceased wife that he had threatened to kill her and that she did not want to get back together with him). And "[i]t is well-established that the state of mind exception to the hearsay rule is a firmly established exception for Confrontation Clause purposes." *Norris v. Davis*, No. 05-60126, 2006 WL 1581410, at *14 (E.D. Mich. May 3, 2006) (collecting cases). Thus, "a witness may testify that someone expressed to them fear of someone or something, but they may not testify as to that person's explanations of *why* they were afraid." *Apanovitch v. Houk*, 466 F.3d 460, 487 (6th Cir. 2006) (applying Fed. R. Evid. 803(3)) (emphasis in original, end citations omitted); *see also Cunningham v. Berghuis*, No. 2:12-CV-12196, 2014 WL 4265786, at *5 (E.D. Mich. Aug. 28, 2014) (finding that the state court properly admitted evidence of statements by the murder victim that she feared the petitioner under MRE 803(3), and that the "statements were offered to show that the victim was afraid of petitioner and to rebut petitioner's claim that the victim's death was an accident"). Thus, Ms. Gonterman's statement regarding Lisa Kindred's warning would have been admissible at trial under MRE 803(3), and is admissible here under Fed. R. Evid. 803(3) as evidence of Lisa's state of mind. *See Apanovitch*, 466 F.3d at 487; *Daniels v. Lafler*, 192 F. App'x 408, 422 (6th Cir. 2006) (noting

that "MRE 803(3) utilizes the exact same language as Federal Rule of Evidence 803(3)").

Plaintiff further argues that Lisa Kindred's statement to Ms. Gonterman is subject to *Brady* for the additional reason that it would have led directly to other admissible evidence – namely the 17 domestic violence complaints and Lisa Kindred's prior divorce complaint and personal protection order. Inadmissible evidence may be material under *Brady* if it would "lead directly" to admissible evidence. *Barton v. Warden, Southern Ohio Corr. Fac.*, 786 F.3d 450, 465-66 (6th Cir. 2015) (citations omitted) ("Although the Kellys' unrecorded statements might have been inadmissible hearsay, disclosure of the substance of these statements might have led directly to admissible evidence."). "The purpose of *Brady* and its progeny is to enforce an independent duty upon the State to hand over all of the material exculpatory evidence that it collects. It is not for the State to weigh the evidence and decide what the jury would ultimately find to be material and exculpatory—that is something that the jury itself must decide." *Id.* at 466. Plaintiff's trial counsel testified that knowledge of Lisa Kindred's warning to her sister would have changed his approach to his examination of Mr. Kindred, (Williams Dep. at pp. 25-26, PageID.1521-22), and Plaintiff argues that this information would have led to a "treasure trove of admissible evidence," including

the divorce complaint and request for an order of protection filed by Lisa Kindred, as well as police records detailing at least 17 incidents of domestic violence by Mr. Kindred, including an episode where Mr. Kindred slammed Lisa Kindred on the toilet and threatened to "kill [Lisa] and the whole family," and that the police twice confiscated a .22 LR rifle from Mr. Kindred – the same type of weapon used in Lisa's murder. (ECF No. 41-4, Roseville Police Department Records and Divorce Complaint, pp. 3, 4, 12, PageID.1600-27.). *See* MRE 404(b)(1) (allowing admission of evidence of "other crimes, wrongs, or acts" for "proof of motive, opportunity, intent, preparation, scheme, plan, or system of doing an act"); Fed. R. Evid. 404(b)(1), (2) (same).

Therefore, at this stage of the proceedings, considering all the facts in the light most favorable to Plaintiff, the Court finds that whether Defendant Officer Jackson is liable under *Brady* for suppressing Ms. Gonterman's statement is a fact issue for the jury to decide.

### C.    Defendants Argue They Are Entitled to Qualified Immunity as to "Some of Plaintiff's Claims"

Defendants argue that Defendant Officer Jackson is entitled to qualified immunity on Plaintiff's malicious prosecution claim, and that Defendants Pritchett, Adams and Simon are entitled to qualified immunity on Plaintiff's *Brady* claim

arising out the alleged failure of Defendant Jackson to write down Ms. Gonterman's statement regarding Lisa Kindred's warning. (Defs.' Mot. at p. 19, PageID.284.)

Plaintiff first responds that Defendants' qualified immunity arguments should be denied because Defendants fail to support their cursory arguments with any legal analysis. (Pl.'s Resp. at p. 21, PageID.1074.) Plaintiff further argues that, drawing all facts and inferences in Plaintiff's favor, Defendants are not entitled to qualified immunity on either the malicious prosecution or *Brady* claims. (*Id.* at pp. 21-25, PageID.1074-78.)

Qualified immunity protects federal and state officials performing discretionary functions from liability for civil damages for constitutional violations. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a qualified immunity defense, a plaintiff must show that the official violated a constitutional right that was "clearly established at the time" of the official's conduct. *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 608-09 (6th Cir. 2015) (alteration in original) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252, 256 (1986)). When determining whether a right was clearly

64

established, the court examines whether the law was "sufficiently clear that a reasonable official would [have understood] that what he [was] doing violate[d] that right." *Tlapanco v. Elges*, 969 F.3d 638, 648 (6th Cir. 2020) (internal quotation marks and citation omitted). In cases with multiple defendants, the court assesses qualified immunity "in the context of each individual's specific conduct." *Hopper v. Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (internal quotation marks and citation omitted); *see also Bey v. Falk*, 946 F.3d 304, 316 (6th Cir. 2019) (reversing a denial of qualified immunity where "there [was] no evidence that [the officer] personally participated in or directed" the alleged constitutional violation).

Defendants concede in their motion that "[s]ince it is clearly established that people have a right to only be arrested/prosecuted when probable cause exists, and not have exculpatory/impeachment evidence withheld from them, it becomes the courts duty to determine whether, in light of the totality of the circumstances, the officers [and which officers] violated plaintiff's 4th Amendment rights and/or due process rights under the 14th Amendment." (Defs.' Mot. at p. 18, PageID.283.) At the hearing on Defendants' motion, Defendants' counsel nevertheless argued that it was not "clearly established" that Defendant Jackson had a duty to record or pass along Ms. Gonterman's statement regarding Lisa Kindred's warning. However, as Plaintiff correctly argues in his response brief, and at the hearing, it is clearly

established law, well before 1999, that a police officer could be held liable under *Brady* and for malicious prosecution for withholding exculpatory evidence and for coercing a witness into making a fabricated statement. *See Jackson v. City of Cleveland*, 925 F.3d 793, 823-24, 826-27 (6th Cir. 2019) .

Thus, the issue to be determined is whether any of these individual Defendants, and, if so, then which of the Defendants, violated Plaintiff's constitutional rights with respect to the two claims at issue. (*See id.*)

### 1.    Plaintiff's malicious prosecution claim against Defendant Jackson

Defendants first contend that Defendant Jackson is entitled to qualified immunity on Plaintiff's claim for malicious prosecution because "it is undisputed fact that [Defendant Jackson] had absolutely nothing to do with the instigation, participation or decision to prosecute the case against Mr. Scott" and that Defendant Jackson's "only involvement in the subject case was taking the statement of witness Jody [sic] Gonterman … and he was not even on the homicide team headed by defendant OIC, Cathy Adams." (Defs.' Mot. at p. 19, PageID.284.) Defendants do not offer any further argument or any legal analysis to support their conclusory argument. Plaintiff argues in response that Defendant Jackson sufficiently

"influenced" the decision to prosecute Plaintiff to be liable for malicious prosecution. (Pl.'s Resp. at pp. 24-25, PageID.1077-78.)

As discussed *supra*, "[t]o succeed on a Fourth Amendment malicious prosecution claim … a plaintiff must prove the following: (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (citing *Sykes*, 625 F.3d at 308-09). Defendants appear to be arguing that Defendant Jackson is entitled to qualified immunity with regard to Plaintiff's malicious prosecution claim because he did not participate in or influence the decision to prosecute Plaintiff Scott.

The term "participated" in a malicious prosecution claim is construed "within the context of tort causation principles." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (quoting *Sykes*, 625 F.3d at 311). "Investigators are deemed to have participated in a prosecution where 'misstatements and falsehoods in [their] investigatory materials … ultimately influenced [a plaintiff's] continued detention." *Sykes*, 625 F.3d at 316. "[T]he fact that [a defendant] did not *make* the decision to

67

prosecute does not per se absolve [him] from liability." *Id.* (emphasis in original). "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge or otherwise 'ultimately influenced [a plaintiff's] continued detention,' and (2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth." *Meeks v. City of Detroit, Michigan.*, 727 F. App'x 171, 178-79 (6th Cir. 2018) (internals citations omitted).

Defendant Jackson's only "participation" in Plaintiff Scott's case involved the taking of Ms. Gonterman's witness statement. Defendant Jackson also took the statement of Justly Johnson, and Defendant Jackson testified that he "relayed all information that [he] came across to the officer in charge," Defendant Adams. (Jackson Dep. at pp. 18, 35-36, PageID.1790, 1807-08.) He was not otherwise involved in the homicide team investigating Lisa Kindred's murder, or the decision to prosecute Plaintiff Scott.

The Court finds that Defendant Jackson is entitled to qualified immunity on Plaintiff's malicious prosecution claim because he did not sufficiently participate in or influence the decision to prosecute Plaintiff Scott for Lisa Kindred's murder. *See Bey v. Falk*, 946 F.3d at 316 (reversing a denial of qualified immunity where the

68

officer was present at the arrest and drafted a police report summarizing the events of the arrest because "there [was] no evidence that [the officer] personally participated in or directed" the alleged constitutional violation).[10]

### 2. Plaintiff's *Brady* claim against Defendants Pritchett, Adams and Simon regarding alleged suppression of the Gonterman statement

Defendants next contend that Defendants Pritchett, Adams, and Simon are entitled to qualified immunity with regard to Plaintiff's *Brady* claim arising out of the alleged failure of Defendant Jackson to write down Ms. Gonterman's statement regarding Lisa Kindred's fear of her husband. Defendants argue that only Defendant Jackson was present when Ms. Gonterman's statement was taken, and there is no evidence that Defendant Jackson told the other three defendants that he omitted

---

[10] Plaintiff notes that Defendants assert in their Statement of Issues that Defendant Jackson is immune from Plaintiff's failure to intervene claim, but that Defendants do not mention that claim anywhere in their brief, and accordingly Defendants have waived that issue. (Pl.'s Resp. at p. 25, fn. 13, PageID.1078.) Nor did Defendants' counsel address Plaintiffs' failure to intervene claim at the hearing. The Court agrees with Plaintiff and finds that Defendants have waived any argument that Defendant Jackson is entitled to qualified immunity on Plaintiff's failure to intervene claim. *See Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012) (issues "adverted to … in a perfunctory manner, unaccompanied by some effort at developed argumentation," are deemed waived); *Stanley v. ExpressJet Airlines, Inc.*, 356 F. Supp. 3d 667, 694-95 (E.D. Mich. 2018) (granting summary judgment to defendant where plaintiff failed to offer any substantive arguments to support her retaliation claims "and indeed doesn't even endeavor to address the basic elements of the claim").

69

anything from Ms. Gonterman's statement. (Defs.' Mot. at p. 19, PageID.284.) Again, as before, Defendants do not offer any further argument or any legal analysis to support their argument.

Plaintiff first notes in his response brief that his *Brady* claim is not based solely on Defendant Jackson's suppression of Ms. Gonterman's statement, but also on the remaining defendants' "failure to inform the prosecutor of the threats, physical assault, and coercion that had led [Mr. Bernette and Mr. Jackson] to sign the statement[s] implicating Mr. Scott and Mr. Johnson." (Pl.'s Resp. at p. 22, PageID.1075, citing FAC ¶¶ 125-28, PageID.113-14.) Plaintiff asserts that "Defendants Adams, Pritchett, and Simon all participated in this suppression" and "[i]t is irrelevant whether Defendants Pritchett, Adams, and Simon also had knowledge of Ms. Gonterman's statement." (*Id.*) Plaintiff then argues that Defendants Pritchett, Adams, and Simon violated *Brady* with respect to their involvement in the statements obtained from Mr. Bernette and Mr. Jackson. (*Id.* at p. 23, PageID.1076.)

As the Sixth Circuit recently explained in *Ricks v. Pauch*, No. 20-1778, 2021 WL 4775145 (6th Cir. Oct. 13, 2021), when a plaintiff alleges a *Brady* claim against multiple defendants, stemming from different instances, the court must consider whether summary judgment was proper as to *each* defendant for each alleged

70

incident. *Id.* at \*6 (concluding that an individual defendant was entitled to qualified immunity for the first of two separate incidents because there was no evidence connecting that defendant with the first incident). Like in *Ricks*, there are two separate *Brady* incidents alleged in this case – (1) the failure to include in Ms. Gonterman's statement Lisa's concerns, and (2) the coercion of the Bernette and Jackson statements. Defendants' motion focuses solely on the suppression of the Gonterman statement, and thus the second incident – Plaintiff's *Brady* claim with respect to the alleged coercion of Bernette and Jackson statements – is not at issue in this motion. Rather, Defendants assert only that Defendants Pritchett, Adams, and Simon were not present during the taking of the Jodi Gonterman statement and that there is no evidence that any of those defendants knew anything about the alleged omitted statement. (Defs.' Mot. at p. 19, PageID.284.)

Although Defendants failed to cite any record evidence in support of their assertions, or include any legal analysis, Plaintiff in his Response fails to offer any evidence that Defendants Pritchett, Adams, and Simon participated in the taking of the Gonterman statement or the alleged omission of Lisa Kindred's warning, or were otherwise involved in the alleged suppression of that evidence. Plaintiff in fact argues that "[i]t is irrelevant whether Defendants Pritchett, Adams, and Simon also had knowledge of Mr. Gonterman's statement." (Pl.'s Resp. at p. 22, PageID.1075.)

Plaintiff's Response instead focuses solely on the Bernette and Jackson statements, which are not at issue in this qualified immunity argument.

At the summary judgment hearing, Plaintiff's counsel argued that because Defendant Adams was the officer-in-charge of the investigation, and all information was supposed to have been relayed to her, a reasonable jury could infer that Defendant Jackson did tell Defendant Adams that he omitted the statement. This claim does not "track." On this record, there is no basis for the jury to reasonably reach that inference, beyond mere speculation or conjecture, which is not permitted. Plaintiff therefore simply cannot sustain his summary judgment burden to show that Defendants Adams, Pritchett and Simon are *not* entitled to qualified immunity on Plaintiff's *Brady* claim related to the Gonterman statement. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) ("When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.").

Accordingly, Defendants Pritchett, Adams, and Simon are entitled to qualified immunity with regard to Plaintiff's *Brady* claim based on the suppression of the Gonterman statement, because there is no evidence that these three defendants personally participated in, or directed the alleged constitutional violation.

72

Defendants Pritchett, Simon, and Adams are liable for Plaintiff's *Brady* claim based on the alleged coercion of Mr. Bernette and Mr. Jackson in making their statements.

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Partial Summary Judgment.

Specifically, the Court **GRANTS** Defendants' motion with respect to Defendants' contention that Defendant Officer Anthony Jackson is entitled to qualified immunity on Plaintiff's malicious prosecution claim, and that Defendants Wayne Pritchett, Catherine Adams, and Barbara Simon are entitled to qualified immunity with regard to Plaintiff's *Brady* claim based on the suppression of the Gonterman statement, because there is no evidence that these defendants personally participated in or directed the alleged constitutional violations.

The Court otherwise **DENIES** Defendants' partial motion for summary judgment with respect to the remaining arguments regarding Plaintiff's malicious prosecution and *Brady* claims.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: December 28, 2021